# EXHIBIT **G** TO MF DECLARATION I-PHONE

1  MAX FOLKENFLIK, ESQ.
   MARGARET McGERITY, ESQ.
2  **FOLKENFLIK & MCGERITY**
   1500 Broadway, 21st Floor
3  New York, NY 10036
   Telephone:   (212) 757-0400
4  Facsimile:   (212) 757-2010

5  H. TIM HOFFMAN (049141)
   ARTHUR W. LAZEAR (083603)
6  MORGAN M. MACK (212659)
   **HOFFMAN & LAZEAR**
7  180 Grand Avenue, Suite 1550
   Oakland, California 94612

8
   *Attorneys for Plaintiffs Paul Holman and Lucy Rivello*
9

ADR

ORIGINAL
FILED

OCT - 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

10              **UNITED STATES DISTRICT COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12

13  PAUL HOLMAN and LUCY RIVELLO, )
    individually and on behalf of all others )
14  similarly situated,                      )
                                             )   C07  05152
15                                           )
              Plaintiffs,                     )   CLASS ACTION COMPLAINT FOR DAMAGES,
16                                           )   INJUNCTIVE RELIEF AND RESTITUTION
    vs.                                      )
17                                           )   [JURY TRIAL DEMANDED]
                                             )
18  APPLE, INC., AT&T MOBILITY, LLC,         )
    and DOES 1 through 50, inclusive,        )
19                                           )
              Defendants.                     )
20  _____ )

21                      **INTRODUCTION**

22       1.    This action arises out of unlawful acts of Defendants which were designed for

23  the express purpose, and had the effect of, improperly interfering with the rights of

24  consumers to freely and lawfully use the product they purchased and paid for.  Plaintiffs,

25  for themselves and others similarly situated, seek:  an award of actual, compensatory and

26  punitive damages; attorneys' fees and costs; equitable relief; and other forms of relief

27  available under California and federal law.

28

Complaint

-1-

## PARTIES

2.    Plaintiff PAUL HOLMAN is an individual residing in the State of Washington.

3.    Plaintiff LUCY RIVELLO is an individual residing in the State of California.

4.    Plaintiffs are informed and believe and thereon allege that Defendant APPLE, INC. (hereinafter "Apple") is a consumer electronics and software company doing business in this judicial district, elsewhere in California and the United States.

5.    Plaintiffs are informed and believe and thereon allege that Defendant AT&T MOBILITY, LLC (hereinafter "AT&T") is a telecommunications company doing business in this judicial district, elsewhere in California and the United States.

6.    The term "plaintiff(s)" as used in this complaint means and includes all persons and entities listed and named as Plaintiff in the caption of this complaint, or any amendment thereto, and in the text paragraphs thereof, and includes any plaintiff hereafter added by amendment, joinder or intervention.  The term "plaintiff(s)" also means and includes both the named plaintiffs individually and as representatives of the class and any subclass herein described, as well as each member of such class and any subclass.

7.    The term "defendant(s)" as used in this complaint means and includes all persons and entities listed and named as a defendant in the caption of this complaint or any amendment thereto and in the text paragraphs thereof, and includes any defendant hereafter added by amendment or otherwise (unless otherwise specified in the amendment).

8.    Plaintiffs are informed and believe and thereon allege that Defendant Apple sells consumer electronics, including products throughout California and the United States. Plaintiffs are informed and believe and thereon allege that Defendant AT&T provides cellular telecommunication services, including services sold and used throughout California and the United States.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction pursuant to the Sherman Antitrust Act, 15 U.S.C.

1  §§ 1, 2, and 28 U.S.C. §§ 1331 and 1337.

2      10.    This Court also has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because

3  sufficient diversity of citizenship exists between parties in this action, the aggregate amount

4  in controversy exceeds $5,000,000, and there are 100 or more members of the proposed

5  Plaintiff Class.

6      11.    Venue is proper in this District pursuant to 28 U.S.C. §1391.  Plaintiff Rivello

7  purchased the iPhone in the Northern District of California.  Defendant Apple has its

8  principal place of business in Cupertino, California in this District and advertised in this

9  District and took or directed in this District the wrongful acts alleged below.

10     12.    Intradistrict assignment to the San Jose Division is proper because defendant

11 Apple's principal place of business is in Cupertino, California, in Santa Clara County, and

12 the acts and occurrences that form the basis of this complaint occurred in Santa Clara

13 County.

14     13.    The law of the State of California applies to the claims asserted in this action

15 against Apple.

16                          **FACTUAL BACKGROUND**

17 **The Apple iPhone**

18     14.    The iPhone is a multimedia and internet-enabled mobile phone designed,

19 manufactured and sold by Defendant Apple.  Pursuant to an agreement with Apple, the

20 iPhone is also sold by Defendant AT&T.

21     15.    The iPhone was first sold on June 29, 2007 from Apple's retail stores, Apple's

22 online store, and from AT&T for a price of $499 for a 4 GB model and $599 for a 8 GB

23 model.

24     16.    In addition to selling the iPhone at AT&T retail locations, AT&T sells and

25 exclusively provides mobile phone services to iPhone users.

26     17.    From the outset, even before iPhone was introduced by Apple on June 29,

27 2007, it was greeted with unprecedented acclaim.  It was hailed as "unique,"

28 "revolutionary," and "unprecedented."  The demand for the product was extraordinary.

Complaint

1 Masses of people lined up for the opportunity to purchase it. For many users, including

2 Plaintiffs and the Class, there was no product available which offered anywhere near the

3 same combination of services and ease of use.

4      18.     Apple announced in their 2007 Q3 sales report and conference call that they

5 sold 270,000 iPhones in the first 30 hours on launch weekend. Estimates for the first week

6 of sales have exceeded 500,000. It is estimated that 4,000,000 iPhones will be sold by the

7 end of this year.

8      19.     As described in more detail below, Defendants agreed to and did implement

9 a scheme to prohibit users from acquiring programs to run on the iPhone unless those

10 programs were purchased directly from Apple.

11      20.     As described in more detail below, Defendants agreed to, and did, implement

12 a scheme to compel users of the iPhone to use only AT&T cellular telephone voice service

13 and only AT&T mobile data services.

14 **The Cellular Telephone Service Market**

15      21.     Cellular telephone service began to be offered to consumers in 1983.

16 Cellular telephones operate using radio frequency channels allocated by the Federal

17 Communications Commission ("FCC"). Geographical service areas, sometimes known as

18 "cells," are serviced by base stations using low-power radio telephone equipment,

19 sometimes known as "cell towers." The cell towers connect to a Mobile Telephone

20 Switching Office ("MTSO"), which controls the switching between cell phones and land line

21 phones, accessed through the public-switched telephone network, and to other cell

22 telephones.

23      22.     In cellular service there are two main competing network technologies:

24 Global System for Mobile Communications ("GSM") and Code Division Multiple Access

25 ("CDMA"), each of which has advantages and disadvantages which might appeal to or be

26 rejected by individual consumers. GSM is the product of an international organization

27 founded in 1987 dedicated to providing, developing, and overseeing the worldwide wireless

28 standard of GSM. CDMA, a proprietary standard designed by Qualcomm in the United

Complaint

1    States, has been the dominant network standard for North America and parts of Asia.

2         23.    To respond to the need for cellular phones which can also send and receive

3    emails, streaming video and provide other services requiring higher data transfer speeds,

4    technologies have been adopted by both CDMA and GSM carriers to comply with what the

5    industry refers to as "3G" standards" or 3rd generation technologies.  Those technologies

6    require the cell phone to be operating on a separate 3G network.

7         24.    EVDO, which is sometimes said to stand for "Evolution, Data Only" and other

8    times referred to as "Evolution, Data Optimized," is also known as CDMA2000.  EVDO is

9    CDMA technology with an announced downstream rate of about 2 megabits per second,

10   although actual user experience is often only a fraction of that, or 300-700 kilobits per

11   second (kbps).  EVDO requires a phone that is CDMA2000 ready.  EVDO is a 3G

12   technology.

13        25.    GSM's high speed data technology is EDGE (Enhanced Data Rates for GSM

14   Evolution), which boasts data rates of up to 384 kbps (about 20% of the EVDO rate) with

15   real world speeds reported closer to 70-140 kbps (about 20 % of the EVDO rate).  With

16   added technologies, UMTS (Universal Mobile Telephone Standard) and HSDPA (High

17   Speed Downlink Packet Access) are, in theory, capable of speends equivalent to EVDO.

18   In practice, however, speeds increase to about 275--380 kbps, still far lower than EVDO,

19   but compliant with the 3G standard.  An EDGE-ready phone is required.

20        26.    As with CDMA and GSM generally, each high speed data technology has

21   advantages and disadvantages which might cause them to be selected or rejected by

22   individual consumers.  In the case of EVDO, high traffic can degrade speed and

23   performance, while the EDGE network is more susceptible to interference.  Both require

24   being within close range of a cell to get the best speeds, while performance decreases with

25   distance.

26        27.    While there are a number of cellular phone service providers, there are only a

27   few with substantial national networks:  AT&T, T-Mobile USA, Inc. (T-Mobile), Sprint

28   Corporation, and Cellco Partnership d/b/a/ Verizon Wireless ("Verizon") (collectively, the

Complaint

-5-

1  "Major Carriers").  Other suppliers may in effect be "resellers" of cellular telephone service

2  which they purchase from the Major Carriers.  Each technology is effectively a duopoly:

3  AT&T and T-Mobile are the two GSM Major Carriers; Sprint and Verizon are the two CDMA

4  Major Carriers.

5      28.    The AT&T services provided to iPhone users described below is on AT&T's

6  2G network, not its 3G network.

7  **The Use of Locked SIM cards, and other Program**
   **Locks to Unlawfully Control Consumer Choice**

8

9      29.    In the United States, as a general rule only GSM phones use SIM (Subscriber

10  Identity Module) cards.  The removable SIM card allows phones to be instantly activated,

11  interchanged, swapped out and upgraded, all without carrier intervention.  The SIM itself is

12  tied to the network, rather than the actual phone.  Phones that are card-enabled generally

13  can be used with any GSM carrier.

14      30.    However, even with existing hardware, some degree of consumer choice is

15  available by replacing a SIM card, a process that the average individual consumer easily

16  can do with no training, by following a few simple instructions in a matter of minutes.  SIM

17  cards are very inexpensive, often in the $25 range.  When the card is changed to the SIM

18  card of another carrier, then the cell phone immediately is usable on the network of the

19  other carrier.  To switch from AT&T to T-Mobile, or the other way around, all that is

20  required is this simple change of the SIM card.

21      31.    For telephone users who travel, particularly to Europe, the ability to change

22  SIM cards to a European carrier such as Orange, Vodephone or TIM, allows the user of a

23  GSM American phone to "convert it" to a "local" phone in the country where they traveled

24  to.  Absent a conversion to local service, when the consumer uses his American GSM cell

25  phone abroad, he must pay for the American service and additionally for "roaming"

26  charges, that is the right to call outside of the customer's primary calling area.  Roaming

27  charges are typically very high, often a dollar or more a minute.  As a result, when a U.S.-

28  based user is traveling abroad, it is a very substantial saving to be able to switch to the ⌐

Complaint

-6-

1  card and pay for local service rather than using the U.S.-based GSM carrier.

2      32.    In an effort to avoid these effects, and to restrain competition among the

3  Major Carriers for customers (thereby suppressing competition and increasing price), the

4  Major Carriers, acting in concert through "trade associations" and "standards setting"

5  organizations such as the CDMA Development Group, the Telecommunications Industry

6  Association, the Third Generation Partnership Project, the Alliance for

7  Telecommunications, the Open Mobile Alliance, the GSM Association, the Universal

8  Wireless Communications Consortium, and the Cellular Telephone Industry Association,

9  and otherwise, agreed to implement Programming Lock features which effectively "locked"

10  individual handsets so that they could not be used without the "locking" code.  The carriers

11  obtained a locking code from the manufacturer and initially refused to disclose the code to

12  the consumer.  That meant that a consumer who purchased a telephone manufactured to

13  work with one of the Major Carriers could not switch to another carrier, even temporarily,

14  such as while traveling abroad, without buying an entirely new phone.

15      33.    In particular, the GSM carriers, AT&T and T-Mobile, adopted a SIM Lock

16  standard, which locked a GSM phone to a particular SIM card, thereby stopping the

17  consumer from simply changing his SIM card.  However, since before the start of and

18  throughout the class period, both T-Mobile and AT&T will unlock SIM cards on request for

19  international travel and even if the customer wants to cancel his/her account and switch to

20  another carrier.  In most cases, the unlock code will be given on request, almost instantly,

21  over the telephone.

22      34.    Accordingly, AT&T will unlock SIM cards on telephones sold only through

23  them, such as the Blackberry Pearl and the Samsung Blackjack.  There is one exception:

24  the iPhone.  AT&T will not provide the unlock code for the iPhone for international travel or

25  otherwise.  On information and belief, that is because AT&T and Apple unlawfully agreed

26  that the iPhone would not be unlocked under any circumstances.

27  / / / / /

28  / / / / /

Complaint
                                    -7-

**The Use of other Program Locks in an Attempt**
**to Unlawfully Control Consumer Choice**

35.     The iPhone operating system also contains "security measures" which are, in effect, Program Locks designed to restrict the consumer from using programs or services on the iPhone other than those sanctioned by, and which generate revenue for, Apple. Other applications or services (collectively. "Third Party Apps") are intended to be precluded.  However, because of the design of the Apple operating system, which is based on the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps were ineffective.

**Defendants Become Aware that they have No Legal**
**Right to Stop Consumers from Unlocking their SIM Cards**

36.     Over the past few years, the Major Carriers were the subject of lawsuits that sought to impose liability based on the existence of Program Locks.  Carriers had claimed that the Program Lock was necessary to protect their copyrighted intellectual property and claimed then, as Defendants do now, that the reason for the lock was to benefit consumer and protect against fraud.  Carriers had also sought to assert that under the terms of the Digital Millennium Copyright Act, 17 U.S.C. §1201, *et. seq.* ("DCMA"), disabling the Program Lock and unlocking a SIM card or other Program Lock would be a violation of law.

37.     However, in November 2006, the Librarian of Congress, who by statute had the authority to create exemptions to the restrictions in §1201 of the DCMA, on the recommendation of the Register of Copyrights, announced an exemption from the prohibition against circumvention of technological measures that control access to copyrighted works for "Computer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network."  Earlier, a decision by the Sixth Circuit in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 387 F.3d 522 (6th Cir. 2004) called into question the ability to prohibit users from evading the use of Program Locks generally.  Because of the inability of Defendants to enforce their Program Locks through legal means,

---

Complaint

1    Defendants Apple and AT&T embarked on a scheme to enforce them unlawfully for the

2    iPhone.

3    **The Apple/AT&T Agreement**

4         38.    While the terms of the Apple/AT&T agreement have not been publically

5    announced, details have leaked out in the press.  First, AT&T and Apple agreed that AT&T

6    would be the exclusive provider for voice and data services to the iPhone in the United

7    States.  On information and belief, AT&T offered iPhone purchasers a two-year contract,

8    but the agreed period of iPhone exclusivity for AT&T is five years.

9         39.    Second, the agreement allows Apple to control the features, content and

10   design of the iPhone.

11        40.    Third, since both Apple and AT&T recognized that the iPhone would create a

12   unique and identifiable market and its users would pay a supercompetitive price for its use

13   compared to other handsets, the pricing structure of the deal was different.  In the normal

14   agreement between a carrier and a handset manufacturer, the carrier "subsidizes" the

15   purchase price of the handset (sell the set to the consumer at a substantial discount off the

16   list price) in return for the consumer entering into a one or multi-year service agreement.

17   This agreement provides benefits to the consumer of a subsidized price for his/her cell

18   phone purchase.  The early termination fee charged by the carrier in this arrangement is

19   justified by the subsidy of the cell phone price.  Upon termination, the cell phone customer

20   can go to any carrier.

21        41.    In the iPhone agreement, AT&T did not agree to subsidize the purchase of

22   the handset, but did agree to share its voice service and data service revenue with Apple.

23   This arrangement provides no benefits for consumers.  The early termination fee is not

24   justifiable, and upon termination and payment of _all_ fees, the customer still may not use

25   his/her iPhone with any voice or data carriers but AT&T.

26        42.    Fourth, on information and belief, AT&T and Apple also agreed that they

27   would not "unlock" the iPhone SIM card, for international travel, to allow the customer to

28   lawfully cancel his AT&T contract (and pay any early termination charges), or to move to

Complaint

-9-

1   another carrier, or otherwise.

2       43.     Fifth, on information and belief, AT&T and Apple agreed that Apple would not

3   unlock its Program Locks on the operating system.

4       44.     Finally, on information and belief, AT&T and Apple agreed that they would

5   take action, legal and otherwise, to prevent users from circumventing the Program Locks

6   and SIM card locks.  On information and belief, Apple intended and AT&T understood that

7   Apple would be taking the unlawful acts described below.  A central purpose of these

8   agreements was to suppress lawful competition by T-Mobile with AT&T and by Third Party

9   Application developers with the Apple iPhone applications, thereby guaranteeing unlawful

10  profits to Apple and AT&T.

11  **The iPhone Unlocked**

12      45.     Almost immediately after the iPhone was launched, Third Party Apps for the

13  iPhone started to appear that generated competition for Apple in various

14  other product markets and for AT&T in the cellular voice service market.  For

15  example, Mobile Chat and FlickIM gave users access to instant messaging

16  programs with which Apple has no partnership.

17      46.     Apple competes in the $500 million ringtone market.  When a customer

18  purchases a song for $1 from the I-Tunes store, Apple charges the customer an additional

19  99 cents to convert any portion of that song into a ringtone.  A number of entities and

20  programers promptly offered a variety of ringtone programs which worked on the iPhone,

21  both for a fee and for free.  Some of these programs allowed customers to use samples of

22  popular songs lawfully downloaded by the customer from Apple's I-Tunes store as a

23  ringtone for their iPhone.  Other programs, such as I-Toner from Ambrosia Software, and

24  IPhone ringtone maker from Efiko software, allowed customers to use songs they owned,

25  by purchases from I-Tunes or otherwise, or to "clip" portions of songs purchased by them

26  from I-Tunes and to use those portions as ringtones.  Still others offered ringtones either

27  free or for a charge.  Since many of these programs used songs downloaded from I-Tunes,

28  Apple initially sought to block the use of those songs as ringtones by updating the I-Tunes

Complaint

1    software to contain Program Locks which would interfere with such use.  However, those

2    efforts were all quickly defeated, sometimes within hours of the release of the update.

3         47.    The unlocking of the SIM card took longer and was more complicated.

4    Initially some customers sought to evade the program lock by altering the hardware,  In

5    August, George Hotz, a 17-year-old high-school student, announced the "first unlocked

6    iPhone" on YouTube.  That method involved soldering a wire to allow the program to

7    bypass the portion of the circuit which contained the Program Lock regarding the SIM chip

8    (a "hardware unlock").  Shortly thereafter, software unlocks were developed and there was

9    an explosion of unlock solutions, both free and for a fee, which appeared over the internet.

10   Many, if not all, of the solutions involved a small change in the software, in some cases as

11   little as two bytes of code were changed.

12   **Apple Strikes Back**

13        48.    To protect its unlawful market position and the anticipated unlawful profits

14   Apple and AT&T expected to earn, Apple repeatedly announced that any attempt to unlock

15   the iPhone SIM or to install Third Party Apps would void the Apple warranty.  This assertion

16   was false as a matter of federal law, and was known by Apple to be false when made.  The

17   Federal Magnuson-Moss Warranty Act prohibits conditioning the iPhone warranty on the

18   use of Apple products only, or on the use of AT&T service only, 15 USCS §2302(c), which

19   is effectively what the Apple warranty approach unlawfully does.

20        49.    This approach did little to stem the tide of unlock solutions being offered.  In

21   the summer of 2007, Apple announced that use of Third Party Apps or unlocking the AT&T

22   SIM card might cause the iPhone to become unusable.  On information and belief, Apple

23   had no reason to believe that statement was true, and, in fact, users who unlocked their

24   iPhones or installed Third Party Apps had complete, and often enhanced, functionality.

25   The computer community thought that Apple was intentionally spreading mis-information

26   (known in the jargon of the computer community as FUD, or Fear, Uncertainty and

27   Despair) for the purpose of scaring users into not making lawful alterations or lawfully using

28   Third Party Apps.

1       50.    Finally, on information and belief, Apple, and on information and belief AT&T

2   agreed to go beyond these tactics and to take affirmative steps to break the iPhones of

3   consumers who lawfully unlocked the AT&T SIM card or who installed Third Party Apps.  In

4   September, when asked about users trying to unlock Apple's iPhone, Steve Jobs, Apple's

5   Chief Executive Officer, stated at a conference in the United Kingdom that "It's a cat-and-

6   mouse game." "We try to stay ahead.  People will try to break in, and it's our job to stop

7   them breaking in."

8       51.    A few days later, on September 24th, Apple released a press release which

9   stated:

10       Apple has discovered that many of the unauthorized iPhone unlocking
        programs available on the Internet cause irreparable damage to the iPhone's
11      software, which will likely result in the modified iPhone becoming permanently
        inoperable when a future Apple-supplied iPhone software update is installed.
12      Apple plans to release the next iPhone software update, containing many
        new features including the iTunes Wi-Fi Music Store later this week.  Apple
13      strongly discourages users from installing unauthorized unlocking programs
        on their iPhones.  Users who make unauthorized modifications to the
14      software on their iPhone violate their iPhone software license agreement and
        void their warranty.  The permanent inability to use an iPhone due to
15      installing unlocking software is not covered under the iPhone's warranty.

16       52.    On information and belief, Apple had not "discovered" that "many" unlocking

17   programs would "cause irreparable damage" to the iPhone.  Instead, Apple had been busy

18   engineering its software update so that it would disable any Third Party Apps and the SIM

19   card unlocks.  On information and belief, the update also was designed to cause damage

20   to the iPhone in the event that any use of non-Apple/AT&T products was detected.

21       53.    On September 28, 2007, Apple released software version 1.1.1 of its iPhone

22   operating system.  On information and belief, when users who had Third Party Apps

23   installed or had unlocked their AT&T SIM card, downloaded the upgrade, their iPhones

24   were immediately disabled and the Third Party Apps were eliminated.  On information and

25   belief, certain iPhones owned by the Class were "bricked," that is, rendered permanently

26   inoperable and, therefore, as useful as a brick.

27       54.    On information and belief, Apple expressly designed its software release

28   version 1.1.1 expressly to disable Third Party Apps and to disable any unlocked SIM ca

Complaint

1  and to create technical barriers to install new Third Party Apps or to unlock the SIM cards.

2  Version 1.1.1 was an upgrade with limited specific changes and improvements, including,

3  in particular, a needed and substantial improvement to power management and

4  accordingly to the battery life of iPhone. However, instead of delivering a "patch" program

5  which would only alter those portions of the program which were changes or improvements

6  announced and documented by Apple, Apple's upgrade was a complete new operating

7  system which not only incorporated the changes and  mprovements, but also changed

8  certain codes that were used by the Third Party Apps and changed the codes necessary

9  for the unlocked SIM cards to function.  In addition, the changes as to the function of the

10  SIM card were "flashed" onto the firmware (software dedicated to operating certain

11  hardware) for the modem on the iPhone.  The modem is the part of the iPhone which

12  controls communication between the iPhone and cellular base stations.

13      55.  As a result of these changes, none of which were technically required for the

14  purposes of the upgrade but were designed solely to advance Apple's unlawful purposes

15  and conduct, and not due to any "unavoidable" conflict or damage resulting from Third

16  Party Apps or SIM unlock procedures or programs, all existing Third Party Apps were

17  rendered useless and all existing SIM cards which were unlocked became re-locked.

18      56.  On information and belief, when iPhone customers went to the Apple stores

19  for service on their iPhones disabled by software release 1.1.1, they were told, on

20  instructions from Apple, that they must have violated their contracts with Apple and their

21  warranty was void.  Apple personnel refused to help those customers, even when they

22  could have readily done so.  For example, it was and is technically feasible to restore the

23  iPhone from Version 1.1.1 down to version 1.0.2, and then re-install all Third Party Apps.

24  Such a restoration, however, would not allow the SIM card to be re-unlocked because of

25  the change to the iPhone modem firmware.  On information and belief, Apple store

26  employees were not allowed to restore iPhones.

27      57.  When confronted with the question of what remedy iPhone purchasers had

28  for disabled iPhones, an Apple spokesman was quoted as saying "they can buy a new

Complaint

-13-

1  iPhone." However, Plaintiffs and the Class also have the remedies provided by the law of

2  California and federal law, and have brought this action to obtain them.

3  ## ALLEGATIONS AS TO THE REPRESENTATIVE PLAINTIFFS

4      58.    Plaintiff Holman purchased two iPhones on the first day they were released,

5  June 29, 2007, in Seattle, Washington.  Plaintiff Rivello purchase an iPhone in August

6  2007.  Because they were required to do so, each of the Plaintiffs purchased a two-year

7  contract with AT&T for voice and data services.  Plaintiff Holman also purchased a

8  "worldwide" data roaming plan which allows the downloading of a specified amount of data

9  in certain non-U.S. countries for $24.99 per month.

10     59.    Because Plaintiff Holman travels for business a great deal, he generally

11  unlocks his phones to accept other SIM cards, so that he can use them abroad with a

12  "local" service provider at lower rates.  After buying the iPhone, he traveled to Finland, a

13  country not covered by the AT&T "worldwide" plan.  His three days of data use on the

14  iPhone, primarily for downloading e-mails, cost him $381 in roaming charges.  Thereafter,

15  he was able to use some of the SIM card unlocking solutions that became available in the

16  summer.  Using his unlocked phone, on a recent trip to Amsterdam he used a prepaid SIM

17  card from T-Mobile to receive his e-mail which cost approximately $20.

18     60.    Plaintiff Holman also uses several Third Party Apps, including MobileChat,

19  which works with the AIM instant messaging program (a competitor with Apple's iChat) and

20  Pushr, which uploads photographs from the iPhone to the web-based photography site

21  Flickr.

22     61.    Because of the unlawful conduct of Apple and AT&T, Plaintiff Holman is

23  faced with the choice of foregoing improvements to his iPhones he is entitled to and has

24  paid for, or losing the ability to change SIM cards when he travels, or, if he wishes, to

25  contract with T-Mobile instead of AT&T.  Because of the unlawful conduct of Apple and

26  AT&T, Plaintiff Holman is faced with the choice of foregoing improvements to his iPhone

27  he is entitled to and has paid for, or losing the use of Third Party Apps which he currently

28  uses.

Complaint

62.     Plaintiff Rivello would like the opportunity to use Third Party Apps on her iPhone and would like the ability to unlock her SIM card for travel, or to change from AT&T to T-Mobile should she choose to do so, but because of the unlawful conduct of Apple and AT&T, she cannot.

## CLASS ACTION ALLEGATIONS

63.     Plaintiffs' action is brought on behalf of themselves and all others similarly situated.  The Class that Plaintiffs seek to represent is defined as all individuals or entities who at any time from June 29, 2007 to the date of judgment in this action, bought and implemented the iPhone and sustained damages as a result.

64.     At this time, the number of individuals in the Plaintiff Class is unknown and can only be ascertained by discovery.  However, the number exceeds 100, and the exact number can easily be determined by obtaining account records from Defendants.  Plaintiffs anticipate that there will be millions of Class members.

65.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a)(1)-(4), and the predominance and superiority requirements of Rule 23(b)(3) and the requirements of Rule 23(b)(2).

66.     Federal Rule of Civil Procedure 23(a) establishes four threshold requirements for class certification:

  1.    the class is so numerous that joinder of all members is impracticable;

  2.    there are questions of law or fact common to the class;

  3.    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

  4.    the representative parties will fairly and adequately protect the interest of the class.  FED.R.CIV.P. 23(a).

67.     Class certification under Rule 23(b)(2) is appropriate because Defendants have acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.  FED.R.CIV.P. 23(b)(2).

Complaint

1    68.    Class certification under Rule 23(b)(3) is appropriate because common
2    questions of law and fact predominate and a class action is superior to other forms
3    available for fair and efficient adjudication of the claims of this action.  FED.R.CIV.P.
4    23(b)(3).
5    69.    The Plaintiff Class satisfies the numerosity standards.  The Class is believed
6    to number in the millions of persons.  As a result, joinder of all Class members in a single
7    action is impracticable.
8    70.    There are questions of fact and law common to the Class which predominate
9    over any questions affecting only individual members   The questions of law and fact
10   common to the Class arising from Defendants' actions include, without limitation, the
11   following:

12            a)    whether, in marketing and selling the iPhone, Defendants entered into
13                  agreements in restraint of trade;
14            b)    whether Defendants' conduct has any technological or competitive
15                  justification;
16            c)    whether Defendants' conduct constituted unlawful, unfair or fraudulent
17                  business acts or practices within the meaning of California Business
18                  and Professions Code §17200;
19            d)    whether Defendants' conduct constituted unlawful business acts or
20                  practices within the meaning of California Business and Professions
21                  Code §16720 et seq.;
22            e)    whether Defendants' conduct constituted unlawful business acts or
23                  practices in violation of Section 1 of The Sherman Act, 15 U.S.C. 1;
24            f)    whether Defendants' conduct constituted unlawful business acts or
25                  practices in violation of Section 2 of The Sherman Act, 15 U.S.C. 2;
26            g)    whether Apple's software release 1.1.1 was designed to or did disable
27                  Third Party Apps and SIM card unlocks without any need or
28                  technological justification for doing so other than to advance produc

tie-in goals which are unlawful under California and federal law;

h)  whether terms of Defendants' contracts with Plaintiffs and the Class are void and unenforceable under federal or state law;

i)  whether the use of Third Party Apps or the unlocking of the SIM card violate enforceable terms of any enforceable contracts between Defendants and Plaintiffs and the Class;

j)  the appropriate measure of damages and other relief.

71.  Common questions predominate over individual ones.

72.  Plaintiffs, as the Class representatives, are asserting claims and defenses typical of the rest of the Class.

73.  Plaintiffs, as Class representatives, will fairly and adequately represent the interests of the Class. Plaintiffs have the same causes of action as the other Class members and do not have interests adverse to them. Plaintiffs are committed to vigorously prosecuting this lawsuit and have retained experienced counsel, Folkenflik & McGerity and Hoffman & Lazear, for this purpose.

74.  Plaintiffs are aware of no difficulty that will be encountered in the management of this litigation that would preclude maintaining this national Class action.

75.  The names and addresses of potential Class members can be obtained from Defendants. Notice can be provided to the members of the Class via first class mail or otherwise as directed by this Court.

## AS AND FOR A FIRST COUNT AGAINST DEFENDANTS

(Cal. Business and Professions Code § 17200 *et seq.*)

76.  Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as if fully set forth herein.

77.  In the terms of service for the iPhone, Defendant Apple, by virtue of its agreement with purchasers of iPhones, agreed that the laws of the State of California, exclusive of its choice of law laws, shall govern any rights or liabilities of the parties to each other. Defendant Apple agreed that Plaintiffs and each member of the Class would be

1  governed by California law, including California Business and Professions Code §17200,

2  *seq*. The terms of service were not included with the iPhone, and are available only on the

3  internet. Plaintiffs did not read, and on information and belief, few members of the Class

4  read the terms of service. Accordingly, those terms are not binding on Plaintiffs and the

5  Class, but are binding on Apple.

6      78.    Such acts of Defendant Apple as described above constitute unfair, unlawful

7  and fraudulent business practices and constitute violations of California Business and

8  Profession's Code §17200, *et seq*.

9      79.    The acts of Defendant Apple and AT&T are unlawful because, among other

10  acts and statutes, they violate The Cartwright Act, California Business and Profession's

11  Code §§16720 and 16726, and The Sherman Act, 15 U.S.C. §§1 and 2 in that such

12  conduct involved unlawful conspiracy and agreement in restraint of trade and the unlawful

13  tying of the iPhone product to other products and services offered by Apple and AT&T and

14  unlawful monopolistic activity. In particular, the agreement between Apple and AT&T

15  requires customers who have purchased the iPhone to use AT&T cellular voice services

16  and AT&T cellular data services, and prohibits the use of any competing services, such as

17  those provided by T-Mobile or European carriers which could be accessed readily, and

18  without any damage to the iPhone, by simply unlocking the iPhone SIM card, or by SKYPE,

19  which could be readily accessed by eliminating Program Locks. In addition, Apple is tying

20  the use of the iPhone to the use of other Apple products, such as the purchase of

21  ringtones from Apple, and AT&T is tying the use of the AT&T voice cellular service to the

22  use of AT&T data cellular service.

23      80.    Apple has monopoly power in the iPhone market, and iPhone is a unique

24  product for which there are no readily available equivalent substitutes. Accordingly, Apple

25  possesses enough economic power in the tying product, iPhone, market to coerce its

26  customers into purchasing the tied products, AT&T wireless voice and data services and, in

27  fact, coerced Plaintiffs and the Class into purchasing AT&T wireless voice and data

28  services. Apple has also coerced the Class into purchasing Apple products for the iPhone,

Complaint

-18-

1   such as Apple-offered ringtones. These unlawful acts and practices and unlawful

2   agreements create an unreasonable restraint of trade and commerce and threaten to

3   extend Apple's monopoly power in the iPhone market to the separate wireless voice

4   services market, wireless data services, ringtone market and other markets for mobile

5   telephone applications.

6       81.    The acts of Defendants Apple and AT&T are unlawful because, among other

7   acts and statutes, they violate the Federal Trade Commission Act, 15 U.S.C. §45 in that

8   they are unfair methods of competition in or affecting commerce, and unfair or deceptive

9   acts or practices in or affecting commerce.

10      82.    The acts of Defendants Apple and AT&T are unlawful because, among other

11  acts and statutes, they violate the public policy established by the Communications Act of

12  1934, as amended, 47 U.S.C. §332 (c), and the Telecommunications Act of 1996, 47

13  U.S.C. §151 *et seq.*

14      83.    The acts of Defendants Apple and AT&T are unlawful because, among other

15  acts and statutes, they violate rules and policies established by the Federal

16  Communications Commission in *In the Matter of Bundling of Cellular Customer Premises*

17  *Equipment and Cellular Service*, CC Docket No. 91-34, 1992 WL 689944 (F.C.C. June 10,

18  1992) and *Telephone Number Portability, First Report and Order and Further Notice of*

19  *Proposed Rule*, 11 F.C.C.R. 8352, 1996 WL 4000225 (1996); and 47 C.F.R. §52.31.

20      84.    As a result of the business practices described above, Plaintiffs, on behalf of

21  the People of the State of California and the Plaintiffs and the Class, pursuant to Business

22  and Professions Code §17203, are entitled to an order enjoining such future conduct on

23  the part of Defendants, and such other orders and judgments which may be necessary,

24  including the appointment of a receiver, to restore to any person in interest all damages as

25  a result of the acts of Defendants.

26      85.    Plaintiffs and the Class has been injured in their business and property as a

27  result of this illegal conduct, and are entitled to the amount of damages proven at trial, but

28  no less than $200 million.

Complaint

**AS AND FOR A SECOND COUNT AGAINST DEFENDANTS**

(Cal. Business and Professions Code § 16720 *et seq.*)

86.    Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as if fully set forth herein.

87.    Defendant Apple, by virtue of its agreement with purchasers of iPhone, agreed that the laws of the State of California, exclusive of its choice-of-law laws, shall govern any rights or liabilities of the parties to each other.  As a matter of contract, Defendant Apple agreed that Plaintiffs and each member of the Class would be governed by California law, including California Business and Profession's Code §16720, *et seq.* The terms of service were not included with the iPhone, and are available only on the internet.  Plaintiffs did not read, and on information and belief, few members of the Class read the terms of service.  Accordingly, those terms are not binding on Plaintiffs and the Class, but are binding on Apple.

88.    Such acts of Defendants Apple and AT&T as described above created an unlawful trust in violation of California Business and Profession's Code §16720 in that they created a combination of capital, skill or acts by two or more persons to create or carry out restrictions in trade or commerce in violation of §16720(a), and prevent competition in manufacturing, making, transportation, sale or purchase of merchandise in violation of §16720(c).  In addition, the agreements between Apple and AT&T coerced and required that an agreement, understanding and practical effect that purchasers of the iPhone could not and cannot use software, products and services of a competitor or competitors of Apple and AT&T and the effect of such restrictions may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in California and in the United States in violation of California Business and Profession's Code §16727.

89.    Plaintiffs and the Class have been injured in their business and property as a result of this illegal conduct, and are entitled to the amount of damages proven at trial, but no less than $200 million, trebled.

## AS AND FOR A THIRD COUNT AGAINST DEFENDANTS

### (The Sherman Antitrust Act, 15 U.S.C. § 1.)

90.   Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as if fully set forth herein.

91.   Apple's unlawful acts and practices and unlawful agreements create an unreasonable restraint of trade and commerce and threaten to extend Apple's monopoly power in the iPhone market to the separate GSM wireless voice services market, GSM wireless data services, ringtone market and other markets for mobile telephone applications, all without legitimate business or technological justification, in a manner which has caused harm to competition in those markets, and in violation of Section 1 of the Sherman Antitrust Act.

92.   The anti-competitive conduct described above results in purchasers of the iPhone paying prices for that software and those services which are higher than if customers had the ability to obtain competitive products and services, and the selection of products and services are lower than it would be if the restrictions on competition unlawfully imposed by Apple and AT&T did not exist.

93.   Plaintiffs and the Class have been injured by the anti-competitive conduct described above and are entitled to the amount of damages proven at trial, but no less than $200 million, trebled.

## AS AND FOR A FOURTH COUNT AGAINST DEFENDANT APPLE

### (The Sherman Antitrust Act, 15 U.S.C. § 2.)

94.   Plaintiffs repeat, reallege and incorporate each and every allegation contained in the paragraphs above as if fully set forth herein.

95.   Apple's unlawful acts and practices and unlawful agreements reveal a specific intent to monopolize a relevant market, to control prices or destroy competition in the United States wireless voice services market, the United States wireless data services, the market for ringtones generally or specifically for ringtones sold for use with the iPhone and other markets for mobile telephone applications generally and markets for such applications sold

Complaint

1  for use with the iPhone, all without legitimate business or technological justification, all with

2  the purpose and having the effect of destroying competition in those markets and creating a

3  probability of achieving monopoly power in those markets, in a manner which has caused

4  harm to competition in those markets, and in violation of Section 2 of the Sherman Antitrust

5  Act.

6       96.    The anti-competitive conduct described above results in purchasers of the

7  iPhone paying prices for that software and those services which are higher than if

8  customers had the ability to obtain competitive products and services, and the selection of

9  products and services are lower than it would be if the restrictions on competition unlawfully

10 imposed by Apple and AT&T did not exist.

11      97.    Plaintiffs and the Class have been injured by the anti-competitive conduct

12 described above and are entitled to the amount of damages proven at trial, but no less than

13 $200 million, trebled.

14               **AS AND FOR A FIFTH COUNT AGAINST DEFENDANT APPLE**

15                        (Computer Trespass/Trespass to Chattels)

16      98.    Plaintiffs repeat, reallege and incorporate each and every allegation contained

17 in the paragraphs above as if fully set forth herein.

18      99.    Apple's conduct in causing its programs to enter into the iPhones of Plaintiffs

19 and the Class in a manner which a) disabled existing Third Party Apps, b) disabled any

20 existing SIM card unlocks, c) altered the product owned by Plaintiffs and the Class to create

21 technical impediments to the purchase of Third Party Apps, and d) altered the product

22 owned by Plaintiffs and the Class to create technical impediments to unlocking the SIM

23 card, were alterations which the Plaintiffs and the Class neither wanted nor invited, and they

24 were not made with any purpose other than to benefit Apple in continuing its unlawful

25 conduct described above.

26      100.   Apple's unwanted and uninvited intermeddling with the iPhones of Plaintiffs

27 and the Class is a trespass to property owned by Plaintiffs and the Class.

28      101.   Plaintiffs and the Class have been injured by the anti-competitive conduct

Complaint

-22-

1  described above and are entitled to the amount of damages proven at trial, but no less than

2  $200 million.

3      102.    In acting as is alleged in this complaint, Defendant acted knowingly, willfully,

4  and maliciously, and with reckless and callous disregard for Plaintiff's rights.

5

6              ## AS AND FOR A SIXTH COUNT AGAINST DEFENDANTS

7                              (Accounting)

8      103.    Plaintiffs repeat, reallege and incorporate each and every allegation contained

9  in the paragraphs above as if fully set forth herein.

10     104.    As a result of the aforementioned conduct, Defendants have received money

11  from Plaintiffs and the Class, a portion of which is due to Plaintiffs and the Class as

12  previously alleged.

13     105.    The amount of money due is unknown to Plaintiffs and cannot be ascertained

14  without an accounting of the aforementioned transactions.

15     **WHEREFORE**, Plaintiffs and the Class Members pray for an award and judgment

16  against Defendants jointly and severally:

17     1.    On Plaintiffs' First Claim for Relief, for restitution of all amounts lost as a result

18           of Defendants' violation of Business and Professions Code §17200 *et seq.*;

19     2.    On Plaintiffs' Second, Third and Fourth Claims for Relief, for an amount to be

20           proven at trial for all direct and consequential damages incurred by Plaintiffs

21           and the Class, but no less than $200 million, trebled to $600 million;

22     3.    On Plaintiffs' Fifth Claim for Relief, for an amount to be proven at trial for all

23           direct and consequential damages incurred by the Plaintiffs and the Class as

24           a result of Defendants' wrongful conduct, but no less than $200 million;

25     4.    On Plaintiffs' Sixth Claim for Relief, for an accounting of all improper earnings,

26           as alleged above;

27     5.    On Plaintiffs' Fifth Claim for Relief, for punitive damages in an amount of no

28           less than $600 million;

6.  On Plaintiffs' First through Fifth Claims for Relief, for an injunction prohibiting in the future the unlawful conduct alleged;

7.  On Plaintiffs' First through Fourth Claims for Relief, for an Order declaring all unlawful terms of the agreements between Apple and AT&T and either of the Plaintiffs or any member of the Class void and unenforceable;

8.  For all costs of suit, including reasonable attorneys' fees, and interest;

9.  For such other and further relief as this Court deems just.

Dated: October 5, 2007

**FOLKENFLIK & McGERITY**

MAX FOLKENFLIK, ESQ.
MARGARET McGERITY, ESQ.
1500 Broadway,
21st Floor
New York, New York  10036
(212) 757-0400

**HOFFMAN & LAZEAR**

By: _____
     ARTHUR W. LAZEAR, ESQ.
     H. TIM HOFFMAN, ESQ.
     MORGAN M. MACK, ESQ.
180 Grand Avenue, Suite 1550
Oakland, California  94612

Complaint

-24-