1  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
2  BETSY C. MANIFOLD (182450)
   manifold@whafh.com
3  RACHELE R. RICKERT (190634)
   rickert@whafh.com
4  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
5  750 B Street, Suite 2770
   San Diego, CA 92101
6  Telephone: 619/239-4599
   Facsimile:  619/234-4599
7
8  MARK C. RIFKIN (*pro hac vice*)
   rifkin@whafh.com
9  ALEXANDER H. SCHMIDT (*pro hac vice*)
   schmidt@whafh.com
10 MARTIN E. RESTITUYO (*pro hac vice*)
   restituyo@whafh.com
11 WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
12 270 Madison Avenue
   New York, NY 10016
13 Telephone: 212/545-4600
   Facsimile:  212/545-4677
14
15 Plaintiffs' Interim Lead Counsel

16 [Additional counsel appear on signature page]

17              UNITED STATES DISTRICT COURT

18          FOR THE NORTHERN DISTRICT OF CALIFORNIA

19                    SAN JOSE DIVISION

20
   IN RE APPLE & AT&TM ANTITRUST          )   Master File No. C 07-5152 JW
21 LITIGATION                             )
                                          )
22                                        )
                                          )   **REVISED CONSOLIDATED AMENDED
23                                        )   CLASS ACTION COMPLAINT**
                                          )
24                                        )
                                          )   **DEMAND FOR JURY TRIAL**
25 _____    )

26

27

28

1    Plaintiffs, for their consolidated amended class action complaint, allege upon personal

2    knowledge as to themselves and their own actions, and upon information and belief, including the

3    investigation of counsel, as follows:

4    ## NATURE OF ACTION

5    1.    This is an antitrust class action pursuant to section 2 of the Sherman Antitrust Act

6    of 1890 ("Sherman Act"), 15 U.S.C. §2 (2004), a consumer class action brought pursuant to the

7    laws of 42 states and the District of Columbia,[1] and a breach of warranty class action pursuant to

8    the federal Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §2301-12 (2008), brought by

9    Plaintiffs on their own behalf and on behalf of classes of persons similarly situated, those being

10    persons who purchased an Apple iPhone from either Defendant between June 29, 2007 (or the

11    actual date that the iPhone became available) through the date of trial of this action (the "Class

12    Period").

13    A.    **Summary of Material Facts**

14    2.    Defendant Apple, Inc. ("Apple") launched its iPhone on or about June 29, 2007.

15    Prior to launch, Apple entered into a secret five-year contract with Defendant AT&T Mobility,

16    LLC ("AT&TM") that establishes AT&TM as the exclusive provider of cell phone voice and data

17    services for iPhone customers through 2012. As part of the contract, Apple shares in AT&TM's

18    revenues and profits. Though plaintiffs and class members who purchased iPhones agreed to enter

19    into a two-year voice and/or data service plan with AT&TM, they did not agree to use AT&TM

20    for five years. Apple's undisclosed five-year exclusivity arrangement with AT&TM, however,

21    effectively locks iPhone users into using AT&TM for five years, contrary to those users' wishes

22    and contractual expectations.

23    3.    To enforce AT&TM's exclusivity, Apple, among other things, programmed and

24    installed software locks on each iPhone it sold that prevented the purchaser from switching to

25    another carrier that competes with AT&TM to provide cell phone voice and data services. Under

26    an exemption to the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. §1201, *et*

27    *seq.* (2008), cell phone consumers have an absolute legal right to modify their phones to use the

---

28    [1]    The state consumer protection statutes being sued upon are identified at ¶152 n.7 below.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

network of their carrier of choice. Defendants have unlawfully prevented iPhone customers from exercising that legal right by locking the iPhones and refusing to give customers the software codes needed to unlock them.

4.    Under its agreement with AT&TM, Apple retained exclusive control over the design, features and operating software for the iPhone. To enhance its iPhone related revenues, Apple has created a number of software programs called "applications," such as ring tone, instant messaging, Internet access, and video and photography enabling software that can be downloaded and used by iPhone owners. Apple has also entered into agreements with other software manufacturers by which Apple "approves" their software applications for iPhone use in exchange for a share of the manufacturer's resulting revenues. Through the present date, Apple has refused to "approve" any application in which Apple has no financial interest. Apple has also unlawfully discouraged iPhone customers from downloading competing applications software (called "third party applications") by telling customers that Apple will void and refuse to honor the iPhone warranty of any customer who has downloaded competing applications.[2] Through these actions, Apple has unlawfully stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone software applications.

5.    In response to consumers exercising their legal right to unlock their iPhones or to install software applications that competed with Apple's, on September 27, 2007, under the guise of issuing an "upgraded" version of the iPhone operating software, Apple knowingly issued and caused transmission of a purported update to the iPhone operating software, known as Version 1.1.1, which "bricked" (that is, rendered completely inoperable) or otherwise damaged some iPhones that were unlocked or had downloaded competing software applications.

---

[2]    In March 2008 – more than five months after the first of these actions was filed – Apple released a "software development kit" ("SDK") for the stated purpose of enabling independent software developers to design third party applications for use on the iPhone. Apple has also recently announced that it intends, in June 2008, to release an updated version of the iPhone operating software, to be called Version 2.0, that will permit iPhone owners to safely download third party applications.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

6.      When iPhone owners took their damaged phones to Apple or AT&TM for repair or replacement, they were unlawfully told that they had breached their warranty agreements by unlocking their phone or downloading unapproved software and that their only remedy was to buy a new iPhone. Because Apple had intentionally released and transmitted Version 1.1.1 knowing that it would damage or destroy unlocked iPhones, Apple and AT&TM were obligated by law to honor their warranties and repair or replace the phones.

**B.      Summary of Claims**

7.      In pursuit and furtherance of their unlawful anticompetitive activities, Apple and AT&TM engaged in numerous breaches of warranty under the MMWA and unlawful deceptive acts or practices within the meaning of the consumer protection laws at issue because they (a) failed to disclose to consumers that Apple and AT&TM had entered into a five-year exclusivity contract, the effect of which was to lock consumers into using AT&TM as their voice and data service provider even after the consumers' two-year service plan contracts with AT&TM expired; (b) failed to disclose to consumers that the iPhone's operating software contained codes that "locked" the iPhones to only accept AT&TM Subscriber Identity Modules ("SIM cards"), thereby preventing iPhone purchasers from using any cell phone voice and data service provider other than AT&TM (with which Apple shares revenues); (c) failed to disclose to consumers that the "unlock code" that would enable consumers to use a service other than AT&TM would not be provided to iPhone owners, even though AT&TM routinely provides such unlock codes for other types of cell phones; (d) failed to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading programs or applications other than those "approved" by, and which generated revenue for, Apple (collectively, "Third Party Apps"); and (e) failed to disclose to consumers that iPhone owners would incur excessive and unconscionable roaming fees – often several thousands of dollars – simply for carrying the iPhone with them while traveling internationally, even if they did not actively use the iPhone's data features during their trip.

8.      Apple also engaged in breaches of warranty under the MMWA and deceptive acts or practices, and committed trespass when, on or about September 27, 2007, it knowingly and intentionally released a purported update of its iPhone operating software ("Version 1.1.1")

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

without adequately disclosing to consumers that Version 1.1.1 would "brick" or cause to malfunction (a) iPhones that had been "unlocked" to enable use of a non-AT&TM provider's voice or data services; or (b) iPhones on which the owner had installed Third Party Apps.

9.    Apple and AT&TM further breached their warranties and engaged in deceptive acts or practices by refusing to repair or replace iPhones that had been destroyed when their owners downloaded Apple's "upgraded" operating system.

10.    Apple and AT&TM violated section 2 of the Sherman Act by monopolizing, attempting to monopolize or conspiring to monopolize the aftermarket for voice and data services for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those aftermarket services.

11.    Apple also violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the software applications aftermarket for iPhones in a manner that harmed competition and injured consumers by reducing output and increasing prices for those applications.

12.    Plaintiff seeks declaratory and injunctive relief, treble and exemplary damages, costs and attorneys' fees. As for equitable relief, Plaintiff seeks an order: (i) requiring Defendant Apple to issue a corrected or upgraded version of its operating software that eliminates the malicious iPhone-destroying codes in its current Version 1.1.1 operating system; (ii) requiring Defendants to repair or replace, at no cost to the consumer, all iPhones rendered inoperable upon downloading Apple's Version 1.1.1 operating system; (iii) restraining Defendants from selling iPhones that are programmed in any way to prevent or hinder consumers from unlocking their SIM card or from downloading Third Party Apps; (iv) requiring Defendants to provide the iPhone SIM unlock codes to members of the class immediately upon request; (v) restraining Defendants from selling locked iPhones without adequately disclosing the fact that they are locked to work only with AT&TM SIM cards; (vi) requiring Defendants adequately to disclose the fact that iPhone owners may incur excessive data roaming charges while traveling internationally; and (vii) requiring Defendant Apple to permit consumers to download Third Party Apps on their iPhones.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

**THE PARTIES**

13.    Plaintiff Herbert H. Kliegerman is an individual residing in New York, New York, who, on or about July 7, 2007, purchased three iPhones and an AT&TM voice and data service plan for the iPhones.

14.    Plaintiff Paul Holman is an individual residing in Seattle, Washington who, on June 29, 2007, purchased two iPhones and an AT&TM voice and data plan.  Holman also purchased a "worldwide" data roaming plan that allows the downloading of a specified amount of data in certain countries outside the United States for $24.99 per month.

15.    Plaintiff Lucy Rivello is an individual residing in Albany, California who, in August 2007, purchased an iPhone and an AT&TM voice and data plan.

16.    Plaintiff Timothy P. Smith is an individual residing in California, who purchased an iPhone and an AT&TM voice and data plan on June 30, 2007.

17.    Plaintiff Michael G. Lee is an individual residing in New York.  Lee formerly resided in California where he purchased an iPhone and an AT&TM voice and data plan on August 22, 2007.

18.    Plaintiff Dennis V. Macasaddu is an individual residing in California, who purchased an iPhone and an AT&TM voice and data plan on June 29, 2007.

19.    Plaintiff Mark G. Morikawa is an individual residing in California, who purchased an iPhone and an AT&TM voice and data plan.

20.    Plaintiff Vincent Scotti is an individual residing in California, who purchased two iPhones and an AT&TM voice and data plan on July 12, 2007.

21.    Plaintiff Scott Sesso is an individual residing in California, who purchased an iPhone and an AT&TM voice and data plan in July 2007.

22.    Defendant Apple is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014. Apple regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States.  Apple manufactures, markets and sells the iPhone, among other consumer electronic devices.

23.    Defendant AT&TM is a Delaware limited liability company with its principal place

of business located at 5565 Glenridge Connector 1725B, Atlanta, Georgia 30349. AT&TM is a cell phone service provider that regularly conducts and transacts business in this District, as well as elsewhere throughout New York and the United States. AT&TM markets and sells the iPhone and, pursuant to a written agreement with Apple, is the exclusive provider of wire and data services to iPhone customers.

## JURISDICTION AND VENUE

24.    This Court has federal question jurisdiction pursuant to the Sherman Act, the Clayton Antitrust Act of 1914, 15 U.S.C. §§15 and 26, 28 U.S.C. §§1331 and 1337, and it has supplemental jurisdiction over the state law and MMWA claims pursuant to 28 U.S.C. §1367.

25.    This Court also has jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of each of the two proposed Plaintiff Classes.

26.    Venue is proper in this District pursuant to 28 U.S.C. §1391 because some Plaintiffs purchased iPhones in this District, Defendant Apple has its principal place of business in this District, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred here, and both Defendants are corporations subject to personal jurisdiction in this District and therefore reside here for venue purposes.

## FACTUAL ALLEGATIONS

### A.    Plaintiffs' Injuries

27.    In Spring 2007, Apple began a massive advertising campaign to market their new wireless communication device, the iPhone. The iPhone was and is advertised as a mobile phone, iPod and "breakthrough" Internet communications device with desktop-class email, an "industry first" "visual voicemail," web browsing, maps and searching capability.

28.    The iPhone debuted on June 29, 2007, and despite its hefty $499 or $599 price tag,[3] consumers waited in line to get their hands on one.

---

[3]    Initially the 4GB iPhone retailed for $499 and the 8GB iPhone retailed for $599. Apple and AT&TM now sell only the 8GB version for $399 and a 16GB version for $499.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

29.    Pursuant to an agreement between Defendants described more fully below, during the Class Period the iPhone has been sold at both Apple's and AT&TM's retail and online stores.

30.    Apple and AT&TM entered into a five-year exclusive service provider agreement, which on information and belief expires in 2012, pursuant to which, among many other things described more fully below, iPhone purchasers who want wireless voice and data services must sign a two-year service contract with AT&TM.

31.    Each Plaintiff purchased one or more iPhones. Each Plaintiff also executed a two-year contract with AT&TM for provision of iPhone wireless voice and data services.

32.    Prior to Plaintiffs' purchases of their iPhones and execution of their service contracts, Defendants had not disclosed that Defendants had a five-year exclusive service provider agreement or that Defendants' five-year agreement would effectively lock Plaintiffs into using AT&TM as their voice and data service provider even after their two-year contracts expired.

33.    Prior to Plaintiffs' purchases of their iPhones and execution of their service contracts, Defendants had not disclosed that Plaintiffs' iPhones were locked to only work with AT&TM SIM cards or that the unlock codes would not be provided to them on request.

34.    Prior to Plaintiffs' purchases of their iPhones and execution of their service contracts, Defendants had not disclosed that Plaintiffs would incur excessive and unconscionable roaming fees for using the data features of the iPhone while traveling internationally.

35.    In fact, Apple stated on its website that "[y]ou can browse the Internet and send emails as often as you like without being charged extra."

36.    After buying his iPhone, Plaintiff Holman traveled to Finland, a country not covered by his "worldwide" data roaming plan. For three days of data use in Finland, primarily for downloading emails, AT&TM charged him $381. Thereafter, Holman, who travels frequently for business, employed a SIM card "unlocking solution" that enabled him to download data without incurring AT&TM's exorbitant international data roaming charges. On a later trip to Amsterdam, for example, Holman used a pre-paid T-Mobile SIM card that allowed him to download his emails for a cost of approximately $20. Due to Defendants' unlawful conduct, Holman fears losing the ability to change SIM cards when he travels, or to switch to a competing domestic voice and data

1  service provider, either before or after his two-year AT&TM service plan expires.

2      37.    Holman downloaded several Third Party Apps on his iPhone, including

3  MobileChat, which works with the AIM instant messaging program, and Pushr, which uploads

4  photographs from the iPhone to the web-based photography site Flickr. Due to Defendants'

5  unlawful conduct, Holman is faced with the choice of foregoing an upgrade to iPhone operating

6  software Version 1.1.1, which contains improvements he has paid for and is entitled to, or losing

7  the Third Party Apps he currently uses.

8      38.    On July 16, 2007, Plaintiff Kliegerman took an iPhone to Mexico while on vacation

9  and used it in Mexico to check emails and surf the Internet. Upon returning home after seven days

10  in Mexico, Kliegerman received a bill from AT&TM, and to his astonishment AT&TM charged

11  him $2,000 in international data roaming fees for using his iPhone while in Mexico.[4]

12      39.    Because Kliegerman is a frequent international traveler, he has desired to purchase

13  a SIM card from a foreign wireless carrier which would allow him to utilize its voice and data

14  networks for approximately $20 to $25 plus local service fees that are substantially less than the

15  $2,000 international data roaming fees charged by AT&TM.

16      40.    Unbeknownst to Kliegerman, his iPhones were locked so that they cannot be used

17  with a non-AT&TM SIM card while traveling abroad.

18      41.    Kliegerman contacted both Apple and AT&TM to obtain the unlock codes for his

19  iPhones and was informed that the unlock codes would not be provided to him.

20      42.    On information and belief, AT&TM provides unlock codes for non-iPhone phones

21  if requested by a consumer.

22      43.    Kliegerman will continue to incur excessive voice and data roaming charges while

23  traveling internationally unless the Defendant provides him with the codes to unlock his iPhones

24  to accept non-AT&TM SIM cards.

25      44.    Kliegerman would like to have the option of switching to a competing domestic

26

27  [4]     After Kliegerman contacted AT&TM, a representative from AT&TM credited his account
$1,500 despite the fact that he requested the entire $2,000 be credited.

28

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

voice and data service provider, either before or after his two-year AT&TM service plan expires.

45.    Kliegerman downloaded Apple's Version 1.1.1 operating system on two of his iPhones since he has paid for and is entitled to utilize Apple's software updates. Kliegerman has declined to download Third Party Apps or to unlock his SIM card because he is fearful that Apple's imbedded malicious codes in the update will damage or permanently disable his iPhones if he does so.

46.    Plaintiff Rivello would like to use Third Party Apps on her iPhone. Rivello would also like to have the ability to unlock her SIM card for international travel and to switch to a competing domestic voice and data service provider other than AT&TM.

47.    Plaintiff Smith wants to transfer to a wireless carrier other than AT&TM. His iPhone was disabled, malfunctioned, and/or his Third Party Apps were erased after downloading iPhone update Version 1.1.1.  Smith contacted Apple to repair his iPhone, but Apple refused to honor its warranty because he had (1) unlocked his iPhone, and (2) installed Third Party Apps.

48.    Plaintiff Michael G. Lee wanted to use a T-Mobile voice and data plan when he purchased his iPhone, but he could not do so at the time because no SIM card unlock solution existed.  Lee later unlocked his iPhone.  When Apple announced that iPhone unlocking causes a non-activated error, Lee was told by an Apple Store "Genius" that his warranty was invalidated by unlocking. Lee contacted Apple to repair his iPhone, but Apple refused to honor its warranty because Lee had (1) unlocked his iPhone, and (2) installed Third Party Apps. Lee now wants to transfer to a wireless carrier other than AT&TM.

49.    Plaintiff Macasaddu's iPhone was disabled, malfunctioned, and/or his Third Party Apps were erased after downloading iPhone update Version 1.1.1. Macasaddu contacted Apple to repair his iPhone, but Apple refused to honor its warranty because he had (1) unlocked his iPhone, or (2) installed a Third Party App.

50.    Macasaddu purchased a third-party warranty at extra cost for his iPhone because of Apple's announcement that it would not honor its warranty on unlocked iPhones.

51.    Macasaddu incurred extraordinary roaming charges while traveling abroad with his iPhone. He also incurred a cancellation fee from a previous wireless carrier when transferring to

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

AT&TM's wireless service. Macasaddu now wants to transfer to a wireless carrier other than AT&TM.

52.    Plaintiff Morikawa purchased two iPhones, one for himself and the other for his son who lives in Canada. Neither AT&TM nor Apple ever explained to him that he would incur roaming charges for use of the iPhone in Canada. Morikawa also was not informed that he would incur roaming charges outside of the United States, and he was not informed that the default setting for the iPhone automatically logged him and his son into the AT&TM network, thereby incurring roaming charges that he did not authorize.

53.    Morikawa was initially billed $2,200 for roaming charges. After paying the non-disputed portions of his AT&TM bill, he was informed that he had incurred yet another $2,000 in roaming charges in addition to the original $2,000 bill he received. Morikawa was not aware that he would continue to incur these fees.

54.    Plaintiff Scotti Purchased two iPhones, one for himself and one for his wife. For his wife, he paid T-Mobile a $200 cancellation fee to transfer to AT&TM. Scotti also purchased a third-party warranty at extra cost for iPhone because of Apple's announcement that it would not honor warranties on unlocked iPhones.

55.    Plaintiff Sesso did not know that he was required to sign with AT&TM. He wanted to stay with T-Mobile but was told he could not do so by the sales representative. Sesso was initially denied credit after he had already purchased two iPhones. After arguing with AT&TM's representative for an hour, he was finally allowed to sign up for service with a $400 deposit — $200 for each phone.

56.    Sesso installed, among other things, Third Party Apps on his iPhone for games and screensavers. His iPhone was bricked, that is, disabled, and his Third Party Apps were erased after he downloaded iPhone update Version 1.1.1. Sesso contacted Apple to repair his iPhone, but Apple refused to honor its warranty because he had (1) unlocked his iPhone, and (2) installed Third Party Apps.

57.    Sesso returned an iPhone to Apple or AT&TM and paid a 10% "restocking fee." He returned the iPhone because he was dissatisfied with AT&TM's service and had initially been

declined service with AT&TM because he did not meet AT&TM's credit criteria. Sesso now wants to transfer to a wireless carrier other than AT&TM.

**B.     The Cell Phone Industry**

58.     Cellular telephone service began to be offered to consumers in 1983. Cellular telephones operate using radio frequency channels allocated by the Federal Communications Commission ("FCC"). Geographical service areas, sometimes known as "cells," are serviced by base stations using low-power radio telephone equipment, sometimes known as "cell towers." The cell towers connect to a Mobile Telephone Switching Office ("MTSO"), which controls the switching between cell phones and land line phones, accessed through the public-switched telephone network, and to other cell telephones.

59.     In cellular service there are two main competing network technologies: Global System for Mobile Communications ("GSM") and Code Division Multiple Access ("CDMA"), each of which has advantages and disadvantages that might appeal to or be rejected by individual consumers. GSM is the product of an international organization founded in 1987 dedicated to providing, developing, and overseeing the worldwide wireless standard of GSM. CDMA has been a dominant network standard for North America and parts of Asia.

60.     To respond to the need for cellular phones that can also send and receive emails, stream video and provide other services requiring higher data transfer speeds, technologies have been adopted by both CDMA and GSM carriers to comply with what the industry refers to as "3rd generation" technologies, or "3G" standards. These technologies require the cell phone to be operating on a separate 3G network. The AT&TM services provided to iPhone users described below is on AT&TM's 2G network, not its 3G network.[5]

61.     While there are a number of cellular phone service providers in the United States, only four have substantial national networks: AT&TM, T-Mobile USA, Inc. ("T-Mobile"), Sprint Corporation ("Sprint"), and Cellco Partnership d/b/a/ Verizon Wireless ("Verizon") (collectively, the "Major Carriers"). Other suppliers may in effect be "resellers" of cellular telephone service

---

[5]     Industry sources are of the belief that Apple's operating software Version 2.0 scheduled for release in June 2008 will enable iPhones to be used on AT&TM's 3G network.

which they purchase from the Major Carriers. AT&TM and T-Mobile are the two GSM Major Carriers; Sprint and Verizon are the two CDMA Major Carriers.

62.    AT&TM and the other wireless carriers have long dominated and controlled the cell phone industry in the United States in a manner that, according to a recent *Wall Street Journal* article, "severely limits consumer choice, stifles innovation, crushes entrepreneurship, and has made the U.S. the laughingstock of the mobile-technology world, just as the cellphone is morphing into a powerful hand-held computer." Walter S. Mossberg, *Free My Phone*, Wall Street Journal (Oct. 22, 2007), at R3, col. 1.

63.    Unlike the personal computer market in general – where computer manufacturers and software developers can offer products directly to consumers without having to gain the approval of Internet service providers, and without paying those providers a penny – the wireless carriers have used their ability to grant or deny access to their wireless networks to control both the type of cell phone hardware and software that can be manufactured, and to extract payments from manufacturers granted access to their networks and customers. *Id.*

64.    The anticompetitive nature of the wireless telephone market the carriers have created facilitated and gave rise to the commercial context in which Apple and AT&TM were able to commit the wrongs and offenses alleged herein.

C.    **The Cell Phone Industry's History of Misusing Locked SIM Cards**

65.    In the United States, as a general rule only GSM phones use SIM cards. The removable SIM card allows phones to be instantly activated, interchanged, swapped out and upgraded, all without carrier intervention. The SIM itself is tied to the network rather than the actual phone. Phones that are SIM card-enabled generally can be used with any GSM carrier.

66.    Thus, the hardware of all GSM compatible cell phones give consumers some degree of choice to switch among GSM carriers' wireless networks by enabling them to replace their SIM card, a process that the average individual consumer easily can do with no training by following a few simple instructions in a matter of minutes. SIM cards are very inexpensive, often in the $20 to $25 range. When the card is changed to the SIM card of another carrier, the cell phone is immediately usable on the other carrier's network. To switch from AT&TM to T-Mobile,

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1    or the other way around, all that is required is this simple change of the SIM card.

2        67.    For telephone users who travel, particularly to Europe, the ability to change SIM

3    cards to a European carrier such as Orange, Vodaphone or TIM, allows the user of a GSM

4    American phone to "convert it" to a "local" phone in the country where they have traveled. Absent

5    a conversion to local service, a consumer using an American GSM cell phone abroad must pay

6    both for the American service and for "roaming" charges, that is, the right to call or retrieve data

7    from outside of the customer's primary calling area. Roaming charges are typically very high,

8    often a dollar or more a minute. As a result, U.S.-based cell phone users traveling abroad can yield

9    very substantial savings by switching the SIM card and paying for local service rather than using

10   the U.S.-based GSM carrier.

11       68.    In an effort to minimize consumers' ability to switch carriers or avoid roaming

12   charges by simply switching SIM cards, the Major Carriers, acting in concert through trade

13   associations and standards setting organizations such as the CDMA Development Group, the

14   Telecommunications Industry Association, the Third Generation Partnership Project, the Alliance

15   for Telecommunications, the Open Mobile Alliance, the CSM Association, the Universal Wireless

16   Communications Consortium, and the Cellular Telephone Industry Association, and otherwise,

17   agreed to implement "Programming Lock" features which effectively "locked" individual handsets

18   so that they could not be used without the "locking" code. The carriers obtained a locking code

19   (normally only six digits long) unique to each cell phone from the cell phone manufacturer and, at

20   least initially, refused to disclose the code to consumers. That meant that a consumer who

21   purchased a telephone manufactured to work with one of the Major Carriers could not switch to

22   another carrier, even temporarily, such as while traveling abroad, without buying an entirely new

23   phone.

24       69.    In particular, the GSM carriers, AT&TM and T-Mobile, adopted a SIM Lock

25   standard, which locked a GSM phone to a particular SIM card, thereby preventing consumers from

26   simply changing their SIM cards. However, throughout the Class Period both T-Mobile and

27   AT&TM typically unlocked SIM cards on request for international travel or even if customers

28   wanted to cancel their accounts and switch to another carrier. In most cases, the unlock code was

given on request, almost instantly, over the telephone.

70.    Accordingly, AT&TM will now unlock SIM cards on telephones sold only through them, such as the Blackberry Pearl and the Samsung Blackjack. There is one exception: the iPhone. AT&TM will not provide the unlock code for the iPhone for international travel or otherwise. On information and belief, that is because, as described more fully below, AT&TM and Apple unlawfully agreed that the iPhone would not be unlocked under any circumstances.

**D.    Apple's Misuse of Other Locked Program Codes**

71.    The iPhone operating system also contains "security measures" which are, in effect, Program Locks designed to restrict the consumer from using programs or services on the iPhone other than those sanctioned by, and which generate revenue for, Apple. By design, Apple initially programmed the iPhone in a manner that prevented iPhone purchasers from downloading any Third Party Apps offered by software manufacturers who did not share their revenues with Apple.

72.    However, because of the design of the Apple operating system, which is based on the widely available Unix platform, Apple's initial efforts to eliminate Third Party Apps and to prevent iPhone customers from unlocking their SIM cards were ineffective, as clever consumers and Third Party programmers quickly circumvented Apple's locking codes and made both "unlocked" iPhones and "unlocking" software for iPhones available for sale on the Internet.

73.    As described below, in September 2007 Apple retaliated against iPhone purchasers who utilized these unlocking features by knowingly and intentionally issuing and transmitting an iPhone operating system "upgrade" that damaged or destroyed many iPhones that had been or might later be unlocked or on which any Third Party App had been or might later be installed.

**E.    Defendants Know they Cannot Legally Prevent Consumers from Unlocking iPhones**

74.    Over the past few years, the Major Carriers were subject to lawsuits that sought to impose liability based on the existence of Program Locks. Carriers had claimed that Program Locks were necessary to protect their copyrighted intellectual property and claimed then, as Defendants do publicly now, that the reason for the locks was to benefit consumers and protect against fraud. Carriers had also sought to assert that under the terms of the DMCA, disabling the Program Locks or unlocking a SIM card would be a violation of law.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

75.    The DMCA was enacted in 1998 to prohibit third parties from circumventing technological measures (called "access controls") that copyright owners had employed to control access to their protected intellectual property. However, in November 2006, the Librarian of Congress, who by statute has authority to create exemptions to the restrictions in §1201 of the DMCA to ensure the public is able to engage in noninfringing uses of copyrighted works, announced a three-year exemption from the prohibition against circumvention of access controls for "[c]omputer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network." The exemption stemmed for a recommendation by the Register of Copyrights, which concluded that "the access controls [on cell phones] do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, *they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business decision that has nothing whatsoever to do with the interests protected by copyright*." 71 Fed. Reg. 68472-01, 68476 (Nov. 27, 2006).

76.    Because Defendants were unable to enforce their Program Locks through legal means, they embarked on a scheme to enforce them unlawfully as to the iPhone.

F.    **The Apple – AT&TM Exclusivity Agreement**

77.    On January 9, 2007, a little over a month after the adverse Librarian of Congress ruling, Apple announced that it had entered into an exclusive agreement making AT&TM the only authorized provider of wireless voice and data services for iPhones in the United States.

78.    While the terms of Defendants' exclusivity agreement and any related agreements (collectively, the "Agreement") have not been made public, some details have leaked out in the press.    First, AT&TM and Apple agreed to share AT&TM's voice service and data service revenue received from iPhone customers.

79.    Second, while AT&TM offers iPhone purchasers a two-year contract, Apple agreed to give AT&TM iPhone exclusivity for five years, so that iPhone customers whose initial service contracts expire before June 29, 2012 would have no choice but to renew with AT&TM.

80. Third, on information and belief, Apple and AT&TM agreed to enforce AT&TM's exclusivity by installing SIM card Program Locks on all iPhones and agreeing never to disclose the unlock codes to iPhone consumers who wished to replace the iPhone SIM card, either for international travel or to lawfully cancel their AT&TM contract to switch to another carrier.

81. Fourth, the Agreement allows Apple to control the features, content, software programming and design of the iPhone.

82. Fifth, since both Apple and AT&TM recognized that the iPhone would create a unique product for which consumers would pay a premium price compared to other cell phones, the pricing structure of the AT&TM exclusivity deal was different than a typical agreement between a carrier and a handset manufacturer. Typically, the carrier subsidizes the purchase price of the handset (that is, sells the cell phone to the consumer at a substantial discount off the list price) in return for the consumer entering into a service agreement with the carrier. This arrangement, the carriers argue, benefits the consumer by lowering the cell phone's price. The carriers, however, charge an early termination fee if consumers wish to cancel their service contracts mid-term, which fee the carriers argue is justified by their subsidization of the cell phone price. Upon termination, the cell phone customer can go to any carrier.

83. In Defendants' Agreement, AT&TM did not agree to subsidize the purchase of the iPhone handset but nevertheless still charges iPhone consumers a $175 early termination fee for each telephone number linked to the service plan. The early termination fee by AT&TM is not justifiable absent subsidization of the handset price.

84. Sixth, on information and belief, AT&TM and Apple agreed that they would take action, legal or otherwise, to prevent users from circumventing the SIM card locks. A central purpose of this agreement was to suppress lawful competition domestically by T-Mobile against AT&TM in the iPhone aftermarket for voice and data services.

85. Finally, on information and belief, Defendants agreed that Apple would be restrained for a period of time from developing a CDMA version of the iPhone to suppress competition by Sprint and Verizon. Defendants agreed to this restraint notwithstanding that Apple could easily develop an iPhone for use on CDMA networks. In fact, Apple originally approached

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1  CDMA carrier Verizon to be the iPhone exclusive service provider before Apple approached

2  AT&TM.

3      86.    The blatantly anticompetitive features of the Defendants' Agreement caused one

4  *USA Today* journalist to describe Apple's agreement with AT&TM as "an easy way to handcuff

5  rivals and steal customers."  Leslie, Cauley, *AT&T Eager to Wield its iWeapon*, USA Today, May

6  21, 2007, *available at* http://www.usatoday.com/money/industries/telecom/2007-05-21-at&t-

7  iphone_n.htm.

8  | **G.    Defendants Quickly Faced Unwanted Competition in the iPhone Aftermarket**

9      87.    Almost immediately after the iPhone was launched, Third Party Apps for the

10  iPhone started to appear that generated competition for Apple in the applications aftermarket and

11  for AT&TM in the cellular voice and service aftermarket. For example, Mobile Chat and FlickIM

12  gave iPhone users access to instant messaging programs from which Apple derived no revenues.

13      88.    Even more significantly, Apple faced competition in the iPhone ring tone

14  aftermarket.  When a customer purchases a song for $1 from the Apple iTunes store, Apple

15  charges the customer an additional 99 cents to convert any portion of that song into a ring tone. A

16  number of competing programmers promptly offered a variety of ring tone programs that worked

17  on the iPhone, which consumers were able to download both for a fee and for free. Some of these

18  programs allowed customers to use samples of popular songs lawfully downloaded from Apple's

19  iTunes store as a ring tone for their iPhone. Other programs, such as I-Toner from Ambrosia

20  Software, and iPhone RingToneMaker from Efiko software, allowed customers to "clip" portions

21  of songs purchased by them from iTunes for use as ring tones.

22      89.    Since many of these programs used songs downloaded from iTunes, Apple initially

23  sought to block the use of those songs as ring tones by updating the iTunes software to install

24  Program Locks that would interfere with such use. However, those efforts were all quickly

25  defeated by third party programmers, sometimes within hours of the release of the update.

26      90.    The availability of Third Party Apps for iPhones reduced Apple's share of the

27  iPhone aftermarket for ring tones and other applications and greatly reduced or threatened to

28  reduce Apple's expected supracompetitive revenues and profits in that aftermarket.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

91.    Unlocking of the SIM card took a little longer and was more complicated. Initially, some customers sought to evade the program lock by altering the hardware. In August 2007, a high-school student announced the first "hardware unlocked" iPhone on YouTube. Shortly thereafter, software unlocks were developed and an explosion of unlock solutions, both free and for a fee, appeared on the Internet. Many of the solutions involved a small change in the software, in some cases in as little as two bytes of code.

92.    The availability of SIM card unlocking solutions enabled iPhone customers to lawfully terminate their AT&TM voice and data service contracts if they were unhappy with AT&TM's service and switch to T-Mobile in the United States, and it enabled iPhone customers to avoid AT&TM's excessive international roaming charges by replacing the AT&TM SIM card with a local carrier's SIM card while traveling.

93.    The availability of SIM card unlocking solutions reduced AT&TM and Apple's share of the iPhone voice and data services aftermarket and greatly reduced or threatened to reduce the supracompetitive revenues and profits they had agreed to share.

**H.    Defendants' Unlawful Retaliation in Response to the Unwanted Competition**

   **1.    Apple's Breaches of Warranty**

94.    To protect Defendants' positions in the iPhone aftermarket for voice and data services and for ring tone and other software applications, Apple repeatedly announced that any attempt to unlock the iPhone SIM or to install Third Party Apps would void the Apple warranty. This assertion was false as a matter of federal law, and was known by Apple to be false when made.  The federal MMWA prohibits conditioning the iPhone warranty on the use of Apple products only, or on the use of AT&TM service only, 15 U.S.C. §2302(c), which is effectively what Apple's warranty announcements did.

95.    When Apple's warranty announcements did little to stem the tide of unlock solutions being offered in the summer of 2007, Apple announced that use of Third Party Apps or unlocking the AT&TM SIM card might cause the iPhone to become unusable. At that time, Apple had no reason to believe that statement was true, and, in fact, users who unlocked their iPhones or installed Third Party Apps had complete functionality. The computer community thought that

Apple was intentionally spreading misinformation (known in the jargon of that community as "FUD," or "Fear, Uncertainty and Despair") to scare iPhone users into not making lawful alterations to unlock the SIM cards or lawfully installing new Third Party Apps.

### 2. Apple's Knowing and Intentional Destruction of iPhones and Defendants' Refusal to Fix Them

96.     When Apple's other efforts to prevent competition in the iPhone aftermarkets failed, Apple decided to punish iPhone customers who had unlocked their phones, and to deter other iPhone purchasers from unlocking their phones in the future, by knowingly and intentionally issuing and transmitting an iPhone operating system "upgrade" called Version 1.1.1 that damaged or destroyed the handsets of iPhone customers who had unlocked a SIM card or installed a Third Party App.

97.     Apple acted deliberately and intentionally to destroy the iPhones of consumers who had lawfully unlocked their iPhones. Apple's willful destruction is revealed by a press release Apple issued on September 24, 2007 (the "September 24 Press Release"), three days before it released Version 1.1.1.

98.     The September 24 Press Release stated (emphases added):

> Apple has discovered that many of the unauthorized iPhone unlocking programs available on the Internet cause irreparable damage to the iPhone's software, *which will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed*. ... Apple strongly discourages users from installing unauthorized unlocking programs on their iPhones. Users who make unauthorized modifications to the software on their iPhone violate their iPhone software licensing agreement and void their warranty. *The permanent inability to use an iPhone due to installing unlocking software is not covered under the iPhone's warranty*.

99.     Before September 24, 2007, few if any iPhone users reported any problems resulting from unlocking their iPhones, much less the handsets "bricking" or otherwise becoming "permanently inoperable." Yet Apple was able to predict in its September 24 Press Release that such problems would begin to occur *after* Version 1.1.1 was released. Apple's statement that the existence of unlock codes would "*likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed*" unambiguously evidences that Apple *knew* Version 1.1.1 would brick unlocked iPhones and *intended* such results.

100.    Moreover, Apple's attempt in the September 24 Press Release to blame the "unlocking software" for the "permanent inability to use an iPhone" was a deliberately deceptive act because Apple knew it was the installation of Version 1.1.1, and not the installation of unlocking programs themselves, that would disable the iPhones.

101.    Apple's premeditated effort to disclaim warranty liability for damage that Apple knew its Version 1.1.1 "upgrade" itself would and did cause to iPhones is also a deceptive act and a breach of Apple's warranty.

102.    Apple issued Version 1.1.1 on September 27, 2007. Apple had announced its operating software update was intended to make limited specific changes and improvements, including, in particular, a needed and substantial improvement to the power management and battery life of iPhone. However, instead of delivering a "patch" program altering only those specific portions of the program, Apple's upgrade was a complete new operating system that not only incorporated the improvements but also changed certain codes that were used by Third Party Apps and changed the codes necessary for the unlocked SIM cards to function.

103.    As a result of these changes, none of which were technically required for the publicly stated purposes of the upgrade but were designed solely to advance Apple's unlawful anticompetitive purposes and conduct, existing Third Party Apps were rendered useless and existing SIM cards that were unlocked became re-locked. As Apple knew and intended, and had predicted three days earlier, in many cases the iPhones of customers who had unlocked their SIM cards or downloaded Third Party Apps were "bricked" and rendered useless when they unsuspectingly downloaded Version 1.1.1.

104.    Both Apple and AT&TM have breached their warranties by refusing to repair or replace iPhones that were damaged or rendered useless by Version 1.1.1. Apple and AT&TM have also engaged in unfair and deceptive acts and practices by falsely asserting that the iPhone customer violated their licensing contracts with Apple by downloading Program Unlocks and that the customers were therefore themselves responsible for the damage to their phones.

105.    When confronted with the question of what remedy iPhone purchasers had for disabled iPhones, an Apple spokesman was quoted as saying "they can buy a new iPhone."

106.    In sum, the September 24 Press Release and surrounding circumstances reveal that Apple plainly intended to punish iPhone owners who had lawfully unlocked their iPhones by damaging their phones through Version 1.1.1 and then by unlawfully disclaiming warranty liability for the damage that Apple knew it had itself caused.

107.    Apple and AT&TM's conduct was and continues to be patently illegal, and Apple and AT&TM should be held fully liable, and punished, for their actions.

## CLASS ALLEGATIONS

108.    Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated for the purpose of asserting claims alleged in this Complaint on a common basis. Plaintiffs' first proposed class (hereinafter the "Nationwide Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following class comprised of:

**All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&TM anywhere in the United States between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' violations of the federal antitrust laws and the Magnuson-Moss Warranty Act, and Apple's violation of Cal. Bus. & Prof. Code §17200, Apple's trespass to chattels, Apple's violation of the Computer Fraud and Abuse Act and Apple's violation of California Penal Code §502 as alleged herein have ceased.**

109.    Plaintiffs' second proposed class (hereinafter the "Consumer Protection Class") is defined under Federal Rules of Civil Procedure 23(b)(2) and (3), and Plaintiffs propose to act as representatives of the following class comprised of:

**All persons, exclusive of the Defendants and their employees, who purchased an iPhone from Apple or AT&TM in any of the 43 jurisdictions identified in Count VI herein between June 29, 2007 (or the actual date that the iPhone became available) through such time in the future when the effects of Defendants' unfair and deceptive acts and practices alleged herein have ceased.**

110.    The Classes for whose benefit this action is brought are so numerous that joinder of all members is impractical.

111.    Plaintiffs are unable to state the exact number of class members without discovery of the Defendants' records but, on information and belief, state that about 1,400,000 iPhones were

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1    sold by October 1, 2007 and that Defendants project that 10,000,000 more iPhones will be sold

2    worldwide during Apple's fiscal year 2008.

3        112.    There are questions of law and fact common to the Classes which predominate over

4    any questions affecting only individual members. The common questions of law and fact affecting

5    the rights of all members of the Classes include the following:

6            a.    Whether either Defendant failed adequately to disclose to consumers the

7                fact that Defendants had entered into a five-year exclusivity agreement

8                whereby consumers would be unable to switch to a competing voice and

9                data service provider either before or after their two-year AT&TM service

10               plans expired;

11           b.    Whether either Defendant failed adequately to disclose to consumers the

12               fact that the iPhones would be locked to only accept AT&TM SIM cards;

13           c.    Whether either Defendant failed adequately to disclose to consumers the

14               fact that they would not provide consumers with the unlock codes for their

15               iPhones so that the iPhones could be used with non-AT&TM SIM cards;

16           d.    Whether either Defendant failed adequately to disclose to consumers the

17               fact that excessive data roaming charges would apply if iPhones are taken

18               abroad;

19           e.    Whether either Defendant failed adequately to disclose to consumers that

20               Apple would seek to prohibit iPhone owners from downloading Third Party

21               Apps;

22           f.    Whether either Defendant failed adequately to disclose to consumers that

23               Apple's Version 1.1.1 would disable any Third Party Apps and SIM card

24               unlocks or would render iPhones that contained such features inoperable;

25           g.    Whether Defendants' conduct in locking the iPhone to only work with

26               AT&TM SIM cards is a deceptive act and practice that violates the

27               consumer protection statutes;

28

h.   Whether Defendants' refusal to give consumers the unlock code for the their iPhone is a deceptive act and practice that violates the consumer protection statutes;

i.   Whether Defendants' conduct in failing adequately to disclose to consumers the fact that excessive data roaming charges apply when the iPhone is taken abroad is a deceptive act and practice that violates the consumer protection statutes;

j.   Whether Defendants' conduct in failing adequately to disclose to consumers that Apple would seek to prohibit iPhone owners from downloading Third Party Apps is a deceptive act and practice that violates the consumer protection statutes;

k.   Whether Defendants' failure adequately to disclose to consumers that Apple's Version 1.1.1 would disable any Third Party Apps and SIM card unlocks or would render iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes;

l.   Whether Apple's design and issuance of Version 1.1.1 containing undisclosed malicious codes that disabled Third Party Apps and SIM card unlocks and rendered iPhones that contained such features inoperable is a deceptive act and practice that violates the consumer protection statutes;

m.   Whether Apple's destruction of iPhones and disabling of Third Party Apps and SIM card unlocks through issuance of Version 1.1.1 breached express and implied warranties of fitness and violated the MMWA;

n.   Whether Defendants breached express and implied warranties of fitness and violated the MMWA by refusing to repair or replace iPhones that had been destroyed when their owners downloaded Version 1.1.1;

o.   Whether Apple violated section 2 of the Sherman Act by monopolizing or attempting to monopolize the aftermarket for iPhone software applications;

p.     Whether Defendants violated section 2 of the Sherman Act by monopolizing, attempting to monopolize or conspiring to monopolize the aftermarket for iPhone wireless voice and data services; and

q.     Whether Apple is liable for common law trespass to chattels for damaging or destroying iPhones when it issued Version 1.1.1.

113.     Each of these enumerated commons questions of law and fact is identical for each and every member of the Classes.

114.     Plaintiffs are members of the Classes they seek to represent, and their claims arise from the same factual and legal basis as those of the Classes; they assert the same legal theories as do all Class members.

115.     Plaintiffs will thoroughly and adequately protect the interests of the Classes, having obtained qualified and competent legal counsel to represent themselves and those similarly situated.

116.     The prosecution of separate actions by individual class members would create a risk of inconsistent adjudications and would cause needless expenditure of judicial resources.

117.     Plaintiffs are typical of the Classes in that their claims, like those of the Classes, are based on the same unconscionable business practices, the same uniform omissions of material facts and the same legal theories.

118.     Defendants have acted on grounds generally applicable to the Classes.

119.     A class action is superior to all other available methods for the fair and efficient adjudication of the controversy.

## RELEVANT MARKET ALLEGATIONS

120.     The iPhone is a unique, premium priced product that generates a unique aftermarket for services and applications that can be used only on iPhones. The price of iPhones is not responsive to an increase in iPhone service or application prices because (a) consumers who purchase an iPhone cannot, at the point of sale, reasonably or accurately inform themselves of the "lifecycle costs" (that is, the combined cost of the handset and its required services, parts and applications over the iPhone's lifetime), and (b) consumers are "locked into" the iPhone due to its

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

- 24 -

1  high price tag and would incur significant costs to switch to another handset. The aftermarket for

2  iPhone services and applications is thus an economically distinct product market, and the service

3  and application products that are sold within that market have no acceptable substitutes. The

4  geographic iPhone aftermarket is national.

5      121.    The aftermarket for iPhone services and applications have at least two analytically

6  distinct sub-markets: (a) the aftermarket for wireless voice and data services (the "Voice and Data

7  Services Aftermarket"), and (b) the aftermarket for software applications that can be downloaded

8  on the iPhone for managing such functions as ring tones, instant messaging, photographic

9  capability and Internet applications (the "Applications Aftermarket").

10                              **COUNT I**
**Unlawful Monopolization of the Applications Aftermarket in Violation of Sherman Act §2**
11           **(Seeking Damages and Equitable Relief against Defendant Apple)**

12      122.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth

13  fully herein.

14      123.    Defendant Apple has acquired monopoly power in the iPhone Applications

15  Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically,

16  Apple has unlawfully acquired monopoly power by (i) "approving" only applications that generate

17  revenues for Apple; (ii) discouraging iPhone customers from using competing applications by

18  spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in

19  a way that disabled all competitors' applications and/or destroyed the iPhones of users that had

20  downloaded competitors' applications.

21      124.    Apple's unlawful acquisition of monopoly power has reduced output and

22  competition and resulted in increased prices for products sold in the iPhone Applications

23  Aftermarket and, thus, harms competition generally in that market.

24      125.    Plaintiffs have been injured in fact by Apple's unlawful monopolization because

25  they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay

26  higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

27      126.    Apple's unlawful monopolization of the iPhone Applications Aftermarket violates

28  Section 2 of the Sherman Act and its unlawful monopolization practices are continuing and will

continue unless they are permanently enjoined.[6]  Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's unlawful monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

### COUNT II
**Attempted Monopolization of the Applications Aftermarket in Violation of Sherman Act §2**
**(Seeking Damages and Equitable Relief against Defendant Apple)**

127.    Plaintiffs reallege and incorporate paragraphs 1 through 126 above as if set forth fully herein.

128.    Defendant Apple has engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Applications Aftermarket. Specifically, Apple has attempted unlawfully to acquire monopoly power by (i) "approving" only applications that generate revenues for Apple; (ii) discouraging iPhone customers from using competing applications by spreading misinformation; and (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all competitors' applications and/or destroyed the iPhones of users that had downloaded competitors' applications. Apple did not have a legitimate business justification for any of these actions.

129.    Apple's anticompetitive actions have created a dangerous probability that Apple will achieve monopoly power in the Applications Aftermarket because Apple has already unlawfully achieved an economically significant degree of market power in that market and has effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

130.    Apple's attempted acquisition of monopoly power has reduced output and competition and resulted in increased prices for products sold in the iPhone Applications Aftermarket and, thus, harms competition generally in that market.

---

[6]     The request for injunctive relief may become moot if Apple follows through on its recently stated intention of permitting Third Party Apps to be installed in iPhones beginning in June 2008. In that event, Plaintiffs' request for relief under Counts I and II will be limited to money damages.

131.    Plaintiffs have been injured in fact by Apple's attempted monopolization because they have (a) been deprived of lower cost alternatives for applications, (b) been forced to pay higher prices for Apple "approved" applications, and/or (c) had their iPhones destroyed.

132.    Apple's attempted monopolization of the iPhone Applications Aftermarket violates Section 2 of the Sherman Act and its anticompetitive practices are continuing and will continue unless they are permanently enjoined.    Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Apple's attempted monopolization, and Apple is therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

**COUNT III**
**Unlawful Monopolization of the Voice and Data Services Aftermarket**
**in Violation of Sherman Act §2**
**(Seeking Damages and Equitable Relief against Both Defendants)**

133.    Plaintiffs reallege and incorporate paragraphs 1 through 132 above as if set forth fully herein.

134.    Apple and AT&TM's revenue sharing arrangement with respect to AT&TM's exclusive five-year iPhone voice and data services contract renders both Defendants participants in the iPhone Voice and Data Services Aftermarket.

135.    Defendants have acquired monopoly power in the iPhone Voice and Data Services Aftermarket through unlawful willful acquisition or maintenance of that power. Specifically, Defendants have unlawfully acquired monopoly power by (i) agreeing without Plaintiffs' knowledge or consent to make AT&TM the exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations that they (a) would be under contract with AT&TM for only two years, and (b) could switch at any time to another carrier after paying the $175 early termination fee; (ii) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iv) refusing to honor the iPhone warranty for users who unlocked their SIM cards.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

136. Defendants' unlawful acquisition of monopoly power has reduced output and competition in the iPhone Voice and Data Services Aftermarket and, thus, harms competition generally in that market.

137. Plaintiffs have been injured in fact by Defendants' unlawful monopolization because they have (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones destroyed.

138. Defendants' unlawful monopolization of the iPhone Voice and Data Services Aftermarket violates Section 2 of the Sherman Act and their unlawful monopolization practices are continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury to their property as a direct and proximate result of Defendants' unlawful monopolization, and Defendants are therefore liable for treble damages, costs and attorneys' fees in amounts to be proved at trial.

**COUNT IV**
**Attempted Monopolization of the Voice and Data Services Aftermarket**
**in Violation of Sherman Act §2**
**(Seeking Damages and Equitable Relief against Both Defendants)**

139. Plaintiffs reallege and incorporate paragraphs 1 through 138 above as if set forth fully herein.

140. Defendants have engaged in exclusionary, predatory and anticompetitive conduct with a specific intent to monopolize the iPhone Voice and Data Services Aftermarket. Specifically, Defendants have attempted unlawfully to acquire monopoly power by (i) agreeing without Plaintiffs' knowledge or consent to make AT&TM the exclusive provider of voice and data services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations that they (a) would be under contract with AT&TM for only two years, and (b) could switch at any time to another carrier after paying the $175 early termination fee; (ii) discouraging iPhone customers from unlocking their SIM cards through misinformation campaigns; (iii) programming Version 1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed the iPhones of users that had unlocked their SIM cards; and (iv) refusing to honor the iPhone

1   warranty for users who unlocked their SIM cards. Defendants did not have a legitimate business

2   justification for any of these actions.

3        141.    Defendants' anticompetitive actions have created a dangerous probability that they

4   will achieve monopoly power in the Voice and Data Services Aftermarket because Defendants

5   have already unlawfully achieved an economically significant degree of market power in that

6   market and have effectively foreclosed new and potential entrants from entering the market or

7   gaining their naturally competitive market shares.

8        142.    Defendants' attempted acquisition of monopoly power has reduced output and

9   competition and resulted in increased prices for products sold in the iPhone Voice and Data

10  Services Aftermarket and, thus, harms competition generally in that market.

11       143.    Plaintiffs have been injured in fact by Defendants' attempted monopolization

12  because they have (a) been deprived of alternatives for voice and data services domestically,

13  (b) been forced to pay higher prices for roaming charges while traveling internationally, and/or

14  (c) had their iPhones destroyed.

15       144.    Defendants' attempted monopolization of the iPhone Voice and Data Services

16  Aftermarket violates Section 2 of the Sherman Act and their anticompetitive practices are

17  continuing and will continue unless they are permanently enjoined. Plaintiffs and members of the

18  Nationwide Class have suffered economic injury to their property as a direct and proximate result

19  of Defendants' attempted monopolization, and Defendants are therefore liable for treble damages,

20  costs and attorneys' fees in amounts to be proved at trial.

21                                      **COUNT V**
                **Conspiracy to Monopolize the Voice and Data Services Aftermarket**
22                          **in Violation of Sherman Act §2**
                   **(Seeking Damages and Equitable Relief against Both Defendants)**
23
         145.    Plaintiffs reallege and incorporate paragraphs 1 through 144 above as if set forth
24
    fully herein.
25
         146.    Defendants have knowingly and intentionally conspired among themselves with the
26
    specific intent to monopolize the iPhone Voice and Data Services Aftermarket. In furtherance of
27
    the conspiracy, Defendants have committed one or more of the following acts: (i) agreeing without
28
    Plaintiffs' knowledge or consent to make AT&TM the exclusive provider of voice and data

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

- 29 -

1   services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations that they

2   (a) would be under contract with AT&TM for only two years, and (b) could switch at any time to

3   another carrier after paying the $175 early termination fee; (ii) discouraging iPhone customers

4   from unlocking their SIM cards through misinformation campaigns; (iii) programming Version

5   1.1.1 of the iPhone operating system in a way that disabled all SIM card unlocks and/or destroyed

6   the iPhones of users that had unlocked their SIM cards; and (iv) refusing to honor the iPhone

7   warranty for users who unlocked their SIM cards.  Defendants did not have a legitimate business

8   justification for any of these actions.

9          147.   Defendants have already unlawfully achieved an economically significant degree of

10  market power in the Data Services Aftermarket as a result of their conspiracy and have effectively

11  foreclosed new and potential entrants from entering the market or gaining their naturally

12  competitive market shares.

13         148.   Defendants' conspiracy has reduced output and competition and resulted in

14  increased prices for products sold in the iPhone Voice and Data Services Aftermarket and, thus,

15  harms competition generally in that market.

16         149.   Plaintiffs have been injured in fact by Defendants' conspiracy because they have

17  (a) been deprived of alternatives for voice and data services domestically, (b) been forced to pay

18  higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones

19  destroyed.

20         150.   Defendants' conspiracy to monopolize the iPhone Voice and Data Services

21  Aftermarket violates Section 2 of the Sherman Act and their anticompetitive practices are

22  continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the

23  Nationwide Class have suffered economic injury to their property as a direct and proximate result

24  of Defendants' conspiracy, and Defendants are therefore liable for treble damages, costs and

25  attorneys' fees in amounts to be proved at trial.

26                              **COUNT VI**
                    **Unfair and Deceptive Acts and Practices**
27          **(Seeking Damages and Equitable Relief against Both Defendants)**

28         151.   Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1    fully herein.

2        152.    The consumer protection and unfair and deceptive trade practices laws of 43

3    jurisdictions in the United States prohibit deceptive acts or practices in the conduct of any business

4    trade or commerce or in the furnishing of any service and authorize a private right of action and

5    class actions against defendants that violate those laws.[7]

6        153.    Defendants sold iPhones to consumers in these 43 jurisdictions without disclosing

7    the fact (a) Defendants had agreed to make AT&TM the exclusive provider of voice and data

8    services for the iPhone for five years, contrary to Plaintiffs' reasonable expectations that they

9    would be under contract with AT&TM for at most two years; (b) that the handsets had been

10   locked to only work with AT&TM SIM cards; (c) that Defendants would not provide the unlock

11   code to consumers; (d) that consumers would incur substantial roaming fees for the use of the

12   iPhone's data features while traveling internationally; (e) that Apple would seek to prohibit iPhone

13

14   ---

     [7]     The state statutes Defendants are alleged to have violated are: **Alaska** (Alaska Stat.
15   §§45.50.471 *et seq*.); **Arizona** (Ariz. Rev. Stat. §44-1522); **Arkansas** (Ark. Code. §§4-88-107 and
     4-88-108); **California** (Cal. Civ. Code §1770(a)(19) and Cal. Bus. & Prof. Code §§17200 and
16   17500); **Colorado** (Colo. Rev. Stat. §6-1-105(u)); **Connecticut** (Conn. Gen. Stat. §42-110(b);
     **Delaware** (6 Del. Code §2513); **District of Columbia** (D.C. Code §28-3904(e),(f)); **Florida**
17   (F.S.A. §501.204); **Hawaii** (Haw. Rev. Stat. §480-2(a)); **Idaho** (Idaho Code §48-603(17),(18));
     **Illinois** (815 Ill. Comp. Stat. 505/2); **Indiana** (Ind. Code §24-5-0.5-3(a)); **Kansas** (Kan. Stat.
18   §§50-626(a),(b) and 50-627(a)); **Kentucky** (Ky. Rev. Stat. §367.170); **Maine** (Me. Rev. Stat. tit.
     5, §207); **Maryland** (Md. Code Com. Law §13-301(1),(3)); **Massachusetts** (Mass. Gen. Laws ch.
19   93A, §§2(a) and 9); **Michigan** (Mich. Stat. §445.903(1)(s),(bb),(cc)); **Minnesota** (Minn. Stat.
     §§8.31 and 325F.67 and 325F.69(1)); **Missouri** (Mo. Rev. Stat. §407.020); **Nebraska** (Neb. Rev.
20   Stat. §59-1602); **Nevada** (NRS 598-0915(5),(15) and 598.0923(2))); **New Hampshire** (N.H. Rev.
     Stat. §358-A:2); **New Jersey** (N.J.S.A. §56:8-2); **New Mexico** (N.M.S.A. §§57-12-2(14),(17) and
21   57-12-3); **New York** (N.Y. Gen. Bus. Law §349); **North Carolina** (N.C. Gen. Stat. §§75-1.1;
     **North Dakota** (N.D. Cent. Code §§51-15-02); **Ohio** (Ohio Rev. Code §§1345-02(A) and
22   1345-03(A) and 4165.02(7),(11) and §4165.03); **Oklahoma** (Okla. Stat. tit. 15, §§752 and 733
     and tit. 78, §53(9)); **Oregon** (Or. Rev. Stat. §§646.607(1) and 646.608(1)(i),(t),(u) and
23   646.608(2)); **Pennsylvania** (73 P.S. §201-2(1)(ix), 201-2(4)(xiv)); **Rhode Island** (R.I. Gen. Laws
     §§6-13.1-1(6)(ix),(xiii),(xiv) and 6-13.1-2); **South Dakota** (S.D. Codified Laws §37-24-6(1));
24   **Tennessee** (Tenn. Code Ann. §47-18-104(a)); **Texas** (Tex. Bus. & Com. Code Ann.
     §§17.46(b)(9),(24) and 17.50); **Utah** (UCA 1953 §§13-11-4(1) and 13-11-5(1)); **Vermont** (Vt.
25   Stat. Ann. tit. 9, §2453(a)); **Washington** (RCWA §§19.86.020 and 19.86.920); **West Virginia**
     (W.Va. Code §§46A-6-102(b)(I),(L),(M) and 46A-6-104); **Wisconsin** (W.S.A. §§100.18 and
26   100.195 and 100.20 and 100.207); and **Wyoming** (WS §40-12-105(a)(x),(xv)).

27

28

1    owners from downloading Third Party Apps; (f) that Apple had embedded malicious codes within

2    Version 1.1.1 that would disable any SIM card unlocks or Third Party Apps and/or "brick" any

3    iPhone that had been unlocked or had Third Party Apps installed; and (g) that Defendants would

4    refuse to honor the iPhone warranty or repair or replace iPhones that had been destroyed when

5    their owners downloaded Version 1.1.1.

6         154.    Defendants' conduct described above is deceptive and misleading in material

7    respects. Defendants, to the extent required under the laws of any jurisdiction, have made

8    misrepresentations and acted unconscionably in connection with the marketing and sale of Apple

9    iPhones and related aftermarket services, including AT&TM's iPhone voice and data service

10   plans.

11        155.    Defendants' acts and practices described above are likely to mislead a reasonable

12   consumer acting reasonably under the circumstances.

13        156.    As a result of the Defendants' deceptive and misleading acts, Plaintiffs and class

14   members have been injured.  To the extent necessary under the laws of any jurisdiction, Plaintiffs

15   have provided Defendants with notice and an opportunity to cure their misleading and deceptive

16   acts and practices and have sought to settle and resolve this dispute.

17        157.    Defendants' conduct violates the consumer protection and unfair and deceptive acts

18   and practices laws of each of the 43 jurisdictions at issue, and their deceptive acts and practices are

19   continuing and will continue unless they are permanently enjoined.  Plaintiffs and members of the

20   Consumer Protection Class have suffered injury as a direct and proximate result of Defendants'

21   conduct, and Defendants are liable for compensatory and treble or other punitive damages, costs

22   and attorneys' fees as each respective jurisdiction may permit, in amounts to be proved at trial.

23                           **COUNT VII**
                 **Violation of the Magnuson-Moss Warranty Act**
24        **(Seeking Damages and Equitable Relief against Both Defendants)**

25        158.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth

26   fully herein.

27        159.    Defendant Apple violated the iPhone warranty under the MMWA by conditioning

28   its written and implied warranties of that product on consumers using, in connection with such

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1    product, articles or services (other than articles or services provided without charge under the

2    terms of the warranty), which are identified by brand, trade, or corporate name, including

3    AT&TM's voice and data service and the software applications "approved" by Apple.

4        160.    Defendants Apple and AT&TM violated the iPhone warranty under the MMWA by

5    not fully and conspicuously disclosing the characteristics or properties of the products, or parts

6    thereof, that are not covered by the warranty, namely, by not fully and conspicuously disclosing

7    that they would not honor the warranty as to iPhones that were damaged and destroyed by Apple's

8    Version 1.1.1 operating system upgrade.

9        161.    Plaintiffs have provided Defendants with reasonable notice and an opportunity to

10   cure their breaches of warranty and MMWA violations.

11       162.    Defendants' breaches of warranty and MMWA violations are continuing and will

12   continue unless they are permanently enjoined.  Plaintiffs and members of the Nationwide Class

13   have suffered actual damages as a direct and proximate result of Defendants' breaches of warranty

14   and MMWA violations, and Defendants are liable for compensatory damages and costs in

15   amounts to be proved at trial.

**COUNT VIII**
**Trespass to Chattels**
**(Seeking Damages and Equitable Relief against Apple)**

16
17

18       163.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth

19   fully herein.

20       164.    Apple deliberately and intentionally caused the issuance and transmission of

21   Version 1.1.1 of its operating software, knowing that the installation of Version 1.1.1 would: (a)

22   damage or brick iPhones; (b) disable existing SIM card unlocks; (c) disable existing Third Party

23   Apps; (d) alter the product owned by Plaintiffs and the class members to create technological

24   impediments to unlocking SIM cards; and (e) alter the product owned by Plaintiffs and the class

25   members to create technological impediments to the purchase of Third Party Apps, knowing and

26   intending that such damage or alteration would result. Plaintiffs and the class members did not

27   want or invite such damage or alterations, and they were not made with any purpose other than to

28   benefit Apple in continuing its unlawful conduct described above.

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

165.    Apple's unwanted and uninvited intermeddling with the iPhone operating software is an actual or intended trespass to property owned by Plaintiffs and each class member.

166.    Apple acted knowingly, willfully, maliciously, and with reckless, callous and criminal indifference to and disregard for the rights of others.

167.    Defendant's trespass is continuing and will continue unless Apple is permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered injury as a direct and proximate result of Apple's conduct, and Apple is liable for compensatory and punitive damages and costs in amounts to be proved at trial.

**COUNT IX**
**Violation of the Computer Fraud and Abuse Act – 18 U.S.C. §1030**
**(Seeking Damages and Equitable Relief against Apple)**

168.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth fully herein.

169.    Apple deliberately and intentionally caused the issuance and transmission of Version 1.1.1 of its operating software, knowing that the installation of Version 1.1.1 would: (a) damage or brick iPhones; (b) disable existing SIM card unlocks; (c) disable existing Third Party Apps; (d) alter the product owned by Plaintiffs and the class members to create technological impediments to unlocking SIM cards; and (e) alter the product owned by Plaintiffs and the class members to create technological impediments to the purchase of Third Party Apps, knowing and intending that such damage or alteration would result. Apple's conduct was a knowing transmission of a program, information, code or command, which intentionally caused damage without authorization to iPhones, which are protected computers within the meaning of 18 U.S.C. §1030, aggregating at least $5,000 in value over one year.

170.    Defendant's violation is continuing and will continue unless Apple is permanently enjoined. Plaintiffs and members of the Nationwide Class have suffered economic injury as a direct and proximate result of Apple's conduct, and Apple is liable for compensatory damages, pursuant to 18 U.S.C. §1030(g), and costs in amounts to be proved at trial.

**COUNT X**
**Violation of California Penal Code §502**
**(Seeking Damages and Equitable Relief against Apple)**

171.    Plaintiffs reallege and incorporate paragraphs 1 through 121 above as if set forth fully herein.

172.    The iPhone is a computer within the meaning of California Penal code §502.

173.    By issuing and transmitting Version 1.1.1 of its operating software, Apple knowingly accessed and without permission damaged, deleted, or destroyed iPhones by: (a) damaging or bricking iPhones; (b) disabling existing SIM card unlocks; (c) disabling existing Third Party Apps; (d) altering the product owned by Plaintiffs and the class members to create technological impediments to unlocking SIM cards; and (e) altering the product owned by Plaintiffs and the class members to create technological impediments to the purchase of Third Party Apps.  Apple's conduct was a willful introduction of a computer contaminant into computers that caused damage.

174.    Defendant's violation is continuing and will continue unless Apple is permanently enjoined.  Plaintiffs and members of the Nationwide Class have suffered injury as a direct and proximate result of Apple's conduct. Apple acted with malice and/or for purposes of oppression or fraud.  Accordingly, Apple is liable for compensatory and punitive damages, costs and attorneys' fees, pursuant to California Penal Code §502(e), in amounts to be proved at trial.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment against the Defendants as follows:

    a.    Permanently enjoining Defendants from damaging and destroying iPhones through software updates or otherwise;

    b.    Ordering Defendants to repair or replace, at no cost to the consumer, all iPhones Defendants have damaged or destroyed;

    c.    Permanently enjoining Defendants from selling locked iPhones that can only be used with AT&TM SIM cards unless such information is adequately disclosed to consumers prior to sale;

    d.    Ordering Defendants to provide the unlock code upon request to all members of the

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1  Classes who purchased an iPhone prior to the disclosures described above;

2  e.  Ordering Defendants to adequately disclose the extent to which fees are charged for
3      taking or using iPhones while traveling abroad;

4  f.  Permanently enjoining Apple from monopolizing or attempting to monopolize the
5      iPhone Applications Aftermarket;

6  g.  Permanently enjoining Defendants from monopolizing, attempting to monopolize
7      and conspiring to monopolize the iPhone Voice and Data Services Aftermarket;

8  h.  Awarding Plaintiffs and the Nationwide Class treble damages for injuries caused by
9      Defendants' violations of the federal antitrust laws;

10  i.  Permanently enjoining Defendants from engaging in unfair and deceptive practices
11     with respect to iPhones in violation of the consumer protection statutes;

12  j.  Awarding Plaintiffs and the Consumer Protection Class compensatory and punitive
13     damages for injuries caused by Defendants' deceptive acts and practices;

14  k.  Permanently enjoining Defendants from violating the MMWA and breaching their
15     express and implied warranties of fitness;

16  l.  Awarding Plaintiffs and the Nationwide Class compensatory damages for injuries
17     caused by Defendants' violations of the MMWA and breaches of their express and
18     implied warranties of fitness;

19  m.  Permanently enjoining Apple from trespassing on class members' iPhones through
20     future software updates or otherwise;

21  n.  Awarding Plaintiffs and the Nationwide Class compensatory and punitive damages
22     for Apple's trespass to chattels;

23  o.  Adjudging Apple guilty of violating the Federal Computer Fraud and Abuse Act,
24     18 U.S.C. §1030 (2006), enjoining further violations of that Act, and awarding
25     Plaintiffs and the Nationwide Class compensatory damages;

26  p.  Adjudging Apple guilty of violating the California Penal Code, enjoining further
27     violations of Penal Code §502, and awarding Plaintiffs and the Nationwide Class
28     compensatory and punitive damages;

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT -- Master File No. C 07-5152 JW

1     q.    Awarding Plaintiffs and the classes reasonable attorneys' fees and costs; and

2     r.    Granting such other and further relief as the Court may deem just and proper.

3                         **DEMAND FOR TRIAL BY JURY**

4    Plaintiffs hereby demand a trial by jury.

5  DATED:  June 4, 2008               WOLF HALDENSTEIN ADLER
                                 FREEMAN & HERZ LLP

6                            FRANCIS M. GREGOREK
                            BETSY C. MANIFOLD

7                            RACHELE R. RICKERT

8                        _____/s/  Francis M. Gregorek_____
                            FRANCIS M. GREGOREK

9

10                        750 B. Street, Suite 2770
                        San Diego, California 92101

11                        Telephone:  619/239-4599
                        Facsimile:  619/234-4599

12                        gregorek@whafh.com
                        manifold@whafh.com

13                        rickert@whafh.com

14                        WOLF HALDENSTEIN ADLER
                                   FREEMAN & HERZ LLP

15                        MARK C. RIFKIN (*pro hac vice*)

16                        ALEXANDER H. SCHMIDT (*pro hac vice*)
                        MARTIN E. RESTITUYO (*pro hac vice*)

17                        270 Madison Avenue
                        New York, New York 10016

18                        Telephone:  212/545-4600
                        Facsimile:   212/545-4677

19                        rifkin@whafh.com

20                        schmidt@whafh.com
                        restituyo@whafh.com

21

22                        Plaintiffs' Interim Lead Counsel

23                        RANDALL S. NEWMAN, P.C.
                        RANDALL S. NEWMAN

24                        The Trump Building
                        40 Wall Street, 61st Floor

25                        New York, New York 10005

26                        Telephone:  212/797-3737
                        Facsimile:   212/797-3172

27                        rsn@randallnewman.net

28

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT  -- Master File No. C 07-5152 JW

1    SHABEL & DENITTIS, P.C.
     STEPHEN P. DENITTIS (*pro hac vice*)
2    NORMAN SHABEL (*pro hac vice*)
     5 Greentree Centre, Suite 302
3    Marlton, New Jersey 08053
     Telephone:  856/797-9951
4    Facsimile:  856/797-9978
     sdenittis@shabeldenittis.com
5

6    FOLKENFLIK & MCGERITY
     MAX FOLKENFLIK
7    MARGARET MCGERITY
     1500 Broadway, 21st Floor
8    New York, NY 10036
     Telephone:  212/757-0400
9    Facsimile:  212/757-2010
10

11   HOFFMAN & LAZEAR
     H. TIM HOFFMAN
12   ARTHUR W. LAZEAR
     MORGAN M. MACK
13   180 Grand Avenue, Suite 1550
     Oakland, CA 94612
14   Telephone:  510/763-5700
     Facsimile:  510/835-1311
15

16   LAW OFFICE OF DAMIAN R. FERNANDEZ
17   M. VAN SMITH
     DAMIAN R. FERNANDEZ
18   14510 Big Basin Way, Suite A, PMB 285
     Saratoga, CA 95070-6091
19   Telephone:  408/344-3021
     Facsimile:  408/904-7391
20   mvsmith@sbcglobal.net
     damianfernandez@gmail.com
21

22   Additional Counsel for Plaintiffs
23

24

25

26

27
     APPLE ANTI:16078.REV. AMD CPT
28

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT  -- Master File No. C 07-5152 JW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SERVICE

I, Maureen Longdo , the undersigned, declare:

1.     That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested in the within action; that declarant's business address is 750 B Street, Suite 2770, San Diego, California 92101.

2.     That on June 4, 2008, declarant served the REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT via the CM/ECF System to the parties who are registered participants of the CM/ECF System and via U.S. Mail to the parties who are not registered participants as notated on the attached service list.

3.     That there is regular communication between the parties.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 4th day of June 2008, at San Diego, California.

_____
MAUREEN LONGDO

REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT  -- Master File No. C 07-5152 JW

APPLE ANTITRUST
Service List – February 13, 2008
Page 1

COUNSEL FOR PLAINTIFFS

Francis M. Gregorek
Betsy C. Manifold
Rachele R. Rickert
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
    619/239-4599
    619/234-4599 (fax)
gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com

Mark C. Rifkin
Alexander H. Schmidt
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016
    212/545-4600
    212/545-4653 (fax)
rifkin@whafh.com
schmidt@whafh.com

Randall S. Newman
NEWMAN & ASSOCIATES, P.C.
The Trump Building
40 Wall Street, 61st Floor
New York, NY 10005
    212/797-3737
    212/797-3172 (fax)
rsn@randallnewman.net

* Stephen P. Denittis
  Norman Shabel
SHABEL & DENITTIS, P.C.
5 Greentree Centre, Suite 302
Marlton, NJ 08053
    856/797-9951
    856/797-9978 (fax)
sdenittis@shabeldenittis.com

Damian R. Fernandez
LAW OFFICE OF DAMIAN R. FERNANDEZ
14510 Big Basin Way
Suite A, PMB 285
Saratoga, CA 95070-6091
    408/355-3021
    408/904-7391 (fax)
Damianfernandez@gmail.com

M. Van Smith
LAW OFFICES OF V. MAN SMITH
14510 Big Basin Way
Suite A, PMB 285
Saratoga, CA 95070-6091
    408/355-3021
    408/904-7391 (fax)
mvsmith@sbcglobal.net

Max Folkenflik
* Margaret McGerity
FOLKENFLIK & MCGERITY
1500 Broadway, 21st Floor
New York, NY 10036
    212/757-0400
    212/757-2010 (fax)
max@fmlaw.net

H. Tim Hoffman
Arthur W. Lazear
Morgan M. Mack
HOFFMAN & LAZEAR
180 Grand Avenue, Suite 1550
Oakland, CA 94612
    510/763-5700
hth@hoffmanandlazear
awl@hoffmanandlazear.com
mmm@hoffmanandlazear.com

*    **Service via U.S. Mail**

APPLE ANTITRUST
Service List – February 13, 2008
Page 2

COUNSEL FOR PLAINTIFFS

Aaron M. Sheanin
Elizabeth C. Pritzker
* Geoffrey A. Munroe
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, CA 94108
    415/981-4800
    415/981-4846 (fax)
ams@girardgibbs.com
ecp@girardgibbs.com

* Kevin T. Barnes
LAW OFFICES OF KEVIN T. BARNES
5670 Wilshire Boulevard, Suite 1460
Los Angeles, CA 90036-5627
    323/549-9100

COUNSEL FOR DEFENDANTS

Hanno F. Kaiser
LATHAM & WATKINS, LLP
885 Third Avenue, Suite 1000
New York, NY 10022
    212/906-1252
    212/751-4864 (fax)
Hanno.kaiser@lw.com

Adrian F. Davis
Alfred C. Pfeiffer, Jr.
Daniel M. Wall
Christopher S. Yates
LATHAM WATKINS, LLP
505 Montgomery Street, Suite 1900
San Francisco, CA 94111
    415/391-0600
adrian.davis@lw.com
al.pfeiffer@lw.com
dan.wall@lw.com
chris.yates@lw.com

David E. Crowe
Daniel A. Sasse
CROWELL AND MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614-8505
    949/263-8400
    949/263-8414 (fax)
dcrowe@crowell.com
dsasse@crowell.com

Jeffrey W. Howard
Christopher E. Ondeck
William R. Smith
CROWELL AND MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
    202/624-2500
    202/628-5116 (fax)
jhoward@crowell.com
condeck@crowell.com
wrsmith@crowell.com

Donald M. Falk
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
    650/331-2030
    650/331-2060 (fax)
dfalk@mayerbrown.com

Archis A. Parasharami
MAYER BROWN LLP
1909 K Street NW
Washington, DC 20006
    202/263-33287
aparasharami@mayerbrown.com

*    **Service via U.S. Mail**