1  Daniel A. Sasse, Esq. (CA Bar No. 236234)
   CROWELL & MORING LLP
2  3 Park Plaza, 20th Floor
   Irvine, CA 92614-8505
3  Telephone:    (949) 263-8400
   Facsimile:    (949) 263-8414
4  Email:        dsasse@crowell.com

5  Donald M. Falk (CA Bar No. 150256)
6  MAYER BROWN LLP
   Two Palo Alto Square, Suite 300
7  3000 El Camino Real
   Palo Alto, CA  94306-2112
8  Telephone: (650) 331-2000
   Facsimile:  (650) 331-2060
9  Email:        dfalk@mayerbrown.com

10 Attorneys for Defendant
   AT&T Mobility LLC
11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14                   SAN JOSE DIVISION

15
                                    Case No. 07-05152-JW
16
                                    DECLARATION OF NEAL S.
17                                  BERINHOUT IN SUPPORT OF
                                    MOTION OF DEFENDANT AT&T
18 IN RE APPLE & AT&TM ANTI-TRUST   MOBILITY LLC TO COMPEL
   LITIGATION                       ARBITRATION AND TO DISMISS
19                                  CLAIMS PURSUANT TO THE
                                    FEDERAL ARBITRATION ACT
20
                                    Date:  September 12, 2008
21                                  Time: 9:00 a.m.

22                                        Honorable James Ware

23

24

25

26

27

28

   DECLARATION OF NEAL S. BERINHOUT IN SUPPORT OF DEFENDANT ATTM'S MOTION TO COMPEL
                 ARBITRATION AND TO DISMISS CLAIMS; CASE NO. 07-05152-JW

1    I, Neal S. Berinhout, hereby declare as follows:

2    1.    I am employed by AT&T Mobility LLC ("ATTM") (formerly Cingular Wireless
3    LLC ("Cingular")) as Associate General Counsel—Litigation. In that position, I have been
4    involved with reviewing the contracts used by ATTM for the provision of wireless services, as
5    well as the procedures for amending subscriber agreements, including arbitration provisions that
6    are part of such agreements. I am familiar with ATTM's procedures for archiving, retaining, and
7    retrieving true and correct copies of contracts between ATTM and its customers.

8    2.    The following facts are of my own personal knowledge, and if called as a witness
9    I could and would testify competently as to their truth.

10                                    **Background**

11    3.    Cingular was formed in 2000 as a joint venture owned 60% by SBC
12    Communications, Inc. and 40% by BellSouth Corporation.

13    4.    On October 26, 2004, Cingular Wireless Corporation acquired AT&T Wireless
14    Services, Inc. ("AWS"). AWS was renamed New Cingular Wireless Services, Inc. ("NCWS"),
15    and was sold to Cingular on October 27, 2004.

16    5.    In November 2005, SBC Communications, Inc. completed its merger with AT&T
17    Corporation, forming AT&T Inc. AT&T Inc. completed its acquisition of BellSouth Corporation
18    by December 29, 2006, thereby consolidating ownership of Cingular.

19    6.    Cingular was renamed ATTM on January 8, 2007. NCWS is a wholly-owned
20    subsidiary of ATTM.

21                                **Arbitration Provision**

22    7.    From July 1999, the former AWS included an arbitration provision in the terms
23    and conditions of service that governed its subscriber agreements.

24    8.    Since ATTM began operating (as Cingular Wireless) in October 2000, it has
25    always included an arbitration provision in the terms and conditions of service that govern its
26    subscriber agreements.

27    9.    In 2006, ATTM revised its arbitration provision to make arbitration more
28    convenient and less expensive for its customers.

1    10.    In creating the 2006 arbitration provision, ATTM consulted with experts,
2    including but not limited to Professor Richard A. Nagareda, a professor at Vanderbilt University
3    Law School whose scholarship focuses on aggregate dispute resolution.

4    11.    ATTM sent a copy of the revised 2006 arbitration provision to all of the
5    customers to whom it sends paper bills on a monthly basis at their billing addresses via first class
6    mail in December 2006. A true and correct copy of the Notice of Improved Arbitration Clause
7    mailed to subscribers is attached as Exhibit 1.

8    12.    ATTM also included a legend on its subscribers' December 2006 and January
9    through March 2007 bills to remind them that the arbitration provision in their contracts had
10    been changed and to invite them to view information about arbitration on ATTM's web site (at
11    http://www.cingular.com/disputeresolution or, later, http://www.att.com/disputeresolution).

12    13.    In January 2007 ATTM modified the language in the revised arbitration provision
13    to make it clear that customers who receive more than the amount of ATTM's last settlement
14    offer are entitled to reimbursement of the expenses incurred in the arbitration in addition to
15    double attorneys' fees.

16    14.    The 2006 revised arbitration provision (as clarified in January 2007) is posted on
17    ATTM's website, and has been included in new ATTM wireless services agreements ("WSAs")
18    as of March 2007, including all iPhone WSAs. A printout of the version of ATTM's provision
19    posted on ATTM's web site (at http://www.att.com/disputeresolution) is attached as Exhibit 2.

20    15.    The features of ATTM's new arbitration provision are explained on ATTM's web
21    site at http://www.att.com/disputeresolution and at http://www.att.com/arbitration-information.
22    (For the convenience of current and former customers, those web pages may also be accessed at
23    http://www.cingular.com/disputeresolution   and   http://www.cingular.com/arbitration-informa-
24    tion.)    The web page at http://www.att.com/arbitration-information provides information
25    designed to explain the arbitration process to non-lawyers. A true and correct copy of that
26    document is attached as Exhibit 3.

27

28

1    16.    Customers may download from ATTM's website all of the necessary paperwork
2  for initiating an arbitration under the 2006 provision.  Customers may use either the demand
3  form available on the American Arbitration Association's ("AAA") website (at
4  http://www.adr.org) or the simplified form provided by ATTM on its website (at
5  http://www.att.com/arbitration-forms).  True and correct copies of these forms are attached as
6  Exhibits 4 and 5.

7    17.    ATTM's 2006 arbitration provision provides that any arbitrations will be
8  conducted under the Commercial Dispute Resolution Procedures and the Supplementary
9  Procedures for Consumer Related Disputes of the AAA, as modified by the arbitration provision.
10  True and correct copies of the current versions of the AAA Commercial Dispute Resolution
11  Procedures and the Supplementary Procedures for Consumer Related Disputes are attached as
12  Exhibits 6 and 7.

13    18.    Many disputes between ATTM and its customers are resolved before a notice of
14  dispute is ever sent to ATTM.  Customers frequently resolve their concerns by calling or e-
15  mailing ATTM's customer service department.  The vast majority of billing problems, including
16  claims by customers that unauthorized or inaccurate charges have appeared on a bill, are quickly
17  resolved by customer service representatives either by explaining the nature of the charges to the
18  satisfaction of the customer or by eliminating the charges from the bill.  A true and correct copy
19  of the Notice of Dispute form provided by ATTM on its website (at http://www.att.com/
20  arbitration-forms) is attached as Exhibit 8.

21    19.    One way to measure how successful ATTM's customer care representatives are at
22  resolving customer concerns and complaints is to determine the dollar value of credits "manually
23  added" to customer accounts in response to concerns and complaints.  For example, from April
24  2007 to April 2008 ATTM representatives provided over $1.3 billion in manual credits in
25  response to customer concerns and complaints.  In April 2008 alone (the most recent month for
26  which data are available), ATTM representatives provided more than 6.5 million credits worth
27  about $139 million.

28

20.     The cost of acquiring a new customer is quite high, averaging several hundred dollars.   This cost includes various marketing and administrative expenses and the cost of subsidizing the new customer's wireless phone.  In part because of the high cost of acquiring a new customer, ATTM generally attempts to accommodate customers who have complaints in order to retain them as customers.  One of the most important metrics by which ATTM and other wireless carriers measure their success is customer "churn," which is the monthly rate at which customers terminate their relationships with the carrier.   By reasonably accommodating customers who have complaints, ATTM may reduce its churn.

21.     Under ATTM's 2006 arbitration provision (as well as under previous versions), customers who seek to arbitrate their disputes are required to send ATTM a notice of their dispute.

22.     From December 23, 2006 to June 13, 2008, ATTM received over 600 Notice of Dispute and Arbitration Initiation forms from its customers.

23.     ATTM is often able to resolve customers' disputes to their satisfaction shortly after receiving notice of the disputes, thus obviating the need for the customer to commence an arbitration.  In fact, ATTM generally responds to a notice of dispute with a written settlement offer.

24.     If a dispute is not resolved within 30 days of the notice of dispute, the customer can initiate arbitration proceedings by completing either of the demand forms discussed in paragraph 16 and attached as Exhibits 4 and 5.

25.     Under ATTM's 2006 arbitration provision (as well as under the preceding version), subscribers have the option of bringing claims against ATTM in small claims court rather than in arbitration.  From 2005 through 2007, over 1100 such claims were brought against ATTM nationwide.   The vast majority of small-claims-court actions against ATTM settled before judgment.  While many of those claims either were settled or resulted in judgments for amounts exceeding $1,000, many subscribers have successfully vindicated claims for small dollar amounts.

1

**Service Agreements**

2      26.    As a condition of obtaining wireless service from ATTM and activating wireless

3   phones for use with ATTM's network, all customers must agree to a WSA that sets forth or

4   incorporates by reference the terms and conditions of service.

5      27.    ATTM has revised the terms of its standard WSA and terms and conditions of

6   service from time to time. When a customer contracts to receive wireless service, he or she does

7   so by accepting the then-current version of the WSA and terms and conditions of service.

8      28.    Customers activate their iPhones for use with ATTM's network online by using

9   the iTunes program. In order to complete the activation process, a customer must check a box

10   that states: "I have read and agree to the AT&T Service Agreement." The service agreement—

11   including the terms of service—is provided in a text box immediately above the box that the

12   customer checks to acknowledge his or her acceptance of the agreement. A true and correct

13   copy of the contents of the service agreement that is displayed in the text box is attached as

14   Exhibit 9. If the customer does not check the box stating "I have read and agree to the AT&T

15   Service Agreement," the customer is not permitted to activate his or her iPhone for use with

16   ATTM's network.

17      29.    The onscreen page views that a customer will see during the course of the iTunes

18   activation process vary slightly, depending on whether the customer has a preexisting account for

19   wireless service with ATTM. Attached as Exhibit 10 is a true and correct copy of screenshots of

20   the iTunes activation process for customers who already subscribe to wireless service from

21   ATTM. Attached as Exhibit 11 is a true and correct copy of the screenshots for new subscribers.

22      30.    After the customer has activated the iPhone, ATTM sends the customer a copy of

23   his or her agreement, which includes the rate plan terms that the customer has selected and

24   incorporates by reference the ATTM Terms of Service booklet then in effect. ATTM includes a

25   copy of the applicable Terms of Service booklet with the agreement. A true and correct copy of

26   the booklet, which reproduces the terms of service that each named Plaintiff accepted when he or

27   she activated the iPhone, is attached as Exhibit 12.

28

1    31.    A customer who purchases his or her iPhone from an ATTM retail store receives
2    at the time of purchase a document summarizing the activation process, available rate plans, and
3    the return policy. A true and correct copy of that document is attached as Exhibit 13. The
4    applicable Terms of Service booklet is also available in the store.

5    32.    To activate service for wireless devices other than the iPhone, some ATTM
6    subscribers are required physically to sign their WSA at a store to accept the terms of the
7    Agreement and to activate service.    Other subscribers instead must execute an electronic
8    signature through an Interactive Voice Response ("IVR") system, which is accessed by calling a
9    toll-free telephone number.

10    33.    The IVR system used to execute electronic signatures on Agreements asks a series
11    of questions. In order to execute the subscriber's electronic signature, the subscriber must select
12    the "YES" option using a telephone keypad in response to the statement: "You agree to the terms
13    as stated in the Wireless Service Agreement and Terms of Service." If the subscriber does not
14    respond "YES" to this question, the IVR system will not permit the electronic signature to be
15    executed and would decline the contract, thereby preventing service from being connected.

16    34.    The dialogue that a customer will hear when calling the IVR system varies
17    slightly, depending on whether the customer calls from a retail store or another location (for
18    example, a customer may call the IVR system from home after receiving a phone he had ordered
19    online). Attached as Exhibit 14 is a description of the IVR system containing the questions that
20    subscribers must answer in order to execute their electronic signatures, as a customer would hear
21    those questions when calling from a retail store.    Attached as Exhibit 15 is the equivalent
22    description of the IVR system, as the customer would experience it when calling from any other
23    location.

24    35.    In the course of the activation process, the subscriber receives a copy of the
25    Agreement just completed, the Terms of Service booklet (if applicable), the rate plan, and
26    applicable feature brochures.

27                                    **Account Histories**

28

1    36.    In the regular and ordinary course of business, ATTM maintains records that
2    contain information relevant to its customers' accounts.

3    37.    After this litigation was commenced, ATTM employees who report up to me
4    retrieved records relating to the account of the named Plaintiffs in this action.

5    38.    I can provide details of these Plaintiffs' account history based on my review of
6    these records.

7                                        **Paul Holman**

8    39.    On or about June 30, 2007, Mr. Holman activated ATTM wireless service for his
9    iPhone using the iTunes program. According to ATTM's records, Mr. Holman had purchased
10   his iPhone in an ATTM retail store.

11                                     **Herbert Kliegerman**

12   40.    On or about March 8, 2007, Mr. Kliegerman activated wireless service with
13   ATTM for a device other than the iPhone by using the IVR process to accept a WSA. A true and
14   correct copy of the Terms of Service booklet that Kliegerman would have been provided at that
15   time is attached as Exhibit 12 (described above).

16   41.    Mr. Kliegerman activated ATTM wireless service for his iPhone using the iTunes
17   program on or about July 7, 2007.

18                                        **Lucy Rivello**

19   42.    A search of ATTM's records could not locate an account in the name of Lucy
20   Rivello. ATTM believes that Ms. Rivello registered her iPhone on the ATTM account of Jeffrey
21   Nagafuji.

22   43.    Ms. Rivello activated ATTM wireless service on this account for her iPhone using
23   the iTunes program on or about August 11, 2007.

24   44.    Prior to Ms. Rivello's obtaining the iPhone, Mr. Nagafuji had previously activated
25   service with ATTM in November 2005. A true and correct copy of the Terms of Service booklet
26   that Mr. Nagafuji would have received at that time is attached as Exhibit 16.

27

28

DECLARATION OF NEAL S. BERINHOUT IN SUPPORT OF DEFENDANT ATTM'S MOTION TO COMPEL
ARBITRATION AND TO DISMISS CLAIMS; CASE NO. 07-05152-JW
7

1    45.    True and correct copies of the first pages of Mr. Nagafuji's December 2006 and
2  January 2007 bills and the last pages of his February and March 2007 bills, with some
3  information redacted, are attached as Exhibit 17.

4    46.    On or about May 7, 2008, Mr. Nagafuji accepted a new WSA. A true and correct
5  copy of that WSA, with some information redacted, and a reproduction of Mr. Nagafuji's
6  signature as recorded by an electronic signature caption device, are attached as Exhibit 18.

7    47.    Mr. Nagafuji's May 2008 WSA refers to and incorporates ATTM's then-current
8  Terms of Service booklet, which he would have received at the time he received his new cell
9  phone. A true and correct copy of that Terms of Service booklet is attached as Exhibit 19.

10                              **Timothy P. Smith**

11    48.    On or about June 30, 2007, Mr. Smith activated ATTM wireless service for his
12  iPhone using the iTunes program.

13                              **Michael G. Lee**

14    49.    I understand that, in their operative complaint, plaintiffs allege that Michael G.
15  Lee activated ATTM wireless service for his iPhone on August 22, 2007 while residing in
16  California, and that Mr. Lee now resides in New York. A search of ATTM's records could not
17  locate Mr. Lee's account.

18                              **Dennis V. Macasaddu**

19    50.    According to ATTM's records, Mr. Macasaddu is an authorized user on the
20  account of Jose Pascasio.

21    51.    Mr. Pascasio activated service with ATTM on or about July 7, 2006 by using the
22  IVR process. A true and correct copy of Mr. Pascasio's July 2006 WSA, with some information
23  redacted, is attached as Exhibit 20.

24    52.    Mr. Pascasio's July 2006 WSA refers to and incorporates ATTM's then-current
25  Terms of Service booklet. A true and correct copy of that Terms of Service booklet is attached
26  as Exhibit 21.

27

28
     DECLARATION OF NEAL S. BERINHOUT IN SUPPORT OF DEFENDANT ATTM'S MOTION TO COMPEL
                   ARBITRATION AND TO DISMISS CLAIMS; CASE NO. 07-05152-JW
                                           8

1    53.    On or about August 9, 2006, Mr. Pascasio added Mr. Macasaddu to the account as
2    an authorized user.

3    54.    True and correct copies of the first pages of Mr. Pascasio's December 2006 and
4    January 2007 bills and the last pages of his February and March 2007 bills, with some
5    information redacted, are attached as Exhibit 22.

6    55.    On or about June 29, 2007, Mr. Macasaddu activated ATTM wireless service for
7    his iPhone on Mr. Pascasio's account using the iTunes program.

8                              **Mark G. Morikawa**

9    56.    On or about March 15, 2004, Mr. Morikawa activated ATTM wireless service for
10   two cell phones.  True and correct copies of the front pages of Mr. Morikawa's WSAs, with
11   some information redacted, are attached as Exhibit 23.  The original WSAs are double-sided,
12   single-page documents printed on legal-sized (8 ½-inch by 14-inch) paper that contain customer-
13   specific information on the front side and the standard terms and conditions on the reverse side.
14   In Exhibit 23, the front side of each WSA is divided to fit on two letter-sized pages.

15   57.    The back pages of those WSAs contained the terms and conditions of service.  A
16   true and correct copy of the terms and conditions of service that is materially identical to the
17   ones that would have appeared on the back of Mr. Morikawa's WSAs is attached as Exhibit 24.
18   The original back pages are printed on legal-sized (8 ½ inch by 14-inch) paper.  In Exhibit 24,
19   the page is divided to fit on two letter-sized pages.

20   58.    On or about August 22, 2006, Mr. Morikawa accepted a new WSA via the IVR
21   process.  A true and correct copy of Mr. Morikawa's August 2006 WSA, with some information
22   redacted, is attached as Exhibit 25.

23   59.    Mr. Morikawa's August 2006 WSA refers to and incorporates ATTM's then-
24   current Terms of Service booklet, which he would have received with his new cell phone.  A true
25   and correct copy of that Terms of Service booklet is attached as Exhibit 21 (described above).

26

27

28

60.     On or about November 9, 2006, Mr. Morikawa accepted a new WSA via the IVR process.  A true and correct copy of Mr. Morikawa's November 2006 WSA, with some information redacted, is attached as Exhibit 26.

61.     Mr. Morikawa's November 2006 WSA refers to and incorporates ATTM's then-current Terms of Service booklet, which he would have received with his new cell phone.  A true and correct copy of that Terms of Service booklet is attached as Exhibit 21 (described above).

62.     True and correct copies of the first pages of Mr. Morikawa's December 2006 and January 2007 bills and the last pages of his February and March 2007 bills, with some information redacted, are attached as Exhibit 27.

63.     On or about July 5, 2007, Mr. Morikawa activated ATTM wireless service for his iPhone using the iTunes program.  According to ATTM's records, Mr. Morikawa purchased his iPhone in an ATTM retail store.

**Vincent Scotti**

64.     According to our records, Mr. Scotti was a customer of the former AWS.  Following the merger between AWS and ATTM (then Cingular), he received wireless service from ATTM.

65.     True and correct copies of the first page of Mr. Scotti's December 2006 and January 2007 bills and second-to-last pages of his February and March 2007 bills, with some information redacted, are attached as Exhibit 28.

66.     On or about March 19, 2007, Mr. Scotti migrated his service to ATTM by accepting an ATTM WSA.  A true and correct copy of the Terms of Service booklet that Mr. Scotti would have received at that time is attached as Exhibit 12 (described above).

67.     On or about July 12, 2007, Mr. Scotti activated ATTM wireless service for his iPhone using the iTunes program.

**Scott Sesso**

68.     On or about July 6, 2007, Mr. Sesso activated ATTM wireless service for his iPhone using the iTunes program.

1    69.    On or about October 12, 2007, Mr. Sesso accepted a new ATTM WSA via the
2    IVR process in order to activate service for a different phone. A true and correct copy of the
3    Terms of Service booklet that Mr. Sesso would have received at that time is attached as Exhibit
4    19 (described above).

5        I declare under penalty of perjury that the foregoing is true and correct. Executed on
6    June 26, 2008.

7

8                                                        Neal S. Berinhout
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28