1  LATHAM & WATKINS LLP
     Daniel M. Wall (Bar No. 102580)
2    Alfred C. Pfeiffer, Jr. (Bar No. 120965)
     Christopher S. Yates (Bar No. 161273)
3    Sadik Huseny (Bar No. 224659)
     Sarah M. Ray (Bar No. 229670)
4  505 Montgomery Street, Suite 2000
   San Francisco, California  94111-6538
5  Telephone:  (415) 391-0600
   Facsimile:  (415) 395-8095
6  Email:   Dan.Wall@lw.com
   Email:   Al.Pfeiffer@lw.com
7  Email:   Chris.Yates@lw.com
   Email:   Sadik.Huseny@lw.com
8  Email:   Sarah.Ray@lw.com

9  Attorneys for Defendant
   APPLE INC.

10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         SAN JOSE DIVISION

14

15  IN RE APPLE & AT&TM ANTI-TRUST          CASE NO. C 07-5152 JW
    LITIGATION
16                                          **DEFENDANT APPLE'S NOTICE OF**
                                            **MOTION AND MOTION TO DISMISS**
17                                          **REVISED CONSOLIDATED AMENDED**
                                            **CLASS ACTION COMPLAINT;**
18                                          **SUPPORTING MEMORANDUM OF**
                                            **POINTS AND AUTHORITIES**
19
                                            Date:       September 12, 2008
20                                          Time:       1:00 p.m.
                                            Place:      Courtroom 8, 4th Floor
21                                          Judge:      Honorable James Ware

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF ISSUES TO BE DECIDED ....................................................3

III.  LEGAL STANDARD.............................................................................................3

IV.   PLAINTIFFS' ANTITRUST ALLEGATIONS FAIL TO STATE A CLAIM.............4

    A.    THE MATERIAL ALLEGATIONS..............................................................4

        1.    Apple's Exclusive Agreement With ATTM. ........................................4

        2.    Apple's Add-on Applications Policy. .....................................................6

    B.    ANALYSIS:  MARKET DEFINITION AND "AFTERMARKETS" ................6

        1.    Single-Product Markets Are Rarely Viable. ..........................................7

        2.    The *Kodak* Aftermarket Exception. ......................................................8

    C.    THE "IPHONE VOICE AND DATA SERVICES AFTERMARKET" FAILS .................11

        1.    Plaintiffs Accepted ATTM Service When they Purchased iPhones, *i.e.,* as Part of the Initial Foremarket Transaction. ................11

        2.    ATTM Cell Phone Service Existed Long Before the iPhone and is Not "Unique" To It...................................................................12

    D.    THE "IPHONE APPLICATIONS AFTERMARKET" FAILS........................................12

        1.    Apple's Third Party Applications Policy Was Public At The Time Plaintiffs Purchased iPhones. ........................................................12

        2.    Plaintiffs Do Not Plead A Cognizable Product Market........................13

V.    PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION FOR COMMON LAW COMPUTER TRESPASS OR STATUTORY COMPUTER FRAUD.............14

    A.    THE MATERIAL ALLEGATIONS..............................................................14

    B.    APPLE DID NOT COMMIT ANY "COMPUTER TRESPASS" ....................15

    C.    PLAINTIFFS FAIL TO STATE A COMPUTER FRAUD CLAIM ..................16

        1.    Plaintiffs Fail To State A CFAA Claim. ..............................................16

        2.    Plaintiffs Fail to State a Claim Under Penal Code § 502.....................18

VI.   THE STATE CONSUMER PROTECTION CLAIMS SHOULD BE DISMISSED..19

    A.   PLAINTIFFS' CONSUMER PROTECTION ALLEGATIONS ........................................19

    B.   PLAINTIFFS LACK STANDING TO MAINTAIN STATE CONSUMER PROTECTION CLAIMS UNDER THE LAWS OF FORTY STATES WHERE NONE OF THEM RESIDES ....................................................20

    C.   PLAINTIFFS FAIL TO PLEAD FRAUDULENT OMISSION WITH SUFFICIENT PARTICULARITY UNDER FEDERAL RULE OF CIVIL PROCEDURE 9(B) ...............20

    D.   PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF A CLAIM UNDER THE STATE CONSUMER PROTECTION STATUTES .....................21

        1.   California UCL and CLRA. ..................................................................21

        2.   Washington Consumer Protection Act ................................................23

        3.   New York Consumer Protection Act. ..................................................24

VII.  PLAINTIFFS FAIL TO PLEAD A VIABLE CLAIM UNDER THE MAGNUSON-MOSS WARRANTY ACT ....................................................................24

VIII. CONCLUSION ...........................................................................................................25

1

## TABLE OF AUTHORITIES

2

3

### CASES

*Alcatel USA, Inc. v. DGI Tech., Inc.,*
  166 F.3d 772 (5th Cir. 1999) ........................................................................ 9

*Bardin v. DaimlerChrysler Corp.,*
  136 Cal. App. 4th 1255 (Cal. Ct. App. 2006) ...................................... 22

*Bell Atlantic Corp. v. Twombly,*
  127 S.Ct. 1955 (2007) ............................................................... 3, 4, 14

*Big Bear Lodging Assoc. v. Snow Summit, Inc.,*
  182 F. 3d 1096 (9th Cir. 1999) ...................................................... 7

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ........................................................................ 7

*Buller v. Sutter Health,*
  160 Cal. App. 4th 981 (2008) ...................................................... 22

*Busey v. P.W. Supermarkets, Inc.,*
  368 F. Supp. 2d 1045 (N.D. Cal. 2005) .......................................... 4

*Butera & Andrews v. IBM Corp.,*
  456 F. Supp. 2d 104 (D.D.C. 2006) ............................................ 17

*Chipanno v. Champion International Corp.,*
  1980 WL 1995 (D. Or. 1980) ...................................................... 21

*Civic Western Corp. v. Zila Indus., Inc.,*
  66 Cal. App. 3d 1 (1977) ...................................................... 15, 16

*Conley v. Gibson,*
  355 U. S. 41 (1957) ........................................................................ 4

*Daugherty v. American Honda Motor Co., Inc.,*
  144 Cal. App. 4th 824 (2006) .................................................. 22, 23

*Digital Equip. Corp. v. Uniq Digital Tech.*, Inc.,
  73 F.3d 756 (7th Cir. 1996) ...................................................... 10

*Eastman Kodak Co. v. Image Tech. Serv.,*
  504 U.S. 451 (1992) ...................................................... 1, 8, 9, 10

*eBay, Inc. v. Bidder's Edge, Inc.,*
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ...................................... 15

*Falk v. Gen. Motors Corp.,*
  496 F. Supp. 2d 1088 (N.D. Cal. 2007) .................................. 22, 23

*Forsyth v. Humana, Inc.,*
  114 F.3d 1467 (9th Cir. 1997) .................................................. 11

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

DEFENDANT APPLE'S MOTION TO DISMISS
CASE NUMBER: C 07-05152 JW

*Gall v. Home Box Office*,
   1992-2 Trade Cas. (CCH) ¶69  (S.D.N.Y. 1992) .................................................................. 8

*Golan v. Pingel Enter., Inc.*,
   310 F.3d 1360 (Fed. Cir. 2002)............................................................................................. 7

*Green Country Food Mkt., Inc. v. Bottling Group LLC*,
   371 F.3d 1275 (10th Cir. 2004) ............................................................................................ 8

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
   105 Wash. 2d 778 (Wash. 1986)......................................................................................... 23

*Hayes v. Packard Bell NEC, Inc.*,
   193 F. Supp. 2d 910 (E.D. Tex. 2001) ............................................................................... 18

*In re Ditropan XL Antitrust Litig.*,
   529 F. Supp. 2d 1098 (N.D. Cal. 2007) .............................................................................. 20

*In re Doubleclick Inc. Privacy Litigation*,
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) ................................................................................ 18

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)................................................................................................... 4

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) .............................................................................................. 21

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) .............................................................................. 20

*In re Terazosin Hydrochloride Antitrust Litig.*,
   160 F. Supp. 2d 1365 (S.D. Fla. 2001) .............................................................................. 20

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*,
   162 Wash. 2d 59 (Wash. 2007).......................................................................................... 24

*Intel Corp. v. Hamidi*,
   30 Cal. 4th 1342 (2003) ..................................................................................................... 15

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) .............................................................................................. 4

*Kerby v. Parsons Corp.*,
   2007 WL 2572334 (W.D. Wash. 2007) ............................................................................. 21

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) .............................................................................................. 4

*M.D. Rutledge v. Boston Woven Hose and Rubber Co.*,
   576 F.2d 248 (9th Cir. 1978) .............................................................................................. 21

*McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc.*,
   2008 U.S. Dist. LEXIS 47428 (D. Haw. 2008) ................................................................... 4

*Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*,
   524 F.3d 726 (6th Cir. 2008) ................................................................................................ 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*NewCal Industries, Inc. v. IKON Office Solution*,
  513 F.3d 1038 (9th Cir. 2008) .................................................................. 2, 9, 10, 11, 12

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A*,
  85 N.Y.2d 20 (N.Y. 1995). .................................................................................... 24

*Parrish v. NFL Players Ass'n*,
  534 F. Supp. 2d 1081 (N.D. Cal. 2007) ................................................................. 21

*Person v. Google, Inc.*,
  2007 U.S. Dist. LEXIS 47920 (N.D. Cal. 2007) ....................................................... 4

*PSI Repair Services v. Honeywell Inc.*,
  104 F. 3d 811 (6th Cir. 1997) .................................................................... 9, 10, 12

*Queen City Pizza v. Domino's Pizza*,
  124 F.3d 430 (3d Cir. 1997).................................................................... 7, 10, 11, 12

*Rambus, Inc. v. Samsung Elecs. Co. Ltd.*,
  2007 WL 39374 (N.D. Cal. 2007) ......................................................................... 20

*Rebel Oil v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ............................................................................... 7, 8

*Schor v. Abbott Labs.*,
  457 F.3d 608 (7th Cir. 2006)................................................................................ 10

*Small v. Lorillard Tobacco Co., Inc.*,
  94 N.Y.2d 43 (N.Y. 1999) ................................................................................... 24

*SMS Systems v. Digital Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999).......................................................................... 10, 12

*Snyder v. Ford Motor Co.*,
  2006 U.S. Dist. LEXIS 63646 (N.D. Cal. 2006) ...................................................... 20

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993).............................................................................................. 7

*Staples v. Hoefke*,
  189 Cal. App. 3d 1397 (1987) ............................................................................. 15

*Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*,
  909 F. Supp 1353 (C.D. Cal. 1995) ...................................................................... 21

*Tanaka v. Univ. of S. Cal.*,
  252 F. 3d 1059 (9th Cir. 2001) .......................................................................... 7, 8

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*,
  875 F.2d 1369 (9th Cir. 1989) ............................................................................... 7

*Thurmond v. Compaq Comp. Corp.*,
  171 F. Supp. 2d 667 (E.D. Tex. 2001) .................................................................. 18

*Ticketmaster L.L.C. v. RMG Techs., Inc.*,
  2008 U.S. Dist. LEXIS 33678 (C.D. Cal. 2008)........................................................ 4

*United States v. Grinnell Corp.,*
    384 U.S. 563 (1966) ................................................................................................ 7

*Vess v. Ciba-Geigy Corp. U.S.A.,*
    317 F.3d 1097 (9th Cir. 2003) ........................................................................ 20, 21

*Volunteer Fireman's Ins. Servs. v. McNeil & Co.,*
    221 F.R.D. 388 (W.D.N.Y. 2004) ..................................................................... 21

*Wilens v. TD Waterhouse Group, Inc.,*
    120 Cal. App. 4th 746 (2003) ............................................................................ 22

*Yang v. Dar Al-Handash Consultants,*
    250 Fed. Appx. 771 (9th Cir. 2007) .................................................................... 4

## STATUTES

California Business & Professions Code § 17200 ............................................... 21, 22

California Business & Professions Code § 17204 ...................................................... 22

California Business & Professions Code § 17500 ...................................................... 21

California Civil Code § 3515 ..................................................................................... 16

California Code of Civil Procedure § 1770 .............................................................. 21

California Penal Code § 502 ......................................................................... 16, 18, 19

15 U.S.C. § 2302 ...................................................................................................... 25

15 U.S.C. § 2304 ...................................................................................................... 25

18 U.S.C. § 1030 ................................................................................................ 17, 18

## OTHER AUTHORITIES

1 ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) ...................... 8, 9

5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 126 ................................ 16

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application, ¶ 564b ............................................................ 8

Restatement (Second) of Torts § 158 ....................................................................... 15

Restatement (Second) of Torts § 252 ....................................................................... 16

Wash. Rev. Code § 19.86.020 .................................................................................. 23

1

**NOTICE OF MOTION AND MOTION**

2          PLEASE TAKE NOTICE THAT on September 12, 2008 at 1:00 p.m., or as soon

3    thereafter as the matter may be heard, in the United States District Court, Northern District of

4    California, San Jose Division, located at San Jose, CA, Courtroom 8, before the Hon. James Ware,

5    Defendant Apple Inc. will, and hereby does, move to dismiss each claim for relief asserted in

6    plaintiffs' Revised Consolidated Amended Class Action Complaint ("RCAC") on the grounds that

7    they fail to state a claim upon which relief can be granted.  This motion is based on this Notice of

8    Motion and Motion, the accompanying Memorandum of Points and Authorities, the pleadings on

9    file in this action, and upon such other matters presented to the Court at the time of the hearing.

10

**RELIEF SOUGHT**

11          Defendant Apple Inc. ("Apple") seeks dismissal of each claim asserted in

12    plaintiffs' Complaint with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6).

13

14    Dated:  June 27, 2008                    Respectfully submitted,

15                                            LATHAM & WATKINS LLP

16

17                                       By _____/s/ Daniel M. Wall_____
                                           Daniel M. Wall

18                                               Attorneys for Defendant
                                           APPLE INC.

19

20

21

22

23

24

25

26

27

28

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

One year ago, Apple released its first cellular telephone product, the iPhone. *See* Revised Consolidated Amended Complaint ("RCAC") ¶¶ 2, 27, 28. Plaintiffs concede the iPhone was a boon to competition: despite a crowded cell phone market, RCAC ¶¶ 61-62, 70, "consumers waited in line to get their hands on" the iPhone. RCAC ¶ 28. It is common knowledge that Apple's cell phone competitors have been forced to improve and expand their products in order to respond to Apple's entry, which indisputably has increased consumer choice.

Nevertheless, plaintiffs' basic theory in this case is that Apple's iPhone entry strategies were anticompetitive and otherwise unlawful. That makes no sense. Entry is the epitome of procompetitive behavior. It makes markets more, not less, competitive. A company's *initial entry strategies* into a highly competitive market cannot be anticompetitive – let alone *monopolistic,* as is the claim here.

Plaintiffs' monopolization claims are contrived. The contrivance is the claim that upon product launch Apple instantly monopolized two iPhone-specific "aftermarkets." An aftermarket is a special kind of antitrust market consisting of unique replacement parts, post-warranty service or other "consumables" specific to some primary product. *See, e.g., Eastman Kodak Co. v. Image Tech. Serv.*, 504 U.S. 451 (1992) (*"Kodak"*). Here, plaintiffs claim there are two relevant aftermarkets: (1) for iPhone-compatible cellular telephone service, which Apple monopolized at the moment of entry by selecting AT&T Mobility LLC ("ATTM") as its exclusive cellular service partner; and (2) for iPhone-compatible software applications, *i.e.,* programs that run on the iPhone, which Apple monopolized because at the time of its entry it restricted the ability of consumers to download third-party applications. (Plaintiffs concede this second claim is at least partially moot, since Apple is now allowing third-party developers access to the platform.)

These are not legally cognizable "aftermarkets" under antitrust law. With respect to the alleged iPhone "Voice and Data Services Aftermarket," the "aftermarket" service – ATTM cellular service – is not unique to the iPhone. To the contrary, it has for many years supported cell phones made by Samsung, RIM, Motorola, Nokia and many others. Further, as the Ninth Circuit

1   made clear in its recent decision *NewCal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038,

2   1048 (9th Cir. 2008) (*"Ikon"*), a claim of aftermarket monopolization cannot be based on

3   obligations a consumer *knowingly* and *voluntarily* assumed at the time of its initial purchase of the

4   primary product.  The RCAC makes clear that Apple's exclusive agreement with ATTM was

5   announced and widely known, and that consumers were informed at the time they purchased their

6   iPhones of the necessity of ATTM cellular service.  As a matter of law, these allegations preclude

7   any claim that the ATTM exclusivity agreement was an act of aftermarket monopolization.

8           The alleged iPhone "Applications Aftermarket" is equally specious.  Plaintiffs do

9   not even allege that Apple participates in this alleged market as a software vendor, but only that it

10  has a kind of "gatekeeper" status in allowing third party developers access to the iPhone operating

11  system.  A seller cannot monopolize a market in which it does not participate.  Moreover, Apple

12  has *already* taken action to open the iPhone to third party applications.  Thus, there is not and

13  cannot be a claim that Apple exploited its control of the iPhone platform to extract monopoly

14  profits in this supposed aftermarket.  That omission is fatal to any *Kodak*-type aftermarket claim.

15          Plaintiffs also advance a number of non-antitrust theories.  Foremost among them

16  is that Apple engaged in "computer trespass" and "computer fraud" by releasing its first operating

17  system upgrade for the iPhone, Version 1.1.1.  Plaintiffs claim this was unlawful because Apple

18  knew Version 1.1.1 would not interoperate with some iPhones whose owners had used third party

19  hacking solutions to "unlock" their iPhones.  But (1) there is no claim that Apple purposefully

20  tried to disable "unlocked" iPhones; (2) Apple did not "invade" anyone's iPhone; rather, owners

21  had to choose to download Version 1.1.1 themselves; and (3) plaintiffs admit Apple warned of the

22  risk before any owner voluntarily downloaded Version 1.1.1.  Each of these points precludes any

23  claim for trespass, much less fraud.  In reality, plaintiffs are claiming that Apple is legally

24  required to maintain interoperability with iPhones whose software had been altered in violation of

25  the software license agreement.  There simply is no such legal duty.

26          Finally, plaintiffs mix in some inherently inconsistent claims about disclosures

27  Apple made, or did not make, in the course of selling iPhones.  On one hand, plaintiffs complain

28  that Apple violated various consumer protection statutes by failing to warn customers about some

DEFENDANT APPLE'S MOTION TO DISMISS
CASE NUMBER: C 07-05152 JW

1   of its policies and practices, as well as the potential risks of downloading Version 1.1.1.  On the

2   other hand, plaintiffs complain that Apple violated the Magnuson Moss Warranty Act ("MMWA")

3   because it actually *did* warn consumers about, among other things, the potential risks of

4   downloading Version 1.1.1.  Plaintiffs' claims fail on both theories.  Plaintiffs lack standing to

5   pursue most of their state law claims, and Apple fully disclosed all that was required under the laws

6   that plaintiffs have standing to assert.  Apple had no duty to provide the type of warranty coverage

7   plaintiffs desire, namely, a guarantee that Apple would support hacked, unlocked iPhones.

8          All of plaintiffs' claims are deficient as a matter of law, and plaintiffs have no

9   prospect of amending them to cure the defects.  The Court should dismiss the RCAC.

10  **II.      STATEMENT OF ISSUES TO BE DECIDED**

11          1.  Whether plaintiffs have pleaded a plausible, legally cognizable "iPhone Voice

12  and Data Services Aftermarket" and whether Apple has market power in any such market;

13          2.  Whether plaintiffs have pleaded a plausible, legally cognizable "iPhone

14  Applications Aftermarket" and whether Apple has market power in any such market;

15          3.  Whether a claim for trespass to chattels, violation of the Computer Fraud and

16  Abuse Act or violation of California Penal Code § 502 lies where a plaintiff authorizes and

17  downloads software, after receiving notice that doing so may cause damage to plaintiff's product

18  if plaintiff has altered the preexisting software in violation of the software license agreement.

19          4.  Whether plaintiffs have standing to claim violations of 43 state consumer

20  protection/unfair business practice statutes; whether plaintiffs have pleaded such claims with the

21  requisite specificity; and whether plaintiffs have stated a claim under any such statutes; and

22          5.  Whether plaintiffs have stated a claim under the Magnuson Moss Warranty Act.

23  **III.     LEGAL STANDARD**

24          The Supreme Court recently addressed pleading standards in general (and antitrust

25  pleading standards in particular) in *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007).

26  Stressing the dangers of permitting costly antitrust litigation to proceed based on speculation and

27  conclusory allegations, the Court held that a complaint must contain "enough facts to state a claim

28  to relief that is plausible on its face," *id.* at 1974, and that "raise a right to relief above the

1  speculative level." *Id.* at 1965.  In other words, the Court required plaintiffs to plead facts

2  sufficient to "nudge[] their claims across the line from conceivable to plausible," or suffer

3  dismissal.  *Id.* at 1974.  The Court "retired" the oft-quoted statement from *Conley v. Gibson,* 355

4  U. S. 41, 45-46 (1957), that a complaint cannot be dismissed on the pleadings "unless it appears

5  beyond doubt that the plaintiff can prove no set of facts in support of his claim which would

6  entitle him to relief." *Twombly,* 127 S.Ct. at 1968 ("after puzzling the profession for 50 years, this

7  famous observation has earned its retirement").  In the single year since *Twombly* was decided,

8  courts have become noticeably less tolerant of improperly pleaded complaints, including antitrust

9  complaints that contain conclusory or implausible market definitions.[1]

10          As already noted, the RCAC makes numerous allegations that Apple failed to

11  disclose various facts about its business model and warranty policies.  In part—and primarily with

12  respect to the consumer protection and MMWA claims—this motion attacks those claims because

13  documents incorporated by reference into the RCAC contradict the conclusory allegations of

14  nondisclosure, for example by showing that the allegedly undisclosed fact was disclosed.  As set

15  forth in greater detail in Apple's accompanying Request for Judicial Notice, the Court may take

16  judicial notice of these materials, and need not "blindly accept the allegations in the pleadings as

17  true" when contradicted by incorporated materials.  *Yang v. Dar Al-Handash Consultants*, 250

18  Fed. Appx. 771, 772 (9th Cir. 2007); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.

19  2005); *Busey v. P.W. Supermarkets, Inc.,* 368 F. Supp. 2d 1045, 1049 (N.D. Cal. 2005) (J. Ware).

20  **IV.    PLAINTIFFS' ANTITRUST ALLEGATIONS FAIL TO STATE A CLAIM**

21      **A.    THE MATERIAL ALLEGATIONS**

22          **1.    Apple's Exclusive Agreement With ATTM.**

23          Apple introduced the iPhone in June 2007.  The iPhone is a "GSM" (Global

24  System for Mobile Communications standard) device which could function on the ATTM and

---

[1]  *See, e.g., Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042 (9th Cir. 2008); *Ticketmaster L.L.C. v. RMG Techs., Inc.,* 2008 U.S. Dist. LEXIS 33678 (C.D. Cal. 2008); *McCabe Hamilton & Renny, Co. v. Matson Terminals, Inc*., 2008 U.S. Dist. LEXIS 47428 (D. Haw. 2008); *Person v. Google, Inc.,* 2007 U.S. Dist. LEXIS 47920 (N.D. Cal. 2007); *see also Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726 (6th Cir. 2008); *In re Elevator Antitrust Litig.*, 502 F.3d 47 (2d Cir. 2007).

1  T-Mobile USA, Inc. GSM networks, but not on the distinct "CDMA" (Code Division Multiple

2  Access standard) cellular telephone networks operated by Sprint Corporation and Verizon

3  Wireless.  RCAC at ¶¶ 59-61, 85.  Apple could have offered the iPhone to both ATTM and

4  T-Mobile, but it chose to enter into an exclusive carrier arrangement with ATTM.  The RCAC

5  does not allege there was anything secret about this exclusivity, nor its binding effect throughout

6  the term of the mandatory two-year ATTM service contract.  The RCAC acknowledges that on

7  January 9, 2007 – the day Apple announced the iPhone and five months before the iPhone was

8  released for purchase – Apple also "announced that it had entered into an exclusive agreement

9  making AT&TM the only authorized provider of wireless voice and data services for iPhones in

10  the United States."  RCAC ¶ 77; RJN Exs. G, H.  In fact, the iPhone box itself, which every

11  purchaser necessarily received on purchase, stated clearly on its outside label the following

12  "requirements": (1) "Minimum new two-year wireless service plan with AT&T required to

13  activate all iPhone features, including iPod features" and (2) "Service plan with AT&T required

14  for cellular network capabilities on expiration of initial new two year agreement," among other

15  things.  RJN Ex. A.

16        The RCAC also admits that when each of the named plaintiffs purchased one or

17  more iPhones, they "executed a two-year contract with AT&TM for provision of iPhone wireless

18  voice and data services."  RCAC ¶¶ 13-21, 31.  This agreement states, in relevant part, that "*All

19  plans require a 2-year AT&T service agreement, an activation fee, and are subject to AT&T credit

20  approval."  RJN Ex. C (iPhone Terms and Conditions).

21        The duration of the exclusive Apple-ATTM agreement was not "secret" either.

22  The RCAC quotes a May 21, 2007 *USA Today* article – published over a month before the

23  iPhone's release – stating, "AT&T has exclusive U.S. distribution rights for five years—an

24  eternity in the go-go cellphone world."  RCAC ¶ 86, RJN Ex. E:  L. Cauley, *AT&T Eager to*

25  *Wield its iWeapon*, USA Today, May 21, 2007.  The tremendous pre-release publicity that

26  accompanied the iPhone also reminded consumers that iPhones were locked to only work with

27  ATTM and would not be unlocked.  The RCAC quotes a Wall Street Journal article noting the

28  ATTM exclusivity and stating that Apple "has locked and relocked the phone to make sure

1    consumers can't override that restriction." RCAC ¶ 62, RJN Ex. F:  W. Mossberg, *Free My*

2    *Phone,* Wall Street Journal, October 22, 2007.[2]  There is no allegation that Apple or ATTM ever

3    told consumers they could or would – at any point – be able to use the iPhone with another carrier.

4          In short, there is no claim, and there could be no claim, that ATTM service was an

5    undisclosed term of an iPhone contract.  It was openly, obviously, part of the deal.

6          **2.    Apple's Add-on Applications Policy.**

7          Plaintiffs admit that, because Apple is in the process of permitting third party

8    software applications for the iPhone, this portion of plaintiffs' claim is largely moot.  RCAC ¶ 126

9    n. 6.[3]  Plaintiffs nevertheless allege that Apple monopolized a supposed iPhone "Applications

10   Aftermarket" by not supporting third party applications immediately and by demanding a share of

11   any revenues generated by third party applications.  RCAC ¶ 4.

12         The RCAC does not claim that plaintiffs or the general public were unaware of

13   Apple's initial policy toward third party applications.  Nor do plaintiffs claim it was "secret," much

14   less that Apple ever represented its initial policy was different than it was.  To the contrary, the

15   RCAC quotes a Wall Street Journal article from October 2007, which among other things stated:

16           Apple has also, so far, barred users from installing third-party
             programs on the iPhone, though the company announced last week it
17           will open the phone to such programs early next year. (Web-based
             iPhone programs – those that run inside the Web browser – have been
18           available from day one.)

19   RCAC ¶ 62, RJN Ex. F, W. Mossberg, *Free My Phone*.

20         Here, too, Apple's position regarding add-on applications was never concealed.

21   More importantly, now that the initial hurdle of a successful introduction of the iPhone has been

22   achieved, Apple has quickly moved towards an ever-increasing third-party application presence.

23   **B.    ANALYSIS:  MARKET DEFINITION AND "AFTERMARKETS"**

24         Plaintiffs' antitrust claims are brought under Section 2 of the Sherman Act, which

25   _____

26   [2]  The extensive press on these issues is evident with a simple web search, *e.g.,* "Apple iPhone
     exclusive AT&T" on Google News (2007 date range).

27   [3]  Apple released a "software development kit" (SDK) in March 2008 in order to enable
     "independent software developers to design third party applications" (RCAC ¶ 4 n. 2) and will
28   shortly release the "updated version of the iPhone operating software, to be called Version 2.0,
     that will permit iPhone owners to safely download third party applications."  *Id.*

1   prohibits monopolization, attempted monopolization and conspiracy to monopolize.  It is therefore

2   incumbent on plaintiffs to plead and ultimately prove that Apple has monopoly power – or at least a

3   dangerous probability of achieving it – in one or more relevant markets.  *United States v. Grinnell*

4   *Corp.,* 384 U.S. 563, 570-71 (1966) ("The offense of monopoly under § 2 of the Sherman Act has

5   two elements: (1) the possession of monopoly power in the relevant market and (2) the willful

6   acquisition or maintenance of that power."); *see also Spectrum Sports, Inc. v. McQuillan,* 506 U.S.

7   447, 455 (1993); *Rebel Oil v. Atlantic Richfield Co.,* 51 F.3d 1421, 1432-33 (9th Cir. 1995).

8         Plaintiffs must plead the contours of the relevant product and geographic markets.

9   *Golan v. Pingel Enter., Inc.,* 310 F.3d 1360, 1369 (Fed. Cir. 2002) ("Defining the relevant market

10  is indispensable to a monopolization claim under § 2 of the Sherman Act.") (*quoting Thurman*

11  *Indus., Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1373 (9th Cir. 1989)).  As the Ninth Circuit

12  has stated:  "Market definition is crucial.  Without a definition of the relevant market, it is

13  impossible to determine market share," from which market power is often inferred.  *Rebel Oil*, 51

14  F.3d at 1434.  "Failure to identify a relevant product market is a proper ground for dismissing a

15  Sherman Act claim."  *Tanaka v. Univ. of S. Cal.,* 252 F. 3d 1059, 1063 (9th Cir. 2001) (affirming

16  dismissal where plaintiff sought to restrict relevant market to single athletic program in Los

17  Angeles where she had preference to stay in Los Angeles); *see also Big Bear Lodging Assoc. v.*

18  *Snow Summit, Inc.,* 182 F. 3d 1096, 1104-05 (9th Cir. 1999) (affirming dismissal where plaintiffs

19  failed to allege that no other goods or services were reasonably interchangeable with product

20  offered by defendant ); *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997).

21  As noted, courts post-*Twombly* are even less tolerant of improperly pleaded complaints containing

22  conclusory or implausible market definitions.  *See* III, n.1, *supra.*

23         **1.    Single-Product Markets Are Rarely Viable.**

24         Markets are typically defined in terms of product interchangeability – that is, a

25  market is the group of products that consumers would view as substitutes for each other.  *Brown*

26  *Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are

27  determined by the reasonable interchangeability of use or the cross-elasticity of demand between

28  the product itself and substitutes for it.")  Thus, the law in this Circuit, as elsewhere, is that "[i]f

1    consumers view the products as substitutes, the products are part of the same market." *Rebel Oil*,

2    51 F. 3d at 1435.  That general rule ends the case:  there is no chance the iPhone would monopolize

3    any market defined in this manner.  Plaintiffs effectively concede as much; they never argue Apple

4    has market power in any equipment market because they cannot: as plaintiffs acknowledged in the

5    earlier *Smith* complaint, ATTM service is used by over 63 million of the 235+ million (estimated)

6    cellular customers in the U.S.  RJN Ex. D, ¶ 63; *see also* RCAC ¶ 86, L. Cauley, *AT&T Eager to*

7    *Wield its iWeapon,* (RJN Ex. E).  By contrast, the RCAC alleges *1.4 million* iPhone customers as of

8    October 2007 (with a forecast of 10 million more by 2008).  RCAC ¶ 111.

9          Instead, plaintiffs try to make the case that the iPhone defines its own separate

10    *aftermarkets,* involving (1) iPhone-compatible cellular service and (2) iPhone-compatible

11    software applications.  Such single-brand markets are rarely tenable.  As a leading treatise puts it:

> 12    Relevant markets generally cannot be limited to a single
>      manufacturer's products.  As the Supreme Court recognized in the
> 13    *United States v. E.I. duPont de Nemours & Co.* [351 U.S. 377
>      (1956)] . . . the "power that, let us say, automobile or soft-drink
> 14    manufacturers have over their trademarked products is not the
>      power that makes an illegal monopoly.  Illegal power must be
> 15    appraised in terms of the competitive market for the product."

16    1 ABA Section of Antitrust Law, Antitrust Law Developments (6th ed. 2007) 588-89; *see also*

17    *Green Country Food Mkt., Inc. v. Bottling Group LLC*, 371 F.3d 1275, 1283 (10th Cir. 2004)

18    (Pepsi products not a relevant market); *Tanaka*, 252 F.3d at 1063-64 (9th Cir. 2001) ("UCLA

19    women's soccer program" not a relevant market); *Gall v. Home Box Office*, 1992-2 Trade Cas.

20    (CCH) ¶69,949 at 68,594 (S.D.N.Y. 1992) ("the natural monopoly every manufacturer has in its

21    own product simply cannot serve as the basis for antitrust liability").

22         **2.**      **The *Kodak* Aftermarket Exception.**

23          Plaintiffs attempt to fit within the narrow exception to the rule against single-brand

24    markets created in *Kodak*.  The effort fails badly.

25          Some products, especially durable goods like automobiles and many types of

26    business equipment, require the customer to purchase additional items *after* the initial purchase,

27    for example repair parts, service and supplies.  It is sometimes said that these additional purchases

28    take place in "aftermarkets."  Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis*

1    *of Antitrust Principles and Their Application*, ¶ 564b ("An aftermarket is a type of derivative

2    market consisting of consumable goods or replacement components that must be used for the

3    proper functioning of some primary good.").  Certain durable goods manufacturers that face intense

4    competition in the market for the initial sale of the primary product have nevertheless been charged

5    with monopolizing the derivative aftermarkets for the post-sale products and services their

6    customers consume.  *Id.; see also* 1 ABA Section of Antitrust Law at 238-39.  *Kodak* and its

7    progeny address whether and when that is possible.

8            Kodak was a significant manufacturer of photocopiers but faced intense interbrand

9    competition.  *Kodak*, 504 U.S. at 455-58.  At one time it sold replacement parts openly, both to

10   independent service organizations (ISOs) and to end-users who patronized ISOs, then ceased to do

11   so, prompting monopolization claims.  *Id.* at 458.  Kodak obtained summary judgment on the

12   ground that the equipment "foremarket" was the relevant market, and thus Kodak lacked market or

13   monopoly power.  *Id.* at 456.  The Ninth Circuit reversed, and the Supreme Court agreed.  While

14   accepting that foremarket competition would ordinarily be expected to constrain aftermarket

15   behavior, *id.* at 469-70 nn.15, 17, the Supreme Court declined to adopt "a substantive legal rule that

16   'equipment competition precludes any finding of monopoly power in derivative aftermarkets.'"  *Id.*

17   at 466 (quotations omitted).  The Court found that parts and service for Kodak copiers could be

18   relevant product markets under specialized circumstances, in particular where "locked-in"

19   consumers were vulnerable to exploitation from *undisclosed* business practices.  *See Ikon,* 513 F.3d

20   at 1048 ("[C]onsumers could not, at the time of purchase, reasonably discover that Kodak

21   monopolized the service market and charged supracompetitive prices for its service.").

22           *Kodak* and it progeny make clear that a claim of aftermarket monopolization

23   cannot exist where the manufacturer's allegedly anticompetitive policies were known and agreed

24   to at the time of purchase.  *See, e.g., PSI Repair Services v. Honeywell Inc*., 104 F. 3d 811, 820-21

25   (6th Cir. 1997) (*Kodak* inapplicable where Honeywell informed customers at time of initial

26   purchase that it would supply basic control equipment as well as replacement components and

27   service as single product); *Alcatel USA, Inc. v. DGI Tech., Inc.*, 166 F.3d 772 (5th Cir. 1999) (no

28   aftermarket where software license disclosed that it could be used only on manufacturer-provided

1   equipment); *Queen City Pizza*, 124 F.3d at 440-41 (*Kodak* inapplicable where franchise contract

2   disclosed that defendant would control access to certain ingredients and supplies); *SMS Systems v.*

3   *Digital Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999) (distinguishing "prospective nature of the

4   warranty" at issue as compared to Kodak's "retroactive change in the rules"); *Digital Equip.*

5   *Corp. v. Uniq Digital Tech.*, Inc., 73 F.3d 756, 763 (7th Cir. 1996) ("[I]f spare parts had been

6   bundled with Kodak's copiers from the outset, or Kodak had informed customers about its

7   policies before they bought its machines, purchasers could have shopped around for competitive

8   lifecycle prices. The material dispute that called for a trial was whether the change in policy

9   enabled Kodak to extract supra-competitive prices from customers who had already purchased its

10   machines.").[4]

11         The Ninth Circuit's *Ikon* decision emphasizes this point, and more specifically

12   holds that where the defendant's alleged market power "arises solely from contractual rights that

13   consumers knowingly and voluntarily gave to the defendant" at the time of their foremarket

14   purchase, the foremarket – not any aftermarket – is the relevant market.  *Ikon*, 513 F. 3d at 1048.

15         Of course, the alleged aftermarket must also *be an aftermarket*.  That is, for this

16   exception to the normal rules of market definition to apply, the alleged market must be for those

17   "unique" and non-interchangeable products or services that are "wholly derivative from and

18   dependent on the primary market."  *Id.* at 1049.  Thus, the typical aftermarket case involves a

19   unique "consumable" product or service that is useful only with respect to the foremarket product.

20   A replacement part that works only in a Kodak copier, and is therefore worthless to owners of

21   Xerox copiers, is the typical example.  This is crucial, for as the Ninth Circuit explained in *Ikon,*

   "one of the primary considerations" in *Kodak* was that:

22            Kodak held a natural monopoly in the submarket for Kodak-brand
23           replacement parts, which gave it a unique position in the wholly
             derivative aftermarket for service contracts.  Kodak was then able to
24            exploit that unique position to gain monopoly power in the derivative
             services market as well, even though its monopoly power in services was
25            neither naturally nor contractually created.

26   [4]   *See also Schor v. Abbott Labs.*, 457 F.3d 608, 614 (7th Cir. 2006) (holding Kodak's change in
      policy "had the potential to raise the total cost of copier-plus-service above the competitive
27      level – and . . . above the price that Kodak could have charged had it followed a closed-service
      model from the outset."); *PSI Repair Servs.*, 104 F.3d at 820 ("the change in policy in *Kodak*
28      was the crucial factor in the Court's decision.")

1    *Id.; see also Queen City Pizza*, 124 F.3d at 439 (aftermarket product "may constitute a relevant

2    market … where the commodity is unique, and therefore not interchangeable with other products").

3              Analyzed in light of these principles, plaintiffs' two "aftermarkets" cannot stand.

4    **C.    THE "IPHONE VOICE AND DATA SERVICES AFTERMARKET" FAILS**

5              **1.    Plaintiffs Accepted ATTM Service When they Purchased
                        iPhones, *i.e.*, as Part of the Initial Foremarket Transaction.**

6

7              Plaintiffs' real complaint is with their *contractual agreement* limiting them to

8    ATTM service – an agreement that on its face restricts their ability to use interchangeable cellular

9    services.  As noted, however, Ninth Circuit law "prohibits an antitrust claimant from resting on

10   market *power* that arises solely from contractual rights that consumers knowingly and voluntarily

11   gave to the defendant."  *Ikon* 513 F.3d at 1048 (emphasis in original); *see also Forsyth v. Humana,*

12   *Inc.,* 114 F.3d 1467, 1476 (9th Cir. 1997) (explicit contractual provisions could not form

13   boundaries of an antitrust aftermarket; rejecting proposed market definition limited to include only

14   hospital customers who held defendant's insurance policies); *Queen City,* 124 F.3d at 439-41.

15   Because all plaintiffs agreed to use ATTM service when they bought their iPhones, RCAC ¶ 31,

16   there cannot be a relevant iPhone service aftermarket under *Kodak* and *Ikon*, and plaintiffs cannot

17   claim that mandatory ATTM service was an act of monopolization.[5]

18             Plaintiffs understand this problem, which the Court may recall was a point of

19   contention among the various candidates for Lead Interim Class Counsel.  Plaintiffs thus try to

20   plead around *Ikon* by alleging that defendants kept "secret" their *five-year* exclusivity deal.  RCAC

21   ¶ 2.  The idea – apparently – is that plaintiffs became unwittingly "locked-in" to ATTM service for

22   three years beyond their agreed two-year service contract.

23             This new twist cannot save plaintiffs' claim.  First, to the extent it matters, there was

24   widespread disclosure of ATTM's five-year exclusivity and no suggestion by Apple or anyone else

25   that iPhones would become unlocked after two years.  In fact, the iPhone box *itself* disclosed to the

26   _____

27   [5]  Plaintiffs also do not adequately plead defendants' market power in this alleged aftermarket.
     While this is itself an independent basis for dismissing these claims, the fact that plaintiffs'
     contract-based "iPhone Voice and Data Services Aftermarket" can never be a cognizable

28   aftermarket under *Ikon* means that plaintiffs will never be able to cure these deficiencies.

1   prospective purchaser that a "[s]ervice plan with AT&T [would be] required for cellular network

2   capabilities on expiration of initial new two-year agreement." IV.A.1, *supra*. This at-purchase

3   information was more than enough disclosure to put consumers on notice that they might never

4   have a choice of cellular service for their iPhone, and to thus preclude a *Kodak*-type aftermarket

5   theory. *See, e.g.*, *PSI Repair Services*, 104 F.3d at 820-21; *Queen City Pizza*, 124 F.3d at 440-41.

6           Moreover, it is sheer speculation – and illogical – that failing to disclose the five-

7   year exclusivity term would *produce monopoly power, i.e.,* would allow Apple, a brand new

8   entrant in cell phones, to "exert raw power in the aftermarket without regard for commercial

9   consequences in the foremarket." *SMS Systems*, 188 F.3d at 17. That is the ultimate inquiry. This

10  "imperfect disclosure" theory is neither logically nor legally a substitute for the kind of change-in-

11  policy or post-contract exploitation scenarios at issue in *Kodak*. Nor, since all iPhone consumers

12  *still fall under their initial ATTM contracts*,[6] could nondisclosure possibly have resulted in the kind

13  of unanticipated price increase that was fundamental to *Kodak*. The theory just makes no sense.

### 2. ATTM Cell Phone Service Existed Long Before the iPhone and is Not "Unique" To It.

15          There is not, nor could there be, any claim that ATTM cell service is unique to the

16  iPhone. Furthermore, ATTM cell service is not an *aftermarket*, it is a *beforemarket* that predates

17  the iPhone, and is interchangeable with and in constant competition with all other cell service

18  providers (including T-Mobile, the cell service provider that some plaintiffs switched from).

19  RCAC ¶¶ 54-55. The notion that cellphone service is the aftermarket borders on the absurd – it

20  simply cannot be the case that as soon as a manufacturer introduces a new product, it makes an

21  "aftermarket" of a preexisting service that works not only with that product but with an

22  undisputed host of others.

### D. THE "IPHONE APPLICATIONS AFTERMARKET" FAILS

24          The same problems, and more, plague plaintiffs' "iPhone Applications Aftermarket."

### 1. Apple's Third Party Applications Policy Was Public At The Time Plaintiffs Purchased iPhones.

26          First, plaintiffs do not plead facts establishing that the general public was unaware

---

[6] The earliest ATTM iPhone contracts will expire on June 29, 2009, two years after the iPhone was released. RCAC ¶ 31.

1   of Apple's third party application policy. They never even allege that Apple tried to keep the

2   policy secret from consumers, much less that any plaintiff was unaware of the policy at the time

3   they purchased their iPhones. And they cite to evidence showing that the policy was known.

4   Section IVA(2), *supra*. So the "undisclosed policy" rationale of *Kodak* is absent.

5          Of course, plaintiffs have also failed to allege that there was any actual exploitation

6   of "ignorance" about Apple's third party applications policy. To the contrary, plaintiffs concede

7   that Apple has changed its policy to *permit* third party applications and issued an SDK to facilitate

8   interoperability. RCAC ¶ 126 n. 6. Here, it's not just an *absence* of the post-purchase

9   opportunistic behavior at issue in *Kodak*; Apple *opened up* the allegedly locked-down "market."

10         **2.    Plaintiffs Do Not Plead A Cognizable Product Market.**

11         Second, plaintiffs' allegations about the purported "iPhone Applications

12  Aftermarket" are hopelessly vague and do not plead *any kind* of relevant market, or monopoly

13  power in it. The RCAC merely describes an "aftermarket for software applications that can be

14  downloaded on the iPhone for managing such functions as ring tones, instant messaging,

15  photographic capability and Internet applications" and alleges that Apple has acquired monopoly

16  power in this purported aftermarket by "approving" some applications and "discouraging" the use

17  of others. RCAC ¶¶ 121, 123. *But plaintiffs do not even allege that Apple makes or sells any add-*

18  *on applications,* much less that it has a monopoly share of such applications. Obviously Apple

19  makes and sells (technically, licenses) software that comes with the iPhone, but there is no claim

20  that Apple makes or sells *aftermarket* applications, as would be required for Apple to monopolize

21  this alleged market. A seller cannot monopolize a market in which it does not compete.

22         Nor do plaintiffs explain how all software applications compatible with the iPhone

23  would make up any kind of market, *e.g.,* how it could possibly be that an instant messaging

24  program could compete with a ring-tone maker, or that a photo application like Flickr could

25  compete with a game program. By the same logic, all software compatible with Microsoft

26  Windows would likewise constitute a market. But these are not even arguably interchangeable

27  products of the kind that meet antitrust market definition requirements. Antitrust law does not

28  recognize a market of products that do not compete with each other, are not substitutes for each

1  other, and whose only unifying feature is that they are compatible with a given software platform.

2          Even for the pleadings stage, this is an illogical mess that fails to meet *Twombly's*

3  mandate that plaintiffs plead "enough facts to state a claim to relief that is plausible on its face"

4  and "above the speculative level." *Twombly*, 127 S. Ct at 1965, 1974.  On these allegations,

5  plaintiffs' claims about monopolization of the "Applications Aftermarket" fail as a matter of law.

6  **V.     PLAINTIFFS FAIL TO STATE A CAUSE OF ACTION FOR COMMON LAW
          COMPUTER TRESPASS OR STATUTORY COMPUTER FRAUD**

7

8          **A.     THE MATERIAL ALLEGATIONS**

9          Plaintiffs claim that Apple "knowingly issued and caused transmission of a

10  purported update to the iPhone operating software, known as Version 1.1.1, which 'bricked' (that

11  is, rendered completely inoperable) or otherwise damaged some iPhones that were unlocked or

12  had downloaded competing software applications."  RCAC ¶ 5.  The RCAC acknowledges that

13  iPhone users had to affirmatively download Version 1.1.1 and that Apple warned them (and the

14  broad "computer community") that the software update could cause irreparable damage to

15  iPhones if the user had modified the embedded iPhone software.  *See* RCAC ¶¶ 37, 98-103; *id.* ¶¶

16  94-95 (Apple "repeatedly announced that any attempt to unlock the iPhone SIM or to install Third

17  Party Apps would void the Apple warranty.").

18          Apple released Version 1.1.1 on September 27, 2007.  RCAC ¶ 102.  iPhone

19  owners had the choice to download it or not.[7]  Prior to installing Version 1.1.1, iPhone owners

20  had to view a bold, capitalized warning stating: **"IF YOU HAVE MODIFIED YOUR**

21  **IPHONE'S SOFTWARE, APPLYING THIS SOFTWARE UPDATE MAY RESULT IN**

22  **YOUR IPHONE BECOMING PERMANENTLY INOPERABLE."**  A screenshot of the

23  warning, as included in the initial *Smith* complaint at ¶ 42 and contained in *Altered iPhones*

24  *Freeze Up*, Katie Hafner, New York Times, September 29, 2007, (RJN Ex. I), follows:

25

26

---

27  [7]  Indeed, plaintiff Kliegerman chose to download Version 1.1.1 on only two of his three
         iPhones (RCAC ¶¶ 13, 45), and plaintiff Holman chose not to download Version 1.1.1 because
28       of his knowledge of the risks associated with his modified iPhone.  RCAC ¶ 36-37.



**B.     APPLE DID NOT COMMIT ANY "COMPUTER TRESPASS"**

Plaintiffs assert that Apple's release of Version 1.1.1 was an "unwanted and uninvited intermeddling" (RCAC ¶ 165) that constitutes common law trespass.  Trespass requires (1) an interference with another's possession of property that is both (2) unlawful and (3) nonconsensual.  *See Staples v. Hoefke*, 189 Cal. App. 3d 1397, 1406 (1987); *Civic Western Corp. v. Zila Indus., Inc.*, 66 Cal. App. 3d 1, 16-17 (1977).  The application of this doctrine to modern-day electronic "intrusions" is controversial, but has received some acceptance in two settings:  "spamming" computer systems, *e.g., Intel Corp. v. Hamidi,* 30 Cal. 4th 1342 (2003), and using "bots" to harvest information from another's computer system, *e.g., eBay, Inc. v. Bidder's Edge, Inc.,* 100 F. Supp. 2d 1058 (N.D. Cal. 2000).  The *sine qua non* of these cases is a defendant initiating an unwanted electronic intrusion into the plaintiff's computer, for that is the "trespass" that underlies the tort.  Plaintiffs' concessions that they consented to the installation of Version 1.1.1, and that Apple warned them about possible consequences, doom their claim in two ways.

First, there simply was not a trespass by Apple.  This case is nothing like *Intel* or *eBay*, in which strangers intruded uninvited into the plaintiffs' computer systems.  An uninvited "intrusion" is fundamental to any trespass, *see, e.g.,* Rest.2d Torts, § 158, cmt. c, and without it there is no basis for invoking this common law doctrine.  Furthermore, it would send shockwaves throughout the software industry if the courts were to find that downloading a software update – one of the most common software delivery models – satisfies the intrusion element of a trespass

1  claim, such that any harm that is claimed to result from the download, intended or not, would be

2  redressable in tort.  That is plainly not the law today; nor should it be.

3          Second, to the extent Apple "entered" plaintiffs' iPhones at all, plaintiffs'

4  consensual choice to download and install Version 1.1.1 precludes any finding of trespass,

5  particularly in light of Apple's multiple warnings.  *See Civic Western Corp.*, 66 Cal. App. 3d at

6  16-17 ("Where there is a consensual entry, there is no tort, because lack of consent is an element

7  of the wrong."); Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it."); *see*

8  *also* Restatement (Second) of Torts § 252 ("One who would otherwise be liable to another for

9  trespass to chattel or for conversion is not liable to the extent that the other has effectively

10 consented to the interference with his rights."); 5 Witkin, Summary of Cal. Law (10th ed. 2005)

11 Torts, § 126, p. 235.  There can be no trespass where the owners of the property at issue – the

12 iPhones – not only consented to the supposed "trespass," but themselves (not Apple) installed the

13 allegedly "trespassing" upgrade.

14         In the end, plaintiffs do not really complain about any "intrusion," much less

15 "trespass;" they try to stretch the doctrine well beyond any reasonable bounds.  Their claim is that

16 Apple acted tortiously by releasing an updated version of its iPhone operating system without

17 *guaranteeing* that the updated operating system would be compatible with all iPhones whose

18 software had been altered to unlock the phones, in violation of the software license agreement.

19 Plaintiffs claim, in other words, that Apple has a duty to maintain software compatibility with all

20 "hacked" iPhones whose software has thereby been altered.  There is no legal authority whatsoever

21 for such a duty, even under the most radical concepts of computer trespass.

22    **C.    PLAINTIFFS FAIL TO STATE A COMPUTER FRAUD CLAIM**

23         Plaintiffs also allege that Apple's release of Version 1.1.1 supports a claim of

24 computer fraud under two criminal statutes allowing corollary civil rights of action – the federal

25 Computer Fraud and Abuse Act ("CFAA") and California Penal Code § 502(c)(8).

26         **1.    Plaintiffs Fail To State A CFAA Claim.**

27         Plaintiffs' claim under the CFAA fails for three reasons.

28         First, plaintiffs fail to – and cannot – allege the requisite intent required under this

1    criminal statute.  The CFAA penalizes only those parties who knowingly transmit a program with

2    the specific and conscious intent of causing damage:  "Whoever *knowingly causes the transmission*

3    of a program, information, code, or command, and as a result of such conduct, *intentionally causes*

4    damage without authorization, to a protected computer…"  18 U.S.C. § 1030(a)(5)(A)(i) (emphasis

5    added).  The "intent" threshold is high – the "conduct or the causing of the result must have been

6    the person's *conscious objective*."  *Butera & Andrews v. IBM Corp.*, 456 F. Supp. 2d 104, 109

7    (D.D.C. 2006), *quoting* S. Rep. No. 99-541, at 23 (1986) (emphasis supplied).

8            Plaintiffs' RCAC does not come close to meeting this stringent requirement.

9    Plaintiffs liberally sprinkle about the conclusory word "intent" but they do not allege what they

10   must:  that it was Apple's "conscious objective" in releasing Version 1.1.1 to damage or destroy

11   unlocked iPhones.  Plaintiffs' allegations, instead, make clear that their claim rests on knowledge

12   of *a potential but unintended* result:  that Version 1.1.1 "would damage or destroy unlocked

13   iPhones."  RCAC ¶ 6.  These allegations are insufficient under the CFAA, which requires that a

14   defendant "*intentionally causes damage* without authorization, to a protected computer…"  18

15   U.S.C. § 1030(a)(5)(A)(i) (emphasis supplied).

16           Plaintiffs' reading of "intent" would effectively mean that (1) manufacturers have a

17   perpetual duty of care to ensure that any software update they issue will not damage or affect any

18   consumer product, regardless of the consumers' own actions in altering the product, and (2)

19   *manufacturers are criminally liable for failure to sustain that duty.*  This is not the law and never

20   should be.  The CFAA's requirement of the strictest standard of "intent" forecloses such

21   expansive assertions of criminal liability.  As plaintiffs do not and cannot allege, in good faith,

22   that Apple issued Version 1.1.1 with the conscious objective to damage iPhones, this claim fails.

23           <u>Second</u>, there can be no violation of the CFAA because every iPhone owner had to

24   authorize the installation of Version 1.1.1 and download the actual update.  *See* VI.A, *supra*.  The

25   CFAA statute only reaches situations where the defendant "*knowingly causes [a] transmission …*

26   and as a result of such conduct, intentionally causes damage *without authorization*, to a protected

27   computer."  18 U.S.C. § 1030(a)(5)(A)(i) (emphasis added).  Here, *plaintiffs* chose whether or not

28   to install Version 1.1.1 – after being forewarned.

1      <u>Third</u>, plaintiffs' allegations regarding the value of their iPhones ($399, $499, $599

2    (RCAC ¶28 n.3) preclude a finding that they meet the requisite minimum of $5,000 in damages

3    per iPhone needed to make out a CFAA claim.  *See Thurmond v. Compaq Comp. Corp.*, 171 F.

4    Supp. 2d 667, 681 (E.D. Tex. 2001) (granting motion for summary judgment based on plaintiffs'

5    failure to establish the requisite $5,000 in losses; explicitly rejecting argument that plaintiffs are

6    permitted to aggregate damages across multiple computers for CFAA claims; *Hayes v. Packard*

7    *Bell NEC, Inc.*, 193 F. Supp. 2d 910, 912-13 (E.D. Tex. 2001) (granting motion to dismiss in light

8    of plaintiff's concession that she could not establish $5,000 in damages per computer); *In re*

9    *Doubleclick Inc. Privacy Litigation*, 154 F. Supp. 2d 497, 524 (S.D.N.Y. 2001) ($5,000 damage

10   threshold must be attributable to single act).  Amendments to the CFAA subsequent to these

11   decisions further clarify that only claims brought by the United States government may aggregate

12   losses attributable to more than one protected computer for purposes of the $5,000 threshold.  *See*

13   18 U.S.C. §§ 1030(a)(5)(A)(i), (B)(i).  Plaintiffs do not, and cannot, allege $5,000 in damages *per*

14   *iPhone* in the aggregate *per year* to state a claim.

15       **2.**  **Plaintiffs Fail to State a Claim Under Penal Code § 502.**

16     Section 502(c)(8) of the California Penal Code punishes an individual who

17   "[k]nowingly introduces any computer contaminant into any computer, computer system, or

18   computer network,"  *Id.*  Section 502(b)(10) defines "computer contaminant" as "computer

19   instructions that are designed to modify, damage, destroy, record, or transmit information within a

20   computer … *without the intent or permission* of the owner of the information," and goes on to

21   offer specific examples of such contaminants, such as "a group of computer instructions

22   commonly called viruses or worms, that are self-replicating or self-propagating and are designed

23   to contaminate other computer programs or computer data. . .."  *Id.* (emphasis supplied).

24     Plaintiffs' assertion that the release of Version 1.1.1 violated CPC § 502 because it

25   "was a willful introduction of a computer contaminant into computers that caused damage" (RCAC

26   ¶ 173) fails for much the same reason as their CFAA claim.  First, plaintiffs do not and cannot

27   allege, as they must, that Version 1.1.1 was *designed* to damage unlocked iPhones, an essential

28   element for their CPC § 502 claim.  Plaintiffs' claim that Apple should be deemed to have

1    "intended" the damage to some iPhones simply because Apple was aware that some modified

2    devices would likely be adversely affected upon download of Version 1.1.1. is a far cry from the

3    "worms" and "viruses" the statute was intended to prohibit. As they cannot allege the requisite

4    intent required by CPC § 502, the claim fails. Second, Version 1.1.1 does not fall within the

5    definition of a "computer contaminant" under CPC §502 because every iPhone owner had to

6    consent to the software's installation. Thus, for the same reason that plaintiffs cannot claim that the

7    installation of Version 1.1.1 was "unauthorized" under the CFAA, plaintiffs cannot claim that it

8    was installed "without the intent or permission of the owner" under CPC § 502(c)(8).[8]

9    **VI.    THE STATE CONSUMER PROTECTION CLAIMS SHOULD BE DISMISSED**

10        **A.    PLAINTIFFS' CONSUMER PROTECTION ALLEGATIONS**

11            Plaintiffs summarize their grab-bag consumer protection allegations as follows:

12            Defendants sold iPhones to consumers … without disclosing the
             fact (a) Defendants had agreed to make AT&TM the exclusive
             provider of voice and data services for the iPhone for five years,
13           contrary to Plaintiffs' reasonable expectations that they would be
             under contract with AT&TM for at most two years; (b) that the
14           handsets had been locked to only work with AT&TM SIM cards; (c)
             that Defendants would not provide the unlock code to consumers;
15           (d) that consumers would incur substantial roaming fees for the use
             of the iPhone's data features while traveling internationally; (e) that
16           Apple would seek to prohibit iPhone owners from downloading
             Third Party Apps; (f) that Apple had embedded malicious codes
17           within Version 1.1.1 that would disable any SIM card unlocks or
             Third Party Apps and/or "brick" any iPhone that had been unlocked
18           or had Third Party Apps installed; and (g) that Defendants would
             refuse to honor the iPhone warranty or repair or replace iPhones that
19           had been destroyed when their owners downloaded Version 1.1.1.

20    RCAC ¶ 153. Plaintiffs' alleged violations of the consumer protection laws of 43 States fail for

21    three reasons: first, plaintiffs lack standing to pursue claims under the laws of the forty states

22    where no named plaintiffs reside; second, the claims – relying on allegations of fraudulent

23    omission or concealment – fail to meet the heightened pleading test of Federal Rule of Civil

24    Procedure 9(b); and third, plaintiffs have failed to state a cognizable cause of action under the

25    three state consumer protection statutes under which they plausibly have standing to proceed.

26

27    _____

      [8]    Version 1.1.1 also fails to meet the definition of any other offense listed in CPC § 502(c), all
28           of which punish acts done "without permission" of the computer's owner.

**B.     PLAINTIFFS LACK STANDING TO MAINTAIN STATE CONSUMER PROTECTION CLAIMS UNDER THE LAWS OF FORTY STATES WHERE NONE OF THEM RESIDES**

The nine plaintiffs named in the RCAC reside in three states:  California, New York and Washington.  RCAC ¶¶ 13-21.  They all purchased their iPhone in one of these states.  *Id.*  Plaintiffs lack standing to pursue claims under the other forty state laws identified in the RCAC because no named plaintiff resides in those states.  *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1106-07 (N.D. Cal. 2007) ("[A]t least one named plaintiff must have standing with respect to each claim the class representatives seek to bring"; dismissing claims under laws of states where no named plaintiff resided, and rejecting argument that determination of standing was "premature prior to class certification."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (granting motion to dismiss claims brought under states' consumer protection and antitrust laws where no named plaintiff resided); *see also In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp. 2d 1365, 1370-72 (S.D. Fla. 2001).

**C.     PLAINTIFFS FAIL TO PLEAD FRAUDULENT OMISSION WITH SUFFICIENT PARTICULARITY UNDER FEDERAL RULE OF CIVIL PROCEDURE 9(B)**

Plaintiffs claim that defendants violated state consumer protection laws because Apple "acted unconscionably in connection with the marketing and sale of Apple iPhones" by omitting or concealing some facts at the time consumers bought their iPhones.  RCAC ¶¶ 153-154.  Because the purported unlawful conduct is based on an alleged unconscionable "failure to disclose" or "fraudulent concealment," these allegations "sound in fraud," and must meet the heightened pleading requirement of Federal Rule of Civil Procedure  9(b).  *Snyder v. Ford Motor Co.*, 2006 U.S. Dist. LEXIS 63646 at *7 (N.D. Cal. 2006) (*citing Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1103-04 (9th Cir. 2003) (claim is "grounded" or "sounds" in fraud where plaintiff alleges fraudulent conduct and relies solely on that conduct to prove a claim:  "In that event, … the pleading of that claim as a whole must satisfy the particularity requirement of 9(b).");  *see also Rambus, Inc. v. Samsung Elecs. Co. Ltd.*, 2007 WL 39374 at * 6 (N.D. Cal. 2007) ("because fraud

1   is the underlying theory of the doctrine of fraudulent concealment, . . . [Rule] 9(b) applies.").[9]

2           Rule 9(b) requires that a false statement must be alleged, that "circumstances

3   indicating falseness" must be set forth with particularity, *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d

4   1541, 1548 (9th Cir. 1994), and that the "[a]verments of fraud must be accompanied by the who,

5   what, when, where, and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (quotation

6   omitted).  Plaintiffs' conclusory allegations do not come close to satisfying Rule 9(b).  Plaintiffs

7   merely allege that defendants "acted unconscionably in connection with the marketing and sale of

8   Apple iPhones" and that defendants failed to disclose a number of facts that either were fully

9   disclosed or were not in existence at the time consumers purchased their iPhones.  RCAC ¶ 154;

10  *see also* IV.C.  There are no specific factual allegations showing that defendants "actively" or

11  "affirmatively" misled the plaintiff, as required by the fraudulent concealment doctrine.  *See, e.g.,*

12  *M.D. Rutledge v. Boston Woven Hose and Rubber Co.,* 576 F.2d 248, 250 (9th Cir. 1978).  Courts

13  routinely reject boilerplate allegations of fraudulent concealment such as these.  *See id.* at 249–50;

14  *Chipanno v. Champion International Corp.*, 1980 WL 1995 at *4 (D. Or. 1980); *Stutz Motor Car*

15  *of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp 1353, 1362-63 (C.D. Cal. 1995).

16      **D.    PLAINTIFFS FAIL TO ALLEGE THE NECESSARY ELEMENTS OF A CLAIM UNDER**
        **THE STATE CONSUMER PROTECTION STATUTES**

17          Plaintiffs' allegations fail to state a cause of action under the consumer protection

18  statutes of the only three states where they have standing:  California, New York and Washington.

19          **1.    California UCL and CLRA.**

20          Plaintiffs allege violations of the California Unfair Competition Law (UCL) and

21  the California Consumer Legal Remedies Act (CLRA).  Cal. Bus. & Prof. Code §§ 17200 &

22  17500 and Cal. Civ. Code § 1770(a)(19).  Section 17200 prohibits business practices that are

23  "unlawful," "unfair," and "fraudulent" while also prohibiting "unfair, deceptive, untrue, or

24  _____

        [9]  The state claims plaintiffs have standing to assert all sound in fraud.  In California, "[s]ection
25      17200 claims that are grounded in fraud must satisfy the particularity requirements of Rule
        9(b)."  *Parrish v. NFL Players Ass'n*, 534 F. Supp. 2d 1081, 1093 (N.D. Cal. 2007).
26      Washington courts routinely hold that "Rule 9(b) extends to all averments of fraud or mistake,
        whatever may be the theory of legal duty…"  *Kerby v. Parsons Corp.*, 2007 WL 2572334 at *2
27      (W.D. Wash. 2007).  And while it is unsettled whether Rule 9(b) applies to all false advertising
        claims in New York, courts apply 9(b) where the claim is "essentially a claim for fraud."
28      *Volunteer Fireman's Ins. Servs. v. McNeil & Co.*, 221 F.R.D. 388, 393 (W.D.N.Y. 2004).

1    misleading advertising." Section 17500 prohibits false and misleading advertising. Section

2    1770(a)(19) of the CLRA prohibits "unconscionable" contract provisions.

3             After the *Daugherty* and *Buller* decisions, it is clear that both the UCL and the

4    CLRA require a showing of affirmative misrepresentations; omissions, absent a duty to disclose,

5    do not suffice. *See Daugherty v. American Honda Motor Co., Inc.,* 144 Cal. App. 4th 824, 838

6    (2006) ("We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is

7    'likely to deceive' anyone within the meaning of the UCL."); *Buller v. Sutter Health,* 160 Cal.

8    App. 4th 981, 987 (2008) (same).[10] The claims thus fail at the threshold. In any event, the RCAC

9    makes clear that each allegedly concealed item was in fact disclosed.

10            RCAC ¶ 153(a): Failure to disclose that ATTM exclusivity was for five years.

11   Plaintiffs, again, can hardly claim that the fact of ATTM exclusivity was kept secret when the

12   iPhone's *own box* proclaimed it. RJN Ex. A. And the RCAC acknowledges that the five-year

13   term of the Apple-ATTM agreement was widely known. RCAC ¶ 86, L. Cauley, *AT&T Eager to*

14   *Wield its iWeapon* (RJN Ex. E). Thus defendants did not have "exclusive knowledge of material

15   facts not known to the plaintiff." *Falk v. Gen. Motors Corp*., 496 F. Supp. 2d 1088, 1094-95

16   (N.D. Cal. 2007). And regardless, plaintiffs have not shown that Apple had any duty to disclose

17   the term of the Apple/ATTM contract, as *Daugherty* and *Buller* require.

18            RCAC ¶ 153(b): Failure to disclose that iPhones were locked to ATTM. Again,

19   the necessity of ATTM service was disclosed. How that was enforced technologically is a detail

20   that Apple and ATTM had no duty to disclose.

21            RCAC ¶ 153(c): Failure to disclose that Defendants would not provide unlock

---

[10] Because Plaintiffs have also failed to identify any injury suffered as a result of Defendants' actions, plaintiffs lack standing to assert these claims. Cal. Bus. & Prof. Code § 17204 (standing restricted to "any person who has suffered injury in fact and has lost money or property as a result of the unfair competition."); *Wilens v. TD Waterhouse Group, Inc*., 120 Cal. App. 4th 746, 754 (2003) (upholding a denial of class certification of a CLRA claim where the plaintiffs would not be able to show actual damage on a class-wide basis). In addition, plaintiffs also must but cannot plead that defendants "had exclusive knowledge of material facts not known to the plaintiff." *Falk v. Gen. Motors Corp*., 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007). Demonstrating materiality requires that "had the omitted information been disclosed, one would have been aware of it and behaved differently," *id.,* and that "members of the public must have had an expectation or an assumption" about the undisclosed fact. *Bardin v. DaimlerChrysler Corp*., 136 Cal. App. 4th 1255, 1275 (Cal. Ct. App. 2006).

1  <u>codes</u>.  This is the same allegation as RCAC ¶ 153(b) with different words.

2          <u>RCAC ¶ 153(d):  Failure to disclose that consumers would incur international</u>

3  <u>roaming fees</u>.  This was plainly disclosed.  ATTM's service agreement (RJN Ex. C, iPhone Terms

4  and Conditions) states: "International Roaming:  Substantial charges may be incurred if phone is

5  taken out of the U.S. even if no services are intentionally used."  No more was required.

6          <u>RCAC ¶ 153(e):  Failure to disclose that Apple would seek to prohibit iPhone</u>

7  <u>owners from downloading Third Party Apps</u>.  This allegation can no longer stand given the

8  RCAC's concession that Apple opened the iPhone to third party applications.  But regardless,

9  (1) Apple's earlier policy was publicly known, *see* IV.A.2, *supra*, and (2) there is no allegation that

10  knowledge of this "omission" would have changed any plaintiff's purchasing decisions.  *Falk,* 496

11  F. Supp. 2d at 1095 ("plaintiff must show that 'had the omitted information been disclosed, one

12  would have been aware of it and behaved differently'").

13          <u>RCAC ¶ 153(f):  Failure to disclose that future operating system upgrades would</u>

14  <u>not support unlocked iPhones</u>.  Apple could not have failed to disclose that a future operating

15  system upgrade, Version 1.1.1, would be incompatible with software hacks that had yet to be

16  developed.  Whatever Apple's legal duties might be, clairvoyance is not among them.

17          <u>RCAC ¶ 153(g):  Failure to disclose that Defendants would refuse to repair or</u>

18  <u>replace iPhones that had been destroyed when their owners downloaded Version 1.1.1</u>.  This is

19  another failure to disclose a future "policy."  Defendants simply cannot have a duty to disclose –

20  at the time of selling an iPhone to plaintiffs – a fact that does not exist at the time of the alleged

21  omission.  *See Daugherty*, 144 Cal. App. 4th at 838.

22          **2.     Washington Consumer Protection Act.**

23          For similar reasons, plaintiffs have failed to state a cause of action under the

24  Washington Consumer Protection Act.  Wash. Rev. Code § 19.86.020 ("Unfair methods of

25  competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are

26  hereby declared unlawful.")  In order to establish a private cause of action, a plaintiff must

27  demonstrate "[a] causal link … between the unfair or deceptive acts and the injury suffered by

28  plaintiff."  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wash. 2d 778, 793

1    (Wash. 1986).  To meet the causation requirement in a CPA claim, "[a] plaintiff must establish

2    that, but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an

3    injury."  *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash. 2d

4    59, 84 (Wash. 2007).  Because the RCAC is bare of allegations that plaintiffs relied on the alleged

5    "omissions" to their detriment, plaintiffs' claim under the RCWA must be dismissed.[11]

6                    **3.    New York Consumer Protection Act.**

7                    Finally, plaintiffs cannot recover under the New York Consumer Protection Act

8    because they have not sufficiently alleged an actual injury from any alleged material omission.

9    To state a claim under this statute, a plaintiff must allege that the defendant has engaged "in an act

10   or practice that is deceptive or misleading in a material way and that plaintiff has been injured by

11   reason thereof."  *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank, N.A.,* 85

12   N.Y.2d 20, 25 (N.Y. 1995).  Plaintiffs must show that "a material deceptive act or practice *caused*

13   *actual, although not necessarily pecuniary, harm…*"  *Small v. Lorillard Tobacco Co., Inc.*, 94

14   N.Y.2d 43, 56 (N.Y. 1999) (emphasis in original).  As discussed above, plaintiffs have failed to

15   plead any material omissions, which is fatal to plaintiffs' NYCPA claim.  This claim also fails

16   because plaintiffs have not identified *any* actual injury resulting from the alleged omissions.  *See*

17   *id.* (rejecting plaintiffs' attempt to "set[] forth deception as both act and injury;" injury not

18   sufficiently pled where plaintiffs did not allege that misrepresentation affected cost of the product

19   or otherwise harmed them); *see also n.* 11, *supra.*

20   **VII.    PLAINTIFFS FAIL TO PLEAD A VIABLE CLAIM UNDER THE MAGNUSON-
         MOSS WARRANTY ACT**

21                   Plaintiffs allege that Apple violated the Magnusson-Moss Warranty Act

22   ("MMWA") in two respects: (1) "by not fully and conspicuously disclosing" that it would not

23   honor the warranties of unlocked iPhones rendered inoperable after installation of Version 1.1.1

24   and (2) by conditioning the iPhone warranties on the owner's use of "articles or services … which

25   are identified by brand, trade, or corporate name, including AT&TM's voice and data service and

26   the software applications 'approved' by Apple."  RCAC ¶¶ 159-60.  Both fail.

27   ──────────────
     [11]  Plaintiffs' claim also fails for the same reason their California claims fail: namely, that the
28        RCAC makes clear that each allegedly concealed item was in fact disclosed.

1    First, as previously discussed, plaintiffs have acknowledged that Apple clearly

2    provided warnings, and stated that: "*The permanent inability to use an iPhone due to installing*

3    *unlocking software is not covered under the iPhone's warranty*." RCAC ¶ 98 (emphasis in

4    original). That admission defeats plaintiffs' claim of nondisclosure under the MMWA.

5    Second, Apple's choice of ATTM as the iPhone's exclusive carrier, and its policies

6    regarding add-on applications, are not prohibited "conditioning" under MMWA. The provision

7    plaintiffs (mistakenly) appear to be relying on, 15 U.S.C. § 2302(c), states:

8    No warrantor of a consumer product may condition his written or
     implied warranty of such product on the consumer's using, in connection
9    with such product, any article or service (other than article or service
     provided without charge under the terms of the warranty) which is
10   identified by brand, trade, or corporate name….

11   *Id.* There was no such "conditioning" here. The RCAC does not allege that any consumer was

12   informed that their iPhone warranty was voided as a result of failing to subscribe to ATTM's

13   services or failing to install applications approved by Apple. Apple's warnings to users regarding

14   unauthorized modifications of the iPhone software were proper. *See generally* 15 U.S.C. § 2304

15   (c) (Warrantor not liable under warranty if "can show that the defect, malfunction, or failure of

16   any warranted consumer product to conform with a written warranty, was caused by damage (not

17   resulting from defect or malfunction) while in the possession of the consumer, or unreasonable

18   use (including failure to provide reasonable and necessary maintenance).")

19   **VIII.   CONCLUSION**

20   The Court should dismiss plaintiffs' complaint with prejudice.

21   Dated:  June 27, 2008                    Respectfully submitted,

22                                            LATHAM & WATKINS LLP

23

24                                           By _____/s/ Daniel M. Wall_____
                                                Daniel M. Wall
25                                              Attorneys for Defendant
                                                APPLE INC.
26   SF\661336

27

28