# EXHIBIT D

# E-FILED

Nov 2, 2007 9:06 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-095781 Filing #G-5903
By C. Fujihara, Deputy

M. Van Smith (CA Bar No. 32007)
Damian R. Fernandez (CA Bar No. 206662)
LAW OFFICE OF DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
Tel: (408) 355-3021; Fax (408) 904-7391
Email: mvsmith@sbcglobal.net; damianfernandez@gmail.com

Joseph Antonelli (CA Bar No. 137039)
Janelle C. Carney (CA Bar No. 201570)
LAW OFFICE OF JOSEPH ANTONELLI
1000 Lakes Drive, Suite 450
West Covina, California 91790
Tel: (626) 917-6228; Fax: (626) 917-7686
Email:   Jantonelli@antonellilaw.com
         Jcarney@antonellilaw.com

Kevin T. Barnes (CA Bar No. 138477)
Gregg Lander (CA Bar No. 194018)
LAW OFFICES OF KEVIN T. BARNES
5670 Wilshire Boulevard, Suite 1460
Los Angeles, California 90036
Tel: (323) 549-9100; Fax: (323) 549-0101
Email:   barnes@kbarnes.com
         lander@kbarnes.com

Co-Counsel for Plaintiffs and the Proposed Class

# Superior Court of California
# County of Santa Clara

Department 17, Civil Complex Litigation: 161 North First Street, San Jose, 95113

| | |
|---|---|
| TIMOTHY P. SMITH; MICHAEL G. LEE; DENNIS V. MACASADDU; MARK G. MORIKAWA; and VINCENT SCOTTI, on behalf of themselves and all others similarly situated, <br><br>           Plaintiffs, <br><br> vs. <br><br> APPLE INC.; AT&T MOBILITY LLC; and DOES ONE through ONE HUNDRED, inclusive, <br><br>           Defendants. | Case No.   1-07-CV-095781 <br><br> **CLASS ACTION** <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES AND PERMANENT INJUNCTIVE RELIEF** <br><br> 1.   Cartwright Act <br> 2.   Sherman Antitrust Act <br> 3.   California Commercial Code <br> 4.   Song-Beverly Warranty Act <br> 5.   Magnuson-Moss Warranty Act <br> 6.   Consumer Legal Remedies Act <br> 7.   Computer Fraud Abuse Act <br> 8.   California Penal Code <br> 9.   Common Law Monopolization <br> 10.   RICO Act <br> 11.   Cal. Bus. & Prof. Code, § 17200 <br><br> **DEMAND FOR JURY TRIAL** |

1

## TABLE OF CONTENTS

2

**NATURE OF THE ACTION**                                                        **5**

3

**INTRODUCTION**                                                                **5**

4          1.      Factual Introduction.                                          5
           2.      Legal Introduction.                                            6

5

6   **JURISDICTION AND VENUE AND APPLICABLE LAW**                              **7**

7   **PARTIES**                                                                 **8**

8   **CALIFORNIA ANTITRUST LAW**                                               **9**
           1.      Summary and overview.                                          9
9          2.      Combination and collusion (Section 16720).                    10
           3.      Exclusive dealing (Section 16727).                            11
10         4.      Tying agreements (Section 16727).                             12

11
    **THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998**                          **13**
12         1.      Statutory Background.                                         13
           2.      Cell phone providers use software locks to restrain competition. 13
13         3.      Unlocking cell phones is a lawful activity.                   14

14  **FACTUAL ALLEGATIONS**                                                    **15**
           1.      Apple enters into an exclusive agreement with AT&T for the sale
15                 of the iPhone tied to the sale of AT&T's cell phone service.  15
           2.      Apple unveils the iPhone.                                     16
16         3.      The uniqueness of the iPhone.                                 17
           4.      The desirability of the iPhone.                              18
17         5.      Apple's guerilla warfare tactics.                             18
           6.      Verizon shuns Apple's demand for control.                     19
18         7.      Consumers lawfully unlock their iPhones to switch cell phone carriers. 19
           8.      Apple declares that unlocked iPhones void consumers' warranties. 19
19         9.      Apple releases an update that "bricks" iPhones.               19
           10.     A congressional subcommittee is critical of Apple's business model. 21
20         11.     Potential consumers of the iPhone, even big Apple fans, are refusing to
                   buy the iPhone because they do not want to switch to AT&T.    22
21

22  **MISREPRESENTATIONS**                                                     **22**

23  **CONCEALED FACTS**                                                        **23**

24  **DUTY TO DISCLOSE THE CONCEALED FACTS**                                   **24**

25
    **ANTITRUST CONDUCT**                                                      **25**
26         1.      Market Definitions and Market Share                          25
           2.      Unlawful Tying of the iPhone                                  27
27         3.      Apple has sufficient economic power in the iPhone (the tying market)
                   to coerce the purchase of AT&T's cell phone service (the tied product). 28
28

| | | | |
|---|---|---|---|
| 4. | A substantial amount of commerce was and will continue to be affected from the sale of AT&T's cell phone service together with the iPhone. | | 28 |
| 5. | Apple's unlawful trust with AT&T substantially lessens competition and tends to create a monopoly in trade and commerce in California and throughout the entire United States. | | 29 |
| 6. | Repeated Nationwide Wrongful Conduct, Profitability, and Reprehensibility. | | 29 |

**NON-MONETARY ANTITRUST HARM**                                    **30**

**MONETARY ANTITRUST HARM**                                        **30**

**BREACHES OF IMPLIED WARRANTIES**                                 **31**
A.  Non-Merchantable Goods—Not fit for Ordinary Purposes, Com. Code § 2314(2)(c)    31
B.  Non-Merchantable Goods—Not fit for Particular Purpose, Com. Code § 2315         32
C.  Breach of Usage of Trade Warranty, Com. Code § 2314(3)                          32

**WARRANTY HARM**                                                  **32**

**CLASS ACTION ALLEGATIONS**                                       **33**
1.  Injunctive Relief Class.                                        33
2.  Damages Class.                                                  33
3.  Class Size.                                                     33
    A.  The basis for class size estimates.                         34
    B.  Impracticability of joinder.                                35
4.  Common Questions of Law.                                        35
5.  Common Questions of Fact.                                       36
6.  Adequacy of Class Representatives.                              36

**RELEVANT MARKET**                                                **37**
1.  The Relevant Product Markets.                                   37
2.  The Relevant Market Share.                                      37
3.  The relevant geographic market for the iPhone and AT&T's cell phone service.    37
4.  A substantial amount of commerce was and will continue to be affected from the sale of the iPhone together with AT&T's cell phone service and iTunes Media.    38

**FIRST CAUSE OF ACTION**                                          **39**
For Violation of Section 16720 of the Cartwright Act (Unlawful Trusts)              39

**SECOND CAUSE OF ACTION**                                         **40**
For Violation of Section 16727 of the Cartwright Act (Unlawful Tying Agreement)     40

**THIRD CAUSE OF ACTION**                                           **41**
    For Violation of Section 1 of the  Sherman Antitrust Act, 15 U.S.C.
    § 1, Unlawful Tying                                             41

**FOURTH CAUSE OF ACTION**                                          **41**
    For Violation of Section 2 of the  Sherman Antitrust Act, 15 U.S.C.
    § 2, Monopolization                                            41

**FIFTH CAUSE OF ACTION**                                           **42**
    For Breach of Implied Warranties, Commercial Code §§ 2314, 2315    42

**SIXTH CAUSE OF ACTION**                                           **42**
    For Breach of Express Warranties, Commercial Code §2313(1)        42

**SEVENTH CAUSE OF ACTION**                                         **43**
    For Breach of Song-Beverly Consumer Warranty Act, Civil Code
    §§ 1790, *et seq.*                                             43

**EIGHTH CAUSE OF ACTION**                                          **44**
    For Breach of Implied Warranty Under Magnuson-Moss
    Warranty—Federal Trade Commission Improvement Act              44

**NINTH CAUSE OF ACTION**                                           **44**
    For Violation of the Consumer Legal Remedies Act, § 1750, *et seq.*  44

**TENTH CAUSE OF ACTION**                                           **46**
    For Violation of the Computer Fraud Abuse Act, 18 U.S.C. § 1030    46

**ELEVENTH CAUSE OF ACTION**                                        **47**
    For Violation of California Penal Code § 502                    47

**TWELFTH CAUSE OF ACTION**                                         **49**
    For Common Law Monopolization                                  49

**THIRTEENTH CAUSE OF ACTION**                                      **50**
    Violation of the RICO Act, Tile 18 U.S.C. §§ 1961-1968         50

**FOURTEENTH CAUSE OF ACTION**                                      **50**
    For Unfair Competition in Violation of Section Cal. Bus. & Prof. C.
    § 17200                                                        50

**PRAYER**                                                          **52**

**DEMAND FOR TRIAL BY JURY**                                        **54**

///

///

1    Plaintiffs, on behalf of themselves and behalf of the Classes defined herein (the "Classes"),

2  allege on information and belief, except as to those actions concerning plaintiffs, as follows:

3                              **NATURE OF THE ACTION**

4       1.      This is a class action lawsuit filed to redress unfair and wrongful practices inflicted

5  by defendants on consumers: (1) the secret locking of the iPhone cell phone to make it impossible

6  or impracticable for customers to switch cell phone service providers without purchasing a new

7  iPhone; (2) requiring that consumers purchase a 2-year contract with AT&T with the purchase of

8  the iPhone; and (3) the intentional disabling of iPhones by Apple in retaliation against consumers

9  who unlocked their iPhones.

10      2.      Plaintiffs seek relief in this action individually and as a class action of behalf of all

11  persons who have purchased or own iPhones. Plaintiffs further allege that defendants have a duty to

12  disclose that they have locked the iPhone before selling it to a consumer, and to disclose the

13  iPhones unlock code in connection with the sale of an iPhone, and that their failure to do so is a

14  fraudulent and deceptive business practice. Plaintiffs seek compensatory damages, punitive

15  damages, and disgorgement of defendants' profits as well as injunctive and declaratory relief

16  against such practices.

17                              **INTRODUCTION**

18  **1.    Factual Introduction.**

19      3.      Apple entered into an exclusive five year agreement with AT&T Mobility LLC

20  ("AT&T") that establishes AT&T as the exclusive provider of cell phone service for the iPhone

21  through 2012 ("Agreement"). As part of the Agreement, Apple receives a portion of AT&T's

22  profit.[1] Apple's Agreement is a *per se* unlawful "tying" agreement because Apple prohibits iPhone

23  consumers from using or purchasing a cell phone carrier[2] service other than AT&T. A tying

24

25

26    [1] The.next.net, "Apple Takes Its Bite of iPhone Mobile Service Fees," July 2007,
http://blogs.business2.com/business2blog/2007/07/apple-takes-its.html (accessed October 3, 2007).

27    [2] For ease of reference, "cell phone carrier" has the same meaning as cellular network provider,
wireless telephone communication network provider, and mobile telecommunications network

28  provider.

---

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

agreement is a requirement that a buyer purchase one product or service as a condition of the purchase of another or that the sale of one product is linked to the other. Apple achieves its prohibition objectives by installing software locks on iPhones that prevent consumers from switching their cell phone service to a competitor's network. Apple's prohibition substantially lessens competition and tends to create a monopoly in the trade and commerce of the iPhone and AT&T's cell phone service.

4.       On September 27, 2007, Apple punished consumers for exercising their rights to unlock their iPhones. Apple issued a software update that "bricked"[3] or otherwise caused iPhone malfunctions for consumers who unlocked their phones and installed the update. Under an exemption to the Digital Millennium Copyright Act of 1998, consumers can lawfully modify their phones for use on a cell phone network of their choice. Apple ignored the exemption in disregard of consumers' rights.

5.       When iPhone owners took their phones to Apple for repair, Apple refused to honor consumers' warranties. Instead, Apple gave a Marie-Antoinette-like response, "[let them] purchase a new iPhone," said Jennifer Bowcock, an Apple spokeswoman.[4]

**2.    Legal Introduction.**

6.       The Digital Millennium Copyright Act (17 U.S.C. § 1201) provides, in part, that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title."

7.       In its 88-page recommendation to the Librarian of Congress, the Register of Copyrights determined that "a strict application of the statutory language of section 1201 would

---

[3] When used in reference to electronics, "brick" describes a device which cannot function in any capacity (such as a machine with damaged firmware). This usage derives from the machine now being considered "as useful, and as entertaining, as a brick." Wikipedia, "Brick, (electronics) – Wikipedia, the free encyclopedia," http://en.wikipedia.org/wiki/Bricking (accessed October 1, 2007). Bricked iPhones are colloquially known as the "iBrick". (*Id.*, at http://en.wikipedia.org /wiki/Ibrick (accessed October 3, 2007).

[4] Katie Hafner, "Altered iPhones Freeze Up," *The New York Times*, September 28, 2007, http://www.nytimes.com/2007/09/29/technology/29iphone.html?_r=1&em&ex=1191211200&en=3 7222d83199c5f92&ei=5087%0A&oref=slogin (accessed October 3, 2007).

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

1  likely to result in a finding that one who circumvents the software lock on a cell phone in order to

2  connect to a new network is engaging in unlawful circumvention of an access control."[5] The

3  Register of Copyrights concluded that cell phone software locks are access controls that adversely

4  affect the ability of consumers to make noninfringing use of the software on their cell phones.[6]

5  Accordingly, on November 27, 2006, the Librarian of Congress—upon recommendation of the

6  Register of Copyrights—issued an exemption for software programs that allow consumers to

7  unlock their cell phones. The Register stated that the exemption was sought "for the sole purpose of

8  permitting owners of cellular phone handsets to switch their handsets to a different network."[7] The

9  exemption was codified in the Code of Federal Regulations as 37 CFR section 201.40(b)(5),

10  effective November 27, 2007 and continuing through October 27, 2009.[8]

11      8.    The Register of Copyrights stated that the recommendation was not "intended to be

12  construed as expressing approval or disapproval of any particular business models, or as expressing

13  any views on telecommunications policy."[9]

14                  **JURISDICTION AND VENUE AND APPLICABLE LAW**

15      9.    This Court has jurisdiction over this action pursuant to California Code of Civil

16  Procedure section 410.10. Plaintiffs seek damages on behalf of themselves and all others similarly

17  situated under the laws of the State of California.

18      10.    Paragraph 10 of the software license agreement for the iPhone ("License") provides

19  that the license will be governed by and construed in accordance with the laws of the State of

20  California.

21      11.    Venue is proper in this Court pursuant to Code of Civil Procedure section 393 and

22  _____

23      [5] James H. Billington, the Librarian of Congress, *Recommendation of the Register of*

24  *Copyrights,* November 17, 2006, U.S. Copyright Office, http://www.copyright.gov/1201/docs/ 1201_recommendation.pdf (accessed October 1, 2007).

25      [6] 71 Fed. Reg. 68472, 68476 (November 27, 2006), U.S. Copyright Office, http://www.copy right.gov/fedreg/2006/71fr68472.html (accessed October 1, 2007).

26      [7] *Id.*, at p. 68476.

    [8] *Id.*, at p. 68472.

27      [9] James H. Billington, the Librarian of Congress, *Recommendation of the Register of*

28  *Copyrights*, at p. 51, *supra* at *fn.* 5.

Civil Code section 1780(c), because:

> (1)     the acts and transactions or any substantial portion thereof, as described herein, occurred within Santa Clara County;

> (2)     Santa Clara County is the place of Apple's principal place of business;

> (3)     the described injuries to property occurred within Santa Clara County.

**PARTIES**

12.     Plaintiffs TIMOTHY P. SMITH, MICHAEL G. LEE, DENNIS V. MACASADDU, MARK G. MORIKAWA, VINCENT SCOTTI are residents of California. During the period of time covered by this Complaint, plaintiffs owned or purchased iPhones from Apple together with the required AT&T cell phone voice and data services. Plaintiffs have suffered Monetary Antitrust Harm, Non-Monetary Antitrust Harm, and Warranty Harm as defined herein. Plaintiffs have purchased and/or have planned to purchase Online Ringtones, Online Music, and Online Videos from Apple. Plaintiffs have been injured by reason of the violations alleged herein.

13.     Defendant Apple Inc. ("Apple") is a corporation organized under the laws of the State of California and has its principal place of business is in Cupertino, California. As stated by Apple in a recent filing with the Securities and Exchange Commission:

> Apple Inc. and its wholly-owned subsidiaries ("Apple" or the "Company") designs, manufactures, and markets personal computers, portable digital music players, and mobile phones and sells a variety of related software, services, peripherals, and networking solutions. The Company sells its products worldwide through its online stores, its retail stores, its direct sales force, and third-party wholesalers, resellers, and value-added resellers. In addition, the Company sells a variety of third-party Macintosh, iPod and iPhone compatible products including application software, printers, storage devices, speakers, headphones, and various other accessories and supplies through its online and retail stores. The Company sells to education, consumer, creative professional, business, and government customers.[10]

///

---

[10] Apple Inc., Form 10-Q, "Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934," August 8, 2007, Q3/FY07, p. 5, http://library.corporate-ir.net/library/ 10/107/107357/items/257461/10Q_Q3FY07.pdf (accessed October 1, 2007).

14.     Defendant AT&T Mobility LLC ("AT&T) is a Delaware corporation doing business in California and throughout the United States. AT&T, formerly named Cingular Wireless LLC,  is the wholly owned wireless subsidiary of AT&T Inc. AT&T Mobility is the largest mobile phone company in the United States and it also operates in Puerto Rico and the United States Virgin Islands. AT&T Mobility has 65.7 million subscribers as of the end of the third quarter for 2007, and claims to operate the largest digital voice and data network in the United States.

15.     The true names and capacities, whether individual, corporate, associate or otherwise, of defendants Does 1 through 100, inclusive, are unknown to plaintiffs, who therefore sue said defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that each of the defendants designated herein as a Doe is legally responsible in some manner for the events and happenings therein referred to and caused, or is responsible in some proportion for the damages sustained by plaintiffs. Plaintiffs may seek leave to amend this complaint to show the true names, capacities, actions and responsibilities of said defendants so fictitiously named whenever the same shall have been ascertained. At that time, plaintiffs will seek leave to include appropriate charging allegations as to said defendants.

16.     At all relevant times alleged in this matter, each defendant acted in concert with, with the knowledge and approval of and/or as the agent of the other defendants within the course and scope of the agency, regarding the acts and omissions alleged.

**CALIFORNIA ANTITRUST LAW**

**1.     Summary and overview.**

17.     California statutory antitrust law is found at sections 16600–17210 of the California Business & Professions Code. It consists of the Cartwright Act, the Unfair Practices Act, and the Unfair Competition Act, as well as various statutory restrictions on covenants not to compete. The Cartwright Act prohibits trusts, which are defined as a combination of capital, skill or acts by two or more persons to, among other things, create or carry out restrictions in trade or commerce. (Section 16720.) It also prohibits sales or leases of products on the condition that the purchaser not deal in the goods of a competitor where the effect is to substantially lessen competition or tend to create a monopoly in any line of commerce. (Section 16727.) The Unfair Practices Act prohibits

sales below cost, locality discrimination, and secret rebates or unearned discounts which injure competition. (Section 17000 *et seq.*) The Unfair Competition Act generally prohibits any unlawful, unfair, or fraudulent business act or practice, as well as deceptive or misleading advertising. (Section 17200 *et seq.*)

**2.     Combination and collusion (Section 16720).**

18.     Section 16720 prohibits trusts, and is the Cartwright Act counterpart to Section 1 of the federal Sherman Act (15 U.S.C. § 2). Trusts are defined in section 16720 as any "combination" of capital, skill or acts by two or more persons to, among other things, carry out restrictions in commerce, prevent competition, or fix prices. Specifically, the Cartwright Act states in section 16726 that: "Except as provided in this chapter, every trust is unlawful, against public policy and void." A trust is defined in section 16720 as follows:

> A trust is a combination of capital, skill or acts by two or more persons for any of the following purposes:
>
> (a)     To create or carry out restrictions in trade or commerce.
>
> (b)     To limit or reduce the production, or increase the price of merchandise or of any commodity.
>
> (c)     To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity.
>
> (d)     To fix at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this State.
>
> (e)     To make or enter into or execute or carry out any contracts, obligations, or agreements of any kind or description, by which they do all or any or any combination of the following:
>
> > (1)     Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value;

///

(2)    Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure;

(3)    Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of any such article or commodity;

(4)    Agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.

19.    Section 16720 applies to a wide variety of anticompetitive conduct, but applies only where there is proof of a "combination of resources of two or more independent entities for the purpose of restraining competition and preventing market competition." (*G.H.I.I. v. MTS, Inc.* (1983) 147 Cal. App. 3d 256, 266; *See also Chavez v. Whirlpool Corp.* (2001) 93 Cal. App. 4th. 363.)

**3.    Exclusive dealing (Section 16727).**

20.    Section 16727 provides, among other things, that it is unlawful to sell or lease goods, or give a rebate or price discount, on the condition that the purchaser not deal in goods of a competitor where the effect is to substantially lessen competition or tend to create a monopoly. Section 16727 is a carbon copy of Section 3 of the Clayton Act (15 U.S.C. § 14). Like its federal counterpart, it does not prohibit all exclusive dealing contracts. Rather, California courts may apply the rule of reason and invalidate only those with the requisite anticompetitive effects. (*Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal. App. 3d 1020.)

21.    The key issue under the rule of reason in exclusive dealing cases is whether the defendant has market power in the relevant market. (*Redwood Theatres v. Festival Enterprises* (1988) 200 Cal. App. 3d 687.) The relevant market normally includes all products that are reasonably interchangeable in price, use and quality. (*Exxon v. Superior Court* (1997) 51 Cal. App. 4th 1672, 1682-84.) If defendant has a small market share, or otherwise lacks market power, a court

could find that the exclusivity requirement will not violate the Cartwright Act. (*Kim v. Servosnax* (1992) 10 Cal. App. 4th 1346.) However, market power may exist even though it falls short of market dominance and exists only with respect to some buyers due to the *desirability* of that product to those buyers, or the *uniqueness* of its attributes. (*Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal.App.3d 532, 544.) (Emphasis added.)

**4.    Tying agreements (Section 16727).**

22.    One species of exclusive dealing is a tying agreement—a requirement that a buyer purchase one product or service as a condition of the purchase of another. Traditionally, the product that is the inducement for the arrangement is called the "tying product," and the product or service that the buyer is required to purchase is called the "tied product." A tying arrangement may be condemned under either or both sections 16720 and 16727. (*Morrison v. Viacom* (1998) 66 Cal. App. 4th 534, 540.) The Cartwright Act states in section 16727 that:

> It shall be unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State.

23.    Tying may be *per se* illegal if the seller has market power over the first product or a substantial amount of commerce was affected in the sale of the second product. (*Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal. App. 3d 532.) The *per se* rule is satisfied under section 16727 if either the market power or substantial commerce tests are satisfied. (*Morrison v. Viacom, supra*, at p. 542.) Under section 16720, both tests must be satisfied. (*Id.*)

///

///

///

---

## THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

**1.    Statutory Background.**

24.    In 1998, Congress enacted the Digital Millennium Copyright Act (''DMCA''), which among other things, amended title 17, United States Code, to add section 1201 ("Section 1201"). Section 1201 prohibits circumvention of technological measures employed by or on behalf of copyright owners to protect their works ("access controls"). Specifically, section 1201(a)(1)(A) ("Copyright Prohibition") provides, in part, that "No person shall circumvent a technological measure that effectively controls access to a work protected under this title." In order to ensure that the public will have continued ability to engage in noninfringing uses of copyrighted works, such as fair use[11], subparagraph (B) of section 1201 limits this prohibition, exempting noninfringing uses of any ''particular class of works'' when users are (or in the next 3 years are likely to be) adversely affected by the prohibition in their ability to make noninfringing uses of that class of works. (Section 1201(a)(1)(B).) ("Copyright Exemption.")

25.    Identification of these exempt classes of works is made in a rulemaking proceeding conducted by the Register of Copyrights who provides notice of the rulemaking, seeks comments from the public, consults with the Assistant Secretary for Communications and Information of the Department of Commerce, and recommends final regulations to the Librarian of Congress. The Librarian of Congress, in exercising his authority under 17 U.S.C. section 1201(a)(1)(C) and (D), shall publish the classes of copyrighted works that shall be subject to the exemption from the Copyright Prohibition.

**2.    Cell phone providers use software locks to restrain competition.**

26.    cell phone network providers are using various types of software locks in order to control customer access to the "bootloader" programs[12] on cell phones and the operating system

---

[11] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights*, p. 3., *fn. 9, supra.*

[12] A bootloader is "A small program stored in ROM and responsible for initializing the hardware to a known initial state and making it possible to download application software to the system to be run." Jack Ganssle and Michael Barr, *Embedded Systems Dictionary* 33 (2003).

---

programs embedded inside cell phones.[13] These software locks prevent customers from using their cell phones on a competitor's network (even after all contractual obligations to the original wireless carrier have been satisfied) by controlling access to the software that operates the cell phones (e.g., the mobile firmware).[14] The Register of Copyrights states that "the access controls do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, *a business decision that has nothing whatsoever to do with the interests protected by copyright.*"[15] (Emphasis added.)

**3.      Unlocking cell phones is a lawful activity.**

27.      In its 88-page recommendation to the Librarian of Congress, the Register of Copyrights determined that "a strict application of the statutory language of § 1201 would be likely to result in a finding that one who circumvents the software lock on a cell phone in order to connect to a new network is engaging in unlawful circumvention of an access control."[16] The Register of Copyrights concluded that cell phone software locks are access controls that adversely affect the ability of consumers to make noninfringing use of the software on their cell phones.[17] Accordingly, on November 27, 2006, the Librarian of Congress—upon recommendation of the Register of Copyrights—issued an exemption for software programs that allow consumers to unlock their cell phones. The Register stated that the exemption was sought "for the sole purpose of permitting owners of cellular phone handsets to switch their handsets to a different network."[18] The exemption was codified in the Code of Federal Regulations as 37 CFR section 201.40(b)(5), effective November 27, 2007 and continuing through October 27, 2009.[19]

---

[13] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*
[14] *Id.*
[15] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*
[16] James H. Billington, the Librarian of Congress, *Recommendation of the Register of Copyrights*, *fn. 9, supra.*
[17] 71 Fed. Reg. 68472, 68476, *fn. 6, supra.*
[18] *Id.*, at p. 68476.
[19] *Id.*, at p. 68472.

**FACTUAL ALLEGATIONS**

1.    **Apple enters into an exclusive agreement with AT&T for the sale of the iPhone tied to the sale of AT&T's cell phone service.**

28.    On January 9, 2007, Apple announced that Cingular—now merged into AT&T—would be Apple's partner for the iPhone,[20] as follows:

(1)    AT&T to be the exclusive provider for iPhone cell phone service in the United States;

(2)    The duration of the exclusive agreement is to be five years until 2012;[21]

(3)    Apple is to receive a portion of AT&T's profit;[22]

(4)    iPhone consumers are to be prohibited from using a cell phone carrier other than AT&T. The prohibition is achieved by the installation of software locks on the iPhone that prevents consumers from switching their cell phone service to a competitor's network;

(5)    Apple is to be restrained for a period of time from developing a version of the iPhone for CDMA[23] wireless networks. (*Id.*)

29.    The restraint on Apple's development of the iPhone for CDMA networks is significant because AT&T's rivals use CDMA technology. Verizon has a 26.3% market share and is one of six U.S. carriers to use CDMA technology—the others being Sprint Nextel (23.6% market

_____

[20] Apple, "Apple Chooses Cingular as Exclusive U.S. Carrier for Its Revolutionary iPhone," January 9, 2007, http://www.apple.com/pr/library/2007/01/09cingular.html (accessed October 3, 2007).
[21] Leslie Cauley, "AT&T eager to wield its iWeapon," May 21, 2007, *The USA Today*, http://www.usatoday.com/tech/wireless/2007-05-21-at&t-iphone_N.htm (accessed October 1, 2007).
[22] The.next.net, "Apple Takes Its Bite of iPhone Mobile Service Fees," July 2007, http://blogs.business2.com/business2blog/2007/07/apple-takes-its.html (accessed October 3, 2007).
[23] CDMA is an acronym for code division multiple access. CDMA allows many users to occupy the same time and frequency allocations in a given band or space. It is reported to consistently provide better capacity for voice and data communications than other commercial mobile technologies, allowing more subscribers to connect at any given time, and it is the common platform on which Third-Generation (3G) wireless data services are built. (CDMA Development Group, "CDG: Technology: CDMA Technology." http://www.cdg.org/technology /index.asp (accessed October 1, 2007).

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

1    share), Alltel, U.S. Cellular, Cricket, Midwest Wireless, and Metro PCS.[24] AT&T uses GSM—a

2    global standard incompatible with CDMA.

3        30.     If an iPhone user consumer terminates their cell phone agreement after the 30 day

4    cancellation period, but before the expiration of their two-year service commitment, they will pay

5    AT&T an early termination fee of $175 for *each* wireless telephone number associated with

6    the service.[25] The termination fee is unlawful and inequitable as the $175 termination fee must be

7    paid every time a consumer terminates the contract after the 30 day grace period and before the

8    expiration of the 2 year contract service commitment.

9        31.     The *USA Today* describes Apple's agreement with AT&T as "an easy way to

10    handcuff rivals and steal customers."[26]

11    **2.**       **Apple unveils the iPhone.**

12        32.     On June 29, 2007, Apple released the iPhone, a "revolutionary and magical product

13    that is literally five years ahead of any other mobile phone," said Steve Jobs, Apple's CEO.[27]

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22

23 _____

24    [24] Wikipedia, "Verizon Wireless – Wikipedia, the free encyclopedia," http://en.wikipedia.org /wiki/Verizon_wireless (accessed October 1, 2007).

25    [25] AT&T, "Service Agreement – AT&T." http://www.wireless.att.com/cell-phone-service/legal/service-agreement.jsp?q_termsKey=postpaidServiceAgreement&q_termsName= Service+Agreement (accessed October 1, 2007).

26    [26] Leslie Cauley, "AT&T eager to wield its iWeapon," *fn. 21, supra.*

27    [27] Apple, "Apple Reinvents the Phone with iPhone," January 9, 2007, http://www.apple.com/pr/ library/2007/01/09iphone.html (accessed October 3, 2007).

28

---

**3.    The uniqueness of the iPhone.**

33.    "The largest and most beautiful screen I've ever seen on a cell phone," enthused *The Wall Street Journal*. [28]



34.    The iPhone is unique because:

(1)    Unlike traditional phones, there is no keypad. It is the only multi-touch display where users can control everything using only their fingers;

_____

[28] Walter S. Mossberg, "BlackJack Beats Out Palm 750, but iPhone May Well Top Both," *The Wall Street Journal Online*, January 11, 2007, http://online.wsj.com/article/SB116846792028 973034.html?mod=mostpop (accessed October 3, 2007).

1        (2)     The iPhone is an iPod. It is the only cell phone that can play music or videos

2  from Apples iTunes Music Store;

3        (3)     It is the only cell phone that has a fully functional web browser;

4        (4)     It is the only cell phone containing Apple's "OS X" operating system;

5        (5)     It is the only cell phone with visual voicemail which allows users to go

6  directly to any of their messages without listening to the prior messages;

**4.    The desirability of the iPhone.**[29]

35.    In San Francisco, consumer David Lau has heard it all, and he does not care. He wants his iPhone. "I have the gear lust that many people experience when the newest, coolest thing comes out," says Lau, 26, who works in real estate.[30] "I work in an office by myself, and this device gives me freedom. It could be my entire office anywhere I choose." (*Id.*) His girlfriend just wants him to stop talking about it. "For the past four weeks, I've heard nothing but iPhone talk from David, his friends, my brother and, basically, any male between the ages of 13 and 40 within earshot. It's insane. I'd pay 500 bucks and sleep outside in line to just shut these guys up." (*Id.*)

**5.    Apple's guerilla warfare tactics.**

36.    Stan Sigman, CEO of wireless at AT&T, makes no apologies for his tough approach. "I'm glad we have (the iPhone) in our bag," he says. "Others will try to match it, but for a period of time, they're going to be playing catch-up."[31] "It's guerrilla warfare," says Jane Zweig, CEO of market researcher The Shosteck Group. "They all want to say 'We're No. 1.'"[32] The *USA Today* says that "carriers [are left] with one option, basically, for adding customers: steal them."[33] Charles

---

[29] *Cf. Suburban Mobile Homes v. AMFAC Communities* (1980) 101 Cal.App.3d 532, 544—market power may exist even though it falls short of market dominance and exists only with respect to some buyers due to the *desirability* of that product to those buyers, or the *uniqueness* of its attributes. (Emphasis added.)

[30] Jefferson Graham, "iPhone mania nears fever pitch," *The USA Today*, June 19, 2007, http://www.usatoday.com/tech/wireless/phones/2007-06-19-iphone-mania_N.htm (accessed October 3, 2007).

[31] *Id.*

[32] Leslie Cauley, "AT&T eager to wield its iWeapon," *fn. 21, supra.*

[33] *Id.*

1    Golvin, a wireless industry analyst at Forrester Research, says, "Today's market is not about

2    finding new opportunities. It's about stealing somebody else's customers." (*Id.*) The software locks

3    employed in the iPhone stifle competition by limiting consumers' choice to one cell phone carrier.

4    **6.    Verizon shuns Apple's demand for control.**
s

5        37.    Verizon passed on the opportunity to become Apple's exclusive U.S. distributor,

6    balking at Apple's demand for control over distribution, pricing, marketing and more.[34] Denny

7    Strigl, Verizon's chief operating officer, decided to pass on the iPhone deal and says he has no

8    regrets: "Time will tell" if he made the right call, he says. (*Id.*)

9    **7.    Consumers lawfully unlock their iPhones to switch cell phone carriers.**

10        38.    In August 2007, consumers downloaded various software programs available on the

11   Internet that unlocked the iPhone. After it was unlocked, several hundred thousand consumers

12   switched their cell phone service to the carrier of their choice. Under a year 2006 exemption to the

13   federal Digital Millennium Copyright Act of 1998, discussed above, consumers had and still have

14   the express and lawful right to unlock their cell phones to switch to other cell phone carriers.

15   **8.    Apple declares that unlocked iPhones void consumers' warranties.**

16        39.    On September 24, 2007, Apple issued a press release warning consumers that

17   unlocked iPhones violated Apple's software license agreement and voided the warranty.[35]

18   **9.    Apple releases an update that "bricks" iPhones.**

19        40.    On September 27, 2007, Apple punished consumers for exercising their rights to

20   unlock their iPhones.[36] Apple issued a software update to the iPhone—known as the iPhone

21

22   _____

23   [34] *Id.*

24   [35] PR News, "Apple today released the following statement," September 24, 2007,
     http://www.prnewswire.com/cgi-bin/stories.pl?ACCT=109&STORY=/www/story/09-24-

25   2007/0004668880 (accessed October 3, 2007).

26   [36] *Cf.* Apple's 1984 television commercial that launched the Apple Macintosh computer. The
     commercial alluded to the growing market share of the IBM PC which grew from a 8.57% market

27   share in 1982 to a 26.42% market share in 1983. The commercial played on the fears of IBM
     domination, and, by the mid-90s, the PC's market share was over 97%, although the International

28   Business Machines Corporation (IBM) eventually exited from the PC market. (Wikipedia, "1984

*Continued  On Next Page*

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

Software Version 1.1.1 update. The update "bricked" or otherwise caused iPhone malfunctions to consumers of unlocked iPhones. In response to consumers requests for help, a spokeswoman for Apple said, "[let them] purchase a new iPhone."

41.     Apple acted in defiance and without sufficient consideration of consumers' rights to unlock their iPhones because it knew that the probable result of its update would be to render unlocked iPhones inoperable. Although the update[37] itself warns that unlocking programs available on the Internet may cause irreparable damage to the iPhone's software, and that if a user has modified the iPhone's software, applying the software update "may result in your iPhone becoming permanently inoperable," it appears that Apple took no steps to issue an update with unlocked firmware or otherwise issue its update to prevent damage to unlocked iPhones.

42.     A picture of the warning to the iPhone Software Version 1.1.1 update ("iPhone Update") appears below.



---

(television commercial) – Wikipedia, the free encyclopedia," http://en.wikipedia.org/ wiki/1984_(television_commercial) (accessed October 3, 2007).

[37] The iPhone Update can be downloaded at http://movies.apple.com/movies /us/apple/iphone/ 2007/itunes_store/iphone-itunesstore_848x480.zip (accessed October 3, 2007).

**10.    A congressional subcommittee is critical of Apple's business model.**

43.    On July 11, 2007, the U.S. Congress' Subcommittee on Telecommunications and the Internet ("Subcommittee") held a hearing to examine the relationship between wireless consumers and wireless service providers.[38] The hearing, entitled "Wireless Innovation and Consumer Protection" took place a week after the much-anticipated release of the Apple iPhone.[39]

44.    During his opening statement congressman and chairman of the Subcommittee, Ed Markey said:

> The iPhone highlights both the promise and the problems with the wireless industry today. On the one hand, it demonstrates the sheer brilliance and wizardry of wireless engineering …. On the other hand, the advent of the iPhone raises questions about the fact that a consumer can't use this phone with other wireless carriers, and that consumers in some areas of the country where AT&T doesn't provide service can't use it in some neighborhoods at all … Moreover, even though consumers must buy an iPhone for the full price for 500 or 600 dollars, AT&T Wireless reportedly still charges an early termination fee of apparently $175 for ending the service contract early, even though the phone cost wasn't subsidized and a consumer can't even take it to use with another network provider. This highlights problems with the current marketplace structure, where devices are provided by carriers, portability of devices to other carriers is limited or non-existent, and many consumers feel trapped having bought an expensive device or having been locked into a long-term contract with significant penalties for switching.

///

///

---

[38] Congressman Ed Markey's official Web site, "July 11, 2007 – MARKEY: Wireless Innovation and Consumer Protection is Critical to Bright Wireless Future," U.S. Congress, House, Subcommittee on Telecommunications and the Internet, *Wireless Innovation and Consumer Protection*, 110th Cong., 1st sess., July 11, 2007, http://markey.house.gov/index.php?option=com_content&task=view&id=2954&Itemid=141 (accessed October 1, 2007).

[39] As of October 4, 2007, the hearing transcript was not available. The printed hearing should be available within 90–120 days (October 9 to November 8, 2007) of the conclusion of the July 11th hearing. Committee on Energy and Commerce, "The House Committee on Energy and Commerce: Hearing," http://energycommerce.house.gov/cmte_mtgs/110-ti-hrg.071107.Consumer Protection.shtml (accessed October 4, 2007).

---

**11.    Potential consumers of the iPhone, even big Apple fans, are refusing to buy the iPhone because they do not want to switch to AT&T.**

45.    The Wall Street Journal reports that potential buyers of the iPhone—even some big Apple fans—are holding out from buying the iPhone because they do not want to be forced to switch to AT&T.[40] Bruce Oksol, a 56 year-old retiree from San Antonio, Texas, has been buying Apple products since the 1980s and says he is enamored with the iPhone.[41] But, he says he refuses to switch to AT&T.[42] He says he would have bought the phone for the original $599 price if he would be able to keep his current phone carrier.[43]

## MISREPRESENTATIONS

46.    Apple and AT&T make representations that are materially false, misleading, and likely to deceive a reasonable consumer. The following misrepresentations are hereafter referred to in this complaint as the "Misrepresentations":

47.    Apple posted on its website that cell phone plans start at $59.99 and include "Unlimited Data — email and web —" and that consumers "can browse the Internet and send emails as often as you like without being charged extra."[44] This is false, misleading, and likely to deceive a reasonable consumer who travels outside the United States. When turned on, iPhones by default automatically and constantly check for incoming e-mails. When users activate their phones in a foreign country, the phone immediately checks for e-mail. An additional complication is that currently they cannot use a European service provider or SIM card with the iPhone, which would allow for local service rates. Most travelers visit U.S. sales representatives to inquire about roaming plans and their rates. The representatives advise them about the most convenient plan, but usually

---

[40] Joseph De Avila, "Why Some Apple Fans Won't Buy the iPhone," *The Wall Street Journal Online*, September 12, 2007, http://online.wsj.com/public/article/SB118954864913424277.html (accessed October 27, 2007).
[41] Id.
[42] Id.
[43] Id.
[44] Apple, "Apple – iPhone – Rate Plans for iPhone,", http://www.apple.com/iphone/easysetup /rateplans.html (accessed October 31, 2007)

---

fail to mention the automatic e-mail feature. So even if they make only one or two actual calls, they are billed for dozens—possibly hundreds—of connections.

48.    In the technical specifications to the iPhone, Apple describes the iPhone as a quad-band GSM[45] phone capable of working in the 850, 900, 1800, and 1900 cellular frequency bands— GSM and CDMA systems can be used on all of these frequencies. Cellular frequencies are the frequencies used by cellular networks to provide service to their subscribers. The representation that the iPhone is a GSM phone conveys to the reasonable consumer that the iPhone will function on any GSM network. The representation that the iPhone is quad-band phone conveys to the reasonable consumer that the iPhone is not limited to AT&T's network. It is reasonable for the consumer to believe this because GSM quad-band phones offered by North American carriers support both European and domestic frequencies.

## CONCEALED FACTS

49.    Defendants concealed and continue to conceal its iPhone locking practices.

50.    Defendants intentionally failed to disclose:

(1)    that iPhones are locked with software codes to create an impediment to activation on non-AT&T networks;

(2)    the software unlock code for the iPhone;

(3)    that iPhones can be unlocked;

(4)    that once unlocked, iPhones can be activated on non-AT&T networks (hereafter, the "Concealed Facts").

51.    The Concealed Facts were known to defendants at all relevant times.

52.    The Concealed Facts are important facts which consumers could not have discovered because software locks are not visible to a purchaser visually inspecting the iPhone. Nor is there an disclosure about the locks on the packaging or materials provided with the iPhone at the time of purchase. In the ordinary course, a purchaser would not discover the locking software until attempting to activate the iPhone with another carrier.

---

[45] GSM is an acronym for Global System for Mobile Communications

53.    Plaintiffs did not know the Concealed Facts when purchasing the iPhone. Nor did other Class members.

54.    Defendants intended to deceive the plaintiffs and other Class members by concealing the Concealed Facts.

55.    Plaintiffs and other Class members reasonably relied on defendants' deception by purchasing iPhones, activating those iPhones on AT&T's network, and either remaining on AT&T's network or unlocking their iPhones and thereafter having their iPhones become inoperable after downloading Update 1.1.1.

**DUTY TO DISCLOSE THE CONCEALED FACTS**

56.    Defendants owed a duty to the named plaintiffs and other Class members to disclose the iPhone lock. There are at least 4 bases for such duty.

57.    First, as a seller, defendants have a duty to disclose the Concealed Facts because they are known to Apple but are not accessible to consumers purchasing iPhones. (*See, e.g., Nussbaum v. Weeks* (1989) 214 CA3d 1589, 1600 ("seller has a general duty to disclose material facts that are not accessible to the buyer"), citing 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts § 700, at 801-802.

58.    Second, as a seller, defendants has a duty to disclose the Concealed Facts in order to correct the Misrepresentations which are false, misleading, and likely to deceive reasonable consumers in the absence of such disclosure. *See, e.g.* Restatement (Second) of Torts, § 551.

59.    Third, defendants have a duty to disclose the Concealed Facts in order to prevent harm to the named plaintiffs and the Class. *See Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397—recognizing a duty to disclose based on "the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy preventing future harm." Such a duty arises here because the Concealed Facts are integral to a transaction that was intended to affect the named plaintiffs and the Class, the harm to plaintiffs and the Class was foreseeable—it was intended and purposeful—, and

1    the defendants' conduct is closely connected to the injuries suffered.

2    60.    Fourth, the substantive legal provisions under which plaintiffs bring their claims

3    impose on the defendants a duty not to engage in unfair, unlawful, fraudulent and deceptive

4    business practices and not to conceal facts the disclosure of which is necessary to avoid violating

5    the said claims.

6    **ANTITRUST CONDUCT**

7    61.    Apple and AT&T have engaged and continue to engage in a pattern and practice of

8    antitrust conduct that is harming and will continue to harm consumers. The following conduct and

9    harm is hereinafter referred to as "Antitrust Conduct and Harm".

10    **1.    Market Definitions and Market Share**

11    62.    The "SIM Card-Smartphone Market" ("SIM-Smartphone") is a market for goods,

12    not services. It is the market for mobile phones offering advanced capabilities beyond a typical

13    mobile phone which includes a complete operating system software providing a standardized

14    interface and platform for application developers. A SIM card (Subscriber Identity Module)

15    securely stores the service-subscriber key (IMSI) used to identify cell phone subscribers. The SIM

16    card allows users to change cell phone carriers by simply removing the SIM card from one mobile

17    phone and inserting it into another mobile phone or broadband telephony device. On information

18    and belief, the iPhone is projected to be the #1 selling mobile phone in the United States in the next

19    3 to 6 months. After a reasonable opportunity for further investigation and for discovery, plaintiffs

20    will show that Apple's share of the SIM-Smartphone Market is greater than 30%.

21    63.    The "Cell Phone Market" is the market for long-range mobile communication that in

22    addition to the standard voice function of a telephone, supports many additional services such as

23    SMS (Short Message Service) for text messaging, email, packet switching for access to the Internet,

24    and MMS (Multimedia Messaging Service) for sending and receiving photos and video. AT&T is

25    the  largest wireless carrier in the United States, serving more than 63.7 million customers.[46]

26    _____

27    [46] AT&T, "AT&T News Room," October 26, 2004, http://www.att.com/gen/press-

28    room?pid=4800&cdvn=news&newsarticleid=21444 (accessed October 1, 2007); Michelle Roberts,

*Continued  On Next Page*

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

1    According to Forrester Research, AT&T has a market share of 27.1%[47] as illustrated below:

### WIRELESS MARKET SHARE

Wireless provider AT&T is the leading carrier in current wireless communication market share.

| | |
|---|---|
| AT&T | 27.1% |
| Verizon | 26.3% |
| Sprint Nextel (2) | 23.6% |
| Others | 11.9% |
| T-Mobile | 11.1% |

Note: Market share values are calculated as if they always have been combined

1 - AT&T acquired Cingular in 2004

2 - Sprint and Nextel merged

*Source: Forrester Research*

On June 29, 2007—**the same day the iPhone went on sale**—AT&T purchased Dobson Communications Corp. for $2.8 billion in cash. The purchase added about 1.7 million customers to its nearly 62 million customer base at a time when some analysts were questioning how much larger carriers could grow in an already saturated U.S. wireless market.[48]

64.    The "Online Music Market" is the market for digital music delivered to the consumer by way of Internet download. Apple's share of the Online Music Market is over 80%.

65.    The "Online Video Market" is the market for digital video files that are purchased and downloaded via the Internet that can be viewed both on a home computer and a video-enabled digital music player. Apple's share of the Online Video Market is at least 75 percent.

///

---

"AT&T agrees to buy Dobson Communications," *The USA Today*, June 29, 2007, http://www.usatoday.com/money/economy/2007-06-29-1121518286_x.htm (accessed October 1, 2007).

[47] Leslie Cauley, "AT&T eager to wield its iWeapon," *footnote 21, supra.*

[48] Michelle Roberts, "AT&T agrees to buy Dobson Communications," *fn. 21, supra.*

---

**November 2, 2007**    **FIRST AMENDED COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF**    **Page 26 of 54**

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

66.    The "Online Ringtones Market" is the market for digital sounds or music delivered by way of Internet or cellular download to customize sounds available on mobile phones.

**2.    Unlawful Tying of the iPhone**

67.    The sale of the iPhone (the tying product) is linked to the purchase of a two year wireless service account with AT&T (the tied product). The sale of the iPhone (the tying product) is also linked to the purchase of music, videos, and ringtones from Apple's iTunes Music Store (the tied products), hereinafter "iTunes Media".

68.    Apple has substantial market power in the SIM–Smartphone Market.

69.    There is no appropriate or legitimate business justification for Apple's use of technological restrictions to force those who purchase iPhones to also purchase AT&T's cellular voice or data services that would offset the anticompetitive effects of its tying conduct, including the foreclosure of competition in the Cell Phone Market. The same is true of tying the iPhone with ringtones, music, and videos from the iTunes Music Store as it forecloses competition in the Online Music Market, the Online Video Market, and the Online Ringtone Market.

70.    Purchasers cannot easily obtain the tied product (cell phone services) from another source because the iPhone is intentionally locked by Apple. Nor can purchasers easily obtain iTunes Media (the tied products) from other sources because iTunes Media only play on the iPod and iPhone. Moreover, for those who manage to unlock their iPhones, Apple has demonstrated that its software updates render iPhones "permanently inoperable." Downloading the iPhone Update was important for consumers because the update addressed several security issues.[49]

71.    This unlawful conduct has harmed competition in the Cell Phone Market, the Online Music Market, the Online Video Market, and the Online Ringtone Market, and has caused injury to every buyer and owner of an iPhone as well as every potential buyer of the iPhone. Prices of the iPhone, AT&T's cellular and data services, and iTunes ringtones are higher than they would have been in a competitive market; the supply and selection of products available is lower than it would

---

[49] Apple Inc., "About the Security Content of the iPhone 1.1.1 Update," September 25, 2007, http://docs.info.apple.com/article.html?artnum=306586 (accessed October 3, 2007).

be in a competitive market; and the number and effectiveness of competitors has been diminished by unlawful means.

**3.    Apple has sufficient economic power in the iPhone (the tying market) to coerce the purchase of AT&T's cell phone service (the tied product).**

72.    Apple has sufficient economic power in the tying market (the iPhone) to coerce the purchase of the tied product (AT&T's cell phone service and iTunes Media) because it has a 100% market share of the iPhone. Further, a new report by research group Strategy Analytics says the iPhone is now the fourth best-selling handset in the U.S. As AT&T's top-selling device during the third quarter -- accounting for nearly 13 percent of overall sales -- the groups says the device could even usurp the Motorola RAZR V3 (currently the No. 1 U.S. phone) in the next 3-6 months.[50]

73.    Moreover, for some buyers, the *desirability* of the iPhone and the *uniqueness* of its attributes has created a frenzy throughout the world. Even as of the third week of September 2007, New Yorkers have to wait 15 minutes in line to purchase an iPhone at 3:00 in the morning.[51]

74.    Todd Smith, a spokesperson for AT&T, says that 40% of iPhone users have come from other cell phone service providers.[52]

**4.    A substantial amount of commerce was and will continue to be affected from the sale of AT&T's cell phone service together with the iPhone.**

75.    As discussed in Relevant Market, AT&T's revenue from the iPhone to date is estimated to be $130.98 to $654.98 million.

76.    A substantial amount of commerce was and will continue to be affected from the sale of the iPhone together with AT&T's cell phone service and iTunes Media.

---

[50] Elizabeth Woyke, "The iPhone Versus The RAZR,", *Forbes.com,* October 25, 2007, http://www.forbes.com/digitalinfrastructure/2007/10/25/iphone-razr-motorola-apple-tech-cx_ew_1025iphone.html (accessed November 1, 2007).
[51] Liz Gannes, "Midnight Madness: Benjamins for iPhones in Manhattan," *GigaOM*, September 26, 2007, http://gigaom.com/2007/09/26/midnight-madness-benjamins-for-iphones-in-manhattan (accessed October 3, 2007).
[52] Joseph De Avila, "Why Some Apple Fans Won't Buy the iPhone," *The Wall Street Journal Online*, September 12, 2007, http://online.wsj.com/public/article/SB118954864913424277.html (accessed October 27, 2007).

---

**5.    Apple's unlawful trust with AT&T substantially lessens competition and tends to create a monopoly in trade and commerce in California and throughout the entire United States.**

77.    Beginning with its exclusive agreement with AT&T in January 2007, Apple and AT&T have engaged in continuing trusts in restraint of trade and commerce, attempts to monopolize, conspiracies to monopolize and monopolization of the Relevant Market, in requiring consumers to purchase AT&T's cell phone service with the purchase of the iPhone.

**6.    Repeated Nationwide Wrongful Conduct, Profitability, and Reprehensibility.**

78.    In 2005, Apple was sued in federal court for antitrust violations under the California Cartwright Act and the federal Sherman Act. (*See Tucker v. Apple Computer Inc.*, ("iPod Antitrust Litigation") Case No. C 06-04457 JW, United States District Court for the Northern District of California, San Jose Division). In *Tucker*, plaintiff alleged that the relationship between the Apple iPod and the Apple iTunes Music Store was an unlawful tying arrangement. *Tucker* alleged that consumers were forced to buy iPod after purchasing music from the iTunes Music Store because the iPod was the only mobile device that can play iTunes media. In a 17 page decision of December 20, 2006, the court denied Apple's motion to dismiss on the grounds that the iPod and the iTunes Music Store constituted a *per se* unlawful tying arrangement.

79.    Although the iPod Antitrust litigation is still pending, Apple was on notice of the law prohibiting tying arrangements. Notwithstanding this knowledge, Apple announced on January 9, 2007—only 20 days after the federal court denied its motion to dismiss—its exclusive agreement with AT&T.

80.    Apple's similar conduct with the iPod and iPhone demonstrates repeated wrongful conduct that is earning Apple unprecedented profits in its history. Moreover, Apple's retaliation against consumers for unlocking their iPhones demonstrates Apple's determination to maintain its monopolistic powers and intimidate consumers from attempting to unlock their iPhones.

81.    Apple's unlawful trusts with AT&T have caused monetary and non-monetary harm as follows:

///

///

---

**November 2, 2007**    **FIRST AMENDED COMPLAINT FOR DAMAGES & INJUNCTIVE RELIEF**    **Page 29 of 54**

### NON-MONETARY ANTITRUST HARM

(1)    Consumers are unable to transfer to cell phone carriers of their choice;

(2)    Consumers have refrained from purchasing iPhones because they do not want to switch their cell phone carrier to AT&T;[53]

(3)    Competition in the sale of cellular voice and data services to iPhone owners has been suppressed, restrained, or eliminated.

### MONETARY ANTITRUST HARM

(1)    Consumers suffered pecuniary loss when iPhones became disabled, malfunctioned, or had third-party applications erased after downloading the iPhone 1.1.1 update;

(2)    Consumers suffered pecuniary loss from the amount of early termination fees that they paid to their previous cell phone service while transferring to the iPhone. Todd Smith, a spokesperson for AT&T, says that 40% of iPhone users have come from other cell phone service providers;[54]

(3)    Consumers suffered pecuniary loss from international roaming charges;

(4)    Consumers suffered pecuniary loss from the cost they paid for third-party warranty plans as a result of Apple's public statement that it will not honor warranties on unlocked iPhones;

(5)    Consumers suffered pecuniary loss for having to purchase a new iPhone after their original iPhone became disable after downloading the 1.1.1 Update.

(6)    Consumers suffered pecuniary loss by paying an extra 99 cents for ringtones in addition to the cost of music from the iTunes Music Store, a cost they would not otherwise pay if they could download ringtones from other than the iTunes Music Store.

(7)    Consumers suffered pecuniary loss by paying supra-competitive prices for

---

[53] David Cassel, "Steve Jobs Addresses New AT&T/Iphone Controversy," *Tech.Blorge.com*, June 28, 2007, http://tech.blorge.com/Structure:%20/2007/06/28/steve-jobs-addresses-new-attiphone-controversy (accessed October 3, 2007).

[54] Joseph De Avila, "Why Some Apple Fans Won't Buy the iPhone," *The Wall Street Journal Online*, September 12, 2007, http://online.wsj.com/public/article/SB118954864913424277.html (accessed October 27, 2007).

---

cell phone voice and data services and international roaming charges;[55]

(8)     Consumers suffered pecuniary loss by paying supra-competitive prices for

the price of the iPhone;

(9)     Consumers who did not meet AT&T's initial credit requirements, suffered

pecuniary loss by having to pay a "security deposit" in order to even purchase cell phone services

from AT&T. Further, consumers suffer pecuniary loss during the time that AT&T is in possession

of the security deposit which is customarily one year, but longer if a customer is late on payments.

82.     Plaintiff's on behalf of themselves and all others similarly situated, have been

injured in their property as a result of Apple's antitrust violations for which they seek treble

damages including pre-judgment interest, injunctive relief, and attorneys' fees and costs, pursuant

to sections 16750(a) and 16761 of the California Business and Professions Code.

## BREACHES OF IMPLIED WARRANTIES

83.     The following conduct is hereinafter referred to as the "Breach of Implied

Warranties Conduct".

**A.     Non-Merchantable Goods—Not fit for Ordinary Purposes, Com. Code § 2314(2)(c)**

84.     Every contract for the sale of goods contains a warranty, implied by law, that the

goods are of merchantable quality. (Com C. §2314(1).) To be merchantable, the goods must be fit

for the ordinary purposes for which such goods are used. (Com. C. § 2314(2)(c).) As provided by

an exemption to the Digital Millennium Copyright Act, consumers can lawfully unlock their cell

phones to connect to a cellular carrier of their choice. (See, 37 CFR section 201.40(b)(5).) By

operation of law, this exemption is implied in the Apple's written warranty for the iPhone.

85.     The ordinary purpose of a cell phone is that it be able to connect to the cell phone

carrier network of the consumer's choice. Apple and AT&T altered the iPhone with a software lock

to prevent consumers from connecting to a cellular network other than AT&T. The iPhone is

---

[55] *See generally*, AP Associated Press, "Woman Sues Over Apple's iPhone Price Cut," October
1, 2007, http://ap.google.com/article/ALeqM5ihibMdRH06j7AlMkqA78PS3QJH_gD8S0NCOG1
(accessed October 3, 2007).

---

therefore not fit to be used for the ordinary and statutory lawful purpose of connecting to cellular networks other than AT&T.

**B.    Non-Merchantable Goods—Not fit for Particular Purpose, Com. Code § 2315**

86.    Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose.(Com C. §2315.)

87.    Plaintiffs at the time of contracting intended to use the iPhone for cell phone voice and data services. Apple and AT&T knew that consumers would be using the iPhone for this purpose. Buyers of the iPhone relied on Apple and AT&T's skill or judgment to furnish goods suitable for these purposes and Apple and AT&T knew of the buyers' reliance.

88.    At the time of purchase, Apple and AT&T failed to disclose to consumers that the iPhone had software locks that prevented users from switching to a carrier other than AT&T.

**C.    Breach of Usage of Trade Warranty, Com. Code § 2314(3)**

89.    Implied warranties may arise from usage of trade. (Com. Code § 2314(3).) Commercial Code section 1303(c) defines a usage of trade as:

> Any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

90.    The industry-wide practice in the cell phone industry is that cell phone carriers regularly unlock cell phones where the consumer pays full price for the phone. Here, iPhone consumers paid full price for their phones. The cost was not subsidized by AT&T or Apple.

<b>WARRANTY HARM</b>

91.    The following conduct is hereinafter referred to as the "Warranty Harm".

(1)    Apple's refusal to honor warranties to iPhones that are unlocked or contain third party applications caused pecuniary loss as measured by the difference between the value of the iPhone at the time of purchase and the value at the time of inoperability or disability;

(2)    The amount of third-party warranty plans paid by Class members as a result

---

1    of Apple's statement that it will not honor warranties on unlocked iPhones;

2           (3)    The effect of Apple's conduct upon, and the injury caused to, the business or

3    property of the Plaintiffs and the Class members;

4    ## CLASS ACTION ALLEGATIONS

5        92.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated

6    pursuant to section 382 of the California Code of Civil Procedure. Plaintiffs seek to represent the

7    following Classes:

8    **1.**    **Injunctive Relief Class.**

9        93.    All persons or entities who:

10       (a)    purchased or own an iPhone, intended for use by themselves, their families,

11   or their members, participants, or employees (the "Class") during the period from June 29, 2007

12   through such time in the future as the effects of Apple's illegal conduct, as alleged herein, have

13   ceased (the "Class Period");

14       (b)    purchased audio or video files from the iTunes Music Store during the

15   Class Period.

16   **2.**    **Damages Class.**

17       94.    All persons or entities who:

18       (a)    purchased or owned an iPhone during the Class Period;

19       (b)    purchased audio or video files from the iTunes Music Store during the

20   Class Period.

21   **3.**    **Class Size.**

22       95.    Plaintiffs do not, as yet, know the exact size of the class, but estimates it to be 1.28

23   million iPhone owners with a projected increase of 25 to 37.6 million within the next 18 months as

24   described below in *The basis for class size estimates*.

25   ///

26   ///

27   ///

28   ///

96.    The number of unlocked iPhones is estimated at several hundred thousand people.[56] That number continues growing every day. (*Id.*) Timothy Cook, Apple's chief operating officer, acknowledged that as many as 250,000 iPhones had been purchased but then not activated for service with AT&T.[57]

### A.    The basis for class size estimates.

97.    On June 14, 2007, Apple's CEO Steve Jobs projected sales of 10 million iPhones within the first 18 months of the release date,[58] worth $3.99 to $4.19 billion in retail sales.[59] "We think 10 million is reasonable," Jobs said.[60] Some tech and Wall Street analysts believe Apple could exceed that.[61]

98.    On September 10, 2007, Apple announced that it sold its one millionth[62] iPhone, just 74 days after its June 29th release date.[63] Based on projections from this information, there are

_____

[56] Erica Sadun, "iPhone Dev Team Issues Statement," September 25, 2007, *Tuaw.com*, http://www.tuaw.com/2007/09/25/iphone-dev-team-issues-statement (accessed October 2, 2007).

[57] John Markoff, "Record Mac Sales Help Apple Earnings Climb 67% in Quarter," *The New York Times*, October 23, 2007, http://www.nytimes.com/2007/10/23/technology/23apple.html?_r=2&oref=slogin&oref=slogin (accessed October 30, 2007).

[58] Jefferson Graham and Edward C. Baig, "iPhone launch gives Apple's Steve Jobs butterflies," *The USA Today*, June 28, 2007, http://www.usatoday.com/tech/wireless/phones/2007-06-28-iphone-launch_N.htm (accessed October 1, 2007).

[59] From its debut through September 4, 2007, the 4 GB iPhone sold for $499 and the 8 GB iPhone sold for $599. (Apple, "Apple Premieres This Friday Night at Apple Retail Stores," June 28, 2007, http://www.apple.com/pr/ library/2007/06/28iphone.html (accessed October 1, 2007). On September 5, 2007, Apple dropped the price of its 8 GB iPhone to $399. (Apple, "Apple Sets iPhone Price at $399 for this Holiday Season," http://www.apple.com/pr/library/2007/09/05 iphone.html (accessed October 1, 2007). The range of $3.99 to $4.19 billion in retail sales is calculated as follows: the first 1 million phones at $399 to $599 equals $399 to $599 million. Nine million phones at $399 equals $3.59 billion.

[60] Jefferson Graham and Edward C. Baig, "iPhone launch gives Apple's Steve Jobs butterflies," *supra* at *fn. 57*.

[61] Jefferson Graham, "iPhone mania nears fever pitch," *footnote 30, supra.*

[62] Apple, "Apple Sells One Millionth iPhone," September 10, 2007, http://www.apple.com/pr/ library/2007/09/10 iphone.html (accessed October 1, 2007).

[63] Apple, "Apple Premieres This Friday Night at Apple Retail Stores," June 28, 2007. http://www.apple.com/pr/ library/2007/06/28iphone.html (accessed October 1, 2007).

1    approximately 1.31 million iPhones that have been sold as of October 1, 2007.[64]

2        99.    Gene Munster, who covers Apple for investment firm Piper Jaffray, projects iPhone

3    sales to be $15 billion by 2009 which amounts to projected sales of 25 to 37.6 million iPhones in

4    the next 15 months.[65]

5        **B.    Impracticability of joinder.**

6        100.    As discussed in "Relevant Market", the geographic market of the iPhone and

7    AT&T's cell phone service is worldwide. With a present class size of 1.31 million iPhone owners

8    and projections of 25 to 37.6 million in the next 15 months, joinder of all Class members would not

9    be practicable.

10   **4.    Common Questions of Law.**

11       101.    There are questions of law and fact common to the class that predominate over any

12   questions that may affect only individual Class members. The following are hereinafter referred to

13   as "Common Questions of Law":

14           (1)    Whether Defendants' conduct violated section 16720 and/or 16727 of the

15   California Business and Professions Code relating to unlawful trusts;

16           (2)    Whether Defendants' conduct constitutes a *per se* violation of sections 16720

17   and 16727;

18           (3)    Whether Defendant's conduct violated sections 1 and/or 2 of the

19   Sherman Act;

20           (4)    Whether Defendants' conduct violated the Consumer Legal Remedies Act

21           (5)    Whether Defendants' conduct violated the Commercial Code;

22           (6)    Whether Defendants' conduct violated the Song-Beverly Warranty Act;

23   _____

24       [64] Calculation: As of September 10, 2007, 1 million iPhones were sold which is an average of

25   13,513 iPhones sold per day. *See fn. 16, supra.* Based on a daily sales average of 13,513 iPhones,
     there were approximately 310,799 iPhones sold from September 11, 2007 through October 3, 2007,

26   inclusive.

27       [65] Jefferson Graham, "iPhone mania nears fever pitch," *footnote 30, supra.* The range of
     iPhone's sold is based on the $399 low and the $599 high price of the iPhone at the time of

28   Munster's projections. *See fn. 15, supra.*

---

(7)     Whether Defendants' conduct violated California Penal Code section 502;

(8)     Whether Defendants' conduct violated the Computer Fraud Abuse Act;

(9)     Whether Defendants' conduct violated the RICO Act;

(10)    Whether Defendants' conduct violated section 17200 relating to unfair or unlawful business acts or practices;

(11)    Whether Defendants' conduct violated the common law of monopolization;

**5.     Common Questions of Fact.**

102.    The following are hereinafter referred to as "Common Questions of Fact":

(1)     Whether Defendants' conduct was willful;

(2)     Whether Defendants' acts, contracts, combinations and/or conspiracies restrained trade, commerce, or competition for the purchase of the iPhone or the purchase of cellular wireless services through carriers other than AT&T;

(3)     Whether Apple obtained, possessed and/or unlawfully used monopoly power over the Relevant Market for the iPhone and AT&T's cell phone service;

(4)     Whether, under common principles of California antitrust law, Plaintiffs and the Class members suffered antitrust injury or were threatened with injury;

(5)     The type and measure of damages suffered by Plaintiffs and the Class members as described above in Monetary Antitrust Harm and Warranty Harm;

(6)     The type of non-monetary damages as described above in Non-Monetary Anti-trust Harm.

**6.     Adequacy of Class Representatives.**

103.    Plaintiffs will fairly and adequately protect the interests of the Class in that Plaintiffs' claims are typical and representative of the claims of all Class members, all of whom own iPhones.

104.    There are no defenses of a unique nature that may be asserted against Plaintiffs individually, as distinguished from the other Class members, and the relief sought is common to the Class. Plaintiffs are a typical owners of the iPhone, do not have any interest that is in conflict with or is antagonistic to the interests of the Class members, and have no conflict with any other member

1    of the Class. Plaintiffs have retained competent counsel experienced in antitrust litigation and class

2    action litigation to represent themselves and the Class members.

3          105.    A class action is superior to other available methods for the fair and efficient

4    adjudication of this controversy. In the absence of a class action, Apple will retain the benefits of its

5    wrongful conduct.

6    **RELEVANT MARKET**

7    **1.    The Relevant Product Markets.**

8          106.    To the extent applicable to the claims alleged herein, the relevant product markets

9    are the markets for:

10              (1)    Smartphones with SIM cards ("SIM-Smartphones");

11              (2)    Cellular Voice Services;

12              (3)    Cellular Data Services;

13              (4)    Online Music;

14              (5)    Online Video;

15              (6)    Online Ringtones

16    **2.    The Relevant Market Share.**

17          107.    The relevant market shares for each market are discussed above in Market

18    Definitions and Market Share.

19    **3.    The relevant geographic market for the iPhone and AT&T's cell phone service.**

20          108.    The relevant geographic market for the iPhone and AT&T's cell phone service is

21    worldwide with AT&T being the exclusive cell phone carrier for the iPhone in the United States.[66]

22    ///

23    ///

24    ///

25    ///

_____

27        [66] Apple Inc. Form 10-Q. "Quarterly Report Pursuant to Section 13 or 15(d) of the Securities

28    Exchange Act of 1934," *fn. 10, supra.*

109.    On September 18, 2007, Apple announced that Telefónica's O2 Telecommunications would be the exclusive carrier of the iPhone in the United Kingdom. The iPhone is scheduled to go on sale on November 9, 2007 together with an 18-month contract.[67]

110.    On September 19, 2007, Apple announced that Deutsche Telekom's T-Mobile would be the exclusive carrier of the iPhone in Germany. The iPhone is scheduled to go on sale on November 9, 2007 together with a 2-year contract.[68]

111.    On September 20, 2007, France Télécom announced that their wireless division Orange SA had a contract with Apple to offer iPhones in France.[69]

112.    Apple is expected to release the iPhone in Australia in 2008.[70]

113.    The market for the iPhone is worldwide because it can be used on any GSM network once the iPhone is unlocked. It is reported that GSM is the most popular standard for mobile phones in the world, with its promoter, the GSM Association, estimating that GSM accounts for 82% of the global mobile market.[71]

**4.    A substantial amount of commerce was and will continue to be affected from the sale of the iPhone together with AT&T's cell phone service and iTunes Media.**

114.    By distributing an equal amount of iPhone users to AT&T's individual and family cell phone plans, the monthly revenue generated by AT&T based on 1.31 million iPhones in use today is estimated as follows:

---

[67] Apple, "Apple Chooses O2 as Exclusive Carrier for iPhone in UK," September 18, 2007. http://www.apple.com/pr/library/2007/09/18iphone.html (accessed October 1, 2007).

[68] Apple, "Apple and T-Mobile Announce Exclusive Partnership for iPhone in Germany," September 19, 2007. http://www.apple.com/pr/library/2007/09/19iphone.html (accessed October 1, 2007).

[69] Laetitia Fontaine, "France Telecom's Orange To Distribute Apple iPhone In France," *The Wall Street Journal Online*, September 20, 2007. http://online.wsj.com/article/BT-CO-20070920-705999-Q4B7U_6vEH_eljKax_y25c35Ilw_20080930.html?mod=crnews (accessed October 1, 2007).

[70] Dan Warne, "Australia won't see iPhone 'til 2008,'" *Ninemsn*, January 10, 2007, http://apcmag.com/4959/australia_wont_see_iphone_til_2008 (accessed October 1, 2007).

[71] GSM Association, "GSM—the website of the GSM Association," http://www.gsmworld.com/gsmstats.shtml (accessed October 1, 2007).

---

| Type of cell phone Plan | Monthly Cost | Estimated Revenue |
|---|---|---|
| Individual Plans | $39.99 to $199.99 | $52.39 to $261.99 million |
| Family Plans | $59.99 to $299.99 | $78.59 to $392.99 million |
| | **Total:** | $130.98 to $654.98 million |

115.    Based on these estimates, AT&T's cell phone service substantially affects commerce to the tune of $130 to $654 million every month or $390 million to $1.96 billion to date.

116.    Worldwide ringtones sales totaled $3.5 billion last year. As Apple is the leading retailer of digital music worldwide, selling more than 3 billion song downloads since the launch of iTunes in 2003. Apple says about half a million of the store's 6 million songs are available as ringtones. With over 1 million iPhones sold, a substantial amount of commerce will be affected from the sale of the iPhone.

**FIRST CAUSE OF ACTION**

**For Violation of Section 16720<br>of the Cartwright Act (Unlawful Trusts)**

117.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of themselves and the Classes. This cause of action is pled against Apple and AT&T.

118.    Plaintiffs and Class members are "persons" within the meaning of the Cartwright Act as defined in section 16702.

119.    Trusts are defined in section 16720 as any "combination" of capital, skill or acts by two or more persons to, among other things, carry out restrictions in commerce, prevent competition, or fix prices. Further, liability can be established under 16720 by a *per se* tying arrangement. A *per se* tying arrangement is established if:

(1)    a tying agreement, arrangement, or condition existed whereby the sale of the tying product was linked to the sale of the tied product or service,

(2)    the party had sufficient economic power in the tying market to coerce the purchase of the tied product,

1          (3)     a substantial amount of commerce was affected in the sale of the tied

2    product, and

3          (4)     the complaining party sustained pecuniary loss as a consequence of the

4    unlawful act. (*Morrison v. Viacom* (1998) 66 C.A.4th 541; *Suburban Mobile Homes v. AMFAC*

5    *Communities* (1980) 101 Cal. App. 3d 532.)

6          120.    Apple and AT&T have engaged in a *per se* tying arrangement and have engaged in

7    unlawful trusts for their Antitrust Conduct and Harm as discussed above.

8          121.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged

9    Classes and is in violation of the Cartwright Act, § 16720.

10         122.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

11   as hereinafter set forth.

12                              **SECOND CAUSE OF ACTION**

13                          **For Violation of Section 16727 of the**
                             **Cartwright Act (Unlawful Tying Agreement)**
14

15         123.    Plaintiffs reallege and incorporate by reference each of the allegations set forth

16   above on behalf of themselves and the Classes. This cause of action is pled against Apple and

17   AT&T.

18         124.    Under section 16727, a *per se* tying arrangement is found if the following elements

19   (1) and (4) are established along with either element (2) or (3):

20         (1)     a tying agreement, arrangement, or condition existed whereby the sale of the

21   tying product was linked to the sale of the tied product or service,

22         (2)     the party had sufficient economic power in the tying market to coerce the

23   purchase of the tied product,

24         (3)     a substantial amount of commerce was affected in the sale of the tied

25   product, and

26         (4)     the complaining party sustained pecuniary loss as a consequence of the

27   unlawful act. (*Morrison v. Viacom* (1998) 66 C.A.4th 541; *Suburban Mobile Homes v. AMFAC*

28   *Communities* (1980) 101 Cal. App. 3d 532.)

---

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

125.    Apple and AT&T have engaged in a *per se* tying arrangement for their Antitrust Conduct and Harm as discussed above.

126.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Cartwright Act, § 16727.

127.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION

**For Violation of Section 1 of the
Sherman Antitrust Act, 15 U.S.C. § 1, Unlawful Tying**

128.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

129.    Apple and AT&T have engaged in a *per se* tying arrangement for their Antitrust Conduct and Harm as discussed above

130.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

131.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION

**For Violation of Section 2 of the
Sherman Antitrust Act, 15 U.S.C. § 2, Monopolization**

132.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

133.    Apple and AT&T have engaged in a *per se* tying arrangement and unlawful trusts for their Antitrust Conduct and Harm as discussed above

134.    The anticompetitive conduct described herein has damaged plaintiffs and the alleged Classes and is in violation of the Sherman Antitrust Act, 15 U.S.C. § 2.

135.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**

**For Breach of Implied Warranties, Commercial Code §§ 2314, 2315**

136.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

137.    Defendants' Breaches of Implied Warranties violated the following Commercial Code sections:

      (1)    section 2314(2)(c), fitness for ordinary purpose;

      (2)    section 2315, fitness for a particular purpose;

      (3)    section 2314(3), usage of trade.

138.    Plaintiffs took reasonable steps to notify Apple and AT&T within a reasonable time that the iPhone and AT&T cell phone plans did not have the quality that a buyer would reasonably expect. Plaintiffs notified Apple and AT&T that their unlocked iPhones became inoperable following the installation of the 1.1.1 Update. Apple refused to honor the warranties of any consumers with unlocked iPhones. Plaintiffs of locked iPhones complained to Apple and AT&T that they incurred substantial international roaming charges because they were unable to switch their SIM cards to connect to other carriers while travelling abroad. Apple and AT&T refused to provide unlock codes or otherwise remedy the roaming charges disputes.

139.    The Breaches of Implied Warranties have caused Warranty Harm to the plaintiffs and the alleged Classes.

140.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

**SIXTH CAUSE OF ACTION**

**For Breach of Express Warranties, Commercial Code §2313(1)**

141.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

142.    Any affirmation of fact or promise made by the seller to the buyer that relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. (Com. C § 2313(1)(a).)

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

143.    Apple and AT&T violated Commercial Code section 2313(1)(a) by making the Misrepresentations.

144.    The breach of express warranty has caused Warranty Harm to plaintiffs and the alleged Classes.

145.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

### For Breach of Song-Beverly Consumer Warranty Act, Civil Code §§ 1790, *et seq.*

146.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

147.    A buyer suing for breach of the implied warranty of merchantability with respect to consumer goods has all the Commercial Code remedies available to it plus a right to damages as provided in the Song-Beverly Consumer Warranty Act (See Civil Code §§ 1791.1(d), 1794.)

148.    Every sale of consumer goods that are sold at retail in this state is accompanied by the manufacturer's and the retail seller's implied warranty that the goods are merchantable. (Civil Code § 1792.) "Every sale of consumer goods that are sold at retail in this state by a manufacturer who has reason to know at the time of the retail sale that the goods are required for a particular purpose and that the buyer is relying on the manufacturer's skill or judgment to select or furnish suitable goods shall be accompanied by such manufacturer's implied warranty of fitness." (Civil Code, § 1792.1.)

149.    Defendants have breached the implied warranties of merchantability and fitness for a particular purpose as alleged in the Breach of Implied Warranties discussed above.

150.    The Breaches of Implied Warranties have caused Warranty Harm to the plaintiffs and the alleged Classes.

151.    If the buyer prevails in an action under the Song-Beverly Consumer Warranty Act, the buyer shall be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the

1    commencement and prosecution of such action. (Civil Code § 1794(d).)

2        152.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

3    as hereinafter set forth.

4                              **EIGHTH CAUSE OF ACTION**

5              **For Breach of Implied Warranty Under Magnuson-Moss**
              **Warranty—Federal Trade Commission Improvement Act**

6

7        153.    Plaintiffs reallege and incorporate by reference each of the allegations set forth

8    above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

9        154.    A consumer damaged by the failure of a warrantor to comply with any implied

10   warranty arising under state law may bring a civil action for damages and other legal and equitable

11   relief under the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15

12   U.S.C. § 2310(d)(1).) If a consumer prevails in an action brought under section 2310(d), he or she

13   may be allowed to recover a sum equal to the aggregate amount of cost and expenses including

14   attorney's fees based on actual time expended determined by the court to have been reasonably

15   incurred by the plaintiffs. (15 U.S.C. §2310(d)(2).)

16       155.    As discussed above in, defendants breached the implied warranties of

17   merchantability and fitness for a particular purpose under California's Commercial Code and the

18   Song-Beverly Warranty Act.

19       156.    The Breaches of Implied Warranties have caused Warranty Harm to the plaintiffs

20   and the alleged Classes.

21       157.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

22   as hereinafter set forth.

23                              **NINTH CAUSE OF ACTION**

24              **For Violation of the Consumer Legal Remedies Act, § 1750,** *et seq.*

25       158.    Plaintiffs reallege and incorporate by reference each of the allegations set forth

26   above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

27       159.    By secretly locking iPhones and failing to disclose the existence and effects of

28   iPhone locks as alleged above, Apple and AT&T have engaged in, and continue to engage in, unfair

1  methods of competition and unfair or deceptive acts and practices in violation of the Consumer

2  Legal Remedies Act, Civil Code sections 1750 *et seq.* (the "CLRA").

3       160.    CLRA section 1770(a)(5) prohibits "Representing that goods or services have

4  sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not

5  have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she

6  does not have." Defendants violated this provision by making the Misrepresentations and by

7  concealing the Concealed Facts. Defendants continue to violate this provision in connection with

8  sales of iPhones to Class members.

9       161.    CLRA section 1770(a)(7) prohibits "Representing that goods or services are of a

10  particular standard, quality, or grade, or that goods are of a particular style or model, if they are of

11  another." Defendants violated this provision by making the Misrepresentations and by concealing

12  the Concealed Facts. Defendants continue to violate this provision in connection with sales of

13  iPhones to Class members.

14       162.    CLRA section 1770(a)(9) prohibits "Advertising goods or services with intent not to

15  sell them as advertised." Defendants violated this provision by making the Misrepresentations and

16  by concealing the Concealed Facts. Defendants continue to violate this provision in connection with

17  sales of iPhones to Class members.

18       163.    Plaintiffs and the Class members by telephone and in-person notified Apple and

19  AT&T that they were not aware of the software locks at the time of purchase and of the Antitrust

20  Harm and Warranty Harm. Apple and AT&T refused to remedy the damages of plaintiffs and the

21  Class members.

22       164.    The violations of the CLRA have caused Pecuniary Loss to plaintiffs and the alleged

23  Classes.

24       165.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

25  as hereinafter set forth.

26  ///

27  ///

28  ///

---

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

**TENTH CAUSE OF ACTION**

**For Violation of the Computer Fraud Abuse Act, 18 U.S.C. § 1030**

166.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

167.    The federal Computer Fraud Abuse Act provides that whoever:

(1)    knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(2)    intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(3)    intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage;" and causes loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value is liable for civil and criminal penalties. (18 U.S.C. § 1030(a)(5)(A)(i-iii).)

The term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device. (18 U.S.C. § 1030(e)(1).

168.    Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage.

169.    The iPhone is a computer under the act because it consists of "OS X" which is a fully functioning operating system that also runs on Apple's desktop computers. Apple knowingly

1   caused the transmission of Update 1.1.1 by luring consumers to download it for enhancements and

2   security fixes. As a result of such conduct, Apple intentionally caused damage without

3   authorization to unlocked iPhones. iPhone users did not authorize Apple to access that portion of

4   the firmware to re-lock or otherwise disable their unlocked phones.

5          170.    The violations of the Computer Fraud Abuse Act has damaged plaintiffs and the

6   alleged Classes as follows:

7                 (1)     Hundreds of thousands of iPhones are no longer operable or otherwise

8   disabled because of the iPhone Update;

9                 (2)     Third party applications were removed by the 1.1.1 update;

10                (3)     Consumers purchased new iPhones to replace their inoperable iPhones.

11         171.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

12   as hereinafter set forth.

13                              **ELEVENTH CAUSE OF ACTION**

14                          **For Violation of California Penal Code § 502**

15         172.    Plaintiffs reallege and incorporate by reference each of the allegations set forth

16   above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

17         173.    Section 502(a) of the California Penal Code (Section 502) provides "It is the intent

18   of the Legislature in enacting this section to expand the degree of protection afforded to individuals,

19   businesses, and governmental agencies from tampering, interference, damage, and unauthorized

20   access to lawfully created computer data and computer systems. The Legislature finds and declares

21   that the proliferation of computer technology has resulted in a concomitant proliferation of

22   computer crime and other forms of unauthorized access to computers, computer systems, and

23   computer data. The Legislature further finds and declares that protection of the integrity of all types

24   and forms of lawfully created computers, computer systems, and computer data is vital to the

25   protection of the privacy of individuals as well as to the well-being of financial institutions,

26   business concerns, governmental agencies, and others within this state that lawfully utilize those

27   computers, computer systems, and data."

28         174.    The iPhone meets the definition of a computer under Section 502.

---

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

175.    Section 502(c) provides in pertinent part that any person who commits any of the following acts is guilty of a public offense:

(1)    Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(4)    Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5)    Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(8)    Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

176.    As discussed above, the iPhone 1.1.1 Update removed third-party applications and disabled unlocked iPhones. The sole purpose of defendant's conduct was to deter consumers from unlocking their iPhones, punish those who unlocked their iPhones, and extort owners of disabled iPhones to purchase new iPhones and remain with AT&T.

177.    Any person who violates these provisions is punishable by criminal and/or civil penalties.

178.    Section 502 provides that in addition to any other civil remedy available, the owner may bring a civil action for compensatory damages and injunctive relief or other equitable relief. (Section 502(e)(1).)

179.    In any action brought pursuant to Section 502, the court may award reasonable attorney's fees. (Section 502(e)(2).)

180.    In any action brought pursuant to Section 502 for a willful violation of the provisions of subdivision (c), where it is proved by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice as defined in subdivision (c) of Section 3294 of the

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

1    Civil Code, the court may additionally award punitive or exemplary damages. (Section 502(e)(4).)

2    181.    The violations of the California Penal Code has damaged plaintiffs and the alleged

3    Classes as follows:

4        (1)    Hundreds of thousands of iPhones are no longer operable or otherwise

5    disabled because of the iPhone Update;

6        (2)    Third party applications were removed by the 1.1.1 update.

7    182.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief

8    as hereinafter set forth.

9                    **TWELFTH CAUSE OF ACTION**

10                    **For Common Law Monopolization**

11    183.    Plaintiffs reallege and incorporate by reference each of the allegations set forth

12    above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

13    184.    Apple has engaged in predatory and anticompetitive conduct intentionally to obtain

14    and maintain monopoly power for Apple and AT&T in the Relevant Market in violation of

15    common law.

16    185.    Apple has willfully acquired and maintained monopoly power, and Apple now has

17    100% of the California and the entire United States' markets for the iPhone.

18    186.    Apple willfully acquired monopoly power and maintained it by suppressing the

19    competition in the iPhone and cell phone service for the iPhone through restrictive and exclusionary

20    conduct. Apple entered into an exclusive agreement with AT&T with the specific intent of

21    acquiring and maintaining monopoly power.

22    187.    Plaintiffs and the Class members, suffered injury in their property as a result of

23    Apple's monopoly power and anticompetitive conduct because Plaintiffs and Class members have

24    been, and continue to be, forced to purchase the iPhone and AT&T's cell phone service at inflated

25    prices, rather than a less expensive alternative through other carriers.

26    188.    Apple forced Plaintiffs and the Class members to pay substantially more for the

27    iPhone and cell phone service than they would have paid in a competitive marketplace either for the

28    iPhone or for AT&T's cell phone service.

---

**November 2, 2007      FIRST AMENDED COMPLAINT FOR      Page 49 of 54**
**DAMAGES & INJUNCTIVE RELIEF**

189.    Plaintiffs and the Class members are entitled to bring this action and to recover herein compensatory damages, the cost of bringing suit, and reasonable attorneys' fees.

### THIRTEENTH CAUSE OF ACTION

### Violation of the RICO Act, Tile 18 U.S.C. §§ 1961-1968

190.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

191.    The elements of a RICO cause of action are: (1) defendant persons, (2) an Enterprise engaged in or affecting interstate commerce, (3) a pattern and practice, (4) racketeering activity. (18 U.S.C. §§ 1961-1968.)

192.    The conduct of Apple and AT&T constitutes criminal violations of California and federal law. Regarding anti-trust issues, the exclusive and unlawful agreement between Apple and AT&T will continue through at least the year 2012. Apple and AT&T have a continuing pattern practice of selling locked iPhones, issuing updates that will disable unlocked iPhones, and refusing to provide warranties to consumers of unlocked phones.

193.    If a plaintiff succeeds in establishing a civil RICO claim, he or she will be awarded monetary damages, in particular three times the actual damages established at trial plus the plaintiff's attorneys' fees and costs.

194.    The violations of the RICO Act has caused Antitrust Conduct and Harm and Warranty Harm to plaintiffs and the Class members.

195.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

### FOURTEENTH CAUSE OF ACTION

### For Unfair Competition in Violation of Section Cal. Bus. & Prof. C. § 17200

196.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above on behalf of the Classes. This cause of action is pled against Apple and AT&T.

197.    Apple's actions to restrain trade, monopolize the market for the iPhone, and fix prices constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, *et seq.*

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

198.    Apple's conduct in engaging in combinations of capital, skill, and acts with AT&T with the intent, purpose, and effect of acquiring and perpetuating Apple and AT&T's monopoly, creating and carrying out restrictions in trade and commerce, increasing or maintaining the price of the iPhone and AT&T's cell phone service, and restraining trade and preventing competition in the Relevant Market, constitutes and was intended to constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of section 17200.

199.    Apple also violated California's Unfair Competition Act by violating the Cartwright Act.

200.    As a result of Apple's violations of Code section 17200, Apple has unjustly enriched itself at the expense of Plaintiffs and the Class members. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

201.    To prevent their unjust enrichment, Apple should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge their illegal gains for the purpose of making full restitution to all injured Class members identified hereinabove. Apple should also be permanently enjoined from continuing their violations of section 17200.

202.    Disgorgement of profits earned by Apple and AT&T is an appropriate remedy because it is the result of repeated, nationwide conduct for acts that are criminal in nature. Without disgorgement, Apple and AT&T will be allowed to profit from their unlawful and criminal activity which was intended to maintain its monopolistic position.

203.    The acts and business practices, as alleged herein, constituted and constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of section 17200, *et seq.*, including, but in no way limited to, for the acts and violations of law as described above in the Common Questions of Law and Fact.

204.    Apple's acts and business practices as described herein, are unfair, unconscionable, unlawful, and fraudulent.

205.    The illegal conduct alleged herein is continuing, and there is no indication that Apple will refrain from such activity into the future.

---

206.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, requests the following classwide equitable relief:

(1)    that a judicial determination and declaration be made of the rights of Plaintiffs and the Class members, and the corresponding responsibilities of Apple;

(2)    that Apple be declared to be financially responsible for the costs and expenses of a Court-approved notice–program by mail, Internet, broadcast media, and publication designed to give immediate notification to Class members; and

(3)    requiring disgorgement and/or imposing a constructive trust upon Apple's ill-gotten gains, freezing Apple's assets, and/or requiring Apple to pay restitution to Plaintiffs and all Class members of all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent, business practice, or to constitute unfair competition.

207.    Wherefore, plaintiffs on behalf of themselves and the Class members, pray for relief as hereinafter set forth.

### PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays that this Court enter judgment on behalf of themselves and the Class members, adjudging and decreeing that:

1.    This action may be maintained as a class action under section 382 of the California Code of Civil Procedure and/or section 1781 of the California Civil Code, and certifying Plaintiffs as representatives of the Class and designating their counsel as counsel for the Class;

2.    Apple has engaged in a trust, contract, combination, or conspiracy in violation of California Business and Professions Code section 16750(a), and that Plaintiffs and the Class members have been damaged and injured in their property as a result of this violation;

3.    The alleged combination and conspiracy be adjudged and decreed to be an unreasonable restraint of trade in violation of the Cartwright and Sherman Acts;

4.    Plaintiffs and the Class members recover threefold the damages determined to have been sustained by them as a result of Apple's Antitrust conduct complained of herein as provided in California Business and Professions Code section 16750(a) and the RICO ACT, and that judgment

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

be entered against Apple in an amount to be proven at trial;

5.     Apple's conduct constitutes unlawful, unfair, and/or fraudulent business practices within the meaning of California's Unfair Competition Act, and California Business and Professions Code sections 17200, *et seq.*;

6.     For disgorgement of ill-gotten profits as allowed by law and equity as determined to have been earned by Apple and AT&T, but not less than the following:

a.     $280 million dollars based on approximately 1.4 million iPhones sold to date at a profit margin of $200 per iPhone,

b.     $5 billion based on Wall Street Analyst Gene Munster's low-end projection of 25 million sales of iPhones in the next 15 months at a profit margin of $200 per iPhone;

c.     $7.52 billion based on Munster's high-end projection of 37.6 million sales of iPhones in the next 15 months at a profit margin of $200 per iPhone;

7.     As an alternative to any treble damages authorized by statute, punitive damages in an amount sufficient to punish and deter the conduct of Apple and AT&T;

8.     Judgment be entered against Apple and in favor of Plaintiffs and all Class members, for damages arising from Apple's monopolization of the Relevant Market as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

9.     For prejudgment and post-judgment interest;

10.    For a permanent injunction precluding Apple from:

a.     selling the iPhone with any software lock;

b.     denying warranty service to users of unlocked iPhones;

c.     requiring iPhone consumers to purchase their cell phone service through AT&T.

11.    For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

12.    For attorneys' fees;

13.    For costs of suit, and

14.    For such other and further relief as the Court may deem just and proper.

---

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

**DEMAND FOR TRIAL BY JURY**

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a trial by jury for all issues so triable.

Date: November 2, 2007

Respectfully submitted,

M. Van Smith (CA Bar No. 32007)
Damian R. Fernandez (CA Bar No. 206662)
LAW OFFICE OF DAMIAN R. FERNANDEZ
14510 Big Basin Way, Suite A, PMB 285
Saratoga, California 95070-6091
Telephone: (408) 355-3021
Facsimile: (408) 904-7391

By: _Damian R. Fernandez_
DAMIAN R. FERNANDEZ

**Joseph Antonelli (CA Bar No. 137039)**
**Janelle C. Carney (CA Bar No. 201570)**
LAW OFFICE OF JOSEPH ANTONELLI
1000 Lakes Drive, Suite 450
West Covina, California 91790
Telephone: ((626) 917-6228
Facsimile: (626) 917-7686

**Kevin T. Barnes (CA Bar No. 138477)**
**Gregg Lander (CA Bar No. 194018)**
LAW OFFICES OF KEVIN T. BARNES
5670 Wilshire Boulevard, Suite 1460
Los Angeles, California 90036
Telephone: ((323) 549-9100
Facsimile: (323) 549-0101

///
///
///
///
///
///

THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
ELECTRONIC FILING - WWW.SCEFILING.ORG
c/o Glotrans
2915 McClure Street
Oakland, CA94609
TEL: (510) 208-4775
FAX: (510) 465-7348
EMAIL: Info@Glotrans.com

# E-FILED

Nov 2, 2007 9:06 AM
KIRI TORRE
Chief Executive Officer
Superior Court of CA, County of Santa Clara
Case #1-07-CV-095781 Filing #G-5903
By C. Fujihara, Deputy

## THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

| | |
|---|---|
| TIMOTHY P. SMITH, on behalf of himself and all others similarly situated, Plaintiffs, | Smith v. Apple, Inc. |
| Plaintiff, | Lead Case No.1-07-CV-095781 |
| vs. | Judge Jack Komar |
| APPLE, INC., Defendants. | |
| Defendant. | **PROOF OF SERVICE** |
| AND RELATED ACTIONS | **Electronic Proof of Service** |

I am employed in the County of Alameda, State of California.

I am over the age of 18 and not a party to the within action; my business address is 2915 McClure Street, Oakland, CA 94609.

The documents described on page 2 of this Electronic Proof of Service were submitted via the worldwide web on Fri. November 2, 2007 at 7:36 AM PDT and served by electronic mail notification.

I have reviewed the Court's Order Concerning Electronic Filing and Service of Pleading Documents and am readily familiar with the contents of said Order. Under the terms of said Order, I certify the above-described document's electronic service in the following manner:

The document was electronically filed on the Court's website, http://www.scefiling.org, on Fri. November 2, 2007 at 7:36 AM PDT

Upon approval of the document by the Court, an electronic mail message was transmitted to all parties on the electronic service list maintained for this case. The message identified the document and provided instructions for accessing the document on the worldwide web.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on November 2, 2007 at Oakland, California.

Dated: November 2, 2007                    For WWW.SCEFILING.ORG

                                           Andy Jamieson

E-Filed: Nov 2, 2007 9:06 AM, Superior Court of CA, County of Santa Clara, Case #1-07-CV-095781 Filing #G-5903

**THE SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**ELECTRONIC FILING SYSTEM - WWW.SCEFILING.ORG**

**Electronic Proof of Service**
**Page 2**

**Document(s) submitted by Damian Fernandez of Law Office of Damian R. Fernandez on Fri. November 2, 2007 at 7:36 AM PDT**

1. 1st Amended Complaint: 2007-11-02, 1st Amended Complaint