FRANCIS M. GREGOREK (144785)
gregorek@whafh.com
BETSY C. MANIFOLD (182450)
manifold@whafh.com
RACHELE R. RICKERT (190634)
rickert@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

MARK C. RIFKIN (*pro hac vice*)
rifkin@whafh.com
ALEXANDER H. SCHMIDT (*pro hac vice*)
schmidt@whafh.com
MARTIN E. RESTITUYO (*pro hac vice*)
restituyo@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Telephone: 212/545-4600
Facsimile: 212/545-4677

Plaintiffs' Interim Lead Counsel

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE APPLE & AT&TM ANTITRUST LITIGATION | Master File No. C 07-5152 JW |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT APPLE'S MOTION TO DISMISS THE REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | DATE:  September 12, 2008 |
| | TIME:   1:00 p.m. |
| | CRTRM:  8 |
| | JUDGE:  Hon. James Ware |

# **TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     THE WELL-PLEADED FACTS ......................................................................... 2

     A.     Cell Phone Industry and Digital Millennium Copyright Act ........................... 2

     B.     Apple and ATTM's Exclusive 5-Year iPhone Deal Violates
           Plaintiffs' DMCA Rights, Stifles Competition and Extracts
           Supracompetitive Profits in the iPhone Voice and Data Services
           Aftermarket ...................................................................................................... 3

     C.     Apple Stifled Competition and Extracted Supracompetitive
           Profits in the Aftermarket for iPhone Applications ......................................... 6

     D.     Apple Retaliated against Consumers who Unlocked their
           iPhones ............................................................................................................ 7

III.    THE LEGAL STANDARD ................................................................................. 8

IV.     LEGAL ARGUMENT ........................................................................................ 9

     A.     Plaintiffs Sufficiently Plead Antitrust Claims under
           *Eastman Kodak* ............................................................................................. 9

          1.     The Dispositive Law ........................................................................... 9

          2.     The iPhone Voice and Data Services and Applications
                Aftermarkets are Adequately Alleged under *Newcal* ........................ 12

          3.     Defendants did not Adequately Disclose their Five-year Deal ........... 15

          4.     The Pre-existence of ATTM's Cell Phone Service is Irrelevant ........ 16

          5.     Plaintiffs Plead a Cognizable Applications Aftermarket ..................... 16

     B.     Plaintiffs Sufficiently Plead Their Consumer Protection Claims ................... 17

          1.     Rule 9(b)'s Particularity Requirement has been Met .......................... 17

          2.     Plaintiffs Sufficiently Allege California CLRA and
                UCL Violations .................................................................................. 18

          3.     Plaintiffs Sufficiently Allege Washington CPA Violations ................ 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4. Plaintiffs Sufficiently Allege New York CPA Violations .................. 22

5. Plaintiffs Have Standing to Assert all of Their Consumer Claims ................................................................................... 22

C. Plaintiffs Plead a Magnuson-Moss Warranty Act Claim ................................ 23

D. Plaintiffs' Trespass to Chattels Claim should be Sustained ............................ 24

E. Plaintiffs State a Federal Computer Fraud and Abuse Act Claim ................................................................................ 24

F. Plaintiffs State Claims under California Penal Code §502(c)(4) and (c)(8) .............................................................................. 25

V. CONCLUSION ........................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

*Adam v. Silicon Valley Bancshares,*
   No. C 93-20399 RMW (EAI), 1994 U.S. Dist. LEXIS 21717
   (N.D. Cal. April 18, 1994) ............................................................................. 23

*Beckermeyer v. AT&T Wireless,*
   No. 00469, Control No. 022091, 2004 Phila. Ct. Com. Pl. LEXIS 116 (Oct. 22, 2004)......... 23

*Bell Atlantic Corp. v. Twombly,*
   127 S. Ct. 1955 (2007) .................................................................................. 8

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)...................................................................................... 17

*Buller v. Sutter Health,*
   160 Cal. App. 4th 981 (2008) ........................................................................ 18

*Burbo v. Harley Douglass, Inc.,*
   125 Wash App. 684 (2005) ........................................................................... 21

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.,*
   20 Cal. 4th 163 (1999) ................................................................................. 19

*Civic Western Corp. v. Zila Industries, Inc.,*
   66 Cal. App. 3d 1 (1977) .............................................................................. 24

*Clausing v. DeHart,*
   83 Wash 2d 70 (1973)................................................................................... 21

*Clemens v. DaimlerChrysler Corp.,*
   No. 06-56410, 2008 U.S. App. LEXIS 12929 (9th Cir. June 19, 2008)...................... 8

*Consumer Advocates v. Echostar Satellite Corp.,*
   113 Cal. App. 4th 1351 (2003) ...................................................................... 18

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.,*
   911 F.2d 242 (9th Cir. 1990) ......................................................................... 9

*Creative Computing v. Getloaded.com LLC,*
   386 F.3d 930 (9th Cir. 2004) ......................................................................... 25

*Cunningham v. Fleetwood Homes of Ga., Inc.,*
   253 F.3d 611 (11th Cir. 2001) ....................................................................... 24

*Datagate, Inc. v. Hewlett-Packard Co.,*
   60 F.3d 1421 (9th Cir. 1995) ......................................................................... 15

*Daugherty v. American Honda Motor Co.,*
   144 Cal. App. 4th 824 (2006) ........................................................................ 18

*Dekro v. Stern Bros. & Co.,*
   540 F. Supp. 406 (W.D. Mo. 1982) ............................................................... 22

*Eastman Kodak Co. v. Image Technical Servs., Inc.,*
   504 U.S. 451 (1992)...................................................................... 9, 11, 14

*eBay, Inc. v. Bidder's Edge, Inc.,*
   100 F. Supp. 2d 1058 (N.D. Cal. 2000) ......................................................... 24

*Erickson v. Pardus,*
   127 S. Ct. 2197 (2007)....................................................................... 8

*Falk v. General Motors Corp.,*
   496 F. Supp. 2d 1088 (N.D. Cal. 2007) ............................................ 17, 18, 19, 20

*Forsyth v. Humana, Inc.,*
   114 F.3d 1467 (9th Cir. 1997) ................................................................ 10

*Gregory v. Albertson's, Inc.,*
   104 Cal. App. 4th 845 (2002) ................................................................. 20

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,*
   105 Wash. 2d 778 (1986) .................................................................... 21

*Holiday Resort Cmty. Ass'n v. Echo Lakes Assocs., LLC,*
   134 Wash. App. 210 (2006) .................................................................. 21

*In re Doubleclick Inc. Privacy Litig.,*
   154 F. Supp. 2d 497 (S.D.N.Y. 2001)........................................................ 25

*In re Nigeria Charter Flights Contract Litig.,*
   233 F.R.D. 297 (E.D.N.Y. 2006) ............................................................. 22

*In re Prudential Ins. Co. Am. Sales Litig. Agent Actions,*
   148 F.3d 283 (3d Cir. 1998)................................................................. 22

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
   No. M:07-cv-01819 CW, MDL No. 1819, 2008 U.S. Dist. LEXIS 15826
   (N.D. Cal. Feb. 14, 2008)................................................................ 8, 9

*Kelley v. Microsoft Corp,*
   No. C07-475 MJP, 2008 WL 509332 (W.D. Wash. Feb. 22, 2008)......................... 22

*LiMandri v. Judkins,*
   52 Cal. App. 4th 326 (1997) ................................................................ 19

*Longden v. Sunderman,*
   123 F.R.D. 547 (N.D. Tex. 1988) ............................................................ 22

*Magney v. Lincoln Mut. Sav. Bank,*
   34 Wash. App. 45 (1985) .................................................................... 21

*Miles v. Am. Online, Inc.,*
   202 F.R.D. 297 (M.D. Fla. 2001)............................................................. 22

*Miner v. Gillette Co.,*
    87 Ill. 2d 7 (1981) ........................................................................................................... 22

*Newcal Industries, Inc. v. IKON Office Solution,*
    513 F.3d 1038 (9th Cir. 2008) ................................................................................ *passim*

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20 (1995) ....................................................................................................... 22

*People v. Duz-Mor Diagnostic Laboratory,*
    68 Cal. App. 4th 654 (1998) .......................................................................................... 20

*Pierce v. NovaStar Mortg. Inc.,*
    238 F.R.D. 624 (W.D. Wash. 2006) .............................................................................. 21

*PSI Repair Services v. Honeywell, Inc.,*
    104 F.3d 811 (6th Cir. 1997) ......................................................................................... 16

*Queen City Pizza v. Domino's Pizza,*
    124 F.3d 430 (3d Cir. 1997) ........................................................................................... 10

*Red Lion Med. Safety, Inc. v. Ohmeda, Inc.,*
    63 F. Supp. 2d 1218  (E.D. Cal. 1999) .......................................................................... 15

*Saunders v. Superior Court,*
    27 Cal. App. 4th 832 (1994) .......................................................................................... 20

*Semegen v. Weidner,*
    780 F.2d 727 (9th Cir. 1985) ......................................................................................... 17

*Siegel v. Shell Oil Co.,*
    480 F. Supp. 2d 1034 (N.D. Ill. 2007) .......................................................................... 23

*Small v. Lorillard Tobacco Co.,*
    94 N.Y.2d 43 (App. Ct. 1999) ....................................................................................... 22

*South Bay Cheverolet v. GMAC,*
    72 Cal. App. 4th 861 (1999) .......................................................................................... 20

*Sunshine Cellular v. Vanguard Cellular Systems, Inc.,*
    810 F. Supp. 486 (S.D.N.Y. 1992) ................................................................................ 16

*Tallmadge v. Aurora Chrysler Plymouth, Inc.,*
    25 Wash. App. 90 (1979) ............................................................................................... 21

*Testo v. Russ Dunmire Oldsmobile,*
    16 Wash. App. 39 (1976) ............................................................................................... 21

*Thorogood v. Sears Roebuck & Co.,*
    No. 06 C 1999, 2007 U.S. Dist. LEXIS 81035 (N.D. Ill. Nov. 1, 2007) ..................... 22

*Thrifty-Tel v. Bezenek,*
    46 Cal. App. 4th 1559 (1996) ........................................................................................ 24

*Vess v. Ciba-Geigy Corp. U.S.A.*,
   317 F.3d 1097 (9th Cir. 2003) ........................................................................ 17

*Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*,
   122 Wash. 2d 299 (1993)............................................................................... 21

## STATUTES AND RULES

15 U.S.C.
   §2301-12 ................................................................................................... 1
   §2302(a) ................................................................................................... 23
   §2302(c) ................................................................................................... 23

17 U.S.C.
   §1201 ....................................................................................................... 1

18 U.S.C.
   §1030....................................................................................................... 25

16 C.F.R.
   §701.3...................................................................................................... 24

71 Fed. Reg. 68472 (Nov. 27, 2006)......................................................... 3

California Bus. & Prof. Code
   §17200................................................................................................... 20
   §17204................................................................................................... 20

California Penal Code
   §502(c)(4) .............................................................................................. 25
   §502(c)(8) .............................................................................................. 25

Federal Rules of Civil Procedure
   8(a) ......................................................................................................... 8
   8(e) ......................................................................................................... 8

1

## I.    **INTRODUCTION**

2    Defendant Apple, Inc. ("Apple") has entered into an exclusive five-year revenue sharing

3    agreement with Defendant AT&T Mobility, LLC ("ATTM") under which Defendants have

4    secretly agreed to force Plaintiffs and other iPhone consumers to use ATTM's voice and data

5    service plan for five years. Defendants' secret lock-up agreement is in reality a scheme to violate

6    the rights expressly granted to cell phone buyers under the Digital Millennium Copyright Act of

7    1998 ("DMCA"), 17 U.S.C. §1201, *et seq.* (2008), to use *any* voice and data service plan they

8    choose. Apple has pursued the scheme so zealously that it even destroyed the iPhones of many

9    customers who dared to exercise their statutory right to switch carriers. Defendants' scheme and

10   their acts in furtherance of it violated the antitrust laws, several state consumer protection statutes,

11   the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §2301-12 (2008), state and federal

12   computer fraud statutes, and several other laws.

13   Apple does not deny that it engaged in such a scheme. Apple does not even mention, much

14   less refute, the allegations regarding Plaintiffs' rights under the DMCA. Apple also does not

15   challenge the merits of Plaintiffs' antitrust claims. Rather, Apple's motion (hereafter "Brf.")

16   attempts to defend the antirust claims by arguing that Plaintiffs' proposed iPhone "Voice and Data

17   Service Aftermarket" and iPhone "Applications Aftermarket" are inadequately defined "product

18   markets" for antitrust purposes. Apple's argument is meritless. The Ninth Circuit's recent decision

19   in *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008), is dispositive

20   and makes plain that Apple cannot refute the proposed Voice and Data Service Aftermarket unless

21   it establishes as a matter of law that Plaintiffs "knowingly contracted" to use only ATTM for five

22   years when they bought their iPhones. Apple cannot meet its burden because (i) it never disclosed

23   its five-year deal with ATTM to iPhone customers, and (ii) those customers were only presented

24   with and signed *two-year* ATTM service contracts that they were led to believe could be

25   terminated at any time. Likewise, Apple cannot show as a matter of law that iPhone customers

26   "knowingly contracted" to permit Apple to monopolize the Applications Aftermarket because

27   Apple did not disclose its plan to do so.

28

1    Apple's effort to dismiss Plaintiffs' other claims in their Revised Consolidated Class

2  Action Complaint ("Cplt.") are equally without merit for all the reasons discussed below.

3  **II.     THE WELL-PLEADED FACTS**

4      **A.     Cell Phone Industry and Digital Millennium Copyright Act**

5      Since their introduction domestically in 1983, cell phones have evolved technologically

6  into small, hand-held computers. Cplt. ¶¶27, 58. The cell phone (or "wireless") service industry is

7  dominated now by four major carriers – ATTM, T-Mobile, Sprint and Verizon – which control the

8  industry in a way that "severely limits consumer choice, stifles innovation, crushes

9  entrepreneurship, and has made the U.S. the laughingstock of the mobile-technology world." *Id.*

10  ¶61. Unlike participants in the general personal computer market – where computer manufacturers

11  and software developers offer products directly to consumers without having to pay or gain

12  approval from Internet service providers – wireless carriers have used their ability to deny access

13  to their networks to control the type of cell phone hardware and software that is manufactured and

14  to extract payments from manufacturers granted access to their customers. *Id.* ¶62. Apple and

15  ATTM have exploited the anticompetitive cell phone market to extract supracompetitive profits

16  from iPhone consumers.

17      Wireless carriers have controlled the industry in part by collaborating, through various

18  industry standard setting organizations and trade associations, to minimize consumers' ability to

19  switch carriers – even temporarily while traveling abroad, where consumers want to switch

20  carriers to avoid international roaming charges. *Id.* ¶¶67-68. To prevent consumers from switching

21  carriers at will, and to insulate themselves from consequent competition, wireless carriers installed

22  "Program Locks" to disable cell phones from working with any carrier's network other than the

23  one the consumer had contracted with when purchasing the phone. *Id.* ¶¶68-69.

24      The carriers claimed their Program Locks were legally permissible "access controls" that

25  were necessary to protect their copyrighted software codes and other intellectual property against

26  unlawful infringement – a claim echoed by Apple and ATTM with respect to the iPhone. *Id.* ¶74.

27  However, on November 27, 2006, six months before iPhones were first sold to consumers, the

28  Librarian of Congress, exercising its statutory authority, rejected the carriers' position and

PLTFS' MEMO IN OPPOSITION TO APPLE'S MOTION TO DISMISS -- Master File No. C 07-05152 JW

1    promulgated an exemption to the DCMA that expressly permitted cell phone users to "unlock"

2    their cell phones to switch to another carrier. *Id.* ¶75. The exemption was recommended by the

3    Register of Copyrights, which concluded that the carriers' purported justification for Program

4    Locks was pretextual, and that their real motive was to limit consumer choice:

> "[T]he access controls [on cell phones] do not appear to actually be deployed in order to protect the interests of the copyright owner or the value or integrity of the copyrighted work; rather, ***they are used by wireless carriers to limit the ability of subscribers to switch to other carriers, a business decision that has nothing whatsoever to do with the interests protected by copyright.***" 71 Fed. Reg. 68472, 68476 (Nov. 27, 2006).

*Id.* (emphasis added in Complaint).

Thus, cell phone consumers have an absolute legal right to modify their phones to use the network of their carrier of choice. *Id.* ¶3. Because Defendants were unable to enforce their secret five-year exclusive deal through legal means, they embarked on a scheme to enforce it unlawfully as to the iPhone. *Id.* ¶76. Specifically, Defendants have unlawfully prevented iPhone customers from exercising their legal right to switch carriers by continuing to install Program Locks on iPhones; refusing to give customers the software codes needed to unlock them; and destroying the phones of many customers who tried to exercise their legal rights. *Id.* ¶¶3-4.

### B.    Apple and ATTM's Exclusive 5-Year iPhone Deal Violates Plaintiffs' DCMA Rights, Stifles Competition and Extracts Supracompetitive Profits in the iPhone Voice and Data Services Aftermarket

Defendant Apple launched its iPhone on June 29, 2007. Prior to launch, Apple entered into a secret five-year contract with Defendant ATTM making ATTM the exclusive provider of cell phone voice and data services for iPhone customers through June 29, 2012. Under the contract, Apple shares in ATTM's revenues and profits. Though Plaintiffs and class members who purchased iPhones agreed to enter into a *two-year* voice and data service plan with ATTM (terminable at will for a $175 fee), they did not agree to use ATTM for five years. Apple's secret five-year deal with ATTM effectively locks iPhone users into using ATTM for all five years, contrary to those users' wishes and contractual expectations that they be bound at most for two

1   years and had a meaningful right to terminate and switch carriers at any time. Cplt. ¶¶2, 28, 30-32,

2   78-80, 83. Unless consumers use ATTM for all five years, their costly iPhones will be useless.

3         To enforce ATTM's exclusivity, Apple programmed and installed Program Locks on each

4   iPhone that prevented the purchaser from switching to another carrier that competes with ATTM.

5   Defendants did not disclose to prospective iPhone buyers that, contrary to their rights under the

6   DMCA, their iPhones would be locked to work only with ATTM Subscriber Identity Modules (or

7   "SIM cards"). Nor did Defendants disclose that they had agreed in their five-year exclusivity

8   contract not to give consumers the software codes needed to unlock the iPhones. *Id.* ¶¶3, 33, 80.

9         Apple falsely contends (Brf. at 5, 11-12) that the iPhone box itself disclosed the existence

10   of the five-year exclusivity deal. But the alleged "disclosure" does not mention the five-year

11   contract. It mentions no contract at all. It states only: "Service plan with AT&T required for

12   cellular network capabilities on expiration of initial new two-year agreement." Apple has also

13   misrepresented the size and clarity of the disclosure. The copy of the box bottom Apple attempts

14   to submit into the record is 70-75% larger than the actual box bottom. (*Compare* Apple's Request

15   for Judicial Notice ("RJN") Ex. A (artificially enlarged) *with* Declaration of Alexander H. Schmidt

16   in Opposition to Apple's Motion to Dismiss ("Schmidt Decl.") Ex. 1 (actual size).) The

17   "disclosure" appears in tiny 5-point font, buried amidst other highly technical information that

18   makes most consumers' eyes gloss over and discourages further reading. The box label containing

19   the alleged "disclosure," in actual font size and style, states:[1]

20                      Includes: iPhone, Stereo Headset with mic., Dock., Dock Connector
to USB 2.0 Cable, and USB Power Adapter, Supports quad-band GSM
(850/900/1800/1900MHz), Wi-Fi (802.11b/g), EDGE, and Bluetooth 2.0.

21                      Requirements: Minimum new two-year wireless service plan with
AT&T required to activate all iPhone features, including iPod

22                      features[1] ● Mac or PC with USB 2.0 ● Mac OS X v10.4.10 or later,
Windows XP Home or Professional (SP2), or Windows Vista ● iTunes
7.3 or later required for activation and some features (free download

23                      from www.apple.com/itunes/download) ● iTunes store account[2] ●
Internet access[3]

24                      [1]Credit check required; must be 18 years or older. Service plan with AT&T required for
cellular network capabilities on expiration of initial new two-year agreement. Wireless

25                      service is solely provided by AT&T and is the responsibility of AT&T. Transferring your mobile
number will terminate your service with your existing provider; termination fees and
other charges may apply. Wireless service and some wireless features are not available
in all areas; see www.att.com for service availability. [2]Free account signup through

26

---

27   [1] The footnote on the iPhone box label is in 5-point Arial font, and is replicated precisely here. The label

28   text appears to be in 6.25 point Arial font, which cannot be precisely replicated by Plaintiffs' Word system.
The text is in 6.5 point font instead. Also, the actual label is black with white type.

1

iTunes; valid credit card may be required. [3]Broadband recommended; fees may apply.
Use is subject to Apple and third party software licenses. Battery has limited recharge
cycles and may eventually need to be replaced by Apple service provider. Battery life
and charge cycles vary by use and settings. See www.apple.com/batteries. 1GB = 1
billion bytes; actual formatted capacity less. AT&T and the AT&T logo are trademarks of
AT&T Knowledge Ventures and/or AT&T affiliated companies.

2

3    Schmidt Decl. Ex. 1. In case the Court missed it, the "disclosure" on which Apple relies to argue it

4    notified consumers of its five-year deal with ATTM is in the second sentence of footnote 1. Aside

5    from being insufficiently visible to give meaningful notice, the alleged "disclosure" was made too

6    late to give consumers notice. Apple admits (Brf. at 5) that the "disclosure" appears only on the

7    bottom of the iPhone box – but iPhone buyers received the box only *after* they bought the phone

8    and signed the initial ATTM service plan.

9         Apple and ATTM agreed to prevent Plaintiffs and other consumers from unlocking their

10   iPhones in part to suppress competition from T-Mobile, which also uses the "GSM" technology

11   that employs SIM cards. Defendants sought to enhance their revenues and competitive position by

12   preventing iPhone users from exercising their lawful right under the DMCA to use T-Mobile.

13   Cplt. ¶¶59, 61, 65-66, 84. Defendants also agreed as part of their five-year exclusive contract that

14   Apple would not manufacture iPhones compatible with the "CDMA" technology used

15   domestically by Sprint and Verizon, thereby suppressing competition from those carriers for

16   iPhone customers and effectively prohibiting them altogether from entering the market for iPhone

17   voice and data services. *Id.* ¶¶59, 61, 85, 121. These blatantly anticompetitive features of the

18   Defendants' Agreement caused a *USA Today* journalist to describe Apple's agreement with

19   ATTM as "an easy way to handcuff rivals and steal customers." *Id.* ¶86.

20        One supracompetitive benefit that Apple and ATTM enjoy from having agreed to impose

21   and enforce SIM card Program Locks in their five-year deal is their ability to share in exorbitant

22   "roaming" fees charged to iPhone customers who take their iPhones abroad. When traveling,

23   particularly to Europe, wireless customers with GSM phones often prefer to switch their SIM card

24   to a European carrier, at a cost of $20-$25, and incur local usage charges rather than the far more

25   substantial "roaming" charges that would apply if they used their ATTM SIM card. *Id.* ¶¶39, 67.

26   While Apple advertised on its website that iPhone purchasers could "browse the Internet and send

27   emails as often as you like without being charged extra," *id.* ¶35, Apple and ATTM failed to

28   disclose adequately to consumers that they would incur hundreds or thousands of dollars in

international roaming charges if they took their iPhones abroad – even if they never turned their iPhones on, *id.* ¶¶7(e), 34, 36, 38, 53. Apple contends (Brf. at 23) it adequately disclosed that consumers could incur several thousand dollars in roaming charges while on a one or two week vacation because ATTM buried the following in its seven-page, single-spaced (in tiny font) Terms and Conditions available on its website: "International Roaming: Substantial charges may be incurred if phone is taken out of the U.S. even if no services are intentionally used." *See* RJN Ex. C. Nowhere, however, did Defendants define "substantial" in a way that gave notice to consumers who bought a $599 iPhone with a $90/month service plan that they might incur *several thousand dollars* in charges simply by packing their iPhones in a suitcase and never using them while out of the country.

### C.    Apple Stifled Competition and Extracted Supracompetitive Profits in the Aftermarket for iPhone Applications

Under its agreement with ATTM, Apple retained exclusive control over the design, features and operating software for the iPhone. Cplt. ¶¶4, 81. To enhance its iPhone revenues, Apple created a number of software programs, called "applications," such as ring tone, instant messaging, Internet access, video and photography enabling software, that can be downloaded and used by iPhone owners. Apple also entered into agreements with other software manufacturers by which Apple "approved" their software applications for iPhone use in exchange for a share of the manufacturer's resulting revenues. Until approximately July 2008, Apple refused to "approve" any application in which Apple had no financial interest.[2] Apple also discouraged iPhone customers from downloading competing applications software (called "third party applications") by telling customers that Apple will void and refuse to honor the iPhone warranty of any customer who has downloaded competing applications. Through these actions, Apple has stifled competition, reduced output and consumer choice, and artificially increased prices in the aftermarket for iPhone software applications. *Id.* ¶¶4, 37, 71, 87-90.

---

[2] Five months after the first of these actions was filed Apple released a "software development kit" to enable independent software developers to design iPhone applications. Apple also recently released iPhone operating software Version 2.0, which permits iPhone owners to safely download third party applications, at least on the recently released 3G version of the iPhone.

**D.     Apple Retaliated against Consumers who Unlocked their iPhones**

In response to consumers exercising their legal right to unlock their iPhones or to install software applications that competed with Apple's, on September 27, 2007, under the guise of issuing an "upgraded" version of the iPhone operating software, Apple issued and caused the transmission of its iPhone operating software Version 1.1.1, which "bricked" (that, is, rendered completely inoperable) or otherwise damaged many iPhones that were unlocked or had downloaded competing software applications. Cplt. ¶¶5, 91-96.

That this was no accident is revealed by a press release Apple issued on September 24, 2007 ("September 24 Press Release"), three days *before* it released Version 1.1.1, which stated:

> Apple has discovered that many of the unauthorized iPhone unlocking programs available on the Internet cause irreparable damage to the iPhone's software, *which will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed*. … Apple strongly discourages users from installing unauthorized unlocking programs on their iPhones. Users who make unauthorized modifications to the software on their iPhone violate their iPhone software licensing agreement and void their warranty. *The permanent inability to use an iPhone due to installing unlocking software is not covered under the iPhone's warranty*.

*Id*. ¶¶97-98 (emphasis added in Complaint).

Before September 27, 2007, iPhone users reported no problems resulting from unlocking their iPhones, much less "bricking." Yet Apple was able to predict with confidence in its September 24 Press Release that such problems would begin to occur *after* Version 1.1.1 was released. Undoubtedly, Apple knew Version 1.1.1 would brick unlocked iPhones, and it most certainly intended such results. *Id.* ¶¶99-103.

When iPhone owners took their damaged phones to Apple or ATTM for repair or replacement, they were told that they had breached their warranty agreements by unlocking their phone or downloading unapproved software, and they were told that their only remedy was to "buy a new iPhone." *Id.* ¶105. Because Apple released and transmitted Version 1.1.1 knowing that it would damage or destroy unlocked iPhones, Apple and ATTM should have honored their warranties and repaired or replaced the phones. *Id.* ¶¶6, 104-107.

1    ## III.    **THE LEGAL STANDARD**

2        The motion to dismiss standard was not substantially altered by the Supreme Court's

3    decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) *("Twombly")*. The Court

4    expressly declined to impose a "heightened" pleading standard for antitrust claims. *Twombly*, 127

5    S. Ct. at 1973 n.14. Thus, even after *Twombly*, an antitrust complaint must contain only a "'short

6    and plain statement of the claim showing that the pleader is entitled to relief,' … [and] [t]he

7    Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which

8    it bases its claim." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. M:07-cv-

9    01819 CW, MDL No. 1819, 2008 U.S. Dist. LEXIS 15826, at **38-39 (N.D. Cal. Feb. 14, 2008)

10   (quoting Fed. R. Civ. P. 8(a), 8(e) and citing *Twombly*, 127 S. Ct. at 1964). Although an antitrust

11   complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the

12   'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic

13   recitation of the elements of a cause of action will not do." *Id.* (citing *Twombly*, 127 S. Ct. at

14   1964). "The complaint must contain sufficient factual allegations 'to raise a right to relief above

15   the speculative level.'" *Id.* (quoting *Twombly*, 127 S. Ct. at 1965).

16       For non-antitrust claims, *Twombly* provides the complaint merely "must plead 'enough

17   facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*,

18   No. 06-56410, 2008 U.S. App. LEXIS 12929, at *4 (9th Cir. June 19, 2008) (quoting *Twombly*,

19   127 S. Ct. at 1974). "Once a claim has been stated adequately, it may be supported by showing

20   any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S. Ct. at 1968.

21       On a motion to dismiss, "a judge must accept as true all of the factual allegations contained

22   in the complaint," *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007), and even as to antitrust

23   claims the court must assume that "all the allegations in the complaint are true (even if doubtful in

24   fact)," *Twombly*, 127 S. Ct. at 1965 (citation omitted). "'Rule 12(b)(6) does not countenance …

25   dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Id.* (quotation

26   omitted). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual

27   proof of these facts is improbable and 'that a recovery is very remote and unlikely.'" *Id.* (quotation

28   omitted).

As shown below, Plaintiffs' antitrust allegations are not merely conclusory or formulaic, and they assert sufficient facts to form plausible claims for relief. Plaintiffs' other claims are adequately pleaded as well.[3]

## IV.    LEGAL ARGUMENT

### A.    Plaintiffs Sufficiently Plead Antitrust Claims under *Eastman Kodak*

#### 1.    The Dispositive Law

Apple's challenge to Plaintiffs' five antitrust claims is limited to whether Plaintiffs have defined a relevant "product market" by focusing their claims on the "aftermarkets" for iPhone "Voice and Data Services" and "Applications." Cplt. ¶¶120-21. Apple argues (Brf. at 11-12) that the Voice and Data Services Aftermarket fails because, under Apple's strained version of the facts, Plaintiffs voluntarily agreed to use ATTM as their exclusive service provider for *five years* when they signed their initial *two-year* service agreements. Apple argues (at 12-14) that the Applications Aftermarket fails because, according to Apple, (i) Plaintiffs were fully "aware" that Apple prohibited third-party applications; and (ii) Apple in any event did not make or sell add-on applications for the iPhone. Apple's arguments misstate the Complaint and fail under dispositive Ninth Circuit law.

As Apple concedes, whether Plaintiffs' product market allegations are sustainable on this motion to dismiss is controlled by the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451 (1992), and the Ninth Circuit's recent application of *Kodak* in *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008). Contrary to Apple's belief, however, those cases – particularly the Ninth Circuit's analysis in *Newcal* – compel the conclusion that Plaintiffs' antitrust claims are adequately pleaded.

In *Newcal*, the Ninth Circuit *sustained* a complaint premised on a *Kodak* theory on facts that were principally indistinguishable to the present case. 513 F.3d at 1043. Like Plaintiffs' claim

---

[3] "When granting a motion to dismiss, a court is generally required to grant a plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile." *In re SRAM Antitrust Litig.*, 2008 U.S. Dist. LEXIS 15826, at *39 (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246-47 (9th Cir. 1990)).

1    here that Apple and ATTM failed to disclose their five-year exclusive deal to iPhone consumers in

2    order to monopolize aftermarkets, Cplt. ¶¶2, 32, 79, the plaintiff in *Newcal* charged that IKON, a

3    copier manufacturer, schemed to foreclose competition in two aftermarkets – for "upgrade

4    equipment" and for "lease-end services" – by inducing customers to sign lease and service

5    contract amendments that ***secretly extended the duration of its customers' original agreements***.

6    513 F.3d at 1043-44. Reversing the lower court, the Ninth Circuit held each of the two alleged

7    aftermarkets was a "relevant market" for antitrust purposes. *Id.* at 1046.

8           The Ninth Circuit court analyzed the issue in *Newcal*, first, by distinguishing two cases on

9    which Apple relies, *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430 (3d Cir. 1997), and

10   *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997). The court found that in each case the

11   plaintiffs had "contractually" bound themselves to buy aftermarket goods or services solely from

12   the defendants and, therefore, could not plead viable "economically distinct antitrust" markets.

13   513 F.3d at 1046-47 (Dominos' franchisees "knowingly and voluntarily signed" "an explicit

14   contractual provision" to use "only Domino's-approved ingredients and supplies"; Humana's

15   insureds' policies had "explicit contractual provisions" limiting them to using certain hospitals).

16          The Ninth Circuit next analyzed *Kodak* and, distinguishing that case from *Queens City*

17   *Pizza* and *Humana*, found that *Kodak* supported Newcal's aftermarket definition:

18           The critical distinction between *Eastman Kodak* and the two circuit court opinions
19           was that the Kodak customers did not knowingly enter a contract that gave Kodak
             the exclusive right to provide parts and services for the life of the equipment. In
20           other words, the simple purchase of Kodak-brand equipment (unlike the signing of
             a Domino's franchise agreement or the purchase of a Humana insurance policy) did
21           not constitute a binding contractual agreement to consume Kodak parts and services
22           in the aftermarket.

23   513 F.3d at 1048. The court continued:

24           Equally critically, the Supreme Court found that market imperfections, including
25           information and switching costs, prevented consumers from discovering, as they
             were shopping for equipment, that the Kodak brand would include a de facto
26           commitment to consume only supracompetitively priced Kodak-brand service
             contracts…. The Supreme Court specifically discussed and rejected the possibility
27           that a consumer's decision to purchase Kodak-brand equipment (in an indisputably
             competitive *equipment* market) was functionally equivalent to the signing of a
28           contractual provision that gave Kodak the exclusive right to service its equipment.

PLTFS' MEMO IN OPPOSITION TO APPLE'S MOTION TO DISMISS -- Master File No. C 07-05152 JW

1
2
3

> The Court rejected that analogy on the ground that the consumers could not, at the time of purchase, reasonably discover that Kodak monopolized the service market and charged supracompetitive prices for its service…. Kodak's market power in parts and services, therefore, did not arise from a knowing contractual (or quasi-contractual) arrangement.

4    *Id.* (citations to *Kodak* omitted).[4]

5    Under *Newcal*, the relevant inquiry for ascertaining if a proper antitrust aftermarket has

6    been alleged is (i) "whether a consumer's selection of a particular brand in the competitive market

7    is the ***functional equivalent of a contractual commitment*** giving that brand an agreed-upon right

8    to monopolize its consumers in an aftermarket," and (ii) "whether consumers ***entered into such***

9    ***'contracts' knowing*** that they were agreeing to such a commitment." 513 F.3d at 1049 (emphasis

10   added). Whether consumers "knowingly contracted" and committed to buy aftermarket services

11   and products only from the branded manufacturer is, of course, an inherently factual inquiry, like

12   other "market definition" related inquiries. *See id.* at 1045, 1051.

13
14
15

---

16   [4] The Supreme Court explained its economic reasoning as to how manufacturers like Kodak and Apple can
17   achieve supracompetitive profits in aftermarkets even if they lack market power in the primary equipment (*i.e.*, copier or "smartphone") market:

18
19
20
21

> For the service-market price to affect equipment demand, consumers must inform themselves of the total cost of the "package" – equipment, service and parts – at the time of purchase; that is, consumers must engage in accurate lifecycle pricing. Lifecycle pricing of complex, durable equipment is difficult and costly. In order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. …

22
23
24

> Moreover, even if consumers were capable of acquiring and processing the complex body of information, they may choose not to do so. Acquiring the information is expensive. If the costs of service are small relative to the equipment price, or if consumers are more concerned about equipment capabilities than service costs, they may not find it cost efficient to compile the information.

25
26

> A second factor … is the cost to current owners of switching to a different product…. If the cost of switching is high, consumers who already have purchased the equipment, and are thus "locked in," will tolerate some level of service-price increases before changing equipment brands.

27   *Kodak*, 504 U.S. at 473-76 (footnotes and citations omitted). *See also id.* at 480-86 (applying similar
28   analysis to uphold Section 2 monopolization claims).

1

2. **The iPhone Voice and Data Services and Applications**
**Aftermarkets are Adequately Alleged under *Newcal***

2

3

4

5

6

7

8

9

Under *Newcal*, the relevant inquiry on this Rule 12(b)(6) motion challenging Plaintiffs' aftermarket definitions is whether Plaintiffs have plausibly alleged that, when buying their iPhones and signing their initial ***two-year*** ATTM service plans, they (1) did not "knowingly" agree to use ATTM as their voice and data provider for ***five years***, both domestically and abroad (thereby waiving their DMCA rights to change their SIM cards or modify their iPhones to use other carriers); and (2) did not "knowingly" agree to buy only "Apple-approved" iPhone applications for as long as they owned their iPhones. The facts alleged in the Complaint more than plausibly demonstrate that Plaintiffs did not knowingly agree to do either of those things.

10

11

12

13

14

15

16

17

18

In *Newcal*, the Ninth Circuit resolved this inquiry in the plaintiff's favor for four reasons, each of which applies equally here. *First*, the court found that Newcal had pled the existence of both a competitive "primary" product (the initial copier lease and service agreement) and "an aftermarket [for replacement equipment and lease-end services] in which the consumers claim that they should be able to shop for a secondary product." 513 F.3d at 1049. Here, Plaintiffs allege a competitive "primary" product (the iPhone and attendant two-year ATTM service plan), and two aftermarkets in which Plaintiffs want to shop for secondary products – voice and data service plans for use after the ATTM plan is lawfully terminated, and third-party applications Plaintiffs can download for free or more cheaply than the "Apple-approved" applications.

19

20

21

22

23

24

25

26

27

28

As explained in *Newcal*, the secondary market should be "derivative from and dependent on" the primary market; that is, the secondary market would not exist without the primary market. *Id.* This addresses the *Kodak* Court's concern that suppliers of a primary product might "exploit that unique position" with their customers "to gain monopoly power in the derivative services market" when such power "was neither naturally nor contractually created." *Id.* In *Newcal*, the Ninth Circuit found both that the market for copier parts and services was derivative from and dependent on the market for copiers, and that the market for replacement copiers and lease-end services would not exist without the market for initial leases and service contracts. *Id.* The court also found that IKON had a "contractually-created monopoly over services provided under ***original*** IKON contracts" that did not violate the antitrust laws, but which gave IKON a unique

1   "contractual *relationship*" with those original consumers that IKON, like Kodak, exploited "to

2   gain [unlawful] monopoly power in a derivative aftermarket in which its power is not

3   contractually mandated." *Id.* at 1050 (emphasis in original).

4          Plaintiffs make identical claims here. The iPhone was a unique and innovative product

5   through which Apple and ATTM lawfully gained a contractual relationship with consumers who

6   bought the product together with its terminable two-year voice and data service plan. The

7   Defendants exploited their original contractual relationships to leverage themselves into a

8   monopoly position whereby consumers are foreclosed from contracting with any other service

9   provider for five years, forcing consumers to pay ATTM's price (including Apple's cut) and to

10  pay supracompetitive prices for international roaming charges throughout that period. Likewise,

11  Apple exploited its position as the provider of the iPhone operating software to prevent consumers

12  from buying iPhone applications in which Apple had no financial interest, thus giving Apple

13  supracompetitive profits and a monopolistic control over the applications aftermarket that it

14  neither naturally nor contractually earned. Accordingly, under *Newcal*, the Complaint alleges the

15  iPhone Voice and Data Aftermarket and the Applications Aftermarket are derivate markets that

16  would not exist without the primary market for iPhones and initial two-year ATTM service plan.[5]

17         *Second*, the Ninth Circuit found a viable *Kodak* claim in *Newcal* because Newcal's

18  allegations of anticompetitive conduct related "only to the aftermarket" and not to the primary

19  market. 513 F.3d at 1050. Plaintiffs make the same allegation here.

20         *Third*, the complaint in *Newcal* complaint alleged that IKON's market power was derived

21  from the "relationship with" and "special access" to its consumers. *Id.* "In other words, no

22  provision of IKON's initial contract [gave] it the power … to extend the contract beyond 60

23  months … or to prevent competition in lease-end services." *Id.* Here, nothing in ATTM's contract

24  gives Defendants the power to extend the voice and data plan from two to five years, or effectively

25

26  _____

    [5] Apple wrongly suggests that the "derivative" requirement typically means the aftermarket must be for
27  "unique" "consumable" products such as replacement parts for Kodak copiers. Brf. at 10. In *Newcal* one of
    the issues was whether an aftermarket for "replacement service plans" could be derived from an "original
28  service plan" – the exact issue presented here.

to prevent consumers from terminating at will to use another domestic or foreign carrier. Similarly, nothing in Apple's contract with iPhone purchasers gave Apple the exclusive right to dictate the use of only Apple-approved applications.

*Fourth*, as in *Newcal*, "market imperfections," as well as Defendants' "fraud and deceit" in failing to disclose their intent to monopolize the aftermarkets, worked to "prevent consumers from realizing that their choice in the initial market will impact their freedom to shop in the aftermarket." *Id.* Just like in *Kodak* and *Newcal*, Plaintiffs' factual allegations here rebut any "presumption that [iPhone] consumers make a knowing choice to restrict their aftermarket options when they decide in the initial (competitive) market to enter an [ATTM] contract" and buy an iPhone. *Id.* In addition to alleging Defendants' lack of adequate disclosure, Plaintiffs have alleged that iPhone purchasers cannot reasonably ascertain the "lifecycle costs" of the handsets and that they would incur high switching costs due to the iPhones high price tag. Cplt. ¶120. Plaintiffs also allege they were more concerned about the iPhone's unique capabilities than its service costs. *See id.* ¶¶27-28.[6]

In the end, the Ninth Circuit summarized that *Newcal's* case against IKON:

> is not a case in which the alleged market power flows from contractual exclusivity. IKON is not simply enforcing a contractual provision that gives it the exclusive right to provide replacement equipment and lease-end services. Rather, it is leveraging a special relationship with its contracting partners to restrain trade in a wholly derivative aftermarket. We therefore reverse the district court's holding that *Queens City Pizza* and *Forsyth* render Newcal's complaint legally invalid.

513 F.3d at 1050. This Court should reach the same conclusion about Apple and ATTM's conduct alleged here, and should likewise sustain Plaintiffs' antitrust claims.

---

[6] The iPhone was a unique, highly anticipated product as to which consumers were "more concerned about equipment capabilities than service costs" and as to which "the costs of [voice and data] service [and applications] are small relative to the equipment price." *See Kodak*, 504 U.S. at 473-76 (quoted in footnote 4, *supra*). Because the iPhone was a new product, consumers could not acquire the "substantial amount of raw data and undertake sophisticated analysis" of total "package" costs to engage accurately in lifecycle pricing of the iPhone and its attendant voice and data services and applications over the life of the iPhone. The "costs of switching" to another smartphone in the event of supracompetitive price increases in voice and data services or applications are high – consumers would lose the utility of their $400 to $600 iPhone; have to buy a somewhat comparably priced alternative smartphone; and would suffer a $175 "termination fee" for breaking their two-year voice and data agreement with AT&TM. *See* Cplt. ¶¶28, 83, 120.

3.    **Defendants did not Adequately Disclose their Five-year Deal**

It is undisputed that Apple and ATTM never advised iPhone consumers at the time of purchase (i) that they would have to use ATTM's service for five-years; (ii) that their contractual right to terminate their ATTM plan at any time was illusory; or (iii) that they were waiving their right to switch SIM cards or modify their iPhones to use other carriers.

Nevertheless, Apple argues that Plaintiffs and the class members "knowingly" contracted to be bound to ATTM's voice and data service plan for five years because some consumers, ***after*** buying an iPhone, may have seen the tiny print on the box bottom stating that an "AT&T service plan" was "required for cellular network capabilities on expiration of initial two-year agreement." Brf. at 11, 5. Apple also claims that knowledge of ATTM's five-year deal was "widespread" because a single newspaper article speculated – months before the iPhone was released – that ATTM would have exclusive U.S. distribution rights for five years. *Id.* Apple's assertion that these two "disclosures" establish as a matter of law that Plaintiffs "knowingly contracted" to use ATTM for five years borders on frivolous.

Apple's virtually unreadable, after-the-fact statement on the iPhone box is nothing more than a tacit admission that disclosure of ATTM's five-year exclusivity deal was required by law, and it reflects, at best, a half-hearted – and woefully inadequate – attempt to feign compliance with that disclosure obligation. *See* pp. 4-5, *supra.* The single newspaper article, which was unlikely to have been read or even remembered but by a few iPhone buyers, is plainly not a basis for establishing the "functional equivalent" of a binding contract. *Newcal,* 513 F.3d at 1049. Unsurprisingly, the case law does not remotely support Apple's argument that it adequately disclosed the five-year deal.[7]

---

[7] The cases from other circuits on which Apple relies (Brf. at 9-10, 12) are inapposite because they adopt a restrictive view of *Kodak* that has been squarely rejected within the Ninth Circuit. *See Red Lion Med. Safety, Inc. v. Ohmeda, Inc.,* 63 F. Supp. 2d 1218, 1229-32 (E.D. Cal. 1999) (citing *Datagate, Inc. v. Hewlett-Packard Co.,* 60 F.3d 1421 (9th Cir. 1995) (distinguishing cases). While other jurisdictions may require proof that a defendant "changed a generally known policy" towards its already "locked in" customers to establish a *Kodak* claim, the Ninth Circuit requires only a showing that plaintiffs had not "knowingly contracted" to buy exclusively from the defendant in the aftermarket. *Newcal,* 513 F.3d at 1049. Even under the "change in policy" interpretation of *Kodak,* however, plaintiffs would prevail here because Apple was not honest and "forthcoming about its … service policies" and did not "divulge all

At the very least, at this pleading stage there is a question of fact as to whether iPhone consumers "knowingly contracted" to use ATTM as their exclusive voice and data service provider, both domestically and abroad, for five years.

### 4.    The Pre-existence of ATTM's Cell Phone Service is Irrelevant

Without citing any authority, Apple makes the strange argument that ATTM's cell phone service for the iPhone cannot be an aftermarket because it is a "beforemarket" that existed before the iPhone. Brf. at 12. A "beforemarket" is not a concept known to antitrust law. If the concept existed, it would have precluded the results of both *Kodak* and *Newcal* – surely, for example, both Kodak and IKON sold earlier-generation copiers that required service and maintenance contracts, yet aftermarkets for servicing their new copiers were found to exist. Likewise, the fact that service plans for smartphones and other cell phones existed before the iPhone does not mean that ATTM's iPhone service plan is an invalid aftermarket for antitrust purposes. It is well established that a single carrier's cell phone service plan can be a valid market. *See Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F. Supp. 486, 494 (S.D.N.Y. 1992) (market defined as "cellular services available to users of Vanguard cellular phones"). Apple offers no reason in logic or law to abrogate the *Kodak* aftermarket concept in this case.

### 5.    Plaintiffs Plead a Cognizable Applications Aftermarket

As shown above, Apple cannot successfully challenge Plaintiffs' Applications Aftermarket definition on this motion to dismiss unless Plaintiffs "knowingly contracted" away their right to object to Apple's monopolization of applications that could be downloaded to iPhones. Thus, Apple's contention (Brf. at 13) that Plaintiffs did not plead that "the general public was unaware" of Apple's third party applications policy is irrelevant. "General public awareness" is not a substitute for the "knowing contractual" waiver requirement in this Circuit. *See* p. 16 n.7, *supra*. In any event, Plaintiffs allege they were unaware of Apple's policy barring third-party applications at the time of purchase. Cplt. ¶¶4, 7(d).

---

relevant information at the time of sale." *PSI Repair Services v. Honeywell, Inc.*, 104 F.3d 811, 820-21 (6th Cir. 1997).

1    Apple also incorrectly contends that Plaintiffs fail to allege that Apple "makes or sells"

2    add-on applications. Brf. at 13. To the contrary, Plaintiffs allege that Apple "has created" several

3    applications itself, including ring tone applications that are compatible only with Apple's iTunes

4    system and allege that Apple earns supracompetitive profits through its revenue sharing

5    agreements with third-party software manufacturers. Cptl.¶¶4, 88-90. The Complaint plainly

6    alleges that Apple "makes or sells" products in the applications aftermarket.

7    Finally, Apple argues that the Applications Aftermarket should not be defined to include

8    "non-interchangeable products" like ringtones, music and photo applications, and other software.

9    Brf. at 13. Even if Apple's inherently factual point is ultimately proved correct after discovery, it

10   would not be a basis for dismissal. Rather, the proper remedy would be to refine the Applications

11   Aftermarket into economically distinct submarkets for separately competing applications, *i.e.*, a

12   ringtone applications submarket, a music maker submarket, etc. Creating such submarkets is a

13   well-accepted practice in antitrust law. *See Newcal*, 513 F.3d at 1045 (citing *Brown Shoe Co. v.*

14   *United States*, 370 U.S. 294, 325 (1962)).

15   Accordingly, Plaintiffs antitrust claims should be sustained.

16   **B.    Plaintiffs Sufficiently Plead Their Consumer Protection Claims**

17   **1.    Rule 9(b)'s Particularity Requirement has been Met**

18   A consumer fraud claim satisfies Rule 9(b) if the allegations "are specific enough to give

19   defendants notice of the particular misconduct which is alleged to constitute the fraud charged so

20   that they can defend against the charge ...." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

21   1985). Less specificity is required for a fraud by omission claim than an affirmative misrep-

22   resentation claim. *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088, 1099 (N.D. Cal. 2007).

23   Even though Plaintiffs primarily allege fraud by omission, they have nevertheless clearly satisfied

24   the more stringent particularly standard by pleading the "'who, what, when, where and how' of the

25   misconduct charged." *Vess v. Ciba-Geigy Corp. U.S.A.*, 317 F.3d 1097, 1106 (9th Cir. 2003).

26   Plaintiffs allege Defendants unlawfully prevented iPhone customers from exercising their

27   legal right to modify and unlock their phones to use their carrier of choice, Cplt. ¶3, and

28   committed "unlawful deceptive acts or practices" within the meaning of the consumer protection

1    laws at issue by omitting to disclose numerous material facts, *id.* ¶¶7-8. Plaintiffs allege

2    Defendants' wrongful acts began when Apple began selling the iPhone in June of 2007 and have

3    continued to the present. *Id.* ¶2, 12. These allegations amply give notice of Plaintiffs' claims.

4            Plaintiffs' fraud allegations premised on Defendants' affirmative misrepresentations are

5    also adequate to give notice of the misconduct charged – including Apple's false representations

6    that iPhone consumers could "browse the Internet and send emails as often as you like without

7    being charged extra," that "unlocking programs" would cause iPhones to malfunction rather than

8    Version 1.1.1 of Apple's operating software, and that Defendants had no obligation to repair or

9    replace the broken phones. *Id.* ¶¶35, 98-105.[8]

10           Plaintiffs also adequately allege they have been injured "in fact" because they have: (a)

11   been deprived of alternatives for voice and data services domestically; (b) been forced to pay

12   higher prices for roaming charges while traveling internationally, and/or; (c) had their iPhones

13   destroyed. *Id.* ¶149. Plaintiffs state the specific harm they each suffered. *Id.* ¶¶37-43, 47-57.

14           **2.     Plaintiffs Sufficiently Allege California CLRA and UCL Violations**

15           Apple relies on two inapposite cases to argue that it had no affirmative duty to disclose the

16   omissions at issue. Neither case involved allegations of material non-disclosed facts about which

17   consumers reasonably expected something different than they received. *See Daugherty v.*

18   *American Honda Motor Co.*, 144 Cal. App. 4th 824 (2006) (no duty to disclose oil leaks in cars

19   other than for model years manufacturer believed were affected); *Buller v. Sutter Health*, 160

20   Cal. App. 4th 981 (2008) (insurer had no duty to disclose discounting policy where it had no

21   legal duty to offer discounts at all).

22

23   _____

     [8] Each of the alleged fraudulent omissions and representations is material. In this district non-disclosed

24   information is material if a plaintiff shows that, "had the omitted information been disclosed," a
     "reasonable consumer" "would have been aware of it and behaved differently." *Falk v. General Motors*,

25   496 F. Supp. 2d at 1095; *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1360
     (2003). Plaintiffs allege they had expectations about the iPhone, such as the ability to exercise their

26   absolute legal right to unlock their iPhones, Cplt. ¶¶74, 74, 76 and 77, because it was common in the
     industry for ATTM to provide unlock codes to consumers, *id.* ¶¶42, 70, and that Defendants' acts were

27   likely to mislead a consumer acting reasonably under the circumstances, *id.* ¶155. Plaintiffs also allege that
     they would have acted differently if Defendants had made the required disclosures. *Id.* ¶¶37, 39, 44-48, 51,

28   55, 57.

     PLTFS' MEMO IN OPPOSITION TO APPLE'S MOTION TO DISMISS -- Master File No. C 07-05152 JW

Plaintiffs can successfully pursue a CLRA claim if Apple was "'obliged to disclose' the potential for problems with the [service or product]." *Falk v. General Motors*, 496 F. Supp. 2d at 1094 (quotation omitted). A duty to disclose can arise "when the defendant had exclusive knowledge of material facts not known to the plaintiff … and … when the defendant makes partial representations but also suppresses some material fact." *Id.* at 1095 (citing *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 337 (1997)). Apple did both things here.

Apple knew but never told iPhone purchasers (1) that their rights to switch carriers under the DMCA were effectively waived; (2) that they would be unable to obtain the iPhone unlock codes, as was common in the industry; (3) that consumers who did unlock their iPhones could have them destroyed[9]; (4) that Apple and ATTM had entered into a five-year exclusivity contract, the effect of which was to lock consumers into using ATTM as their voice and data service provider even after the consumers' two-year service plans with ATTM expired[10]; (6) that iPhone owners would incur unconscionable roaming fees – often several thousands of dollars simply for carrying the iPhone with them while traveling internationally, even if they did not actively use the iPhone's data features during their trip; and (7) that Apple would seek to prohibit iPhone owners from downloading programs or applications other than those "approved" by, and which generated revenue for, Apple. Thus, Plaintiffs have pled a CLRA claim.

The UCL is a broad statute that permits an individual to challenge wrongful business conduct in a "sweeping" array of contexts. *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). It prohibits "unfair competition," which it broadly defines as including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive,

---

[9] Apple's attempt to argue that its September 24, 2008 press release remedied this non-disclosure fails because the press release was sent out three months *after* the iPhones first went on the market, and there is no allegation that every iPhone owner saw it.

[10] As shown above, Apple's alleged "disclosure" on the iPhone box bottom was wholly inadequate. *See* pp. 4-5, *supra*. The statement that a "service plan with AT&T may be required for network capabilities on expiration of initial two-year agreement" was the epitome of a misleading partial representation – Apple should never have suppressed the material facts that consumers would be stuck with ATTM for five years and would be completely unable to have cell phone service with *any* carrier domestically or abroad even if they paid $175 to exercise their "right to terminate" ATTM's plan.

---

1    untrue or misleading advertising...." Cal. Bus. & Prof. Code §17200. The statute is violated

2    where a defendant's act or practice is (1) unlawful, (2) unfair, (3) fraudulent, or (4) in violation

3    of section 17500 (false or misleading advertisements). *South Bay Cheverolet v. GMAC*, 72 Cal.

4    App. 4th 861, 878 (1999). Section 17200 "'is not confined to anticompetitive business practices,

5    but is also directed toward the public's right to protection from fraud, deceit, and unlawful

6    conduct.... 'The statute imposes strict liability. It is not necessary to show that the defendant

7    intended to injure anyone.'... 'Allegations of actual deception, [and] reasonable reliance ... are

8    unnecessary.'" *Id.* at 577-78 (citations omitted).[11]

9        "The 'unlawful' practices prohibited by section 17200 are any practices forbidden by law,

10   be it civil, criminal, federal, state, or municipal, statutory, regulatory, or court-made." *Saunders*

11   *v. Superior Court*, 27 Cal. App. 4th 832, 838-39 (1994). Plaintiffs have alleged that Apple

12   violated the UCL by violating the CLRA. Cplt. ¶¶40-52. Hence, Plaintiffs have alleged UCL

13   violations under this prong.

14       A defendant's business practice "is unfair ... if it offends an established public policy or ...

15   is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *People*

16   *v. Duz-Mor Diagnostic Laboratory*, 68 Cal. App. 4th 654, 658 (1998). "[T]he public policy which

17   is a predicate to the action must be 'tethered' to specific constitutional, statutory, or regulatory

18   provisions." *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 854 (2002). Apple's failure to

19   disclose several material facts about the iPhone was unfair and substantially injurious to

20   consumers and contrary to the "established public policy" of the CLRA. Therefore, Plaintiffs

21   have alleged a UCL claim under the "unfairness" prong as well.

22       Unlike common law fraud, the term "fraudulent" as used in the UCL has required only a

23   showing "that members of the public are likely to be deceived." *Falk*, 496 F. Supp. 2d at 1098.

24   Apple's argument that it cannot be held liable under the fraud prong of the UCL because it was

25

26

---

27   [11] Proposition 64 amended the UCL in November 2004 by requiring the plaintiff to show that the UCL

28   violation resulted in a loss of money or property. *See* Cal. Bus. & Prof. Code § 17204.

1    under no duty to disclose fails for the same reason it fails with respect to the CLRA claims. As

2    discussed above, Plaintiffs have alleged facts demonstrating that Apple has violated this prong.

3              **3.    Plaintiffs Sufficiently Allege Washington CPA Violations**

4              The WCPA requires Plaintiffs to plead five elements: (1) an unfair or deceptive act or

5    practice; (2) occurring in trade or commerce; (3) a public interest impact; (4) injury to plaintiff in

6    her business or property; and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title*

7    *Ins. Co.*, 105 Wash. 2d 778, 780 (1986). "[W]hat constitutes an unfair and deceptive act or

8    practice is a question for the fact finder." *Burbo v. Harley Douglass, Inc.*, 125 Wash. App. 684,

9    700 (2005). A practice is unfair when it offends public policy as established by statutes, common

10   law or otherwise; is immoral, unethical, oppressive or unscrupulous; or causes substantial injury to

11   consumers. *Magney v. Lincoln Mut. Sav. Bank,* 34 Wash. App. 45, 57 (1985).

12             Courts have found nondisclosure of material facts similar to those alleged here to qualify

13   as both "unfair" and "deceptive" under the WCPA. *See, e.g., Holiday Resort Cmty. Ass'n v. Echo*

14   *Lakes Assocs., LLC*, 134 Wash. App. 210, 226 (2006); *Tallmadge v. Aurora Chrysler Plymouth,*

15   *Inc.*, 25 Wash. App. 90, 93 (1979); *Testo v. Russ Dunmire Oldsmobile*, 16 Wash. App. 39, 52 n.2

16   (1976). *See also Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wash. 2d

17   299, 311 (1993) (holding that drug company's failure to warn doctors of known dangers of drug

18   was unfair and deceptive). A material fact is "a fact to which a reasonable man would attach

19   importance in determining his choice of action." *Clausing v. DeHart,* 83 Wash 2d 70, 73 (1973)

20   (citation omitted). Whether a non-disclosure is material enough to cause injury is a question of fact

21   for the jury. *See Washington State Physicians*, 122 Wash 2d at 315 (whether doctor who

22   prescribed drug that injured patient would have acted differently if adequately warned was jury

23   question).

24             Plaintiffs "need not prove reliance or deceptive misrepresentation but only that the actions

25   have a tendency or capacity to deceive a substantial portion of the public." *Tallmadge*, 25 Wash

26   App. at 93; *Testo*, 16 Wash App. at 51 ("Whether a plaintiff-consumer has been actually deceived

27   is irrelevant."); *Pierce v. NovaStar Mortg. Inc.*, 238 F.R.D. 624 (W.D. Wash. 2006) (finding no

28   requirement to show reliance on an omission).

1    Plaintiffs allege ample facts regarding the materiality of Apple's failure to disclose crucial

2    information about the iPhone, which had the capacity to deceive Plaintiffs and render them unable

3    to make a fully informed choice to purchase their iPhones.

4         **4.    Plaintiffs Sufficiently Allege New York CPA Violations**

5         To state a claim under the New York Consumer Protection Act Plaintiffs must allege only

6    that Defendants engaged "in an act or practice that is deceptive or misleading in a material way

7    and that plaintiff has been injured by reason thereof." *Oswego Laborers' Local 214 Pension Fund*

8    *v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). The deceptive act or practice must cause

9    "actual, although not necessarily pecuniary, harm." *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43,

10   56 (App. Ct. 1999). As shown with respect to the California and Washington statutes, Plaintiffs

11   have alleged sufficient facts to prove New York Consumer Protection Act violations as well.

12        **5.    Plaintiffs Have Standing to Assert all of Their Consumer Claims**

13        Courts routinely have certified nationwide classes applying either the law of the forum

14   state or the law of multiple states where there is no prohibitive conflict among state law that would

15   make the litigation unmanageable. *E.g., Kelley v. Microsoft Corp*, No. C07-475 MJP, 2008 WL

16   509332 (W.D. Wash. Feb. 22, 2008) (court certified nationwide class action applying Washington

17   consumer protection laws to plaintiffs in all 50 states); *Thorogood v. Sears Roebuck & Co.*, No. 06

18   C 1999, 2007 U.S. Dist. LEXIS 81035 (N.D. Ill. Nov. 1, 2007) (certifying class comprising of

19   residents of 28 states under their respective consumer fraud statutes though lead plaintiffs were

20   from Tennessee); *Miner v. Gillette Co.*, 87 Ill. 2d 7, 17-18 (1981) (consumer fraud laws of 50

21   states held allocable into manageable number of subclasses). *See also In re Prudential Ins. Co.*

22   *Am. Sales Litig. Agent Actions*, 148 F.3d 283, 315 (3d Cir. 1998) (affirming multi-state

23   certification); *In re Nigeria Charter Flights Contract Litig.*, 233 F.R.D. 297, 305-06 (E.D.N.Y.

24   2006) (potential differences in applicable state laws do not defeat class certification where the

25   defendant fails to show they would create insuperable obstacles); *Miles v. Am. Online, Inc.*, 202

26   F.R.D. 297 (M.D. Fla. 2001) (certifying nationwide class); *Longden v. Sunderman*, 123 F.R.D.

27   547, 555-556 (N.D. Tex. 1988) (granting nationwide certification where defendants failed to show

28   substantive variations in state fraud laws); *Dekro v. Stern Bros. & Co.*, 540 F. Supp. 406, 418

1    (W.D. Mo. 1982) (same).

2          Apple confuses standing with the requirements for class certification. Apple's assertion

3    that Plaintiffs have no standing to assert claims on behalf of residents of states other than their

4    own "is a 'standing' argument, but is an argument that pertains to standing under Fed. R. Civ. P.

5    23, not standing in the Article III sense." *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1044 (N.D.

6    Ill. 2007). Under Rule 23, so long as the same course of conduct underlies each claim, the class

7    representatives do not need to have individual standing for each of the claims asserted by the class.

8    *See Adam v. Silicon Valley Bancshares,* No. C 93-20399 RMW (EAI), 1994 U.S. Dist. LEXIS

9    21717, at **4-6 (N.D. Cal. April 18, 1994). Here, Plaintiffs allege, in detail, how Apple unfairly

10   and deceptively marketed the iPhone. Cplt. ¶¶7-9, 32-36, 65-76. That same course of conduct

11   harmed all iPhone consumers, *i.e.*, via broken iPhones, substantial roaming fees, and suppression

12   of their legal right to use the cell phone carrier of their choice. *Id.* ¶¶27-57. Thus Apple's standing

13   argument fails.

14       **C.**    **Plaintiffs Plead a Magnuson-Moss Warranty Act Claim**

15         Apple's forcing iPhone customers to use ATTM as their exclusive voice and data carrier is

16   prohibited "conditioning" under the MMWA, 15 U.S.C. §2302(c).[12] A case involving an ATTM

17   predecessor is directly on point. *See Beckermeyer v. AT&T Wireless*, No. 0469, Control No.

18   022091, 2004 Phila. Ct. Com. Pl. LEXIS 116, at *7 (Oct. 22, 2004) (AT&T and Panasonic's

19   undisclosed locking of SIM card and refusal to provide unlocking code held impermissible

20   conditioning of cell phone warranty on customers' use of AT&T's own branded service). That is

21   exactly what Plaintiffs claim Apple did in this case. The reasoning in *Breckermeyer* applies

22   equally to Apple's tying its warranty to ATTM's service and to Apple's tying its warranty to only

23   Apple-approved software applications.

24         Apple's "warnings" to users regarding making "unauthorized" modifications to the iPhone

25   _____

26   [12] That section states:

27         No warrantor of a consumer product may condition its written or implied warranty
           of such product on the consumers using, in connection with such product, any article
           or service (other than article or service provided without charge under the terms of

28         the warranty) which is identified by brand, trade or corporate name.

1    were also improper and violated 15 U.S.C. § 2302(a), which requires a warrantor to conform the

2    terms of written warranties to FTC standards, including its rule requiring plain disclosure in a

3    "single document" of, *inter alia*, all the products, parts, characteristics, components, or properties

4    excluded from the warranty. 16 C.F.R. §701.3. Defendants did not disclose the locked "properties"

5    of the iPhone, so Apple's announcements that owners' warranties would be void if consumers

6    unlocked their phones violated the single document rule. *See Cunningham v. Fleetwood Homes of*

7    *Ga., Inc.*, 253 F.3d 611, 621 (11th Cir. 2001).

8            **D.    Plaintiffs' Trespass to Chattels Claim should be Sustained**

9            Plaintiffs allege that Apple punished and damaged iPhone owners who had unlocked their

10   iPhones or installed non-Apple approved applications by deliberately releasing an operating

11   system upgrade containing a code that would relock unlocked iPhones and disable or remove

12   offending applications. Cplt. ¶¶47, 49, 56, 96, 102-103, 164, 166. On these facts a trespass to

13   chattels claim lies because Apple's unauthorized "intentional interference with the possession of

14   personal property has proximately caused injury." *Thrifty-Tel v. Bezenek*, 46 Cal. App. 4th 1559,

15   1566 (1996). *See eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1070-71 (N.D. Cal.

16   2000). Plaintiffs did not consent to Apple's destructive acts. Plaintiffs limited their consent to

17   installation of Version 1.1.1. based on Apple's representation that it was a needed and helpful

18   upgrade. A trespass may occur when a party entering pursuant to limited consent or for a limited

19   purpose exceeds that limit. *Civic Western Corp. v. Zila Industries, Inc.*, 66 Cal. App. 3d 1, 17

20   (1977). Apple exceeded the scope of the Plaintiffs' limited consent and is liable for any resulting

21   damage.

22           Apple's rhetoric that Plaintiffs' allegations would require Apple to "guarantee" that

23   Version 1.1.1 would be compatible with all unlocked iPhones overstates the case. Plaintiffs merely

24   seek to require that Apple not again release a software update that it knows will damage and

25   destroy iPhones. If Apple knows that its software will interfere with consumers DMCA rights to

26   switch carriers in any way, Apple should be (and is) obligated to make commercially reasonable

27   efforts to design around the problem.

28

E.    **Plaintiffs State a Federal Computer Fraud and Abuse Act Claim**

The Computer Fraud and Abuse Act provides a private right of action against anyone who knowingly causes the transmission of a program, information, code, or command, that intentionally causes damage to a protected computer, resulting in an aggregated loss of at least $5,000 in value to one or more persons during any one-year period. 18 U.S.C. §1030.

Apple's argument that Plaintiffs have not alleged that Apple "knowingly" and "intentionally" released Version 1.1.1 to damage iPhones simply misstates the Complaint.

The Ninth Circuit has held that to meet the $5,000 threshold, damages caused to many computers by the same act may be aggregated, and its reasoning applies equally to aggregating across many victims. *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 934-35 (9th Cir. 2004); *see In re Doubleclick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 520 (S.D.N.Y. 2001).

F.    **Plaintiffs State Claims under California Penal Code §502(c)(4) and (c)(8)**

California Penal Code §502(c)(4) provides a civil cause of action against an individual that "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network." CPC §502(c)(8) provides a cause of action against an individual that "[k]nowingly introduces any computer contaminant into any computer, computer system, or computer network." For the reasons stated above, Plaintiffs have asserted facts sufficient to state claims under both sections, and their limited consent to installation of Version 1.1.1 did not constitute consent to Apple's destruction of their iPhones.

V.    **CONCLUSION**

Apple's motion to dismiss should be DENIED.

Dated:  August 6, 2008

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
BETSY C. MANIFOLD
RACHELE R. RICKERT

_____/s/  Francis M. Gregorek_____
FRANCIS M. GREGOREK
750 B. Street, Suite 2770
San Diego, California 92101
Telephone:  619/239-4599
Facsimile:  619/234-4599

gregorek@whafh.com
manifold@whafh.com
rickert@whafh.com

WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP
MARK C. RIFKIN (*pro hac vice*)
ALEXANDER H. SCHMIDT (*pro hac vice*)
MARTIN E. RESTITYO (*pro hac vice*)
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:  212/545-4677
rifkin@whafh.com
schmidt@whafh.com
restituyo@whafh.com

Plaintiffs' Interim Lead Counsel

RANDALL S. NEWMAN, P.C.
RANDALL S. NEWMAN
The Trump Building
40 Wall Street, 61st Floor
New York, New York 10005
Telephone:  212/797-3737
Facsimile:  212/797-3172
rsn@randallnewman.net

SHABEL & DENITTIS, P.C.
STEPHEN P. DENITTIS (*pro hac vice*)
NORMAN SHABEL (*pro hac vice*)
5 Greentree Centre, Suite 302
Marlton, New Jersey 08053
Telephone:  856/797-9951
Facsimile:  856/797-9978
sdenittis@shabeldenittis.com

Additional Counsel for Plaintiffs

APPLE:16255.OPP

PLTFS' MEMO IN OPPOSITION TO APPLE'S MOTION TO DISMISS -- Master File No. C 07-05152 JW