LATHAM & WATKINS LLP
Daniel M. Wall (Bar No. 102580)
Alfred C. Pfeiffer, Jr. (Bar No. 120965)
Christopher S. Yates (Bar No. 161273)
Sadik Huseny (Bar No. 224659)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Dan.Wall@lw.com
Email: Al.Pfeiffer@lw.com
Email: Chris.Yates@lw.com
Email: Sadik.Huseny@lw.com

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE APPLE & AT&TM ANTITRUST LITIGATION

CASE NO. C 07-5152 JW

**DEFENDANT APPLE'S REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS REVISED CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Date: September 12, 2008
Time: 9:00 a.m.
Place: Courtroom 8, 4th Floor
Judge: Honorable James Ware

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION .......... 1

II. PLAINTIFFS' CLAIM THAT THE DMCA CREATED AN "ABSOLUTE LEGAL RIGHT" TO UNLOCK CELL PHONES IS BASELESS AND IRRELEVANT .......... 2

III. PLAINTIFFS' ANTITRUST CLAIMS ARE DEFICIENT AS A MATTER OF LAW .......... 3

A. THE "IPHONE VOICE AND DATA SERVICES AFTERMARKET" FAILS .......... 3

1. There Is No iPhone Services Aftermarket .......... 3

2. Inadequate Disclosure Does Not Result in Aftermarket Monopoly Power .......... 6

3. Plaintiffs' Opposition Concedes There Was Ample and Multiple Disclosure of ATTM's Long-Term Exclusivity .......... 7

B. THE "IPHONE APPLICATIONS AFTERMARKET" FAILS .......... 9

IV. PLAINTIFFS ESSENTIALLY ABANDON THEIR COMMON LAW COMPUTER TRESPASS AND STATUTORY COMPUTER FRAUD CLAIMS .......... 9

A. PLAINTIFFS CONCEDE APPLE DID NOT COMMIT A COMPUTER TRESPASS .......... 9

B. PLAINTIFFS' COMPUTER FRAUD CLAIMS ARE BASELESS .......... 10

V. THE STATE CONSUMER PROTECTION CLAIMS SHOULD BE DISMISSED .......... 11

A. PLAINTIFFS LACK STANDING TO MAINTAIN STATE CONSUMER PROTECTION CLAIMS UNDER THE LAWS OF FORTY STATES WHERE NONE OF THEM RESIDES .......... 11

B. PLAINTIFFS FAIL TO PLEAD FRAUDULENT OMISSION WITH SUFFICIENT PARTICULARITY UNDER FEDERAL RULE OF CIVIL PROCEDURE 9(B) .......... 12

C. PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER THE CALIFORNIA, WASHINGTON, AND NEW YORK STATE CONSUMER PROTECTION STATUTES .......... 12

VI. PLAINTIFFS FAIL TO PLEAD A VIABLE CLAIM UNDER THE MAGNUSON-MOSS WARRANTY ACT .......... 14

VII. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

## CASES

*Bardin v. DaimlerChrysler Corp.*,
136 Cal. App. 4th 1255 (2006) .......... 13

*Bell Atlantic Corp. v. Twombly*,
127 S.Ct. 1955 (2007) .......... 7

*Breckermeyer v. AT&T Wireless*,
No. 00469, Control. No. 022091,
2004 Phila. Ct. Com. Pl. LEXIS 116 (Oct. 22, 2004) .......... 15

*Buller v. Sutter Health*,
160 Cal. App. 4th 981 (2008) .......... 13

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004) .......... 11

*Daugherty v. Am. Honda Motor Co., Inc.*,
144 Cal. App. 4th 824 (2006) .......... 13

*Digital Equip. Corp. v. Uniq Digital Techs.*,
73 F.3d 756, 763 (7th Cir. 1996) .......... 3

*Eastman Kodak Co. v. Image Tech. Servs.*,
504 U.S. 451 (1992) .......... 3, 4, 5, 6

*Falk v. General Motors Corp.*,
496 F. Supp. 2d 1094 (N.D. Cal. 2007) .......... 13

*Forsyth v. Humana, Inc.*,
114 F.3d 1467 (9th Cir. 1997) .......... 5

*In re Ditropan XL Antitrust Litig.*,
529 F. Supp. 2d 1098 (N.D. Cal. 2007) .......... 11

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......... 11

*M.D. Rutledge v. Boston Woven Hose and Rubber Co.*,
576 F.2d 248 (9th Cir. 1978) .......... 12

*Newcal Indus., Inc. v. Ikon Office Solution*,
513 F.3d 1038 (9th Cir. 2008) .......... 3, 4, 5, 6, 7

*PSI Repair Servs. V. Honeywell, Inc.*,
104 F.3d 811 (6th Cir. 1997) .......... 6

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
124 F.3d 430 (3rd Cir. 1997) .......... 4, 5, 6

*SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) .......... 4, 6

*Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp 1353 (C.D. Cal. 1995) .......... 12

*Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F. Supp. 486 (S.D.N.Y. 1992).......... 5

OTHER AUTHORITIES

16 C.F.R. § 701 .......... 15

15 U.S.C. § 2301.......... 14

17 U.S.C. § 1201.......... 2, 3

18 U.S.C. § 1030.......... 11

37 C.F.R. § 201.40 .......... 2

5 Moore's Federal Practice § 23.63(1)(b) (3rd ed. 2008) .......... 11

71 Fed. Reg. 68,472, 68,476 (Nov. 27, 2006).......... 3

P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 564 (3d ed. 2006) .......... 6

H. Hovenkamp, M.D. Janis & M.A. Lemley, IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, § 21.04 (2002 and 2006 Supp.) .......... 4

RULES

Federal Rules of Civil Procedure 9 .......... 12

Federal Rules of Civil Procedure 23 .......... 11

## I. INTRODUCTION

Entry is the epitome of procompetitive behavior. There is no denying that this case is about Apple's *initial entry strategies* into the crowded cell phone market; indeed, it is primarily about Apple's *pre-entry* decision to give ATTM exclusive rights to the iPhone. If that's all a person knew about this case, it would seem absurd that Apple is accused of *monopolization*. Monopolization at the moment of entry—into a crowded market, no less—is oxymoronic.

The issue raised by plaintiffs' opposition brief is whether the law concerning so-called "aftermarkets" permits the conclusion that Apple entered the cell phone business as a monopolist. Plaintiffs claim that Apple had instant monopoly power, in "iPhone service" and "iPhone applications," for essentially one reason: because Apple and ATTM supposedly made *inadequate disclosures* to iPhone customers about the length of their exclusive agreement and other matters. That is not a proper basis for defining an antitrust market. A new entrant is not saddled with the antitrust obligations of a monopolist—nor subjected to antitrust treble damages—based on the kinds of disclosures it allegedly makes to customers about its business policies. This market definition theory badly mischaracterizes *Kodak*, and fails as a matter of law.

The Digital Millennium Copyright Act does not change the outcome. Plaintiffs are wrong that this statute confers to consumers an affirmative, "absolute legal right to modify their phones to use the network of their carrier of choice." It does not, and plaintiffs' constant repetition of this contention—presented as a self-evident truth but *entirely* unsupported—is frivolous. But it is also irrelevant. Plaintiffs' antitrust claims require proof of monopoly power in a cognizable antitrust market, and nothing about the DMCA excuses or relaxes that requirement. Plaintiffs' remaining claims likewise have specific elements not diminished by the DMCA.

As to the "computer trespass" and "computer fraud" claims, plaintiffs' opposition makes clear that these claims rely simply on Apple's release of an operating system update that failed to support all user-modified iPhones. Plaintiffs argue that Apple had an affirmative duty to design its software to work with "hacked" iPhones. No authority—including the DMCA—imposes such a duty, and it would be an improper expansion of the law to equate a software incompatibility (particularly one resulting from unauthorized hacking) with a "trespass" or a "fraud."

After that, plaintiffs' claims are quibbles about whether consumers were told

enough about defendants' business practices. Plaintiffs lack standing to sue under most of the state laws they invoke, and their claims under the three states where plaintiffs have standing are unsustainable, primarily because Apple had no obligation to disclose the alleged omissions.

There is no prospect of amending the claims to cure their defects. The Court should dismiss the Revised Consolidated Amended Class Action Complaint ("RCAC") with prejudice.

## II. PLAINTIFFS' CLAIM THAT THE DMCA CREATED AN "ABSOLUTE LEGAL RIGHT" TO UNLOCK CELL PHONES IS BASELESS AND IRRELEVANT

Apple must begin by answering plaintiffs' contention that the Digital Millennium Copyright Act of 1998 ("DMCA"), 17 U.S.C. § 1201, *et seq.*, created "an *absolute legal right*" for consumers "to use the network of their carrier of choice." Opp. at 3 (emphasis added). Plaintiffs do not and cannot sue under the DMCA, but they invoke this "right" as a principal rationale for their arguments on nearly every pleaded cause of action. *See* Opp. at 1, 2, 3, 5, 12, 17, 24. Plaintiffs' reliance on the DMCA is frivolous. The statute neither establishes such a right nor alters the elements of the causes of action that plaintiffs advance.

The DMCA protects copyright holders by prohibiting circumvention of technological measures used to protect copyrighted works. *See* 17 U.S.C. § 1201(a)(1)(A). It does this by allowing the copyright holder to sue the person who "breaks the lock" on the software, even if there was no direct infringement (i.e., copying) by that person. Because access controls enforced by the DMCA might be used to protect non-copyrighted works or noninfringing uses of copyrighted works, the Librarian of Congress was empowered to issue exemptions from the DMCA upon a showing that a "class" of access controls was likely to have a substantial adverse effect on noninfringing uses. *See id.* at §§ 1201(a)(1)(C), (D).

In 2006 the Librarian of Congress issued one such exemption: for "[c]omputer programs in the form of firmware that enable wireless telephone handsets to connect to a wireless telephone communication network, when circumvention is accomplished for the sole purpose of lawfully connecting to a wireless telephone communication network." 37 C.F.R. § 201.40(5); 71 Fed. Reg. 68,472, 68,476 (Nov. 27, 2006). This exemption means that consumers cannot be *sued for copyright infringement* merely for unlocking their cell phones to use them with different service providers. The exemption does not provide consumers with any affirmative rights, let

alone an "absolute legal right" to unlock their phones. That is necessarily so—the DMCA only gives the Librarian of Congress authority to identify "noninfringing uses" of copyrighted works, 17 U.S.C. §§ 1201(a)(1)(C), (D), not authority to confer new rights on consumers.

There is no claim of copyright infringement in this case, so the DMCA is irrelevant. In particular, there is absolutely no authority for the notion that a DMCA exemption alters the analysis of an antitrust claim, the common law of computer trespass, or any of the other laws and doctrines that actually are implicated by the RCAC. Similarly, nothing in the DMCA or the cited exemption nullifies the plaintiffs' two-year exclusive contracts with ATTM or the explicit provisions in the iPhone software license agreement against altering the iPhone software.

We may therefore turn to the claims actually pleaded, leaving the DMCA behind.

## III.   PLAINTIFFS' ANTITRUST CLAIMS ARE DEFICIENT AS A MATTER OF LAW

The question presented is whether Apple's entry strategies could be acts of monopolization. Plaintiffs implicitly concede the answer is "no" if the relevant market is cell phones, but allege there are "aftermarkets" for "iPhone Voice and Data Services" and "iPhone Applications" which Apple and ATTM monopolized from the moment the iPhone was available. In both cases, plaintiffs' theory is that because Apple did not tell consumers enough about its business practices, aftermarket monopoly power arose. That argument fails as a matter of law.

### A.   THE "IPHONE VOICE AND DATA SERVICES AFTERMARKET" FAILS

Plaintiffs' theory here is that Apple acquired monopoly power by not disclosing that it had entered into a five-year exclusivity agreement with ATTM when consumers signed up for two-year ATTM service contracts. Even assuming that were true (which it is not, *see* Section III.A.3, *supra*), there is no rationale or logic under antitrust law that allows a claim of monopoly power to rest on this kind of "non-disclosure."

#### 1.   There Is No iPhone Services Aftermarket.

Plaintiffs fail to grasp the logic of "aftermarkets." Neither the Supreme Court in *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451 (1992), nor the Ninth Circuit in *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008), made "non-disclosure" a method of market definition. Markets are defined by reference to the choices a consumer has at the

time of purchase. If, as is obvious and undisputed, a consumer interested in the package of an iPhone and ATTM service had (and has) the option of a Motorola Razor with Verizon service, a RIM Blackberry with T-Mobile service, etcetera, then these options are in the relevant market. This is true regardless of what the consumer was told about the experience they might have as an Apple/ATTM customer, a Motorola/Verizon customer or so on. Everything that happens up front, well-informed or uninformed, is a "foremarket" transaction that is presumptively disciplined by the competitive options available to consumers in the foremarket. *See, e.g.*, *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999) (mandatory three-year warranty analyzed as foremarket purchase; claim dismissed); *Digital Equip. Corp. v. Uniq Digital Techs.*, 73 F.3d 756, 763 (7th Cir. 1996) (operating system and computer bundle analyzed as single product).

The "aftermarket" concept addresses the possibility that, for a consumer of durable goods, a *later* transaction—one by definition made *after* the foremarket transaction has taken place—may not be constrained by competition because of that consumer being "locked in" to its initial foremarket purchase. For example, in *Kodak*, consumers who bought copiers in the foremarket later purchased replacement parts and post-warranty service in the aftermarket. Similarly, in *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430 (3rd Cir. 1997), plaintiffs who bought franchise rights in the foremarket later purchased pizza ingredients and paper cups in the aftermarket. Once committed to the foremarket product, a consumer may have no realistic prospect of switching brands in response to anticompetitive aftermarket practices. But that is all about the "lock in" effect of the earlier purchase. As the Supreme Court put it, "consumers who *already have purchased the equipment, and are thus 'locked in,'* will tolerate some level of [aftermarket]-price increases before changing equipment brands." *Kodak*, 504 U.S. at 476 (emphasis added). It has nothing to do with those consumers—such as plaintiffs and other iPhone purchasers—who are not yet locked-in and are making an initial equipment choice. This is not controversial. A leading treatise states, "[i]t should … be clear that *Kodak*-style 'lock-in' occurs only when the primary market decision and the 'aftermarket' decision are made at different times." H. Hovenkamp, M.D. Janis & M.A. Lemley, IP AND ANTITRUST: AN ANALYSIS OF ANTITRUST PRINCIPLES APPLIED TO INTELLECTUAL PROPERTY LAW, § 21.04 (2002 and 2006 Supp.).

There cannot be any "iPhone Voice and Data Services Aftermarket" at this time. The reason is simple: the iPhone purchase and ATTM service agreement were both part of the *initial foremarket transaction*, and all iPhone purchasers still remain under the two-year ATTM service contracts to which they agreed when they first bought an iPhone. The earliest of these agreements expires on June 29, 2009, the second anniversary of the iPhone's release. In other words, plaintiffs (and all iPhone purchasers) are still governed by the terms of the contracts they executed *in the foremarket*—contracts that could not possibly have been the product of aftermarket monopoly power. In this particular case, the foremarket transaction is the iPhone and the ATTM Service Contract, and there is no "aftermarket" as yet. And that is dispositive. There is absolutely no basis in the law for condemning Apple's *initial entry strategies* as an abuse of *possible future* aftermarket power when there has been no aftermarket transaction.

Contrary to plaintiffs' suggestion, *Ikon* was a true aftermarket case: the allegedly monopolized products were for replacement equipment and lease-end services, by definition products bought *after* the consumer first purchased an Ikon copier and *after* its initial service contract expired. This is entirely distinguishable from the case here.

Furthermore, the *Ikon* court stressed that it was dealing with "unique" and non-interchangeable products or services "wholly derivative from and dependant on the primary market." *Ikon*, 513 F.3d at 1049 (distinguishing *Queen City*, 124 F.3d 430 and *Forsyth v. Humana, Inc.*, 114 F.3d 1467 (9th Cir. 1997), where the alleged "aftermarket" products "would exist whether or not there was a market" for the primary product). Plaintiffs cannot meet this requirement either, as they do not and cannot claim that ATTM service is unique to the iPhone, "wholly derivative from and dependant on" the iPhone, and would not exist but for the iPhone.[1]

---

[1] Plaintiffs' claim that "[i]t is well established that a single carrier's cell phone service plan can be a valid market[ ]" is irrelevant and false. Opp. at 16. The single case cited for this "well-established" principle, *Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F. Supp. 486 (S.D.N.Y. 1992), does not involve an alleged exclusive cell phone/cell service "aftermarket." Instead, the case was a monopsony (buying-side) case between cell companies for roaming services. Moreover, *Sunshine Cellular* did not define the market as "cellular services available to users of Vanguard cellular phones," as plaintiffs claim. Opp. at 16. The court merely found that a market defined as "providing roaming cellular services to Vanguard customers who roam into Pennsylvania 8 and desire to use their cellular telephone while there" survived Rule 12(b)(6). *Sunshine Cellular*, 810 F. Supp. at 493-94.

**2. Inadequate Disclosure Does Not Result in Aftermarket Monopoly Power.**

As a logical matter, there is absolutely no reason to think that a new entrant into a market with none of the usual attributes of a monopolist (e.g., a high market share) would obtain monopoly power by not disclosing information about its business practices. Plaintiffs claim otherwise. They seize on a passage in *Ikon* where the Ninth Circuit wrote that an antitrust claimant may not rest "on market *power* that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant." *Ikon*, 513 F.3d at 1048 (emphasis in original). Plaintiffs make a remarkable negative inference from this language, contending that whenever consumers do not grant a "knowing contractual waiver" about some business practice, it may be deemed an act of monopolization. Opp. at 16 (internal quotation marks omitted). That is a *non sequitur*, fundamentally mischaracterizing the role of "imperfect information" in the aftermarket analysis.

Under *Kodak*, imperfect consumer information about long-term costs of ownership is a necessary *but not sufficient* condition for finding a relevant aftermarket. The Supreme Court's point was that foremarket competition could be expected to discipline an aftermarket if consumers could reasonably anticipate the long-term costs of ownership when adopting the brand, but might not if adequate information was unavailable. *Kodak*, 504 U.S. at 473. Subsequent cases have made clear that unless "consumers *could not*, at the time of purchase, *reasonably discover*" such information, an aftermarket monopoly claim will fail. *See Ikon*, 513 F.3d at 1048 (emphasis added); *PSI Repair Servs. v. Honeywell, Inc.*, 104 F.3d 811, 820-21 (6th Cir. 1997); *Queen City Pizza*, 124 F.3d at 440-41.[2] But no case holds the converse: that aftermarket power *will necessarily exist*, or even *can be presumed to exist*, simply because foremarket purchases are tainted by allegedly imperfect information or inadequate disclosures about the future. There still must be a genuine aftermarket, locked-in consumers, and most of all a basis for finding that "the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket." *SMS*, 188 F.3d at 17. Alleged inadequate disclosures alone do not suffice.

*Ikon* in no way transforms the *Kodak* aftermarket analysis into a simple inquiry that

---

[2] *See also* P. Areeda & H. Hovenkamp, ANTITRUST LAW ¶ 564 (3d ed. 2006) ("[I]gnorance should be measured by an objective test requiring proof that aftermarket prices were simply not available …; otherwise, we reward customers for not making reasonable inquiries about aftermarket costs.").

"requires only a showing that plaintiffs had not 'knowingly contracted' to buy exclusively from the defendants in the aftermarket." Opp. at 15 n.7; *see also id.* at 12. In fact, *Ikon narrowed* the circumstances in which aftermarkets could be found. Specifically, the court examined whether the complaint before it sufficiently related to a "wholly derivative aftermarket" (discussed above), examined whether the complaint sufficiently alleged post-sale actions or exploitation occurring *in that aftermarket* (as opposed to the initial market), and in that context, created what amounts to a "safe harbor" for contractual power the manufacturer acquires at the time of the foremarket sale. *Ikon*, 513 F.3d at 1048-49. This is fatal to plaintiffs' aftermarket theory: the original ATTM iPhone service contracts are still in effect and plaintiffs are bound only by those agreements.[3]

Plaintiffs' new, expansive theory of aftermarket liability is not merely unsupported; it is dangerous. Under plaintiffs' theory, the mere allegation of what is often a contestable issue—the adequacy of disclosures about future events—would serve to create an unassailable, motion-proof monopolized antitrust aftermarket, even in the case of brand new entrants.[4] This turns antitrust law on its head, converting the narrow *Kodak* aftermarket *exception* into a general, positive principle that finds an aftermarket as a matter of law whenever a defendant does not explicitly include, in foremarket contracts, all terms that may relate to future potential costs and obligations. It expands antitrust liability to cover what is, if anything, a contracting problem, and what is also more than adequately addressed by consumer protection statutes tailored to promote optimal disclosures. Antitrust law is not—nor should it be made to be—a substitute for contract and consumer protection law. Plaintiffs' aftermarket theory cannot be sustained.

**3. Plaintiffs' Opposition Concedes There Was Ample and Multiple Disclosure of ATTM's Long-Term Exclusivity.**

We cannot leave unchallenged the "factual" predicate for plaintiffs' claim of an "iPhone Voice and Data Services Aftermarket"—that the five-year Apple-ATTM exclusivity

---

3 The RCAC's allegations are hardly "identical" to or "indistinguishable" from those in *Ikon*. First, the alleged unlawful action (not disclosing a five-year exclusive arrangement with ATTM) occurred *before or at the time of the foremarket sale*. Second, "iPhone Voice and Data Service" is not a derivative "aftermarket"; ATTM has sold the same service sold to millions of other, non-iPhone consumers.

4 This is not only baseless, it is antithetical to *Twombly*'s admonition that courts should carefully assess the adequacy of pleadings "before allowing a potentially massive factual controversy to proceed[,]" particularly in the antitrust context. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1967 (2007).

agreement was undisclosed, and served to hoodwink consumers into five years of ATTM service. Not that it matters, but this is baseless too.

Plaintiffs essentially concede the widespread disclosure of and publicity about ATTM's long-term iPhone exclusivity. Plaintiffs admit that the label on the iPhone box states: "Minimum new two-year wireless service plan with AT&T required to activate all iPhone features" and that "Service plan with AT&T required for cellular network capabilities on expiration of initial new two-year agreement." Opp. at 4. The two articles *plaintiffs themselves cite* in the RCAC state that: (i) ATTM exclusivity was for five years, and (ii) that the iPhones were locked to only work with ATTM. RCAC ¶¶ 86, 62; RJN Exs. E, F. And plaintiffs admit that the very day Apple introduced the iPhone to the world, "Apple announced that it had entered into an exclusive agreement making AT&TM the *only authorized provider of wireless voice and data service for iPhones in the United States*." RCAC ¶ 77 (emphasis added); *see also* RJN Exs. G, H (Apple's January 9, 2007 Press Releases introducing the "multi-year partnership" making ATTM the "exclusive US carrier partner for Apple's revolutionary iPhone unveiled today.")

Hemmed in by their own allegations, plaintiffs resort to complaining that: (1) the iPhone box label was in small font and only seen after the iPhone purchase, and (2) only a "single newspaper article" speculated that ATTM's exclusivity would be for five years. This speaks volumes. The size of the font on a disclosure, or whether there was one or a hundred articles about the length of the Apple-ATTM agreement, has no relevance to whether a new entrant holds *monopoly power*. Plaintiffs' apparent suggestion that Apple could negate an inference of monopoly power by showing that it used a 12 point font, or by producing more newspaper articles, serves only to show how senseless the theory of "monopoly power by inadequate disclosure" really is: as a new entrant, neither a candid Apple nor a less forthcoming Apple could have had monopoly power. But plaintiffs are also wrong. The iPhone box label was perfectly legible, and plaintiffs cannot allege otherwise. Plaintiffs also cannot claim they did not see or understand the label (*inherently* small, given the size of the iPhone box), nor do they deny they could have returned their iPhones for a full refund. There is no authority—and plaintiffs can cite to none—for the proposition that "small font" disclosure (on the product box itself) of the very thing plaintiffs allege

was undisclosed serves to create an "aftermarket" or forms an actionable basis for any other claim.[5]

### B. THE "IPHONE APPLICATIONS AFTERMARKET" FAILS

For purposes of this motion, we will ignore the fact that Apple has recently *opened up* any so-called "iPhone applications aftermarket" by releasing a software development kit and opening the iPhone Apps Store. Plaintiffs still have not pled that Apple is an "iPhone applications monopolist," and nothing in plaintiffs' three-paragraph response answers this fatal flaw.

In this instance, one does not even need to delve into the specific law of aftermarkets. Plaintiffs cannot and do not claim that Apple actually makes and sells anything close to a monopoly share of aftermarket iPhone applications. Plaintiffs' opposition can point only to the sole allegation that Apple has created "ring tone applications that are compatible only with Apple's iTunes system", Opp. at 17, but this means at best only that Apple is in the "iPhone applications aftermarket," not that it monopolizes that market. If anything, the alleged fact that Apple makes and sells only a few ring-tones via iTunes concedes the point that Apple is nowhere near a "monopolist" in the entire "Applications Aftermarket." That moots all other considerations.

## IV. PLAINTIFFS ESSENTIALLY ABANDON THEIR COMMON LAW COMPUTER TRESPASS AND STATUTORY COMPUTER FRAUD CLAIMS

Plaintiffs barely try to rebut the fatal deficiencies with their claims that Apple's release of operating software Version 1.1.1 constituted "computer trespass" and "computer fraud."

### A. PLAINTIFFS CONCEDE APPLE DID NOT COMMIT A COMPUTER TRESPASS

Plaintiffs concede three points fatal to their computer trespass claim. First, plaintiffs entirely fail to address Apple's showing that its release of Version 1.1.1 comprised no actual "trespass" or "uninvited entry" because Apple did not initiate an unwanted electronic intrusion into any consumer's computer. Rather, *each consumer* made the "entry" onto Apple's site (with Apple's consent, of course) to download Version 1.1.1. Plaintiffs' failure to rebut this fact disposes of the trespass claim at the threshold.

Second, plaintiffs concede that they affirmatively consented to and authorized the

---

5 Furthermore, plaintiffs know—from their *own* prior *Holman* complaint in this action as well as Apple's Motion and Request for Judicial Notice—that *many hundreds* of articles, posts and publications discussed and even criticized the iPhone/ATTM deal, including the long-term ATTM exclusivity. *See, e.g.*, Supplemental Request for Judicial Notice ("SRJN") Exs. B-E.

installation of Version 1.1.1. It is undisputed that iPhone users had to affirmatively download Version 1.1.1 and that Apple warned them (and the broad "computer community") that the update could cause irreparable damage to iPhones if the user had modified the iPhone software. *See* RCAC ¶¶ 37, 98-103; *id*. at ¶¶ 94-95. Prior to installing Version 1.1.1, iPhone owners had to view a warning stating: **"IF YOU HAVE MODIFIED YOUR IPHONE'S SOFTWARE, APPLYING THIS SOFTWARE UPDATE MAY RESULT IN YOUR IPHONE BECOMING PERMANENTLY INOPERABLE."** Mot. at 15 (displaying screenshot). In other words, iPhone owners had to choose to download Version 1.1.1 after full warnings of the risks. Some of the plaintiffs chose to do so, while others did not. *See* RCAC ¶¶ 13, 36-37, 45.

Plaintiffs argue that they "limited their consent to installation of Version 1.1.1 based on Apple's representation that it was a needed and helpful upgrade," and that Apple "exceeded the scope of the [p]laintiffs' limited consent …." Opp. at 24. That argument implies a "conversation" that is not pled and could not have occurred. Downloading Version 1.1.1 was an automated process that presented everyone with the large, crystal-clear warning screen quoted above. Furthermore, Version 1.1.1 was a "needed and helpful upgrade." There was just a catch, fully disclosed, that **"IF YOU HAVE MODIFIED YOUR IPHONE'S SOFTWARE, APPLYING THIS SOFTWARE UPDATE MAY RESULT IN YOUR IPHONE BECOMING PERMANENTLY INOPERABLE."** Mot. at 15. That some consumers who had "hacked" their iPhones went ahead anyway does not mean that Apple committed a trespass.

<u>Third</u>, plaintiffs weakly protest that Apple "overstates the case" when it notes that plaintiffs expect Apple to guarantee its software updates will be compatible with all unauthorized software hacks. Opp. at 24. But in the next breath, plaintiffs admit it is so by arguing "[i]f Apple knows that its software will interfere with consumers' DMCA rights to switch carriers in any way, Apple should be (and is) obligated to make commercially reasonable efforts to design around." *Id.* This, of course, is the same thing. Plaintiffs cite no legal authority for such a duty; there is none, even under the most radical concepts of computer trespass. The trespass claim fails.

### B. PLAINTIFFS' COMPUTER FRAUD CLAIMS ARE BASELESS

Plaintiffs do not and cannot rebut Apple's showing that plaintiffs fail to plead the

requisite high level of intent required under the criminal computer fraud statutes plaintiffs cite. Plaintiffs simply proclaim, without explanation, that "Apple's argument that plaintiffs have not alleged that Apple 'knowingly' and 'intentionally' released Version 1.1.1 to damage iPhones simply misstates the Complaint." Opp. at 25. This is insufficient, and contrary to plaintiffs' allegations in the RCAC. Similarly, plaintiffs largely ignore Apple's point that there can be no violation of the computer fraud statutes because plaintiffs authorized (and themselves consented to and downloaded) Version 1.1.1.; plaintiffs merely incant again that they gave only "limited consent" and did not "consent to Apple's destruction of their iPhones." Opp. at 25. Given Apple's express warnings, that argument fails for the reasons discussed above. *See* Section IV.A, *supra*.[6]

## V. THE STATE CONSUMER PROTECTION CLAIMS SHOULD BE DISMISSED

### A. PLAINTIFFS LACK STANDING TO MAINTAIN STATE CONSUMER PROTECTION CLAIMS UNDER THE LAWS OF FORTY STATES WHERE NONE OF THEM RESIDES

Plaintiffs don't even try to distinguish the authority set forth in Apple's Motion that "at least one named plaintiff must have standing with respect to *each claim* the class representatives seek to bring." *In re Ditropan XL Antitrust Litig.*, 529 F. Supp. 2d 1098, 1107 (N.D. Cal. 2007) (emphasis added) (dismissing claims under laws of states where no named plaintiff resided, and rejecting argument that determination of standing was "premature prior to class certification."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (granting motion to dismiss claims brought under states' consumer protection and antitrust laws where no named plaintiff resided); *see also* J. Moore, *et al.*, 5 Moore's Federal Practice § 23.63(1)(b) (3rd ed. 2008). Instead plaintiffs cite to inapposite cases from outside this district that deal with a variety of irrelevant class certification issues under Fed. R. Civ. P. 23, not the issue of standing to assert these claims. Opp. at 22. The legal issue is substantively unrebutted because the law is clear: the Court should dismiss the claims under the forty state laws identified in the RCAC where no named plaintiff resides.

---

[6] Plaintiffs also do not and cannot allege $5,000 in damages *per iPhone* in the aggregate *per year* to state a claim under the Federal Computer Fraud and Abuse Act. Plaintiffs fail to rebut Apple's authority on this issue. The case they cite, *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930 (9th Cir. 2004), deals with whether individual intentional acts can be aggregated; nothing in its reasoning applies to whether plaintiffs can aggregate damages across multiple computers, as plaintiffs seek here, and the CFAA makes clear that only the United States government may aggregate losses attributable to more than one protected computer for purposes of the $5,000 threshold. *See* 18 U.S.C. §§ 1030(a)(5)(A)(i), (B)(i).

### B. PLAINTIFFS FAIL TO PLEAD FRAUDULENT OMISSION WITH SUFFICIENT PARTICULARITY UNDER FEDERAL RULE OF CIVIL PROCEDURE 9(B)

Plaintiffs admit that their consumer protection claims, which are based on Apple's alleged failure to disclose/fraudulent concealment, must meet the heightened pleading requirement of Federal Rule of Civil Procedure 9(b). RCAC ¶ 153, Opp. at 17. Plaintiffs' conclusory allegations that defendants (i) "acted unconscionably in connection with the marketing and sale of Apple iPhones" and (ii) failed to disclose a number of facts, RCAC ¶ 154, do not suffice. *See, e.g.*, *M.D. Rutledge v. Boston Woven Hose and Rubber Co.*, 576 F.2d 248, 249–50 (9th Cir. 1978); *Stutz Motor Car of Am., Inc. v. Reebok Int'l, Ltd.*, 909 F. Supp 1353, 1362-63 (C.D. Cal. 1995). Plaintiffs point to only two alleged "affirmative misrepresentations" in the RCAC that arguably meet the specificity requirements: Apple's alleged false representation that (i) "iPhone consumers could 'browse the Internet and send emails as often as you like without being charged extra,'" (when in fact these services would cost extra when traveling internationally) and (ii) "that 'unlocking programs' would cause iPhones to malfunction … and that Defendants had no obligation to repair or replace the broken phones." Opp. at 18; *see also id.* at 5-6. Both claims are baseless, as described in Section VI.C, *infra*. Everything else fails at the threshold of Rule 9(b).

### C. PLAINTIFFS FAIL TO ALLEGE A CLAIM UNDER THE CALIFORNIA, WASHINGTON , AND NEW YORK STATE CONSUMER PROTECTION STATUTES

Plaintiffs fail to show how they can state a claim under the consumer protection statutes of the three states where they have standing: California, New York and Washington. Plaintiffs' consumer protection claims rest on Apple's alleged nondisclosures. *See* RCAC ¶ 153. But plaintiffs cannot allege or show, among other things, that Apple had any duty to disclose the alleged omissions, that the omissions were material in any respect, or that in fact there *were* any nondisclosures. In fact, plaintiffs' iPhones admittedly came in boxes that stated that ATTM service was required to activate the iPhone *and* for phone service "on expiration of initial new two-year agreement." Opp. at 4. The iPhone software license agreement and Apple's repeated warnings also made clear that plaintiffs were not authorized to, and were taking risks in, hacking the iPhone. Plaintiffs' consumer protection claims are thus essentially complaints about not being able to breach their ATTM service contracts and Apple licenses and warranties so as to buy the

iPhone on their own preferred terms. Consumer protection laws serve many purposes, but they do not permit consumer to unilaterally set contract terms with manufacturers and carriers.

First, plaintiffs' California consumer protection claims under the CLRA and UCL fail because Apple had no duty to disclose any of the claimed omissions. Both the UCL and the CLRA require a showing of affirmative misrepresentations; omissions, absent a duty to disclose, do not suffice. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (2006); *Buller v. Sutter Health*, 160 Cal. App. 4th 981, 987 (2008). Plaintiffs can allege no such duty to disclose here, which requires at a minimum that "members of the public must have had an expectation or an assumption" about the issue in question. *Buller*, 160 Cal. App. 4th at 987 (quoting *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (2006). Plaintiffs' central suggestion that Apple had a duty to disclose (beyond the language on the iPhone box, in the software license agreement and iPhone warranty, and in the numerous other public statements referenced above) that users could not hack around their contractual obligations has no basis under the law. As they cannot rebut this controlling law, plaintiffs' claims fail at this threshold.[7]

Second, plaintiffs acknowledge that "non-disclosed information is material if a plaintiff shows that, 'had the omitted information been disclosed,' a 'reasonable consumer' 'would have been aware of it and behaved differently.'" Opp. at 18 n.8. Plaintiffs cannot meet these requirements. The paragraphs cited to as alleging that plaintiffs had "expectations" about unlocking their iPhone (RCAC ¶¶ 42, 70, 74, 76-77) and that "plaintiffs would have acted differently if Defendants had made the required disclosures" (RCAC ¶¶ 37, 39, 44-48, 51) state no such thing. There are no references in these paragraphs to plaintiffs having any expectations as to the iPhone being "unlocked" (unsurprisingly), nor do plaintiffs allege they would not have bought

---

[7] Plaintiffs simply characterize the controlling California state cases as "inapposite" and cite to the standard in *Falk v. General Motors Corp.*, 496 F. Supp. 2d 1088 (N.D. Cal. 2007) in replacement. Just as *Daugherty* and *Buller*, *Falk* demonstrates that there is no actionable duty to disclose. *Falk* states that "a failure to disclose or concealment can constitute actionable fraud in four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material fact." *Id.* at 1095. None of these applies. There is no fiduciary relationship here; Apple indisputably did not have "exclusive" knowledge of anything (as plaintiffs' own allegations demonstrate); there are no allegations of active concealment; and the allegations and conceded facts demonstrate that Apple never made any "partial representations" while suppressing "material fact[s]." *Id.*

the iPhone if they had been aware of these alleged omissions.

Third, each allegedly concealed item was in fact disclosed. Although Apple will not repeat here why all of plaintiffs' specific allegations of nondisclosure are false, plaintiffs' claims are based on four categories: (i) alleged nondisclosure regarding the ATTM five-year exclusivity (and corresponding locking of the iPhone); (ii) alleged nondisclosure regarding international roaming fees; (iii) alleged nondisclosure of Apple's add-on applications policy; and (iv) alleged nondisclosure regarding Version 1.1.1. Apple has already demonstrated, in large part through plaintiffs' allegations and conceded facts, that public disclosure existed of information regarding the five-year exclusivity/iPhone lock, applications policy, and Version 1.1.1. *See* Sections III.A.3, IV.A, *supra*; Mot. at 14, 21-23. With respect to international roaming, plaintiffs concede that the ATTM service agreement itself explicitly includes a section stating "International Roaming: *Substantial charges may be incurred* if phone is taken out of the U.S. even if no services are intentionally used." RJN Ex. C; Opp. at 6 (emphasis added). This ends the analysis. Plaintiffs' argument that the disclosure was somehow inadequate because it was part of a multi-page service agreement, and did not specify how large "substantial" could be, is absurd. This type of argument would serve to invalidate the disclosures of all multi-page service agreements for being too "long" (while, paradoxically, requiring them to be longer still in order to flesh out the exact parameters of every term in the agreement.) There is no authority for this proposition.

## VI. PLAINTIFFS FAIL TO PLEAD A VIABLE CLAIM UNDER THE MAGNUSON-MOSS WARRANTY ACT

Plaintiffs allege that Apple violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq.*, by (1) "not fully and conspicuously disclosing" that it would not honor the warranties of unlocked iPhones rendered inoperable after installation of Version 1.1.1, and (2) improperly conditioning the iPhone warranties on the owner's use of ATTM service and add-on applications approved by Apple. RCAC ¶¶ 159-60.

Apple's iPhone warranty clearly states, among other things, that the "warranty does not apply … to a product or part that has been modified to alter functionality or capability[.]" *See* SRJN Ex. A. Plaintiffs admit that Apple later warned them (and the broad "computer community") that Version 1.1.1. could cause irreparable damage to iPhones if the user had modified the

embedded iPhone software, in violation of the warranty. *See* RCAC ¶¶ 98-103; Section IV.A, *supra*. These admissions defeat plaintiffs' claim of nondisclosure under the MMWA. Having trumpeted Apple's repeated warnings in their complaint, plaintiffs can hardly rebut them. Instead, plaintiffs claim for the first time that Apple's warnings violated the "single document" rule under 16 C.F.R. § 701.3—apparently because they were issued separately from the warranty document. Opp. at 24. Not so. Apple's warnings did not alter the warranty; rather, they reminded iPhone users of the terms of the already-existing warranty terms. These reminder warnings in no way needed to be (nor could be) part of the original warranty document. Indeed, had Apple not issued these reminders, plaintiffs would undoubtedly be arguing *that* failure as the violation.

Apple's choice of ATTM as the iPhone's exclusive carrier, and its policies regarding add-on applications, are not prohibited "conditioning" under the MMWA. The RCAC does not allege that any consumer was informed that their iPhone warranty was voided as a result of failing to subscribe to ATTM's services or failing to install applications approved by Apple. Apple thus did not "condition" its warranty on the use of a particular article or service, but did appropriately limit its warranty—as set forth in the warranty document itself—in cases of unauthorized modifications to the software. Indeed, if the MMWA prohibited manufacturers from entering into exclusive contracts, no seller could ever enter into such exclusive agreements, and plaintiffs would presumably be able to cite to a legion of cases so stating. They cannot do so.[8]

## VII. CONCLUSION

The Court should dismiss plaintiffs' complaint with prejudice.

Dated: August 25, 2008

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ Daniel M. Wall
Daniel M. Wall
Attorneys for Defendant APPLE INC.

---

[8] Plaintiffs' reliance on *Breckermeyer v. AT&T Wireless*, No. 00469, 2004 Phila. Ct. Com. Pl. LEXIS 116 (Oct. 22, 2004), is misguided. In that case the plaintiff, "prior to the purchase of the phone … advised defendant that he did not intend to purchase wireless service from AT&T, but was not advised the phone would only work on AT&T's network." *Id.* at *1-2. The state court thus found that defendant's refusal to provide an unlock code served to violate the "ordinary purpose component" of Pennsylvania's implied warranty of merchantability. Here, plaintiffs were explicitly informed of ATTM service and themselves signed two-year contracts. The iPhone was thus unquestionably fit for its normal and intended use.