1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4

5                               )  C-07-05152-JW
                                )
6       IN RE:  APPLE & AT&TM    )  SEPTEMBER 12, 2008
        ANTITRUST LITIGATION.    )
7                               )
        _____ )  PAGES 1- 97
8

9

10

11          THE PROCEEDINGS WERE HELD BEFORE

12         THE HONORABLE UNITED STATES DISTRICT

13                  JUDGE JAMES WARE

14   A P P E A R A N C E S:

15

16   FOR THE PLAINTIFFS: WOLF, HALDENSTEIN, ADLER,
                         FREEMAN & HERZ
17                       BY:  MARK C. RIFKIN
                         270 MADISON AVENUE
18                       NEW YORK, NEW YORK 10016

19                       RANDALL S. NEWMAN, P.C.
                         BY:  RANDALL S. NEWMAN
20                       40 WALL STREET
                         61ST FLOOR
21                       NEW YORK, NEW YORK 10005

22        (APPEARANCES CONTINUED ON THE NEXT PAGE.)

23

24

     OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
25                       CERTIFICATE NUMBER 8074

                                                        1

1

2        A P P E A R A N C E S: (CONT'D)

3

4        FOR THE DEFENDANTS:        CROWELL & MORING
                                    BY:  DANIEL A. SASSE
                                    3 PARK PLAZA
5                                   20TH FLOOR
                                    IRVINE, CALIFORNIA 92614
6
                                    MAYER & BROWN
7                                   BY:  DONALD M. FALK
                                    TWO PALO ALTO SQUARE
8                                   SUITE 300
                                    PALO ALTO, CALIFORNIA 94306
9
                                    LATHAM & WATKINS
10                                  BY:  DANIEL M. WALL
                                        SADIK H. HUSENY
11                                      ALFRED C. PFEIFFER, JR.
                                    505 MONTGOMERY STREET
12                                  SUITE 1900
                                    SAN FRANCISCO, CALIFORNIA
13                                  94111

14

15

16

17

18

19

20

21

22

23

24

25

                                                            2

```
1    SAN JOSE, CALIFORNIA              SEPTEMBER 12, 2008
2                    P R O C E E D I N G S
3              (WHEREUPON, COURT CONVENED AND THE
4    FOLLOWING PROCEEDINGS WERE HELD:)
5              THE CLERK:  BEFORE WE BEGIN, I WANTED TO
6    MAKE A BRIEF INTRODUCTION.  ONE OF THE JOYS OF THIS
7    POSITION AS A DISTRICT JUDGE IS THE ABILITY TO
8    TEACH AND A LOT OF MY COLLEAGUES SPEND TIME IN THE
9    CLASSROOM.  IT'S OUR WAY OF GIVING BACK.
10             AND I INVITED STUDENTS FROM MY FEDERAL
11   COURTS CLASS TO ATTEND VARIOUS SESSIONS OF COURT,
12   AND SOME OF THEM HAVE CHOSEN TO BE HERE FOR
13   PURPOSES OF THESE PROCEEDINGS.
14             AND THE REASON I'M POINTING THAT OUT, AND
15   THERE MAY BE QUESTIONS THAT I ASK OF YOU WITH
16   STUDENTS PRESENT THAT I WOULDN'T ASK OTHERWISE
17   BECAUSE WE MAKE CERTAIN ASSUMPTIONS ABOUT THE
18   THINGS THAT I THINK SOMETIMES CAN HELP THEM MAKE IT
19   EXPLICIT TO HELP THE ARGUMENT.
20             AND I DIDN'T WANT MY QUESTIONS TO PROMPT
21   YOU TO THINK, "MY GOODNESS, HE'S ASKING A
22   FUNDAMENTAL QUESTION.  I WONDER IF HE HAS READ MY
23   PAPERS."  BUT I HAVE READ YOUR PAPERS AND SO THE
24   REASON FOR MY QUESTIONS WOULD BE TO EDUCATE WITH
25   RESPECT TO THIS ARGUMENT.
```

3

1          VERY WELL.  CALL THE CASE.

2          THE CLERK:  CALLING CASE NUMBER 07-05152,

3     IN RE:  APPLE AND AT & TM ANTITRUST LITIGATION.

4          ON FOR DEFENDANT'S AT & TM'S MOTION TO

5     COMPEL ARBITRATION AND DEFENDANT'S MOTION TO STAY

6     DISCOVERY.  TEN MINUTES EACH SIDE.

7          DEFENDANT APPLE'S MOTION TO DISMISS.

8     TWENTY MINUTES EACH SIDE.

9          COUNSEL, PLEASE COME FORWARD AND STATE

10    YOUR APPEARANCES.

11         MR. WALL:  GOOD MORNING.  DANIEL WALL AND

12    AL PFEIFFER FROM LATHAM & WATKINS REPRESENTING

13    APPLE.

14         MR. FALK:  GOOD MORNING.  DONALD FALK

15    FROM MAYER BROWN REPRESENTING AT & T MOBILITY.

16         MR. SASSE:  AND DAN SASSE ALSO

17    REPRESENTING AT & T MOBILITY.

18         MR. RIFKIN:  GOOD MORNING.  MARK RIFKIN

19    FROM WOLF, HALDENSTEIN IN NEW YORK ON BEHALF OF

20    PLAINTIFFS.

21         MR. NEWMAN:  GOOD MORNING, YOUR HONOR.

22    RANDALL NEWMAN FROM NEW YORK ON BEHALF OF

23    PLAINTIFFS AS WELL.

24         THE COURT:  VERY WELL.  WE SORT OF

25    DIVIDED UP THE TIME WITH RESPECT TO THIS MOTION.

4

1    AND I ACTUALLY, BY THE CLERK'S CALLING OF THE CASE,

2    SUGGESTED THAT WE HEAR THIS MOTION HAVING TO GO DO

3    WITH AT & T'S MOTION TO DISMISS AND TO COMPEL

4    ARBITRATION FIRST.

5                  WHO IS GOING TO HANDLE THAT ARGUMENT?

6                  MR. FALK:  I AM, YOUR HONOR.

7                  THE COURT:  MR. FALK.

8                  THAT MIKE MIGHT BE BETTER.

9                  MR. FALK:  IT SEEMS CLOSER TO THE

10   STUDENTS AND IT'S DEFINITELY LIVE.

11                 THANK YOU, YOUR HONOR.

12                 WE HAVE SEVERAL PLAINTIFFS HERE AND A FEW

13   ISSUES TO COVER.  I'D LIKE TO -- I WILL BACK UP A

14   LITTLE BIT FOR THE BENEFIT OF THE STUDENTS.

15                 WE BROUGHT THIS MOTION TO COMPEL

16   ARBITRATION ACCORDING TO THE AGREEMENTS INTO WHICH

17   THE PLAINTIFFS WHO ARE CUSTOMERS OF AT & T MOBILITY

18   AND THE AGREEMENTS THEY ENTERED INTO WHEN THEY

19   BEGAN SERVICE WITH AT & T MOBILITY.

20                 FOR TWO OF THOSE PLAINTIFFS, KLIEGERMAN

21   AND LEE, WHO ARE NEW YORK RESIDENTS, THE

22   ARBITRATION AGREEMENT IS CLEARLY ENFORCEABLE.

23   PLAINTIFFS HAVE NOT EVEN CONTENDED THAT IT IS

24   SUBSTANTIVELY UNCONSCIONABLE AND THEIR CONTENTIONS

25   THAT IT IS PROCEDURALLY UNCONSCIONABLE ARE

                                                        5

1    CORRECTED BY NEW YORK DECISIONS WHICH HAVE FOUND

2    BOTH THE FACT THAT A PRODUCT IS UNIQUE, CAN BE

3    CHARACTERIZED AS UNIQUE OR OTHERWISE DESIRABLE DOES

4    NOT NECESSARILY AND, IN FACT, DOES NOT IN A GENERAL

5    PRINCIPAL MAKE ALL CONTRAST WITH RESPECT TO THAT

6    PRODUCT PROCEDURALLY UNCONSCIONABLE AND THAT A

7    ROUTINE STOCKING FEE APPLIED TO ELECTRONICS AND

8    OTHER PRODUCTS FROM TIME TO TIME IS ALSO NOT

9    SOMETHING THAT RENDERS A CONTRACT UNCONSCIONABLE.

10            MOREOVER, NEW YORK REQUIRES A FINDING OF

11   BOTH PROCEDURAL AND UNCONSCIONABILITY AND BECAUSE

12   THE ONLY GROUND OF SUBSTANTIVE AND CONSCIONABILITY

13   ASSERTED HERE IS THE FACT THAT THE AGREEMENTS, THE

14   PLAINTIFFS HAVE AGREED TO ARBITRATE THEIR CLAIMS

15   INDIVIDUALLY AND NOT IN A CLASS ACTION.

16            THAT GROUND IS ACCEPTED BY THE NEW YORK

17   COURTS AS SOMETHING AND IT'S FULLY ENFORCEABLE.

18            SO I'D LIKE TO MOVE -- UNLESS THE COURT

19   HAS QUESTIONS WITH RESPECT TO THE NEW YORK

20   PLAINTIFFS, I'D LIKE TO MOVE TO THE CALIFORNIA AND

21   WASHINGTON PLAINTIFFS.

22            THE COURT:  LET ME ASK JUST WITH RESPECT

23   TO THE NEW YORK ARGUMENT, YOUR ARGUMENT IS THAT

24   UNDER NEW YORK LAW YOU NEED BOTH PROCEDURAL AND

25   SUBSTANTIVE UNCONSCIONABILITY?

6

1          MR. FALK:  YES, YOUR HONOR.

2          THE COURT:  AND THIS IS A MOTION WHICH

3    ADDRESSES THE ALLEGATIONS OF THE COMPLAINT AND IS

4    IT SUFFICIENT IF THE PLAINTIFFS ALLEGE PROCEDURAL

5    AND SUBSTANTIVE UNCONSCIONABILITY AT THIS POINT OR

6    MUST I FIGURE OUT WHETHER THEY CAN PROVE IT?

7          MR. RIFKIN:  WELL, YOUR HONOR, IN A

8    MOTION TO COMPEL ARBITRATION BY CONTRAST WITH THE

9    MOTION TO DISMISS THAT YOU'LL BE HEARING SHORTLY IT

10   WAS NOT ENTIRELY DETERMINED ON THE PLEADINGS.

11         THE COURT HAS TO EXAMINE THE CONTRACT AND

12   EXAMINE WHATEVER FACTS ARE PRESENTED IN THE CASE

13   BECAUSE THIS IS A MOTION TO DIVERT THIS CASE FROM

14   THE COURTROOM TO ANOTHER DISPUTE RESOLUTION

15   PROCEEDING.

16         AND THIS IS UNLIKE THE MOTION TO DISMISS,

17   WHICH IS THE FIRST STAGE IN THE LITIGATION AND THEN

18   THERE WILL BE FACTUAL ELEMENTS TO RESOLVE THE

19   ISSUES, THE ISSUES WITH RESPECT TO THE

20   ENFORCEABILITY OF THE ARBITRATION CLAUSE HAS TO BE

21   DETERMINED HERE AND NOW.

22         THE COURT:  RIGHT.  AND SO YOUR

23   SUGGESTION IS THAT I SHOULD PAUSE AND TAKE EVIDENCE

24   OF THE CIRCUMSTANCES AND ASSUME THAT I HAVE THEM

25   ALL SET OUT IN FRONT OF ME AND ALL OF THAT AND

                                                    7

1    FIGURE OUT WHETHER THAT APPLIES JUST TO THE NEW

2    YORK PARTIES.

3          MR. FALK:  STARTING WITH THE NEW YORK

4    PARTIES.  AND IT IS, UNDER ALL OF THE RELEVANT

5    LAWS, IT IS THE PLAINTIFF'S BURDEN TO SHOW THAT A

6    CONTRACT IS UNCONSCIONABLE AND THUS UNENFORCEABLE.

7          THE COURT:  UNDER YOUR ARGUMENT, WOULD I

8    CONSIDER THIS AN ADHESION CONTRACT?

9          MR. FALK:  UNDER CALIFORNIA LAW?

10          THE COURT:  NO, UNDER NEW YORK LAW.

11          MR. FALK:  IT'S NOT UNCONSCIONABLE.

12          THE COURT:  NO, THAT'S NOT MY QUESTION.

13    IS IT A CONTRACT OF ADHESION?

14          MR. FALK:  IT IS A FORM CONTRACT SO TO

15    THE EXTENT -- I DO NOT BELIEVE THAT NEW YORK HAS

16    QUITE THE BLANKET LABELLING OF ALL FORM CONTRACTS

17    OF ADHESION THAT CALIFORNIA HAS.  IT IS CERTAINLY A

18    FORM CONTRACT.  IT IS NOT AN INDIVIDUALLY

19    NEGOTIATED CONTRACT.

20          THE COURT:  SO YOU WOULD NOT WANT ME TO

21    USE THE TERM CONTRACT OF ADHESION BUT IT IS TAKE IT

22    OR LEAVE IT.

23          MR. FALK:  IT IS TAKE IT OR LEAVE IT,

24    YOUR HONOR.  AND UNDER THE NEW YORK ANALYSIS, WHAT

25    I'M SUGGESTING, YOUR HONOR, IS THAT FOR THE ISSUE

                                                    8

1    OF PROCEDURAL UNCONSCIONABILITY, THE MERE FACT OF A

2    FORM DOES NOT NECESSARILY GET YOU EVEN SLIGHTLY

3    OVER THE LINE.

4              WE CONCEDE IN OUR PAPERS THAT IN

5    CALIFORNIA IT APPEARS, AT LEAST THERE'S ONE LINE OF

6    CASES, THERE ARE TWO CONFLICTING LINE OF CASES AND

7    THE NINTH CIRCUIT HAS ADOPTED THE LINE THAT HAS

8    SAID THAT ANY FORM CONTRACT IS A CONTRACT OF

9    ADHESION AND THUS AT LEAST MINIMALLY PROCEDURALLY

10   UNCONSCIONABLE.

11             THE COURT:  AND, WELL, THESE ARE

12   CIRCUMSTANCES WHERE THE CONSUMER IS NOT PERMITTED

13   TO CORRECT ANOTHER PROVIDER.

14             MR. FALK:  WELL, YOUR HONOR, THE --

15   THE -- IT DEPENDS.  WHEN YOU LOOK AT CONSUMERS

16   CHOICE, IT DEPENDS WHAT KIND YOU'RE LOOKING AT.

17   THERE ARE DOZENS AND DOZENS OF MULTI CELL PHONES

18   THAT PLAY MUSIC OUT THERE.

19             THE CONSUMER WHO WANTED AN IPHONE HAD TO

20   BUY FROM APPLE AND HAD TO GET SERVICE FROM AT & T.

21             THE COURT:  BUT THAT PURCHASE OF SERVICE

22   TAKES PLACE AFTER YOU BOUGHT THE PHONE.

23             MR. FALK:  IT'S MEANINGFULLY

24   SIMULTANEOUS, YOUR HONOR.

25             THE COURT:  AND SO DOES THAT MAKE A

                                                        9

1    DIFFERENCE IF IT'S MEANINGFULLY SIMULTANEOUS?

2            MR. FALK:  WELL, WE'RE DISCUSSING AN

3    ISSUE THAT IS OBVIOUSLY QUITE, IN OUR VIEW, IS, IN

4    FACT, QUITE IMPORTANT UNDER -- I'LL SLOW IT DOWN A

5    LITTLE BIT.

6            UNDER CALIFORNIA UNCONSCIONABILITY LAW

7    THERE IS A LINE OF CASES THAT SAYS THAT IF THERE'S

8    A MEANINGFUL CHOICE, AND WE BELIEVE THAT THERE IS,

9    A MEANINGFUL CHOICE OF A PRODUCT OR SERVICE, THEN

10   THE CONTRACT IS NOT PROCEDURALLY UNCONSCIONABLE AT

11   ALL.

12           THE COURT:  LET ME MOVE BEYOND THIS

13   BECAUSE WE'RE GOING TO SPEND A LOT OF TIME HERE AND

14   I DON'T THINK IT'S NECESSARY.

15           MR. FALK:  YES.

16           THE COURT:  BECAUSE I WAS ASSUMING FROM

17   WHAT I WAS READING THAT THE PLAINTIFFS ASKED THE

18   COURT TO REGARD THERE TO BE NO MEANINGFUL

19   DISTINCTION BETWEEN CALIFORNIA, WASHINGTON, NEW

20   YORK LAW WITH RESPECT TO THIS.

21           AND IF YOU SEE A DISTINCTION, MAYBE

22   THAT'S WHAT YOU OUGHT TO HIGHLIGHT FOR ME, WHAT IS

23   IT THAT IS DIFFERENT ABOUT THE LAW IN NEW YORK AS

24   YOU START OFF THAT IS SO DIFFERENT THAT I SHOULD BE

25   LOOKING AT THE NEW YORK PEOPLE DIFFERENTLY?

                                                      10

1           MR. FALK:  WELL, WHAT IS MOST DIFFERENT

2     IS THE SUBSTANTIVE UNCONSCIONABILITY PART OF THE

3     ANALYSIS.  PROCEDURAL UNCONSCIONABILITY IS SLIGHTLY

4     DIFFERENT BUT WHAT IS DISPOSITIVELY DIFFERENT IS

5     THE UNCONSCIONABILITY ANALYSIS.

6           NEW YORK COURTS HAVE REPEATEDLY UPHELD

7     ARBITRATION AGREEMENTS THAT HAVE REQUIRED

8     INDIVIDUAL ARBITRATION RATHER THAN CLASS

9     ARBITRATION AND THAT PRETTY MUCH ENDS THE ANALYSIS

10    BECAUSE THE NEW YORK COURT OF APPEALS REQUIRES A

11    FINDING OF BOTH PROCEDURAL AND SUBSTANTIVE

12    UNCONSCIONABILITY.

13          PLAINTIFFS HAVE NOT EVEN CONTENDED THAT

14    THESE CONTRACTS ARE SUBSTANTIVELY UNCONSCIONABLE

15    UNDER NEW YORK LAW.  AND THAT IS THE DISPOSITIVE

16    DIFFERENCE, BUT WITH THE COURT'S INDULGENCE I'D

17    LIKE TO TURN TO THE CALIFORNIA AND WASHINGTON.

18          THE COURT:  GO AHEAD.

19          MR. FALK:  WHICH THE PLAINTIFFS HAVE NOT

20    CONTENDED THAT THIS CONTRACT IS PROCEDURALLY

21    UNCONSCIONABLE UNDER WASHINGTON LAW.

22          UNDER CALIFORNIA LAW THE ANALYSIS, I

23    THINK WE COVERED THAT AT LEAST TO MY SATISFACTION.

24    IF THE COURT HAS FURTHER QUESTIONS, I'M HAPPY TO

25    TOUCH ON THOSE.  BUT I'D LIKE TO FOCUS, IF I MAY,

                                                      11

1    ON THE SUBSTANTIVE, THE WAY THAT THE AT & T

2    AGREEMENT HAS PROVIDED BOTH AN ACCESS AND INCENTIVE

3    FOR CONSUMERS TO RESOLVE THEIR CLAIMS INDIVIDUALLY

4    IN A WAY THAT BRINGS IT OUTSIDE OF THE HOLDINGS OF

5    SHROYER AND THE CALIFORNIA COURTS AND THE SIMILAR

6    HOLDING OF THE WASHINGTON COURTS.

7         IN BOTH, IN SHROYER, WHICH IS THE NINTH

8    CIRCUIT DECISION ADDRESSING CALIFORNIA LAW, THE

9    FOCUS WAS ON THE OPPORTUNITY FOR GAIN OF THE

10   INDIVIDUAL CONSUMER.

11        THE CONCERN WAS THAT A CONSUMER WITH A

12   SMALL CLAIM, EVEN IF HE DIDN'T HAVE TO PAY

13   ARBITRATION FEES AND HAD A POSSIBILITY OF GETTING

14   ATTORNEY'S FEES IF HE PREVAILED, WOULD NOT HAVE THE

15   INCENTIVE TO BRING A SUIT.

16        LIKEWISE THE CONCERN IN WASHINGTON IS

17   WHETHER CONSUMERS WILL GO TO THE TIME AND TROUBLE,

18   I BELIEVE THE PHRASE WAS, TO VINDICATE THEIR

19   CLAIMS.

20        UNDER THIS PROVISION, THE CONSUMERS HAVE

21   A FULL INCENTIVE TO BRING THEIR CLAIMS TO AT & T

22   AND TO ARBITRATE THEM IF AT & T DOES NOT SATISFY

23   THEM BEFORE IT GETS TO THAT STAGE.  AND, IN FACT,

24   THE PREMIUMS THAT HAVE BEEN BUILT INTO THIS

25   ARBITRATION CLAUSE ENSURE THAT.

                                                    12

1          UNDER AT & T'S CURRENT ARBITRATION

2   CLAUSE, WHICH IS THE ONE AT ISSUE FOR EVERYONE

3   HERE, THEY'RE ALL CURRENT AND VERY RECENT

4   CUSTOMERS, IF A CONSUMER HAS NOT GOTTEN

5   SATISFACTION THROUGH AT & T'S INFORMAL DISPUTE

6   RESOLUTION PROCESS AND BRINGS A NOTICE OF

7   ARBITRATION, AND AT & T DOES NOT SETTLE THE CASE OR

8   AT & T'S LAST SETTLEMENT OFFER IS LESS THAN WHAT

9   THE CONSUMER GETS AT ARBITRATION, THE CONSUMER

10  AUTOMATICALLY, NO MATTER HOW SMALL THE CLAIM, GETS

11  IN CALIFORNIA $7,500, IN ANY STATE AT LEAST 5,000

12  DEPENDING UPON THE SMALL CLAIMS COURT CUTOFF AND

13  DOUBLE ATTORNEY FEES.

14          THAT IS ENOUGH TO BOTH PROVIDE A POWERFUL

15  INCENTIVE FOR AT & T TO PROVIDE ACCEPTANCE IN THE

16  WEAKEST OF CLAIMS AND TO PROMPT CONSUMERS TO BRING

17  THEIR CLAIMS.

18          INDEED --

19          THE COURT:  BUT WHY IN SCOTT, WHICH WAS A

20  WASHINGTON CASE, THE WAIVER OF THE CLASS ACTION WAS

21  ALSO PRESENT AND A BASIS OF THE COURT TO FIND

22  SUBSTANTIVE UNCONSCIONABILITY?

23          WHY SHOULD I NOT FIND THE SAME THING

24  HERE?

25          MR. FALK:  WELL, YOUR HONOR, IN BOTH

13

1   SCOTT AND THE CALIFORNIA CASES, AND SHROYER, THE

2   NINTH CIRCUIT CASES AS A SHORTHAND BUT IN THE

3   CALIFORNIA CASES, IN BOTH STATES, HOWEVER, THE

4   COURTS HAVE SAID THAT THERE IS NOT AN ACROSS THE

5   BOARD BAN ON CLASS WAIVERS.  WHAT THERE IS, IS

6   SUFFICIENT INCENTIVE FOR PEOPLE TO BRING CLAIMS AND

7   WHETHER OR NOT THEY'RE LIKELY TO GET MEANINGFUL

8   RELIEF.

9           AND THE PLAINTIFFS DO NOT DISPUTE THAT

10  WERE THEY TO ARBITRATE ACCORDING TO THEIR

11  AGREEMENTS, THEIR CHANCES OF GETTING FULL RELIEF

12  ARE AT LEAST AS GOOD OR PROBABLY SUBSTANTIALLY

13  BETTER THAN THEY WOULD BE UNDER A CLASS

14  ENVIRONMENT.

15          THE COURT:  AND YOUR ARGUMENT IS THAT THE

16  INCENTIVES THAT WERE BUILT IN WERE PRESENT WEREN'T

17  PRESENT IN SCOTT?

18          MR. FALK:  THEY WEREN'T.

19          THE COURT:  WERE THEY IN STIENER?

20          MR. FALK:  YES, THEY WERE.

21          THE COURT:  WHAT HAPPENED THERE?

22          MR. FALK:  IN THAT CASE JUDGE ARMSTRONG

23  WENT -- JUDGE ARMSTRONG IMPOSED A NEW REQUIREMENT

24  WHICH IS THAT THE PROPONENT OF AN ARBITRATION

25  CLAUSE, SHE SHIFTED THE BURDENS.

                                              14

```
1              THE BURDEN'S ON THE OPPONENT OF AN
2     ARBITRATION CLAUSE.  JUDGE ARMSTRONG SHIFTED THE
3     BURDEN TO THE PROPONENT TO SHOW THAT THE OVERALL
4     RECOVERY OF A POTENTIAL CLASS ACTION WOULD BE EQUAL
5     OR EXCEEDED BY THE RECOVERY BY ALL OF THE
6     HYPOTHETICAL PEOPLE WHO MIGHT BRING CLAIMS WITHIN
7     THE ARBITRATION PROCEDURE.
8              THE COURT:  WAS THAT AN ERROR ON HER
9     PART?
10             MR. FALK:  YES, YOUR HONOR.
11             THE COURT:  IS THAT ON APPEAL?
12             MR. FALK:  YES, IT IS.
13             THE COURT:  SO I SHOULDN'T CONSIDER THAT
14    AS SETTLED LAW?
15             MR. FALK:  IT CERTAINLY IS NOT CONSIDERED
16    AS SETTLED LAW.  IT'S AN INNOVATION GETS FAR BEYOND
17    WHAT THE COURTS HAVE ACTUALLY HELD AND FOCUSSED ON.
18             AND, IN FACT, BECAUSE OF THE DIFFICULTY
19    AND, IN FACT, IT'S PURE SPECULATION TRYING TO
20    FIGURE OUT WHETHER A PUNITIVE CLASS WILL BE
21    CERTIFIED AND WHETHER THEY WIN AND WHAT THE
22    SETTLEMENT WOULD BE, HOW MUCH THE RECOVERY WOULD
23    BE, WHO WOULD ACTUALLY SIGN UP FOR THE DISCOVERY
24    AND ALL OF WHICH WE COVERED IN SOME DETAIL IN THEIR
25    PAPERS.
```

1              BUT IT'S A FAIRLY SMALL FRACTION OF A

2     HIGHLY SPECULATIVE ANALYSIS AND EQUALLY SPECULATIVE

3     ON THE OTHER SIDE.  WHO WOULD BRING ARBITRATION

4     CLAIMS AND WHO WOULD BRING INFORMAL CLAIMS AND WHAT

5     THEY WOULD GET AND HOW YOU ADD THAT ALL UP, THAT'S

6     AN ANALYSIS THAT EFFECTIVELY PRECLUDES ANY KIND OF

7     REQUIREMENT OF INDIVIDUAL ARBITRATION.

8              AND IT ALSO IMPOSES A HURDLE TO THE

9     ENFORCEMENT OF THE ARBITRATION AGREEMENT THAT IS

10    COMPLETELY INCONSISTENT WITH THE FEDERAL

11    ARBITRATION ACT WHICH BASICALLY SAYS THAT YOU'RE

12    SUPPOSED TO ENFORCE THESE AND GET THESE INTO --

13             THE COURT:  AND LET ME ASK THIS, AND I'LL

14    HEAR FROM YOUR OPPONENT.

15             IF YOU'RE IN A CIRCUMSTANCE SUCH AS THIS,

16    WHERE THE ISSUE TO BE ARBITRATED IS INEXTRICABLY

17    TIED TO AN ISSUE WHICH IS NOT SUBJECT TO

18    ARBITRATION, WHAT DOES THE COURT DO?

19             DOES THE COURT SEND OUT THE ISSUE FOR

20    ARBITRATION AND SAY LET'S JUST ARBITRATE EVEN

21    THOUGH WHATEVER IS DECIDED IN THE ARBITRATION CAN'T

22    BE DEFINITIVE BECAUSE THERE ARE ISSUES THAT THE

23    ARBITRATOR WILL HAVE TO CONSIDER THAT THE

24    ARBITRATOR CAN'T CONSIDER BECAUSE THEY'RE NOT

25    ARBITRATABLE?

                                                    16

1          IT SEEMS TO ME THAT THE QUESTION OF THE

2     TIE BETWEEN THE CLAIMS BETWEEN AT & T AND APPLE,

3     THEY PUT THEMSELVES INTO A CONTRACT WHICH BINDS

4     THEM, BUT ONE HAS AN ARBITRATION CLAUSE AND THE

5     OTHER EXPRESSLY DOES NOT.  WHAT DO I DO THERE?

6          MR. FALK:  WELL, THE SUPREME COURT HAS

7     ANSWERED THAT QUESTION IN THE DEAN WHITTER VERSUS

8     BYRD CASE WHERE THE COURT WITHOUT DESCENT REVERSED

9     THE NINTH CIRCUIT DECISION THAT SAID IN THAT CASE

10    THAT THE SUPREME COURT SAID THAT THE POLICIES OF

11    THE FEDERAL ARBITRATION ACT PREVAIL HERE AND THE

12    PARTS THAT GET ARBITRATED, GET ARBITRATED AND THE

13    PARTS THAT GET LITIGATED, GET LITIGATED.

14          THE COURT:  BUT THAT PRESUMES THAT THEY

15    CAN BE PARSED OUT AND SEPARATELY CONSIDERED AND

16    SEPARATELY DECIDED.

17          MR. FALK:  WELL, THEY CAN.  WE HAVE TWO

18    SEPARATE DEFENDANTS.

19          THE COURT:  ALL RIGHT.

20          MR. FALK:  APPLE IS NOT PART OF THE

21    AT & T ARBITRATION AGREEMENT.

22          THE COURT:  IT'S NOT PART OF THE AT & T

23    ARBITRATION AGREEMENT, BUT IT'S INEXTRICABLY TIED

24    TO THE SERVICE.

25          MR. FALK:  BUT IT'S NOT -- THEIR

                                                    17

1    LIABILITY IS NOT OUR LIABILITY.  OUR LIABILITY IS

2    NOT THEIR LIABILITY.

3              WHEN IT COMES DOWN TO A DISPUTE, IT HAS

4    TO BE, YOU KNOW, SOMEONE -- IF PLAINTIFFS PREVAIL,

5    SOMEONE HAS TO PAY AND WHAT COMES OUT OF OUR POCKET

6    DOESN'T COME OUT OF THEIR POCKET AT LEAST FOR

7    PURPOSES OF SETTING ASIDE ANYTHING NOT BEFORE THE

8    COURT.

9              I MEAN, WHAT WE HAVE IS TWO SEPARATE

10   DEFENDANTS AND THE CONDUCT --

11             THE COURT:  I HESITATE TO RAISE THE

12   QUESTION BECAUSE I HAVEN'T THOUGHT IT THROUGH, BUT

13   IT DOES SEEM TO ME THAT IF YOU'RE CORRECT THAT I

14   MUST SEND FOR ARBITRATION, THE NEXT BIG JOB IS HOW

15   TO ARBITRATE?  WHAT PART I'M ARBITRATING WITHOUT

16   GIVING TO THE ARBITRATOR MATTERS THAT THE

17   PLAINTIFFS ARE ENTITLED TO HAVE TRIED IN A COURT

18   GIVEN THE NATURE OF THE INTERTWINING OF THE

19   RELATIONSHIPS AND THAT PART I HAVEN'T THOUGHT

20   ABOUT, BUT I WANTED TO RAISE IT AND IT SOUNDS LIKE

21   YOU HAVEN'T THOUGHT A LOT ABOUT IT BUT YOU'RE READY

22   TO.

23             MR. FALK:  WELL, YOUR HONOR, WHAT IS AN

24   ADJUDICATION AGAINST AT & T OR IN FAVOR OF AT & T

25   DOES NOT NECESSARILY CARRY OVER TO APPLE.

                                                    18

1          THE COURT:  WELL, THAT'S THE QUESTION --

2     YOU'RE MAKING THAT AS A STATEMENT.  I'M NOT SURE

3     I'VE COME THERE YET.

4          AND SO IF I WERE TO FIND THAT, THEN THAT

5     WOULD PUT US BOTH IN A BETTER POSITION AND WHATEVER

6     IS THE QUESTION WITH RESPECT TO SERVICE AND THE

7     ABILITY TO SWITCH SERVICES AND TIE IT INTO SERVICE

8     IS SEPARATELY ARBITRATABLE AND WILL NOT REQUIRE

9     THAT THE PLAINTIFFS LITIGATE IN THE ARBITRATION

10    MATTERS THAT THEY ARE ENTITLED TO TRY TO A COURT.

11    THAT PART I HAVEN'T QUITE GOTTEN TO.

12         MR. FALK:  THEY'RE ENTITLED TO TRY THEM

13    AGAINST APPLE.  THEY'RE NOT ENTITLED TO TRY THEM IN

14    A COURT AGAINST AT & T.

15         THE COURT:  THAT'S YOUR ARGUMENT.

16         MR. FALK:  THE AGREEMENT DOESN'T REACH

17    THEIR CLAIMS AGAINST APPLE.  IT REACHES THEIR

18    CLAIMS AGAINST US AND AS I SAID THE COURT NOT

19    ONLY -- THE SUPREME COURT NOT ONLY TOLERATES BUT

20    MANDATED PIECEMEAL CIRCUMSTANCES.  THANK YOU.

21         THE COURT:  VERY WELL.  COUNSEL.

22    MR. RIFKIN.

23         MR. RIFKIN:  GOOD MORNING, YOUR HONOR.

24    MAY IT PLEASE THE COURT, MY NAME IS MARK RIFKIN AND

25    I REPRESENT THE PLAINTIFFS AND THE CLASS IN THIS

19

1    CASE.

2             I WOULD LIKE TO BEGIN BY PICKING UP ON

3    THE LAST POINT YOU RAISED WITH MY OPPONENT AND THAT

4    IS THE QUESTION THAT WE ALWAYS HAD ABOUT THIS

5    ARBITRATION AGREEMENT.

6             AS YOUR HONOR KNOWS THE HEART OF THIS

7    CASE IS A CONSPIRACY BETWEEN APPLE AND AT & T TO

8    MONOPOLIZE CERTAIN AFTER-MARKETS FOR IPHONE

9    SERVICE.

10            THIS IS THE TWO AFTER-MARKETS THAT WE

11   HAVE DEFINED.  ONE HAS TO DO WITH THE REGULAR

12   CELLULAR VOICE AND DATA SERVICE AND THE OTHER IS

13   THE AFTER-MARKET.

14            WE CANNOT CONCEIVE OF A WAY THAT APPLE

15   COULD BE FOUND TO PARTICIPATE IN A CONSPIRACY WITH

16   AT & T BUT AT & T FOUND NOT TO HAVE PARTICIPATED IN

17   THAT SAME CONSPIRACY.

18            AND SO IT STRUCK US THAT AN ARBITRATION

19   AGREEMENT WOULD RUN THAT EXACT RISK IF THE

20   ARBITRATION PROVISION WERE ENFORCEABLE, WHICH WE

21   DON'T THINK IT IS.

22            BUT IF IT WERE ENFORCEABLE, IT CERTAINLY

23   WOULDN'T ADVANCE THE INTERESTS OF PROMPT AND

24   EFFICIENT RESOLUTION OF ANY CLAIMS WHERE THERE

25   WOULD BE THAT RISK OF AN ADJUDICATION AGAINST APPLE

                                              20

1    IN THE COURT AND AN ADJUDICATION AGAINST AT & T IN

2    AN ARBITRATION THAT MIGHT CONCEIVABLY BE DIFFERENT.

3           IF ALL OF THE CLAIMS WERE ADJUDICATED IN

4    THE SAME FORUM, WE THINK THAT RISK WOULD BE

5    VIRTUALLY ZERO IF NOT PRACTICALLY ZERO.

6           THE COURT:  WELL, LET'S NOT FACE THAT

7    QUESTION YET.  LET'S DETERMINE AND FOCUS ON THE

8    QUESTION OF WHETHER OR NOT THIS IS AN ARBITRATION

9    CLAUSE THAT IS VALID AND FOR THAT, WHAT I WANTED TO

10   HAVE YOU FOCUS ON ARE THESE INCENTIVES.

11          THESE SEEM TO BE SOMETHING NEW AND

12   DIFFERENT.  YOUR OPPONENT DOES ARGUE THAT JUDGE

13   ARMSTRONG'S JUDGMENT NOTWITHSTANDING THERE COULD BE

14   A DIFFERENCE IN THE FACT THAT THESE INCENTIVES HAVE

15   BEEN ADDED WHICH BRING THE CONSUMER IN A DIFFERENT

16   POSITION THAN BEFORE.

17          WHAT DO YOU SAY ABOUT THAT?

18          MR. RIFKIN:  WELL, I THINK TO PUT THAT

19   ARGUMENT IN ITS CONTEXT AND TO UNDERSTAND JUDGE

20   ARMSTRONG'S DECISION IN STIENER, WE HAVE TO TAKE A

21   STEP BACK AND LOOK AT THE NINTH CIRCUIT DECISION IN

22   SHROYER, WHICH IS THE CASE THAT INVALIDATED THE

23   PRIOR AGREEMENT THAT AT & T AGREEMENT HAD, THE

24   PRIOR ARBITRATION AGREEMENT, BECAUSE I THINK THAT

25   LAYS OUT THE FRAMEWORK THAT ALL OF THIS HAS TO BE

21

1    ANALYZED IN.

2         AND I FIRST WANT TO CORRECT A

3    MISIMPRESSION THAT MAY HAVE BEEN MADE BY MY

4    OPPONENT.  WE DO ABSOLUTELY ALLEGE BOTH PROCEDURAL

5    AND SUBSTANTIVE UNCONSCIONABILITY.  AND LET ME

6    EXPLAIN IT NOW BECAUSE SHROYER SETS THEM.  SHORE

7    SAYS THERE'S A THREE-PART TEST TO DETERMINE WHETHER

8    A CLASS ACTION WAIVER IN A CONSUMER CONTRACT IS

9    UNCONSCIONABLE.

10        THE FIRST PRONG IS WHETHER THE AGREEMENT

11   IS A CONSUMER CONTRACT OF ADHESION WHICH SHROYER

12   SAYS IS PROCEDURAL UNCONSCIONABILITY.

13        NOW, THERE'S NO QUESTION THAT UNDER

14   CALIFORNIA LAW, WHICH THIS COURT OBVIOUSLY HAS TO

15   APPLY UNLESS THERE'S SOME COMPELLING REASON FOR IT

16   TO APPLY SOME OTHER STATE'S LAW.

17        UNDER CALIFORNIA LAW, THIS IS A CONTRACT

18   OF ADHESION, AND I HAVE NOT HEARD AT & T ARGUE

19   OTHERWISE.  SO THAT SUBSTANTIVE UNCONSCIONABILITY

20   PRONG AT LEAST IN CALIFORNIA AND EVERYWHERE ELSE IS

21   AT LEAST ESTABLISHED.

22        THE OTHER PART IS SUBSTANTIVE

23   CONSCIONABILITY.  AND THE SHROYER TEST HAS TWO

24   PARTS THERE.  THE FIRST IS WHETHER THE AGREEMENT

25   OCCURS IN THE SETTING IN WHICH DISPUTES PREDICTABLY

                                                    22

1    INVOLVE SMALL AMOUNTS OF DAMAGES, WHICH AGAIN, FOR

2    EVERYBODY WHO BOUGHT AN IPHONE IS UNQUESTIONABLY

3    THE CASE.

4            AND THEN THE SECOND PART OF THAT IS

5    WHETHER THE PARTY WITH A SUPERIOR BARGAINING POWER

6    CARRIED OUT A SCHEME TO CHEAT LARGE NUMBERS OF

7    CONSUMERS OUT OF SMALL SUMS OF MONEY.

8            AND AGAIN, WITH RESPECT TO EVERYBODY WHO

9    BOUGHT AN IPHONE, NO MATTER WHERE THEY BOUGHT AN

10   IPHONE, THERE'S NO QUESTION THAT THIS SITUATION,

11   THIS CASE MEETS BOTH OF THOSE TWO SUBSTANTIVE

12   UNCONSCIONABILITY PRONGS.

13           MY OPPONENT MENTIONED SEVERAL TIMES THAT

14   WE DID NOT MENTION PROCEDURAL AND SUBSTANTIVE

15   UNCONSCIONABILITY, AND I RESPECTFULLY DISAGREE.

16           THE COURT:  THAT'S THIS CHEATING.  WE ARE

17   NOWHERE NEAR A FINDING THAT THERE HAS BEEN ANY

18   CHEATING BUT WITH THE INCENTIVES BUILT IN, IT

19   SOUNDS LIKE WHAT AT & T HAS DONE IS TO SAY IF YOU

20   ACTUALLY TAKE US TO ARBITRATION, YOU'RE ACTUALLY

21   GOING TO GET A BONUS.

22           I ACTUALLY DIDN'T PUT THAT FORMULA

23   TOGETHER.  I KEPT PROMISING MYSELF I WAS GOING TO

24   TAKE THAT FORMULA AND WORK IT OUT BECAUSE IT IS A

25   FORMULA THERE.

                                                      23

1      THERE HAS TO BE AN OFFER AND THE AMOUNT

2   HAS TO REACH SOME THRESHOLD AND IT HAS TO DO WITH

3   THE JURISDICTION OF THE COURT AND THEN YOU GET

4   DOUBLE AMOUNT AND SOMEHOW THAT ALGORITHM HAS TO BE

5   WORKED OUT, BUT I'LL ASSUME THAT THE DEFENDANT IS

6   CORRECT THAT THAT OPERATES TO BE A BONUS.

7      LET'S ASSUME THAT IT IS, DOESN'T THAT

8   TAKE AWAY SUBSTANTIVE UNCONSCIONABILITY?

9      MR. RIFKIN:  WELL, THIS IS WHAT JUDGE

10  ARMSTRONG FOLLOWED IN STIENER, AND I THINK IT'S THE

11  CORRECT ANALYSIS AND SHOULD BE FOLLOWED HERE.

12     UNDER CALIFORNIA LAW THE DISCOVER BANK CASE

13  THAT WE CITED IN OUR BRIEF, THE ISSUE ULTIMATELY

14  TURNS ON WHETHER THE ARBITRATION CLAUSE BECOMES IN

15  PRACTICE AN EXEMPTION FROM LIABILITY.

16     AND THE COURT BOTH IN SHROYER AND THE

17  NINTH CIRCUIT AND THEN JUDGE ARMSTRONG IN STIENER

18  CONCLUDED THAT BOTH THE PRIOR VERSION OF THE AT & T

19  ARBITRATION PROVISION, AND THE NEW VERSION OF THE

20  AT & T ARBITRATION PROVISION IN PRACTICE BECOME

21  EXCULPATIONS FROM LIABILITY AND JUDGE ARMSTRONG'S

22  ANALYSIS WENT AS FOLLOWS:

23     "NOTWITHSTANDING THE PREMIUM AND THE

24  ATTORNEY PREMIUM," AND I THINK THE WAY IT WORKS,

25  AND I'LL CONFESS IT'S RATHER COMPLICATED IN ITS

24

1    FORMATION, BUT I THINK THE WAY IT WORKS IS THIS:

2    IF AT & T MAKES AN OFFER TO ANYONE WHO HAS AGREED

3    AND GOES THROUGH THE TROUBLE OF DEMANDING AN

4    INDIVIDUAL ARBITRATION AND AT & T LOSES IN THE

5    ARBITRATION, THEN AT & T AGREES TO PAY A SPECIFIC

6    DOLLAR AMOUNT, AND I THINK I HEARD SOME SUGGESTION

7    THAT IN CALIFORNIA IT MAY BE $7500, BUT I THINK

8    IT'S $5,000.

9            AND IN ADDITION TO THAT AT & T WOULD ALSO

10   AGREE TO PAY SOME PREMIUM ON THE ATTORNEY'S FEE.

11   AND THEY HAVE ADDED THIS AS A WAY OF GETTING AROUND

12   WHAT WAS ORIGINALLY OBSERVED IN THE SHROYER CASE

13   THAT THERE WAS NO INCENTIVE FOR ANYBODY TO BRING AN

14   INDIVIDUAL CLAIM.

15           AND SO THEY ATTACK THIS CHANGE ONTO THE

16   AGREEMENT TO TRY TO ANSWER THAT PROBLEM.

17           BUT JUDGE ARMSTRONG SAID, LOOK, THIS

18   PREMIUM AND THIS ATTORNEY'S PREMIUM ARE VERY EASILY

19   UNDONE.

20           IF AT & T SIMPLY MAKES AN OFFER OF A FULL

21   SETTLEMENT TO THE HANDFUL OF CONSUMERS WHO ARE

22   LIKELY TO DEMAND ARBITRATION, AND THE COST IN THOSE

23   INSTANCES WILL BE OBVIOUSLY EXTREMELY SMALL FOR

24   AT & T COMPARED TO THE ENORMOUS LIABILITY IT FACES

25   IN A CLASS ACTION.

25

1          AND SO ON THAT BASIS JUDGE ARMSTRONG,

2    QUITE CORRECTLY I BELIEVE, SAID WHAT IS REALLY AT

3    STAKE HERE IS NOT THE FEW DAYS THAT AT & T MAY HAVE

4    TO PAY TO A SMALL NUMBER OF INDIVIDUALS WHO GO TO

5    THE TROUBLE OF BRINGING AN ARBITRATION IF THEY'RE

6    EVEN AWARE OF THE ARBITRATION, AND I'LL ADDRESS

7    THAT IN A MOMENT, BECAUSE THAT IS DWARFED BY THE

8    POTENTIAL LIABILITY THAT AT & T HAS TO THE ENTIRE

9    CLASS OF IPHONE CONSUMERS.

10          AND FOR THAT REASON JUDGE ARMSTRONG

11   CONCLUDED, AND I BELIEVE CORRECTLY, AND I BELIEVE

12   THERE'S NO REASON FOR THE COURT TO DISAGREE WITH

13   JUDGE ARMSTRONG'S CONCLUSION, THAT WHAT THIS STILL

14   IS, IS A PROVISION THAT IS INTENDED TO EXCULPATE AT

15   & T AND INSULATE THEM FROM LIABILITY TO THE WHOLE

16   GROUP OF CONSUMERS WHO THEY HARMED IN VERY SMALL

17   INDIVIDUAL AMOUNTS AND THIS PREMIUM AND ATTORNEY'S

18   PREMIUM ARE BOTH INADEQUATE AND SO EASY TO AVOID,

19   OR AS JUDGE ARMSTRONG SAYS UNDO, THAT THEY SIMPLY

20   DON'T OVERCOME THE STRONG PUBLIC POLICY PREFERENCE

21   IN CALIFORNIA FOR CLASS ACTION ADJUDICATION AS

22   OPPOSED TO INDIVIDUAL ARBITRATIONS.

23          I DID WANT TO MAKE A COMMENT ABOUT ONE

24   OTHER ISSUE THAT YOUR HONOR RAISED WHEN MY OPPONENT

25   WAS SPEAKING AND THAT HAD TO DO WITH WHEN THE

26

1    CONTRACT IS ENTERED INTO AT THE TIME THE IPHONE IS

2    PURCHASED OR AT SOME LATER TIME.

3              IT'S NOT ENTERED INTO AT THE TIME OF

4    PURCHASE AND AT LEAST WHEN THESE PHONES WERE SOLD

5    IT WAS NOT.  THE CONSUMER GOES INTO THE STORE AND

6    BUYS A PHONE AND DOESN'T SEE ANYTHING UNTIL HE

7    COMPLETES THE TRANSACTION FOR THE PHONE AND SIGNS

8    UP FOR SERVICE WITH THE AT & T AND AT WHICH TIME

9    HE'S GIVEN THE SUMMARY OF THE TERMS OF SERVICE.  IN

10   THE STORE THE SUMMARY TERMS OF SERVICE DOES NOT SET

11   FORTH ANYTHING ABOUT THE ARBITRATION PROVISION.

12             THE ARBITRATION PROVISION DOESN'T APPEAR

13   UNTIL THE CONSUMER TAKES THE PRODUCT HOME, TAKES

14   THE IPHONE OUT OF THE BOX, CONNECTS THE IPHONE UP

15   TO A COMPUTER, DOWNLOADS ITUNES IF HE HASN'T

16   ALREADY DONE SO, AND INSTALLS THE NECESSARY

17   SOFTWARE IN THE PHONE, REGISTERS THE PHONE FOR USE.

18             IN THE PROCESS OF THAT AT HOME

19   TRANSACTION, THE CONSUMER THEN SEES A DIALOGUE BOX,

20   WHICH SHOWS THE TERMS OF SERVICE.

21             AND IF A CONSUMER TAKES THE TIME TO

22   SCROLL DOWN THAT DIALOGUE BOX FAR ENOUGH, THE

23   CONSUMER WILL SEE AT THE VERY END, WILL SEE THIS

24   ARBITRATION PROVISION.  BUT THAT'S LONG AFTER THE

25   TRANSACTION HAS ALREADY BEEN COMPLETED.

                                                    27

1          THE TRANSACTION IS COMPLETE IN THE STORE.

2     AT NO POINT IN TIME IN THE STORE WERE ANY OF THESE

3     PLAINTIFFS SHOWN OR TOLD ANYTHING ABOUT AN

4     ARBITRATION PROVISION.

5          THE COURT:  WELL, IN THE ELECTRONIC WORLD

6     THAT WE LIVE IN, ISN'T THAT A BENEFIT TO THE

7     CONSUMER?  I MEAN, THE CONSUMER WANTS TO MAKE THE

8     PURCHASE AND GET OUT OF THERE.  IN THE GOOD OLD

9     DAYS YOU WOULD HAVE TO STAND THERE AND AT THE STORE

10    AND AT THE POINT IT WAS ACTIVATED RIGHT AT THE

11    POINT OF PURCHASE.

12         SO WHAT AT & T HAS DONE IS TO PUT THE

13    CONSUMER IN A GREATER CONVENIENCE BY ALLOWING IT TO

14    HAPPEN LATER IN TIME AND ALL OF THESE TERMS, THERE

15    ARE MULTIPLE TERMS THAT CONSUMERS CAN CHOOSE TO

16    READ OR NOT.

17         BUT I GUESS WHAT BECOMES A PROBLEM FOR

18    THE COURT AND THE ONE THAT YOU POINT OUT IN YOUR

19    BRIEF IS IF THE CONSUMER HAPPENS TO SEE IT AND SAY,

20    I DON'T LIKE THAT AND WANTS TO RETURN THE PHONE,

21    THERE'S A PENALTY.

22         MR. RIFKIN:  CORRECT.

23         THE COURT:  BUT THAT'S NOT IMPOSED BY

24    AT & T, IS IT?

25         MR. RIFKIN:  WELL, THE PENALTY IS

                                                      28

1    CORRECTED BY AT & T OR WHOMEVER YOU BOUGHT THE

2    PHONE FROM AND IF YOU BOUGHT THE PHONE FROM AT & T,

3    WHICH FOR MANY OF THESE PLAINTIFFS WHO BOUGHT THE

4    PHONE, THAT'S WHERE YOU HAVE TO PAY YOUR MONEY BACK

5    TO.  THEY WON'T TAKE THE PHONE UNLESS YOU PAY THE

6    MONEY BACK.  YOU ONLY GET SO MUCH BACK, BUT IT

7    REALLY DOESN'T MATTER IF IT GOES TO APPLE OR

8    AT & T.

9              THE COURT:  SO AT & T WERE RESALING

10   PHONES AS WELL AS APPLE?

11             MR. RIFKIN:  OH, YES.  IT REALLY DOESN'T

12   MATTER THOUGH BECAUSE APPLE AND AT & T AGREED TO

13   THIS.  THIS WAS NOT SOMETHING THAT APPLE DID

14   WITHOUT AT & T'S CONSENT.

15             IT WAS, FRANKLY, NOT SOMETHING THAT

16   AT & T DID WITHOUT APPLE'S CONSENT.  THEY AGREED TO

17   THAT $50 OR $60 RESTOCKING FEE.

18             IT REALLY DOESN'T MATTER RESPECTFULLY.  I

19   RECOGNIZE THAT THERE IS SOME CONVENIENCE TO A

20   CONSUMER NOT TO HAVE TO READ A CONTRACT IN THE

21   STORE, BUT EVEN IF THEY HAD READ IT, UNDER THE

22   CALIFORNIA LAW, THEY'RE NOT BOUND BY THAT

23   ARBITRATION CLAUSE BECAUSE IT'S REPUGNANT TO

24   CALIFORNIA PUBLIC POLICY.

25             AND WHETHER THEY KNEW ABOUT IT OR DIDN'T

                                                      29

1    KNOW ABOUT IS OF SOMEWHAT LESS IMPORTANCE.  IN

2    FACT, THEY HAVE NO CHOICE.  THEY ARE BOUND BY IT.

3    IT IS A CONTRACT OF ADHESION.  THAT SATISFIES THE

4    SUBSTANTIVE UNCONSCIONABILITY PRONG OF THE SHROYER

5    ANALYSIS.

6              THE COURT:  NOW, I'M PROBABLY PUTTING

7    THIS A LITTLE BIT THE CART BEFORE THE HORSE BUT IT

8    DOES IMPRESS ME THAT IF I'M IN A CASE THAT I HAVE

9    TO PAY ATTENTION TO WASHINGTON LAW, NEW YORK LAW,

10   CALIFORNIA LAW THAT AS A CLASS ACTION, I'M IN

11   TROUBLE BECAUSE I DON'T HAVE A COMMON ISSUE OF LAW,

12   DO I?

13             DOES, DOES -- DO I HAVE TO MAKE THE

14   DECISION NOW THAT CALIFORNIA LAW IS THE LAW TO

15   APPLY OR CAN I PROCEED WITH THIS -- WITH THREE

16   SUBSTANTIVE LEGAL PRINCIPLES INVOLVED?

17             MR. RIFKIN:  WELL, THERE ARE A NUMBER OF

18   ANSWERS TO THAT.

19             THE FIRST ANSWER IS THAT THE QUESTION OF

20   PROCEEDING AS A CLASS ACTION IS NOT BEFORE THE

21   COURT RIGHT NOW.

22             THE ONLY QUESTION THAT IS PRESENTLY

23   BEFORE THE COURT IS WHETHER THESE INDIVIDUAL

24   PLAINTIFFS HAVE AGREED TO AN ENFORCEABLE

25   ARBITRATION PROVISION.

30

1            AND ALTHOUGH THEY COME FROM DIFFERENT

2      PARTS OF THE COUNTRY, AND AT & T HAS CHOSEN TO

3      BRIEF CALIFORNIA LAW, NEW YORK LAW, AND WASHINGTON

4      LAW, WE THINK THAT, THAT THE STARTING PLACE IS

5      CALIFORNIA LAW, BECAUSE WE'RE HERE IN THIS FORUM,

6      AND AS YOUR HONOR KNOWS, SINCE THE FEDERAL COURT IS

7      SITTING HERE IN CALIFORNIA, IT HAS TO APPLY

8      CALIFORNIA'S CHOICE OF LAW RULES, AS WELL AS

9      CALIFORNIA LAW, UNLESS SOME OTHER LAW APPLIES.

10           WE THINK UNDER CALIFORNIA CHOICE OF LAW

11     RULES, THE AOL VERSUS SUPERIOR COURT CASE THAT WE

12     CITED IN OUR BRIEF, THE COURT, THE COURT WOULD

13     NOT -- THE CALIFORNIA COURT WOULD NOT APPLY THE LAW

14     OF ANY OTHER STATE TO ENFORCE AN ARBITRATION

15     PROVISION IF THE APPLICATION OF THAT ARBITRATION

16     PROVISION WOULD OPERATE AS A CLASS ACTION WAIVER

17     UNLESS IT WAS DEMONSTRATED THAT THAT OTHER STATE

18     HAD A MORE COMPELLING INTEREST IN THE CONTROVERSY

19     THAN CALIFORNIA HAS IN THE CONTROVERSY.

20           AND WE HAVE ARGUED TO THE COURT AND WE

21     BELIEVE THAT NEITHER WASHINGTON NOR NEW YORK HAVE A

22     MORE COMPELLING INTEREST IN THE OUTCOME OF THE

23     LITIGATION EVEN THOUGH SOME OF THE PLAINTIFFS, BUT

24     NOT ALL OF THEM, EVEN THOUGH SOME OF THE PLAINTIFFS

25     HAPPEN TO BE RESIDENTS OF OR HAD BILLING ADDRESSES

31

1    IN NEW YORK OR WASHINGTON.

2              THE COURT:  NOW, I UNDERSTAND YOUR

3    POSITION.

4              MR. RIFKIN:  BUT EVEN MORE TO THE POINT,

5    THERE'S NO DIFFERENCE BETWEEN LAW IN NEW YORK AND

6    WASHINGTON AND CALIFORNIA.

7              WE CITED THE RENEERY VERSUS BELL ATLANTIC

8    CASE WHICH SAYS THAT ARBITRATION PROVISIONS WHICH

9    ARE CONTRACTS OF ADHESION ARE UNCONSCIONABLE AND

10   UNENFORCEABLE.

11             AND WE CITED THE SCOTT VERSUS CINGULAR

12   CASE, WHICH YOUR HONOR MENTIONED WHEN YOU WERE

13   ASKING QUESTIONS OF MY OPPONENT, WHICH SAID THAT AN

14   ARBITRATION PROVISION IS UNENFORCEABLE, IF, AND

15   HERE ARE THE TWO PRONGS, IT MEETS TWO PRONGS, AND,

16   NUMBER ONE, IT'S CONTRARY TO WASHINGTON'S POLICY

17   FAVORING THE CONSUMER PROTECTION ACT, AND WHICH

18   THIS WOULD BE; AND, NUMBER TWO, IT OPERATES AS AN

19   EXCULPATORY CLAUSE WHICH IS, OF COURSE, THE TEST

20   THAT STIENER AND SHROYER AND DISCOVER BANK APPLIED

21   UNDER CALIFORNIA LAW.

22             THE COURT:  AND YOU'RE NOT INVOLVED IN

23   JUDGE ARMSTRONG'S CASE?

24             MR. RIFKIN:  NO, I'M NOT.  IN THE STIENER

25   CASE, NO, I'M NOT.

                                                    32

1          THE COURT:  DO YOU WANT TO SPEAK TO THE

2     ISSUE THAT YOUR OPPONENT BROUGHT UP, NAMELY, THAT

3     THEY'RE APPEALING ON THE GROUND THAT SHE SHIFTED

4     THE BURDEN OF PROOF.  I DON'T RECALL -- I DIDN'T

5     CAPTURE ALL THAT WAS BEING CRITICIZED, BUT IS THAT

6     SOMETHING THAT YOU'RE FAMILIAR WITH?

7          MR. RIFKIN:  I THINK THEIR ARGUMENT IS

8     THAT JUDGE ARMSTRONG SHIFTED THE BURDEN OF PROOF TO

9     THE DEFENDANT WHO WAS ADVOCATING THE

10    UNCONSCIONABILITY, WHO WAS ADVOCATING THE

11    ARBITRATION PROVISION, THAT IT WAS NOT

12    UNCONSCIONABLE, AS OPPOSED TO REQUIRING THE

13    PLAINTIFF, WHO WAS DEFENDING AGAINST THE

14    ARBITRATION, THE MOTION TO ARBITRATE HAVING THAT

15    BURDEN.

16         RESPECTFULLY, I THINK THE BURDEN DOES

17    BELONG ON THE PARTY ASSERTING THE ARBITRATION

18    PROVISION TO DEMONSTRATE ITS ENFORCEABILITY JUST

19    LIKE ANY PARTY COMING INTO COURT TO ENFORCE THE

20    TERMS OF ANY CONTRACT WOULD HAVE TO PROVE, NUMBER

21    ONE, THERE WAS A CONTRACT; NUMBER TWO, THE CONTRACT

22    WAS ENFORCEABLE; AND, NUMBER THREE, THE PARTY WHO

23    WAS BEING CHARGED HAS SOMEHOW BREACHED THE

24    CONTRACT.  I DON'T SEE ANY DIFFERENCE.

25         THE COURT:  I DO NOTE THAT THE PLAINTIFF

                                                      33

1    HERE HAS NOT MADE A MOTION WITH RESPECT TO THIS.

2             MR. RIFKIN:  THIS IS AT & T'S MOTION AND

3    SINCE THEY'RE TRYING TO ENFORCE THE ARBITRATION

4    PROVISION, WE THINK IT'S THEIR BURDEN.

5             THE COURT:  BUT YOU HAVE NOT ASKED ME TO

6    MAKE A DECLARATION ONE WAY OR THE OTHER WITH

7    RESPECT TO THIS.

8             MR. RIFKIN:  WE HAVE NOT.  WE BELIEVE

9    THAT IT'S THEIR BURDEN, AS THE MOVANT, TO SHOW THAT

10   THE PROVISION IS ENFORCEABLE, BUT, AGAIN, I SIMPLY

11   COME DOWN TO THE FACT THAT IT REALLY DOESN'T MATTER

12   WHOSE BURDEN THIS IS BECAUSE WHETHER IT'S THEIR

13   BURDEN OR THE PLAINTIFF'S BURDEN AT THE END OF THE

14   LINE THERE'S THE SHROYER CASE WHICH ESTABLISHES THE

15   LAW AND JUDGE ARMSTRONG'S ANALYSIS IN STIENER,

16   WHICH I THINK SIMPLY ECHOS THAT.  AND THAT IS THE

17   CHANGES ON THE MARGIN THAT AT & T HAS MADE TO THIS

18   CONTRACT TO CREATE THIS PREMIUM AND THIS ATTORNEY

19   PREMIUM DON'T OVERCOME THE FUNDAMENTAL FACT THAT

20   THIS IS PRIMARILY AN EXCULPATORY CLAUSE.

21            THIS IS NOT A PREFERENCE FOR ARBITRATION

22   VERSUS LITIGATION.  IF IT WERE, THEN AT & T

23   WOULDN'T REQUIRE A CLASS ACTION WAIVER.

24            THIS IS AN ATTEMPT BY AT & T TO EXCULPATE

25   THEMSELVES FROM THE ENORMOUS LIABILITY THEY FACE IN

                                                      34

1    FAVOR OF VERY, VERY, VERY MODEST LIABILITY TO A

2    HANDFUL OF CONSUMERS WHO WILL EVER CONCEIVABLY

3    COMMENCE IN INDIVIDUAL ARBITRATIONS AND SO FOR THAT

4    REASON I THINK JUDGE ARMSTRONG'S ANALYSIS IN

5    STIENER CORRECTLY APPLIES THE NINTH CIRCUIT'S

6    DECISION IN SHROYER TO THE EXACT SAME CONTRACT THAT

7    IS IN FRONT OF YOUR HONOR NOW.

8              AND FOR THE POLICY REASONS THAT I

9    ADDRESSED AT THE BEGINNING OF MY REMARKS, I JUST

10   DON'T SEE THERE'S ANY BENEFIT TO ENFORCING THE

11   ARBITRATION PROVISION HERE.

12             THE COURT:  VERY WELL.

13             MR. RIFKIN:  THANK YOU, YOUR HONOR.

14             THE COURT:  MR. FALK, I INTERFERED WITH

15   YOUR ARGUMENT WITH SO MANY QUESTIONS AND SINCE

16   YOU'RE THE MOVING PARTY I DID WANT TO GIVE YOU AN

17   OPPORTUNITY FOR A BRIEF REBUTTAL.

18             IS THERE ANYTHING YOU WOULD WISH TO

19   HIGHLIGHT FOR ME?

20             MR. FALK:  I'LL BE AS BRIEF AS I CAN,

21   YOUR HONOR.  I THINK I CAN BE QUITE BRIEF.

22             FIRST, YOUR HONOR, I RARELY HAVE BEEN IN

23   A POSITION WHERE SOMEONE HAS RESISTED ENFORCEMENT

24   OF THE CONTRACT BECAUSE THEY SAY IT'S TOO EASY FOR

25   THE PLAINTIFF TO WIN IF THEY GO ACCORDING TO THE

                                                    35

1    AGREEMENT THAT THEY ENTERED INTO.

2              THAT SEEMS TO BE THE PROBLEM HERE IS THAT

3    THE INDIVIDUAL PLAINTIFFS, ANYBODY WHO RAISES A

4    DISPUTE IS LIKELY TO GET FULL RELIEF.

5              AND THE FOCUS UNDER THE FEDERAL

6    ARBITRATION ACT AND UNDER CALIFORNIA, AND MOST

7    OTHER STATES ON UNCONSCIONABILITY LAW, IS THE

8    CIRCUMSTANCES OF THE PRESENT PARTY, NOT SOME

9    HYPOTHETICAL EFFECTS ON SOME ABSENT PARTIES.

10             MOREOVER, THE --

11             THE COURT:  I HESITATE TO DO THIS TO YOU

12   BUT HERE'S THE QUESTION, WHAT IS IT THAT IS

13   ARBITRATABLE THAT IS THE SUBJECT OF THIS CASE THAT

14   WOULD BE THE SUBJECT OF FULL RELIEF BEING GIVEN IN

15   THE CONTEXT OF THE ARBITRATION?

16             MR. FALK:  ANY INJURY THAT HAS BEEN

17   SUSTAINED BY ANY PLAINTIFF.

18             THE COURT:  SO AN ANTITRUST INJURY WOULD

19   BE ARBITRATABLE?

20             MR. FALK:  YES.

21             THE COURT:  SO WHAT WOULD BE THE

22   ANTITRUST RELIEF THAT WOULD BE GIVEN IN THE COURSE

23   OF THE ARBITRATION?

24             MR. FALK:  WELL, I MEAN, CERTAINLY

25   DAMAGES AND CERTAINLY -- THE SUPREME COURT HAS SAID

36

1    A NUMBER OF THINGS.

2            THE COURT:  LET ME SEE IF I HAVE YOU.  SO

3    YOUR ARGUMENT IS UNDER THE ARBITRATION CLAUSE, THE

4    ARBITRATOR WOULD BE ABLE TO AFFORD TO AN INDIVIDUAL

5    PLAINTIFF FULL ANTITRUST DAMAGES SUSTAINED BY THAT

6    CONSUMER?

7            MR. FALK:  YES, YOUR HONOR, ABSOLUTELY.

8    THERE'S NO QUESTION THAT THE ARBITRATOR HAS THE

9    POWER TO, YOU KNOW, OR WHATEVER IS CONSISTENT WITH

10   THE LAW AND THE SUPREME COURT HAS ADDRESSED THIS IN

11   THE ANTITRUST CASE AND IN THE MITSUBISHI CASE SAYS

12   ANTITRUST CLAIMS ARE ARBITRATABLE.

13           THE COURT:  SO WHAT I HAVE IS ANTITRUST

14   CLASS ACTION, ANTITRUST ACTION BEING ARBITRATABLE

15   AND WILLING TO RAISE THE ISSUES AND PROVE RELEVANT

16   MARKET, AND MARKET POWER AND ALL OF THE ISSUES THAT

17   WOULD HAVE TO BE MOUNTED BY IN THE COURSE OF THIS

18   LITIGATION WOULD BE DONE BEFORE THESE VARIOUS

19   INDIVIDUAL ARBITRATORS EVERY INSTANCE WHERE A

20   CONSUMER WOULD, AND THEN THERE'S NO RES JUDICATA

21   THAT COMES OUT OF THAT.

22           IF THE CONSUMER WINS, THAT IS NOT -- DO I

23   GET PRECLUSION SO THAT THEREAFTER APPLE WILL HAVE

24   BEEN PRECLUDED SO THAT ANY OTHER CONSUMER WHO SUES

25   FOR A VIOLATION OF ANTITRUST LAW WOULD SAY THAT'S

                                                    37

1    ALREADY BEEN LITIGATED, YOU LOSE ON LIABILITY AND

2    LET'S JUST TALK DAMAGES?

3           MR. FALK:  WELL, WITHIN THE ARBITRATION

4    CONTEXT THAT'S NOT USUALLY THE WAY IT WORKS.  IT

5    WOULD CERTAINLY BE PERSUASIVE PARTICULARLY FOR THE

6    SAME ARBITRATOR.  THEY WOULD HAVE -- THEY'RE NOT

7    CONFIDENTIAL ARBITRATIONS.

8           THE COURT:  BUT THE ARBITRATION COULD BE

9    MADE A JUDGMENT OF THE COURT.

10          MR. FALK:  CERTAINLY IT COULD BE ENFORCED

11   AND MADE A JUDGMENT OF THE COURT.

12          THE COURT:  WOULD THAT BE PRECLUSIVE?

13          MR. FALK:  I DO NOT BELIEVE IT WOULD GO

14   BEYOND THE SCOPE OF THE ARBITRATION AGREEMENT, BUT

15   I HAVE TO CONFESS THAT I HAVE NOT CONSIDERED THAT

16   ISSUE FULLY WITHIN -- USUALLY BECAUSE THE

17   ARBITRATION IS A CONTRACTUAL REMEDY, I DON'T

18   BELIEVE IT WOULD BE PRECLUSIVE AGAINST OTHER

19   PARTIES BUT, YOU KNOW, I HESITATE TO GIVE A

20   DEFINITIVE ANSWER BECAUSE I HAD NOT --

21          THE COURT:  WELL, THAT'S ANOTHER RIGHT

22   THAT WOULD BE GIVEN UP IN THE ARBITRATION PROCESS.

23          MR. FALK:  NOT BY THE CONSUMER THAT

24   AGREED TO ARBITRATE.  THE CONSUMER TO ARBITRATE

25   WOULD GET FULL RELIEF.

                                                    38

1            THE COURT:  WELL, THAT'S WHAT I'M TRYING

2       TO FIGURE OUT, WHAT IS FULL RELIEF?

3            MR. FALK:  I THINK IT'S --

4            THE COURT:  BUT ANTITRUST IS TO THE

5       COMPETITION TO THE MARKET.  I'M HAVING DIFFICULTY

6       CONCEPTUALLY WITH WHAT I WOULD BE ARBITRATING IN AN

7       ANTITRUST CONTEXT.  BUT, AGAIN, THESE ARE MATTERS

8       THAT I'M JUST NOW STARTING TO THINK ABOUT.

9            I APPRECIATE THAT THIS IS A MOTION THAT

10      INVITES ME TO MAKE A DECISION NOW.  AND YOU WOULD

11      WISH TO GET OUT OF THIS AND GO TO ARBITRATION NOW,

12      OR AT LEAST YOUR CLIENT WOULD, BUT I'M NOT SURE I'M

13      PERSUADED THAT I'M IN THAT POSITION AT THIS POINT.

14      GO AHEAD.

15           MR. FALK:  THE DIFFICULTY ISSUES WITH

16      ANTITRUST LAWS AND HOW THOSE APPLY ARE SUPPOSED TO

17      BE IN THIS INSTANCE ARE TO BE CONSIDERED BY THE

18      ARBITRATOR.  AND THE WHOLE POINT OF THE CASE IS TO

19      HAVE IT ARBITRATED IN TRIBUNAL.

20           JUST VERY, VERY BRIEFLY.  I NOTICE THE

21      PLAINTIFFS DIDN'T SAY A WORD ABOUT NEW YORK AND

22      UNCONSCIONABILITY LAW.  THEY DIDN'T SAY THE HOLDING

23      OF THE EERIE CASE THAT INDIVIDUAL OR/AND

24      ARBITRATION OR CLASS WAIVERS ARE UNENFORCEABLE NOR

25      DID THEY GIVE THE COURT MUCH REASON TO ARBITRATE A

                                                      39

1    NEW YORK PLAINTIFFS CLAIM UNDER CALIFORNIA LAW

2    BECAUSE THE PLAINTIFF HAS SENT A LETTER TO

3    CALIFORNIA TO FILE A LAWSUIT HERE OR HAS HAD A

4    LAWSUIT TRANSFERRED HERE.  THAT'S NOT THE WAY THESE

5    THINGS USUALLY WORK.

6             IF THE STATE -- THERE IS A CHOICE OF LAW

7    AGREEMENT AND EVEN IF THERE WERE NONE, THE STATE

8    WITH THE GREATER CONTEXT OF THE NEW YORK PLAINTIFF

9    TO THE WASHINGTON PLAINTIFF ARE THOSE OTHER STATES

10   NOT CALIFORNIA.  THERE'S NO JUSTIFICATION FOR

11   APPLYING CALIFORNIA LAW THERE.

12            I POINT OUT THAT WITH RESPECT TO THE

13   CONTRACTUAL PROCESS THERE'S A 14 DAY ABILITY TO

14   RESCIND ON THE PART OF THE CONSUMER AND ALSO NO ONE

15   HAS STATED THAT THEY WERE IN ANY WAY DETERRED FROM

16   GETTING OUT OF THEIR CONTRACTS OR WANTED TO GET OUT

17   OF THE CONTRACTS BUT WERE PRECLUDED OR DETERRED IN

18   ANY WAY BY THE RESTOCKING FEE.  AGAIN, THAT'S A

19   HYPOTHETICAL CONCERN THAT IS NOT PRESENT IN THIS

20   CASE.

21            THE COURT:  THE 14 DAY RESCISSION WOULD

22   BE WITHOUT PENALTY?

23            MR. FALK:  THAT'S AT & T.  THE RESTOCKING

24   FEE IS A DIFFERENT ISSUE.  SO THERE WOULD STILL BE

25   IN MOST INSTANCES.  IT'S FACTUALLY FAIRLY

40

1      COMPLICATED, AND I DON'T THINK IT'S FULLY VETTED IN

2      THE RECORD WHAT ACTUALLY HAPPENED, BUT I THINK ON

3      THIS RECORD THE RESTOCKING FEE WOULD STILL APPLY.

4             BUT WHAT I'M SAYING IS THAT NO ONE

5      PLAINTIFF HAS SAID I DIDN'T LIKE THIS DEAL AND I

6      WOULD HAVE GOTTEN OUT OF IT, BUT I WAS DETERRED BY

7      THE RESTOCKING FEE.

8             NO ONE SAID THAT.  SO THAT'S THE

9      HYPOTHETICAL CONCERN THAT DOES NOT APPLY TO THESE

10     INDIVIDUALS BUT OUR MOST IMPORTANT POINT, AND I'LL

11     CLOSE WITH THIS, IS THAT INSTEAD OF LOOKING AT HOW

12     THE ARBITRATION AGREEMENT APPLIES TO THE PLAINTIFFS

13     HERE AND WHETHER IT GIVES THEM INCENTIVES AND GIVES

14     THEM RELIEF AND WHETHER THEIR PROBLEMS COULD BE

15     RESOLVED, THE PLAINTIFFS WANT TO TAKE INTO ACCOUNT

16     EFFECTS ON OTHER PARTIES UNDER THE PUBLIC POLICY

17     RUBRIC.

18            BUT THE FEDERAL ARBITRATION ACT REQUIRES

19     ENFORCEMENT OF AGREEMENTS, AGREEMENTS AS THEY'RE

20     WRITTEN.  AND THEY COULD BE -- THAT ENFORCEMENT

21     COULD BE WITHHELD ONLY ON GROUNDS THAT ARE

22     APPLICABLE TO ALL CONTRACTS AND NOT ON SOME

23     VAGUE -- CALIFORNIA PUBLIC POLICY DOESN'T TRUMP THE

24     POLICY OF FEDERAL ARBITRATION.  IT WORKS THE OTHER

25     WAY.  THE FEDERAL ARBITRATION ACT TRUMPS GENERAL

                                                      41

1    PUBLIC POLICY UNLESS IT'S THE SORT OF THING THAT

2    WOULD STOP ANY CONTRACT WHATSOEVER.

3              AND GENERAL NOTIONS OF PUBLIC POLICY, IF

4    THAT WERE ENOUGH, THEN THE FEDERAL ARBITRATION ACT

5    IS TRULY ILLUSORY.

6              THANK YOU, YOUR HONOR.

7              MR. RIFKIN:  YOUR HONOR, I HAVE ONLY ONE

8    THING TO SAY BECAUSE I NEED TO CORRECT ANOTHER

9    MISSTATEMENT ON THE PART OF MY ADVERSARY.  THE

10   FEDERAL ARBITRATION ACT DOES NOT SAY WHAT COUNSEL

11   JUST SAID IT SAYS.

12             THE FEDERAL ARBITRATION ACT SAYS THAT

13   CONTRACTS ARE CONTRACTS OR ARBITRATION AGREEMENTS

14   ARE ENFORCEABLE, EXCEPT IF THEY'RE INVALID ON THE

15   GROUNDS THAT WOULD APPLY TO ANY CONTRACT, NOT TO

16   ALL CONTRACTS.

17             IT'S NOT LIKE WE HAVE TO COME UP WITH

18   SOME UNIVERSAL UNENFORCEABILITY STANDARD.  THAT'S

19   THE ARGUMENT THAT AT & T MADE IN ITS REPLY BRIEF.

20   THEY ARE SIMPLY WRONG.

21             THE WORD IN THE FEDERAL ARBITRATION ACT

22   IS ANY, NOT ALL.

23             THE COURT:  ALL RIGHT.  WELL, LET'S --

24   LET ME HAVE UNDER SUBMISSION THIS QUESTION AND I

25   APPRECIATE THAT IF GIVEN MORE TIME HERE YOU WOULD

                                                    42

1    ON ORAL ARGUMENT SAY MORE ABOUT THE MATTERS.

2              SO LET'S GO NOW TO THE MOTION THAT IS

3    MADE BY APPLE TO DISMISS ALL OF THE PLAINTIFFS'

4    CAUSES OF ACTION.

5              NOW, GIVEN THE CONTEXT OF THE LIMITED

6    TIME WE HAVE HERE, I DON'T EXPECT YOU TO GO THROUGH

7    ALL OF THOSE.

8              SO WHAT I WOULD HAVE YOU DO IS TO HAVE

9    YOU TELL ME WHICH OF THE VARIOUS MOTIONS OR ISSUES

10   IN THOSE MOTIONS YOU THINK WOULD BE MOST IMPORTANT

11   FOR THE COURT TO HEAR ORAL ARGUMENT ON AND ADDRESS

12   THOSE MATTERS.

13             MR. WALL:  THANK YOU, YOUR HONOR.  LET ME

14   JUST SAY THAT I -- WHEN WE HAD THE LAST CMC YOUR

15   HONOR HAD DECIDED TO SET THE ARGUMENT ON THESE

16   MOTIONS SPECIALLY SO THAT THERE WOULD BE AMPLE TIME

17   FOR YOU TO HEAR THE ANTITRUST ARGUMENT.

18             I AM A LITTLE BIT CONCERNED THAT WHAT WAS

19   SUPPOSED TO BE A 20 MINUTE ARGUMENT TOOK NEARLY AN

20   HOUR THAT WE'RE GOING TO BE SQUEEZED FOR TIME.

21             THE COURT:  I WON'T SQUEEZE YOU FOR TIME

22   AS LONG AS YOUR ARGUMENT IS PRODUCTIVE.

23             MR. WALL:  OKAY.

24             THE COURT:  MY MAIN CONCERN IS WHAT ISSUE

25   DO YOU WANT ME TO --

                                                    43

1           MR. WALL:  ABSOLUTELY.

2           THE COURT:  SO THE REASON I SPECIALLY SET

3     IT HAS TWO BENEFITS.  ONE, IT MEANS THAT YOU'RE

4     HERE AND THERE ARE NOT OTHER THINGS -- THERE IS ONE

5     OTHER MATTER I HAVE.  BUT BY MOVING IT, IT HAS ALSO

6     BEHIND THE SCENES SHIFTED THE PERIOD OF TIME I

7     WOULD HAVE TO REVIEW IT.  SO THERE IS MORE TIME.

8           MR. WALL:  AND THAT'S HOW MARKETS WORK,

9     WHICH IS A REAL THEME FOR TODAY.

10          LET ME SAY I THINK THE CASE CAN BE

11    DIVIDED INTO THREE PARTS:  THE ANTITRUST PART, THE

12    COMPUTER TRESPASS FRAUD PART, AND THEN THE SORT OF

13    CONSUMER PROTECTION CLRA TYPE OF CLAIMS.

14          COUNSEL STARTED BY SAYING THAT THE HEART

15    OF THE CASE IS THE ANTITRUST CASE SO I THINK THAT'S

16    WHERE I WOULD BEGIN.  IF WE HAVE SOME TIME WE CAN

17    TALK ABOUT THE COMPUTER TRESPASS ISSUES AS WELL.

18          BUT LET'S START WITH THE ANTITRUST AND ON

19    THE ANTITRUST CASE I THINK THE ISSUE IS VERY SIMPLE

20    TO FRAME AND IT IS THIS IS A CHALLENGE TO A

21    DISTRIBUTION STRATEGY, A DISTRIBUTION STRATEGY THAT

22    APPLE HAD AT THE MOMENT IT ENTERED THE CELL PHONE

23    BUSINESS.

24          THE ALLEGATIONS ARE VERY CLEAR THAT APPLE

25    ANNOUNCED IT HAD AN AGREEMENT MAKING AT & T ITS

                                                    44

1    EXCLUSIVE PARTNER FOR IPHONE SERVICE.  IT ANNOUNCED

2    THAT AGREEMENT IN JANUARY OF '07.

3            THAT WAS NEARLY SIX MONTHS BEFORE APPLE

4    ENTERED THE CELL PHONE BUSINESS BY INTRODUCING THE

5    IPHONE IN JANUARY 29TH, 2007.

6            SO WHAT WE HAVE IS AN ENTRY STRATEGY.  WE

7    HAVE A SITUATION WHERE APPLE IN ZERO MARKET SHARE

8    IN ANY CONCEIVABLE MARKET, WE DON'T EVEN NEED TO

9    WORRY ABOUT MARKET DEFINITION, BECAUSE IN ANY

10   CONCEIVABLE MARKET APPLE HAS ZERO MARKET SHARE,

11   DECIDES IT WANTS TO INTRODUCE THIS NEW PRODUCT INTO

12   ONE OF THE MOST VIBRANT COMPETITIVE MARKETS ON THE

13   FACE OF THE EARTH, THE CELL PHONE MARKETS THAT ALL

14   OF US KNOW ITS COMPETITORS IN OUR DAY-TO-DAY LIVES

15   AND IT THINKS THAT THE BEST WAY TO DO THAT IS AN

16   EXCLUSIVE PARTNERSHIP WITH ONE CARRIER AND IT

17   HAPPENED TO HAVE PICKED AT & T.

18           NOW, THE QUESTION BEFORE THE COURT IS

19   THERE ANY VIABLE LEGAL THEORY THAT CAN MAKE THAT

20   ENTRY STRATEGY OF PARTNERING WITH AT & T

21   EXCLUSIVELY AN ACT OF MONOPOLIZATION?

22           AND IT'S MONOPOLIZATION BECAUSE THE ONLY

23   ANTITRUST CLAIMS IN THIS CASE ARE MONOPOLIZATION

24   CLAIMS, SECTION II OF THE SHERMAN ACT CLAIMS.

25           THAT'S A VERY DELIBERATE DECISION BECAUSE

                                                    45

1    YOUR HONOR WILL REMEMBER WHEN THESE CASES WERE

2    FIRST FILED THERE WERE ALL SORTS OF DIFFERENT

3    THEORIES THROWN TOGETHER.

4         WHEN YOUR HONOR APPOINTED LEAD COUNSEL,

5    THEY REVISED THE COMPLAINT.  THEY THOUGHT THROUGH

6    IT.  THEY CAME IN EXCLUSIVELY WITH MONOPOLIZATION

7    CLAIMS.

8         AND THOSE CLAIMS, AS COUNSEL REFERRED TO

9    EARLIER, ARE PREDICATED ON THIS NOTION THAT THERE

10   ARE THESE AFTER-MARKETS FOR IPHONE SERVICE AND

11   IPHONE APPLICATIONS.

12        BUT BEFORE WE GET TO THAT, I THINK I WANT

13   TO START AT FIRST PRINCIPLES AND BE SURE THAT WE'RE

14   ALL CLEAR.  ALL MONOPOLIZATION OFFENSES, ALL OF

15   THEM COMBINE A CONDUCT ELEMENT WITH A MONOPOLY

16   POWER ELEMENT.

17        IF THERE IS NOT EXISTING OR AT LEAST

18   IMMINENT MONOPOLY POWER, IT REALLY DOESN'T MATTER

19   WHAT THE CONDUCT IS BECAUSE THE FUNDAMENTAL BELIEF

20   SYSTEM OF THE MONOPOLIZATION ANALYSIS UNDER THE

21   SHERMAN ACT IS THAT IF A FIRM DOESN'T HAVE MONOPOLY

22   POWER, IT IS SUBJECT TO MARKET DISCIPLINES THAT ARE

23   A BETTER SYSTEM OF REGULATING ITS CONDUCT THAN

24   JUDICIAL INTERVENTION THROUGH ANTITRUST CASES.

25        AND LET ME GIVE YOU AN EXAMPLE BECAUSE I

46

1    SAW A COMMERCIAL ON TELEVISION THIS WEEKEND FOR A

2    NEW PRODUCT CALLED MOTOROLA ROCKER.  IT'S A CELL

3    PHONE FROM MOTOROLA, AND I GUESS THE SECRET SAUCE

4    OF THIS CELL PHONE IS THAT IT HAS A VERY GOOD MUSIC

5    PLAYER ON IT HENCE "THE ROCKER."

6              IT'S AVAILABLE ONLY THROUGH T-MOBILE.  IF

7    YOU WANT TO GET THE ROCKER, YOU HAVE TO SIGN UP FOR

8    T-MOBILE SERVICE.

9              NOW, NOT EVERY CONSUMER IS GOING TO LIKE

10   THAT.

11             THERE ARE GOING TO BE PLENTY CONSUMERS

12   KIND OF LIKE THE PLAINTIFF IN THIS CASE ARE GOING

13   TO BE ABLE TO MIX AND MATCH.  THEY'RE GOING TO WANT

14   THE MOTOROLA ROCKER BUT THEY'RE GOING TO WANT

15   AT & T SERVICE OR THEY'RE GOING TO WANT VERIZON

16   SERVICE.

17             BUT UNDER ANTITRUST THEORY WE ALLOW

18   MOTOROLA TO DISTRIBUTE THE ROCKER IN AN EXCLUSIVE

19   PARTNERSHIP WITH WHOMEVER IT FEELS LIKE BECAUSE THE

20   THEORY IS THAT WITHOUT MONOPOLY POWER, WITHOUT THE

21   POWER TO FORCE CONSUMERS TO TAKE THAT PRODUCT

22   AGAINST THEIR WILL, THE MARKET WILL ADEQUATELY

23   DISCIPLINE.  TO THE EXTENT THAT THAT IS AN

24   ATTRACTIVE PRODUCT COMBINATION, THEY'LL DO WELL.

25             TO THE EXTENT THAT THERE ARE SOME

47

1    CONSUMERS WHO THINK THAT THE COST OF HAVING TO TAKE

2    T-MOBILE SERVICE IS TOO GREAT, THEY'LL LOSE SALES.

3              THE COURT:  NOW, LET ME JUMP IN AT THIS

4    POINT BECAUSE UP TO NOW I THINK I'M IN GENERAL

5    AGREEMENT WITH EVERYTHING THAT YOU HAVE SAID

6    BECAUSE PREMISED IN YOUR ARGUMENT IS THE NOTION

7    THAT THE CONSUMER KNOWS, THE CONSUMER BUYS THE

8    PRODUCT KNOWING OF THE TIE TO AT & T AND MAKES A

9    CHOICE AND COULD MAKE OTHER CHOICES.

10             THE PLAINTIFF'S CONTENTION IS THAT THERE

11   ARE ASPECTS OF THE AT & T AND APPLE CONTRACT WHICH

12   IS UNKNOWABLE BY THE CONSUMER AND THAT MARKET POWER

13   IS CREATED AT THE PURCHASE, AND, THEREFORE, THIS

14   UNKNOWABLE ELEMENT AFFECTS THE CONSUMER AFTER THE

15   PURCHASE HAS TAKEN PLACE.

16             MR. WALL:  RIGHT.

17             THE COURT:  AND IF IT'S UNKNOWABLE, IT

18   GIVES CONTROL OF THE CONSUMER IN A FASHION THAT THE

19   CONSUMER CANNOT CHOOSE NOT TO BE IN BECAUSE THE

20   CONSUMER DOESN'T KNOW ABOUT IT.

21             I'M SAYING THESE THINGS THAT IS VERY

22   COLLOQUIAL, BUT I'M TRYING TO GET TO THE QUESTION

23   OF WHAT ABOUT THAT?

24             MR. WALL:  WELL -- AND THAT IS THE

25   ESSENCE OF THIS CONCEPT OF AN AFTER-MARKET AND THE

                                                    48

1    ESSENCE OF THE KODAK CASE AND SOME OF THE OTHER

2    CASES THAT HAVE TO DO WITH THAT.

3              THE CRITICAL THING ABOUT THAT IS --

4    THERE'S -- IT COULD ABSOLUTELY BE THAT SOME DAY

5    AFTER-MARKETS WILL ARISE FOR AN IPHONE.  IT IS IN

6    THE NATURE OF ALL DURABLE GOODS THAT THERE IS A

7    POSSIBILITY THAT THERE IS AN AFTER-MARKET THAT

8    ARISES SOME DAY.

9              AND SHOULD IT EVER BE THE CASE THAT AN

10   AFTER-MARKET ARISES AND APPLE UNDER THE STANDARDS

11   OF THE SUPREME COURT HAS LAID DOWN IN KODAK COULD

12   BE FOUND TO HAVE IN THAT AFTER-MARKET, THEN FROM

13   THAT POINT FORWARD, APPLE WILL HAVE TO MODIFY ITS

14   CONDUCT AND MODIFY ITS CONDUCT TO BE SURE THAT IT

15   IS CONSISTENT WITH THE RESTRICTIONS THAT THE LAW

16   PLACES ON THE BEHAVIOR OF MONOPOLISTS.

17             JUST AS IT IS THE CASE THAT IF IN A, YOU

18   KNOW, IN A PERFECT WORLD EVERYONE BOUGHT AN IPHONE.

19             THE COURT:  SO IS YOUR ARGUMENT THAT THE

20   CLAIM IS NOT RIPE?

21             MR. WALL:  IT'S NOT -- IN A SENSE THAT'S

22   IT.  I MEAN, THAT'S GETTING TO THE POINT.  THE

23   POINT IS THAT A CLAIM OF AFTER-MARKET

24   MONOPOLIZATION IS PREMATURE.  IT CAN'T -- IT

25   COULDN'T HAVE EXISTED.

                                              49

1          MY POINT IS THAT THEY ARE ATTACKING AN

2     ENTRY STRATEGY.  THIS IS ACTUALLY THE LEMMON CASE.

3     THIS IS THE EASIEST CASE THAT THERE COULD BE

4     BECAUSE THEY'RE TALKING ABOUT THE ACTUAL

5     DISTRIBUTION STRATEGY BY WHICH APPLE ENTERED THE

6     BUSINESS IN WHICH IT MAKES NO SENSE WHATSOEVER TO

7     THINK THAT APPLE COULD HAVE MONOPOLY POWER.

8          AND WHAT THE PLAINTIFF IS ASKING YOUR

9     HONOR TO DO IS SAY, SURE, THEY HAD 0 PERCENT OF THE

10    CELL PHONE MARKET AND, SURE, EVEN AT & T, WHICH HAS

11    BEEN IN BUSINESS FOR A LONG TIME, DOESN'T HAVE

12    ANYTHING CLOSE TO A MONOPOLY SHARE OF THE SERVICE

13    MARKET.  THEY HAVE A MARKET SHARE IN THE TWENTIES

14    OR SOMETHING LIKE THAT.  IT'S NOT EVEN IN THE BALL

15    PARK OF MONOPOLY POWER.

16         SO EVEN THOUGH THERE'S INDISPUTABLY NO

17    MONOPOLY POWER IN THE TWO MOST LOGICAL MARKETS THAT

18    ARE IMPLICATED BY THIS CONDUCT, LOOK AT IT ANOTHER

19    WAY.  THINK ABOUT THE POSSIBILITY THAT AT THE

20    INSTANT OF TIME WHEN SOMEBODY BOUGHT THE IPHONE,

21    THAT THAT'S WHEN THE AFTER-MARKET WAS CREATED.

22         SO THE AFTER-MARKET IS A PRESENT MARKET.

23    RESPECTFULLY THAT'S OVERTHINKING IT.  THAT IS

24    REALLY OVERTHINKING THIS BECAUSE --

25         THE COURT:  WELL, LET'S THINK ABOUT IT.

                                                    50

1    YOUR ARGUMENT IS THAT AS A MATTER OF LAW A

2    PLAINTIFF CANNOT STATE A CLAIM FOR MONOPOLY AND

3    ANTITRUST VIOLATION IF AT THE POINT OF PURCHASE THE

4    CONSUMER IS TOLD THAT YOU HAVE TO BUY THIS SERVICE

5    FOR TWO YEARS?

6             MR. WALL:  RIGHT.

7             THE COURT:  BUT IN REALITY THE CONSUMER

8    MUST BUY THE SERVICE FOR SUBSEQUENT YEARS.  AND

9    THEN UNTIL THE SUBSEQUENT YEARS COME, THAT THERE IS

10   NO EXERCISE OF, OF POWER --

11            MR. WALL:  RIGHT.

12            THE COURT:  -- OVER THE CONSUMER BECAUSE

13   YOU HAVE TO WAIT FOR THAT TO HAPPEN.  YOU CANNOT

14   ALLOW A CLAIM TO BE TRIED IN COURT BASED UPON THE

15   INEVITABILITY OF THE TWO-YEAR PERIOD.

16            TIME IS GOING TO KEEP MOVING INEVITABLY,

17   BUT YOU CANNOT STATE A CLAIM NOW FOR SOMETHING THAT

18   INEVITABLY HAPPENS AT THE END OF THE TWO-YEAR

19   PERIOD.

20            MR. WALL:  INDEED.  AND WHAT THE POINT --

21   AND THAT'S WHY I STARTED WITH FIRST PRINCIPLES AND

22   I GO BACK TO FIRST PRINCIPLES.

23            ALWAYS IN MONOPOLIZATION LAW THE CONDUCT

24   MUST BE MARRIED TO THE MONOPOLY POWER.

25            IT IS NOT EVER ALLOWABLE TO SAY THAT YOU

                                                         51

```
1    DIDN'T HAVE MONOPOLY POWER WHEN YOU DID THAT AND
2    YOU WERE SUBJECT TO MARKET DISCIPLINE WHEN YOU DID
3    THAT, BUT WE'RE GOING TO SAY THAT IT IS ILLEGAL NOW
4    BECAUSE OF WHAT MAY OR MAY NOT HAPPEN IN THE
5    FUTURE.
6              THE COURT:  IT IS NOT A MAY OR MAY NOT.
7    THIS IS CONTRACTUAL.  IT'S TECHNOLOGICALLY BUILT
8    INTO THE PHONE.
9              MR. WALL:  RIGHT.
10             THE COURT:  AND IT IS CONTRACTUALLY BUILT
11   INTO THE RELATIONSHIP THAT THE CONSUMER IS TIED IN
12   A WAY THAT, THAT MAKES AT & T THE ONLY SERVICE THAT
13   THE CONSUMER COULD GO TO.
14             MR. WALL:  ABSOLUTELY.
15             THE COURT:  AT THE END OF THE TWO-YEAR
16   CONTRACT.
17             MR. WALL:  RIGHT.  AND IT'S ON THE BACK
18   OF THE BOX.  IT SAYS RIGHT THERE ON THE BACK OF THE
19   BOX IT SAYS BOTH AT A MINIMUM TWO-YEAR WIRELESS
20   SERVICE PLAN WITH AT & T IS REQUIRED AND THAT A
21   SERVICE PLAN WITH AT & T IS REQUIRED FOR CELLULAR
22   NETWORK CAPABILITIES UNTIL EXPIRATION OF THE
23   INITIAL TWO-YEAR PLAN.  IT'S ALL UPFRONT.
24             IT'S THE DEAL THAT PEOPLE LINED UP TO
25   SIGN UP TO.  THAT'S THE DEAL.
```

52

1          THE COURT:  ALL RIGHT.  WELL, I'LL TAKE

2    YOUR ARGUMENT BECAUSE I'M NOT SURE THAT WAS THE

3    FEATURE, BUT I'LL HAVE TO ASSUME THAT.

4          MR. WALL:  TRUST ME, I REPRESENT APPLE.

5    IT WAS THE PHONE.  THEY WANTED THE PHONE.  NO

6    DISRESPECT.  IT WAS THE PHONE.

7          BUT THE POINT IS THAT, YOU KNOW, THE WAY

8    THIS WORKED, COUNSEL DESCRIBED THE PROCESS HERE,

9    THIS WAS A REAL NICE PAPER WEIGHT UNTIL YOU

10   ACTIVATED IT BY SIGNING IT UP FOR AT & T SERVICE.

11         SO THE FOREMARKET TRANSACTION IN KODAK

12   PARLANCE, YOU HAVE FOREMARKET TRANSACTIONS AND

13   AFTER-MARKET TRANSACTIONS.  THE FOREMARKET

14   TRANSACTION WAS THIS PHONE ACTIVATED WITH AT & T

15   SERVICE.

16         AND WHAT ALL OF THESE CASES SAY IS THAT

17   WHATEVER HAPPENS UPFRONT, WHATEVER HAPPENS AT THAT

18   INITIAL POINT OF PURCHASE, THE ANTITRUST ANALYSIS

19   IS DID YOU HAVE MONOPOLY POWER AT THAT TIME?

20         THE COURT:  WELL, LET'S GO TO KODAK

21   BECAUSE THERE YOU HAD A CIRCUMSTANCE WHERE THE

22   MARKET WAS INDEPENDENT SERVICE PROVIDERS WHO WOULD

23   SERVICE MACHINES AND SERVICE AND GET PARTS FOR

24   MACHINES.

25         BUT I'LL HAVE TO GO BACK TO THE CASE AND

                                                    53

1      LOOK.

2                WASN'T THAT A CONDITION THAT EXISTED AT

3      THE POINT OF PURCHASE THAT KODAK HAD ALREADY BUILT

4      INTO ITS SERVICE AGREEMENT WHICH IT WAS SELLING

5      WITH THE MACHINE?

6                THAT WAS A TYING CASE SO IT WASN'T QUITE

7      THE SAME AS WHAT WE'RE DEALING WITH HERE, BUT

8      WEREN'T THOSE CONDITIONS, HOWEVER, IMPOSED AT THE

9      VERY POINT OF THE BEGINNING?

10               NOW, THAT'S ONE -- THAT'S ONE ASPECT OF

11     WHAT YOUR ARGUMENT IS.  BUT I WANT TO BE CLEAN

12     ABOUT THIS.  YOUR ARGUMENT IS THAT THERE CAN BE NO

13     MONOPOLY POWER EXERCISED AT THE POINT OF PURCHASE.

14               MR. WALL:  AT THE POINT OF ENTRY IS WHAT

15     WE'RE SAYING HERE.

16               THE COURT:  WELL, WHAT DO YOU MEAN

17     "ENTRY?

18               MR. WALL:  WHAT WE'RE SAYING THIS IS NOT

19     AN ATTACK.  THIS IS NOT AN ATTACK ON THE PURCHASE

20     OF THE IPHONE.

21               IT'S ON AN EXCLUSIVITY AGREEMENT WITH

22     AT & T, WHICH THE PLAINTIFFS SAY LIMIT THE SERVICE.

23     AND THIS WAS A PREDECISION BY APPLE AND AT & T AS

24     AN INITIAL DISTRIBUTION STRATEGY.

25               AND, YES, WHAT I'M SAYING IS THAT THERE'S

                                                      54

1    NO ANTITRUST THEORY OF ANY KIND THAT CAN SAY THAT

2    AN ENTRY STRATEGY IS AN ACT OF MONOPOLIZATION ON

3    THE THEORY THAT SOME DAY YOU MIGHT BE ABLE TO,

4    TO -- AND WE DON'T KNOW BECAUSE THE FUTURE IS

5    UNPREDICTABLE BUT SOME DAY YOU MIGHT BE AN

6    AFTER-MARKET ANALYSIS.

7         AND WE QUOTED IN OUR REPLY BRIEF A

8    STATEMENT FROM PROFESSOR HOVENCAMP AND HIS

9    ANTITRUST TREATISE WHICH SAY, OF COURSE, THIS

10   THEORY DOES NOT APPLY TO WHATEVER WAS PURCHASED

11   UPFRONT.

12        I MEAN, THIS IS -- THE PHRASE, YOUR

13   HONOR, AFTER-MARKET, THE FACTUAL PATTERN IN

14   KODAK -- AND BY THE WAY, I LOST THE KODAK CASE SO I

15   CAN TALK YOUR EAR OFF FOR A LONG TIME ABOUT WHAT

16   THAT WAS.

17        THE SUPREME COURT WENT OUT OF ITS WAY IN

18   THAT CASE TO EMPHASIZE THE FACT THAT KODAK HAD

19   ACTUALLY CHANGED ITS AFTER-MARKET POLICIES YEARS

20   AFTER PEOPLE BOUGHT THEIR COPIERS FROM ONE IN WHICH

21   IT FACILITATED INDEPENDENT SERVICE TO ONE IN WHICH

22   IT CUT OFF THE SUPPLY OF PARTS.

23        AND IT WAS A CRITICAL POINT FOR THE COURT

24   BECAUSE IT WAS SAYING, IT DIDN'T MATTER HOW

25   KNOWLEDGEABLE A CONSUMER WAS AT THE BEGINNING.  IT

55

1    WAS IMPOSSIBLE TO KNOW THAT, THAT THEY WERE GOING

2    TO FACE A MONOPOLIZED AFTER-MARKET BECAUSE KODAK

3    DIDN'T DO THAT UNTIL YEARS LATER.

4            HERE YOU HAVE THE OPPOSITE SET OF

5    CIRCUMSTANCES WHERE THIS PRODUCT AND THE NECESSITY

6    THAT IS ON THE BOX TO GET AT & T SERVICE AND TO

7    RENEW THAT CONTRACT WITH AT & T IS COMPLETELY

8    UPFRONT.

9            AND IT'S, IT'S AN ENTRY STRATEGY.  IT

10   TAKES PLACE AT A TIME WHEN -- I THINK OF THIS AS

11   THE REALITY CHECKPOINT.

12           YOU KNOW, SOMETIMES WITH MARKET

13   DEFINITION, WE CAN SORT OF TIE OURSELVES INTO KNOTS

14   ABOUT WHAT IS POSSIBLE BUT THEY -- HOW COULD APPLE

15   UNDER ANY THEORY HAVE BEEN A MONOPOLIST AT THE

16   MOMENT OF ENTRY?  THAT MAKES ABSOLUTELY NO SENSE.

17           WE CAME IN WITH ZERO MARKET SHARE.

18           THE COURT:  IT DEPENDS ON YOUR DEFINITION

19   OF THE MARKET THOUGH, DOESN'T IT?

20           MR. WALL:  THAT'S THE POINT.  THE

21   PLAINTIFFS WANT TO SAY THAT IT DEPENDS ON THE

22   DEFINITION OF THE MARKET.

23           WHAT I'M SAYING IS REALITY CHECK.  HOW IS

24   IT POSSIBLE LOGICALLY?  HOW IS IT POSSIBLE IN

25   NATURE, THAT SOMEBODY AT THE MOMENT OF THEIR FIRST

                                                56

1    ENTRY INTO A CROWDED MARKET HAD MONOPOLY POWER?

2              BECAUSE WHAT THE PLAINTIFF IS PROVIDING

3    IS A SEMANTIC ANSWER.  AND IT'S A SEMANTIC ANSWER

4    WHICH DOESN'T HOLD UP UNDER THE ANALYSIS OF KODAK

5    AND ICON AND THESE OTHER CASES.

6              BUT A SEMANTIC ANSWER SHOULD NEVER WORK

7    UNDER ANY CIRCUMSTANCES.  IT SHOULD NOT BE ALLOWED

8    TO CHANGE THE REALITY THAT A NEW ENTRANT CANNOT BE

9    A MONOPOLIST.

10             THE COURT:  PART OF THE STRENGTH OF YOUR

11   ARGUMENT IS THE POINT YOU JUST MADE, AND I WANT TO

12   HEAR FROM YOUR OPPONENT ON IT IS THAT THIS IS ALL

13   DISCLOSED.

14             LET'S MOVE TO ANOTHER ASPECT OF IT THAT

15   IS NOT DISCLOSED.  WHAT I UNDERSTAND TO BE APPLE'S

16   PRACTICE OF DISABLING THE PHONE, IF THERE IS THIRD

17   PARTY SOFTWARE.

18             MR. WALL:  THAT'S NOT, THAT'S NOT REALLY

19   WHAT APPLE'S PRACTICE IS.

20             THE ALLEGATION IS THAT APPLE RELEASED AN

21   UPDATE TO ITS OPERATING SYSTEM, VERSION 1.1.1.

22             THAT IF A CONSUMER WHO HAD UNLOCKED ITS

23   PHONE THROUGH HACKING SOFTWARE, NOT SOMETHING THAT

24   APPLE PROVIDED BUT SOMETHING THAT THEY DOWNLOADED

25   OFF THE INTERNET.

57

1        IF THEY HAD UNLOCKED THEIR PHONE AND THAT

2   THERE WAS AN INCOMPATIBILITY WITH THE NEW OPERATING

3   SYSTEM.

4        AND WHAT THE PLAINTIFFS ARE CLAIMING IS

5   THAT APPLE RELEASED THAT OPERATING SYSTEM KNOWING

6   THAT IT WOULD NOT BE COMPATIBLE WITH SOME UNLOCKED

7   IPHONES.

8        THE COURT:  NOT ONLY THAT, BUT THAT IT

9   WOULD ACTUALLY UNNECESSARILY DESTROY THE --

10       MR. WALL:  LET ME BE VERY CLEAR ABOUT

11  THIS BECAUSE THERE WAS, THERE WAS A -- I'M

12  CONSTRAINED ON WHAT I COULD SAY IN AGREEMENT WITH

13  COUNSEL.  BUT THERE WAS A DIALOGUE WITH PLAINTIFFS

14  ABOUT WHAT IT WAS THAT THEY WERE ALLEGING AND WHAT

15  THEY WERE NOT ALLEGING.

16       AND THE COMPLAINT WAS REVISED.  THE

17  COMPLAINT BEFORE YOU IS CALLED THE REVISED

18  CONSOLIDATED AMENDED COMPLAINT.  AND IF YOU LOOK AT

19  THE DIFFERENCES BETWEEN THE REVISED CONSOLIDATED

20  AMENDED COMPLAINT AND THE IMMEDIATELY PRECEDING

21  COMPLAINT, YOU WILL SEE THAT THEY DELETED ANY

22  ALLEGATIONS OF A CONSCIOUS OBJECTIVE TO DISABLE

23  IPHONES.

24       WHAT -- ALL THAT THEY ARE SAYING IS THAT

25  WE KNEW THAT THE REVISED OPERATING SYSTEM WOULD BE

58

1    INCOMPATIBLE WITH CERTAIN UNLOCKED IPHONES.

2            NOW, THE IRONY IS THE REASON THAT THEY

3    SAY WE KNEW ABOUT IT IS BECAUSE THERE WAS AN

4    EXPLICIT WARNING ON THE APPLE WEB SITE THAT WHEN

5    YOU WENT TO DOWNLOAD VERSION 1.1.1 AND WE HAVE

6    SCREEN SHOTS IN OUR BRIEFS, THERE'S, FRANKLY, A

7    SCARY LOOKING WARNING THAT SAYS THAT IF YOU HAVE

8    ALTERED YOUR IPHONE, DOWNLOADING THIS SOFTWARE MAY

9    DISABLE IT.

10           THE COURT:  MAY OR WOULD.

11           MR. WALL:  MAY -- BECAUSE I'M TRYING TO

12    STAY WITHIN THE COMPLAINT BUT IF I CAN JUST FOR

13    CONTEXT, THE PROBLEM HERE, WHAT HAPPENED IS THAT

14    ONE OF THE UNLOCKING SOLUTIONS THAT WAS PROPAGATED

15    ON THE INTERNET CORRUPTED A FILE IN THE IPHONE'S

16    FIRMWARE.

17           THE TECHNIQUE OF HOW IT UNLOCKED THE

18    PHONE INVOLVED CORRUPTING A FILE IN THE FIRMWARE.

19           AND THE NEW OPERATING SYSTEM COULDN'T

20    WORK WITH THAT CORRUPTED FILE.

21           THE COURT:  NOW, CAN I JUST TAKE THAT

22    PART OF THE CASE AND SAY LET'S JUST LEAVE THAT FOR

23    LATER BECAUSE I NEED TO KNOW A LOT OF FACTS.  THIS

24    IS A 12(B)(6) MOTION.  WHY SHOULD I BOTHER IN

25    TRYING TO GET RID OF THAT PART OF THE CASE ON THE

59

1    PLEADING?

2              MR. WALL:  I, FRANKLY, THINK, YOUR HONOR,

3    IT IS THE SINGLE EASIEST PART OF THE CASE TO GET

4    RID OF ON THE PLEADINGS BECAUSE OF THE TWO CLAIMS

5    THAT ARE MADE ABOUT IT WHICH ARE COMPUTER TRESPASS,

6    THE COMMON LAW, COMPUTER TRESPASS.

7              THE COURT:  WHY IS THAT SO EASY?

8              MR. WALL:  BECAUSE THERE'S NO AUTHORITY

9    ANYWHERE FOR THE PROPOSITION THAT IT IS A TRESPASS,

10   WHICH IS AN INTENTIONAL TORT THAT IT IS A TRESPASS

11   TO PUT INTO COMMERCE AN OTHERWISE PERFECTLY USEFUL

12   PIECE OF SOFTWARE.  NOBODY CLAIMS THAT VERSION

13   1.1.1 WAS ANYTHING THAN AN ORDINARY PIECE OF

14   SOFTWARE.

15             THE CLAIM IS THAT IT'S A TRESPASS BECAUSE

16   CONSUMERS WHO DOWNLOADED IT AND HAD THEMSELVES

17   MODIFIED THEIR PHONES, COULDN'T USE THE DEVICE ANY

18   LONGER.

19             A TRESPASS IS AN INTENTIONAL TORT WHERE I

20   HAVE GONE TO ANOTHER PERSON'S PROPERTY -- EXCUSE

21   ME -- I GO ONTO ANOTHER PERSON'S PROPERTY AND I DO

22   SOME HARM.

23             THE COURT:  YOU DON'T HAVE TO DO ANY

24   HARM.

25             MR. WALL:  I DON'T HAVE TO DO ANY HARM

                                                    60

1    BUT I HAVE TO --

2            THE COURT:  THE TRESPASS IS THE DAMAGE.

3    IN OTHER WORDS, IT SEEMS TO ME THAT THE REASON THAT

4    I WANTED TO DEFER THIS IS THAT I NEED TO UNDERSTAND

5    BETTER BECAUSE I SAID "UNNECESSARILY DISABLED."

6            IN OTHER WORDS, IF THE ALLEGATION IS THAT

7    IT MIGHT HAVE ACCIDENTALLY DONE IT, THAT MIGHT TAKE

8    A DIFFERENT TACT BUT IT SEEMS TO ME THAT THE

9    TRESPASS IS COMMITTED IF THE 1.1, WHATEVER, UPDATE

10   GOES TO PLACES THAT IT NOT NECESSARILY NEED TO GO

11   AND UPDATES AND DOES THINGS TO THE PHONE THAT

12   DISABLES IT WHEN INDEED IT COULD VERY WELL DO ITS

13   WORK WITHOUT THAT.

14           MR. WALL:  BUT THE POINT IS THAT THE

15   COURTS HAVE BEEN VERY CAREFUL ABOUT EXTENDING THE

16   TRESPASS DOCTRINE TO DAMAGING COMPUTERS.

17           AND THE KEY CASES WHICH ARE THE INTEL

18   VERSUS HAMIDI, H-A-M-I-D-I, AND THE E-BAY VERSUS

19   BITTERS EDGE CASE, THOSE WERE SITUATIONS IN WHICH

20   YOU WERE DEALING WITH SPAMMING AND YOU WERE DEALING

21   WITH THE USE OF BOTS TO GO INTO SOMEBODY ELSE'S

22   COMPUTER.  SO SOMEONE FROM AFAR ENTERED THE

23   PLAINTIFF'S COMPUTER WITHOUT ANY AUTHORIZATION.

24           THE COURT:  YES.

25           MR. WALL:  THIS IS A SITUATION IN WHICH

                                                      61

1    THE PLAINTIFFS CHOSE TO DOWNLOAD A NEW PRODUCT.

2                THE COURT:  FOR A PURPOSE.

3                MR. WALL:  FOR A PURPOSE.  AND WHAT

4    THEY'RE TRYING TO READ INTO THAT IS ESSENTIALLY AN

5    IMPLIED WARRANTY THAT IT WILL WORK WITH ALTERED

6    DEVICES.

7                THE COURT:  YES, BUT, YOU KNOW, THIS IS

8    ELECTRONICS, AND I HATE TO USE THESE TERMS BUT AN

9    INVITEE CAN TRESPASS.

10               MR. WALL:  THERE'S NO QUESTION THAT AN

11   INVITEE CAN TRESPASS.

12               THE COURT:  SO IF I LET YOU IN AND I SAY

13   DON'T GO TO THAT ROOM AND YOU COME IN WITH THE IDEA

14   THAT YOU'RE GOING TO USE MY PROPERTY PERMISSIBLY

15   BUT YOU GO TO A ROOM THAT YOU DON'T NECESSARILY

16   HAVE PERMISSION TO GO TO AND YOU DO SOMETHING THERE

17   THAT IS HARMFUL.

18               AND I AGREE WITH YOU GOING INTO THE ROOM

19   MAY NOT BE ENOUGH, BUT I THINK IT'S A TRESPASS JUST

20   TO GO TO THE ROOM, THEN, PERHAPS, THAT CLAIM IS

21   VIABLE.

22               BUT I THINK I HAVE ENOUGH TO DO WITHOUT

23   WORRYING ABOUT THAT, ALTHOUGH YOU SAY IT'S EASY.

24   IF IT'S SO EASY THEN I'LL WAIT UNTIL LATER TO DO IT

25   AND FOCUS ON THE HARD JOB WHAT YOU'RE GIVING ME

62

1    HAVING TO DO WITH THESE ANTITRUST CLAIMS.

2            MR. WALL:  LOOK, I HAVE DONE THIS LONG

3    ENOUGH TO KNOW HOW TO TAKE A LEAD.

4            HOW CAN I HELP FURTHER ON THE ANTITRUST

5    CLAIM BECAUSE I DO THINK IT'S TRANSFORMATIVE?

6            THE COURT:  I THINK YOU HAVE MADE AN

7    EFFECTIVE ARGUMENT AND YOU CAN USE THE REST OF YOUR

8    TIME COMING BACK.

9            MR. WALL:  THANK YOU.

10            MR. RIFKIN:  THANK YOU AGAIN, YOUR HONOR.

11    I'M WARMED UP.  WE HAVE A DISAGREEMENT WITH APPLE

12    ABOUT THE NATURE OF THE CLAIM AND ABOUT WHAT WE'RE

13    REALLY CHALLENGING AND THE CONDUCT THAT WE THINK

14    VIOLATES THE ANTITRUST LAWS.

15            MY OPPONENT HAS CHARACTERIZED THE

16    COMPLAINT AND IN THEIR REPLY BRIEF THEY

17    CHARACTERIZE THE COMPLAINT AS ONE THAT CHALLENGES

18    APPLE'S ENTRY STRATEGY INTO THE HYPER COMPETITIVE

19    CELL PHONE MARKET.

20            WE DO NO SUCH THING, AND WE HAVE NEVER

21    DONE SUCH THING.  AND THERE WERE OTHER PLAINTIFFS

22    AND PLAINTIFF'S COUNSEL WHO AT A TIME MAYBE THOUGHT

23    ABOUT THAT.

24            OUR POSITION HAS ALWAYS BEEN WAS THAT

25    THERE WAS NOTHING WRONG WITH APPLE'S DECISION TO

                                                    63

1    ENTER THE MARKET THE WAY IT DID AND THERE WAS

2    NOTHING WRONG WITH APPLE TO PROVIDE THEIR IPHONE

3    ONLY TO AT & T BUT THAT WHAT APPLE HAS DONE

4    SECRETLY AND WHAT APPLE HAS DONE SUBSEQUENTLY HAVE

5    BEEN UNLAWFUL EXERCISES OF ACTUAL OR THREATENED

6    MONOPOLY POWER.

7              AND IF I CAN I'D LIKE TO EXPLAIN EXACTLY

8    WHAT I MEAN BY THAT.  APPLE'S ENTRY INTO THE IPHONE

9    MARKET WAS NOT IN A VACUUM.

10             EVERYONE KNOWS THAT THE IPHONE -- I'M

11   SORRY -- THAT THE CELLULAR TELEPHONE MARKET WAS

12   WELL ESTABLISHED BEFORE APPLE BROUGHT IT'S PRODUCT

13   TO MARKET SO APPLE HAD TO CALL IT A REVOLUTIONARY

14   PRODUCT BECAUSE IT COMBINED THE FEATURES OF THE

15   CELL PHONE WITH THE FEATURES OF AN IPOD AND THE

16   FEATURES OF A WEB DEVICE THAT ALLOWED CONSUMERS TO

17   BASICALLY CARRY A PERSONAL COMPUTER IN THEIR

18   POCKETS.

19             AND APPLE, AND I THINK MY OPPONENT GLADLY

20   ACKNOWLEDGES THAT APPLE'S PRODUCT IS PRIMARILY WHAT

21   SELLS THE IPHONE TO PEOPLE BECAUSE IT IS A VERY

22   UNIQUE COMBINATION OF PRODUCTS.

23             BUT THE FEATURE THAT APPLE WANTS THE

24   COURT TO IGNORE IS THAT UNDER THE AT & T AGREEMENT

25   AND UNDER WELL-ESTABLISHED EXISTING PRACTICE IN THE

                                                      64

1    CELLULAR PHONE INDUSTRY, CONSUMERS WHO BUY THE

2    IPHONE OR ANY OTHER CELL PHONE FOR THAT MATTER HAVE

3    A RIGHT TO TERMINATE THEIR SERVICE AGREEMENTS WITH

4    THE EXCLUSIVE PROVIDER AND IN EVERY OTHER CASE,

5    EXCEPT FOR THIS PRODUCT, IN EVERY OTHER CASE,

6    EXCEPT FOR THE IPHONE, CONSUMERS HAVE A RIGHT TO

7    USE THAT PRODUCT THAT THEY BUY.

8              THEY DON'T LEASE IT.  THEY BUY IT.  THEY

9    HAVE A RIGHT TO USE THAT PRODUCT ON ANOTHER

10   CELLULAR PROVIDERS NETWORK.  THERE ARE FOUR,

11   ESSENTIALLY FOUR CELLULAR PROVIDERS IN THE UNITED

12   STATES.  THERE'S AT & T AND T-MOBILE WHO OPERATE

13   SOMETHING CALLED THE GSM SERVICE NETWORK.  AND THEN

14   THERE'S VERIZON AND CINGULAR WHO OPERATE SOMETHING

15   CALLED THE CDMA CELLULAR NETWORK.

16             AND WHILE YOU CAN USE A CDMA PHONE ON A

17   GSM NETWORK, YOU CAN USE A GSM PHONE ON ANY OTHER

18   GSM NETWORKS, INCLUDING GSM NETWORKS IN VIRTUALLY

19   EVERY OTHER COUNTRY IN THE WORLD.

20             THE IPHONE WORKS ON THE GSM NETWORK, AND

21   I MENTIONED THE OTHER PROVIDERS IN THE WORLD

22   BECAUSE IT'S ONE OF THE THINGS THAT APPLE AND AT &

23   T DID NOT TELL CONSUMERS ABOUT, BUT IT IS ONE OF

24   THE THINGS THAT HAS CAUSED SUBSTANTIAL INJURY TO

25   THE PLAINTIFFS ALREADY AND THAT IS WHEN YOU TAKE

                                                    65

1    THIS PHONE IN YOUR SUITCASE, LIKE MOST OF US DO WHO

2    TRAVEL, IF YOU LEAVE IT IN YOUR SUITCASE AND NEVER

3    ANSWER A CALL, THAT PHONE CONSTANTLY COMMUNICATES

4    WITH THE LOCAL CELLULAR NETWORK WHICH IN THE CASE

5    SOME OF OUR CLIENTS WERE OVERSEAS CELLULAR

6    NETWORKS.

7           AND YOU INCUR -- UNWITTINGLY AND

8    UNKNOWINGLY YOU INCUR THOUSANDS OF DOLLARS IN

9    ROAMING CHARGES SIMPLY BECAUSE YOU PACK YOUR PHONE

10   IN YOUR BAG.

11          THIS IS BECAUSE APPLE AND AT & T HAVE

12   AGREED THAT IN ORDER TO ENFORCE THE FIVE-YEAR

13   COMMITMENT THAT APPLE MADE TO AT & T, IN ORDER TO

14   ENFORCE IT, THEY CANNOT LET THE PLAINTIFFS OR ALL

15   OF THE OTHER CONSUMERS WHO BOUGHT IPHONES EXERCISE

16   THE TWO YEAR -- I'M SORRY -- EXERCISE THE

17   TERMINATION RIGHTS THAT AT & T DESCRIBED IN THE

18   SERVICE AGREEMENT AND APPARENTLY BIND THEM TO THREE

19   ADDITIONAL YEARS THAT, THAT NO ONE, NO ONE EVER

20   AGREED TO.

21          AND THE WAY THEY DO THAT IS THEY HAVE

22   REFUSED TO PROVIDE THE UNLOCK CODES FOR SOMETHING

23   CALLED THE SUBSCRIBER IDENTITY MODULE, THE SIMM

24   CARD, WHICH IDENTIFIES THIS PHONE, NOT THIS KIND OF

25   PHONE BUT THIS ACTUAL HANDSET.  IDENTIFIES THIS

66

1  HANDSET TO THE CELLULAR WORLD SO THE CELLULAR WORLD

2  SAYS, OH, GEES, IT'S MARK MAKING A PHONE CALL AND

3  LET ME ROUTE IT THROUGH.  AND IF THEY'RE CALLING

4  MARK, LET ME FIND OUT WHERE MARK IS IN THE WORLD

5  AND LET ME DIRECT THE PHONE CALL TO HIM.  THAT'S

6  WHAT THE SIMM CARD DOES.

7        THE COURT:  BUT THAT'S NOT AN

8  AFTER-MARKET FEATURE.  THAT'S SOMETHING THAT IS A

9  FEATURE OF THE PHONE ITSELF.

10       IN OTHER WORDS, WHAT YOU'RE, WHAT

11  YOU'RE -- I'M JUST TRYING TO CLARIFY THE PROBLEMS.

12  IN OTHER WORDS, WHEN YOU BUY THIS PHONE, IT DOES

13  NOT COME EQUIPPED WITH A FEATURE WHICH ALLOWS YOU

14  TO LOCK ITS SIMM CARD.

15       MR. RIFKIN:  YOU'RE RIGHT, THIS ONE

16  DOESN'T.  THIS ONE DOESN'T.  ALTHOUGH EVERY OTHER

17  ONE YOU CAN BUY THE PHONE AND YOU CAN CALL AT & T,

18  VERIZON, OR T-MOBILE AND SAY, LOOK, I'D LIKE TO

19  TRAVEL TO MEXICO --

20       THE COURT:  BUT DO ALL CELLULAR PHONES

21  HAVE THAT CAPABILITY?  I GUESS I'M GETTING BEYOND

22  MOTIONS TO DISMISS IN THE COMPLAINTS BUT ARE -- ARE

23  ALL PHONES CAPABLE OF HAVING THEIR SIMM CARDS

24  UNLOCKED IN A WAY THAT WOULD ALLOW YOU TO USE

25  ANOTHER NETWORK?

67

1        MR. RIFKIN: CERTAINLY ALL MODERN CELL

2   PHONES. I WON'T SPEAK TO CELL PHONES THAT PEOPLE

3   WERE CARRYING THAT WERE BOUGHT 15 YEARS AGO, BUT

4   ALL CELL PHONES THAT ARE SOLD NOW HAVE THIS

5   FEATURE.

6        AND, IN FACT, I HAVE HEARD MY OPPONENT

7   MENTION MOTOROLA ROCKER AND MY GUESS IS, AND I

8   OBVIOUSLY DON'T WANT TO STRAY OUTSIDE OF THE

9   COMPLAINT BECAUSE OBVIOUSLY WE'RE ON A MOTION TO

10  DISMISS, BUT T-MOBILE WILL PROVIDE UNLOCK CODES FOR

11  THE MOTOROLA ROCKER LIKE IT WILL PROVIDE UNLOCK

12  CODES FOR ALL OF THE OTHER PHONES ON ITS NETWORK.

13       AND WE ALLEGE AND WE BELIEVE IT'S THE

14  CASE THAT AT & T PROVIDES UNLOCK CODES FOR EVERY

15  PHONE IT SELLS, EXCEPT FOR THIS ONE.

16       THE COURT: WELL, WHAT'S WRONG WITH THAT?

17  WHAT IS WRONG WITH -- SO THE CONSUMER IS NOT ABLE

18  TO USE THE PHONE IN EUROPE?

19       MR. RIFKIN: WELL, THE CONSUMER CAN USE

20  THE PHONE IN EUROPE BUT MUST PAY SUPER COMPETITIVE

21  PRICES TO DO SO AND THAT'S WHY WE TALK ABOUT

22  AFTER-MARKETS AND THIS IS WHERE WE HAVE A

23  FUNDAMENTAL DISAGREEMENT BETWEEN --

24       THE COURT: SUPER COMPETITIVE PRICES TO

25  WHOM?

                                                68

1          MR. RIFKIN:  TO AT & T.

2          THE COURT:  IS THAT RIGHT?  IN OTHER

3    WORDS, YOU CAN USE -- YOUR ALLEGATION IS THAT YOU

4    CAN UNLOCK IT, BUT THEY TECHNOLOGICALLY MADE THE

5    LOCK SUCH THAT IT'S ONLY AVAILABLE THROUGH AT & T?

6          MR. RIFKIN:  WELL, YOU CAN UNLOCK IT AND

7    EITHER IT'S ONLY AVAILABLE THROUGH AT & T AND

8    AT & T HAS AGREED WITH APPLE NOT TO GIVE IT OUT OR

9    YOU CAN GO OUT AND YOU CAN OBTAIN THIS SOFTWARE

10   THAT LET'S YOU UNLOCK YOUR SIMM CARD, IN WHICH CASE

11   APPLE'S VERSION 1.1.1 SOFTWARE DESTROYS THE PHONE.

12         JUST TO ILLUSTRATE BECAUSE THIS IS REALLY

13   CRITICAL AND THIS IS REALLY THE HEART OF THE ISSUE.

14         MY BLACKBERRY IS A WORLD EDITION CELL

15   PHONE AND WHEN I BOUGHT IT I HAD TO BUY THIS LITTLE

16   INTERNATIONAL CHIP THAT YOU ACTUALLY STICK IN THE

17   BACK OF THE PHONE AND IT GOES IN THE PHONE AND IT

18   LET'S ME USE IT INTERNATIONALLY.

19         SO WHEN I TRAVEL INTERNATIONALLY

20   OCCASIONALLY WHEN I HAVE TIME TO DO IT, I CALL

21   VERIZON WHO IS MY CARRIER AND I SAY I'M GOING TO BE

22   TRAVELLING TO MEXICO, CAN YOU ARRANGE FOR ME TO

23   HAVE LOCAL SERVICE IN MEXICO THROUGH A LOCAL

24   SERVICE PROVIDER THERE?  AND THEY SAY, YES, OF

25   COURSE, AND THEY DO WHATEVER THEY DO.  WHEN I

                                                    69

1    TRAVEL TO MEXICO, I PAY REGULAR RATES WHEN I USE

2    THE PHONE LIKE LOCAL.

3           IN OTHER WORDS, TO THE CELL PHONE IT

4    DOESN'T MATTER WHETHER THE CELL PHONE CALL

5    ORIGINATES IN MEXICO OR SAN JOSE BECAUSE IT'S A

6    CALL.

7           BUT IN THIS CASE IT'S AN IPHONE, BECAUSE

8    APPLE AND AT & T HAVE AGREED NOT TO LET CONSUMERS

9    DO THAT.

10          WHEN ONE OF OUR PLAINTIFFS TRAVELLED TO

11   MEXICO AND LEFT HIS PHONE IN HIS POCKET, IN THE TWO

12   WEEKS HE WAS THERE, HE INCURRED $2,000 OF ROAMING

13   CHARGES BECAUSE HIS PHONE WAS CONSTANTLY

14   COMMUNICATING WITH THE MEXICAN CELL PHONE NETWORK

15   TO RETRIEVE E-MAIL.  HE NEVER READ THE E-MAIL BUT

16   IT WAS READING E-MAIL ALL OF THE TIME.

17          AND, UM, HE CAME BACK AND HAD A PHONE

18   CALL THAT WAS $2,000.  AND THAT'S BECAUSE APPLE AND

19   AT & T AGREED THAT THE SIMM CODE WOULD NOT BE

20   PROVIDED SO THAT WHEN THE PHONE WAS TAKEN TO

21   ANOTHER COUNTRY, THE PHONE COULD BE REGISTERED ON

22   SOME LOCAL SERVICE THERE WHERE, BY THE WAY, I

23   SHOULD ADD APPLE DOES NOT GET A KICKBACK.

24          THE PLAINTIFFS HAVE ALLEGED THAT THE

25   REASON FOR THIS COMFORTABLE ARRANGEMENT BETWEEN

                                                    70

1    APPLE AND AT & T IS A REVENUE SHARING AGREEMENT

2    BETWEEN APPLE AND AT & T, WHERE AT & T AGREES TO

3    KICKBACK TO APPLE A PERCENTAGE OF THE REVENUE

4    AT & T EARNS ON THE SERVICE FOR THE IPHONE.

5              SO APPLE HAS AN INCENTIVE IN ALLOWING

6    AT & T TO EARN AS MUCH REVENUE AS POSSIBLE ON THE

7    IPHONE BECAUSE APPLE HAS A PIECE OF THAT.

8              THE COURT:  NOW, IS THAT PART OF THE

9    CLAIM THAT THAT REVENUE SHARING NEEDS TO BE

10   DISCLOSED AND IS NOT?

11             MR. RIFKIN:  WELL, I THINK IT'S, NUMBER

12   ONE, IT'S NOT DISCLOSED.

13             BUT, NUMBER TWO, I THINK IT MIGHT HELP

14   THE MOST KNOWLEDGEABLE CONSUMER TO UNDERSTAND WHAT

15   THE NATURE OF THIS TRANSACTION USUALLY IS.

16             THE COURT:  AND BY THE WAY, YOUR FRIEND

17   GOING TO MEXICO, IS THAT A CHARGE THAT WOULD HAVE

18   STILL HAVE BEEN INCURRED IF THE PHONE WERE ON AND

19   OFF?  IT'S IN THE SUITCASE, I PRESUME IT'S ON.

20             MR. RIFKIN:  I BELIEVE THAT'S CORRECT.  I

21   BELIEVE IF THE PHONE IS OFF, IT DOESN'T COMMUNICATE

22   WITH THE NETWORK SO I WOULD HAVE NO WAY OF

23   EXPECTING THAT THE CHARGES WOULD BE INCURRED.

24             BUT I MUST SAY THAT WHEN APPLE TELLS YOU

25   WHAT IT SAYS TO THE CONSUMERS, ONE OF THE THINGS IT

71

U.S. COURT REPORTERS

1    SAYS IS THAT YOU CAN SEND AND RECEIVE E-MAIL,

2    UNLIMITED E-MAIL WITHOUT INCURRING ANY ADDITIONAL

3    CHARGES.

4             THAT'S JUST BLATANTLY MISLEADING BECAUSE

5    IT DOESN'T TELL YOU THAT YOU CAN ONLY DO THAT IN

6    YOUR HOME AREA WHICH FOR MOST PEOPLE IS THE

7    DOMESTIC UNITED STATES.

8             BUT ONCE YOU WALK ACROSS THE BORDER,

9    WHETHER IT'S MEXICO, CANADA, FRANCE OR GERMANY --

10   WELL, NOT FRANCE OR GERMANY BECAUSE NOW THEY

11   REQUIRE APPLE TO PRODUCE UNLOCK CODES FOR THE

12   IPHONE, BUT OTHER COUNTRIES IN EUROPE, YEAH, IF

13   YOU'VE GOT THE PHONE IN YOUR POCKET AND IT'S ON,

14   YOU DON'T HAVE TO SEND A CALL OR RECEIVE A CALL,

15   YOU DON'T HAVE TO SEND AN E-MAIL, YOUR PHONE IS

16   JUST RACKING UP CHARGES FOR AT & T AND WHICH IT

17   SHARES WITH APPLE.

18             THE COURT:  WELL, WHAT BOTHERS ME ABOUT

19   YOUR ARGUMENT IS THAT IT SOUNDS NOW THAT AS THOUGH

20   YOU'RE ARGUING THAT THE FEATURE OF THE AT & T

21   SERVICE PROVIDED COMBINED WITH THE IPHONE IS NOT,

22   PERHAPS, AS GOOD AS YOU CAN GET WITH ANOTHER

23   COMPANY AND WHY DO THAT.

24             AND IF IT'S DISCLOSED, THAT THE FEATURE

25   IS AT & T, AND YOU CAN FIGURE OUT THAT THAT'S NOT

72

1    AS GOOD AS OTHERS.  YOU COULD GO TO SOMEPLACE ELSE.

2              SO WHAT ABOUT IT, THOUGH?  I WAS

3    CONCERNED THAT YOUR ALLEGATION WAS THAT THERE WAS

4    UNKNOWABLE FEATURES.

5              AND SO IS YOUR ARGUMENT THAT IT IS

6    UNKNOWABLE TO A CONSUMER THAT IN THE UNLIKELY -- OR

7    IN THE EVENT THAT THEY TRAVEL TO A FOREIGN COUNTRY,

8    THEY WILL NOT BE ABLE TO USE THE PHONE IN THE SAME

9    WAY AS THEY MIGHT BE ABLE TO USE ANOTHER PHONE?

10             MR. RIFKIN:  WELL, THERE ARE CERTAIN

11   PARTS OF THIS THAT ARE UNKNOWABLE, AND I'LL GO

12   THROUGH SOME OF THEM NOW.

13             FOR EXAMPLE, WHEN YOU BUY THIS PHONE, YOU

14   HAVE NO WAY OF KNOWING THAT APPLE WILL NOT PROVIDE

15   THE UNLOCK CODES FOR THE SIMM CARD.  WE HAVE NO WAY

16   OF KNOWING THAT.  EVERY PHONE IS SOLD ON A NETWORK

17   AND EVERY PHONE HAS A TERMINATION AGREEMENT.

18             THE COURT:  BUT IF YOU ARE CHOOSING AMONG

19   FEATURES OF A PHONE, YOU CAN SAY AS YOU SAY, I WANT

20   A PHONE WITH A CARD THAT IS ALREADY ENABLED SO WHEN

21   I GO I CAN USE IT AND YOU -- A CONSUMER CAN ASK, I

22   WANT, I WANT A PHONE THAT HAS THOSE FEATURES, AND

23   IF YOU'RE TOLD THIS ONE DOESN'T, YOU DON'T BUY THAT

24   PHONE.

25             SO IT IS, IT IS NOT -- IT'S NOT HIDDEN,

                                                            73

1      IS IT?

2                MR. RIFKIN:  IT'S NOT HIDDEN IN THE SENSE

3      THAT WE HAVE NOT ALLEGED THAT ANY OF THE PLAINTIFFS

4      ASKED AND WERE TOLD SOMETHING THAT WAS UNTRUE.

5                IT IS HIDDEN IN THE CASE THAT WE HAVE

6      SAID, WE HAVE ALLEGED THAT APPLE AFFIRMATIVELY SAYS

7      THAT YOU WON'T INCUR ANY EXTRA CHARGES FOR SENDING

8      AND RECEIVING E-MAILS, NO MATTER HOW MANY E-MAILS

9      YOU SEND AND RECEIVE.  THAT STATEMENT WAS SIMPLY

10     UNTRUE.

11               IT WAS NEVER SAID TO CONSUMERS AT ANY

12     POINT IN TIME, UNLESS THEY ASKED FOR IT, AND I

13     FRANKLY DON'T KNOW WHAT HAPPENED WHEN THEY DID ASK

14     FOR IT SO I DON'T WANT TO VENTURE A GUESS.

15               BUT IT WAS NEVER TOLD TO CONSUMERS THAT

16     YOU WOULD NOT BE PROVIDED WITH SIMM UNLOCKS.  IT

17     WAS NEVER TOLD TO CONSUMERS THAT THEY REALLY HAVE

18     NO WAY OF TERMINATING THEIR CONTRACT WITH AT & T

19     EXCEPT TO SIMPLY SWALLOW THE COST OF THE PHONE.

20               ONE OF THE REASONS WHY ALL OF THESE

21     CONTRACTS ARE NOW TERMINABLE IS BECAUSE THERE IS A

22     VIABLE AFTER-MARKET FOR CELLULAR SERVICE, NOT JUST

23     FOR THE IPHONE, BUT FOR MOST PHONES.

24               AND, AND WHEN, WHEN I BUY A PHONE, FOR

25     EXAMPLE, ON THE VERIZON NETWORK, SOME OTHER

                                                        74

1    PROVIDER MAY COME ALONG AND OFFER ME AN INCENTIVE

2    TO JOIN THAT NETWORK, IN WHICH CASE I EXERCISE MY

3    TERMINATION RIGHT UNDER THE VERIZON CONTRACT.  I

4    TAKE MY PHONE TO THE OTHER STORE AND I SAY, "WILL

5    YOU PLEASE ACTIVATE MY PHONE?"  AND THEY DO.

6         BUT IN THE CASE OF THE IPHONE, ALTHOUGH

7    YOU ARE GIVEN A TWO-YEAR CONTRACT WITH THE RIGHT TO

8    TERMINATE IT BEFORE THE END OF THE TWO-YEAR

9    CONTRACT, THAT TERMINATION RIGHT IS ILLUSORY

10   BECAUSE APPLE WILL NOT ALLOW YOU TO TAKE YOUR

11   IPHONE TO T-MOBILE, THE OTHER CDMA CARRIER -- I'M

12   SORRY -- THE OTHER GSM CARRIER, AND IT WILL NOT LET

13   YOU TAKE IT AND ACTIVATE ON THE CARRIER BECAUSE IT

14   REFUSES TO GIVE THE SIMM CODES TO T-MOBILE.  SO

15   T-MOBILE HAS NO WAY OF IDENTIFYING YOUR PHONE ON

16   THE NETWORK AND THAT'S BECAUSE IN THE AGREEMENT

17   BETWEEN APPLE AND AT & T WE SAY AFFECTS THE MARKET

18   FOR CELLULAR TELEPHONE OF VOICE AND DATA SERVICE.

19        THERE'S NO QUESTION THERE'S A ROBUST

20   MARKET FOR PEOPLE TO SWITCH CARRIERS ALL OF THE

21   TIME.

22        I DON'T KNOW ABOUT YOU, BUT MY EXPERIENCE

23   AS A CONSUMER IS I'M INUNDATED FROM COMMERCIALS AND

24   FLYERS FROM OTHER CELLULAR CARRIERS SOLICITING MY

25   BUSINESS.  AND I KNOW I HAVE A RIGHT TO TERMINATE

75

1    MY VERIZON SERVICE AND MAYBE I HAVE TO PAY AN EARLY

2    TERMINATION FEE, BUT, OKAY, I CAN DO THAT.  BUT I

3    CAN'T DO IT HERE BECAUSE APPLE AND AT & T HAVE

4    AGREED THAT THAT WON'T BE ALLOWED.

5         NOW, THERE'S AN ISSUE ABOUT THE DURATION

6    OF THIS AGREEMENT AND THEY POINT TO THE STUFF ON

7    THE BOX.  AND YOU'LL HAVE TO FORGIVE ME, I NEED TO

8    PUT MY GLASSES ON TO READ THIS.

9         BUT IT SAYS IT REQUIRES A SERVICE PLAN

10   WITH AT & T AND WHICH IS AN INITIAL TWO-YEAR

11   AGREEMENT.  NO QUESTION IT SAYS THAT.

12        AND THEN IT SAYS WIRELESS SERVICE IS

13   SOLELY PROVIDED BY AND IS THE RESPONSIBILITY OF

14   AT & T.

15        IT SAYS SERVICE PLAN WITH AT & T REQUIRED

16   FOR CELLULAR NETWORK CAPABILITIES ON EXPIRATION OF

17   THE INITIAL TWO-YEAR AGREEMENT.

18        NOW, YOU DON'T GET THE BOX UNTIL AFTER

19   YOU BUY THE PHONE, BUT LEAVING THAT APART FOR A

20   MINUTE.

21        IF AT & T WERE TO COME INTO THIS COURT OR

22   ANY OTHER COURT ANYWHERE AND TRY TO ENFORCE THE

23   LABEL ON THE BOX OR TRY TO ENFORCE THE NEWSPAPER

24   ARTICLE THAT APPEARED MONTHS BEFORE THESE PHONES

25   WERE EVER SOLD TO CONSUMERS, AS A BINDING CONTRACT

76

1    AGAINST ANYBODY WHO BOUGHT ONE OF THESE THINGS AND

2    TRY TO ENFORCE THAT FOR THE FULL FIVE-YEAR DURATION

3    OF THE AGREEMENT BETWEEN APPLE AND AT & T, I DON'T

4    BELIEVE THERE'S A COURT ANYWHERE WHO WOULD FIND THE

5    LABEL ON THIS BOX, OR THAT NEWSPAPER ARTICLE, TO

6    CONSTITUTE A BINDING CONTRACT BETWEEN THE CONSUMER

7    AND AT & T FOR FIVE YEARS, ESPECIALLY WHEN THE

8    CONTRACT ITSELF THAT THE CONSUMER HAS TO ACCEPT IS

9    ONLY A TWO-YEAR CONTRACT, DOESN'T SAY FIVE YEARS

10   ANYWHERE IN IT.

11          THE COURT:  WELL, THERE ARE PHONES THAT

12   YOU BUY WHICH HAVE LIMITED LIFE AND AFTER THAT THE

13   PHONE IS NO GOOD.  YOU HAVE TO DO SOMETHING ELSE

14   WITH IT.

15          MR. RIFKIN:  BUT IT'S NOT A $500 OR $600

16   CELL PHONE.

17          THE COURT:  WELL, I'M NOT SURE THAT PRICE

18   IS THE DETERMINATIVE FACTOR, BUT WHAT I HEAR YOU

19   ARGUING AT THIS POINT IS THAT THIS IS AN INSTRUMENT

20   WHICH HAS A LIMITED LIFE.

21          DOES IT HAVE TO AMOUNT TO CONTRACTUAL

22   PROVISIONS FOR IT TO OVERCOME YOUR -- THE --

23   OVERCOME THE OBJECTION THAT YOU HAVEN'T ALLEGED,

24   THE ANTITRUST ISSUE?

25          MR. RIFKIN:  YES, I THINK IT DOES AND LET

77

1    ME TURN TO THAT NOW.

2                YOUR HONOR, THIS CONCEPT OF AFTER-MARKET

3    AND ANTITRUST CLAIMS ARISES BECAUSE OF THE SUPREME

4    COURT'S DECISION IN THE KODAK CASE, WHICH OBVIOUSLY

5    YOU'RE AWARE OF.  IT HAS BEEN THE SUBJECT OF

6    EXTENSIVE BRIEFING.

7                THERE ARE THREE LEGAL PRINCIPLES FROM THE

8    KODAK CASE WHICH WE THINK ARE RELEVANT HERE.  FIRST

9    THE SUPREME COURT HELD THAT AN ANTITRUST CLAIM CAN

10   BE BASED ON THE UNLAWFUL MONOPOLIZATION OF AN

11   AFTER-MARKET, EVEN WHERE THE PLAINTIFF DOES NOT

12   ALLEGE THAT THE DEFENDANT HAS OR EXERCISES MONOPOLY

13   POWER OVER THE PRIMARY MARKET.

14               THAT ANSWERS THE MISCHARACTERIZATION OF

15   THE COMPLAINT WHICH APPLE HAS MADE WHICH SAYS THAT

16   WE HAVE CHALLENGED THEIR ENTRY STRATEGY.

17   RESPECTFULLY WE HAVE NOT AND WE NEVER HAVE AND

18   NEVER WILL.

19               WE CAN READ KODAK AS WELL AS ANYBODY ELSE

20   HAS READ KODAK AND WE BROUGHT AFTER-MARKET CLAIMS

21   FOR A REASON.  IF WE WERE BRINGING PRIMARY MARKET

22   CLAIMS, WE WOULDN'T HAVE CALLED THEM AFTER-MARKET

23   CLAIMS.

24               THE NEXT PRINCIPLE THAT ARISES FROM THE

25   KODAK CASE IS THAT THE LAW PERMITS AN ANTITRUST

78

1    CLAIMANT TO DEFINE A RELEVANT MARKET IN TERMS OF A

2    SINGLE PRODUCT OR BRAND OF PRODUCT.

3           THAT'S WHAT WE HAVE DONE HERE.  WE HAVE

4    DEFINED THIS MARKET, THIS AFTER-MARKET, THIS

5    RELEVANT AFTER-MARKET AS THE MARKET FOR IPHONE

6    VOICE AND DATA SERVICE OR IPHONE THIRD PARTY

7    APPLICATIONS.

8           IN ADDITION, THE THIRD RELEVANT PRINCIPLE

9    AND I THINK THE MOST DIRECTLY RELEVANT ONE IS THAT

10   IN THE ABSENCE OF A CONTRACTUAL COMMITMENT ON THE

11   PART OF THE PLAINTIFF, THE CONSUMER WITH KNOWLEDGE

12   THAT THEY WERE AGREEING TO SUCH A COMMITMENT, THE

13   AFTER-MARKET CLAIM IS A VIABLE CLAIM.  THERE ARE A

14   SERIES OF THREE CASES THAT WE HAVE TRIED TO

15   UNDERSTAND IN CONTEXT IN THIS SETTING.

16          ONE OF THOSE CASES IS KODAK AND THE OTHER

17   TWO ARE THE CASES THAT WE CALL THE QUEEN CITY PIZZA

18   CASE, THAT'S THE DOMINOS PIZZA CASE.  AND THE OTHER

19   IS FORESIGHT VERSUS HUMANA, AND THAT'S THE HUMANA

20   INSURANCE CASE.

21          AND WE HAVE THE BENEFIT OF THE NINTH

22   CIRCUIT'S DECISION IN UCAL VERSUS ICON EXPLAINING

23   EXACTLY HOW TO DISTINGUISH THOSE THREE CASES AND

24   HOW THE SUPREME COURT COULD FIND A VIABLE -- HOW

25   THEY COULD FIND A VIABLE AFTER-MARKET ANTITRUST

79

1    CLAIM IN THE KODAK CASE BUT HOW THERE WAS NOT AN

2    ANTITRUST AFTER-MARKET IN THE QUEEN CITY AND

3    HUMANA.

4            AND THE DISTINCTION THE NINTH CIRCUIT

5    POINTS TO IS THAT IN THE OTHER TWO CASES PLAINTIFFS

6    AGREE RIGHT UP-FRONT TO THE EXCLUSIVITY THAT WAS

7    DEMANDED OF THEM BY DOMINOS PIZZA.

8            IN THAT CASE IT WAS FRANCHISEES HAD TO

9    BUY ALL OF THEIR PIZZA MAKING SUPPLIES FROM DOMINOS

10   AND IN THE CASE OF HUMANA IT WAS THAT YOU HAD TO

11   USE A HUMANA APPROVED HOSPITAL IF YOU WERE GOING TO

12   GET THE BENEFIT OF YOUR INSURANCE COVERAGE.

13           THERE MUST BE A CONTRACTUAL COMMITMENT

14   ENTERED INTO BY A CONSUMER WHO KNOWS THAT THEY WERE

15   AGREEING TO SUCH A COMMITMENT BEFORE WE ARE REMOVED

16   FROM THE KODAK AFTER-MARKET CLAIM AND THAT'S WHY WE

17   SAY THIS, THIS LABEL ON THE BOX, OR THAT, THAT

18   NEWSPAPER ARTICLE, ARE NOT ANYWHERE NEAR A

19   CONTRACTUAL COMMITMENT ON THE PART OF THE CONSUMERS

20   TO USE AT & T AND AT & T ONLY TO GIVE UP THEIR

21   RIGHT TO TERMINATE THE CONTRACTS NOT TO ACCEPT

22   UNLOCKING THE SIMM CARDS TO USE THEM WHEN THEY'RE

23   TRAVELLING OR TO USE THEM HERE IN THE UNITED

24   STATES, NOT TO USE A SINGLE THIRD PARTY APPLICATION

25   THAT DOES NOT PROVIDE A REVENUE STREAM TO APPLE.

1          ALL OF THOSE THINGS ARE NOT CONTRACTUAL

2    COMMITMENTS ON THE PART OF THE PURCHASERS OF

3    IPHONES THE WAY WE CAN THINK OF THE DOMINOS

4    FRANCHISEE OF AGREEING, YES, IF I'M GOING TO BE A

5    DOMINOS FRANCHISEE AND OPERATE UNDER THE DOMINOS

6    LABEL.  I'M GOING TO BUY MY SUPPLIES FROM DOMINOS.

7          YES, IF I'M GOING TO HAVE A HUMANA

8    INSURANCE COMPANY, I UNDERSTAND AND AGREE THAT I

9    ONLY WILL HAVE THE BENEFIT OF THAT INSURANCE

10   COVERAGE IF I USE HOSPITALS THAT ARE DESIGNATED BY

11   HUMANA.

12          THE COURT:  SO YOU DON'T MAKE THAT

13   ARGUMENT WITH RESPECT TO THE FIRST TWO YEARS?

14          MR. RIFKIN:  NO, I DO.  I DO.  AND THAT'S

15   BECAUSE OF THE EARLY TERMINATION RIGHT.  AND IT'S

16   IMPORTANT TO UNDERSTAND THAT, AND I'M GLAD YOU

17   ASKED THAT QUESTION.

18          THERE'S NO QUESTION THAT AFTER THE

19   TWO YEARS EXPIRES, NO CONSUMER EVER AGREED TO ANY

20   THREE-YEAR EXTENSION.  IT'S JUST NOT HERE.

21          AND BUT EVEN WITH RESPECT TO THAT FIRST

22   TWO-YEAR DURATION, I WANT THE COURT TO UNDERSTAND

23   THAT WE HAVE ALLEGED THAT THE CONTRACT BETWEEN

24   AT & T AND THE CONSUMER GIVES THE CONSUMER THE

25   RIGHT TO TERMINATE.

81

1          THAT RIGHT EXISTS BECAUSE THESE CELLULAR

2     PHONES ARE USUALLY AND IN EVERY OTHER CASE EXCEPT

3     THE IPHONE, THEY ARE USUALLY PORTABLE FROM ONE

4     CELLULAR SERVICE TO ANOTHER.

5          AND THE ONLY REASON THAT THEY'RE NOT

6     PORTABLE HERE, THE PLAINTIFFS ALLEGE, IS BECAUSE

7     APPLE AND AT & T AGREED THAT THEY WOULD NOT PROVIDE

8     THE UNLOCK CODES WITH THE SIMM CARDS TO THE

9     CONSUMERS WHO THEY, THEREFORE, LOSE THE RIGHT TO

10    EXERCISE THEIR EARLY TERMINATION.

11         THE COURT:  WHERE IS THAT AGREEMENT?  IS

12    THAT --

13         MR. RIFKIN:  WHICH AGREEMENT?

14         THE COURT:  THE AGREEMENT TO NOT PROVIDE

15    THE UNLOCK CODE.

16         MR. RIFKIN:  THAT'S AN EXCLUSIVE

17    AGREEMENT BETWEEN AT & T AND APPLE.

18         THE COURT:  SO WHAT HAPPENS AT THE END OF

19    THAT FIVE YEARS?  IS THAT AGREEMENT STILL ENFORCE

20    AND EFFECT?

21         MR. RIFKIN:  WE HAVE NO IDEA.  REMEMBER,

22    WE'RE ONLY A LITTLE MORE THAN A YEAR OUT.

23         THE COURT:  WELL, BUT IF THE FIVE-YEAR

24    CONTRACT IS THE ONLY SOURCE OF THE RESTRICTION, AND

25    AT THE END OF THE FIVE YEARS, WE DON'T KNOW, AND,

                                                    82

```
 1    AND CONSUMERS ARE TOLD YOU ARE LOCKED IN TO AT & T

 2    FOR TWO YEARS AND IN THE RENEWAL YOU'RE LOCKED INTO

 3    AT & T, IT SOUNDS TO ME LIKE A GOOD ARGUMENT CAN BE

 4    MADE THAT THE ENTIRE FIVE YEARS IS COVERED.  I

 5    DON'T -- I'M NOT -- I'M JUST TRYING TO LAY THE

 6    ARGUMENT OUT.  I HAVEN'T THOUGHT ENOUGH ABOUT IT

 7    BUT WHY WOULDN'T THE NOTICE THAT YOU'RE LOCKED INTO

 8    THIS PROVIDER FOR TWO YEARS AND THEREAFTER BE

 9    ENOUGH TO SAY TO A CONSUMER, IF I WANT TO -- IF YOU

10    DON'T WANT TO BE LOCKED IN, BUY A DIFFERENT PHONE?

11            MR. RIFKIN:  WELL, AGAIN, FOR TWO

12    REASONS.  I THINK THE NUCAL VERSUS ICON CASE THE

13    NINTH CIRCUIT HAS MADE CLEAR THAT UNLESS THE NOTICE

14    TO A CONSUMER IS SUCH THAT THE COURT CAN INFER A

15    CONTRACTUAL COMMITMENT, WE DON'T GET OUT OF THE

16    KODAK AFTER-MARKET THEORY, THERE IS NO WAY THAT

17    THIS IS THE EQUIVALENT OF A CONTRACTUAL EQUIVALENT,

18    THAT'S NUMBER ONE.

19            NUMBER TWO, IF YOU WERE TO SAY THAT AT

20    LEAST THEY HAVE BEEN TOLD THAT THEY WERE BOUND FOR

21    TWO YEARS, THEY REALLY HAVEN'T BEEN TOLD THAT THEY

22    WERE BOUND FOR TWO YEARS.  THEY HAVE BEEN TOLD THAT

23    THEY HAVE A TWO-YEAR CONTRACT, WHICH THEY CAN

24    TERMINATE AT ANY TIME.

25            AND IT TURNS OUT THAT THAT IS REALLY
```

                                                    83

1       ILLUSORY BECAUSE IF THEY TERMINATE IT --

2                   THE COURT:  I UNDERSTAND YOUR ARGUMENT ON

3       THAT.

4                   MR. RIFKIN:  YOUR HONOR, I'M HAPPY TO

5       ADDRESS THE OTHER CLAIMS.  I WILL JUST SAY ONE

6       THING BRIEFLY ABOUT THE CONSUMER TRESPASS CLAIM.  I

7       THINK I GET THE SENSE OF THE COURT'S APPROACH TO

8       THAT, AND I THINK WE PROBABLY DON'T NEED TO ADD

9       MUCH TO IT, BUT WE DO BELIEVE THAT APPLE DID WHAT

10      IT DID WHEN IT RELEASED VERSION 1.1.1 KNOWING THAT

11      IT WAS GOING TO CREATE THIS HARM AND WE FULLY

12      EXPECT TO BE ABLE TO --

13                  THE COURT:  WHAT I'D HAVE YOU ADDRESS IS

14      TO WHETHER THERE IS ANY SIGNIFICANCE TO THE

15      REVISION.

16                  MR. RIFKIN:  I'M SORRY, TO THE?

17                  THE COURT:  THE ARGUMENT WAS MADE THAT

18      YOU REVISED YOUR COMPLAINT AND IN THE REVISION

19      SOMETHING WAS TAKEN AWAY FROM THE INTENTION THAT IT

20      WAS DONE DELIBERATELY.

21                  MR. RIFKIN:  YES, WE HAVE -- WE HAD A

22      DISAGREEMENT WITH APPLE ABOUT ONE PARTICULAR ISSUE

23      AND THAT WAS DID APPLE SIT DOWN AND WRITE THE CODE

24      WITH THE EXPRESSED PURPOSE IN MIND OF DESTROYING

25      PHONES?

                                                          84

1           WE DON'T KNOW THAT TO BE A FACT.  AND

2    WHEN WE ALLEGE THAT, ALTHOUGH WE BELIEVE THAT TO BE

3    THE CASE BECAUSE OF EVERYTHING ELSE THAT HAPPENED

4    AROUND IT, APPLE SAID THAT WE DON'T WANT THAT

5    ALLEGATION TO BE PURSUED IN THE COMPLAINT.

6           AND WE SAID, FINE, WE DON'T THINK THAT WE

7    NEED TO ALLEGE, OR ACTUALLY SOMEBODY SAT DOWN AT

8    THE COMPUTER AND SAID, AH-HA-HA-HA, LET ME SEE HOW

9    I CAN DESTROY THESE PHONES.

10          AND WE HAVE ALLEGED AND THERE'S NO

11   DISPUTE WITH THAT, WE HAVE ALLEGED THAT WHEN APPLE

12   RELEASED 1.1.1.1, IT KNEW THAT IT WOULD DESTROY

13   PHONES THAT WOULD HAD BEEN MODIFIED.

14          NOW, COUNSEL SAID IT WAS A SINGLE PHONE

15   THAT HAD SOME INCOMPATIBILITY ISSUE AND IT'S NOT.

16          AND WE HAVE ALLEGED PLAINLY IN THE

17   COMPLAINT THAT ACCORDING TO APPLE, THIS IS NOT US,

18   BUT ACCORDING TO APPLE A LARGE NUMBER OF MODIFIED

19   PHONES OR UNLOCKED PHONES OR PHONES THAT HAD THIRD

20   PARTY APPLICATIONS WERE GOING TO BE AFFECTED BY

21   VERSION 1.1.1 AND WERE AFFECTED BY 1.1.1, THE

22   CONTENTION, THE DISPUTE BETWEEN US, WHICH WE AGREED

23   TO PUT OFF TO ANOTHER DAY IS WHETHER THE PROGRAMMER

24   SAT DOWN WITH THE SPECIFIC INTENTION OF WRITING THE

25   LINE OF CODE THAT DID THAT OR NOT.

                                                    85

1            WE DON'T THINK THAT'S NECESSARY.

2            THE COURT:  BUT WHAT I HAD TAKEN FROM

3    YOUR COMPLAINT, AND PERHAPS WRONGLY, BECAUSE I

4    DIDN'T UNDERSTAND THIS REVISION, WAS THAT THAT WAS

5    UNNECESSARY, THAT 1.1.1 COULD HAVE BEEN WRITTEN TO

6    DO THE WORK THAT IT DID, WITHOUT NECESSARILY

7    DESTROYING THE FUNCTIONALITY OF THE PHONE.

8            MR. RIFKIN:  THAT IS CORRECT, YOU HAVE

9    CORRECTLY --

10           THE COURT:  THAT IS STILL YOUR

11   CONTENTION.

12           MR. RIFKIN:  THAT IS OUR CONTENTION.

13           THE COURT:  SO ALTHOUGH YOU DON'T KNOW

14   WHETHER IT WAS DONE DELIBERATELY, IT WAS DONE

15   KNOWINGLY.

16           MR. RIFKIN:  THAT IS CORRECT.  WE DON'T

17   KNOW WHETHER THE PROGRAMMER HAD A SPECIFIC

18   INTENTION IN MIND.  WE DON'T THINK IT MATTERS.

19   THERE'S NO DISPUTE, AND WE HAVE ALLEGED, AND

20   FRANKLY APPLE HAS ANNOUNCED THAT IT KNEW WHEN IT

21   RELEASED VERSION 1.1.1 THAT IT WAS GOING TO DESTROY

22   PHONES.

23           STEVE JOBS REFERRED TO IT AS A CAT AND

24   MOUSE GAME.  AND HE SAID WE PLAY A CAT AND MOUSE

25   GAME.  AND HE KNEW WHAT THEY WERE DOING.

86

1        WE ARE CONFIDENT THAT WE'RE GOING TO BE

2   ABLE TO PROVE THAT TECHNOLOGICALLY THEY CAN DO THIS

3   BECAUSE THEY'VE CHANGED THE WAY THEY'RE DOING IT

4   NOW.  BUT AT LEAST WHEN THEY RELEASED VERSION 1.1.1

5   THAT'S WHAT THEY SET OUT THE FIVE-YEAR AGREEMENT

6   THAT BOUND CONSUMERS TO AT & T FOR FIVE YEARS.

7        IF YOU TRY TO EXERCISE THE RIGHTS OF THE

8   REGISTER OF COPYRIGHTS IN THE LIBRARY OF CONGRESS

9   THAT YOU HAVE, IF YOU TRY TO EXERCISE THE RIGHTS

10  THAT EVERY OTHER CELL PHONE CARRIER GIVES TO EVERY

11  OTHER CELL PHONE OWNER, WE'RE GOING TO DESTROY YOUR

12  PHONES.  AND WE THINK THAT'S A PRETTY HARSH ACTION.

13       THE COURT:  VERY WELL.  LET ME GO BACK TO

14  MR. WALL AND YOU HAD TIME LEFT ON YOUR CLOCK AND SO

15  I'LL HAVE YOU REPLY.

16       MR. WALL:  THANK YOU, YOUR HONOR.  I

17  SUPPOSE IT WOULD PROBABLY BE OUT OF SCHOOL IF I

18  JUST ASKED PROFESSOR SANDOVAL TO COMMENT AT THIS

19  POINT.

20       THE COURT:  I THINK YOUR EARS WILL BE

21  BURNING IN CLASS THOUGH.

22       MR. WALL:  I'VE HAD THE PLEASURE OF

23  TEACHING THAT CLASS AT SANTA CLARA AND I'M A 1980

24  GRAD.  SO GO BRONCOS.

25       LOOK, IT'S VERY CLEAR THAT THEY HATE OUR

                                                    87

1    BUSINESS MOTTO.  THEY REALLY DON'T LIKE THE FACT

2    THAT WE SIGNED AN EXCLUSIVE AGREEMENT WITH AT & T.

3              THEY OBVIOUSLY HAVE THIS STRONG POLITICAL

4    PHILOSOPHY THAT PEOPLE SHOULD BE UNABLE TO LOCK

5    THEIR PHONES AND MOVE WHEREVER THEY WANT NONE OF

6    THAT IS AN ANTITRUST ARGUMENT AND IT'S CERTAINLY

7    NOT A MONOPOLIZATION ARGUMENT.

8              I THINK WE HAVE TO GO BACK TO FIRST

9    PRINCIPLES HERE.  THEY ARE DEAD.  THEY HAVE NO CASE

10   AT ALL UNLESS THEY SAY THAT THE APPLE, AT & T

11   AGREEMENT IN THIS EXCLUSIVE DISTRIBUTION STRATEGY

12   IS AN ACT OF MONOPOLIZATION, THAT IT IS -- IT WAS

13   AN ABUSE OF MONOPOLY POWER THAT WE MONOPOLIZED AT

14   THAT POINT IN TIME.

15             MOTOROLA WITH ITS ROCKER IS OUT THERE

16   DOING THE SAME THING AND WILL BEAR THE

17   CONSEQUENCES.

18             APPLE PUT THIS OUT.  WE DO SHOW SOME OF

19   THE PUBLICITY THAT SURROUNDED THIS BECAUSE IT HAD

20   BEEN IN A NUMBER OF OTHER COMPLAINTS.

21             PEOPLE IDENTIFY IT AS A NEGATIVE ABOUT

22   IPHONE THAT IT WAS ONLY GOING TO BE AVAILABLE FROM,

23   FROM ONE CARRIER.  THEY ALSO IDENTIFIED AS A

24   NEGATIVE THAT IT WOULD ONLY BE AVAILABLE ON THE GS

25   NETWORK, WHICH SOME PEOPLE DON'T LIKE AS MUCH AS

88

1    THEY LIKE THE CDMA NETWORK.

2             WHATEVER.  THIS IS NOT AN ANTITRUST

3    ARGUMENT BECAUSE IF EVERYTHING WE SAID ABOUT THE

4    IPHONE WAS FALSE, MISLEADING, BLATANT LIES, CALL IT

5    WHAT YOU WILL, THAT DOESN'T LOGICALLY OR LEGALLY

6    INFER THAT WE WERE A MONOPOLIST.

7             WE MAY HAVE BEEN A, WE THINK, WE ARE, A

8    VERY ABOVE BOARD HONEST COMPANY WITHOUT MONOPOLY

9    POWER BUT MAYBE THEY THINK OTHERWISE.

10            ON NECESSITY, EXTENT OF DISCLOSURE, THESE

11   KINDS OF CONSUMER PROTECTION THEMES HAVE NO LOGICAL

12   OR LEGAL RELEVANCE TO THE QUESTION OF WHETHER WE

13   WERE A MONOPOLIST WHEN THIS STRATEGY WAS

14   UNDERTAKEN.

15            AND THAT'S THE, THAT'S THE OVERARCHING

16   FUNDAMENTAL DISCONNECT BETWEEN THEIR CASE.

17            NOW, IT TURNS SO MUCH UPON A READING OF

18   KODAK AND ICON THAT I'D LIKE TO USE THE REST OF MY

19   TIME TO JUST SORT OF TALK ABOUT THOSE TWO CASES

20   AND, AND THEN I'LL SUBMIT IT.

21            THE THING ABOUT KODAK IS THAT IT'S JUST

22   WRONG TO SAY THAT KODAK WAS FOUND TO HAVE MONOPOLY

23   POWER BECAUSE OF THE INADEQUACY OF ITS DISCLOSURES

24   OR BECAUSE CONSUMERS DIDN'T KNOW.

25            WHAT HAPPENED IS THAT THE SUPREME COURT

                                                    89

1    REJECTED A DEFENSE, FRANKLY, I PRESSED FORWARD

2    PERSONALLY THAT A DEFENSE TO A CLAIM OF MONOPOLY

3    POWER WHICH IS THAT THE 90 PERCENT SHARE THAT WE

4    HAD OF THE SERVICE MARKET AND THE 90 PERCENT SHARE

5    THAT WE HAD OF THE PARTS MARKET, AND THE EVIDENCE

6    THAT THE PLAINTIFF SAID THAT, THAT WE HAD RAISED

7    PRICES AND WE HAD EXCLUDED COMPETITION WAS ALL

8    LEGALLY IRRELEVANT BECAUSE WE DID NOT HAVE MARKET

9    POWER IN THE FOREMARKET, IN THE EQUIPMENT MARKET.

10           AND THE SUPREME COURT IN UNPACKING THAT

11   ARGUMENT, FOCUSSED ON TWO THINGS.

12           IT SAID, WELL, IN AN AFTER-MARKET WHAT

13   CAN GO WRONG IS THAT IT'S A TWO-STAGE GAME.  AND AT

14   ONE STAGE YOU BUY A COPIER AND A COPIER COSTS

15   $50,000 AND IT'S LIKE THE OLD ADAGE WHEN YOU DRIVE

16   THE CAR OFF THE LOT IT'S NOT WORTH WHAT YOU JUST

17   PAID FOR IT.  IT DEPRECIATES AND YOU HAVE STRANDED

18   INVESTMENT IN THAT COPIER.

19           AND SO THE SUPREME COURT IS SAYING WITH

20   THOSE SWITCHING COSTS, YOU'RE NOT GOING TO --

21   YOU'RE NOT GOING TO ABANDON A $50,000 COPIER

22   BECAUSE KODAK CHARGES AN EXTRA $10 FOR A

23   REPLACEMENT PART EVEN IF THAT'S AN UNFAIR PRICE,

24   JUST NO SANE PERSON WOULD DO THAT.

25           SWITCHING COSTS COULD CREATE AN

                                                      90

1    AFTER-MARKET IN A SECOND PERIOD.

2              OUR ANSWER TO THAT WAS, BUT, WAIT, YOU

3    CAN ANTICIPATE THAT.  YOU CAN THINK THAT, THAT --

4    YOU CAN KNOW THROUGH EXPERIENCE AND OTHERWISE THAT

5    YOU ARE VULNERABLE TO EXPLOITATION THREE YEARS DOWN

6    THE LINE AND SO YOU CAN PROTECT YOURSELF.

7              SO THE SUPREME COURT SAID ONLY IF YOU'RE

8    ADEQUATELY INFORMED.

9              THE NET OF THAT WAS WE'RE BACK TO THE 90

10   PERCENT MARKET SHARE AND THE EVIDENCE OF RAISED

11   PRICES AND EXCLUDED COMPETITION.  THE CLASSIC

12   INDICATORS OF MONOPOLY POWER.

13             IT HAS NOTHING TO DO WITH A PRINCIPLE

14   THAT SAYS THAT NONDISCLOSURE ALONE CAN INFER OR

15   IMPLY MONOPOLY POWER.  THAT'S A NON SEQUITUR.

16             JUST THINK ABOUT IT.  I'M IN THE LEGAL

17   SERVICES MARKET.  AND I AM PITCHING FOR A PIECE OF

18   BUSINESS, AND I GO TO APPLE AND I GIVE THEM MY

19   EXPERIENCE AND I SAY SO HONESTLY AND FORTHRIGHTLY

20   AND I SAY THAT I WILL COMMIT MY TIME TO THIS CASE

21   AND I MEAN IT, AND I LIVE UP TO THAT OBLIGATION.

22             NOW, THE SAME FACTS EXCEPT THAT I'M

23   REALLY BUSY AND I HAVE NO INTENTION OF WORKING ON

24   THIS CASE, AND I'M GOING TO PUSH IT DOWN TO SOME

25   YOUNG ASSOCIATE.

                                                 91

1          NOW, THAT'S NOT VERY GOOD.  THAT IS MAYBE

2     DECEITFUL BUT DOES THAT MAKE ME A MONOPOLIST?  DOES

3     THAT GIVE ME MARKET POWER IN ANY ANTITRUST SENSE?

4     OF COURSE NOT.

5          THE COURT:  WELL, YOU SEE, WHAT I'M

6     LISTENING FOR IS WHETHER OR NOT -- THIS IS A PHONE.

7          MR. WALL:  RIGHT.

8          THE COURT:  IT IS OF NO USE EITHER AS A

9     PHONE OR A DATA PROCESSOR UNLESS IT RECEIVES SOME

10    SERVICE.

11         MR. WALL:  AND WE DON'T EVEN ALLOW YOU TO

12    TURN IT ON UNLESS YOU GET SERVICE.

13         THE COURT:  IT WON'T POWER UP?

14         MR. WALL:  IT WILL POWER UP BUT UNTIL YOU

15    ACTIVATE IT, YOU CAN'T USE ANY OF THE OTHER

16    FUNCTIONS.

17         THE COURT:  IT CAN'T PERFORM ITS

18    ESSENTIAL FUNCTION WITHOUT THE SERVICE.

19         MR. WALL:  RIGHT.  RIGHT.

20         THE COURT:  AND WHAT THE PLAINTIFFS ARE

21    CONCERNED ABOUT AS I READ THEIR COMPLAINT IS THAT

22    ESSENTIALLY THEY ARE LOCKED IN FOR A PERIOD OF TIME

23    AND, QUITE FRANKLY, THEY'RE LOCKED IN FOREVER.

24    THERE'S NO OTHER PLACE TO GO FOR THE FEATURE OF THE

25    PHONE THAT IS THE HEART OF IT, BUT TO A, A MARKET

                                                      92

1    THAT, THAT IS -- HAS ONLY ONE SERVICE PROVIDER.

2              MR. WALL:  RIGHT.

3              THE COURT:  AND SO THAT SERVICE PROVIDER,

4    IN THE FUTURE, CAN CHARGE WHATEVER IT WISHES FOR

5    THAT SERVICE.

6              MR. WALL:  AND, AND IF IN THE FUTURE THE,

7    THE -- YOU KNOW, AT & T OR APPLE DO SOMETHING TO,

8    TO HARM COMPETITION AND IN THE FUTURE, I BET YOU

9    SOMEBODY IS GOING TO TRY TO ARGUE THAT THAT IS AN

10   ABUSE OF FUTURE AFTER-MARKET POWER BUT THAT HAS

11   NOTHING TO DO WITH TODAY.

12             THE COURT:  IT MIGHT IN THE SENSE THAT

13   THE CONSUMER DOESN'T KNOW OF THAT FEATURE.

14             IS THERE ANYTHING THAT SAYS TO A

15   CONSUMER, YOU ARE LOCKED IN FOREVER?

16             MR. WALL:  YES.  THE BOX (INDICATING).

17             THE COURT:  WELL.

18             MR. WALL:  I'M NOT SURE THERE IS MUCH ON

19   THIS BOX.

20             THE COURT:  WELL, I'M NOT SURE THERE'S

21   ENOUGH FOR THAT MOTION TO DISMISS FOR FAILURE TO

22   STATE A CLAIM ONLY.  MAYBE AFTER MOTIONS AND

23   CONSIDERATIONS THE CASE CAN COME TO A DIFFERENT

24   CONCLUSION AS TO WHETHER THERE IS AN ABILITY TO

25   STATE A CLAIM HERE.  I HAVE TO BE VERY LIBERAL

                                              93

1    HERE.

2              MR. WALL:  WELL, YOU HAVE TO BE LIBERAL

3    BUT YOU HAVE TO BE TRUE TO THE PRINCIPLES OF WHAT

4    THE LAW LAYS DOWN FOR HOW YOU PROVE MONOPOLY POWER.

5              AND REMEMBER, WHAT I'M TRYING TO EXPLAIN

6    HERE IS THAT IN THE KODAK SETTING, WHAT THE SUPREME

7    COURT -- THE SIGNIFICANCE OF INFORMATION AND THE

8    QUALITY OF INFORMATION IS VERY NARROW.

9              IT IS EXCLUSIVELY TO ANSWER THE CLAIM

10   THAT WHERE THERE IS OTHERWISE A REAL AFTER-MARKET

11   AND WHERE THERE IS OTHERWISE SWITCHING COSTS, AND

12   WHERE OTHER -- AND WHERE THE CONDUCT OCCURS LATER

13   IN THE TIME AFTER THE INITIAL PURCHASE AND IT

14   AFFECTS THE AFTER-MARKET, THAT THE FACT THAT THIS

15   MIGHT HAVE BEEN ANTICIPATED ISN'T ENOUGH TO GET THE

16   DEFENDANT OFF THE HOOK.

17             THAT'S NOT THE SAME THING AS SAYING, AS

18   SAYING BECAUSE THERE'S, THERE'S A PROBLEM WITH THE

19   QUALITY OF INFORMATION THAT IS AVAILABLE AT THE

20   TIME OF PURCHASE, A BRAND NEW ENTRANT INTO A MARKET

21   CAN BE -- CAN BE SADDLED WITH THE OBLIGATIONS OF A

22   MONOPOLIST SUBJECTED TO TREBLED DAMAGES AND SO

23   FORTH.

24             YOUR HONOR, I CAN SAY THIS BECAUSE I

25   REPRESENTED KODAK, I HAVE LIVED THESE CASES

                                                    94

1    PROBABLY MORE THAN ANYONE ELSE IN THE COUNTRY,

2    THERE HAS NEVER BEEN A CASE, EVER, WHERE THE

3    AFTER-MARKET THEORY WAS APPLIED TO A STRATEGY THAT

4    WAS AN INITIAL ENTRY STRATEGY LIKE THIS ONE AND THE

5    PLAINTIFFS CAN SAY THAT THEY'RE NOT CHALLENGING OUR

6    ENTRY STRATEGY, BUT THEY ARE CHALLENGING THE

7    EXCLUSIVE DISTRIBUTION AGREEMENT BY WHICH WE

8    ENTERED THIS MARKET.

9              THAT IS THE SAME THING.

10             THE COURT:  WELL, I AM GOING TO CUT YOU

11   OFF AT THIS POINT.

12             MR. WALL:  YOU PROBABLY HAVE TO OR I'LL

13   KEEP GOING.  I UNDERSTAND THAT.

14             THE COURT:  YOU KNOW, IT'S INTERESTING, I

15   HAD THIS FEELING OF DEJA VU BECAUSE RON KATZ WAS

16   INVOLVED IN THE KODAK CASE.

17             MR. WALL:  YES, HE WAS.

18             THE COURT:  AND I HAD HIM MAKING AN

19   ARGUMENT IN ANOTHER ANTITRUST CASE AND HE WAS

20   MAKING THAT SAME PASSIONATE PLEA, I WAS INVOLVED IN

21   KODAK.  SO I FEEL LIKE I WAS THERE.

22             MR. WALL:  IT'S SORT OF LIKE IF YOU WERE

23   A VIETNAM VETERAN AND YOU WERE THERE AND YOU WAKE

24   UP IN THE MIDDLE OF THE NIGHT WITH SWEATS, IT'S

25   THAT KIND OF THING.

95

1           THE COURT:  THANK YOU, COUNSEL.  AND I

2    APOLOGIZE YOU HAVEN'T BEEN GIVEN MORE TIME BECAUSE

3    I'M SURE THE ARGUMENT WOULD HAVE BENEFITED FROM IT,

4    BUT I THINK I HAVE ENOUGH.

5           AND AS I SUGGESTED TO YOU, WHAT I WILL

6    PROBABLY DO IS DO AS MUCH OF THIS AS I CAN NOW AND

7    SAVE LATER PARTS FOR LATER AND SO YOU'LL GET

8    ANOTHER SHOT AT IT IF I DO THAT.

9           OTHERWISE, SINCE THE NATURE OF THESE

10   MOTIONS ARE EARLIER IN THE CASE, I'M SURE AS THESE

11   ISSUES ARE SHARPENED BY FURTHER PROCEEDINGS, I'LL

12   BENEFIT FROM FURTHER ARGUMENT ON THESE MATTERS AS

13   WELL.

14           SO MATTERS ARE SUBMITTED.

15           MR. WALL:  THANK YOU, YOUR HONOR.

16           (WHEREUPON, THE EVENING RECESS WAS

17   TAKEN.)

18

19

20

21

22

23

24

25

                                                    96