**United States District Court**

For the Northern District of California

1
2
3
4
5
6            IN THE UNITED STATES DISTRICT COURT

7        FOR THE NORTHERN DISTRICT OF CALIFORNIA

8                    SAN JOSE DIVISION

9                                   NO. C 07-05152 JW

10   In re Apple & AT&TM Antitrust Litigation      **ORDER DENYING DEFENDANT
                                                    AT&TM'S MOTION TO COMPEL
11                                                  ARBITRATION AND TO DISMISS;
                                                    DENYING  DEFENDANT AT&TM'S
12                                                  MOTION TO STAY DISCOVERY;
                                                    GRANTING IN PART AND DENYING
13                                                  IN PART DEFENDANT APPLE'S
                                                    MOTION TO DISMISS
14
   _____/
15

16                        **I.  INTRODUCTION**

17        In the cellular telephone market, it has become a common practice for an equipment

18   manufacturer and a voice and data supply company to join together to introduce a new cellular

19   telephone to the market.  Often, to obtain a particular model of telephone at a given price from a

20   given manufacturer, purchasers must sign a contract with the joined service provider for voice and

21   data services of a stated period of time.  This case concerns such an arrangement between Apple,

22   Inc. and AT&T Mobility upon the introduction to the market of the iPhone.  Plaintiffs allege that

23   consumers were offered iPhones only if they signed a two-year service agreement with AT&T

24   Mobility.  Plaintiffs allege, however, that unknown to consumers, the companies had agreed to

25   technologically restrict voice and data service in the aftermarket for continued voice and data

26   services, i.e., after the initial two-year service period expired.  The question before the Court is

27   whether if these allegations are true, the Complaint states a claim for a violation of the federal

28   antitrust laws and other consumer protection laws.   The Court finds that it does.

## II.  BACKGROUND

Plaintiffs[1] bring this putative class action against Apple, Inc. ("Apple") and AT&T Mobility, LLC ("ATTM") (collectively, "Defendants") alleging, *inter alia*, violations of Section 2 of the Sherman Antitrust Act ("Sherman Act"), 15 U.S.C. § 2 and breach of warranty under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301-12.  In a Revised Amended Consolidated Class Action Complaint filed on June 4, 2008, Plaintiffs allege as follows:

### The Defendants and the iPhone

Defendant Apple is a California corporation with its principal place of business in Cupertino, California.  (Revised Consolidated Amended Class Action Complaint ¶ 22, hereafter, "Complaint," Docket Item No. 109.)  Apple markets and sells the iPhone, which it launched on June 29, 2007.  (Id. ¶¶ 2, 22.)  The iPhone is a wireless communication device that acts simultaneously as a mobile phone, iPod, and Internet communications device.  (Id. ¶ 27.)

Defendant ATTM is a Delaware limited liability company with its principal place of business in Atlanta, Georgia.  (Id. ¶ 23.)  ATTM is a cellular phone service provider that markets and sells the iPhone and is the exclusive provider of wire and data services to iPhone customers, pursuant to a written agreement with Apple ("The Agreement").  (Id. ¶¶ 2, 23, 77.)  Apple and ATTM entered into the Agreement prior to the commercial release of the iPhone, making ATTM the only authorized provider of wireless voice and data services for iPhones in the United States for five years.  (Id. ¶¶ 2, 79.)

### The Agreement

The Agreement, which lasts until 2012, provides that iPhone purchasers who want voice and data services must sign a two-year service contract with ATTM.  (Complaint ¶ 30.)  Although the Agreement itself is not public, some of its provisions have been revealed

---

[1] Plaintiffs are Herbert H. Kliegerman, Paul Holman, Lucy Rivello, Timothy P. Smith, Michael G. Lee, Dennis V. Macasaddu, Mark G. Morikawa, Vincent Scotti, and Scott Sesso.

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1    in the press.  First, Apple and ATTM share revenue stemming from provision of voice and

2    data services to iPhone users.  (Id. ¶ 78.)  Second, because of ATTM's position as exclusive

3    provider of iPhone services for five years, customers will be forced to renew with ATTM,

4    despite initially being required to agree to only a two-year contract.  (Id. ¶ 79.)  Third, Apple

5    will enforce ATTM's exclusivity by installing SIM card program locks on all iPhones, while

6    agreeing to never disclose the unlock codes to iPhone consumers who wish to replace the

7    SIM cards for international travel or to lawfully cancel their ATTM contracts to switch to

8    another carrier.  (Id. ¶ 80.)  Fourth, Apple is permitted to control the features, software,

9    content, programming, and design of the iPhone.  (Id. ¶ 81.)  Fifth, contrary to standard

10   industry practice, by which wireless providers subsidize the purchase of the cellular device in

11   exchange for the consumer signing a contract with the provider conditioned on payment of a

12   fee in the event of early termination, ATTM is not required to subsidize the consumer's

13   purchase of the iPhone, but nonetheless charges a $175 early termination fee.  (Id. ¶¶ 82-83.)

14   Sixth, Apple and ATTM agreed to take action, legal or otherwise, to prevent users from

15   circumventing SIM card locks to access the services of non-ATTM providers.  (Id. ¶ 84.)

16   Seventh, Apple agreed to restrain from developing a CDMA[2] version of the iPhone for an

17   unspecified period of time, which would prevent the iPhone from being used on Verizon or

18   Sprint's networks.  (Id. ¶ 85.)

19   **Third-Party Applications and Software Update Version 1.1.1**

20        Apple has created software programs for the iPhone known as "applications," such as

21   ring tones, instant messaging, and Internet access, all of which can be downloaded by iPhone

22   users.  In addition, Apple has made agreements with some third-party software

23   manufacturers by which Apple "approves" their applications, usually in exchange for a share

24   of revenues resulting from sales of those applications.  (Complaint ¶ 4.)  Apple, however, has

25

26        [2] CDMA is one of two competing wireless network technologies in the United States, the
     other being GSM.  Of the four major American carriers, ATTM and T-Mobile are GSM carriers and

27   Verizon and Sprint are CDMA carriers.

28                                                    3

United States District Court

For the Northern District of California

refused to approve any application in which it does not have a financial interest, and has told customers that it will not honor the warranties of any customer who has downloaded competing applications.  (<u>Id.</u>)  Nonetheless, some consumers were able to unlock their iPhones to install unapproved third-party applications ("TPAs"), as well as to use the SIM cards of wireless providers other than ATTM.  (<u>Id.</u> ¶¶ 5, 89-93.)

On September 27, 2007, Apple issued an "upgraded" version of the iPhone operating software, known as Version 1.1.1.  (<u>Id.</u> ¶¶ 5, 96.)  Although issued as a software update, ostensibly intended to make several changes and improvements to the iPhone operating system, Version 1.1.1 was issued by Apple for the purpose of retaliating against consumers who had unlocked their iPhones or installed unapproved TPAs.  (<u>Id.</u> ¶¶ 5, 96-98, 102.)  Apple knew prior to release of Version 1.1.1 that the update would "brick" (render completely inoperable) or otherwise damage some iPhones that were unlocked or which contained unapproved TPAs.  This knowledge is evident by a September 24, 2007 press release in which Apple stated that downloading Version 1.1.1 "will likely result in the modified iPhone becoming permanently inoperable when a future Apple-supplied iPhone software update is installed."  (<u>Id.</u>)  In the September 24 press release, Apple attempted to disclaim warranty liability for any damage to consumers' iPhones as a result of installing Version 1.1.1.  (<u>Id.</u> ¶ 98.)  The iPhones of some consumers who installed Version 1.1.1 were, in fact, damaged in the manner predicted by Apple.  (<u>Id.</u>)  Consumers whose iPhones were damaged as a result of installing Version 1.1.1 were then told that they had breached their warranty agreements by unlocking their phones or by downloading unapproved TPAs.  (<u>Id.</u> ¶¶ 5, 104-106.)

**<u>The Plaintiffs</u>**

The nine named Plaintiffs in this nationwide class action are residents of California, Washington, and New York.  (<u>Id.</u> ¶¶ 13-21.)  Each Plaintiff purchased one or more iPhones and each executed a two-year contract for provision of voice and data services with ATTM.  (<u>Id.</u> ¶ 31.)  Prior to Plaintiffs' purchases of their iPhones and execution of their service contracts, Defendants did not disclose to them the existence of the five-year exclusivity

provision in the Agreement, or that Plaintiffs would be locked into using ATTM after the expiration of their initial two-year service contracts (Id. ¶ 32); disclose that Plaintiffs' iPhones were locked to only work with ATTM SIM cards or that the unlock codes would not be provided to them upon request (Id. ¶ 33); nor disclose that Plaintiffs would incur excessive and unconscionable roaming fees for using the iPhone's data features while traveling internationally.  (Id. ¶ 34.)  Instead, Apple's website represented to Plaintiffs that "[y]ou can browse the Internet and send emails as often as you like without being charged extra."  (Id. ¶ 35.)

On the basis of the allegations above, Plaintiffs allege 10 causes of action:

| Cause of Action | | Defendant |
|---|---|---|
| 1 | Monopolization of the aftermarket for iPhone applications, in violation of Section 2 of the Sherman Act | Apple |
| 2 | Attempted Monopolization of the aftermarket for iPhone applications, in violation of Section 2 of the Sherman Act | Apple |
| 3 | Monopolization of the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |
| 4 | Attempted monopolization of the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |
| 5 | Conspiracy to monopolize the aftermarket for iPhone voice and data services, in violation of Section 2 of the Sherman Act | Apple, ATTM |
| 6 | Unfair and deceptive trade practices in violation of the consumer protection laws of 43 jurisdictions in the United States | Apple, ATTM |
| 7 | Unlawful conditioning of the iPhone warranty on consumers' use, in connection with the iPhone, of products and services "approved" by Apple, in violation of the Magnuson-Moss Warranty Act | Apple, ATTM |
| 8 | Trespass to chattels for issuance and transmission of Version 1.1.1, knowing it would alter or damage consumers' iPhone products | Apple |
| 9 | Knowing transmission of a program, which intentionally caused damage without authorization to iPhones, in violation of the Consumer Fraud and Abuse Act, 18 U.S.C. § 1030 | Apple |
| 10 | Knowing transmission of a program, which accessed users iPhones without permission, resulting in damage to those iPhones, in violation of California Penal Code § 502 | Apple |

Presently before the Court are (1) ATTM's Motion to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act (hereafter, "ATTM's Motion," Docket Item No.

United States District Court

For the Northern District of California

115); (2) ATTM's Motion to Stay Discovery Pending Resolution of Its Soon-to-Be-Filed Motion to Compel Arbitration (hereafter, "Motion to Stay," Docket Item No. 104); and (3) Apple's Motion to Dismiss Revised Consolidated Amended Class Action Complaint (hereafter, "Apple's Motion," Docket Item No. 116).  The Court conducted a hearing on September 12, 2008.

## III.  DISCUSSION

**A.    ATTM's Motion to Compel Arbitration**

Defendant ATTM moves to compel Plaintiffs to individually arbitrate its Sherman Act, Magnuson-Moss Warranty Act, and consumer protection claims brought against ATTM.  (ATTM's Motion at 1.)  Plaintiffs contend that ATTM's Arbitration Agreement is unconscionable and therefore unenforceable under California, Washington, and New York law.[3]

**1.    The Arbitration Agreement**

It is undisputed that Plaintiffs signed an Arbitration Agreement ("Terms of Service" or "TOS") with ATTM when they activated their ATTM voice and data services for their iPhones.  (Motion to Stay, Ex. 1.)

The Arbitration Agreement provides in relevant parts:

> • **"[W]e each agree to resolve . . . disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.**  Arbitration is more informal than a lawsuit in court.  Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts.  Arbitrators can award the same damages and relief that a court can award.  **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.**  AT&T will pay all costs of arbitration, no matter who wins, so long as your claim is not frivolous.  Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court.  In addition, under certain circumstances (as explained below), AT&T will pay you and your attorney a special premium if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute."  (emphasis in original) (Id. at 11-12.)

---

[3]  Although Plaintiffs alternatively contend that California unconscionability law should be applied to all named Plaintiffs, the Court defers that issue because it finds that the Arbitration Agreement is unconscionable under all relevant state laws.  (Plaintiffs' Opposition to Defendant AT&T Mobility LLC's Motion to Compel Arbitration and to Dismiss Claims Pursuant to the Federal Arbitration Act at 13-15, hereafter, "Opposition to ATTM," Docket Item No. 126.)

United States District Court

For the Northern District of California

1

- • "**You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.**" (emphasis in original) (Id. at 12.)

2

3

- • "**YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**" (emphasis in original) (Id. at 15.)

4

5

6 When customers purchase an iPhone in stores, they are presented with a document

7 summarizing the activation process, available rate plans, and return policy. (Declaration of Neal S.

8 Berinhout in Support of Motion of Defendant AT&T Mobility LLC to Compel Arbitration and to

9 Dismiss Claims Pursuant to the Federal Arbitration Act ¶ 31, hereafter, "Berinhout Decl.," Docket

10 Item No. 117.) Customers do not see the Arbitration Agreement until they return home with their

11 new iPhone, connect to the Internet, and then are presented with the Terms of Service. (Id. ¶ 28.)

12    **2.    Unconscionability**

13 Defendant ATTM moves to compel arbitration on the ground that the Arbitration Agreement

14 is not unconscionable and is thus enforceable under the laws of California, New York, and

15 Washington. The Court addresses each in turn.

16    **a.    California Unconscionability Law**

17 Under California law, a determination of whether a class action waiver is unconscionable

18 depends on three factors: "(1) Whether the contract is a consumer contract of adhesion, written by a

19 party that has superior bargaining power; (2) whether the agreement occurs in a setting in which

20 disputes between the contracting parties predictably involve small amounts of damages; and (3)

21 whether it is alleged that the party with the superior bargaining power has carried out a scheme to

22 deliberately cheat large numbers of consumers out of individually small sums of money." Discover

23 Bank v. Superior Court, 36 Cal. 4th 148, 160 (2005); see also Shroyer v. New Cingular Wireless

24 Services, Inc., 498 F.3d 976, 983 (9th Cir. 2007) (holding unconscionable a prior version of

25 ATTM's arbitration agreement under the Discover Bank standard). The first "procedural

26 unconscionability" factor focuses on "oppression or surprise due to unequal bargaining power."

27 Stiener v. Apple Computer, Inc., 556 F. Supp. 2d 1016, 1026 (N.D. Cal. 2008) (quoting Discover

28

7

United States District Court

For the Northern District of California

1   Bank, 36 Cal. 4th at 160).  The second and third "substantive unconscionability" factors focus on

2   whether the class waiver operates as an exculpatory clause.  Id. at 1028.

3          The recently-decided Stiener case is informative to the Court's analysis in this case, because

4   the Court finds that the Arbitration Agreement in this case is identical to the Agreement at issue in

5   Stiener.  In Stiener, a class of iPhone purchasers sued Apple and ATTM for claims relating to

6   allegedly hidden fees associated with replacement of the iPhone's battery.  Id. at 1020.  ATTM,

7   invoking the provisions of the Arbitration Agreement contained in the iPhone purchasers' Terms of

8   Service, attempted to compel the plaintiffs to individually arbitrate their disputes.  Id. at 1017.

9          Judge Armstrong, however, found the Arbitration Agreement unenforceable because it was

10  both procedurally and substantively unconscionable under Shroyer and Discover Bank.  Id. at 1026-

11  29; see also Kaltwasser v. Cingular Wireless LLC, 543 F. Supp. 2d 1124 (N.D. Cal. 2008).  In doing

12  so, Judge Armstrong relied on the Ninth Circuit's invalidation of a prior ATTM arbitration

13  agreement in Shroyer.[4]  Id. at 1018 (citing Shroyer, 498 F.3d at 978).  Specifically, Judge

14  Armstrong's found that (1) the Arbitration Agreement was a contract of adhesion; (2) the setting

15  involved a small amount of damages; and (3) a scheme of deliberate cheating was alleged.  Id. at

16  1024-25.  Notably, Judge Armstrong also found that the incentives to arbitrate that ATTM had

17  incorporated into the class waiver since Shroyer were insufficient to render the overall Agreement

18  anything other than an exculpatory clause.[5]  Id. at 1030-33.

19         The Court finds no substantive difference between the arguments in Stiener and those made

20  by ATTM in this case.  Although the claims in Stiener related to battery problems with the iPhone,

21  and involved correspondingly lower damage claims than those alleged here, the outcome still must

22  _____

23         [4]  In Shroyer, the Ninth Circuit found that an ATTM arbitration provision with a class action
    waiver operated as an exculpatory clause, even though the Agreement provided for attorney fees and
24  arbitration costs to be paid to arbitrating consumers.  498 F. 3d at 986.

25         [5]  In Stiener, Judge Armstrong found that newly-added incentives to arbitrate contained in
    ATTM's iPhone Arbitration Agreement - a premium paid to arbitrating consumers and to their
26  attorneys under certain circumstances - could not save the Agreement.  Judge Armstrong concluded
    that "[t]he Premium is insufficient inducement for individuals to sue, such that the class arbitration
27  waiver operates to immunize AT&T from liability from claims suitable for class action."  Stiener,
    556 F. Supp. at 1030.

28

1    be the same.  Id. at 1025.  The fact that damages here are alleged to be up to $599 plus tax per

2    plaintiff, and those in Stiener were only $114.95 per plaintiff, does not change the outcome in the

3    present case.  Under the California Discover Bank standard, damages of even $1,000 are small

4    enough to support a finding of substantive unconscionabilty.  Id. at 1024.  In addition, both iPhone

5    cases involve the allegation of post-purchase fees that were deliberately concealed by Apple and

6    ATTM.  Other than the specific underlying legal claims, therefore, there is no appreciable difference

7    between this case and Stiener.  Although ATTM has submitted a number of arguments that the

8    Arbitration Agreement is enforceable, these are the same arguments ATTM advanced in Stiener to

9    defend the *same agreement* it seeks to defend here.

10       Accordingly, the Court DENIES Defendant ATTM's Motion to Compel Arbitration of the

11   California Plaintiffs' claims.

12                **b.    New York Unconscionability Law**

13       Under New York law, "a determination of unconscionability generally requires a showing

14   that the contract was both procedurally and substantively unconscionable when made."  Gillman v.

15   Chase Manhattan Bank, N.A., 534 N.E. 2d 824, 828 (N.Y. 1988).  The procedural element "requires

16   an examination of the contract formation process and the alleged lack of meaningful choice."  Id.

17   The element of substantive unconscionability, meanwhile, "entails an analysis of the substance of

18   the bargain to determine whether the terms were unreasonably favorable to the party against whom

19   unconscionability is urged."  Id. at 829.  Under New York law, arbitration contracts of adhesion may

20   be unconscionable when a plaintiff can offer "evidence that he could not have chosen another

21   service provider."  Ranieri v. Bell Atlantic Mobile, 304 A.D. 2d 353, 354 (N.Y. App. Div. 2003).

22       Here, as alleged, the Agreement is a contract of adhesion, with which Plaintiffs were

23   confronted in a "take-it-or-leave-it fashion" *after* they brought their iPhones home.  Presuming that

24   Plaintiffs' allegations are true, an element of procedural unconscionability is present.  (Berinhout

25   Decl. ¶¶ 28, 31); see also Stiener, 556 F. Supp. 2d at 1016.  In addition, because ATTM was the only

26   permissible service provider, Plaintiffs would have been charged a 10% restocking fee for the

27   iPhone had they rejected ATTM's contract and returned their iPhones.  (Complaint ¶ 57.)  This is a

28                                                    9

sufficient allegation that Plaintiffs "could not have chosen another service provider." <u>Ranieri</u>, 304

A.D. 2d at 354.  Thus, New York's procedural unconscionability requirement is met.  With respect

to substantive unconscionability under New York law, the manner in which the Arbitration

Agreement operates as an exculpatory clause shows that "the terms were unreasonably favorable to"

ATTM.  <u>Gillman</u>, 534 N.E. 2d at 829.  As discussed in the context of California law, the Arbitration

Agreement is procedurally and substantively unconscionable under New York law.

Accordingly, the Court DENIES Defendant ATTM's Motion to Compel Arbitration of the

New York Plaintiffs' claims.

### c.   Washington Unconscionability Law

Under Washington law, an class action waiver is unconscionable if it "undermines

Washington's Consumer Protection Act to the extent it is injurious to the public." <u>Scott v. Cingular</u>

<u>Wireless</u>, 160 Wash. 2d 843, 853 (2007).  Unconscionability will be found if a contract effectively

exculpat[es] its drafter from liability for a large class of wrongful conduct." <u>Id.</u> at 854.  In <u>Scott</u>, the

Washington Supreme Court held that a prior ATTM (then Cingular) arbitration provision was

substantively unconscionable because its class action waiver was effectively an exculpatory clause.

<u>Id.</u> at 854-857.  In addition, the court required no showing of procedural unconscionability.  In so

holding, the court cited <u>Discover Bank</u>, the major California precedent relied on by the Ninth Circuit

in <u>Shroyer</u> and this District in <u>Stiener</u>.  <u>Id.</u> at 855.  As such, Washington substantive

unconscionability analysis mirrors that of California.  Indeed, the agreement invalidated in <u>Scott</u> was

a prior ATTM arbitration clause and class waiver that was nearly identical to the one held invalid in

<u>Shroyer</u>, with both courts focusing on the exculpatory nature of the agreement.  Thus, the Court

finds that under Washington law, the ATTM Arbitration Agreement at issue here is similarly

unconscionable.

Accordingly, the Court DENIES Defendant ATTM's Motion to Compel Arbitration of the

Washington Plaintiffs' claims.

**B.**     **ATTM's Motion to Dismiss**

Defendant ATTM moves to dismiss Plaintiffs' claims on the ground that the Federal Arbitration Act ("FAA") preempts application of state unconscionability law to the Arbitration Agreement.  (ATTM's Motion at 4-5.)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against a defendant for failure to state a claim upon which relief may be granted against that defendant. Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.  <u>Balistreri v. Pacifica Police Dep't</u>, 901 F.2d 696, 699 (9th Cir. 1990); <u>Robertson v. Dean Witter Reynolds, Inc.</u>, 749 F.2d 530, 533-534 (9th Cir. 1984).

The FAA provides that written agreements to settle disputes by arbitration "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

ATTM contends that state law is preempted in this instance either by the doctrines of express or conflict preemption.  (ATTM's Motion at 18-20.)  ATTM's preemption argument is that invalidation of ATTM's allegedly consciable Arbitration Agreement here could only be *because it is an arbitration agreement*.  ATTM contends that invalidation of the Agreement under these circumstances would violate the FAA's mandate that such agreements only be invalidated on bases that generally exist "for the revocation of any contract."  9 U.S.C. § 2.  ATTM advanced the same argument in <u>Stiener</u>, and Judge Armstrong found the contention without merit.  556 F. Supp. 2d at 1034-35.  In <u>Stiener</u>, Judge Armstrong held that ATTM's agreement was unconscionable, and that the agreement was invalid not because it was an arbitration agreement, but because it failed to pass muster under California's generally applicable unconscionability law.  <u>Id.</u> at 1035.  Application of general state unconscionability laws to the Arbitration Agreement therefore neither conflicts with an express federal law, nor "stands as an obstacle" to the accomplishment of a federal objective to encourage arbitration.  <u>See</u> <u>United States. v. Locke</u>, 529 U.S. 89, 109 (2000).

Accordingly, the Court DENIES Defendant ATTM's Motion to Dismiss on grounds of preemption by the Federal Arbitration Act.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1   **C.      ATTM's Motion to Stay Discovery**

2         Given that the Court has denied ATTM's Motion to Compel Arbitration and ATTM's

3   Motion to Dismiss under the FAA, ATTM's Motion to Stay Discovery is DENIED as moot.

4   **D.      Apple's Motion to Dismiss**

5         Defendant Apple moves to dismiss all of Plaintiffs' causes of action.  (Apple's Motion at 3.)

6   The Court considers the sufficiency of Plaintiffs' factual allegations with respect to each of the

7   claims.

8                **1.      Section 2 of the Sherman Act**

9         Apple contends that Plaintiffs have not stated a claim under § 2 of the Sherman Act, because

10  they have neither alleged legally cognizable markets under the Sherman Act, nor legally sufficient

11  monopolization of those markets.  (Apple's Motion at 1-2.)

12        Section 2 of the Sherman Act prohibits monopolization, attempted monopolization and

13  conspiracy to monopolize "any part of the trade or commerce among the several States."  15 U.S.C.

14  § 2.  To state a valid claim under the Sherman Act, a plaintiff "must allege that the defendant has

15  market power within a 'relevant market.'"  Newcal Industries, Inc. v. IKON Office Solution, 513

16  F.3d 1038, 1044 (9th Cir. 2008) (citing Eastman Kodak Co. v. Image Technical Services, Inc., 504

17  U.S. 451, 481 (1992)).

18                  **a.      Relevant Markets**

19        At issue in this case are two markets alleged by Plaintiffs: (1) an aftermarket in iPhone voice

20  and data services and (2) an aftermarket in applications for the iPhone.

21        Several factors must be considered when evaluating a plaintiff's market allegations in a

22  motion to dismiss under Fed. R. Civ. P. Rule 12(b)(6).  First, the "relevant market must be a product

23  market," the boundaries of which are defined by products and producers.  Id. at 1045 (citing Brown

24  Shoe v. United States, 370 U.S. 294, 325 (1962)).  Second, the market encompasses the product at

25  issue, in addition to all reasonably interchangeable economic substitutes.  Id.  Third, an antitrust

26  plaintiff may allege a submarket, which must be "economically distinct from the general product

27

28

1    market."  Id.  Relatedly, a cognizable antitrust claim can be based on allegations of a "relevant

2    market containing only a single brand of the product at issue."  Id. at 1048.

3          Relying on Eastman Kodak, the Ninth Circuit in Newcal applied these principles to permit a

4    § 2 monopolization claim where a plaintiff had alleged derivative aftermarkets for replacement parts

5    and services for a specific brand of copy machines, where the aftermarkets were created by contract

6    between the plaintiff and the defendant copy machine manufacturer.  Newcal, 513 F.3d at 1049.  The

7    claim in Eastman Kodak had been that Kodak unlawfully forced owners of its copy machines to

8    purchase replacement parts and services from Kodak.  The claim was premised on an allegation that

9    Kodak held market power in a market "consisting of those customers that had already purchased

10   Kodak-brand equipment and that needed replacement parts and services for that particular

11   equipment," giving Kodak a natural monopoly in the derivative services market.  Id. at 1048

12   (discussing Eastman Kodak, 504 U.S. at 456-59).  Notably, there was no claim that Kodak held

13   market power in the predicate market for copiers themselves.  The Supreme Court held that the

14   claimed aftermarket was legally cognizable.  Eastman Kodak, 504 U.S. at 462-63.

15         Similarly, in Newcal, the plaintiff's claim related only to an aftermarket for copier parts and

16   services, and not to the primary market for the copiers themselves.  Newcal, 513 F.3d at 1050.

17   Specifically, the Newcal plaintiff claimed that the defendant had an original contract-created

18   monopoly in the derivative services aftermarkets for its copiers, which it then exploited to gain

19   further monopoly power that was not contractually created.  Id.  In finding such aftermarkets legally

20   cognizable, the Ninth Circuit placed a strong emphasis on the fact that "the market for replacement

21   copiers and lease-end services would not exist without the [primary] market for copier leases and

22   services," and was thus, "wholly derivative from and dependant on the primary market."  Id. at 1049.

23         In so holding, the Ninth Circuit distinguished two cases in which courts found that

24   contractual creation of a monopoly in an aftermarket prevented that aftermarket from being legally

25   cognizable under the Sherman Act.  Id. at 1046-50 (distinguishing Queen City Pizza, Inc. v.

26   Domino's Pizza, Inc., 124 F.3d 430 (3d Cir. 1997) (aftermarket for pizza ingredients and restaurant

27   supplies created by a pizza franchise contract); Forsyth v. Humana, Inc., 114 F.3d 1467 (9th Cir.

28

United States District Court

For the Northern District of California

1997) (aftermarket for use of specified hospitals created by an insurance contract)).  In both cases,

plaintiffs alleged monopolization in aftermarkets, the boundaries of which were created by written

contracts between the plaintiffs and the defendants.  Both instances involved contracts wherein the

plaintiffs obligated themselves to make certain purchases exclusively from the defendants.

According to the Ninth Circuit, the fundamental distinction between Newcal, on one hand, and

Forsyth and Queen City Pizza, on the other, was that the aftermarkets alleged in the latter cases for

pizza supplies and hospital services were in no way dependent on the primary markets for pizza

franchises and health insurance, respectively.  Id. at 1049.  The fact of critical significance that

rendered the aftermarket Newcal akin to the one in Eastman Kodak, therefore, was that it was

"wholly dependent" on the primary market.  Id.  Thus, according to the Newcal analysis, there can

be a legally cognizable aftermarket in a single brand's products, even if that market is created by a

contractual relationship.

### i.     Voice and Data Services Aftermarket

Apple moves to dismiss on the ground that there is no relevant aftermarket for

iPhone voice and data services.  (Apple's Motion at 11.)

Plaintiffs allege that:

> iPhone purchasers "agreed to enter into a two-year voice and/or data service
> plan with ATTM" and "did not agree to use ATTM for five years," even after
> the expiration of their initial contracts.  (Complaint ¶¶ 2, 31.)  In addition,
> Apple and ATTM enforced this exclusivity by programming and installing
> software locks on each iPhone to prevent purchasers from later switching to
> another wireless carrier.  (Id. ¶¶ 3, 33.)  Consumers were bound for the full
> five years of the Agreement between Apple and ATTM, and were
> technologically prevented from switching carriers, even if they paid ATTM's
> $175 termination fee prior to the end of their initial contracts.  (Id. ¶¶ 2-3, 32-
> 33, 83.)

The allegations in the Complaint recite facts, which, if presumed to be true, would support the

existence of an aftermarket for iPhone voice and data services, under the standard articulated by the

Ninth Circuit in Newcal.  Principally, Plaintiffs have alleged an aftermarket for iPhone voice and

data services that "would not exist without" the primary market for iPhones, and is thus "wholly

derivative from and dependant on the primary market."  Newcal, 513 F.3d at 1049.  Plaintiffs'

United States District Court

For the Northern District of California

14

1   Complaint is also adequate to the extent the alleged aftermarket is predicated on an initial

2   contractual relationship between Defendants and iPhone purchasers.  Id.  Even though Apple rightly

3   contends that Plaintiffs entered into two-year ATTM service contracts at the time of purchase,

4   Plaintiffs allege that the aftermarket includes the full five-year period during which they are bound

5   to use ATTM voice and data services, including the three years after the initial contract expiration,

6   which is enforced by both technological and contractual means.

7          Apple also contends that there is no aftermarket because "the iPhone purchase and ATTM

8   service agreement were both part of the *initial foremarket transaction*, and all iPhone purchasers still

9   remain under the two-year ATTM service contracts to which they agreed when they first bought an

10  iPhone."  (Apple's Reply Brief in Support of Motion to Dismiss at 5, hereafter, "Apple's Reply,"

11  Docket Item No. 137 (emphasis in original).)  Plaintiffs' Complaint, however, alleges that the

12  consumers have suffered a present injury even if they have not attempted to switch service.  It is

13  alleged that iPhone purchasers "agreed to enter into a two-year voice and/or data service plan with

14  ATTM" and "did not agree to use ATTM for five years," after the expiration of their initial

15  contracts.  (Complaint ¶¶ 2, 31.)  These allegations state a claim which is ripe for adjudication

16  because Plaintiffs are alleging that at the point of purchase and initiation of service, Defendants

17  involuntarily impose on consumers a contract exclusivity restriction which restricts their freedom

18  from that point forward for at least the next five years and conceivably for the life of the iPhone.

19  Even though consumers might sign a two-year service contract, they own the iPhone and are free to

20  terminate service with ATTM, subject, of course, to having to fulfil any financial commitment which

21  they have made to it.  The fact that some consumers might not have sought to switch service and

22  thus do not realize the restriction which the Apple/ATTM Agreement has imposed on them does not

23  alter the effect of Plaintiffs' allegation that their freedom in the aftermarket has already been taken

24  from them.

25         Under Newcal, Plaintiffs have sufficiently alleged an aftermarket in iPhone voice and data

26  services sufficient to state a claim under § 2 of the Sherman Act.

27

28

1

United States District Court
For the Northern District of California

ii.     The iPhone Applications Aftermarket

Apple moves to dismiss on the ground that there is no relevant aftermarket for iPhone applications. (Apple's Motion at 11.)

Plaintiffs allege that:

iPhone-specific TPAs began to appear immediately after the iPhone was launched. (Complaint ¶ 87.) Apple created a number of iPhone-specific applications itself, sold ring tones from the iTunes Store, and also had revenue-sharing arrangements with approved TPA software manufacturers. (Id. ¶¶ 4, 88-90.) Additionally, Apple built technological restrictions into the iPhone, and policed its restrictions on unapproved TPAs by damaging iPhones and downloaded TPAs through the guise of software update Version 1.1.1. (Id. ¶¶ 4-5, 94-103.)

Plaintiffs have alleged an aftermarket for iPhone applications that "would not exist without" the primary market for iPhones, and is thus "wholly derivative from and dependant on the primary market." Newcal, 513 F.3d at 1049. The allegations in the Complaint recite facts, which, if presumed to be true, would support the existence of an aftermarket for iPhone applications, under the standard articulated by the Ninth Circuit in Newcal.

Apple contends that there is no such aftermarket because (1) Apple does not sell or make any add-on applications and (2) that the array of differing applications for the iPhone could not possibly make up a single relevant market. (Apple's Motion at 13.)[6] Apple further contends that because Apple has now opened up the iPhone to TPAs, Plaintiffs' claims as to the applications aftermarket are moot.[7] (Apple's Reply at 9.) Plaintiffs, however, have alleged that Apple enforced entry into the Applications Aftermarket, and limited access to software applications in which it maintained a financial interest.

Under Newcal, Plaintiffs have sufficiently alleged a relevant aftermarket in iPhone applications sufficient to state a claim under § 2 of the Sherman Act.

_____

[6] A determination of whether the "applications aftermarket" should appropriately be split into more specific sub-markets is a factual issue more appropriate for determination at a later state in this litigation.

[7] Plaintiffs have alleged injury, however, for the period before Apple opened up the iPhone to TPAs. In addition, the extent to which Apple has opened up the applications aftermarket is not clear from the pleadings or the parties' papers.

16

b.      **Market Power**

To sustain an antitrust claim, a plaintiff must allege that the defendant possesses power in the relevant market.  Id. at 1046.  There can be no legally cognizable antitrust claim, however, where there is a claim of "market *power* that arises solely from contractual rights that consumers knowingly and voluntarily give to the defendant."  Id. at 1048 (emphasis in original).  According to the Ninth Circuit, whether a consumer *knowingly* places a defendant in a monopoly position in an aftermarket is "[t]he critical distinction" between Eastman Kodak and the paired cases of Queen City Pizza and Forsyth.  Id.  In Eastman Kodak, copier purchasers could not, at the time of purchase, reasonably determine that Kodak monopolized the aftermarkets for replacement parts and services for its brand copiers.  Eastman Kodak, 504 U.S. at 473-78.

In applying the lessons of Eastman Kodak, the Newcal Court found two aspects of the plaintiffs' complaint relevant to whether there was a legally cognizable claim of market power.  First, the defendant did not "achieve market power through contractual provisions that it obtain[ed] in the initial market [for copiers]."  Id. at 1050.  Rather, the initial contract gave the defendant "special access to its consumers," by which it was later able to induce those consumers into purchasing aftermarket equipment and services from the defendants.  Id.  Second, the complaint alleged market imperfections such as information and switching costs, along with fraud and deceit on the part of the defendants, so as to "prevent consumers from realizing that their choice in the initial market will limit their freedom to shop in the aftermarket."  Id.  In other words, "[c]ompetition in the initial market . . . does not necessarily suffice to discipline anticompetitive practices in the aftermarket."  Id.  As such, the Court held that no *per se* rule exists against recognition of contractually created submarkets.  Id.

i.      **Market Power in the Voice and Data Services Aftermarket**

Apple moves to dismiss on the ground that Plaintiffs have made no legally cognizable claim of market power in the alleged voice and data services aftermarket.  (Apple's Motion at 11.)

1    Plaintiffs allege that:

2         Defendants had not disclosed that Defendants had a five-year exclusive
          service provider agreement or that Defendants' five-year agreement would
3         effectively lock Plaintiffs into using ATTM as their voice and data service
          provider even after their two-year contracts expired.  (Complaint ¶ 32.)  In
4         addition, Defendants did not disclose the SIM card locks on each iPhone or
          the extent of the roaming fees iPhone users would incur during or after the
5         expiration of their two-year contracts.  (Id. ¶¶ 33-34.)

6    In other words, Plaintiffs have alleged that Defendants "achieve[d] market power through

7    contractual provisions that they obtain[ed] in the initial market" for iPhones and attendant two-year

8    service contracts.  Newcal, 513 F.3d at 1050.  Through the initial iPhone purchase and contracting,

9    Defendants are alleged to have gained the "special access" to consumers by which they are then able

10   to lock purchasers into use of ATTM.  Id.  In addition, the Complaint has alleged the types of

11   information costs relating to the iPhone that caused concern for the Ninth Circuit in Newcal.

12   Ultimately, the dispositive issue is whether Plaintiffs "knowingly placed [Defendants] in a monopoly

13   position" in the alleged voice and data services aftermarket.  Id. at 1049.  Apple's contention is that

14   Plaintiffs' market power and monopolization allegations fail because "inadequate disclosure does

15   not result in aftermarket monopoly power" (Apple's Reply at 6.)  The fact that Apple disputes

16   whether Plaintiffs "knowingly placed [Apple] in a monopoly position" merely creates a factual

17   dispute better suited for resolution at a later stage of this litigation.

18        In sum, the Court finds Plaintiffs have sufficiently alleged market power and monopolization

19   in the iPhone voice and data services aftermarket, which, taken with Plaintiffs' market allegations, is

20   sufficient to state a claim for violation of § 2 of the Sherman Act.

21        Accordingly, the Court DENIES Apple's Motion to Dismiss Plaintiffs' antitrust claims

22   relating to the iPhone voice and data services aftermarket.

23                    ii.        Market Power in the iPhone Applications Aftermarket

24        Apple moves to dismiss on the ground that Plaintiffs have made no legally cognizable claim

25   of market power or monopolization in the alleged iPhone applications aftermarket.  (Apple's Motion

26   at 11.)

27

28

United States District Court

For the Northern District of California

Plaintiffs allege that:

> Plaintiffs were unaware of Apple's policies barring TPAs when they entered into their iPhone purchase contracts. (Complaint ¶¶ 4, 7.) Apple maintained complete control over which applications were made available for the iPhone. (Id. ¶¶ 4-5.) Additionally, Apple built technological restrictions into the iPhone, and policed its restrictions on unapproved TPAs by damaging iPhones and downloaded TPAs through the guise of software update Version 1.1.1. (Id. ¶¶ 4-5, 94-103.)

As discussed, *supra*, a monopolization claim can proceed where it is alleged that a plaintiff did not "knowingly and voluntarily" place the defendant in a monopoly position. Through the initial iPhone purchase and contracting, Apple is alleged to have gained the "special access" to consumers by which it is then able to lock consumers into use of only applications in which Apple maintained a financial interest. Newcal, 513 F.3d at 1050. Apple is then alleged to have enforced its special position through technological controls and the issuance of software update Version 1.1.1.

In sum, Plaintiffs have sufficiently alleged market power and monopolization in the iPhone voice and data services aftermarket, which, taken with Plaintiffs' market allegations, is sufficient to state a claim for violation of § 2 of the Sherman Act.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' antitrust claims relating to the iPhone applications aftermarket.

### 2.    Computer Trespass

Apple moves to dismiss Plaintiffs' trespass to chattels claim on the grounds that (1) Plaintiffs allege no "intrusion" sufficient to constitute trespass and (2) Plaintiffs' trespass claim is vitiated by consent. (Apple's Motion at 15-16.) The Court considers each contention in turn.

Common law trespass "lies where an intentional interference with the possession of personal property has proximately caused injury." eBay, Inc. v. Bidder's Edge, Inc., 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000) (quoting Thrifty-Tel v. Bezenek, 46 Cal. App. 4th 1559, 1566 (1996)).

With respect to their computer trespass claim, Plaintiffs allege as follows:

> Apple "acted deliberately and intentionally to destroy the iPhones of consumers who had unlocked their iPhones." (Complaint ¶ 97.) Version 1.1.1 contained codes targeted at the unlocked iPhones that were not necessary to the stated purposes of Version 1.1.1. (Id. ¶¶ 102-03.)

United States District Court

For the Northern District of California

Plaintiffs' iPhones were damaged or disabled as a result of downloading Version 1.1.1.  (Id. ¶¶ 47, 49, 56.)

Apple contends, however, trespass law only applies to computer systems where there is an "uninvited intrusion" into a plaintiff's computer (i.e., through "spamming"), such that trespass can never lie as the result of a willful download.  (Apple's Motion at 15.)  Although Apple cites cases where a defendant did make an "uninvited intrusion" into a plaintiff's computer system, those cases do not, as a matter of law, foreclose a trespass claim incident to a software download.  See eBay, 100 F. Supp. 2d 1058; Intel Corp. v. Hamidi, 30 Cal. 4th 1342 (2003).  Rather, there must be an "intentional interference with the possession of personal property" to find a trespass.  eBay, 100 F. Supp. 2d at 1069.  As discussed, Plaintiffs here allege that Apple intentionally damaged their iPhones via its dissemination of Version 1.1.1.  Plaintiffs therefore allege facts to support a claim of trespass sufficient to survive a motion to dismiss.

Whether Plaintiffs' trespass claim can be permitted to proceed, however, depends on whether Plaintiffs consented to the alleged trespass when they downloaded Version 1.1.1, despite being first confronted with a warning that stated "IF YOU HAVE MODIFIED YOUR IPHONE'S SOFTWARE, APPLYING THIS SOFTWAREUPDATE MAY RESULT IN YOUR IPHONE BECOMING PERMANENTLY INOPERABLE."  (Apple's Motion at 14-15.)

"Where there is a consensual entry, there is no tort, because lack of consent is an element" of a trespa§ claim.  Civic Western Corp. v. Zila Industries, Inc., 66 Cal. App. 3d 1, 16-17 (1977). Consent can be limited by its scope, however, and "creates a privilege to [enter] only in so far as [a] condition or restriction is complied with."  Id. at 17.

Plaintiffs contend that the scope of their consent was limited to installation of Version 1.1.1, which they allege was "intended to make limited specific changes and improvements including . . . a needed and substantial improvement to the power management and battery life of [the] iPhone." (Plaintiffs' Opposition at 24; Complaint ¶ 102.)  Plaintiffs also allege that some customers "unsuspectingly downloaded Version 1.1.1."  (Complaint ¶ 103.)  The Court takes this to mean that, even if these consumers had given nominal consent pursuant to Apple's warning, they were not

20

1   aware of what they were consenting to.  In addition, there is some ambiguity in Apple's warning that

2   may also serve to vitiate Plaintiffs' consent.  The warning says that "if you have modified your

3   iPhone's software," permanent inoperability "may" result from installing Version 1.1.1.  Under these

4   circumstances, Plaintiffs' claims cannot conclusively be dismissed on consent grounds, as a matter

5   of law.

6          Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' trespass to

7   chattels claim.

8          **3.     Computer Fraud**

9          Apple moves to dismiss Plaintiffs' computer fraud claims under (1) the federal Computer

10  Fraud and Abuse Act ("CFAA") and (2) California Penal Code § 502(c)(8).  The Court considers

11  each contention in turn.

12              **a.     Computer Fraud Abuse Act**

13         Apple contends that Plaintiffs' CFAA claim fails because (1) Plaintiffs fail to allege the

14  requisite intent required by the CFAA; (2) Plaintiffs authorized the installation of Version 1.1.1; and

15  (3) Plaintiffs fail to allege the $5,000 minimum in damages required by the CFAA.  (Apple's Motion

16  at 16-18.)

17         The CFAA provides for liability for "knowingly caus[ing] the transmission of a program,

18  information, code, or command, and as a result of such conduct, intentionally caus[ing] damage

19  without authorization, to a protected computer."  18 U.S.C. § 1030(a)(5)(A)(i).  A plaintiff must also

20  demonstrate that the defendant's action caused over $5,000 in damage over a one-year period.  Id. at

21  § 1030(a)(5)(B)(i).

22         With respect to their computer fraud claims, Plaintiffs allege as follows:

23         Apple specifically intended to disable iPhones that contained unapproved
           program unlocks.  (Complaint ¶ 99.)  Apple was aware of the potential
24         ramifications of Version 1.1.1 prior to its release and none of the damaging
           aspects of Version 1.1.1 were necessary to effectuate Apple's stated intent in
25         releasing that software upgrade.  (Id. ¶¶ 98-103.)   Plaintiffs authorized a
           software update,  but did not authorize damage to their iPhones.  (Id. ¶¶ 102-
26         03.)

27

28
                                                  21

United States District Court

For the Northern District of California

Plaintiffs allege more than that Apple had "knowledge of a potential but unintended result." (Apple's Motion at 17.)  Contrary to Apple's contention, therefore, Plaintiffs have adequately alleged the requisite intent to satisfy a motion to dismiss under Rule 12(b)(6).

Plaintiffs' contentions regarding their lack of "authorization" are also sufficient to state a claim under the CFAA.  As discussed in the Computer Trespass subsection, *supra*, Plaintiffs have alleged that they authorized a software update, not that they authorized damages to their iPhones. Given the ambiguity surrounding Apple's warning and the fact that Plaintiffs allege that some downloading of Version 1.1.1 was "unsuspected," Plaintiffs allegations are sufficient to defeat Apple's motion to dismiss.

Finally, the Court rejects Apple's contentions that Plaintiffs' CFAA claims are barred on ground that they have not adequately pleaded the $5,000 minimum in damages.  Apple contends that Plaintiffs are not permitted to aggregate damage to their individual iPhones to reach the $5000 jurisdictional minimum because damages to multiple computers cannot be aggregated under the CFAA.  (Apple's Motion at 18.)  In In re Toys R Us, Inc. Privacy Litigation, however, Judge Chesney permitted a class of plaintiffs to aggregate damages to their individual computers where it was alleged that the "defendants caused an identical file to be implanted in each of the plaintiffs' computers, resulting in damages of a uniform nature."  2001 WL 34517252, *11 (N.D. Cal. 2001). In Toys R Us, the allegation was that the defendants had caused a damaging "cookie" to be implanted in multiple plaintiffs' computers.  The court permitted the plaintiffs' CFAA claims to proceed.  Id.  Thus, the Court is persuaded by the holding of Toys R Us, as it found that the legislative history of the CFAA revealed that Congress intended to permit aggregation of damages, so long as those damages arose from the same act by a defendant.  Id.  The Court therefore permits Plaintiffs to aggregate their individual damages to reach the $5,000 threshold.

Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' CFAA claim.

1

#### b.    California Penal Code §§ 502(c)(4) and 502(c)(8)

2    The California Penal Code ("CPC") permits an action against an individual who

3    "[k]nowingly accesses and without permission adds, alters, damages, deletes, or destroys any data,

4    computer software, or computer programs which reside or exist internal or external to a computer."

5    CPC § 502(c)(4).  In addition, the CPC allows an action against an individual who "[k]nowingly

6    introduces any computer contaminant into any computer, computer system, or computer network.

7    Id. § 502(c)(8).  Under the CPC, a "computer contaminant" is defined as "computer instructions that

8    are designed to . . . damage [a computer] . . . without the intent or permission of the owner."  Id. §

9    502(b)(10).

10    Apple's contentions here mirrors its arguments relating to Plaintiffs' trespass and computer

11    fraud claims.   Namely, Apple contends that the Complaint insufficiently alleges that Apple designed

12    and released Version 1.1.1 with the intent that it visit damage on Plaintiffs' iPhones, and that

13    Plaintiffs' authorized introduction of Version 1.1.1 onto their iPhones.  (Apple's Motion at 18.)  For

14    the reasons discussed in those prior sections, *supra*, Plaintiffs have sufficiently alleged knowledge

15    and intent on the part of Apple, as well as their own insufficient consent.

16    Accordingly, the Court DENIES Apple's Motion to Dismiss Plaintiffs' claims under

17    California Penal Code § 502.

18    **4.    Unfair and Deceptive Trade Acts and Practices**

19    Apple moves to dismiss Plaintiffs' consumer protection claims on the grounds that (1)

20    Plaintiffs lack standing to pursue claims under the laws of the forty states where no named plaintiffs

21    reside; (2) the claims, which rely on allegations of fraudulent omission or concealment, fail to meet

22    the heightened pleading test of Federal Rule of Civil Procedure 9(b); and (3) Plaintiffs have failed to

23    state a claim under the laws of the three states in which named Plaintiffs reside, California,

24    Washington, and New York.  (Apple's Motion at 19.)  The Court considers each contention in turn.

25    **a.    Standing**

26    Apple contends that Plaintiffs lack standing to bring consumer protection claims in the forty

27    states where no named Plaintiff resides.  (Motion at 19-20.)

28

1    A demonstration of standing requires that "named plaintiffs who represent a class must allege

2    and show that they personally have been injured, not that injury has been suffered by other,

3    unidentified members of the class to which they belong and which they purport to represent." Lewis

4    v. Casey, 518 U.S. 343, 347 (1996).  This standing predicate was recently addressed in two antitrust

5    class action cases in this District.  In In re Ditropan XL Antitrust Litig., plaintiffs were denied

6    standing to bring claims based on the laws of states in which no named plaintiffs resided.  529 F.

7    Supp. 2d 1098, 1107 (N.D. Cal. 2007); see also In re Graphics Processing Units Antitrust Litig., 527

8    F. Supp. 2d (N.D. Cal. 2007).  As is the case here, Judge White in Ditropan addressed the issue of

9    standing prior to class certification.  Id. (citing Easter v. American West Financial, 381 F.3d 948,

10   962 (9th Cir. 2004)).

11        Since named Plaintiffs here only reside in California, New York, and Washington, but have

12   alleged violations of the consumer protection laws of forty-two states and the District of Columbia,

13   the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' consumer protection claims

14   for all jurisdictions except for California, New York, and Washington.

### b.    Application of Federal Rule of Civil Procedure 9(b)

16        Apple contends that Plaintiffs' consumer protection claims must meet the heightened

17   pleading requirement of Rule 9(b), because these claims are based on Apple's alleged failure to

18   disclose and fraudulent concealment of facts in connection with Plaintiffs' iPhone purchases.

19   (Apple's Motion at 20-21; Apple's Reply at 12.)

20        Fed. R. Civ. P. Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state

21   with particularity the circumstances constituting fraud or mistake."  Allegations under Rule 9(b)

22   must be stated "specificity including an account of the time, place, and specific content of the false

23   representations as well as the identities of the parties to the misrepresentations." Swartz v. KPMG

24   LLP, 476 F.3d 756, 764 (9th Cir. 2007); Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994).  The

25   pleading must be "specific enough to give defendants notice of the particular misconduct . . . so that

26   they can defend against the charge and not just deny that they have done anything wrong." Vess v.

27   Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation omitted).  Where

28

1  the claim is one of fraud by omission, however, the pleading standard is lowered on account of the

2  reduced ability in an omission suit "to specify the time, place, and specific content" relative to a

3  claim involving affirmative misrepresentations.  Falk v. General Motors Corp., 780 F. Supp. 2d

4  1088, 1099 (N.D. Cal. 2007).

5       Here, Plaintiffs do not contest that their allegations are governed by the requirements of Rule

6  9(b).  Plaintiffs allegations of material omissions on the part of Defendants include the following:

7       Non-disclosure (1) of the five-year exclusivity agreement between Apple
and ATTM, the result of which was that consumers would be locked into

8       ATTM service beyond their initial contract terms; (2) that iPhone SIM cards
were locked; (3) that SIM card unlock codes would not be provided to

9       iPhone owners; (4) that Apple would seek to limit iPhone owners' use of
unapproved TPAs; and (5) the extent of the international roaming fees

10       associated with international use of the iPhone.  (Complaint ¶ 7.)

11  Since these are allegations of fraudulent omissions, Plaintiffs failure to specify the time and place of

12  the omissions will not bar their claims.  Falk, 780 F. Supp. 2d at 1099.  Plaintiffs have, however,

13  pleaded the content of the omissions, the identity of the parties responsible for the omissions, and the

14  injuries resulting from the omissions with sufficient particularity to survive Rule 9(b) scrutiny.

15       Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' consumer

16  protection claims on ground of failure to plead fraudulent omission with sufficient particularity.

17       **c.**    **Plaintiffs' Claims Under California Consumer Protection Laws**

18       Apple contends that Plaintiffs fail to state a cause of action under the California Unfair

19  Competition Law ("UCL") and the California Consumer Legal Remedies Act ("CLRA").  Cal. Bus.

20  & Prof. Code §§ 17200, 17500; Cal. Civ. Code § 1770(a)(19).

21       **i.**    **The CLRA**

22       The CLRA prohibits "[i]nserting unconscionable provisions in contracts."  Cal. Civ. Code §

23  1770(a)(19).  Liability under the CLRA for an omission can result when a defendant has a "duty to

24  disclose" potential problems with a product in four circumstances: (1) when the defendant is in a

25  fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material

26  facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the

27  plaintiff; and (4) when the defendant makes partial representations but also suppresses some material

28

fact. <u>Falk</u>, 496 F. Supp. 2d at 1095.  Materiality depends on a plaintiff showing that "had the omitted information been disclosed," a reasonable consumer "would have been aware of it and behaved differently." <u>Id</u>. at 1094.

In this case, Plaintiffs adequately allege that Defendants "had exclusive knowledge of material facts not known" to Plaintiffs.[8] <u>Id</u>. at 1095.  As discussed, *supra*, Plaintiffs allege that Defendants failed to disclose numerous legal and technical limitations associated with the iPhone. Plaintiffs Complaint alleges a number of consumer expectations in the cellular industry relating to the abilities of consumers to unlock SIM cards and for cellular providers to provide unlock codes. (Complaint ¶¶ 42, 70.)   The Complaint does not, however, allege facts supporting the claim that a reasonable consumer "would have behaved differently."  The Complaint merely alleges that a number of the named Plaintiffs now would like to unlock their iPhones or switch service providers, and does not allege that those Plaintiffs would have made a different product choice at the outset. (<u>Id</u>. ¶¶ 37, 39, 44-48, 51.)  Plaintiffs have thus not pleaded a "duty to disclose" under the CLRA.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' CLRA claim with leave to amend to plead facts consistent with this Order.

### ii.    The UCL

The UCL is a broad statute that defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.  Similarly, "false and misleading advertising" is also proscribed.  <u>Id</u>. § 17500.  Given the sweep of the statute, a "practice may be deemed unfair even if not specifically proscribed by some other law." <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 180 (1999).  There can thus be a violation of the UCL if a business practice was unlawful, unfair, or fraudulent.  A business practice is unfair if "it offends established public policy . . . or is substantially injurious to consumers." <u>People v. Duz-Mor Diagnostic Laboratory</u>, 68 Cal. App. 4th

---

[8]  The parties' dispute over whether Plaintiffs were aware of the alleged omissions or whether Defendants were in exclusive possession of the relevant material facts is a factual dispute more suited to resolution at a later point in this litigation.  For the purposes of this Motion to Dismiss, Plaintiffs' allegations that Apple never disclosed those facts suffices.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

654, 658 (1998).  Finally, a business practice is fraudulent under the UCL if a plaintiff can show that "members of the public are likely to be deceived." <u>Bardin v. Daimlerchrysler Corporation</u>, 136 Cal. App. 4th 1255, 1261 (2006).

Plaintiffs' claim is that Apple violated the UCL by violating the CLRA.  (Plaintiffs' Opposition at 20).  As discussed above, Plaintiffs' pleading is inadequate to sustain a claim under the CLRA.  Plaintiffs' UCL claim therefore must also fail.  This is true under either the unlawfulness, unfairness, or fraudulence prongs of the UCL.  In <u>Falk</u>, Judge Alsup permitted a plaintiff's UCL claims under all three prongs, only because the plaintiff had adequately pleaded a duty to disclose under the CLRA as a predicate.  496 F. Supp. 2d at 1098.  Therefore, to the extent Plaintiffs allege a UCL violation based on the same behavior alleged to underlie Plaintiffs' CLRA claim, Plaintiffs have not pleaded facts sufficient to state a claim under the UCL.

Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims under the California UCL, with leave to amend to plead facts consistent with this Order.

### d.   Washington Consumer Protection Act

Apple contends that Plaintiffs fail to state a cause of action under the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.020, on the ground that the Complaint fails to adequately plead the required causation element.  (Apple's Motion at 23-24.)

Under the WCPA, a plaintiff must prove five distinct elements: "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; and (5) causation."  <u>Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.</u>, 105 Wash. 2d 778, 780 (1986).  In <u>Hangman Ridge</u>, the Washington Supreme Court held that the "need to find a causal link between the alleged acts and the plaintiff's injury" is essential to a WCPA claim.  <u>Id.</u> at 793.

Under the WCPA, the causation element operates in the same manner as the materiality requirement for omissions under the CLRA, in that liability under both is predicated on whether a consumer "would have . . . behaved differently."  <u>Falk</u>, 496 F. Supp. 2d at 1094.  As discussed above, Plaintiffs make no allegations that their choice to purchase an iPhone and enroll in ATTM's

1   service plan would have been different had Defendants made the relevant disclosures.  Therefore, for

2   the reasons articulated in the CLRA section, *supra*, Plaintiffs fail to state a claim under the WCPA.

3          Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims

4   under the WCPA, with leave to amend to plead additional facts consistent with this Order.

5                  **e.      New York Consumer Protection Act**

6          Apple contends that Plaintiffs fail to state a cause of action under the New York Consumer

7   Protection Act ("NYCPA").  Gen. Bus. L. § 349.

8          To state a claim under the NYCPA, a plaintiff must allege "an act or practice that is

9   deceptive or misleading in a material way and that plaintiff has been injured by reason thereof."

10  Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y. 2d 20, 25 (N.Y.

11  1995).  Actual harm must be caused by a defendant's material deceptive act or practice.  Small v.

12  Lorillard Tobacco Co., Inc., 94 N.Y. 2d, 43, 56 (N.Y. 1999).

13         As discussed, *supra*, Plaintiffs do not allege that Defendant's alleged material omissions

14  were the actual cause of the harm they claim to have suffered.  Nowhere in the Complaint is an

15  allegation that any of the Plaintiffs would not have bought an iPhone if armed with the knowledge

16  Defendants' are alleged to have withheld.  Plaintiffs therefore fail to state a claim under the NYCPA.

17         Accordingly, the Court GRANTS Defendant Apple's Motion to Dismiss Plaintiffs' claims

18  under the NYCPA, with leave to amend to plead additional facts consistent with this Order.

19         **5.      Magnuson-Moss Warranty Act**

20         Apple moves to dismiss Plaintiffs' Magnuson-Moss Warranty Act ("MMWA") claims on the

21  grounds that (1) the Complaint did not allege prohibited "conditioning" under the MMWA and (2)

22  Apple made disclosures regarding Plaintiffs' iPod warranties as required by the MMWA.  15 U.S.C.

23  §§ 2301, *et seq.*

24                 **a.      Warranty Conditioning Under the MMWA**

25         Under the MMWA, "[n]o warrantor of a consumer product may condition its written or

26  implied warranty of such product on the consumer's using, in connection with such product, any

27

28

United States District Court

For the Northern District of California

1   article or service (other than article or service provided without charge under the terms of the

2   warranty) which is identified by brand, trade, or corporate name." 15 U.S.C. § 2302(c).

3           The Complaint alleges in relevant part that:

4               Apple "[told] customers that Apple will void and refuse to honor the
                iPhone warranty of any customer who has downloaded competing
5               applications." (Complaint ¶ 4.) As a result of installing unlocking
                software for the specific purposes of using non-ATTM SIM cards and
6               unapproved TPAs on their iPhones, their phones were damaged or disabled
                when Apple subsequently released software update Version 1.1.1. (Id. ¶¶
7               5-6, 47, 56, 94.) Apple refused to honor the warranties of customers whose
                iPhones had been damaged as a result of downloading Version 1.1.1 after
8               previously installing the unapproved software. (Id. ¶¶ 5,7, 94-95, 104.)

9   Plaintiffs' Complaint thus alleges sufficient facts to state a claim under § 2302(c), because it alleges

10  that Apple refused to honor the warranties of customers who used iPhone applications and cellular

11  service not approved by Apple.

12          Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' MMWA

13  claims under 15 U.S.C. § 2302(c).

14                    **b.    Warranty Disclosure Under the MMWA**

15          The MMWA requires that a warrantor make a "full and conspicuous disclosure of the terms

16  and conditions" of a warranty. 15 U.S.C. § 2302(a). Magnuson-Moss requires warrantors to

17  "clearly and conspicuously disclose [warranty terms] in a single document in simple and readily

18  understood language." Cunningham v. Fleetwood Homes of Ga., Inc., 253 F.3d 611 (11th Cir.

19  2001) (quoting 16 C.F.R. § 701.3(a)).

20          Plaintiffs' primary allegation in support of their claim under § 2302(a) is that Defendants did

21  not "fully and conspicuously disclos[e] that they would not honor the warranty as to iPhone that

22  were damaged and destroyed by Apple's Version 1.1.1 operating system upgrade." (Complaint ¶

23  160.) Apple, however, contends that Plaintiffs' claim fails because their original warranty expressly

24  did not apply "to a product or part than has been modified to alter functionality or capability."

25  (Apple's Reply at 14.) Plaintiffs' contention, however, is that the alleged iPhone damage was as a

26  result of Apple's issuance of Version 1.1.1, not as a result of Plaintiffs' installation of unapproved

27  software on their iPhones. As such, Plaintiffs are claiming that Apple's warranty never stated that it

28

                                                    29

1   would not cover damage as a result of installation of Apple's own software updates.  The fact that,

2   as both parties agree, Apple issued a press release in advance of Version 1.1.1 that disclaimed

3   warranty liability for iPhone damage resulting from installation of Version 1.1.1 is of no moment to

4   the permissibility of Plaintiffs' claims, because such a later disclaimer runs afoul of the single

5   document rule.  16 C.F.R. § 701.3(a).

6        Accordingly, the Court DENIES Defendant Apple's Motion to Dismiss Plaintiffs' MMWA

7   claims under 15 U.S.C. § 2302(a).

8                              **IV.  CONCLUSION**

9        The Court DENIES ATTM's Motion to Compel Arbitration, DENIES ATTM's Motion to

10  Dismiss, and DENIES ATTM's Motion to Stay Discovery.  The Court GRANTS in part and

11  DENIES in part Apple's Motion to Dismiss, as follows:

12       (1)   The Court DENIES Apple's Motion to Dismiss all of Plaintiffs' Sherman Act claims;

13       (2)   The Court DENIES Apple's Motion to Dismiss Plaintiffs' computer trespass claim;

14       (3)   The Court DENIES Apple's Motion to Dismiss all of Plaintiffs' computer fraud

15             claims;

16       (4)   The Court GRANTS Apple's Motion to Dismiss Plaintiffs' unfair and deceptive trade

17             practices claims for all jurisdictions except California, Washington, and New York;

18       (5)   The Court GRANTS Apple's Motion to Dismiss Plaintiffs' unfair and deceptive trade

19             practices claims under California, Washington, and New York law, with leave to

20             amend;

21       (6)   The Court DENIES Apple's Motion to Dismiss Plaintiffs' Magnuson-Moss Warranty

22             Act claims.

23       Any Amended Complaint shall be filed on or before **October 15, 2008.**  If no Amended

24  Complaint is filed by the specified date, Defendants shall file and serve their Answers on or before

25  **October 30, 2008.**

26

27

28

United States District Court
For the Northern District of California

1       The parties shall appear for a Case Management Conference on **November 17, 2008 at 10**

2   **a.m.**  The parties shall meet and confer and file a Joint Case Management Statement on or before

3   **November 7, 2008.**  The Statement shall, among other things, set forth a good faith discovery plan,

4   including a proposed date for the close of all discovery.

5

6   Dated: October 1, 2008                  _James Ware_____

7                                      JAMES WARE
                                   United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

31

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Aaron M. Sheanin ams@girardgibbs.com
Adrian Frank Davis adrian.davis@lw.com
Alexander H. Schmidt schmidt@whafh.com
Alfred Carroll Pfeiffer Al.Pfeiffer@lw.com
Archis Ashok Parasharami aparasharami@mayerbrown.com
Arthur William Lazear awl@hoffmanandlazear.com
Christopher E Ondeck condeck@crowell.com
Christopher S. Yates chris.yates@lw.com
Damian Rene Fernandez damianfernandez@gmail.com
Daniel Allen Sasse dsasse@crowell.com
Daniel Murray Wall dan.wall@lw.com
David Eldon Crowe dcrowe@crowell.com
Donald M. Falk dfalk@mayerbrown.com
Elizabeth Cheryl Pritzker ecp@girardgibbs.com
Eric H. Gibbs ehg@girardgibbs.com
Francis M. Gregorek gregorek@whafh.com
H. Tim Hoffman hth@hoffmanandlazear.com
Jeffrey H. Howard jhoward@crowell.com
M. Van Smith mvsmith@sbcglobal.net
Marisa C. Livesay livesay@whafh.com
Mark Carl Rifkin rifkin@whafh.com
Max Folkenflik max@fmlaw.net
Morgan Matthew Mack mmm@hoffmanandlazear.com
Rachele R. Rickert rickert@whafh.com
Randall Scott Newman rsn@randallnewman.net
Stephen DeNittis sdenittis@shabeldenittis.com
Wm. Randolph Smith wrsmith@crowell.com

**Dated: October 1, 2008**                    **Richard W. Wieking, Clerk**

                                              **By:   /s/ JW Chambers**
                                                    **Elizabeth Garcia**
                                                    **Courtroom Deputy**