1   Jason C. Murray, Esq. (State Bar No. 169806)
    CROWELL & MORING LLP
2   515 South Flower Street, 40th Floor
    Los Angeles, CA 90071
3   Telephone:     (213) 622-4750
    Facsimile:     (213) 622-2690
4   Email:         jmurray@crowell.com

5   Shari Ross Lahlou, Esq.
    Kyler E. Smart, Esq.
6   CROWELL & MORING LLP
    1001 Pennsylvania Ave. N.W.
7   Washington, D.C. 20004
    Telephone:     (202) 624-2500
8   Facsimile:     (202) 628-5116
    Email:         slahlou@crowell.com
9                  ksmart@crowell.com

10  Attorneys for Defendant
    AT&T Mobility LLC

11

12                  UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                       SAN JOSE DIVISION

15  In Re Apple & AT&TM              Case No. C 07-05152 JW
    Antitrust Litigation
16                                   DEFENDANT AT&T MOBILITY LLC'S
                                     OPPOSITION TO PLAINTIFFS'
17                                   MOTION FOR CLASS CERTIFICATION

18                                   Date:      May 10, 2010
                                     Time:      9:00 a.m.
19                                   Crtrm.:    8
                                     Judge:     Honorable James Ware
20

21

22

23

24

25

26

27

28

                                                    Case No. 07-CV-05152-JW
    DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
                               CERTIFICATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ ii

I.     INTRODUCTION ..................................................................................................................... 1

II.    PROCEDURAL AND FACTUAL BACKGROUND ............................................................ 2

III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF DEMONSTRATING THAT THE REQUIREMENTS OF RULE 23 ARE SATISFIED. ........................................ 9

    A.    Plaintiffs' Claims Necessitate An Assessment Of Each Consumer's Knowledge, Understanding And Intent, Precluding Certification. ....................... 11

    B.    Assessing Impact Requires An Inquiry Into What Each Consumer Would Have Done Had There Been Fuller Disclosures. ................................................ 22

    C.    Determining Damages Will Require A Highly Individualized Inquiry. ................ 31

IV.   PLAINTIFFS' CLAIMS ARE NOT TYPICAL, INCLUDING THE CLAIMS OF PLAINTIFFS WHO LACK STANDING. ............................................................................ 31

V.    PLAINTIFFS' INJUNCTIVE CLAIM DOES NOT PROVIDE AN APPROPRIATE BASIS FOR CERTIFICATION. .................................................................................... 34

VI.   CONCLUSION ...................................................................................................................... 35

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# **TABLE OF AUTHORITIES**

## **Cases**

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*,
   247 F.R.D. 156 (C.D. Cal. 2007) ............................................................ 10, 24, 30, 31

*Bell Atl. Corp. v. AT&T Corp.*,
   339 F.3d 294 (5th Cir. 2003)................................................................................ 25, 33

*Blades v. Monsanto Co.*,
   400 F.3d 566 (8th Cir. 2005) ............................................................................... 10, 16

*Chin v. Chrysler Corp.*,
   182 F.R.D. 448 (D.N.J. 1998) ...................................................................................... 33

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ...................................................................................... 24

*Daubert v. Merrell Dow Pharms.*,
   509 U.S. 579 (1993) ...................................................................................................... 32

*Doninger v. Pac. Nw. Bell, Inc.*,
   564 F.2d 1304 (9th Cir. 1977) ...................................................................................... 37

*Dukes v. Wal-mart, Inc.*,
   509 F.3d 1168 (9th Cir. 2007) *(en banc ruling pending)* ............................................. 10

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ........................................................................................................ 3

*Freeland v. AT&T Corp.*,
   238 F.R.D. 130 (S.D.N.Y. 2006)............................................................................ 11, 22

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   903 F.2d 176 (2d Cir. 1990) ......................................................................................... 35

*General Tel. Co. v. Falcon*,
   457 U.S. 147 (1982) ...................................................................................................... 10

*Gonzalez v. Procter & Gamble Co.*,
   247 F.R.D. 616 (S.D. Cal. 2007).......................................................................... 1, 21, 22

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992).............................................................................. 10, 34, 35

*Hill v. A-T-O, Inc.*,
   80 F.R.D. 68 (E.D.N.Y. 1978) ..................................................................................... 22

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
   Nos. C 87-1686 BAC, C 94-0524 BAC, C 94-1070,
   1994 U.S. Dist. LEXIS 12652 (N.D. Cal. Sept. 2, 1994).............................................. 20

*In Re Dynamic Random Access Memory Antitrust Litig.*,
    No. M 02-1486-PJH, 2006 WL 1530166 (N.D. Cal. Jun. 5, 2006) .................................... 32

*In Re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008) ...................................................................................... 37

*In Re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2009) ............................................................................ 11, 23, 24

*In Re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ................................................................................................ 11

*In Re Universal Srvc. Fund Tel. Billing Practices Litig.*,
    No. 02-MD-1468-JWL, 2008 U.S. Dist. LEXIS 74548 (D. Kan. Sep. 26, 2008) .............. 32

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ............................................................................................................... 22

*Kanter v. Warner-Lambert Co.*,
    265 F.3d 853 (9th Cir. 2001) ............................................................................................. 38

*Kelley v. Microsoft Corp.*,
    No. C07-0475MJP, 2009 WL 973368 (W.D. Wash. Apr. 10, 2009) ..................... 20, 21, 22

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    78 F.R.D. 108 (C.D. Cal. 1978) ......................................................................................... 37

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................................... 35

*Martin v. Home Depot U.S.A., Inc.*,
    225 F.R.D. 198 (W.D. Tex. 2004) ...................................................................................... 20

*Molski v. Gleich*,
    318 F.3d 937 (9th Cir. 2003) ............................................................................................. 37

*Netbula, LLC v. BindView Dev. Corp.*,
    516 F. Supp. 2d 1137 (N.D. Cal. 2007) ............................................................................. 23

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................................. 3, 12, 22, 23

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ............................................................................................................. 2

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
    100 Fed. Appx. 296 (5th Cir. 2004) ................................................................................... 11

*Poulos v. Caesars World, Inc.*,
    379 F.3d 654 (9th Cir. 2004) ......................................................................................... 1, 20

*Rebel Oil v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................................. 24

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

crowell moring

iii

Case No. C 07-05152 JW

*Retired Chicago Police Ass'n v. City of Chicago,*
    7 F.3d 584 (7th Cir. 1993) ................................................................ 34

*Rissetto v. Plumbers & Steamfitters Local 343,*
    94 F.3d 597 (9th Cir. 1996) ................................................................ 2

*Smith v. Apple, Inc.,*
    Case No. 07-CV-095781 (Cal. Super. Ct. Oct. 5, 2007) ................... 15

*Sprague v. Gen. Motors Corp.,*
    133 F.3d 388 (6th Cir. 1998) ......................................................... 34, 35

*Szabo v. Bridgeport Machs, Inc.,*
    249 F.3d 672 (7th Cir. 2001) ............................................................. 10

*Thorogood v. Sears, Roebuck & Co.,*
    547 F.3d 742 (7th Cir. 2008) ............................................................. 26

*Wilcox Dev. Co. v. First Interstate Bank of Or., N.A.,*
    97 F.R.D. 440 (D. Or. 1983) ............................................................ 20

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    395 U.S. 100 (1969) ..................................................................... 24, 38

*Zinser v. Accufix Research Inst.,*
    253 F.3d 1180 (9th Cir. 2001) ......................................................... 9, 10

**Rules**

Fed. R. Civ. P. 23(a) ............................................................................ 9, 34

crowell &amp; moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

Case No. C 07-05152 JW
DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1   **I.      INTRODUCTION**

2          Plaintiffs' theory is that ATTM and Apple have exploited them and other iPhone

3   consumers by locking them into ATTM service, even after each consumer's two-year contract

4   with ATTM is completed, because they did not realize that their iPhone would only work on the

5   ATTM network.  This "lock-in" supposedly placed Defendants in a monopoly position with

6   respect to the Plaintiffs.  Plaintiffs have clearly and repeatedly disavowed any challenge to the

7   exclusive nature of the agreement between ATTM and Apple and instead are fully committed to

8   this theory of post-contract exploitation.  Central to Plaintiffs' case is their assertion that

9   Defendants did not adequately disclose the precise duration of their exclusive agreement, or the

10  fact that iPhone "unlock codes" would not be provided to purchasers.  As the Court has stated, a

11  dispositive issue in the case is thus whether Plaintiffs "***knowingly*** placed [Defendants] in a

12  monopoly position in the alleged voice and data services aftermarket."[1]  (Mot. to Dismiss Order,

13  Docket No. 144, at 18) (emphasis added).)

14         Predicated on such a "knowingly" standard, Plaintiffs' claims are inherently and

15  unavoidably premised on individualized issues of who knew what and when, and whether any

16  particular iPhone purchaser would have acted differently or has suffered any injury as a result of

17  what he either did or did not know.  Plaintiffs' own varied stories demonstrate the individualized

18  nature of their claims.  Class certification is inappropriate and routinely rejected in such

19  circumstances.[2]

20         Plaintiffs attempt to evade this result by changing the subject.  Rather than offer a method

21  of common proof by which they might establish whether any class member "knowingly" placed

22  Defendants in a monopoly position, Plaintiffs now assert that the question is irrelevant and then

23

24  _____

25  [1] In adopting the Court's framing of the relevant issue, ATTM in no way concedes either that the
    alleged aftermarket is legally sustainable or that ATTM has a monopoly in *any* relevant market.

26
    [2] *See, e.g., Poulos v. Caesars World, Inc.*, 379 F.3d 654, 655-66 (9th Cir. 2004) (members did "not
27  share a common universe of knowledge"); *Gonzalez v. Procter & Gamble Co.*, 247 F.R.D. 616,
    623 (S.D. Cal. 2007) (common proof could not show what each consumer relied upon).

28
                                                              Case No. 07-CV-05152-JW
    _____
         DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
                                      CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   largely ignore it.  Plaintiffs therefore have not carried their burden of demonstrating that they can

2   establish market power in their defined market using proof common to the class.

3          On the critical issues of class-wide impact and damages, Plaintiffs rely exclusively on their

4   economic expert, Professor Wilkie.  Professor Wilkie offers only two methodologies, both of

5   which expressly rely upon a challenge to exclusivity that Plaintiffs abandoned long ago.  Professor

6   Wilkie readily concedes that he did *nothing* to analyze what was disclosed to the putative class,

7   what the effect of those disclosures was on individual consumers, or how that effect changed over

8   time.[3]  In other words, he undertook no analysis that is actually relevant to Plaintiffs' claims.

9   Instead, he *assumes* the disclosures were inadequate and uniformly affected the class, and then he

10  proceeds to analyze impact and damages as if exclusivity were illegal.  Having offered no theory

11  by which impact and damages flowing from the challenged conduct could be proven with

12  evidence common to the class, Plaintiffs have completely abdicated their burden.

13         Plaintiffs' failures are dispositive.  They cannot embrace a legal theory that hinges on the

14  knowledge of individual consumers and then ignore it or assume it away.  And, they cannot pursue

15  one legal theory for purposes of a motion to dismiss, and another for purposes of class

16  certification.[4]  Plaintiffs' motion should be denied.

17  **II.   PROCEDURAL AND FACTUAL BACKGROUND**

18         Plaintiffs have alleged that AT&T Mobility LLC ("ATTM") and Apple Inc. ("Apple")

19  monopolized, attempted to monopolize and conspired to monopolize an "iPhone Voice and Data

20  Services Aftermarket."  (Revised Consolidated Amended Complaint, Docket No. 109 ("RCAC")

21  ¶¶ 138, 144, 150.)  The core allegation is that ATTM and Apple did not disclose the precise

22  duration of their agreement under which ATTM would be the exclusive voice and data service

23  provider for the iPhone.  (RCAC ¶¶ 2, 7; Plaintiffs' Motion for Class Certification, Docket No.

24

25  [3] Declaration of Kyler Smart ISO ATTM's Opposition to Plaintiffs' Motion for Class Certification
    ("Smart Decl.") Ex. A (Wilkie Dep. 53:19-55:3).

26  [4] *Pegram v. Herdrich*, 530 U.S. 211, 228 (2000) (citing *Rissetto v. Plumbers & Steamfitters Local
    343*, 94 F.3d 597, 605 (9th Cir. 1996)) ("Judicial estoppel generally prevents a party from
27  prevailing in one phase of a case on an argument and then relying on a contradictory argument to
    prevail in another phase.").

28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   240 ("Pl. Br.") at 1-2, 14; Plaintiffs' Opposition to Defendant AT&T Mobility LLC's Motion to

2   Dismiss, Docket No. 166 ("Pl. Opp. ATTM MTD") at 8.)

3          It is the alleged non-disclosure, or inadequate disclosure, that underpins Plaintiffs'

4   hypothesized aftermarket for iPhone voice and data services and ATTM's and Apple's market

5   power in a market so defined, both essential elements of an antitrust claim. Plaintiffs' theory is

6   one of lock-in. Relying on cases such as *Eastman Kodak Co.* v. *Image Tech. Servs., Inc.*, 504 U.S.

7   451 (1992) and *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008),

8   Plaintiffs assert that Defendants' failure to disclose the precise length of the exclusivity period at

9   the time of purchase "effectively locked iPhone users into using ATTM for five years despite their

10  contractual rights and contrary to their ***reasonable expectations***."[5] (Pl. Br. at 5) (emphasis added).

11  Thus, Plaintiffs' claims require a factual finding of what each iPhone consumer's "reasonable

12  expectations" were and how those expectations squared with her real world experience.

13         As Plaintiffs themselves have previously made clear, they do ***not*** challenge the legality of

14  the exclusive agreement itself. In response to ATTM's motion to dismiss, Plaintiffs unequivocally

15  disavowed any challenge to the exclusivity:

16              Plaintiffs have not asserted that ATTM's exclusive contract was
                unlawful in and of itself. Plaintiffs contend **only** that Apple and
17              ATTM unlawfully captured market share **after** their contract term
                began by ***misleading*** iPhone purchasers to believe they had a
18              meaningful right to terminate ATTM to use another voice and data
                service provider after two years (or sooner if they paid a
19              termination fee), thereby, "locking" them in unwittingly to using
                ATTM for five years.[6]
20
    (Pl. Opp. ATTM MTD at 7-8) (emphasis added). Plaintiffs presumably staked themselves to this
21
    theory because any challenge to exclusivity would be unavailing. Exclusivity agreements are
22

23  _____

24  [5] As explained below, ███████████████

    [6] At the hearing on Apple's motion to dismiss, Plaintiffs similarly rejected the notion that they
25  were challenging the exclusive agreement: "Our position has always been was that there was
    nothing wrong with Apple's decision to enter the market the way it did and there was nothing
26  wrong with Apple to provide their iPhone only to AT&T but that what Apple has done secretly
    and what Apple has done subsequently have been unlawful exercises of actual or threatened
27  monopoly power." Declaration of Sadik Huseny ISO Apple Inc.'s Opposition to Plaintiffs'
    Motion for Class Certification ("Huseny Decl."), Ex. LL (MTD Hr'g Tr. at 63:24-64:6).
28

1    generally pro-competitive and lawful,[7] and here, Plaintiffs would be forced to contend with a

2    much broader, and unquestionably competitive, market for wireless voice and data services than

3    the exceedingly narrow one they have alleged.  Even their own economic expert—a self-professed

4    expert in telecom issues—readily concedes that "cellular carriers in the U.S. compete vigorously

5    for new subscribers."  (Expert Declaration of Simon J. Wilkie, Ph.D., Docket No. 243 ("Wilkie

6    Decl.") ¶ 14.)  Thus, Interim Lead Counsel for Plaintiffs, after consulting with an expert

7    economist, well understood the need to base their claim on a *Kodak*-style aftermarket lock-in, and

8    made a conscious decision to do so.  (Reply in Further Support of Cross-Motion for Appointment

9    of Interim Lead Class Counsel, Docket No. 88, at 6.)

10       But because Plaintiffs really don't like the exclusivity,[8] they try to have it both ways.

11   Plaintiffs contend that they were misled by the early termination provisions in their contracts with

12   ATTM into believing that they would be permitted to cancel and take their phone to another

13   carrier.  (Pl. Br. at 5, 17.)  Plaintiffs also argue that ATTM and Apple failed to disclose that they

14   would not unlock the phones either during or after the consumer's initial two-year agreement.

15   (RCAC ¶ 7.)  As Plaintiffs acknowledge, the iPhones are locked "[t]o enforce ATTM's

16   exclusivity."  (Pl. Br. at 6.)  Because the exclusivity is not challenged, the lock that enforces that

17   exclusivity cannot legitimately be challenged either.[9]  Plaintiffs nonetheless attempt to back door a

18

19

20

21   [7] Rubinfeld Decl. ¶¶ 17 n.1, 79-83.

     [8] Smart Decl. Ex. B (Smith Dep. 69:10-17, Ex. 3 ("I feel even more let down by Apple at this
22   point because even if I were to unlock my phone to get T-Mobile service, their service isn't that
     great either.  Since this phone is on a SIM card and there are only two U.S. carriers that allow SIM
23   cards, I feel rather limited in my choices of carriers.")); *id.* Ex. C (Lee Dep. 50:25-51:5 ("the
     business model between AT&T and Apple is unlawful")); *id.* Ex. D (Holman Dep. 73:24-74:5
24   ("Being stuck with AT&T is a pretty crummy fate....I could pay extra to stop paying AT&T, but I
     couldn't then use my phone anywhere else, I mean, according to Apple's scheme.")).

25   [9] Notwithstanding the adamant position that Plaintiffs have previously taken that they are not in
     any way challenging the exclusivity itself, Plaintiffs persist in contending that "By refusing to
26   unlock the iPhones, Defendants have unlawfully stifled competition ...."  (Pl. Br. at 7.)  There
     clearly can be no exclusivity without a lock.  Plaintiffs' sleight of hand, attempting to sneak in
27   their challenge to the exclusivity while enjoying the benefits of a strictly limited market definition,
     should not be permitted.

28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   challenge to the exclusivity by dressing it up as a disclosure problem with respect to ATTM's

2   policy not to provide unlock codes.[10]

3          Plaintiffs' claims, and their request for class certification, thus rise or fall on the hypothesis

4   that they and all iPhone consumers purchased their iPhones completely unaware that they would

5   be obligated to use ATTM for voice and data services for the period of the exclusive agreement

6   between ATTM and Apple, and consequently were injured.  Such claims, as discussed more fully

7   below, by their very nature are not amenable to class proceedings.

8          To place Plaintiffs' claims and their current bid for class certification in context, it is useful

9   to briefly review the history of the iPhone, and Plaintiffs' own experiences with it.

10          On or about ███████████ Apple and ATTM (then Cingular) entered into an agreement

11   governing the distribution of the iPhone.[11]

12   ████████████████████████████████████████████

13   ██ [12] ██████████████████████████████████████

14   ████████████████████████ [13] ██████████████████

15   ████████████████████████████████████████████

16   ███████████████████████ [14] ███████████████████

17   ████████████████████████████████████████████

18   ██ [15]

19          On January 9, 2007, Apple CEO Steve Jobs announced at the MacWorld Tradeshow and

20   Conference that Apple had chosen Cingular (soon to be the new AT&T) to be the exclusive

21   _____

22   [10] As explained below, the contention that ATTM and Apple did not disclose their policy about
     not unlocking iPhones is demonstrably wrong as a matter of fact; disclosures were readily made.
23   In any event, the claim leads to individualized inquiries about what any consumer knew,
     understood and desired with respect to whether his or her iPhone would be unlocked.

24   [11] Declaration of Rachele R. Rickert ISO Plaintiffs' Motion for Class Certification, Docket No.
     241 ("Rickert Decl."), Ex. A.

25   [12] *Id.* ██

26   [13] *Id.* █████

27   [14] *Id.* █████

28   [15] *Id.* Ex K ███.

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  provider of voice and data services in the United States,[16] explaining, "We've chosen Cingular . . .

2  .[T]hey are the best and most popular network in the country - 58 million subscribers. They are

3  number one and they are going to be our exclusive partner in the U.S." Stan Sigman, then-CEO of

4  Cingular took the stage after Steve Jobs, stating, "We are announcing a partnership that takes the

5  mobile phone experience to a new level. . . . We are changing the way companies work together.

6  Apple and Cingular have a ***multi-year exclusive partnership***. The new iPhone is ***only available***

7  with Cingular wireless services."[17]

8       The iPhone's introduction was preceded by a wealth of print and internet publicity, and

9  was the topic of choice on scores of blogs available to the public. Those populating the blogs,

10  including many of the Plaintiffs here,[18] discussed a full range of issues including that ATTM

11  would be the exclusive provider for the iPhone for five years.[19] The notion of a five-year

12  exclusive agreement was similarly reported repeatedly in the press.[20]

13       The iPhone was first sold commercially on June 29, 2007. Many consumers, particularly

14  Apple-philes and some of the Plaintiffs here, could not wait to buy the latest Apple innovation.

15  They waited in long lines to be among the first to have the novel device and wanted it regardless

16  of the conditions, including the wireless carrier they would be obligated to use. (Declaration of

17  ───────────────

18  [16] Since the iPhone is built on GSM technology, the only other U.S. wireless carrier that could support it is T-Mobile.

19  [17] Smart Decl. Ex. E (MacWorld transcript) (emphasis added). On January 9, 2007, Cingular and
20  Apple also issued a joint press release announcing that "Cingular… will be Apple's *exclusive* US carrier partner for Apple's revolutionary iPhone unveiled today. As part of this ***multi-year***
21  partnership, Apple and Cingular are working together to provide innovative new features to mobile phone users… [Steve Jobs stated] We are thrilled to be offering our revolutionary new
22  iPhone *exclusively* with Cingular…." *Id.* Ex. F (internal quotations omitted, emphasis added).

[18] *See Id.* Ex. D (Holman Dep. 46:10-48:20 (noting that he actively follows BoingBoing and
23  Slashdot and also receives daily RSS feeds with hundreds of technology-related articles and postings)); *id.* Ex. B (Smith Dep. 21:24-24:11 (noting that he reads blogs such as iPhoneblog,
24  modmyi, Slashdot, and gizmodo)); *id.* Ex. G (Macasaddu Dep. 70:21-24, 75:10-24 (noting that he reads iPhoneblog and the iPhone Dev. Team blog)); *id.* Ex. C (Lee Dep. 21:16-22:16, 23:18-24:1
25  (acknowledges reading Gizmodo, Engadget, and TUAW)).

26  [19] See Joint Appendix ("J.A.") (attached to Declaration of Timothy Carson ISO Apple's and
ATTM's Oppositions to Plaintiffs' Motion for Class Certification), Part B for a representative
27  listing.

[20] See *id.* Part A for a representative listing.

28

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  Sadik Huseny ISO Apple Inc.'s Opposition to Plaintiffs' Motion for Class Certification ("Huseny

2  Decl."), Ex. K (Lee RFA Resp. Nos. 30, 31) (admitting that he would have purchased his iPhone

3  "whether or not it was 'locked' to work only with ATTM voice and data services" and "regardless

4  of which cellular company provided the voice and data services")); (Smart Decl. Ex. H (Pascasio

5  Dep. 42:24-43:10 (testifying that he didn't care about exclusivity because he "just wanted the

6  phone.").))

7          At its launch, the iPhone could be purchased either at an Apple store or an ATTM store.

8  All iPhone consumers were required to enter a two-year contract with ATTM for voice and data

9  services.[21]  Consumers could choose among the wide variety of ATTM voice plans that were

10  available to all ATTM subscribers for any device at the same price.[22]  Thus, there was no

11  difference in the cost of the voice rate plans for consumers of iPhones, BlackBerrys or any other

12  mobile phone.  iPhone consumers were also required to purchase a data plan, which for 2G phones

13  cost $20 for unlimited data,[23] less than the $30 cost for unlimited data on other smartphones.[24]  For

14  the later 3G and 3GS iPhone models, the data plan costs $30, the same as for other smartphones.[25]

15  The total price that iPhone consumers paid for voice and data services has therefore never been

16  more than the total price paid by ATTM subscribers with the same type of voice and data plans on

17  other devices.

18          ATTM's customer service representatives were trained to give iPhone consumers prior to

19  purchase a "Pre-Purchase Understanding" document disclosing that the iPhone was available

20  "[o]nly on AT&T" and that "AT&T and Apple have an exclusive relationship."[26]  In addition, the

21  iPhone box disclosed that "Service plan with AT&T required for cellular network capabilities on

22  _____

23  [21] For consumers who failed the credit check, a prepaid option was available.  *See, e.g.*, Smart
    Decl. Ex. I (Farber Dep. 50:24-51:9).

24  [22] *Id.* (Farber Dep. 27:23, 102:5-8).

25  [23] *Id.* (Farber Dep. 18:8-20:7, Ex. 1).

26  [24] *Id.* (Farber Dep. 24:11-32:11, Exs. 2, 3).

27  [25] *Id.* (Farber Dep. Ex. 6).

28  [26] Rickert Decl. Ex. F ¶¶ 3.a, 4.c; Smart Decl. Exs. J, K.

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    expiration of initial two-year agreement."[27]   And, if there was any doubt about whether consumers

2    would be able to unlock their iPhones despite the multiple disclosures about the multi-year

3    exclusivity, ATTM and Apple readily conveyed their policy against unlocking the phones.[28]

4         Notwithstanding the abundance of information available to consumers from a variety of

5    sources, Plaintiffs here persist in their claims that there can be a class of consumers who did not

6    know enough about the exclusivity situation to make an informed purchasing decision.  They

7    assert that the effect and materiality of the information available was uniform among consumers.

8    Now the Court must put Plaintiffs to their proof and determine whether they can establish their

9    antitrust claims, including the elements of market power and impact, with evidence that is

10   common to the class as a whole.

11        The stories of named Plaintiffs alone demonstrate that the answer to that critical question is

12   no.  Plaintiffs have diverse backgrounds and have had a variety of experiences with respect to their

13   iPhones.  While some Plaintiffs consider themselves to be astute about all things technologically

14   oriented, others do not.  Most Plaintiffs followed closely the news about the iPhone from the

15   initial announcement, through the launch and thereafter; others only saw some advertisements.

16   Some Plaintiffs purchased their initial 2G iPhones fully aware of the exclusivity and that the

17   phones were locked; others assert they were not aware.  Some Plaintiffs never traveled

18   internationally with their iPhones; others received substantial credits for international roaming

19   charges, and others unlocked and used international SIM cards while abroad.  Many Plaintiffs say

20   that they would have bought the iPhone regardless of the existence or length of the exclusivity

21   with ATTM, while others contend that they would not have.

22

23

---

24   [27] Rickert Decl. Ex. T.

25   [28] Declaration of Caroline Mahone-Gonzalez ISO ATTM's Opposition to Plaintiffs' Motion for
     Class Certification ("Mahone-Gonzalez Decl."), ¶¶ 6-11.  In addition, the FAQs available on

26   iTunes as part of the activation process included: "*Can I "unlock" my iPhone for use with another*
     *wireless provider?*  No, AT&T is the exclusive wireless provider for the iPhone in the United

27   States."  *See* Declaration of Eddie Cue ISO Apple's Opposition to Plaintiffs' Motion for Class
     Certification ¶ 4, Ex. C.

28

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

While some Plaintiffs are very familiar with the concept of unlocking and changing SIM cards to alternate between ATTM and T-Mobile, others were not. Some Plaintiffs had no desire to use T-Mobile, while others did. And *all* Plaintiffs upgraded to 3G and/or 3GS iPhones well after they filed lawsuits, with full knowledge of that they would be required to use ATTM.

These are only examples of the wide variety of experiences that Plaintiffs—representative of the putative class—had. They illustrate the fallacy in Plaintiffs' contention that relevant common issues predominate over individual ones.

## III.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF DEMONSTRATING THAT THE REQUIREMENTS OF RULE 23 ARE SATISFIED.

As discussed in more detail below, Plaintiffs have not come close to meeting their burden of demonstrating that they have satisfied each of the Rule 23(a) requirements and at least one of the Rule 23(b) requirements. *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Under Rule 23(a), Plaintiffs must establish numerosity, commonality, typicality and adequacy. Fed. R. Civ. P. 23(a). Under Rule 23(b)(3), Plaintiffs must demonstrate that common questions predominate over individual ones. In other words, Plaintiffs must show that they can prove not only their claims but those of the absent class members with evidence that is common to members of the class. "The court must... determine whether, given the factual settings of the case... common evidence could suffice to make out a prima facie case for the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). "If the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser*, 253 F.3d at 1189.

Plaintiffs cannot discharge this significant burden by relying on a series of bare conclusions, implausible hypotheses and inapposite arguments. Rather, the court must conduct a "rigorous analysis" that allows it to "probe behind the pleadings." *General Tel. Co. v. Falcon*, 457 U.S. 147, 160-61 (1982). Ninth Circuit courts have been consistent in "consider[ing] *evidence* which goes to the Rule 23 requirements." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992) (internal quotations omitted, emphasis added); *see also Szabo v. Bridgeport Machs, Inc.*, 249 F.3d 672, 675 (7th Cir. 2001) ("The proposition that a district judge must accept all of

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23

2    and has nothing to recommend it.").

3      Equally critical to the required rigorous analysis, and contrary to Plaintiffs'

4    representations, is a careful examination of expert testimony. Experts must present "properly

5    analyzed, scientifically reliable evidence tending to show that a common question of fact... exists

6    with respect to all members of the class." *Dukes v. Wal-mart, Inc.*, 509 F.3d 1168, 1179 (9th Cir.

7    2007), *en banc ruling pending*. And Plaintiffs must show that the expert's proposed methodology

8    will actually work, and that it is not incomplete or otherwise defective. *See Allied Orthopedic*

9    *Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D. 156, 173, 177 (C.D. Cal. 2007); *see*

10   *also In Re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006) ("disavow[ing] the

11   suggestion . . . that an expert's testimony may establish a component of a Rule 23 requirement

12   simply by being not fatally flawed"); *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,

13   100 Fed. Appx. 296, 300 (5th Cir. 2004) (expert was unable to demonstrate how the regression

14   analysis would work); *Freeland v. AT&T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006) ("[w]here

15   significant variables . . . are omitted from a regression analysis . . . the study may become so

16   incomplete that it is inadmissible as irrelevant"). Moreover, "[w]eighing conflicting expert

17   testimony at the certification stage is not only permissible; it may be integral to the rigorous

18   analysis Rule 23 demands." *In Re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 323 (3d Cir.

19   2009).

20     In short, Plaintiffs must offer more than just "some showing" in support of each of the

21   Rule 23 requirements. *In Re IPO*, 471 F.3d at 27. These demanding standards apply with equal

22   force in antitrust cases. Indeed, courts "should not suppress doubt as to whether a Rule 23

23   requirement is met-no matter the area of substantive law." *Hydrogen Peroxide*, 552 F.3d at 321

24   (internal quotations omitted). For a host of reasons, Plaintiffs fail to meet these exacting

25   standards.

26

27

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

*(margin, left side)* crowell moring 1001 Pennsylvania Ave NW Washington, DC 20004 (202) 624-2599

**A.   Plaintiffs' Claims Necessitate An Assessment Of Each Consumer's Knowledge, Understanding And Intent, Precluding Certification.**

A predicate to Plaintiffs' antitrust claims is proving "market power" in a "relevant market." But as this Court has held, Plaintiffs cannot state a claim for monopolization of an iPhones aftermarket for voice and data service if individual consumers "***knowingly*** placed [Defendants] in a monopoly position in the alleged voice and data services aftermarket." (Mot. to Dismiss Order at 18 (emphasis added).)

> The law prohibits an antitrust claimant from resting on market power that arises solely from contractual rights that consumers knowingly and voluntarily gave to the defendant . . . the law permits an inquiry into whether a consumer's selection of a particular brand in the competitive market is the functional equivalent of a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in an aftermarket. The law permits inquiry into whether consumers entered into such "contracts" knowing that they were agreeing to such a commitment.

*Newcal*, 513 F.3d at 1048. In other words, if a consumer knew that he or she could use the iPhone only on the ATTM network, even after the expiration of his or her two-year contract with ATTM, the consumer cannot then challenge that knowingly-granted monopoly power.[29] In that case, Plaintiffs' claims would fail from the outset. Plaintiffs' claims consequently turn on questions of individual knowledge and intent.

Plaintiffs readily admit that ATTM and Apple consistently disclosed, from the moment the iPhone was first announced, that they had a "multi-year," "exclusive" agreement, and that the iPhone was available "only on AT&T."[30] They nonetheless contend that neither they nor any putative class member could possibly have knowingly agreed that ATTM would be the exclusive service provider for their iPhones because the disclosures did not specify five years for the exclusivity period. (Pl. Br. at 23.) ███████████████████████

---

[29] As Professor Rubinfeld explains in his declaration, consumers enter into the initial two-year service contract as part of the purchase of their iPhone; the device and service are sold and purchased as a bundle. The initial contract therefore cannot legitimately be viewed as an aftermarket transaction. Rubinfeld Decl. ¶¶ 14-16,21-23, 68-70, 71 n.40.

[30] Pl. Br. at 4, 23 & n.21; Rickert Decl. Ex. F ¶¶ 3.a, 3.k; Smart Decl. Exs. J, L.

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   ███████ [31] Plaintiffs' argument leads directly to individual questions of fact that turn on what

2   each consumer knew and how he or she interpreted and relied on the information he or she

3   received.

4        Plaintiffs attempt to avoid the impact of their legal theory by contending that ATTM and

5   Apple made consistent disclosures.  Those disclosures, however, including that it was a multi-

6   year, exclusive agreement and that the phones would not be unlocked,[32] certainly were read by

7   some significant portion of the putative class, which thus became aware that they would only be

8   able to get voice and data services from ATTM.  Determining who was and who was not aware of

9   the exclusivity requires an inescapable inquiry into each consumer's situation.

10        For example, while ATTM does not believe that there is any ambiguity in "multi-year,

11  exclusive," Plaintiffs apparently do.  Thus, under their theory, one would need to determine

12  whether each consumer interpreted "multi-year" to mean two, three, four, five or more years.

13  Similarly, one would need to determine whether each consumer interpreted the repeated

14  disclosures that ATTM was the "exclusive provider in the U.S." and that the iPhone would be

15  available "only on AT&T" to mean that he or she could use T-Mobile at any point in time.  And,

16  whether each consumer actually believed that he or she could unlock their iPhone and take it to T-

17  Mobile during the two-year service contract or after, whether he or she were told by a consumer

18  service representative that the iPhone would not be unlocked or whether he or she read the iTunes

19  activation FAQs conveying the same message are inexorably questions that must be determined on

20  a consumer-by-consumer basis.

21        Further, in determining whether each consumer was aware when he purchased the iPhone

22  of the extent to which he would be required to use ATTM's service, one cannot limit the inquiry to

23  ATTM's and Apple's disclosures alone, as Plaintiffs suggest.  (Pl. Br. at 23-24.)  The number and

24  _____

25  [31] ████████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

    [32] *Id.* Ex. F; Mahone-Gonzalez Decl. ¶¶ 6-11.

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

substance of disclosures about the arrangement between ATTM and Apple for the iPhone extended far beyond those made by ATTM and Apple themselves.  In fact, there was pervasive public information from other sources, before the iPhone was launched, stating that the exclusivity would be multi-year and numerous reports that it would be for five years.  Some examples include:

- The "unofficial Apple web blog" and others aimed at technology savvy readers, including ones read by several Plaintiffs, carried the MacWorld announcement of the iPhone and discussed the multi-year exclusive agreement.[33]

- Numerous blogs discussed that the exclusivity would last five years.[34]  One, frequented by some of the Plaintiffs, posted:  "There are carrier exclusivity agreements, and there are *carrier exclusivity agreements* – and Apple's iPhone deal must have been pretty sweet for Cupertino to guarantee their new hotness to AT&T and **AT&T alone for five friggin years**. *USA Today* reports the supposed half-decade deal precludes Apple from developing a CDMA handset in that time (duh), meaning that **if you live in the US and don't want to move to AT&T, it's going to be 2012 before you even have a chance at an iPhone**."[35]

- No fewer than 30 print and internet media outlets similarly reported the exclusive relationship, emphasizing that it would be for five years.[36]

- A June 19, 2007, article on macworld.com stated "People that took the survey were also informed of the iPhone price and the five-year AT&T exclusive."[37]

With such extensive coverage of the multi-year, exclusive arrangement between ATTM and Apple, and numerous reports that the exclusivity would be for a period of five years before the

---

[33] *See* J.A. Ex. EE (MacWorld 2007 Keynote Live Blog, Jan. 9, 2007).

[34] See *id.* Part B for a compilation of blogs.

[35] *Id.* Ex. HH (Ryan Block, *Apple iPhone on AT&T for Five Years?*, Engadget, May 22, 2007 (bold emphasis added)).

[36] See *id.* Part A for a representative listing.  One reported that the "two people with direct knowledge of the deal say it's a five-year contract." *Id.* Ex. A (Leslie Cauley, *Verizon Rejected Apple iPhone Deal* (Jan. 28, 2007).

[37] *Id.* Ex. X (Jim Dalrymple, *Analyst: iPhone success not a certainty*, Jun. 19, 2007).

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  iPhone was even launched, it defies logic to suggest that no consumers purchased the iPhone with

2  knowledge that it would only work on ATTM, as Plaintiffs contend.

3       Moreover, the question of what information was available, and therefore what any

4  particular consumer might have known regarding ATTM and Apple's exclusive agreement and its

5  duration, cannot be judged at a static point in time. For all of the disclosures that existed pre-

6  launch, they multiplied exponentially over time. There were scores of additional articles and blogs

7  discussing the exclusive arrangement, its length and the fact that the iPhone could not be used on

8  T-Mobile,[38] not to mention word of mouth, as consumers learned more. As an example, an article

9  in the Seattle Post-Intelligencer on July 2, 2007, only a few days after the launch, reported that

10  "neither company will provide an unlock code for the iPhone… AT&T is the exclusive wireless

11  carrier for iPhone in the United States."[39] And, of course, there were the Plaintiffs' lawsuits, the

12  first of which was filed in August 2007,[40] just two months after the initial launch of the iPhone.[41]

13  Plaintiffs' lawsuits challenging the level of disclosure of the supposed five-year exclusive deal and

14  the unlocking policy have themselves generated significant press.[42] As Plaintiff Lee stated

15

16

17  _____

18  [38] See id. Part C for representative samples of additional disclosures.

19  [39] Id. Ex. RR (Phuong Cat Le, Consumer Smarts: Want Your iPhone Unlocked? Too Bad, Jul 2,
    2007. iPhone consumers also began discussing disabling the lock with software hacks. See id.
20  Exs. WW, YY for some additional examples.

    [40] See Huseny Decl. Ex. MM (Kliegerman Compl.).
21
    [41] Plaintiff Smith's initial complaint, which was filed in October 2007 states "Apple entered into
22  an exclusive five year agreement with AT&T Mobility LLC ("AT&T") that establishes AT&T as
    the exclusive provider of cell phone service for the iPhone through 2012… Apple achieves its
23  prohibition objectives by installing software locks on iPhones that prevent consumers from
    switching their cell phone service to a competitor's network." Smart Decl. Ex. M (Smith Compl.
24  ¶ 1, Smith v. Apple, Inc., Case No. 07-CV-095781 (Cal. Super. Ct. Oct. 5, 2007)).

    [42] See, e.g., J.A. Ex. III (Chris Foresman, Judge: antitrust suit against Apple and AT&T can
25  proceed, Oct. 7, 2008 ("The main point of contention is Apple and AT&T's five-year exclusivity
    agreement, which originally made AT&T the only carrier for Apple's then-revolutionary mobile
26  device. Though consumers only had to agree to a two-year contract to use the device, after the
    contract was up, consumers would still have been beholden to AT&T for service for the iPhone for
27  up to five years.")); id. Ex. JJJ (Richard Koman, Antitrust suit against Apple, AT&T moves
    forward, Oct. 7, 2008).
28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    regarding the sources of information on iPhone details and developments, there are "too many of

2    them now to keep track of."[43]

3            To deal with this pervasive information, Plaintiffs stand the burden of proof on its head.

4    They attempt to neutralize the effect of these abundant and diverse disclosures by arguing that

5    they do not "prove that any Plaintiff or Class member knowingly and voluntarily gave Apple or

6    ATTM monopoly power over the iPhone voice and data or applications aftermarkets for five

7    years." (Pl. Br. at 23 n.21.)  But the burden of proof is on Plaintiffs to demonstrate that they can

8    establish with common proof that neither any of them nor any putative class member had

9    sufficient information to understand at the point of purchase of their iPhone that they could only

10   obtain voice and data services from ATTM.  *See Blades*, 400 F.3d at 566.  Plaintiffs do not, and

11   cannot, meet their burden.  To determine who did and who did not have sufficient knowledge

12   requires an inquiry into each individual's situation:  What reports did he or she read or hear?

13   What did he or she understand them to mean?  What was his or her intent with respect to using

14   ATTM when buying an iPhone?  What did he or she ask at the store?  What was he or she told?

15          Plaintiffs here prove the point.  For example, Plaintiff Holman is a self-professed hacker.[44]

16   He travels the world to speak on technology issues, and each day reads up to 500 technology-

17   related headlines and 20 to 30 technology-related articles in an effort to stay on top of the latest

18   developments.[45]  Holman brags that when he purchased his original 2G iPhone, he "knew more

19   about [the iPhone] than [the consumer service reps] did and probably didn't need their help."[46]

20   When he bought his iPhone, Holman knew about the exclusive deal with ATTM and knew it was

21   "locked" to only accept ATTM SIM cards.[47]  Yet, Holman somehow perceives this knowledge to

22   be insufficient since he still pursues his claims.  Another reasonable iPhone consumer, on the other

23

24   [43] Smart Decl. Ex. C (Lee Dep. 34:25-35:1).

25   [44] Holman stated "I hacked my phone and now I'm suing Apple and AT&T for trying to stop me."
     *Id.* Ex. D (Holman Dep. 72:5-6).

26   [45] *Id.* (46:10-17; 51:6-57:5; 85:10-20).

27   [46] *Id.* (101:19-24).

28   [47] *Id.* (82:1-5); Huseny Decl. Ex. I (Holman RFA Resp. Nos. 19, 22).

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   hand, could have the same information and conclude that he or she would only be able to use

2   ATTM for iPhone voice and data services for the life of the iPhone.

3          Plaintiff Lee also considers himself an "early adopter of technology" and passionate about

4   electronics and technology, and regularly follows various blogs and other media sources because

5   of his desire to remain on "the leading edge of technology."[48]   He followed the iPhone closely, and

6   read several articles about it, including those that discussed a five-year agreement.[49]   Lee bought

7   his iPhone fully aware that ATTM was the exclusive provider and that the phone would be

8   locked.[50]   But Lee contends that he knew that ATTM had a policy of unlocking phones on

9   consumer request, had heard ATTM said that it would not unlock iPhones and yet still was not

10  sure if he would be able to unlock his iPhone.[51]   Many other consumers are not aware of any

11  "unlocking policy" so would never consider that they might have an option to unlock their iPhone.

12  Others would have concluded that even if there is a policy for other phones, when ATTM said it

13  would not unlock the iPhone, it meant it.

14         Similarly, Plaintiff Macasaddu admits that before he bought his iPhone, he knew ATTM

15  was the exclusive provider and that it was locked, but claims he still thought it was possible

16  ATTM might provide unlock codes in certain circumstances.[52]   He called ATTM to request the

17  unlock code about a week after purchasing his iPhone.[53]   He was told that ATTM would not

18  provide unlock codes.[54]   After he asked for the explanation in writing, ATTM emailed him:

19  "AT&T and Apple have formed a multi-year exclusive partnership, leveraging the strengths of

20  both companies, to create revolutionary new wireless products . . . The iPhone cannot be unlocked

21  _____

22  [48] Smart Decl. Ex. C (Lee Dep. 19:2-25; 21:16-22:16).

23  [49] *Id.* (65:12-68:16); Huseny Decl. Ex K (Lee RFA Resp. Nos. 11, 15, 16, 17).

24  [50] Huseny Decl. Ex. K (Lee RFA Resp. No. 22); Smart Decl. Ex. C (Lee Dep. 69:1-8 (acknowledging that he "knew that Cingular was due to be the launch partner for the phone")).

25  [51] Smart Decl. Ex. C (Lee Dep. 95:12 -97:15).

26  [52] *Id.* Ex. G (Macasaddu Dep. 63:4-63:17); Huseny Decl. Ex. L (Macasaddu RFA Resp. Nos. 7, 30).

27  [53] *Id.* Ex. G (Macasaddu Dep. 62:12-63:17).

28  [54] *Id.* (Macasaddu Dep. 66:1-5).

Case No. C 07-05152 JW

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  due to a contractual agreement between AT&T and Apple that AT&T would be the sole wireless

2  provider for the iPhone."[55]  Because he learned the iPhone would not be unlocked only a week

3  after his purchase, Macasaddu had the option of cancelling his service without paying an early

4  termination fee and could have returned his iPhone for a minimal re-stocking fee.[56]  But he chose

5  to keep his phone with full knowledge that he would only be able to use ATTM for service for the

6  duration of the exclusive agreement.[57]  Another consumer with the same information might have

7  chosen instead to exercise her right to return the phone and cancel service.

8      These stories only highlight the information Plaintiffs had when they bought their 2G

9  phones at or close to launch.  As more information became available over time, the more likely it

10  is that even greater numbers of consumers purchased their iPhones with full knowledge and with

11  the expectation that they would be required to use ATTM for voice and data services.  The effect

12  of the expanding universe of information about the duration and extent of ATTM and Apple's

13  exclusive arrangement is again exemplified in Plaintiffs' own stories.

14      Although they had each filed a lawsuit and joined the RCAC, which clearly acknowledged

15  the supposed five-year exclusive agreement between ATTM and Apple for the iPhone and that the

16  phones would not be unlocked, all Plaintiffs actually bought 3G or 3GS iPhones (although Rivello

17  requested hers as a gift) and all but Macasaddu signed new two-year contracts beginning on July

18  11, 2008, when the 3G version was released.[58]  Plaintiffs admit, as they must, that they knew of

19  the allegations in their complaints, including the fact that the agreement was exclusive for a period

20

---

21  [55] *Id.* Ex. N (Macasaddu email).  This is entirely consistent with the information ATTM
22  representatives were instructed to tell consumers asking about unlocking their iPhones.  *See*
   Mahone-Gonzalez Decl. ¶¶ 6-11.

23  [56] AT&T allows subscribers to cancel their contract within 30 days of activation to avoid the early
   termination fee.  Smart Decl. Ex. O (return policy).  This policy applied to iPhone subscribers as
24  well.  *See* Rickert Decl. Ex F ¶ 3.g; Smart Decl. Ex. P.

25  [57] Smart Decl. Ex. G (Macasaddu Dep. 67:22-68:1 (noting that he did not pursue the issue any
   further after being told he was unable to unlock the iPhone)).

26  [58] *Id.* Ex. D (Holman Dep. 15:3-14); *id.* Ex. Q (Kliegerman Dep. 9:11-18); *id.* Ex. R (Sesso Dep.
   58:2-3); *id.* Ex. B (Smith Dep. 38:9-17); *id.* Ex. C (Lee Dep. 45:20-23); *id.* Ex. S (Morikawa Dep.
27  19:18-24); *id.* Ex. T (Rivello Dep. 9:13-17, 20:24-23:20); *id.* Ex. G (Macasaddu Dep. 11:24-
   12:12).

28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  of more than two years and that the phones would be locked to only work with ATTM, when they

2  bought their new iPhones.[59]  Surely they cannot claim they did not knowingly or voluntarily

3  commit to ATTM as the sole provider at that point.

4      The bottom line is that for any putative class member to prove her claim, she must be able

5  to demonstrate that she did not know or understand that she would only be able to get voice and

6  data services for her iPhone from ATTM for the period of the exclusive agreement between

7  ATTM and Apple.  Given the wealth of information available from a wide variety of sources, what

8  any consumer read or heard will inevitably vary, as will any consumer's interpretation of what he

9  or she read or heard.  This inquiry depends in part on life experiences.  For example, in light of the

10  disclosures that ATTM and Apple had entered into a multi-year, exclusive agreement, that the

11  iPhone would be offered "only on ATT" and that service on ATTM was required after an initial

12  two-year agreement, many—perhaps most—iPhone consumers likely never had an expectation

13  that they would be able to unlock their phone and use T-Mobile (the only other carrier that would

14  be an option since the iPhone uses GSM technology) either during or after their contract term.

15  Indeed, many consumers—particularly those new to GSM technology[60]–likely never even have

16  heard of the notion of unlocking and therefore would have no expectation that they would be able

17  to do so.

18      The Court must therefore go through a series of individual questions to determine whether

19  each consumer "knowingly placed ATTM in a monopoly position."  Did a consumer read one or

20  more articles about the exclusive deal lasting five years?  Did a consumer believe that meant he

21  would not be able to unlock his iPhone to use on T-Mobile for that period?  Did a consumer hear

22  about the exclusive relationship between ATTM and Apple and understand that to mean that she

23  

24  [59] Huseny Decl. Exs. 11-15, 17-18 (Holman, Kliegerman, Lee, Macasaddu, Morikawa, Sesso,
25  Smith RFA Resp. Nos. 20, 23); Smart Decl. Ex. D (Holman Dep. 75:18-20); id. Ex. B (Smith Dep.
42:2-12); id. Ex. S (Morikawa Dep. 24:16-19); id. Ex. G (Macasaddu Dep. 47:14-23, 49:1-7); id.
26  Ex. Q (Kliegerman Dep. 93:12-94:1); id. Ex. C (Lee Dep. 54:3-6, 64:3-8); id. Ex. R (Sesso Dep.
104:8-105:11); id. Ex. T (Rivello Dep. 23:8-20).

27  [60] As Plaintiffs explained in their RCAC, CDMA does not use SIM cards so the phenomenon of
unlocking a phone and using it on a different carrier only exists on GSM networks.  RCAC ¶ 65.
28  

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   would only be able to use ATTM for the life of her iPhone?  The permutations are many, and must

2   be evaluated at the individual consumer level.

3        The fact that Plaintiffs' claims turn on issues of disparate knowledge, understanding and

4   intent doom them for certification.  As courts consistently acknowledge, such issues are innately

5   individualized and cannot be addressed with common proof.  *See, e.g., Poulos v. Caesar's World,*

6   *Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) (denial of class because members did "not share a common

7   universe of knowledge"); *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 202 (W.D. Tex.

8   2004) ("Claims like these, which turn on a plaintiff's individual knowledge . . . are not appropriate

9   for class certification.  Knowledge is highly individualistic and cannot be determined on a

10  classwide basis."); *Wilcox Dev. Co. v. First Interstate Bank of Or., N.A.*, 97 F.R.D. 440, 447 (D.

11  Or. 1983) ("Class certification is improper when knowledge of individual class members requires

12  separate adjudications . . . [and] would require an individual inquiry of each class member's

13  understanding of the term . . . .").

14        Indeed, we are not aware of a single case that analyzed the knowledge element of an

15  aftermarket claim and certified the class.[61]  In the analogous setting of consumer protection claims

16  where the adequacy of the disclosures about a product is challenged, courts in this Circuit have

17  routinely rejected class certification precisely because the issue boils down to what each consumer

18  knew and understood at the time of purchase.  Most recently, in *Kelley v. Microsoft Corp.*, No.

19  C07-0475MJP, 2009 WL 973368 (W.D. Wash. Apr. 10, 2009), the plaintiff challenged

20  Microsoft's marketing of its Vista program.  The core allegation was that the labeling on

21  computers misled consumers about the level of the Vista program to which they could upgrade at

22  no cost.  2009 WL 973368, at *1.  The court refused to certify the various proposed classes

23  holding that individual consumer's differing levels of knowledge about the upgrade program

24

25

26  [61] The only aftermarket case we are aware in which a class was certified at all is *Kodak* itself, and
    that is the only one Plaintiffs cite.  *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, Nos. C 87-
    1686 BAC, C 94-0524 BAC, C 94-1070, 1994 U.S. Dist. LEXIS 12652, at *7 (N.D. Cal. Sept. 2,

27  1994).  But *Kodak* never analyzed the monopolization claim, discussing instead the tying claim.
    As discussed below, tying claims are wholly distinct.

28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

19                                                          Case No. C 07-05152 JW

1    colored the particular consumer's expectations of what he or she would receive with an upgrade.

2    *Id.* at \*5. Because a "host of individualized questions exist[ed] regarding Plaintiffs' personal

3    knowledge," the court held that the "different knowledge ... is the dominant inquiry." *Id.* The

4    court also held that issues such as whether each consumer saw the mislabeling or was aware,

5    through other education or advertising, of the specifics of the Upgrade Program were subjective

6    issues "not amenable to class-wide treatment." *Id.* at \*6. As a result, individual issues

7    predominated. *Id.* at \*9.

8         In a similar case, *Gonzalez v. Procter & Gamble Co.*, 247 F.R.D. 616, 619 (S.D. Cal.

9    2007), the allegations revolved around the defendant's representations about the capabilities of its

10   hair products. The court noted that prior to purchasing the hair products, consumers could have

11   been exposed to a variety of representations including labeling, television commercials, website

12   promotions and other promotions of the product. *Id.* at 623-24. The court denied class

13   certification holding that individual proof would be required to determine what each consumer had

14   been exposed to, what he or she knew and the extent to which he or she relied on that information

15   at the time of purchase, and thus those individual issues would predominate. *Id.*

16        Plaintiffs, however, seek to circumvent the inherently individualized nature of the

17   knowledge standard, and the cases that dictate that such issues are not amenable to class

18   certification, by attempting to draw comparisons to the "coercion" requirement in tying cases. (Pl.

19   Br. at 13-14.) Plaintiffs argue that there is "no principled basis" for distinguishing between the

20   coercion and knowledge inquiries. *Id.*

21        Plaintiffs' analogy is obviously flawed. Tying cases do not turn on knowledge-based

22   inquiries in the same way that Plaintiffs' claims do here. Tying arrangements are condemned

23   when the seller improperly leverages its market power with respect to one product "to force a

24   purchaser to do something that he would not do in a competitive market." *Jefferson Parish Hosp.*

25   *Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984). A few courts, as Plaintiffs cite, have held that coercion

26   can be implied from proof of an "unremitting policy of tie-in"—*e.g.*, where there is an explicit

27   contract conditioning the sale of one product on another. *Hill v. A-T-O, Inc.*, 80 F.R.D. 68, 69

28   (E.D.N.Y. 1978). But that is far from the general rule as Plaintiffs suggest. On the contrary,

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    certification is routinely denied where coercion requires individual proof. *See, e.g., Freeland*, 238

2    F.R.D. at 142, 156. More important, here, the analysis is quite different. While disclosures that

3    ATTM and Apple made are certainly relevant, and arguably themselves dispositive, the inquiry

4    cannot end there. Because the question, as framed by the Court, is whether a consumer knowingly

5    placed ATTM in a monopoly position with respect to iPhone voice and data services, all sources

6    of knowledge must be explored, regardless of any "policy" by ATTM and Apple. *See Newcal*,

7    513 F.3d at 1049 (explaining that "the law permits an inquiry into whether a consumer's selection

8    of a particular brand in the competitive market is the functional equivalent of a contractual

9    commitment"). A market-level presumption is inappropriate for cases that turn on questions of

10   actual knowledge. *See Kelley*, 2009 WL 973368, at *9 (individual issues predominated where

11   knowledge issues were involved); *Gonzalez*, 247 F.R.D. at 623-24 (same).

12           Nor can Plaintiffs evade the dispositive effect of the individualized nature of the

13   knowledge inquiry their claims require by contending that any knowledge is irrelevant since it is

14   undisputed that Plaintiffs (and putative class members) never entered into a contract of longer than

15   two years. As explained in ATTM's Reply in Support of its Motion to Strike, Plaintiffs' focus on

16   the two-year contractual term is entirely beside the point. (*See* ATTM Reply In Further Support of

17   Its Motion to Strike or Dismiss the Class Allegations, Docket No. 178, ("Mot. Str. Rep.") at 5.)

18           The question is one of whether buying a certain product—here, the iPhone—serves as the

19   "functional equivalent of a contractual commitment." *Newcal*, 513 F.3d at 1049. It is *not* whether

20   there is an actual contract. Contracts are a matter of offer and acceptance and consent. *Netbula,*

21   *LLC v. BindView Dev. Corp.*, 516 F. Supp. 2d 1137, 1155 (N.D. Cal. 2007). ATTM and Apple

22   offered the iPhone for sale under the terms that ATTM would be the exclusive provider of voice

23   and data services for a "multi-year" period and the iPhones would not be unlocked during that

24   period. When consumers purchase the iPhone with knowledge of these terms, they express their

25   consent to be bound. In contract terms, they have accepted the offer. In aftermarket terms, their

26   "selection of a particular brand in the competitive market, [the iPhone,] is the functional

27   equivalent of a contractual commitment." *Newcal*, 513 F.3d at 1049. Whether that intent is

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    reduced to a writing called a contract is immaterial to contract law and certainly to the aftermarket

2    law that Plaintiffs have chosen.

3              In sum, Plaintiffs have adopted a theory of the case that requires the Court to determine the

4    level of knowledge and understanding each individual consumer had regarding ATTM's

5    exclusivity. Plaintiffs offer no viable method for resolving those inherently consumer-focused

6    inquiries on a class-wide basis. Accordingly, this class cannot be certified.

**B.      Assessing Impact Requires An Inquiry Into What Each Consumer
Would Have Done Had There Been Fuller Disclosures.**

9              Plaintiffs do not even attempt to explain in their brief how they possibly could establish the

10   critical element of impact with common proof.[62] The reason is clear. Just as with the predicate

11   element of market power in Plaintiffs' defined market, determining whether each class member

12   was injured requires an inquiry into each consumer's individual preferences and priorities. The

13   key question is: was the ability to use the iPhone on T-Mobile's network material to the

14   consumer's decision to purchase the iPhone? Some consumers may have cared and decided not to

15   purchase the iPhone, and some would have purchased the iPhone anyway. So there can be no

16   class-wide proof of impact.

17             Proof of injury or impact is an essential element of every antitrust claim. *Rebel Oil v. Atl.*

18   *Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995); *Hydrogen Peroxide*, 552 F.3d at 311

19   ("individual injury (also known as antitrust impact) is an element of the cause of action; to prevail

20   on the merits, every class member must prove at least some antitrust impact *resulting from the*

21   *alleged violation*") (emphasis added). Antitrust impact is measured by whether the plaintiff was

22   actually economically harmed by the challenged conduct. *Zenith Radio Corp. v. Hazeltine*

23   *Research, Inc.*, 395 U.S. 100, 114 n.9 (1969) (alleged illegal conduct must be the "material cause

24   of the injury"). The question is whether the plaintiff would have done something different, and

25   paid less, in the *absence of the challenged conduct*, otherwise known as the "but-for world."

26   _____

27   [62] "In antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Hydrogen Peroxide*, 552 F.3d at 311.

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    *Allied Orthopedic*, 247 F.R.D. at 165 (the "but-for" world must be "characterized by the absence

2    of the . . . challenged practices"); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055

3    (8th Cir. 2000) (to establish antitrust impact, plaintiffs are "required to construct a hypothetical

4    market, a but-for market, free of the ***restraints and conduct alleged to be anticompetitive***")

5    (emphasis added).

6       Here, Plaintiffs challenge the nature of the disclosures made regarding the exclusivity and

7    the policy regarding unlocking.  (RCAC ¶¶ 2, 7; Pl. Br. at 1, 14; Pl. Opp. ATTM MTD at 8.)  The

8    but-for world, therefore, would be one in which fuller disclosures were made and the exclusivity

9    and locking would remain.[63]  The question then becomes what Plaintiffs and class members would

10    have done in that circumstance.

11       The logical options are (1) they would have bought the iPhone anyway knowing they

12    would be required to use ATTM, or (2) they would not have bought the iPhone but instead would

13    have (a) kept the phone and service they had, either with ATTM or another carrier, (b) bought a

14    different phone and used ATTM service, or (c) bought a different phone and used another carrier's

15    service, whether that be Verizon, T-Mobile or Sprint.  If they would have bought the iPhone

16    anyway, then they were not harmed.  If they would not have bought an iPhone in a world of

17    allegedly fuller disclosures, then an analysis needs to be undertaken to compare what they actually

18    paid versus what they would have paid in the but-for world to determine whether they paid more

19    in the as-is world such that they were injured by the challenged conduct.

20       Figuring out what each consumer would have done if he or she had the benefit of what

21    Plaintiffs would consider to be adequate disclosures is patently—and dispositively—an

22    individualized inquiry.  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)

23    ("[W]here fact of damage cannot be established for every class member through proof common to

24

25    [63] Of course, in the "as-is" world, there was already full disclosure about the unlocking policy
from day one.  In addition to other announcements, ATTM and Apple referred to their agreement

26    as "exclusive," noted that the iPhone was available "only on AT&T," announced on the box label
that service with AT&T was required after the initial two-year contract *and* customer service

27    representatives were instructed to fully disclose to consumers who asked that the phones would
not be unlocked.  Mahone-Gonzalez Decl. ¶¶ 6-11.

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3)

2   predominance."). It requires an understanding of each consumer's preferences and priorities.

3   Some consumers love everything Apple and thrive on having the latest and greatest device, such

4   that the length and conditions of exclusivity would not have dissuaded them from buying the

5   iPhone. Some consumers might be lifelong ATTM loyalists such that they would want to use

6   ATTM regardless of any requirement to do so. Some consumers might value the ability to switch

7   between carriers over the device itself. Such issues of preferences, interpretation and reliance are

8   not suited for class treatment. *See, e.g., Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 747

9   (7th Cir. 2008) (certification improper where "evaluation of the class members' claims will require

10  individual hearings [because each] will have to testify to what he understands to be the meaning of

11  a label or advertisement . . . .").

12       Undoubtedly, significant numbers of consumers would have done nothing different—in

13  other words, they would not have been injured, or economically affected by the allegedly

14  inadequate disclosures. Plaintiffs here are good examples. As the Court previously observed,

15  Plaintiffs do not actually allege that they would not have bought the iPhone if adequate disclosures

16  had been made. (Mot. to Dismiss Order at 26, 27-28.) Indeed, in discovery, Holman stated, "as

17  far as being tied to Cingular...we could deal with it."[64] When asked "so *was there any way you*

18  *weren't going to purchase an iPhone*?" Holman testified, "*Seems improbable.*"[65] Lee readily

19  admits that he would have purchased his iPhone regardless of it being locked to ATTM,[66]

20  testifying "there were less expensive phones on the market but... the iPhone represented... an

21  evolutionary change to phones and to mobile devices and that *it was a good idea...to make sure*

22  *that I had that phone.*"[67] Smith testified he didn't pay attention to the contract terms when he got

23  his first 2G iPhone. When asked for a "ballpark range of what [he] thought the contract [he] might

24

25  _____

[64] Smart Decl. Ex. D (Holman Dep. 82:1-5) (emphasis added).

26  [65] *Id.* (36:20-25) (emphasis added).

27  [66] Huseny Decl. Ex. K (Lee RFA Resp. Nos. 30, 31).

28  [67] Smart Decl. Ex. C (Lee Dep. 79:2-7) (emphasis added).

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1  be signing was" he testified, "To be honest, I really didn't consider it. I wanted the iPhone,"

2  agreeing that *"it could have been a five-year term."*[68]

3      Perhaps it is because so many, if not most, iPhone consumers would have purchased the

4  phone even if different or more disclosures were made that Plaintiffs never consider this as a but-

5  for world. In their complaint, Plaintiffs alleged that they have been injured "because they have (a)

6  been deprived of alternatives for voice and data services domestically, (b) been forced to pay

7  higher prices for roaming charges while traveling internationally, and/or (c) had their iPhones

8  destroyed. (RCAC ¶¶ 137, 143, 149.) These forms of injury do not logically flow from the

9  Plaintiffs' claims that ATTM's and Apple's disclosures were inadequate, and therefore do not

10 suffice to demonstrate the necessary element of impact.

11     In any event, these alleged injuries, as explained at length in the briefing on ATTM's

12 Motion to Strike, require highly consumer-specific examinations. (ATTM Motion to Strike the

13 Class Allegations, Docket No. 148, at 11-15; Mot. Str. Rep. at 2-5.) Being deprived of

14 alternatives can only begin to constitute injury if alternatives were desired and would have been

15 pursued. Many consumers would not have wanted to use T-Mobile because they preferred

16 ATTM's service. These results are echoed in the discovery taken to date. Rivello, for example,

17 has never used or even considered using T-Mobile.[69] She testified that she does not get ATTM

18 service in her house, and yet, when the contract expired for her 2G iPhone in August 2009 – long

19 after she filed her lawsuit – she did nothing to research switching to T-Mobile or switching to any

20

21

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

22 [68] *Id.* Ex. B (Smith Dep. 192:15-198:4). Similarly, Sesso learned that he would have to use
   ATTM after he purchased the iPhone but before he activated service, yet made a decision to keep
23 the phone and activate ATTM service. *Id.* Ex. R (Sesso Dep. 40:7-18 ("You know, you make a
   decision because you want to get the latest, greatest phone, and you get it. I was disappointed to
24 find out that I had to go to AT&T, not because I had a problem with AT&T. I thought I could
   keep my carrier with T-Mobile. .... And I wanted the phone as well. And so, you know, I made a
25 decision to move forward, you know.")).

26 [69] *Id.* Ex. T (Rivello Dep. 36:1-37:3) (emphasis added). Rivello specifically amended her original
   October 2007 complaint to delete references to a desire to switch to T-Mobile. *Id.* (34:15-35:25).
27 When pressed during her deposition about whether there was a specific carrier she would like to
   switch to, she testified, "No, just another carrier." *Id.* (34:3-10).

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  other carriers.[70]  Instead, she asked her husband to get her an iPhone 3GS for her birthday and

2  entered into a new two-year contract with ATTM until August 2011.[71]  Smith did not want to go to

3  T-Mobile because he didn't think the service was adequate.[72]  Jose Pascasio, a friend of

4  Macasaddu, was a longtime ATTM subscriber, switched to T-Mobile for a period, and then

5  switched back because: "The coverage [on T-Mobile] is not that much.  It's cheaper but I always

6  got dropped."[73]  Lee ordered his first 2G iPhone on August 22, 2007.[74]  He activated it on ATTM

7  on August 24, 2007, signing a two-year contract for voice and data service on his iPhone.[75]  On

8  September 18, 2007, when Lee was still within the 30-day period during which an early

9  termination fee would not apply, he used a software hack to unlock his iPhone and considered

10  canceling his ATTM contract and using T-Mobile service for his iPhone.[76]  He did a cost-benefit

11  analysis and chose to stay with ATTM.[77]

12       Consumers who would choose to stay with ATTM regardless were not injured.  The same

13  is true of consumers who would not keep their iPhones for more than two years, ▮▮▮▮▮▮▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[78] as was the case with several Plaintiffs who upgraded to a 3G

15  or 3GS phone before their initial two-year contract expired.[79]  Determining who would have

16  actually used T-Mobile is, quite plainly, the most individualized of inquiries.

17  

18  [70] Id. (36:8-37:4, 39:24-40:10).  This despite her brother's T-Mobile service working in her house.
   Id. (36:8-10).

19  [71] Id. (20:24-23:20).

20  [72] Id. Ex. B (Smith Dep. 69:10-25; 193:4-6; Ex. 3).

21  [73] Id. Ex. H (Pascasio Dep. 63:18-20).

22  [74] Id. Ex. C (Lee Dep. 92:18-93:1, Ex. 8).

   [75] Id. (Lee Dep. Ex. 20).

23  [76] Id. (130:21-132:3; 208:7-213:11, Ex. 11).

   [77] Id.

24  [78] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Rubinfeld Decl. ¶ 136.

25  [79] Smart Decl. Ex. D (Holman Dep. 119:3-5, 96:23-97:2 ("You know, like I don't even know how
   long my contract with AT&T is now, but considering I buy a new iPhone basically once a year

26  and every time I do it I have to extend my contract by two years, it starts to add up.")); id. Ex. B
   (Smith Dep. 38:9-21, 122:10-11 (describing his reason for getting the 3G "I was excited about

27  some of the newer features, faster internet, things like that.")); id. Ex. C (Lee Dep. 188:1-189:4);
   id. Ex. R (Sesso Dep. 58:1-3).

28  

Case No. C 07-05152 JW
DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    Allegedly high or unfair international roaming charges is another prototypical form of

2  individualized impact. Not everyone travels or wants to travel abroad; and many people do not

3  take their U.S. phones with them when they do travel internationally. (Smart Decl. Ex. T (Rivello

4  Dep. 33:23-34:2 (testifying she has never used a wireless handset abroad).)) Further, as the record

5  of Plaintiffs' experiences demonstrates, many consumers who were charged high international

6  roaming fees were given significant credits. (*Id.* Ex. Q (Kliegerman Dep. 132:2-135:9, Ex. 13

7  (admitting ATTM credited him over $1500 due to international data roaming charges he incurred

8  without an international data plan in place)); *id.* Ex. S (Morikawa Dep. 139:21-22, 145:10-146:7

9  (testifying that he was not sure if disputed charges forming the basis of his lawsuit were for

10  international data roaming, international voice calls or international text messaging and that

11  ATTM credited his account more than $2,600, but he wasn't sure if he was owed more: "I'm

12  disputing those amounts, you let me know if I'm correct.")).) Other travelers unlocked their

13  iPhones and used an international SIM card. (*Id.* Ex. U (Holman Resp. to ATTM 2nd Set

14  Interrog. # 2 (unlocked iPhone with a software hack and used a T-Mobile prepaid SIM card while

15  in Amsterdam)); *id.* Ex. C (Lee Dep. 119:9-15 (unlocked iPhone with a software hack and used a

16  TIM prepaid SIM card while in Italy)).) Again, the experiences are widely diverse and would

17  require an individual analysis to determine whether any particular consumer was actually injured

18  by paying allegedly inappropriate international roaming fees.

19    It is not surprising then that Plaintiffs make no effort to explain how these forms of

20  potential injury, which they continue to press, could possibly be amenable to common proof. (Pl.

21  Br. at 6-7.) Instead, Plaintiffs rest entirely on Professor Wilkie's opinion that iPhone consumers

22  were uniformly impacted in that they, according to him, paid more for voice and data services.

23  (Pl. Br. at 29-31.) He contends that "in the absence of the challenged conduct, ATTM's prices for

24  voice and data services would have been driven down by competition with other cellular carriers

25  such that those prices would have been approximately equal to T-Mobile' [sic] prices." (Wilkie

26  Decl. ¶ 64.)

27

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    Professor Wilkie, however, has unapologetically answered the wrong question.  He opines

2    that absent the *exclusivity* there would be more competition for iPhone consumers with T-Mobile

3    and that competition would drive down ATTM's price.  He testified:

4        Q.    In the but-for world against which you would compare real world experiences, are
         you assuming that there is no exclusivity agreement?
5
         A.    In the but-for world we are assuming there is not the AT&T/Apple ▓▓▓▓
6        exclusive agreement, correct.

7        Q.    Is there any exclusive agreement?

8        A.    No.

9    (Smart Decl. Ex. A (Wilkie Dep. 42:15-22).)

10    That is simply the wrong target.  Here, as Plaintiffs have defined it, the challenged conduct

11    is the inadequacy of disclosures, not the exclusivity.  So any theory of impact based on what

12    would have happened in a but-for world of no exclusivity—*i.e.*, in which consumers could

13    legitimately go to T-Mobile for iPhone voice and data service—is utterly irrelevant to this case.

14    *See Allied Orthopedic*, 247 F.R.D. at 175 (where Plaintiffs in Section 2 case did not challenge

15    defendant's bundling and co-marketing programs as unlawful, these practices "continue to exist in

16    the but-for world").

17    Professor Wilkie never even undertook an analysis of a proper but-for world; he never

18    considered the effect of the available disclosures on any iPhone consumers or what consumers

19    would have done had there been fuller disclosures.  (Smart Decl. Ex. A (Wilkie Dep. 42:3-43:9;

20    44:20-45:11).)  While agreeing that "as we get deeper into that class period, *i.e.,* closer to the

21    present, more is known by the putative class members about the nature of the agreement between

22    AT&T and Apple than was true at the very beginning," Professor Wilkie admitted that he did "not

23    purport to analyze what impact that would have upon any particular putative class member at any

24    given point in time." (*Id.* (197:18-198:5).)  He also admitted that he did not "study whether early

25    iPhone adopters … had an expectation that they would be able to move the phone to another

26    carrier"; did not empirically "study whether it was [subjectively] important to some or all early

27    iPhone adopters that they would be able to move the phone to another carrier"; and did not

28    "determine whether the willingness of a consumer to adopt the iPhone at any given price for both

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

28

1  the device and for the associated service would have been significantly affected by their

2  perception as to whether they could unlock it and move it to another carrier." (*Id.* (53:19-55:3).)

3        Having chosen to ignore the potential effect of the conduct at issue and instead base his

4  analyses on a but-for world that doesn't belong in this case, Professor Wilkie has rendered his

5  opinions wholly irrelevant. To even begin to be considered, his analyses must fit the theory

6  Plaintiffs pursue. They do not. Plaintiffs therefore have offered ***absolutely no method*** by which

7  impact—which must be judged against the conduct that is actually being challenged—can be

8  established using common proof. That fact alone unquestionably precludes certification. *See,*

9  *e.g., Allied Orthopedic,* 247 F.R.D. at 165 ("[C]lass certification is precluded where plaintiffs have

10 not shown that the fact of injury element can be proven for all class members with common

11 evidence.").

12       In any event, Professor Wilkie's theory that ATTM iPhone voice and data service prices

13 would have fallen to meet T-Mobile's finds no support in the facts. As discussed at length in

14 Professor Rubinfeld's declaration, Professor Wilkie's theory and the "analysis" on which it is

15 based are fundamentally flawed.

16       First, iPhone subscribers have always paid the same price as other ATTM subscribers for

17 voice services and the same or lower price for data. Professor Wilkie's assertion that ATTM used

18 its "monopoly power" over iPhone subscribers to charge them more than other smartphone users

19 is simply wrong.[80]



26

27 [80] Rubinfeld Decl. ¶¶ 32, 99-104.

28 [81] Smart Decl. Ex. A (Wilkie Dep. 96:3-18).

crowell⬛moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1 ████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ██████████████████[82]

6       Professor Wilkie's second theory—that it is possible to calculate on a class-wide basis the

7 value any individual iPhone purchaser would place on the "option" of switching to T-Mobile—is

8 even more of a stretch. It again assumes a but-for world where there is no exclusivity, and relies

9 necessarily on an idiosyncratic inquiry into how any particular purchaser would value the option

10 to use T-Mobile, or not.[83]

11       Professor Wilkie's failings do not just go to the weight of his testimony, they go to its

12 admissibility. In short, Professor Wilkie's expert report is so riddled with false assumptions,

13 double-counting, and flawed methodology that it fails to meet the basic standards for admissibility

14 and reliability set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms.*,

15 509 U.S. 579 (1993).[84] His opinions should therefore be excluded. *See In Re Universal Srvc.*

16 *Fund Tel. Billing Practices Litig.*, No. 02-MD-1468-JWL, 2008 U.S. Dist. LEXIS 74548, at *23

17 (D. Kan. Sep. 26, 2008) (excluding Professor Wilkie's testimony because "expert economists do

18 not reasonably rely on such spreadsheets" as he did for his opinions).

19       Even under the most liberal of class certification standards, Plaintiffs are required to

20 "advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-

21 wide basis." *In Re Dynamic Random Access Memory Antitrust Litig.*, No. M 02-1486-PJH, 2006

22

23 _____

24 [82] Rubinfeld Decl. ¶¶ 32, 100.

[83] Rubinfeld Decl. ¶¶ 33-37, 111-17.

25 [84] Expert testimony is only admissible if the proponent demonstrates that it (1) is based upon sufficient facts or data, (2) is the product of reliable principles and methods, and (3) applies the

26 principles and methods reliably to the facts of the case. Fed. R. Evid. 702. Equally important, courts must ensure that that "expert testimony proffered in the case is sufficiently tied to the facts

27 of the case." *Daubert,* 509 U.S. at 591 (citations omitted) ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

28

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  WL 1530166, at *9 (N.D. Cal. Jun. 5, 2006).  They have not.  Their bid for certification must be

2  denied on that basis as well.

### C.  Determining Damages Will Require A Highly Individualized Inquiry.

4  For all of the same reasons that proving impact will require individual proof, determining

5  individual damages also will require many mini-trials.  Plaintiffs do not offer any model

6  demonstrating that damages *from the challenged conduct* could be calculated on a class-wide

7  basis.  Instead, Plaintiffs again attempt to escape the class-preclusive effect of their theory by

8  answering a different question.  As explained above and in Professor Rubinfeld's declaration, both

9  of Professor Wilkie's damages scenarios address the wrong conduct—exclusivity; neither

10  accounts for what effect the alleged lack of sufficient disclosures had on iPhone consumers.

11  Viewed through the lens of an appropriate but-for world, assessing damages will quickly

12  "devolve into an unmanageable morass of divergent legal and factual issues."  *Chin v. Chrysler*

13  *Corp.*, 182 F.R.D. 448, 462 (D.N.J. 1998).  It will necessitate determining whether consumers who

14  would not have bought the iPhone if fuller disclosures were made paid more or less than they did

15  by buying the iPhone, and if more, how much.  More specifically, it will require a showing of

16  what the consumer would have done:  (1) would he or she have purchased a different device, and

17  if so which one and for how much?; (2) what carrier would he or she have used, and what kind of

18  plan would he or she have selected, and at what price?

19  These issues cannot be addressed formulaically, and thus independently preclude

20  certification.  *See, e.g., Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 308 (5th Cir. 2003)

21  (declining to certify class where calculation of damages could not be performed class wide).

22  Plaintiffs cannot escape the highly individualized nature of potential damages flowing from their

23  claims by propounding models that do not address the conduct that Plaintiffs are actually

24  challenging.

### IV.   PLAINTIFFS' CLAIMS ARE NOT TYPICAL, INCLUDING THE CLAIMS OF PLAINTIFFS WHO LACK STANDING.

27  In addition to utterly failing to satisfy the predominance element of Rule 23(b)(3),

28  Plaintiffs also fail to establish that their claims are sufficiently typical of the class as a whole.  Fed.

crowell moring

1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1    R. Civ. P. 23(a)(3).  This typicality inquiry involves a determination of "whether other members of

2    the class have the same or similar injury, whether the action is based on conduct which is not

3    unique to the named plaintiffs, and whether other class members have been injured by the same

4    course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992).

5          Plaintiffs face typicality problems here because of the diversity of information and

6    understanding they and class members had in purchasing their iPhones, particularly because the

7    information available changed over time.  Courts have routinely refused to certify classes on

8    typicality grounds where the success of claims hinges on the type and nature of representations

9    made and available information to potential class members.  *See Sprague v. Gen. Motors Corp.*,

10   133 F.3d 388, 399 (6th Cir. 1998) (class certification denied on typicality grounds because the

11   class claims were based on "widely divergent facts"); *Retired Chicago Police Ass'n v. City of*

12   *Chicago*, 7 F.3d 584, 597 (7th Cir. 1993) (same).  The underlying premise is that where the

13   dispositive issue of a case centers on what class members knew and where varying knowledge

14   levels exist, the ability of a class representative to prove his or her respective case does not

15   necessarily translate to an ability to prove other class members' claims.

16         As described at length above, Plaintiffs' claims are predicated on what each class member

17   knew when entering into a voice and data service contract with ATTM.  And, the nature and

18   substance of the information available about the exclusivity and locking varied, and increased

19   vastly over time.  Plaintiffs all purchased their 2G iPhones around the time of the initial launch of

20   the phone.  The vast majority of the alleged class, on the other hand, purchased their iPhones after

21   Plaintiffs filed their lawsuits, and at a time when the nature and amount of information available

22   about the exclusivity was richer than it was when Plaintiffs bought their phones.  Where, as here,

23   the rights and theories to recovery differ based on the type and nature of the information to which

24   each class member was exposed, typicality is not satisfied.  *See Sprague*, 133 F.3d at 399.

25         Further, because Plaintiffs all bought (or for Rivello, requested) 3G and/or 3GS phones

26   with full knowledge of the terms, one of two things is true.  Either their purchasing behavior (*i.e.,*

27   upgrading their iPhones while understanding that they would have to use ATTM) is typical of the

28

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   class, in which case no one is harmed by the alleged non-disclosure.  Or, their purchasing behavior

2   is not typical, in which case the element of typicality is not satisfied.

3       Nor is typicality satisfied where "a putative class representative is subject to unique

4   defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508 (quoting

5   *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180

6   (2d Cir. 1990)).  Here, it is already clear that some Plaintiffs lack standing.  *See Lujan v.*

7   *Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

8       Plaintiff Rivello, for example, did not actually purchase an iPhone or sign the contract for

9   the service—her husband did both.[85]  In addition, Rivello had never unlocked a phone, had been

10  using AT&T for more than five years, had never traveled internationally with her phone and

11  expressly disclaimed a desire to switch to T-Mobile.[86]  Plaintiff Rivello has suffered no injury, and

12  as a result, she fails to typify the class and is unable to serve as a class representative.

13      Like Rivello, Plaintiff Macasaddu never paid for his service.[87]  Instead, he was added to

14  the account of his business partner and friend, Jose Pascasio.[88]  For a while, the business paid for

15  the bill, and then Pascasio paid for it himself.[89]  Pascasio canceled the account when Macasaddu

16  ran up a high bill.[90]  Although his contract had not yet expired, ATTM waived the $175 early

17  termination fee and canceled the line.[91]  Macasaddu thus also lacks standing.

18      Plaintiffs' motion should be denied on the independent basis that their claims are not

19  typical of the putative class members they seek to represent.

20

21

22  _____

23  [85] Smart Decl. Ex. T (Rivello Dep. 14:3-16:3).

24  [86] *Id.* (19:17-23; 24:17-25:12; 33:11-37:4; 39:24-40:10).

    [87] *Id.* Ex. H (Pascasio Dep. 85:18-86:5).

25  [88] *Id* (85:4-10).

26  [89] *Id.* (92:16-93:3).

27  [90] *Id.* Ex. H (Pascasio Dep. 93:7-11); *id.* Ex. G (Macasaddu Dep. 140:10-142:17, Ex. 20).

    [91] *Id.* Ex. H (Pascasio Dep. 150:8-13); *id.* Ex. G (Macasaddu Dep. 142:5-22, Ex. 20).

28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

**V.     PLAINTIFFS' INJUNCTIVE CLAIM DOES NOT PROVIDE AN APPROPRIATE BASIS FOR CERTIFICATION.**

Nor can Plaintiffs circumvent the insurmountable hurdles barring certification under Rule 23(b)(3) by relying instead on certification of their claims for injunctive relief. Plaintiffs' claims for injunctive relief clearly do not predominate over their enormous damages claims (██████████████████████████████████████████████████—before trebling), and final injunctive relief or corresponding declaratory relief is not appropriate respecting the class as a whole.

Certification under Rule 23(b)(2) is only appropriate where claims for equitable relief predominate. Any claim for monetary damages must be "merely incidental" or "secondary" to the claim for injunctive relief. *See Molski v. Gleich*, 318 F.3d 937, 949-50 (9th Cir. 2003); *see also Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1314 (9th Cir. 1977) (Rule 23(b)(2) certification is inappropriate where "the action seeks as a major portion of the claimed relief, monetary restitution"). While asserting a ███████ damages claim, Plaintiffs contend that they "seek primarily 'to bring an end to [Defendants'] restrictive technology practices.'" (Pl. Br. at 21.) Plaintiffs cannot satisfy the predominance requirement simply by asserting it. Rather, the Court must rigorously analyze the specific facts and circumstances of the case. *Molski*, 318 F.3d at 950.

Courts have repeatedly denied certification under Rule 23(b)(2) in cases alleging claims for antitrust treble damages. *E.g.*, *In Re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 507-08 (N.D. Cal. 2008); *Krehl v. Baskin-Robbins Ice Cream Co.*, 78 F.R.D. 108, 117 (C.D. Cal. 1978). Here, Plaintiffs have gone to great lengths to highlight their massive damages estimates, making only a passing effort at suggesting that their primarily goal is injunctive relief. *See Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 860 (9th Cir. 2001) ("if Plaintiffs succeed in obtaining a significant award of monetary damages, they will likely accomplish . . . their essential goal . . . without the added spur of an injunction").

Further, Plaintiffs' effort to get injunctive relief fails both because the request does not address the conduct that forms the basis of their claims, and because the requested relief is essentially moot at this juncture. Plaintiffs request an order requiring Defendants to not violate

DEFENDANT AT&T MOBILITY LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599

1   Section 2 of the Sherman Act; provide unlock codes; and to not sell locked phones without the

2   various requested disclosures.  (RCAC Prayer for Relief c, d, e, and g; Pl. Br. at 21.)

3          As an initial matter, an order enjoining Defendants from monopolizing, attempting to

4   monopolize and conspiring to monopolize the iPhone Voice and Data Services Aftermarket is an

5   order to not violate Section 2 of the Sherman Act and is thus not properly defined.  *Zenith Radio,*

6   395 U.S. at 133.  More importantly, any order to provide unlock codes or to not sell locked phones

7   would flow from a challenge to the exclusivity between Apple and ATTM, which Plaintiffs have

8   emphatically disavowed.  (Pl. Opp. to ATTM's MTD at 8; MTD Hr'g Tr. at 63.)  Plaintiffs cannot

9   get injunctive relief addressing conduct they do not challenge, let alone use that as a basis for

10  obtaining class certification.  That leaves Plaintiffs with the sole argument that the court should

11  prevent Defendants from selling the iPhone without the various requested disclosures.  The

12  hypothesized need for an injunction regarding disclosures at this point is, however, entirely moot.

13  First, there is sufficient information in the marketplace regarding the terms of ATTM's and

14  Apple's agreement. ███████████████████████████████████████

15  ████████████   There is no need for injunctive relief.

16         Plaintiffs' pursuit of injunctive relief does not predominate over their pursuit of damages.

17  Certification under Rule 23(b)(2) is inappropriate.

18  **VI.    CONCLUSION**

19         For all of the reasons discussed above and in the declaration of Professor Rubinfeld,

20  Plaintiffs unquestionably have fallen far short of satisfying their burden to demonstrate that the

21  requirements of Rule 23 are satisfied.  Plaintiffs' motion for class certification should be denied.

22  DATED:  March 16, 2010                    CROWELL & MORING LLP

23

24

25                              By:  /s/ Shari Ross Lahlou
                                     Shari Ross Lahlou
26                                   1001 Pennsylvania Ave NW
                                     Washington DC 20004
27                                   Attorneys for Defendant
                                     AT&T Mobility LLC
28

crowell moring
1001 Pennsylvania Ave NW
Washington, DC 20004
(202) 624-2599