Case5:07-cv-05152-JW Document365 Filed03/16/10 Page1 of 41

LATHAM & WATKINS LLP
Daniel M. Wall (Bar No. 102580)
Alfred C. Pfeiffer, Jr. (Bar No. 120965)
Christopher S. Yates (Bar No. 161273)
Sadik Huseny (Bar No. 224659)
505 Montgomery Street, Suite 2000
San Francisco, California 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095
Email: Dan.Wall@lw.com
Email: Al.Pfeiffer@lw.com
Email: Chris.Yates@lw.com
Email: Sadik.Huseny@lw.com

Attorneys for Defendant
APPLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE APPLE & AT&TM ANTITRUST LITIGATION

CASE NO. C 07-5152 JW (PVT)

**DEFENDANT APPLE INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date: May 10, 2010
Time: 9:00 AM
Place: Courtroom 8, 4th Floor
Judge: The Honorable James Ware

**PUBLIC REDACTED VERSION**

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page2 of 41

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 6

A. The iPhone And Agreement Between Apple and ATTM .......... 6

B. Disclosures Regarding Exclusivity and Unlocking .......... 7

C. Disclosures Regarding Applications .......... 8

D. Consumers Continue to Adopt iPhones .......... 9

E. Hacking iPhones and OS Version 1.1.1 .......... 10

III. LEGAL STANDARD .......... 11

IV. PLAINTIFFS FAIL TO MEET THEIR RULE 23 BURDENS ON THE VOICE AND DATA SERVICES AFTERMARKET CLAIMS .......... 12

A. Plaintiffs' Aftermarket Monopolization Claims Are Inherently Not Conducive to Classwide Adjudication .......... 12

1. Plaintiffs Made State of Mind a Critical Issue in Assessing Market Power in Aftermarkets .......... 12

2. Plaintiffs' "Aftermarket" Theory Turns on Individual Knowledge, an Inherently Individualized Inquiry .......... 13

3. Plaintiffs' Various Arguments That "Knowledge" Is Not An Individualized Inquiry Are Makeweight .......... 15

B. Plaintiffs Have Failed to Demonstrate That Common Issues Predominate As to Antitrust Impact And That The Challenged Conduct Had a Common Impact on iPhone Consumers .......... 17

1. The Importance of Impact in Class Certification Law .......... 17

2. It Is Apparent that Numerous Class Members Were Not Injured .......... 18

3. Injury Claims Based on Nondisclosure Are Inherently Individualized .......... 18

4. Plaintiffs' Economist Offers No Viable Theory to Demonstrate Common Impact or Common Proof of Impact .......... 19

a. Dr. Wilkie Addressed the Effects of Exclusivity, Not the Effects of the Conduct Actually Challenged In This Litigation .......... 19

b. Dr. Wilkie's Testimony Does Not Comport With the Legal Concept of Aftermarket Monopolization .......... 21

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page3 of 41

c. "Option Value" is Not a Proper Method of Calculating Damages for Aftermarket Monopolization. ... 22

V. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEIR APPLICATIONS AFTERMARKET CLAIMS ARE APPROPRIATE FOR CLASS CERTIFICATION . 24

A. Plaintiffs' Brand New, Unpleaded Monopolization Theory ... 24

B. Plaintiffs Cannot Establish By Common Proof The Existence of Market Power In The Purported Applications Aftermarket ... 26

C. Dr. Wilkie's Testimony on the Applications Aftermarket Issues Is Without Foundation and Fails to Meet Plaintiffs' Burden ... 27

D. Plaintiffs' New Approach Is an Indirect Purchaser Theory Foreclosed by *Illinois Brick* ... 28

VI. 1.1.1-RELATED CLAIMS ARE NOT AMENABLE TO CLASS CERTIFICATION . 29

A. Plaintiffs' Widely Divergent Experiences Defeat Certification ... 29

B. Plaintiffs' Proposed Bricking "SubClass" Is Fatally Flawed ... 31

C. Plaintiffs Failed to Establish That Common Issues Predominate As to Their MMWA, Computer Fraud or Trespass Claims ... 32

1. The Magnuson Moss Warranty Act Claims ... 32

2. Computer Fraud And Trespass to Chattels Claims ... 32

VII. DAMAGES ARE NOT INCIDENTAL, SO AN INJUNCTIVE CLASS IS NOT APPROPRIATE ... 35

VIII. CONCLUSION ... 35

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page4 of 41

# TABLE OF AUTHORITIES

## CASES

*Alabama v. Blue Bird Body Co.*,
573 F. 2d 309 (5th Cir. 1978) .......... 17

*Allied Orthopedic Appliances v. Tyco Healthcare Group*,
247 F.R.D. 156 (C.D. Cal. 2007) .......... 12

*Bell Atl. Corp. v. AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) .......... 23

*Blades v. Monsanto*,
400 F.3d 562 (8th Cir. 2005) .......... 18

*Cady v. Anthem Blue Cross Life & Health Ins. Co.*,
583 F. Supp. 2d 1102 (N.D. Cal. 2008) .......... 32

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) .......... 29

*Cash v. Arctic Circle, Inc.*,
85 F.R.D. 618 (E.D. Wa. 1979) .......... 17

*Crosby v. Social Sec. Admin*,
796 F.2d 576 (1st Cir. 1986) .......... 32

*Feinstein v. Firestone Tire & Rubber Co.*,
535 F. Supp. 595 (S.D.N.Y. 1982) .......... 32

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) .......... 12

*Gene and Gene LLC v. Biopay LLC*,
541 F.3d 318 (5th Cir. 2008) .......... 33

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) .......... 28

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
504 U.S. 451 (1992) .......... 22

*Image Technical Servs., Inc. v. Eastman Kodak Co.*,
125 F.3d 1195 (9th Cir. 1997) .......... 21

*In re Apple and AT&TM Antitrust Litig.*,
596 F. Supp. 2d 1288 (N.D. Cal. 2008) .......... *passim*

*In re Graphics Processing Units Antitrust Litig. (In re GPU)*,
253 F.R.D. 478 (N.D. Cal. 2008) .......... 12, 28

*In re Hotel Tel. Charges*,
500 F.2d 86 (9th Cir. 1974) .......... 23

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

i

APPLE INC.'S MOTION FOR SUMMARY JUDGMENT
ON PLAINTIFFS' VERSION 1.1.1 CLAIMS
CASE NUMBER: C 07-05152 JW

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page5 of 41

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008)....................12, 14, 17

*In re Initial Pub. Offering Sec. Litig. (In re IPO)*,
471 F.3d 24 (2d Cir. 2006)....................12

*In re Microsoft Xbox 360 Scratched Disc Litig.*,
2009 U.S. Dist. LEXIS 109075 (W.D. Wash. 2009)....................34

*In re New Motor Vehicles Canadian Export Antitrust Litig. (In re New Motor Vehicles)*,
522 F.3d 6 (1st Cir. 2008)....................17, 21

*In re Nissan Motor Corp. Antitrust Litig.*,
552 F. 2d 1088 (5th Cir. 1977)....................31

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005)....................23

*Intratex Ga. Co. v. Beeson*,
22 S.W.3d 398 (Tex. 2000)....................31

*Kline v. Coldwell, Banker & Co.*,
508 F.2d 226 (9th Cir. 1974)....................17

*Kohen v. Pacific Investment Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009)....................18

*Moore v. Jas. H. Matthews & Co.*,
550 F.2d 1207 (9th Cir. 1977)....................17

*Murray v. Financial Visions, Inc.*,
2008 U.S. Dist. LEXIS 93419 (D. Ariz. 2008)....................33

*Navellier v. Sletten*,
262 F.3d 923 (9th Cir. 2001);....................27

*NewCal Industries, Inc. v. IKON Office Solution*,
513 F.3d 1038 (9th Cir. 2008)....................13

*Pichler v. UNITE*,
228 F.R.D. 230 (E.D. Pa. 2005)....................31

*Poulos v. Caesars World, Inc.*,
379 F.3d 654 (9th Cir. 2004)....................18

*Romberio v. Unumprovident Corp.*,
2009 WL 87510 (6th Cir. Jan. 12, 2009)....................18

*Sanchez v. Wal Mart Stores, Inc.*,
2009 U.S. Dist. LEXIS 48428 (E.D. Cal. 2009)....................34

*Smith v. Denny's Restaurants Inc.*,
62 F.R.D. 459 (N.D. Cal. 1974)....................17

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page6 of 41

*Smith v. Mobil Oil Corp.*,
667 F. Supp. 1314 (W.D. Mo. 1987) .......... 16

*SMS Systems Maintenance Servs. Inc. v. Digital Equip. Corp.*,
188 F.3d 11 (1st Cir. 1999) .......... 21

*Somers v. Apple Inc.*,
258 F.R.D. 354 (N.D. Cal. 2009) .......... 5

*Temple v. Fleetwood Enters.*,
133 Fed. Appx. 254 (6th Cir. 2005) .......... 32

*Thorogood v. Sears, Roebuck and Co.*,
547 F.3d 742 (7th Cir. 2008) .......... 19

*Util. Consumers' Action Network v. Sprint Solutions, Inc.*,
259 F.R.D. 484 (S.D. Cal. 2009) .......... 35

*Vinole v. Countrywide Home Loans, Inc.*,
571 F.3d 935 (9th Cir. 2009) .......... 30

*Walsh v. Ford Motor Co.*,
130 F.R.D. 260 (D.D.C. 1990) .......... 32

*Walsh v. Ford Motor Co.*,
807 F.2d 1000 (D.C. Cir. 1986) .......... 32

*Whiteway v. FedEx Kinko's Office & Print Servs.*,
2006 WL 2642528 (N.D. Cal. 2006) .......... 32

*Wilcox Dev. Co. v. First Interstate Bank, N.A.*,
97 F.R.D. 440 (D. Or. 1983) .......... 13

*Wilson v. Home Depot U.S.A., Inc.*,
225 F.R.D. 198 (W.D. Tex. 2004) .......... 13

*Zinser v. Accufix Research Inst., Inc.*,
253 F.3d 1180 (9th Cir. 2001) .......... 11

**OTHER AUTHORITIES**

*Aftermarkets and Consumer Welfare: Making Sense of Kodak*,
63 ANTITRUST L. J. 483 (1995) .......... 22

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

iii

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page7 of 41

# I. INTRODUCTION

In the early days of this case, plaintiffs and defendants battled over the nature of plaintiffs' antitrust claims and their legal sufficiency. Defendants moved to dismiss, arguing that the case attacked Apple's entry strategies—namely its decisions to enter the cellular telephone industry with an exclusive cellular service partner, AT&T Mobility, LLC ("ATTM"), and a controlled rather than "open" applications platform. Plaintiffs wanted no part of that battle. They repeatedly foreswore any intention to challenge Apple's business model, and instead advanced a novel theory of "aftermarket monopolization" by nondisclosure. The theory posited that Apple and ATTM failed to tell consumers that ATTM would be the exclusive iPhone carrier for five years, that iPhones could not be "unlocked," and that "jailbreaking" iPhones to run third party applications would be prohibited, such that consumers buying iPhones and signing two-year ATTM service contracts were unwittingly committing themselves to years of "aftermarket monopoly."

Defendants vigorously disputed the legal basis for this aftermarket theory, but the Court denied Apple's motion to dismiss. It held that plaintiffs' theory *might* be valid depending on whether consumers buying iPhones were aware of the risk that ATTM would be their only service option and that Apple would control applications distribution. *See, e.g., In re Apple and AT&TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1305-06 (N.D. Cal. 2008) (defining the issue as whether plaintiffs "knowingly placed [Defendants] in a monopoly position in the alleged voice and data service aftermarket") (internal quotes omitted). The Court said that Apple's arguments about what ATTM and Apple disclosed regarding these practices "merely create[d] a factual dispute better suited for resolution at a later stage of this litigation." *Id*. at 1306.

Plaintiffs have now realized that the theory they crafted to avoid dismissal is a disaster for class certification.[1] Here's why: the theory depends on the notion that, at one point in time, Apple and ATTM lured unsuspecting consumers into buying iPhones through inadequate disclosures so that, at a later point in time—*after* consumers were committed to their iPhones, they could exploit consumers in the "aftermarkets." But if part of the liability calculus in this case is a consumer's

[1] Plaintiffs have also discovered a huge substantive problem with their theory: [redacted]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

*awareness* and *knowing acceptance* of the risks that ATTM would be the only cellular network available to him, or that the iPhone would be a closed platform, then this clearly individualized inquiry will dominate any trial. Claims that turn on a plaintiff's mental state are not amenable to classwide adjudication.

Further, plaintiffs' aftermarket theory does not have a common impact among the putative class of *all iPhone purchasers*. The theory by definition affects only those consumers who, having been first "locked in" via deception, then buy overpriced aftermarket service or applications. That means, for example, a second service contract after the initial two-year service contract expires. But this is a small—and in the case of the named plaintiffs, practically a null—set of consumers. Most iPhone customers never buy "aftermarket service" because they upgrade to a new phone within two years. Six of the eight named plaintiffs fall into this category: each acquired a new iPhone with ATTM service within two years, never bought aftermarket service, and thus—like millions of similarly situated consumers—could not have suffered an aftermarket injury. These are fatal problems for class certification.

Plaintiffs' response is to say one thing while doing another. In their brief and expert testimony, plaintiffs *say* they are staying true to the nondisclosure theory, but they are not. This is revealed by the "but for worlds" used by plaintiffs' economist to demonstrate impact and damages, in which (a) there is no Apple-ATTM exclusivity agreement and (b) Apple has lost all control over iPhone applications distribution. Plaintiffs' "preliminary" damages study of services—[redacted]—has nothing to do with measuring the value of incomplete disclosure, nor is it focused on "aftermarket" cellular service. Rather, it measures the effects of eliminating exclusivity, which would supposedly cause ATTM service prices to decline to the much lower rates that T-Mobile once charged. Similarly, plaintiffs unveil a brand new theory for how Apple supposedly monopolized the "iPhone Applications Aftermarket," and it has nothing to do with deception. It is, rather, a frontal attack on Apple's "closed" iPhone platform, with a damages model that presumes an "open" platform.

This is improper. A plaintiff cannot defend its complaint based on one theory and seek class certification on another—let alone a theory disavowed at the pleadings stage. The

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page9 of 41

fundamental inquiry under Rule 23 is whether the case that would go to trial admits to classwide adjudication. That always and inherently depends on what the plaintiff is legally required to prove to establish liability and what the defendant is permitted to prove in defense. Once this Court defined the substantive elements of a viable "aftermarket monopolization" claim, plaintiffs had to follow that template and meet the requirements of Rule 23 with respect to those elements. Plaintiffs have not even tried to do so—so they clearly have not met their Rule 23 burden.

It is no mystery why plaintiffs are trying to substitute a more class-friendly theory for that which they proposed originally. The original theory does not work as a class action.

It does not result in a common impact. It takes a great leap of faith to think that *anyone* was hurt because Apple announced that it had a "multi-year" exclusive agreement with ATTM rather than, as plaintiffs prefer, a "five year" exclusive agreement— [redacted] Regardless, think about what has to happen in order for that "nondisclosure" to result in aftermarket exploitation.

- First, the theory requires consumers not to grasp the significance of the disclosures that were indisputably made, including the fact of a "multi-year" exclusive relationship and that a "Service plan with AT&T [is] required for cellular network capabilities on expiration of initial new two year agreement." *See* II.B, below. Even if for now we must assume there are people who could read that and think that a service plan with AT&T was *not* required "on expiration of initial new two year agreement," surely not *everyone,* or even most, could think that. Consumers would at worst vary in their awareness of what they were getting into by purchasing an iPhone. Consumers who understood and accepted what awaited them in the "aftermarket" would have no claim.

- Second, the theory requires consumers to have purchased their iPhones while the supposed "secrets" remained unknown. If Apple's policies were ever secret,[2] they were not secret very long. Indeed, plaintiffs understood enough to sue over these alleged

[2] For the record, it wasn't a secret. Apple and ATTM may not have said all that plaintiffs prefer, but the Apple-ATTM agreement was widely reported as a "five-year term" in the press beginning as early as January 2007—shortly after the iPhone was announced and 5 months prior to its sales launch. It was also announced in a May 21, 2007 *USA Today* article that at least one individual plaintiff admits reading. *See* Huseny Decl. Ex. K (Lee Response to RFA 11), *see generally* Defendants' Joint Appendix ("JA"), attached to the Declaration of Timothy Carson, for a representative sample of many articles and reports on public disclosures regarding defendants' policies.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page10 of 41

nondisclosures and related practices by November 2007, just a few months after the iPhone went on sale. Only very early purchasers of the iPhone, those who purchased before these issues became a *cause célèbre*, could reasonably claim to have been adversely impacted by any alleged nondisclosure.

[redacted]

- Fourth and perhaps most importantly, the theory requires consumers to have purchased "aftermarket service." Only then are they subject to aftermarket exploitation. But most never do. Rather, like the individual plaintiffs, they upgrade to a new iPhone before their initial two year contract expires, and never enter the aftermarket. So most could not possibly prove antitrust injury.

These four factors alone make it highly unlikely that even a significant minority of iPhone customers could plausibly claim an aftermarket injury. One thing is clear: since plaintiffs have not addressed any of this, there is no basis in the record upon which the Court could conclude that "aftermarket monopolization" hurt consumers generally. That precludes certification.

Plaintiffs cannot prove an antitrust violation with common proof. Antitrust cases are certified as class actions when the anticompetitive conduct inherently hurts everyone, without regard to consumers' state of mind or individual interactions with the defendants. This is when common proof tends to predominate. Plaintiffs, however, pled themselves out of that model. They created an antitrust theory that turns on concepts of deception and expectations, in particular whether consumers knowingly bestowed an aftermarket monopoly on defendants. Those who did have no claim; those who did not may or may not have a claim depending on other elements. That is plainly an individualized inquiry not conducive to class certification.

This case is rife with individualized issues.

- Plaintiffs claim that disclosures of a "multi-year" exclusive deal failed to convey that ATTM would be the only choice for iPhone service after the first two years. Whether any given consumer failed to understand that is an individualized issue.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page11 of 41

- Plaintiffs claim that consumers "expect" to be able to get unlock codes so they can move their cell phones to new carriers. Whether any given consumer shares that mindset is an individual issue.
- Plaintiffs claim that consumers thought they would have numerous avenues for getting iPhone applications (even though Apple never said anything of the kind). Whether—and how—any consumer thought that is an individualized issue.
- Plaintiffs claim that Apple "bricked" the iPhones of certain consumers who altered their iPhones to unlock or "jailbreak" them, and denied warranty service to others. Nothing about this behavior even arguably impacted consumers generally; thus, whether any given consumer was adversely affected is necessarily an individualized issue.

The deposition testimony of the class representatives confirms these are individualized issues. Every plaintiff's story on every one of these issues is distinct and idiosyncratic, making it clear that a trial could never be limited to common proofs.

Plaintiffs cannot prove antitrust injury with common proof. The antitrust class action cases hold that unless injury-in-fact, or "impact," is capable of formulaic determination, common issues do not predominate as required by Rule 23. Furthermore, as this Court held in *Somers v. Apple Inc.*, 258 F.R.D. 354, 361 (N.D. Cal. 2009), plaintiffs must demonstrate and validate the existence of appropriate methods of proving impact in order to obtain class certification.

Plaintiffs completely defaulted on this obligation. Their economist did not even study the right issue—plaintiffs' claim of aftermarket monopolization by inadequate disclosure. Instead, he studied the impact of exclusivity, an issue that is not and cannot be the basis of liability. Nothing about his analysis focuses on whether ATTM service contract renewals are priced at levels indicating aftermarket opportunism. Plaintiffs thus offer no proof of what market impact there would have been had Apple and ATTM said more about the implications of a "multi-year exclusive partnership." The same is true with respect to the "iPhone Applications Aftermarket" claims. Plaintiffs' expert studied an entirely irrelevant issue about "opening" Apple's iPhone platform, and did nothing to address the effects of supposed nondisclosure.

The "bricking" claims turn completely on individual inquires. Plaintiffs advance a number of claims based on injuries allegedly suffered when in September 2007 Apple released a software

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page12 of 41

update (version 1.1.1) that allegedly rendered some altered iPhones inoperable. This was a one-time occurrence that affected relatively very few customers, many of whom—like each and every one of the named plaintiffs—suffered no injury at all. Plaintiffs nevertheless seek to certify a "subclass" of "iPhone customers whose phones were also 'bricked' by Defendant Apple." Mot. at 8, n. 11. This is improper on its face. A class definition cannot require a liability determination to ascertain the class. Plaintiffs are forced to violate this rule because iPhones were "bricked" (rendered inoperable) depending on what the users did to their own iPhones, in particular whether one specific "hacking" program was used. Consequently, only an individualized inquiry can fairly adjudicate a "bricking" claim. Each device must be inspected, and each plaintiff must prove how the device was altered, and each plaintiff needs to describe any injury supposedly suffered. Plaintiffs have now proven this by opposing Apple's pending summary judgment motion with individualized claims of injury. That is not a class action.

## II. FACTUAL BACKGROUND

This case arises in the intensely competitive market for mobile cellular handsets and the provision of wireless services for those devices. Plaintiffs do not dispute that there is vigorous competition in this marketplace. *See* Kingo Decl. Ex. A (Revised Consolidated Amended Complaint, Docket No. 109 ("RCAC"), ¶ 61); Huseny Decl. Ex. JJ (Wilkie Dep. 187:23-188:19).

### A. THE IPHONE AND AGREEMENT BETWEEN APPLE AND ATTM

Apple launched its first cellular telephone product, the 2G iPhone, on June 29, 2007. Cue Decl. ¶ 4. The iPhone is a GSM device, which means it can only function on GSM cellular networks. *Id*. That means that, in the U.S., an iPhone can run on the ATTM and T Mobile GSM networks, but not on the Verizon or Sprint CDMA networks. *Id.;* RCAC ¶¶ 59-61, 85.

Apple chose to enter into this market with an exclusive carrier arrangement with ATTM. Cue Decl. ¶ 2. [REDACTED] The parties' agreement makes ATTM the exclusive cellular provider for the iPhone in the United States for the term of the agreement. *Id.* ¶¶ 5-6. [REDACTED]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page13 of 41

**B. DISCLOSURES REGARDING EXCLUSIVITY AND UNLOCKING**

There is no real dispute as to the content and scope of public disclosures about ATTM's status as the exclusive provider of iPhone voice and data services. The parties have stipulated that multiple such disclosures were made, and that these disclosures stated that the iPhone was available "only on AT&T" pursuant to a "multi-year exclusive" partnership. *See* Kingo Decl. Exs. B, L; Rickert Decl., Ex. F, ¶ 3.a; Smart Decl. Ex. J. Indeed, the box containing the 2G iPhone states that ATTM service will be required for the initial *and subsequent* plans (Kingo Decl. Ex C; Cue Decl. ¶ 4, Ex. B):

> "Requirements: Minimum new two-year wireless service plan with AT&T required to activate all iPhone features, including iPod features…. Service plan with AT&T required for cellular network capabilities on expiration of initial new two year agreement."

Defendants also disclosed that iPhones would not be unlocked. The 2G iPhone was activated by users at home using Apple's iTunes software. iTunes included an "FAQ" section

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page14 of 41

which provided answers to commonly-asked questions, and stated the following:

- *Why do I have to activate with AT&T? Can I use my current wireless provider?* AT&T is the exclusive provider for the iPhone in the U.S. If you are currently with another wireless provider, you can opt to transfer your current number when you activate your AT&T account.

- *Can I "unlock" my iPhone for use with another wireless provider?* No, AT&T is the exclusive wireless provider for the iPhone in the United State[s].

Kingo Decl. Ex. K; Cue Decl. ¶ 4, Ex. C; Huseny Decl. Ex. GG; *see also* Mahone-Gonzalez Decl. ¶¶ 6-7 (ATTM representatives to inform customers that iPhones would not be unlocked).

There was also long and extensive press coverage regarding exclusivity. *See* Joint Appendix. Many articles stated that iPhones were locked to only work with ATTM and would not be unlocked. The RCAC quotes a Wall Street Journal article about the ATTM exclusivity, which reported that Apple "has locked and relocked the phone to make sure consumers can't override that restriction." RCAC ¶ 62; JA Tab HHHH (W. Mossberg, *Free My Phone,* Wall Street Journal, October 22, 2007). An article in the *Seattle Post-Intelligencer*, provocatively titled "*Want Your iPhone Unlocked? Too Bad,"* quoted Apple in a Q&A: "Q: Is it possible to unlock an iPhone? A: 'Neither company will provide an unlock code for the iPhone,' wrote Apple spokeswoman Jennifer Bowcock in an e-mail response to a question from the Seattle P-I." JA Ex. RR.

### C. DISCLOSURES REGARDING APPLICATIONS

Today, the iPhone is known as much for the third party applications it supports as for anything else. The proliferation of third-party applications that one can download through Apple's App Store is nothing short of astounding. [REDACTED] Apple customers have downloaded over *3 billion* applications to date, [REDACTED] *Id.* at ¶¶ 14, 17. That makes plaintiffs' claim that Apple has suppressed output by monopolizing the distribution of applications utterly nonsensical, but we must discuss these arguments nonetheless.

Plaintiffs' complaint alleges that Apple inadequately disclosed its intention of controlling iPhone apps. In fact, at around the time the iPhone was announced on January 9, 2007, Apple

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page15 of 41

stated that third party applications would be restricted—a position widely reported in the following months. Apple's CEO gave media interviews in which he stated that the iPhone would not be an "open platform," that Apple would "define everything that is on the phone," and that applications would be handled through an Apple-controlled environment. *See* JA Exs. OOO, TTT, CCCC.

That is what happened. Apple announced the App Store in March 2008 and opened it in July 2008. Cue Decl., ¶¶12, 14, and Ex. D. The press release announcing the App Store disclosed the terms under which Apps would be made available: "Developers set the price for their applications—including free—and retain 70 percent of all sales revenues. Users can download free applications at no charge to either the user or developer, or purchase priced applications with just one click. … Third party iPhone and iPod touch applications must be approved by Apple and will be available exclusively through the App Store." Cue Decl. ¶ 12, Ex. D.

### D. CONSUMERS CONTINUE TO ADOPT IPHONES

Plaintiffs' case suggests that if consumers only knew that they were locked into ATTM service for their iPhones, and could only get apps through Apple's App Store, they would be less inclined to buy iPhones. This is a testable hypothesis—and plaintiffs' theory fails the test.

Since launching the iPhone, Apple has introduced two new iPhone models. Cue Decl. ¶ 9. On June 9, 2008, Apple announced its iPhone 3G, and on June 8, 2009, Apple announced its iPhone 3GS. *Id*. Both models were introduced after these consolidated cases were filed, and therefore after the alleged nondisclosures had indisputably become public knowledge. What transpired is telling: many original iPhone customers upgraded to the iPhone 3G and/or the iPhone 3GS even though it meant signing a new two-year agreement with ATTM. *Id.* ¶ 9, 10; Rubinfeld Decl. ¶ 25 n. 4. Indeed, *all* of the named plaintiffs acquired new 3G or 3GS iPhones after their initial 2G purchases, six of them acquiring the upgraded iPhones prior to or at the time of the expiration of his or her initial ATTM contract for their 2G iPhone, and entering into new two-year ATTM contracts. Huseny Decl. Ex. A (Holman Tr. 119:3-121:1, 124:22-126:9), Ex. B (Kliegerman Tr. 95:2-96:7, 99:2-8), Ex. C (Lee Tr. 52:4-53:5), Ex. F (Rivello Tr. 22:8-23:20); Ex. G (Sesso Tr. 57:25-58:3), Ex. H (Smith Tr. 38:18-39:15, 122:6-8). Millions more consumers purchased iPhone 3G or 3GS devices than had purchased the 2G—notwithstanding that everything

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

relevant about the ATTM exclusivity or Apple's applications policies was public. [redacted] No one can claim those customers were duped into anything.

E. HACKING IPHONES AND OS VERSION 1.1.1

Almost immediately after the release of the iPhone, hackers began efforts to "jailbreak" and "unlock" it. RCAC ¶ 87; Declaration of John Wright ISO Opposition ("Wright Decl."), ¶ 15. Jailbreaking involves altering the iPhone's operating system software (OS) to permit the installation of unauthorized third-party applications. *Id.* Similarly, unlocking typically involves altering iPhone software to allow the iPhone to connect to an unauthorized network. *Id.* In both cases, someone makes unauthorized modifications to the copyrighted iPhone software—a breach of the iPhone software license agreement. *See* Kingo Dec. Exs. G-J.

Plaintiffs allege that Apple used an operating system update, iPhone OS 1.1.1, to punish jailbreakers. Here is what happened.

Apple continuously improves the OS software at the heart of its iPhones; since the launch of the 2G iPhone, there have been over 16 software updates, each of which improved the functionality and capabilities of the iPhone. Wright Decl. ¶¶ 6-7. iPhone OS 1.1.1 was no exception. It introduced several new capabilities, including the ability to turn data roaming off when traveling internationally (resolving one of plaintiffs' original complaints). *Id.* ¶ 14.

iPhone OS 1.1.1 was released on September 27, 2007. [redacted]

[redacted]

[3] [redacted]

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page17 of 41

Apple issued a press release warning of the dangers of unlocking on September 24, 2007, three days before the scheduled release of Version 1.1.1. *Id.* ¶ 27. Apple also created a large warning box that users had to view prior to installing Version 1.1.1:

Important Information
iPhone Software
Version 1.1.1
WARNING: Apple has discovered that some of the unauthorized unlocking programs available on the Internet may cause irreparable damage to the iPhone's software. IF YOU HAVE MODIFIED YOUR iPHONE'S SOFTWARE, APPLYING THIS SOFTWARE UPDATE MAY RESULT IN YOUR iPHONE BECOMING PERMANENTLY INOPERABLE. Making unauthorized modifications to the software on your iPhone violates the iPhone software license agreement, and the inability to use your iPhone due to unauthorized software modifications is not covered under your iPhone's warranty.

No iPhone customer installing Version 1.1.1 could do so without first seeing this warning screen on his or her computer. *Id.* ¶ 28.

We do know that none of the putative class representatives suffered any cognizable injury on account of iPhone OS 1.1.1. This is the basis for Apple's pending summary judgment motion.

## III. LEGAL STANDARD

A class may be certified only if the party seeking certification (i) establishes the prerequisites of Rule 23(a) (commonality, typicality, numerosity, and adequacy of representation) and (ii) shows that the action is maintainable under Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Here, plaintiffs seek an injunctive class under Rule 23(b)(2) and a damages class under 23(b)(3). A Rule 23(b)(3) damages class may only be certified if, in addition to the requirements of Rule 23(a), "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

is superior to other available methods for fairly and efficiently adjudicating the controversy."

Plaintiffs carry the burden of proving all of Rule 23's requirements by "a preponderance of the evidence." *Zinser*, 253 F.3d at 1186; *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008). The trial court must conduct a "rigorous analysis" to determine whether plaintiffs have met this burden. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). In conducting this analysis, the court must "probe behind the pleadings" and consider all of the evidence necessary to determine whether common issues will predominate at trial. *Id*. at 160. Furthermore, "the court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *In re Hydrogen Peroxide,* 552 F.3d at 307; *see also In re Initial Pub. Offering Sec. Litig. (In re IPO)*, 471 F.3d 24, 33 (2d Cir. 2006) (same); *In re Graphics Processing Units Antitrust Litig. (In re GPU),* 253 F.R.D. 478, 492 (N.D. Cal. 2008). This obligation extends to expert testimony. *In re Hydrogen Peroxide*, 552 F.3d at 307. Thus, it is no longer the case that "an expert's report will sustain a plaintiff's burden so long as it is not 'fatally flawed.'" *In re IPO*, 471 F.3d at 40; *see Allied Orthopedic Appliances v. Tyco Healthcare Group*, 247 F.R.D. 156, 165-72 (C.D. Cal. 2007).

## IV. PLAINTIFFS FAIL TO MEET THEIR RULE 23 BURDENS ON THE VOICE AND DATA SERVICES AFTERMARKET CLAIMS

### A. PLAINTIFFS' AFTERMARKET MONOPOLIZATION CLAIMS ARE INHERENTLY NOT CONDUCIVE TO CLASSWIDE ADJUDICATION

#### 1. Plaintiffs Made State of Mind a Critical Issue in Assessing Market Power in Aftermarkets

Apple's motion to dismiss the RCAC led to extensive discussion about what plaintiffs were and were not challenging in this case. Apple maintained that plaintiffs—despite their purported reliance on "failure to disclose" aftermarket claims—were in fact challenging Apple's decision to enter the cell phone market by way of an exclusive agreement with ATTM. Plaintiffs' counsel emphatically rejected Apple's characterization of the complaint as an attack on exclusivity: "We do no such thing, and we have never done such thing. . . . Our position has always been [ ] that there was nothing wrong with Apple's decision to enter the market the way it did and there was nothing wrong with Apple to provide their iPhone only to AT&T. . . ." Huseny Decl. Ex. LL at 63-64; *see also id.* at p. 78 ("Apple … says that we have challenged their entry strategy. Respectfully

we have not and we never have and never will."). Opposing ATTM's motion to dismiss, plaintiffs also denied they were challenging exclusivity or anything about the iPhone-ATTM service package first offered to consumers. Opp. to ATTM's Motion to Dismiss at 7-8 (Docket No. 166).

The Court denied Apple's and ATTM's motions to dismiss the antitrust claims. Based on its interpretation of *NewCal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038 (9th Cir. 2008), the Court held that the legal sufficiency of plaintiffs' aftermarket theories, and in particular whether Apple and ATTM had "aftermarket power," could not be resolved without fact-finding as to "whether Plaintiffs 'knowingly placed [Defendants] in a monopoly position' in the alleged voice and data service aftermarket." *In re Apple and AT&TM*, 596 F. Supp. 2d at 1305.

In short, to survive pleading motions, plaintiffs tied their market power theory to an alleged failure *to adequately inform* consumers about the terms of defendants' policies, such that plaintiffs were essentially misled into giving defendants "aftermarket monopolies."

**2. Plaintiffs' "Aftermarket" Theory Turns on Individual Knowledge, An Inherently Individualized Inquiry**

If, as the Court has held, the relevant inquiry and "dispositive issue" for assessing the existence of market power in the alleged aftermarkets is "whether Plaintiffs knowingly placed Defendants in a monopoly position," then obviously this cannot be a class action. That kind of knowledge—akin to accepting the risk of aftermarket opportunism—is an individualized matter. One person may have understood everything and purchased an iPhone anyway. That person has no claim; she "knowingly placed Defendants in a monopoly position." Another person might be differently situated. Common proof alone cannot sort this out.

Whenever a cause of action requires the fact finder to consider a plaintiff's mental state, class certification is inappropriate. *See, e.g., Wilcox Dev. Co. v. First Interstate Bank, N.A.*, 97 F.R.D. 440, 447 (D. Or. 1983) ("Class certification is improper when knowledge of individual class members requires separate adjudications."); *Wilson v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 202 (W.D. Tex. 2004) ("Claims like these, which turn on a plaintiff's individual knowledge about the characteristics and alleged defects of treated wood, are not appropriate for class certification. Knowledge is highly individualistic and cannot be determined on a classwide basis.") This is a specific application of the rule that "[i]f proof of the essential elements of the cause of

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page20 of 41

action require individual treatment, then class certification is unsuitable." *In re Hydrogen Peroxide*, 552 F.3d at 311. Here, whether a consumer "knowingly and voluntarily placed defendant in a monopoly position"—inherently involves inquiry into that individual's state of knowledge, circumstances and awareness. It is not, as plaintiffs stress, solely about what disclosures were made; it is also about how different individuals reacted to those disclosures. What disclosures did they see? What did they think were defendants' policies on exclusivity, unlocking and applications? Did that matter to them, *i.e.,* was there reliance? There is no "one size fits all" answer to these questions. It requires individual inquiry.

The named plaintiffs' own disparate circumstances and awareness that ATTM was the exclusive cellular provider for the iPhone confirm that individual issues predominate. Some of the named plaintiffs—Holman, Lee, and Smith—are "technologically savvy" consumers who were not only aware of the iPhone from the instant it was officially announced at the MacWorld conference in January 2007, but also tracked the iPhone to launch in June 2007. Huseny Decl. Ex. A (Holman Dep. 45:22-24, 79:24-80:25); Ex. C (Lee Dep. 19:2-19, 67:14-68:16, 72:18-73:18); Ex. H (Smith Dep. 20:6-14, 45:8-46:2. 48:3-9). Plaintiff Holman testified that he watched the MacWorld conference introducing the iPhone, where the Apple/ATTM multi-year exclusive partnership was announced; plaintiff Lee followed that same conference, as did Smith. *Id.* Ex. A (Holman Dep. 51:24-52:4, 80:11-22, 82:1-8); Ex. C (Lee Dep. 65:12-69:2); Ex. H (Smith Dep. 45:8-46:2); Kingo Decl. Ex. P at 27-29). Other plaintiffs did not, and perhaps knew less, but were nonetheless well aware of the requirement to use ATTM before purchase. *Id.* Ex. B (Kliegerman Dep. 23:15-24:6); Ex. F (Rivello Dep. 12:6-23); Ex. L (Macasaddu Resp. to Apple RFA No. 7).

Plaintiff Lee vividly illustrates the importance of individualized proof, as he admitted that prior to purchasing his iPhone, he read a May 21, 2007, *USA Today* article, "AT&T eager to wield its iWeapon," which reported that "AT&T, its [the iPhone's] exclusive U.S. distributor . . . has exclusive U.S. distribution rights for five years." Huseny Decl. Ex. K (Lee Resp. to Apple RFA No. 11). In all events, there was *a range of knowledge* (or at least perception) about the terms of the Apple-ATTM exclusivity. This demonstrates why individual knowledge must be addressed so one can determine who, like plaintiff Lee, bought an iPhone knowing everything,

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page21 of 41

and who, if anyone, managed to filter out all the relevant disclosures and believed they would have a choice of carriers. That disparity precludes class certification.

Circumstance, as well as cognitive differences, distinguishes different class members. For example, it is difficult to comprehend how anyone but very early iPhone purchasers could possibly have adopted the iPhone in ignorance. Everything plaintiffs allege was not disclosed with respect to exclusivity was indisputably public within a few months after the iPhone's launch, and Apple announced its applications policies both in January 2007, before the iPhone launch, and again in March 2008 (regarding the App Store). No one who adopted the iPhone after March 2008 at the latest could establish reliance. [REDACTED].[4] Consumers who never kept a given iPhone for longer than two years fall into another group, because they never entered the alleged voice and data services aftermarket, so they never even risked an aftermarket injury. We could go on, but the point is clear. Whether by virtue of idiosyncratic variations in cognition and exposure to information, or circumstances that create categorical bars to recovery, putative class members will vary greatly in their ability to prove that they did not "knowingly and voluntarily place[] defendant in a monopoly position." That means that plaintiffs' aftermarket power theory, as the Court has understood it, is not a proper class action.

**3. Plaintiffs' Various Arguments That "Knowledge" Is Not An Individualized Inquiry Are Makeweight**

Plaintiffs recognize that, under the standard that the Court articulated, they cannot hope to establish by common proof defendants' market power in the purported aftermarket. As a result, they offer several reasons why the Court should essentially presume that all class members "knowingly and voluntarily gave market power to defendants." Each fails.

First, plaintiffs try to avoid the issue of an individual's knowledge by advancing a "knowingly contracted" standard that disregards any information that is not contained in ATTM

---

[4] *See also* Rubinfeld Decl. at ¶¶ 42, 69, noting that the *extent* of lock-in varies from consumer-to-consumer according to their idiosyncratic investments in the iPhone platform. Plaintiffs' expert admitted to this as well. Huseny Decl. Ex. JJ (Wilkie Dep. 105:18-107:8, 108:11-23).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page22 of 41

service contracts.[5] This is meritless. As an initial matter, it squarely contradicts what plaintiffs told the Court previously. When Apple moved for interlocutory appeal, it predicted that plaintiffs would interpret the Court's Order as containing such an "in the contract" standard. Plaintiffs said not so, because "the Court made perfectly clear that a plaintiff must allege more … including 'the types of information costs…that caused concern for the Ninth Circuit in *Newcal*.'" Opp. to Interlocutory Appeal, Docket No. 165, at 5. They cannot now flip their position on this, too. "In the contract" is simply not the rule upon which the Court allowed plaintiffs to proceed.

Second, plaintiffs argue that they can meet their burden by showing "either that (i) defendants had a blanket policy of not disclosing the 5-year deal, or (ii) defendants did not disclose their deal to an appreciable number of iPhone consumers." Mot. at 14. Apple disagrees, but even if plaintiffs limit *their* case in this manner, Apple and ATTM have a right to put on all probative evidence in their defense. As already noted, people vary in what they need to hear to make an informed decision, and what they do hear. Those who "got it," and certainly those like plaintiff Lee who read in *USA Today* that Apple and ATTM had a five-year exclusive, cannot rely on others' ignorance. Individual-specific evidence is clearly important, and in the end each plaintiff's case has to stand on its own merits.

Plaintiffs cite to no case or authority holding that subjective knowledge-based inquiries can be resolved by a presumption. Instead, they borrow the concept from a few antitrust tying cases, arguing that some courts have held "coercion" can be shown at the market level, and that "knowingly plac[ing] defendants in a monopoly position" is an "identical" type of factual inquiry. This is frivolous. First, being coerced into something and knowingly accepting something are conceptual *opposites*, not identical. As for the tying cases, they hold that coercion can be established by common proof when there is explicit tying.[6] In tying cases as elsewhere, once it is

---

5 *See* Mot. at 24 ("Surely, ATTM could ***not*** enforce either the newspaper article or the iPhone box panel as a binding contract for five years on any Plaintiff or any other Class member, whether they knew about them or not."); Mot. at 24, n.23 ("It is well settled that "extrinsic evidence is not admissible to add to, detract from or vary the terms of a written contract. This is especially true in the case of an integrated agreement, such as ATTM's two-year service agreement here.")

6 *See, e.g., Smith v. Mobil Oil Corp.,* 667 F. Supp. 1314, 1329-1330 (W.D. Mo. 1987) (class action by franchisees; absent explicit tying in written franchise agreement, action must be dismissed given plaintiff's stipulation that no individual coercion of franchisees would be shown).

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

16

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page23 of 41

clear that individual circumstances and states of mind do matter, class certification is improper. *See, e.g., Smith v. Denny's Restaurants Inc.*, 62 F.R.D. 459, 461 (N.D. Cal. 1974); *Cash v. Arctic Circle, Inc.*, 85 F.R.D. 618, 620 (E.D. Wa. 1979).[7]

### B. PLAINTIFFS HAVE FAILED TO DEMONSTRATE THAT COMMON ISSUES PREDOMINATE AS TO ANTITRUST IMPACT AND THAT THE CHALLENGED CONDUCT HAD A COMMON IMPACT ON IPHONE CONSUMERS

#### 1. The Importance of Impact in Class Certification Law

"[T]he issue of liability in antitrust cases includes not only the question of violation, but also the question of fact of injury, or impact." *Alabama v. Blue Bird Body Co.*, 573 F. 2d 309, 320 (5th Cir. 1978); *Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 233 (9th Cir. 1974) ("[p]roof of injury is an essential substantive element of" an antitrust claim); *In re New Motor Vehicles Canadian Export Antitrust Litig. (In re New Motor Vehicles)*, 522 F.3d 6, 19 n.18 (1st Cir. 2008) ("The element of injury in the antitrust context … requires both injury-in-fact and a showing that the injury is the result of the antitrust activity.").

This is often a decisive issue in antitrust class certification decisions. Every plaintiff must suffer injury to recover, so if proving injury requires individualized proof, it is nearly impossible to establish that common issues predominate. *Id.* at 20 ("In antitrust class actions, common issues do not predominate if the fact of antitrust violation and the fact of antitrust impact cannot be established through common proof"); *In re Hydrogen Peroxide*, 552 F.3d at 311 ("In antitrust cases, impact often is critically important for the … predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof."). In most cases where one cannot fully adjudicate impact for each class member with common proof—that is, where individualized proof matters—class certification is denied. *See, e.g., Blades v. Monsanto*,

---

[7] Plaintiffs argue that the tying standard is whether the defendant can impose burdensome terms on an appreciable number of consumers, which they say is a marketwide inquiry. The district court case plaintiffs cite is based on *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1217 (9th Cir. 1977), a case which the leading antitrust treatise says "is no longer authoritative." Phillip E. Areeda and Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION (3rd ed. 2007) ¶1738. Even then, cases such as *Moore* require market power in the tying product to be established before the "burdensome terms" inquiry comes into play. *Moore,* 550 F.2d at 1217. It would be circular to apply that standard here, where market power *is* the issue. Plaintiffs cannot avoid the implications of their deception-based aftermarket theory by citing an inapposite and discredited tying doctrine.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page24 of 41

400 F.3d 562, 572-74 (8th Cir. 2005).

Plaintiffs must also show that the challenged conduct had a "common impact," meaning that it caused an actionable injury to most members of the putative class. While not everyone must be injured, a class may not be certified "if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pacific Investment Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009), *citing Romberio v. Unumprovident Corp.*, 2009 WL 87510, at *8 (6th Cir. Jan. 12, 2009) (class certification improper "[w]here a class definition encompasses many individuals who have no claim at all to the relief requested").

**2. It Is Apparent that Numerous Class Members Were Not Injured**

The record in this case is clear that millions of members of the putative class were not injured due to the alleged aftermarket monopolization. At the very least, this includes (a) the millions of class members who never bought "aftermarket service" because they upgraded their iPhones at or before the expiration of their two-year service contract, and [REDACTED] We could easily add more groups to these "safe harbors," *e.g.,* consumers who bought their first iPhones after allegedly secret information became public, but it would just be gilding the lily. It is clear enough that plaintiffs' class "contains a great many persons who have suffered no injury at the hands of the defendant." *Id.*

**3. Injury Claims Based on Nondisclosure Are Inherently Individualized**

In exactly the same way that plaintiffs' nondisclosure theory creates individualized inquires concerning market power, injuries resulting from nondisclosures—or antitrust violations rooted in nondisclosure—are very poor candidates for classwide adjudication. This is hardly a novel issue. Courts routinely decline to certify classes comprised of persons allegedly injured by misrepresentations on the ground that determining injury in such circumstances depends on the extent to which the proposed class members would have behaved differently but for the misrepresentations—an inherently individualized inquiry. *See, e.g.*, *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665-66 (9th Cir. 2004) (affirming denial of certification for "scheme to defraud" because "individualized reliance issues related to plaintiffs' knowledge, motivations, and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

expectations bear heavily on the causation analysis," and potential class members did "not share a common universe of knowledge and expectations."); *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 747-48 (7th Cir. 2008) (decertifying class where evaluation of consumer protection claims would "require individual hearings [regarding what] [e]ach [class] member understands to be the meaning of [the allegedly misleading] label or advertisement.").

**4. Plaintiffs' Economist Offers No Viable Theory to Demonstrate Common Impact or Common Proof of Impact**

In support of their motion, plaintiffs offer opinions from an economist, Dr. Simon Wilkie, purporting to demonstrate how impact could be shown on a common basis. Dr. Wilkie offers two methodologies, both of which skirt the key question of how individual consumers would have reacted to better disclosures.[8] Furthermore, Dr. Wilkie's analysis is not about or dependent on whether "aftermarket monopoly" resulted in monopolistic prices for aftermarket service. He studied the effects of exclusivity, resulting in a report on impact and damages that is irrelevant.

**a. Dr. Wilkie Addressed the Effects of Exclusivity, Not the Effects of the Conduct Actually Challenged In This Litigation**

[8] That is not surprising. As the Court noted in its Order on Apple's motion to dismiss, "Plaintiffs do not allege that Defendants' alleged material omissions were the actual cause of the harm they claim to have suffered. Nowhere in the Complaint is an allegation that any of the Plaintiffs would not have bought an iPhone if armed with the knowledge Defendants are alleged to have withheld." *In re Apple and AT&TM*, 596 F. Supp. 2d at 1312.

[9] Indeed, some of the named plaintiffs had no interest in switching to T-Mobile because they experienced poor service coverage. *See, e.g.,* Huseny Decl. Ex. H (Smith Dep. 69:10-18, Ex. 3).

1  ████████████████████████████████████████  The answer, incredible as

2  it seems, is because Dr. Wilkie assumes the "but for world" is one *without any exclusivity*.

3  ██ ███████████████████████████████████████

4  ██ ███████████████████████████████

5  ██ ███████████████████████████████████

6  ██ █████████████████████████

7

8  ████████████████

9      In fact, at deposition, Dr. Wilkie admitted that he *did not study at all* the elements of the

10  theory that plaintiffs were permitted to pursue:  defendants' alleged nondisclosures and resulting

11  "lock-in" and exploitation of consumers.  When asked whether he had analyzed the alleged

12  nondisclosures or their effects on consumers, Dr. Wilkie admitted over and over that "we have not

13  performed that analysis."  *See* Huseny Decl Ex. JJ (Wilkie Dep. 42:23-43:5, 44:20-45:11, 126:5-

14  11).  Dr. Wilkie also admitted that he had not studied empirically or otherwise examined the degree

15  to which iPhone customers had any expectation they would be able to unlock their iPhones and

16  move them to another carrier.  *Id.* at 52:23-53:24.  Nor had he done anything to determine whether

17  a customer's willingness to buy an iPhone would have been affected at all by the perception of

18  whether they could unlock it or otherwise move to another carrier in the future.  *Id.* at 54:2-19.

19      Dr. Wilkie's testimony simply does not address the fundamental question on this motion—

20  whether the alleged nondisclosures had a common impact on putative class members.  This

21  abdication is of enormous import.  Dr. Wilkie's opinion is the only thing plaintiffs offered to

22  attempt to meet their burden to show that there is common proof that defendants' caused antitrust

23  injury and common impact.  His failure to analyze that topic according to the elements established

24  by the Court mandates denial of plaintiffs' motion.  *See Somers*, 258 F.R.D. at 361.[11]

25  [10]   Plaintiffs and Dr. Wilkie actually have two paths to attacking exclusivity:  Dr. Wilkie directly assumes a
        "but for world" without exclusivity, and also theorizes that if consumers were allowed to unlock their
26      iPhones, ATTM's entire pricing structure would collapse.  Wilkie Decl. ¶ 63.  Either way, it is a
        backdoor attack on exclusivity, contrary to what plaintiffs promised the Court they were alleging.

27  [11]   Dr. Wilkie's analysis of the effects of exclusivity is based on assumptions and conjectures that are
        inconsistent with the real world.  In particular, Dr. Wilkie's analysis is predicated on false
28      assumptions regarding T-Mobile and ATTM rate plans.  *See, e.g.* Rubinfeld Decl. ¶¶ 32, 99-100.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

20

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page27 of 41

At the very least, Dr. Wilkie has violated the rule that impact and damages testimony must distinguish between that which makes conduct unlawful and the permissible alternatives that may have been adopted in the "but for world." *In re New Motor Vehicles*, 522 F.3d at 27 (class certification improper where plaintiffs' economist failed to consider whether lawful vertical restraints could have had the same effect as challenged concerted action); *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1224 (9th Cir. 1997) ("[plaintiffs] must segregate damages attributable to lawful competition from damages attributable to Kodak's monopolizing conduct"). The permissible alternatives here clearly include the same exclusivity agreement but with better, even "perfect" disclosures. Dr. Wilkie never studied that:

> Q: Now, as I understand it, you have not attempted to study what Apple's and AT&T's pricing would have been in a but-for world where there is still exclusivity, but that it needs to fully disclose the length of the exclusive agreement and its policies against unlocking; right? You haven't done that?
>
> A. We have not done that, correct.

Huseny Decl. Ex. JJ (Wilkie Dep. 74:7-13; *id.* at 42:23-43:16. There are analytical tools Dr. Wilkie might have used to address these questions; he just did not use them. *Id.* 74:7-76:2. That is fatal to class certification. *Somers*, 258 F.R.D. at 361; *In re New Motor Vehicles*, 522 F.3d at 27.

#### b. Dr. Wilkie's Testimony Does Not Comport With the Legal Concept of Aftermarket Monopolization

Dr. Wilkie claims that *all iPhone service contracts* evidence monopoly overcharges, including the initial service contracts that iPhone purchasers entered into when they were, by definition, not locked-in to anything. [redacted] This is illegitimate. As a matter of law, one cannot claim that "contractual rights that consumers knowingly and voluntarily gave to the defendant" at the time of their foremarket purchase are the consequence of aftermarket monopolization. *Newcal*, 513 F.3d at 1048. Thus *Newcal* forecloses any damages based on "overcharges" during the two-year period for which, when purchasing their iPhones, all plaintiffs agreed to accept ATTM voice and data services. *Id.* As a matter of law, that is not aftermarket service. *SMS Systems Maintenance Servs. Inc. v. Digital Equip. Corp.,* 188 F.3d 11, 20-21 (1st Cir. 1999) (holding that service bought with computer hardware is a foremarket purchase).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page28 of 41

It is apparent that Dr. Wilkie disagrees with *Newcal* and *SMS Systems,* as he claims that all service, even that delivered pursuant to a warranty (as in *SMS Systems),* would be aftermarket service. Wilkie Dep. 18:16-19:2. The law trumps Dr. Wilkie's opinions, and so does the economics literature. Aftermarket claims by their very nature turn on exploitation of consumers *after* they are "locked-in" to a given system by their initial equipment purchase; they cannot be exploited before they have bought in. *See* Rubinfeld Decl. ¶ 14-15, 62; Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak,* 63 ANTITRUST L. J. 483 (1995). This is also confirmed by the measure of damages for aftermarket monopolization: the increase in the price of *aftermarket* products or services caused by exclusionary conduct. *Image Tech. Servs., Inc. v. Eastman Kodak Co.,* 504 U.S. 451, 465 (1992) (Kodak "boosted service prices").

Dr. Wilkie did not study whether ATTM service contract renewals appeared to be overpriced on account of opportunism. In fact, "boosted service prices" such as were cited by the Supreme Court in *Kodak,* 504 U.S. at 465, play no part in Dr. Wilkie's testimony—*nor can they* since he admits that "all iPhone customers pay the same price for any given voice and data plan." Wilkie Decl. ¶ 63. In other words, the cost of service in the "monopolized" aftermarket is exactly the same as in the competitive foremarket. The record is bereft of any evidence that ATTM has exploited consumer lock-in in some legally significant manner, much less that the fact and measure of such exploitation can be addressed through common proof.[12]

#### c. "Option Value" is Not a Proper Method of Calculating Damages for Aftermarket Monopolization.

Dr. Wilkie has a second method of attempting to prove impact and damages, which he refers to as "option value." He claims that "all iPhone customers lost the value of the option to switch to an alternative cellular carrier." Wilkie Decl. ¶ 67. He states one can calculate this option

---

[12] Plaintiffs seek to get around this core limitation of *Newcal* by arguing that some consumers expected to be able to pay an early termination fee and then have their iPhone "unlocked" by defendants, apparently so they could switch to T-Mobile immediately. This is hard to swallow. "Multi-year exclusive agreement" had to mean something, and the least it could mean was that ATTM was the sole provider for iPhone voice and data services for two years. Regardless, ATTM cannot exploit such consumers in an aftermarket unless and until their initial service contract expires. Until then, the consumer is protected by the initial contract, which was indisputably purchased in a competitive market. So even if a few consumers were prevented from entering the aftermarket earlier than they liked, that is still just a problem with the contract they purchased in the foremarket—not a legally cognizable aftermarket injury.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page29 of 41

value by "multiplying (1) the reduction in prices that occurs when an iPhone customer switches from ATTM to T-Mobile by (2) the likelihood of switching…." Wilkie Decl. ¶ 68. This results, in Dr. Wilkie's "but-for world," in customers paying a lower price for all their iPhone service plans, again including not just renewal contracts but those purchased together with their iPhones.

Dr. Wilkie's "option value" theory suffers from several analytical flaws. First, it once again does not track plaintiffs' theory of liability. The "option" consumers supposedly lost due to inadequate disclosure is to switch carriers—an option which necessarily means there would be no Apple/ATTM exclusivity. Rubinfeld Decl. ¶ 33-34. Thus, yet again, Dr. Wilkie negates plaintiffs' numerous statements disavowing any argument that the Apple/ATTM exclusivity was unlawful.

Second, even if it matched plaintiffs' liability theory, the "option value" approach would require highly individualized inquiries into the value individual consumers placed on the presumed option to switch. Consumers would not value such an option equally. For example, some, like plaintiff Smith, would put no value on an option to switch to T-Mobile [redacted] *See, e.g.,* Huseny Decl. Ex. H (Smith Tr. 69:22-25). Dr. Wilkie admits that which consumers would switch at any given price difference is an "inherently individualized question." Wilkie Decl. ¶ 61. Dr. Wilkie tries to solve for this with an act of imagination: he hypothesizes a "market" in which every consumer's private option value is "traded," resulting in a uniform market price that is his measure of damages. But there is no such market; Dr. Wilkie is just making it up. *See* Rubinfeld Decl. ¶ 35. Further, by imagining this market, Dr. Wilkie violates the Cardinal rule against awarding average damages.[13] He is proposing to give all consumers the same measure of damages, overcompensating those whose option value is low or zero (because they do not care to switch) and undercompensating those with higher option values. *Id.* ¶¶ 29, 36, 114-16.[14]

---

[13] *In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir. 1974) ("[A]llowing gross damages by treating unsubstantiated claims of class members collectively significantly alters substantive rights under the antitrust statutes … [and] is clearly prohibited."); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 304-05 (5th Cir. 2003) (rejecting estimate of individual damages based on nationwide averages); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 86 (D. Mass. 2005).

[14] Dr. Wilkie also violates the rule against averaging by using "churn" rates to estimate the probability that consumers would switch carriers. The "churn" rate is not a measure of any one customer's likelihood of switching; it is a measure of the average incidence of switching. By incorporating it in his calculation, Dr. Wilkie is implicitly assuming that everyone has the same proclivity to unlock their iPhone and move to T-Mobile.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

23

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page30 of 41

Third, this is not an aftermarket analysis at all. It assumes a change in the *foremarket* price—the price consumers would pay for their initial iPhone and service bundle, not the price of service purchased after the expiration of the initial 2-year contract. That is ironic, because if it were true, as Dr. Wilkie says, that aftermarket policies affect foremarket pricing, it would defeat *Kodak*-style claims of aftermarket monopolization. *See SMS Systems*, 188 F.3d at 17 ("Unless the evidence shows that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket, the aftermarket is not the relevant market."). This theory therefore cannot measure the impact from an alleged aftermarket monopoly.

Fourth, the "option value" theory produces damages even if aftermarket exploitation never occurs. This is plain from the formula, which has only two variables: a price difference and a probability of switching. So long as there is some price difference between ATTM and T-Mobile service and some probability of switching, the theory will always indicate positive damages and common impact, even if ATTM has been a perfect citizen and not exploited the aftermarket in the least. Obviously that is improper, *Kodak II,* 125 F.3d at 1224, as is Dr. Wilkie's testimony.

## V. PLAINTIFFS HAVE FAILED TO ESTABLISH THAT THEIR APPLICATIONS AFTERMARKET CLAIMS ARE APPROPRIATE FOR CLASS CERTIFICATION

### A. PLAINTIFFS' BRAND NEW, UNPLEADED MONOPOLIZATION THEORY

Plaintiffs' class certification papers marked the arrival of a brand new theory of liability for the Applications Aftermarket claims. The RCAC rests on alleged nondisclosures about how the iPhone would be a "closed" system that would not allow consumers to download and use third-party applications, and how Apple would "refuse[ ] to 'approve' any application in which Apple has no financial interest." *See, e.g.,* RCAC ¶ 4, 7, 112, 123. That is certainly what the Court understood when it allowed the case to proceed: that consumers "were unaware of Apple's policies barring TPAs [third party applications] when they entered into their iPhone purchase contracts." *In re Apple and AT&TM*, 596 F. Supp. 2d at 1306. [REDACTED] So, once again, plaintiffs have just changed theories.

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page31 of 41

Plaintiffs' new claim arrived not in an amended pleading but in plaintiffs' class certification brief and Dr. Wilkie's report. Plaintiffs now say they "seek primarily to bring an end to [Defendants'] restrictive technology practices," by which they mean the fact that Apple controls what can be downloaded to iPhones. Mot. at 21. Dr. Wilkie complements this by claiming as the measure of the illegal "aftermarket monopoly" every dollar Apple collects in its capacity as a *distributor* of third party apps. [REDACTED] Dr. Wilkie maintains that if Apple could not technologically mandate a closed platform, the "competitive" price for distribution would be zero; hence, according to Dr. Wilkie, everything Apple collects when developers sell apps through the App Store is a monopolistic overcharge. Huseny Decl. Ex. JJ (Wilkie Dep. 48:9-149:17, 154:8-12). Consumers are supposedly harmed because the application developers adjust their prices to cover this cost.

None of this has anything to do with nondisclosure. It is true that Apple did not announce the particulars of its App Store policies when the iPhone was first announced in 2007, but there was nothing to announce; Apple did not develop those policies until later. *See* Cue Decl. ¶¶ 11-12. All Apple could say for most of 2007 is what it said: that third party apps would be restricted on the iPhone. Apple's CEO himself gave several interviews with prominent media outlets where he stated that the iPhone would not be an "open platform," that Apple would "define everything … on the phone," and that third party downloadable apps would be handled through an Apple-controlled environment. *See* JA Exs. OOO, TTT, CCCC. In October 2007, Apple announced it would open up the platform to third-party applications in 2008. JA Ex. HHHH. In March 2008, it announced:

> Developers set the price for their applications—including free—and retain 70 percent of all sales revenues. Users can download free applications at no charge to either the user or developer, or purchase priced applications with just one click. …Apple will cover all credit card, web hosting, infrastructure and DRM costs associated with offering applications on the App Store. *Third party iPhone and iPod touch applications must be approved by Apple and will be available exclusively through the App Store.*

Cue Decl. ¶ 12, Ex. D (emphasis added).

Plaintiffs do not and cannot claim that any of that was misleading when said or false in retrospect. Instead, they attack Apple's "closed" distribution system directly. They state explicitly

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page32 of 41

that their current theory is comparable to *the Apple iPod iTunes Anti-Trust Litigation* pending before this Court, which is also a direct attack on a supposedly closed platform. *See* Motion at 21 ("Here, as in *iTunes*, Plaintiffs seek primarily to bring an end to [Defendants'] restrictive technology practices").[15] This should not be allowed. If plaintiffs cannot show that the pleaded theory about nondisclosure is a proper class action, then this motion should be denied.

### B. PLAINTIFFS CANNOT ESTABLISH BY COMMON PROOF THE EXISTENCE OF MARKET POWER IN THE PURPORTED APPLICATIONS AFTERMARKET

Plaintiffs fail to propose any market power theory that supports a claim about the monopolization of apps distribution, and Apple is aware of none. But since the RCAC and this Court's Order speak of aftermarket monopolization by deception, we begin by addressing whether it is possible to resolve predominately by common proof whether a consumer "knowingly and voluntarily placed defendant in a monopoly position" in this aftermarket.

The answer is the same as with plaintiffs' Voice and Data Services Aftermarket claims: it cannot be done. We are still faced with a universe of consumers who will "not share a common universe of knowledge and expectations[,]" *Poulos,* 379 F.3d at 665-66, the only difference being that they will vary with respect to their knowledge and awareness of whether the iPhone would be an "open" applications platform. Thus a plaintiff who read the *New York Times* article in which Steve Jobs is quoted as saying that Apple will "define everything that is on the phone," or the *Slate* article stating that "Apple agreed to lock the phone so that third-party software applications can't be installed and run over Cingular's network," will not be able to make out a *prima facie* case. JA Exs. OOO, TTT, BBBB, CCCC. Nor will a plaintiff who read or is charged with knowledge of Apple's press release announcing the App Store. Of course individual knowledge will vary; we already see this in the experience of the named plaintiffs. Some named plaintiffs hacked their iPhones to attempt to add third-party applications with full knowledge that Apple, at that time, did not support third party apps. Plaintiff Holman falls into this group, and had every intention of jailbreaking his iPhone "with or without Apple's help." Huseny Decl. Ex. A (Holman Dep. 30: 20-

---

[15] Plaintiffs and Dr. Wilkie resort to semantics by arguing that they are only challenging the unexpected means by which Apple keeps others from opening up the iPhone platform, such as technologies that supposedly disable apps not downloaded from the App Store. That still constitutes an attack on the closed platform, as Dr. Wilkie eventually admitted. Huseny Decl. Ex. JJ (Wilkie Dep. 169:21-170:10).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page33 of 41

31:1, 31:17-25; *id.* 60:14-20 ("[I]t's very clear, everyone knows what *Apple* intended with an iPhone. I want to discover what's the future of the iPhone, what can we make this do?").[16] Plaintiff Lee was similarly aware that Apple did not at first support third-party applications on the iPhone, and like Holman was nonetheless "planning on adding functionality" to his iPhone from hackers who he expected would develop additional iPhone applications. Huseny Decl. Ex. C (Lee Dep. 106:8-109:10); Ex. 11 (Lee Resp. RFA 38). There is no type of common proof that can obviate examination of these individual-specific facts. Common proof thus cannot predominate.

### C. DR. WILKIE'S TESTIMONY ON THE APPLICATIONS AFTERMARKET ISSUES IS WITHOUT FOUNDATION AND FAILS TO MEET PLAINTIFFS' BURDEN

Dr. Wilkie's testimony that the 30% fee Apple charges developers for the sale of paid applications is a proper measure of impact and damages is a bald assertion, unsupported by any empirical analysis. Wilkie Dep. 151:18-152:7. When asked repeatedly for the evidentiary foundation for this testimony, Dr. Wilkie kept saying, "We haven't conducted that analysis . . . ." Wilkie Dep. 153:20-154:3, 154:13-155:7, 158:3-11. In fact, he conducted no genuine analysis.

Dr. Wilkie has one data point behind his testimony that the competitive distribution price is zero: Google, for its Android Marketplace, charges nothing for distribution. However, as Dr. Wilkie acknowledged, Google has a unique, advertising-based strategy that causes it to provide most of its products for free. Dr. Wilkie picked this Google benchmark even though he does not know if Google's strategy is comparable to Apple's. *Id.* at 155:20-156:15.

Similarly, Dr. Wilkie has not studied how any changes in Apple's distribution fees would have affected the prices for apps—the product consumers are buying. iPhone apps do not all have the same pricing or cost structure. Prices vary significantly, from free to $100 or more, and the costs to develop apps undoubtedly varies as well. Consequently, nothing dictates that in the but-for

---

[16] Holman admits Apple's applications policy makes the iPhone "vastly superior" to other smartphones, to this day. Huseny Decl. Ex. A (Holman Dep. 29:12-22; *id.* at 35:9-12 ("[P]art of why the iPhone is so deluxe is that Apple, like with a Mac, controls all the software and all the hardware and integration in between.")). This explains the lack of evidence that the putative class, or even all named plaintiffs, seek an end to the closed platform. [REDACTED] It also establishes that neither the typicality nor adequacy of representation requirements of Rule 23 can be met – where some members of the putative class benefit from a practice whereas others are supposedly harmed, certification is not proper. *Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001); *Allied Orthopedic*, 247 F.R.D. at 177.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

27

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page34 of 41

world, the price of every app would decrease in exact proportion to a reduction in Apple's distribution fees. Developers make the pricing decisions, and there is no telling what would happen if thousands of iPhone developers were to revisit their pricing after distribution fees decline. That is an extremely complicated economic issue. In fact it is a recurring issue in antitrust class actions and very often results in the denial of certification. *See, e.g., In Re GPU,* 253 F.R.D. at 497 (class certification denied where common proof could not determine how elevated prices for graphics chips affected prices of computers that contained graphics cards). Courts deny certification where, as here, the plaintiffs' expert offers nothing but theory to predict the common impact. *Id*. 493-97.

Overall, Dr. Wilkie's shockingly meager testimony recalls this Court's recent decision in *Somers,* 258 F.R.D. at 361, where class certification was denied upon a finding that the plaintiffs' expert's testimony "was limited to making unspecified proposals as to how he might be able to prove damages." Dr. Wilkie's testimony likewise fails to meet plaintiffs' burden of proof.

### D. PLAINTIFFS' NEW APPROACH IS AN INDIRECT PURCHASER THEORY FORECLOSED BY *ILLINOIS BRICK*

Lastly, plaintiffs' new theory is legally improper. Dr. Wilkie has walked plaintiffs headlong into the barrier of *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730-31, 734 (1977), which holds that indirect purchasers cannot sustain federal antitrust actions.

Dr. Wilkie asserts that the 30% fee Apple charges developers for the sale of paid applications through its App Store injures consumers who purchase such applications. [REDACTED] Now consider *how* they are supposedly hurt. Dr. Wilkie reasons that developers, knowing Apple will impose this fee, choose a price for the app that passes-through Apple's entire fee to the consumer.[17] He is thus proposing a classic indirect purchaser dynamic: a supposed overcharge (Apple's distribution fee) increases the price of the product consumers purchase (the app), allegedly resulting in antitrust injury. The *Illinois Brick* doctrine forecloses this claim:

> An indirect purchaser is one who bears some portion of a monopoly overcharge only by virtue of an antecedent transaction between the monopolist and another, independent purchaser. Such indirect purchasers may not sue to recover damages for the portion

---

17 The developer, not Apple, sets the app price; Apple just handles the billing. Cue Decl. ¶¶ 12, 16, Ex. D.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page35 of 41

> of the overcharge they bear. The right to sue for damages rests with the direct purchasers, who participate in the antecedent transaction with the monopolist.

*Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1170 (8th Cir. 1998). In other words, if there is a cause of action for Apple's imposition of the 30% fee, it belongs to developers, not consumers.

*Ticketmaster* is right on point. In a consumer class action, Ticketmaster was accused of monopolizing the market for ticket distribution services to large-scale popular music shows. This allegedly allowed Ticketmaster "to extract from the plaintiffs supracompetitive fees for ticket distribution services." *Id.* at 1169. The fees were added to the face amount of the ticket and collected by Ticketmaster. Plaintiffs claimed that because Ticketmaster added this fee, it made those who bought tickets through Ticketmaster direct purchasers. *Id.* at 1171. The court disagreed. "[B]illing practices," it held, "are not determinative of indirect purchaser status." *Id.*

> As the plaintiff's complaint makes clear, ticket buyers only buy Ticketmaster's services because concert venues have been required to buy those services first. [S]uch derivative dealing is the essence of indirect purchaser status, and it constitutes a bar under the antitrust laws to the plaintiffs' suit for damages.

Dr. Wilkie is advancing the same injury theory as was rejected in *Ticketmaster*. This is the only purported common impact theory presented by plaintiffs as to these claims. As it is foreclosed under *Illinois Brick*, the class cannot be certified.

## VI. 1.1.1-RELATED CLAIMS ARE NOT AMENABLE TO CLASS CERTIFICATION

Plaintiffs have steadily narrowed their "bricking" allegations, moving from a claim that iPhone OS version 1.1.1 intentionally and maliciously bricked the iPhones of "any" consumer who had downloaded or unlocked their iPhone (CAC ¶ 5) to the claim that 1.1.1 bricked the iPhones of "some" consumers who had downloaded or unlocked their iPhones. RCAC ¶ 5. This narrowing has enormous consequences for their certification motion, but the dispositive factor is the testimony of the named plaintiffs themselves. Plaintiff after plaintiff admitted that the allegations of the RCAC are false, and confirmed that what they did to their iPhones is critical to any liability determination. The version 1.1.1 claims cannot be adjudicated on a common basis.

### A. Plaintiffs' Widely Divergent Experiences Defeat Certification

On the iPhone OS 1.1.1 issues, the facts tell it all. Plaintiffs' experiences with version 1.1.1

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

29

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page36 of 41

could not be more varied—and less indicative of a class action. The only constant is that every claim that an iPhone was bricked begins with something the plaintiff did to alter his or her iPhone.

- Plaintiff Smith jailbroke his iPhone, and in fact testified to a pattern of consistently and regularly hacking his iPhones. Smith claimed to have bricked his iPhone when he updated it to version 1.1.1; however, Apple replaced that phone under warranty—just as it had on six other occasions. Smith Dep. 30:16-20, 64:15-23, 77:23-78:5, 113:21-114:13, 121:19-122:2, 128:7-129:9, 137:14-141:1.

- Plaintiff Sesso testified that he paid a stranger in a shopping mall $70 to modify his iPhone and add third-party apps. Sesso Dep. 66:12-72:14, 74:14-75:25. During a subsequent visit to an Apple Store, Sesso gave an Apple employee approval to update his iPhone software to version 1.1.1. Sesso Dep. 74:14-75:25, 77:22-78:4. When "there was a problem with [the] phone" after the software update, Apple immediately replaced Sesso's iPhone. *Id.* 78:6-13.

- Plaintiff Macasaddu testified that he installed a third-party app called "AppTap" on his iPhone. Despite being aware of the risk of downloading version 1.1.1 on his modified iPhone, he did so, ending up (he says) with a bricked iPhone. Macasaddu Dep. 50:1-24. Macasaddu testified that after he bricked his modified iPhone, Apple refused to replace his iPhone. However, Apple and ATTM records conclusively establish that he received a replacement iPhone. Huseny Decl. Ex. D (Macasaddu Dep. Exs. 15-16); Ex. II (Gust Dep. 79:18-84:24 and Exs. 2, 6, and 11); Declaration of Caroline Mahone-Gonzalez (Docket 268).

Other plaintiffs did not experience bricking at all—including those who had unlocked and/or jailbroken their iPhones. For example, although Plaintiff Holman used both hardware and software hacks to unlock and jailbreak his various iPhones, they remained fully operational when he downloaded and installed version 1.1.1 on his iPhones. Huseny Decl. Ex. A (Holman Dep. 28:15-22, 51:24-52:4, 130:20-134:11, 150:1-152:21). Plaintiffs Rivello and Morikawa installed Apple's various software updates on their respective iPhones and neither one of them ever had a bricked iPhone. *Id.* Ex. E (Morikawa Dep. 80:8-17); Ex. F (Rivello Dep. 41:14-42:1). Plaintiff Kliegerman downloaded 1.1.1 on various iPhones with no incident. *Id.* Ex. B (Kliegerman Dep. 103:21-104:2, 106:19-107:9).

If it weren't already obvious that bricking claims, regardless of the legal theory asserted, are highly individualized, plaintiffs' response to Apple's summary judgment motion makes it so. Plaintiffs argued individual-specific facts to show highly idiosyncratic injuries, such as "loss of use" injuries until Apple replaced their iPhones and the lost value of their personal apps libraries. When the evidence gets "in the trenches" like this, a class trial would be no more than an amalgamation of individual mini-trials and would not achieve judicial economy. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946-47 (9th Cir. 2009).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

30

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page37 of 41

**B. Plaintiffs' Proposed Bricking "SubClass" Is Fatally Flawed**

Plaintiffs do not try to argue that the class of "All persons who purchased an iPhone" is appropriate for the bricking-specific claims. They propose instead to certify a "sub-class" of "iPhone customers whose phones were also 'bricked' by Defendant Apple." Mot. at 8, fn. 11. Plaintiffs' sub-class is not a properly defined class.

Every class must be objectively defined, not rest on unresolved questions of liability, and not include elements of the harm allegedly suffered. *See Pichler v. UNITE*, 228 F.R.D. 230, 247 (E.D. Pa. 2005) (rejecting proposed class definition that "inextricably intertwines identification of class members with liability determinations."); *Intratex Ga. Co. v. Beeson,* 22 S.W.3d 398, 404-05 (Tex. 2000) ("A proposed class definition that rests on the paramount liability question cannot be objective, nor can the class members be presently ascertained; when the class definition is framed as a legal conclusion, the trial court has no way of ascertaining whether a given person is a member of the class until a determination of ultimate liability as to that person…").

"Bricked," the operative term of the proposed sub-class, is a core liability question. Whether a phone was "bricked"—let alone "bricked by Defendant Apple"—depends on a series of merits questions, starting with what the plaintiff did to its iPhone, whether it became inoperable and why (cell phones malfunction for more than one reason), consumer awareness and consent in downloading 1.1.1, and whether Apple replaced the iPhone (honoring the warranty, according to plaintiffs) or left the consumer with an inoperable device. Plaintiffs are effectively incorporating this entire inquiry into the class definition. They are seeking to certify a class of "those who were injured by what we eventually establish was unlawful." That is improper.

The contingent nature of the proposed sub-class also makes it impossible to identify putative class members, a basic and essential element of class actions. *In re Nissan Motor Corp. Antitrust Litig.,* 552 F. 2d 1088, 1104-05 (5th Cir. 1977). In order to identify the putative sub-class members, the Court would be forced to (1) define what "bricked" actually means, (2) identify those individuals whose iPhones were "bricked," and (3) ensure that each iPhone was in fact "bricked" by Apple. Each of these steps requires individualized factual determinations—a fatal shortcoming. *See, e.g.*, *Whiteway v. FedEx Kinko's Office & Print Servs.,* 2006 WL 2642528, at *3 (N.D. Cal.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page38 of 41

2006) ("The Court must be able to determine class members without having to answer numerous fact-intensive questions."); *Crosby v. Social Sec. Admin,* 796 F.2d 576, 580 (1st Cir. 1986).

Plaintiffs' dilemma, of course, is that there is no *a priori* way to identify or describe iPhone purchasers who might have bricking claims. No one can tell who the potential class members are other than through individual inquiry. That is all the more reason why these are not class claims.

### C. Plaintiffs Failed to Establish That Common Issues Predominate As to Their MMWA, Computer Fraud or Trespass Claims

Plaintiffs were required to explain how they could prove the elements of their Magnuson Moss, Computer Fraud and Trespass to Chattels claims through common proof. The page-and-a-half of their brief that touches on this (Mot. at 14-15) fails to carry this burden. All it says is that bricking claims *raise* common issues, not that those issues *predominate*. In reality, plaintiffs cannot prove the elements of their bricking claims by common proof.

#### 1. The Magnuson Moss Warranty Act Claims

MMWA claims require an actionable warranty claim, meaning that (1) the product was warranted, (2) the seller did not conform to the warranty, (3) the seller was given an opportunity to cure any defect, and (4) the seller failed to do so. *Temple v. Fleetwood Enters*., 133 Fed. Appx. 254, 268 (6th Cir. 2005). On its face, that requires inquiry into the interaction of buyer and seller when a warranty claim was presented. We know from the record that some plaintiffs exchanged their bricked iPhones for new ones without incident. That obviously defeats any MMWA claim.[18] Indeed, no plaintiff in this case had a warranty claim denied by Apple. This is not only a complete defense to their claims; it disqualifies them from bringing such a claim on behalf of a putative class. *See Cady v. Anthem Blue Cross Life & Health Ins. Co.*, 583 F. Supp. 2d 1102, 1106 (N.D. Cal. 2008); *Feinstein v. Firestone Tire & Rubber Co.*, 535 F. Supp. 595, 603 (S.D.N.Y. 1982).

#### 2. Computer Fraud And Trespass to Chattels Claims

To prove their computer fraud (CFAA and CPC § 502) and trespass to chattels claims,

---

18 Furthermore, the MMWA requires application of the warranty laws of the 50 states. *See Walsh v. Ford Motor Co.*, 807 F.2d 1000, 1012 (D.C. Cir. 1986). Plaintiffs in MMWA class actions bear the burden of showing that the differences in state warranty laws do not defeat predominance. *See e.g.*, *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 271 (D.D.C. 1990) (denying certification where plaintiffs failed to clear state variance "hurdle" in purported MMWA class action). Plaintiffs have failed to undertake this showing, which requires denial of their motion. *See, e.g.*, *id*. at 271-74.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

32

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page39 of 41

plaintiffs must be able to show that (1) they did not consent to or authorize the installation of version 1.1.1 on their iPhones; (2) they suffered injury after installing version 1.1.1; and (3) version 1.1.1 was the cause of their injury. *See* Apple's Motion For Summary Judgment at 23-25 (Docket No. 265). These elements cannot be resolved by common proof. Individual circumstances matter far too much. In fact, plaintiffs' Opposition to Apple's Motion for Summary Judgment (Docket 346) confirms the sorts of individual proof necessary by relying on plaintiff-specific testimony to attempt to establish a genuine issue.

Consent: The Court has already noted the individualized inquiry required to address consent. The issue, in short, is whether individual consumers understood the warnings Apple provided. *See In re Apple and AT&TM*, 596 F. Supp. 2d at 1307 ("Plaintiffs also allege that some customers unsuspectingly downloaded Version 1.1.1…. [E]ven if *these* customers had given nominal consent pursuant to Apple's warning, they were not aware of what they were consenting to."). Any given plaintiff's awareness of the meaning of Apple's warning will need to be individually adjudicated. The record already contains substantial diversity on that issue. Plaintiffs Holman and Smith delayed upgrading to 1.1.1 out of concern that their iPhones might possibly brick, while plaintiff Lee, rather than delay, traded his unlocked iPhone for a phone that already had 1.1.1 installed. *See* Huseny Decl. Ex. A (Holman Dep. 150:1-15); Ex. H (Smith Dep. 76:2-82:25); Ex. C (Lee Dep. 145:8-151:1. Plaintiff Sesso approved employees at the Apple Store to upgrade his iPhone to 1.1.1 for him. *Id.* Ex. G (Sesso Dep. 58:14-25). The named plaintiffs' own behavior demonstrates that the question of consent necessarily is an individualized inquiry that would predominate over questions common to the class. *See Gene and Gene LLC v. Biopay LLC*, 541 F.3d 318, 328-29 (5th Cir. 2008) (individualized question of which putative class members consented to receipt of faxes, and which did not, defeated predominance); *Murray v. Financial Visions, Inc.*, 2008 U.S. Dist. LEXIS 93419 at *13 (D. Ariz. 2008).

Injury and Causation: Apple did not do anything that bricked iPhones generally, or even unlocked or jailbroken iPhones generally. As confirmed by plaintiffs' software expert Dr. John M. Strawn, only *some* iPhones that were unlocked or jailbroken were bricked after downloading version 1.1.1. RCAC ¶ 103; Mot. at 8; Huseny Decl. Ex. KK (Strawn Dep. 63:9-13). [redacted]

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

33

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page40 of 41

Determining whether each member of the putative class has suffered an Apple-caused bricking injury is therefore necessarily an individualized inquiry, which in this case would predominate over any issues common to the class. *Sanchez v. Wal Mart Stores, Inc.*, 2009 U.S. Dist. LEXIS 48428 at *6-7, 11 (E.D. Cal. 2009) (denying class certification in action alleging defective strollers where question of whether putative class members replaced stroller or derived economic value from stroller was individualized).

The analysis has to start with a particular broken iPhone. Why is it broken—because 1.1.1 was installed or for some other reason? If the former, had the iPhone been altered and if so how This will be a tough issue for some plaintiffs, because not all know which hacking "solutions" were applied to their iPhones. *See* Huseny Decl. Ex. G (Sesso Dep. 71:19-72:5) (paid stranger to hack iPhone). A forensic evaluation of iPhones is necessary to determine what a particular hack did to the iPhone; Then one needs to assess the extent of any injury. Obviously those who took their iPhones to Apple and were able to exchange them are not in the same boat as those who did not. This is all individualized inquiry and overwhelms any inquiries that would be common to the putative class. *Zinser,* 253 F.3d at 1192; *In re Microsoft Xbox 360 Scratched Disc Litig.*, 2009 U.S. Dist. LEXIS 109075 at *23 (W.D. Wash. 2009) (denying certification when possibility of product misuse—and not design defect—could have caused alleged scratching of discs).

Dr. Strawn's report and testimony do nothing to establish that common questions of fact will predominate in the adjudication of the bricking claims. At bottom, all Dr. Strawn says Apple would have stipulated to that. What Dr. Strawn does not do is explain why only *some* iPhones that were jailbroken or unlocked became inoperable after installing Version 1.1.1 and how common proof can establish which iPhones bricked, which did not, and why. *See id.*, 90:6-91:21, 164:18-165:14; Wright Decl. ¶ 39. To the contrary, Dr. Strawn admitted

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

34

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)

Case5:07-cv-05152-JW Document365 Filed03/16/10 Page41 of 41

that a study of both the bricked iPhone and of the hack applied to the phone would be relevant to causation. *Id.* 141:6-143:15; *see also* Wright Decl. ¶¶ 38-39. In short, Dr. Strawn conceded the individualized nature of the causation inquiry.

## VII. DAMAGES ARE NOT INCIDENTAL, SO AN INJUNCTIVE CLASS IS NOT APPROPRIATE

A class seeking monetary damages may only be certified pursuant to Rule 23(b)(2) "where such relief is merely incidental to the primary claim for injunctive relief." *Util. Consumers' Action Network v. Sprint Solutions, Inc.*, 259 F.R.D. 484, 488 (S.D. Cal. 2009); *In GPU,* 253 F.R.D. at 507. Plaintiffs admit this. Mot. at 20.

Plaintiffs fail these requirements. First, there is no question that this case is primarily about damages. [REDACTED] Second, and critically, plaintiffs' request for injunctive relief has nothing to do with the conduct they claim is unlawful—the alleged failure to disclose. If the problem was that Apple and ATTM failed to adequately disclose their policies, then the injunctive relief is to have them disclose that information more adequately. Of course, nowhere in plaintiffs' moving papers do they ask for that relief. They are not interested in it—because *everyone already knows about the policies, and has known for a long time.*

Finally, it is exceedingly unlikely that these plaintiffs are typical of the classes they seek to represent with respect to injunctive relief. Apple's efforts to create the iPhone and App Store are among the most procompetitive business ventures that one will ever see. The consumer reaction to these efforts has been phenomenal, even historic. Plaintiffs, in their disdain for Apple's business model, are outliers and not representative of consumers generally. If they wish to pursue injunctive relief in their own names, so be it, but they do not represent the interests of most Apple customers.

## VIII. CONCLUSION

Plaintiffs' Motion for Class Certification should be denied.

Dated: March 16, 2010

Respectfully submitted,

LATHAM & WATKINS LLP

By /s/ Daniel M. Wall
Daniel M. Wall
Attorneys for Defendant APPLE INC.

SF\743830

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35

APPLE INC.'S OPPOSITION
TO MOTION FOR CLASS CERTIFICATION
CASE NUMBER: C 07-05152 JW (PVT)