1  FRANCIS M. GREGOREK (144785)
   gregorek@whafh.com
2  RACHELE R. RICKERT (190634)
   rickert@whafh.com
3  WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
4  750 B Street, Suite 2770
   San Diego, CA 92101
5  Telephone: 619/239-4599
   Facsimile: 619/234-4599
6
7  MARK C. RIFKIN (*pro hac vice*)
   rifkin@whafh.com
8  ALEXANDER H. SCHMIDT (*pro hac vice*)
   schmidt@whafh.com
9  ZACHARY W. BIESANZ (*pro hac vice*)
   biesanz@whafh.com
10 WOLF HALDENSTEIN ADLER
     FREEMAN & HERZ LLP
11 270 Madison Avenue
   New York, NY 10016
12 Telephone: 212/545-4600
   Facsimile: 212/545-4677
13
   Plaintiffs' Interim Lead Counsel
14

15              UNITED STATES DISTRICT COURT

16        FOR THE NORTHERN DISTRICT OF CALIFORNIA

17

18                    SAN JOSE DIVISION

19

| | |
|---|---|
| 20  IN RE APPLE & ATTM ANTITRUST )<br>LITIGATION ) | Master File No. C 07-05152 JW |
| 21  ) | **PLAINTIFFS' REPLY MEMORANDUM** |
| ) | **OF POINTS AND AUTHORITIES IN** |
| 22  ) | **FURTHER SUPPORT OF THEIR** |
| ) | **MOTION FOR CLASS** |
| 23  ) | **CERTIFICATION** |
| 24  ) | |
| ) | |
| 25  ) | DATE:     May 10, 2010 |
| ) | TIME:     9:00 a.m. |
| 26  ) | CRTRM:   8, 4th Floor |
| 27  _____ ) | JUDGE:    Hon. James Ware |

28      **DOCUMENT SUBMITTED UNDER SEAL PURSUANT TO L.R. 79-5(d)**

TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ..................................................................................................... 1

II.   LEGAL ARGUMENT .............................................................................................. 4

      A.    Defendants Concede Numerosity of the Class and Sub-Class ................................. 4

      B.    Defendants Do Not Dispute That Plaintiffs and Their Counsel Are Adequate ........ 4

      C.    Defendants Have Not Shown That Plaintiffs' Claims Are Atypical ......................... 4

      D.    Whether Consumers Contractually Granted Apple And ATTM A Monopoly
            In The Voice And Data Service Aftermarket Can And Should Be Resolved By
            Common Proof ...................................................................................................... 5

            1.    The Relevant Inquiry Is Whether Consumers Contractually Agreed
                  To Give Apple And ATTM Monopoly Power .................................................. 5

            2.    This Court Did Not Make Consumers' State Of Mind Relevant
                  Because No Consumer Contractually Gave Monopoly Power To
                  Defendants ........................................................................................................ 9

            3.    All Members Of The Class Were Harmed As Soon As iPhones
                  Were Released Into The Market ...................................................................... 10

            4.    None Of The Plaintiffs Knew They Would Be Required To Use
                  ATTM For ███████ ..................................................................................... 11

      E.    Whether Defendants' Exclusivity Agreement Was ███████ – Which
            It Was – Is A Question Of Fact Common To All Members Of The Class ............. 15

      F.    Prof. Wilkie Properly Measured The Effect Of Defendants' Unlawful
            Monopoly Rather Than Defendants' Miscast "Non-Disclosure" Claim ................ 16

            1.    Prof. Wilkie's Opinions Are Based On Widely Accepted Methods
                  And Properly Measure The Anticompetitive Effect Of Defendants'
                  Challenged Conduct ....................................................................................... 17

            2.    Defendants' Expert Has Not Offered Any Valid Criticisms Of Prof.
                  Wilkie's Opinions That Would Require The Court To Deny Class
                  Certification .................................................................................................... 20

            3.    ATTM's Premature Challenge To The Admissibility Of Prof. Wilkie's
                  Opinions Do Not Defeat Class Certification ................................................... 23

      G.    Plaintiffs' Antitrust Claims Against Apple Relating To The Applications
            Aftermarket Can And Should Be Resolved By Common Proof ............................ 24

      H.    Plaintiffs' Sub-Class Of Consumers Whose iPhones Were Bricked Should
            Be Certified ...................................................................................................... 25

1.  The Sub-Class Is Properly Defined And Can Be Identified Based Upon Objective Criteria ............................................................................. 25

2.  Common Issues Predominate As To Plaintiffs' Magnuson-Moss Warranty Act ("MMWA"), Computer Fraud and Trespass Claims............ 26

I.  An Injunctive Class Is Appropriate ......................................................................... 30

III.   CONCLUSION .................................................................................................................. 30

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- ii -

# TABLE OF AUTHORITIES

PAGE

## CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.,*
  247 F.R.D. 156 (C.D. Cal. 2007) ............................................................................................. 18

*Bafus v. Aspen Realty, Inc.,*
  236 F.R.D. 652 (D. Id. 2006) ................................................................................................... 16

*Carabetta Enterprises, Inc. v. United States,*
  68 Fed.Cl. 410 (Fed. Cl. 2005)................................................................................................. 28

*Concord Boat Corp. v. Brunswick Corp.,*
  207 F.3d 1039 (8th Cir. 2000).................................................................................................. 18

*Daubert v. Merrell Dow Pharm., Inc.,*
  509 U.S. 579, 113 S. Ct. 2786 (1993) ..................................................................................... 23

*Dukes v. Wal-Mart, Inc.,*
  222 F.R.D. 189 (N. D. Cal. 2004) ............................................................................................ 23

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
  504 U.S. 451, 112 S. Ct. 2072 (1992) ....................................................................................... 6

*Estate of Garrison v. Warner Bros., Inc.,*
  No. CV-95-8328 RMT, 1996 WL 407849 (C.D. Cal. 1996) ................................................... 16

*Forsyth v. Humana, Inc.,*
  114 F.3d 1467 (9th Cir. 1997).................................................................................................... 6

*Gene And Gene LLC v. BioPay LLC,*
  541 F.3d 318 (5th Cir. 2008)................................................................................................... 28

*Hanlon v. Chrysler Corp.,*
  150 F.3d 1011 (9th Cir. 1998).................................................................................................... 4

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992)...................................................................................................... 4

*Heartland Commc'n v. Sprint Corp.,*
  161 F.R.D. 111 (D. Kan. 1995).................................................................................................. 8

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- i -

*Image Tech. Servs., Inc. v. Eastman Kodak Co.*,
  Nos. C 87-1686 BAC, C 94-0524 BAC, C 94-1070,
  1994 U.S. Dist. LEXIS 12652 (N.D. Cal. Sept. 2, 1994).............................................................. 9

*In re Apple and AT&TM Antitrust Litig.*,
  596 F. Supp. 2d 1288 (N.D. Cal. 2008) .............................................................. *passim*

*In re Apple iPod iTunes Antitrust Litig.*,
  No. C-05-00037 JW, 2008 WL 5574487 (N.D. Cal. Dec. 22, 2008),
  order amended by 2009 WL 249234 (N.D. Cal. Jan. 15, 2009) ............................................ 4, 30

*In re Domestic Air Transp. Antitrust Litig.*,
  137 F.R.D. 677 (N.D. Ga. 1991) ................................................................................... 16

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  No. M 02-1486 PJH, 2006 WL 1530166 (N. D. Cal. June 5, 2006)..................................... 16, 19

*In re First Am. Corp. ERISA Litig.*,
  Nos. SACV 07-01357-JVS (RNBx), CV 07-07602; CV 07-07585,
  SACV 08-00110, 2009 WL 928294 (C.D. Cal. April 2, 2009) ........................................... 23, 24

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3rd Cir. 2008)........................................................................................ 18

*In re Live Concert Antitrust Litig.*,
  247 F.R.D. 98 (C.D. Cal 2007) .................................................................................... 16

*In re New Motor Vehicles Canadian Export Antitrust Litig.*,
  522 F.3d 6 (1st Cir. 2008) ............................................................................................ 17

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ................................................................................. 16

*In re Static Random Access (SRAM) Antitrust Litigation*,
  No. C 07-01819 CW, 2008 WL 4447592 (N.D. Cal. Sept. 29, 2008) ........................................ 4

*In re Sugar Indus. Antitrust Litig.*,
  No. MDL 201, 1976 WL 1374 (N.D. Cal. May 21, 1976)......................................................... 19

*In re Tableware Antitrust Litig.*,
  241 F.R.D. 644 (N.D. Cal. 2007) ................................................................................. 16

*In re Universal Srvc. Fund Tel. Billing Practices Litig.*,
  No. 02-MD01468-JWL, 2008 U.S. Dist. LEXIS 74548 (D. Kan. Sep. 26, 2008)...................... 24

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- ii -

*Intratex Gas Co. v. Beeson*,
   22 S.W.3d 398 (Tex. 2000) ........................................................................................... 26

*Kleiner v. First Nat'l Bank of Atlanta*,
   97 F.R.D. 683 (N.D. Ga. 1983) ...................................................................................... 8

*Little Caesar Enters., Inc. v. Smith*,
   172 F.R.D. 236 (E.D. Mich. 1997) ................................................................................ 19

*McPhail v. First Command Fin. Planning, Inc.*,
   247 F.R.D. 598 (S.D. Cal. 2007) ................................................................................... 24

*Menagerie Prods. v. Citysearch*,
   No. CV 08-4263 CAS (FMO), 2009 U.S. Dist. LEXIS 108768 (C.D. Cal. Nov. 9, 2009) .... 8, 10

*Murray v. Financial Visions, Inc.*,
   No. CV-07-2578 PHX-FJM, 2008 U.S. Dist. LEXIS 93419 (D. Ariz. Nov. 6, 2008) ............... 28

*Newcal Indus., Inc. v. IKON Office Solution*,
   513 F.3d 1038 (9th Cir. 2008) .............................................................................. *passim*

*O'Connor v. Boeing North American, Inc*.,
   184 F.R.D. 311 (C.D. Cal. 1998) ................................................................................... 26

*Peoples v. Sebring Capital Corp.*,
   No. 01 C 5676, 2002 U.S. Dist. LEXIS 4104 (N.D. Ill. Mar. 13, 2002)....................................... 8

*Perez v. First American Title Ins. Co.*,
   No. CV-08-1184-PHX-DGC, 2009 WL 2486003 (D. Ariz. Aug. 12, 2009) .............................. 26

*Pichler v. UNITE*,
   228 F.R.D. 230 (E.D. Pa. 2005) ................................................................................... 26

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3rd Cir. 1997)........................................................................................... 6

*Sterling v. Velsicol Chemical Corp.*,
   855 F.2d 1188 (6th Cir.1988)......................................................................................... 26

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
   209 F.R.D. 159 (C.D. Cal 2002) ............................................................................. 23, 24

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100, 89 S. Ct. 1562 (1969) ............................................................................. 18

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- iii -

1

**STATUTES**

15 U.S.C.
  § 2302(c) ............................................................................................................... 27

18 U.S.C.
  § 1030(a)(5)(A) ...................................................................................................... 27

Cal. Civ. Code
  § 1638 ...................................................................................................................... 8

Cal. Penal Code
  § 502 ...................................................................................................................... 27

Fed. R. Civ. P.
  23(a)(1) ..................................................................................................................... 4
  23(a)(3) ..................................................................................................................... 4
  23(a)(4) ..................................................................................................................... 4

**OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF CONTRACTS
  § 211(2) (1981) ........................................................................................................ 8

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1   Plaintiffs Herbert H. Kliegerman, Paul Holman, Lucy Rivello, Timothy P. Smith, Michael

2   G. Lee, Dennis V. Macasaddu, Mark G. Morikawa, and Scott Sesso ("Plaintiffs") hereby submit

3   their Reply Memorandum of Points and Authorities in Further Support of Their Motion for Class

4   Certification.[1]

5   **I.      INTRODUCTION**

6   Plaintiffs have always claimed that Defendants Apple Inc. ("Apple") and AT&T Mobility

7   LLC ("ATTM") engaged in a classic bait-and-switch. iPhone consumers contracted to buy one

8   thing – a two-year service contract with ATTM that could be terminated at any time – but

9   Defendants have attempted to lock them in to something different – a commitment to use ATTM

10  for iPhone voice and data service for five years. The iPhone consumers have a valid basis for their

11  claim: (i) *every identical ATTM service contract* provided for a *two-year term*; (ii) *every identical*

12  *ATTM contract* purported to give consumers the *right to terminate*; and (iii) those contractual

13  provisions were consistent with standard practice in the cell phone market.

14  Plaintiffs have also always alleged that the aftermarket arose as soon as iPhones were sold

15  to the public, in part because ATTM's two-year contracts permitted early termination. This Court

16  previously recognized that Plaintiffs allege that the aftermarket began "*at the point of purchase*

17  *and initiation of service*," and continued "*from that point forward* for at least the next five years

18  and conceivably for the life of the iPhone." *In re Apple and AT&TM Antitrust Litig.*, 596 F. Supp.

19  2d 1288, 1304 (N.D. Cal. 2008) ("*iPhones*") (emphasis added). This Court also rejected

20  Defendants' argument that Plaintiffs' claims depend upon whether particular consumers wanted to

21  switch carriers. Acknowledging that Plaintiffs have alleged that "consumers have suffered a

22  present injury *even if they have not attempted to switch service*," the Court then held, "[t]he fact

23  that some consumers might not have sought to switch service and thus do not realize the

24  restriction which the Apple/ATTM Agreement has imposed on them *does not alter the effect of*

25  *Plaintiffs' allegations that their freedom in the aftermarket has already been taken from them*."

26

27  [1]   Plaintiffs are concurrently filing their Memorandum of Points and Authorities in

28  Opposition to Motion to Appoint Co-Lead Counsel for Computer Trespass and Unfair Trade
    Practice Claims, which also serves as a reply in further support of the motion to appoint Wolf
    Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") as Lead Class Counsel.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 1 -

1   *iPhones*, 596 F. Supp. 2d at 1303-04 (emphasis added).

2    Throughout the litigation, Defendants have sought to mischaracterize or distort the nature

3   of Plaintiffs' claims to suit their own purposes.  Moving to dismiss the Complaint, Defendants

4   argued – inaccurately – that Plaintiffs challenged Apple's "entry strategy" into the cell phone

5   market.  Their motion to dismiss was unsuccessful and the Court sustained Plaintiffs' Complaint,

6   upholding Plaintiffs' claim that "the companies had agreed to technologically restrict voice and

7   data service in the aftermarket for continued voice and data services, *i.e.*, after the initial two-year

8   service period expired."  *iPhones*, 596 F. Supp. 2d at 1294.

9    Again, in opposing Plaintiffs' class certification motion, Defendants mischaracterize the

10  nature of Plaintiffs' claims.  This time, Defendants assert that Plaintiffs claim that they lured

11  unsuspecting consumers into buying iPhones "through inadequate disclosures so that, at a later

12  point in time – *after* consumers were committed to their iPhones, they could exploit consumers in

13  the 'aftermarkets.'" *E.g.,* Defendant Apple Inc.'s Opposition To Plaintiffs' Motion For Class

14  Certification ("Apple Br.") [Docket No. 365] at 1 (emphasis original).   Based upon this

15  mischaracterization, Defendants argue that class certification should be denied because Plaintiffs'

16  aftermarket claim depends upon purportedly individualized issues of what each consumer may

17  have believed or known when they bought their iPhones based on market rumors or other vague

18  disclosures  outside  their  written  two-year  contracts ███████████████████

19  ████████████████.  That inquiry, however, is utterly irrelevant under the Ninth

20  Circuit's *Newcal* decision, which governs this aftermarket monopolization case.  Under *Newcal*,

21  the only relevant inquiry is ***whether Plaintiffs contractually agreed to give Defendants monopoly***

22  ***power in the relevant aftermarkets***.  *See Newcal Indus., Inc. v. IKON Office Solution*, 513 F.3d

23  1038, 1046-49 (9th Cir. 2008).   Whether any individual consumers may have been aware of

24  rumors or other information in the market that may have led them to believe that their "two year

25  terminable at will" service contracts with ATTM did not really mean what they said is completely

26  beside the point.

27   Defendants' fundamental distortion of Plaintiffs' claims permeates their opposition to class

28  certification.  For example, Apple argues that Plaintiffs' claim "turns on concepts of deception and

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 2 -

expectations," in particular whether consumers "knowingly bestowed" – which is a different standard than "contractually agreed" – an aftermarket monopoly on Defendants.  Apple Br. at 4. Likewise, according to ATTM, "[c]entral to Plaintiffs' case is the [ ] assertion that Defendants did not adequately disclose the precise duration of their exclusive agreement, or the fact that iPhone 'unlock codes' would not be provided to purchasers."   Defendant AT&T Mobility LLC'S Opposition To Plaintiffs' Motion For Class Certification ("ATTM Br.") [Docket No. 362] at 1. Further, according to ATTM, "Plaintiffs' claims, and their request for class certification, thus rise or fall on the hypothesis that … iPhone consumers purchased their iPhones completely unaware that they would be obligated to use ATTM" ███████████.  *Id*. at 5.  Therefore, ATTM argues, "Plaintiffs' claims are inherently and unavoidably premised on individualized issues of who knew what and when, and whether any particular iPhone purchaser would have acted differently or has suffered any injury as a result of what he either did or did not know."  *Id*. at 1.

Defendants' attempt to recast Plaintiffs' antitrust claim in a way that appears to make consumers' knowledge relevant is understandable.  *First*, they have no other basis on which to oppose class certification.  Indeed, Apple concedes that class certification is routinely granted where, as here, anticompetitive conduct hurts everyone without regard to "individual interactions with the defendants" and does not depend on consumers' state of mind.  Apple Br. at 4.  Since Defendants admit there were ***no individual interactions*** with them, the relevance of consumers' state of mind is all that is left for them to unavailingly argue.  *Second*, Defendants have no genuine defense to the merits of Plaintiffs' claim, unless the Court accepts their argument that knowledge is relevant even where, as here, no consumer ***contractually*** granted them aftermarket monopoly power.

Whether consumers' admittedly ***identical contracts***[2] conferred monopoly power upon Apple and ATTM can and should be determined on a class-wide basis.  The common legal and factual issues necessary for that determination will be overwhelmingly predominant when the case

---

[2]     An example of an ATTM service agreement is attached to the Supplemental Declaration of Rachele R. Rickert in Further Support of Plaintiffs' Motion for Class Certification ("Rickert Reply Decl.") as Exhibit A, filed concurrently herewith.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 3 -

is tried.  Furthermore, Apple has conceded that when "anticompetitive conduct inherently hurts everyone" – as it does here – antitrust actions are routinely certified because "common proof tends to dominate." Apple Br. at 4.  Accordingly, the Court should certify this class action.

## II.    LEGAL ARGUMENT

### A.    Defendants Concede Numerosity of the Class and Sub-Class

Defendants do not dispute that the Class and the Sub-Class are sufficiently numerous. *See* Fed. R. Civ. P. 23(a)(1).  Because millions of customers bought iPhones throughout the United States, common sense dictates that numerosity has been met. *See In re Apple iPod iTunes Antitrust Litig.*, No. C-05-00037 JW, 2008 WL 5574487, at *3 (N.D. Cal. Dec. 22, 2008), order amended by 2009 WL 249234 (N.D. Cal. Jan. 15, 2009) ("*iTunes*").

### B.    Defendants Do Not Dispute That Plaintiffs and Their Counsel Are Adequate

Although Defendants argue that Plaintiffs have had "varied" experiences with their iPhones, they do ***not*** contend that "plaintiffs [or] their counsel have any conflicts of interest with other class members" or that Plaintiffs and their counsel will not "prosecute the action vigorously on behalf of the class." *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  In the absence of such conflicts, where Plaintiffs and their counsel will vigorously prosecute the action on behalf of the Class (as already reflected by the record in this litigation), the adequacy requirement of Fed. R. Civ. P. 23(a)(4) is met.

### C.    Defendants Have Not Shown That Plaintiffs' Claims Are Atypical

Under Fed. R. Civ. P. 23(a)(3), typicality is met where the plaintiffs and "other [class] members have the same or similar injury, . . . the action is based on conduct which is not unique to the named plaintiffs, and . . . other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992); *In re Static Random Access (SRAM) Antitrust Litigation*, No. C 07-01819 CW, 2008 WL 4447592, at *2 (N.D. Cal. Sept. 29, 2008) ("*SRAM*").  Apple does not expressly dispute Plaintiffs' typicality, and neither Defendant addresses the narrow issues relevant to typicality.  Instead, ATTM argues that Plaintiffs are not typical "because of the diversity of information and understanding they and class members had in purchasing their iPhones, particularly because the information available changed over

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 4 -

1   time."  ATTM Br. at 32.  ATTM's objection to typicality is merely a variation on the principal

2   theme of Defendants' opposition to class certification that Plaintiffs' claims depend upon what

3   each consumer knew and when they knew it.  That argument lacks basis and is addressed fully in

4   Section II.D.1, *infra*.

5         ATTM also argues that Plaintiffs Rivello and Macasaddu are subject to a unique defense

6   because they did not pay for iPhones or sign contracts for service with ATTM.  Ms. Rivello's

7   husband bought her iPhone and paid their iPhone bill.  Defendants never inquired whether Ms.

8   Rivello's husband did so with his own money or marital assets.  Had they done so, they would

9   have discovered he used their joint checking account to buy the iPhone and pay ATTM's monthly

10  bills.  Rickert Reply Decl., Ex. B (Rivello Decl.), ¶¶ 2-3.  Likewise, despite ATTM's assertion to

11  the contrary, Mr. Macasaddu paid for his iPhone voice and data service through a business account

12  that he and his former business partner funded.  Rickert Reply Decl., Ex. C (Macasaddu Tr.), 25:6

13  to 27:17; Ex. D (Pascasio Tr.), 83:13 to 86:5; 28:12 to 30:9.  Therefore, ATTM cannot sustain its

14  defense that Plaintiffs Rivello and Macasaddu suffered no harm.

15
16      **D.**    **Whether Consumers Contractually Granted Apple And ATTM A Monopoly In The Voice And Data Service Aftermarket Can And Should Be Resolved By Common Proof**

17        Apple and ATTM oppose class certification principally by arguing repeatedly (but

18  incorrectly) that Plaintiffs' claims are based upon Defendants' failure to disclose ███████

19  ██████████████████.[3]  Apple and ATTM argue that Plaintiffs' claims, as Defendants have

20  mischaracterized them, require individual proof of what millions of Class members knew about

21  the length of ATTM's exclusivity when they bought their iPhones, rendering class certification

22  impossible.

23      **1.**    **The Relevant Inquiry Is Whether Consumers Contractually Agreed To Give Apple And ATTM Monopoly Power**

24        The legally relevant inquiry in an aftermarket claim is whether monopoly power was

25  ***contractually given*** to the defendant.  If it was given, and if it was given "knowingly and

26  voluntarily" (that is, as opposed to involuntarily, such as in a contract of adhesion), then an

27
28  [3]     *See*, *e.g.*, Apple Br. at 4; ATTM Br. at 1-2.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

aftermarket claim cannot be asserted.  The principle is that by contractually conferring monopoly power upon the defendant, consumers in such a case could be said to be "participants" in the monopoly.  The *sine qua non* – and the starting point for the analysis of such claims – is whether consumers contractually agreed to the defendant's monopoly.  When, as here, monopoly power is *not* contractually given, "knowingly and voluntarily" or otherwise, an aftermarket claim can be asserted.  Because in this case consumers did *not* contractually agree to ███████████ ██████, but rather agreed only to terminable two-year service contracts, whether they did so "knowingly" or "voluntarily" is not relevant.

The Ninth Circuit in *Newcal*, 513 F.3d at 1049, relying on *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 112 S. Ct. 2072 (1992), permitted a Section 2 monopolization claim "where a plaintiff had alleged derivative aftermarkets for replacement parts and services for a specific brand of copy machines, where the aftermarkets were created *by contract* between the plaintiff and the defendant copy machine manufacturer."  *iPhones*, 596 F. Supp. 2d at 1302 (emphasis added).  Subsequent cases considered how such an aftermarket may be defined.  For example, in *Queen City Pizza*, the Third Circuit affirmed dismissal of an aftermarket antitrust claim by Domino's Pizza franchisees who had *contractually agreed* to use only Domino's pizza ingredients and supplies.  As the Ninth Circuit explained in discussing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3rd Cir. 1997), "the only thing that prevented franchisees from substituting other brands for Domino's-approved pizza ingredients was an *explicit contractual provision* that the franchisees knowingly and voluntarily signed."  *Newcal*, 513 F.3d at 1046 (emphasis added).  The Third Circuit held that the aftermarket could not be defined by the explicit *contractual* provision.

In *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) ("*Humana*"), the Ninth Circuit affirmed summary judgment dismissing antitrust claims by employers and employees whose group health insurance *contracted* with Humana obligating them to use only certain hospitals in Clark County, Nevada.  In *Newcal*, the Ninth Circuit discussed its prior decision and explained as follows:

> the plaintiffs claimed a submarket whose boundaries depended entirely on a *written contract*. … And just as the Third Circuit had done in *Queen City Pizza*, we

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 6 -

rejected that market definition, holding that *explicit contractual provisions* limiting Humana insureds to certain hospitals could not form the boundaries of an antitrust submarket.

*Newcal*, 513 F.3d at 1047 (emphasis added). The Ninth Circuit held that the aftermarket could not be defined by the terms of the *written contract* between Humana and its insureds.

In *Newcal*, the Ninth Circuit distinguished *Eastman Kodak* from *Queen City Pizza* and *Humana* as follows:

> The critical distinction between *Eastman Kodak* and the two circuit court opinions was that the Kodak customers did not knowingly enter a *contract* that gave Kodak the exclusive right to provide parts and services *for the life of the equipment*. In other words, the simple purchase of Kodak-brand equipment (unlike the signing of a Domino's franchise agreement or the purchase of a Humana insurance policy) did not constitute a *binding contractual agreement* to consume Kodak parts and services in the aftermarket.

*Newcal*, 513 F.3d 1048 (emphasis added).

In denying Apple's motion to dismiss, this Court likewise noted the differences between *Eastman Kodak* and *Newcal* on the one hand and *Queen City Pizza* and *Humana* on the other. As the Court held, in *Queen City Pizza* and *Humana*, where aftermarket claims were dismissed, "the boundaries of [the aftermarkets] were created by *written contracts* between the plaintiffs and the defendants. Both instances involved *contracts* wherein the plaintiffs obligated themselves to make certain purchases exclusively from the defendants." *iPhones*, 596 F. Supp. 2d at 1302-03 (emphasis added).

Therefore, it could not be clearer that the definition of the aftermarket in this case depends upon whether Plaintiffs or any other members of the Class entered into binding written contracts that obligated them to use ATTM for voice and data service for the life of the iPhones. And on that critical legal issue, none of the *identical* written service contracts with ATTM obligated them to do so. Every one of the *identical* contracts obligated consumers to use ATTM for voice and data service for only two years – ▮▮▮▮▮▮▮ – and every one of the *identical* contracts expressly permitted consumers to terminate their service with ATTM at any time. No matter what newspaper or magazine articles or Internet web sites consumers may have seen, and regardless what cryptic statement appeared on the bottom of the iPhone box, the undisputed common fact is

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 7 -

1    that every ATTM service contract lasted only two years and could be terminated at any time.[4]

2           In *Newcal*, the Ninth Circuit noted that "the law permits an inquiry into whether a

3    consumer's selection of a particular brand in the competitive market is the functional equivalent of

4    a contractual commitment, giving that brand an agreed-upon right to monopolize its consumers in

5    an aftermarket.  The law permits an inquiry into whether consumers entered into such 'contracts'

6    knowing that they were agreeing to such a commitment." *Newcal*, 513 F.3d at 1049.  Defendants

7    have seized upon the Ninth Circuit's comment to argue that such an inquiry necessarily raises

8    individual issues of knowledge that would swamp the common issues.  Defendants' argument that

9    this action should not be certified because what particular Class members "knew" ███████

10   ██████████████████████████████████████████ raises myriad individual questions is a

11   deliberate exercise in misdirection.

12          Indeed, "claims arising from interpretations of a form contract appear to present the classic

13   case for treatment as a class action," *Kleiner v. First Nat'l Bank of Atlanta*, 97 F.R.D. 683, 692

14   (N.D. Ga. 1983) (citing cases), and for that reason breach of contract class actions are routinely

15   certified.    In *Menagerie Prods. v. Citysearch*, No. CV 08-4263 CAS (FMO), 2009 U.S. Dist.

16   LEXIS 108768 (C.D. Cal. Nov. 9, 2009), the Court certified a breach of contract class over the

17   defendant's argument that "a contract's objectively reasonable meaning can be determined only in

18   context."  *Id.* at *34-35.   In *Peoples v. Sebring Capital Corp.*, No. 01 C 5676, 2002 U.S. Dist.

19   LEXIS 4104, at *22 (N.D. Ill. Mar. 13, 2002), quoting RESTATEMENT (SECOND) OF CONTRACTS

20   § 211(2) (1981), the court held that a "standardized agreement 'is interpreted wherever reasonable

21   as treating alike those similarly situated, ***without regard to their knowledge or understanding*** of

22   the standard terms of the writing.'"  *See also Heartland Commc'n v. Sprint Corp.*, 161 F.R.D. 111,

23   116 (D. Kan. 1995) (holding that the validity of a clause in a form contract is a common question);

24   *accord* Cal. Civ. Code § 1638 ("language of a contract is to govern its interpretation, if the

25   language is clear and explicit, and does not involve an absurdity").

26   _____

27   [4]     That the iPhone voice and data aftermarket is predicated on those two-year service
     agreements is no impediment to Plaintiffs' claims.  As this Court held, "Plaintiffs' Complaint is
28   also adequate to the extent the alleged aftermarket is predicated on an initial contractual
     relationship between Defendants and iPhone purchasers." *iPhones*, 596 F. Supp. 2d at 1303
     (citing *Newcal*, 513 F.3d at 1049).

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 8 -

ATTM claims it is not aware of "a single case that analyzed the knowledge element of an aftermarket claim and certified the class." ATTM Br. at 19. ATTM's argument is premised upon the assumption that an aftermarket claim cannot be certified because such a claim inevitably gives rise to individual knowledge issues that preclude class certification. Of course, ATTM has not cited any case where a court has denied class certification in an aftermarket case on the basis that consumers' knowledge raises too many individual issues for certification, and Plaintiffs believe there is none. Indeed, Defendants have not cited any case in which an aftermarket claim was not certified *for any reason*, and again Plaintiffs believe there is none.[5] That no court has "analyzed the knowledge element" in an aftermarket claim is easily explained by the fact that, no matter how many times Defendants argue otherwise, knowledge is not a relevant issue in the absence of a contractual agreement conferring monopoly power.

## 2. This Court Did Not Make Consumers' State Of Mind Relevant Because No Consumer Contractually Gave Monopoly Power To Defendants

Apple asserts that the Court made each consumer's state of mind relevant when it "held that plaintiffs' theory *might* be valid depending on whether consumers buying iPhones were aware of the risk that ATTM would be their only service option and that Apple would control applications distribution." Apple Br. at 1 (citing *iPhones*, 596 F. Supp. 2d at 1305-06). That assertion forms the basis for Apple's main argument: an antitrust claim based on a failure to inform consumers inevitably gives rise to individual issues that precludes class certification. *See*, *e.g.*, Apple Br. at 13-15.

Although this Court used the words "knowingly" and "voluntarily" to discuss *Eastman Kodak*, *Newcal*, *Queen City Pizza*, and *Humana*, it did so in reference to "**contractual rights**" that consumers gave to the monopolists:

> There can be no legally cognizable antitrust claim, however, where there is a claim of "market *power* that arises solely from **contractual rights** that consumers knowingly and voluntarily give to the defendant."

---

[5] The only reported decision discussing class certification of an aftermarket claim is *Eastman Kodak*, in which the class was certified. *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, Nos. C 87-1686 BAC, C 94-0524 BAC, C 94-1070, 1994 U.S. Dist. LEXIS 12652, at *7 (N.D. Cal. Sept. 2, 1994). That Court there did not discuss the "knowledge element" reflects the simple fact that knowledge was not an issue in that case because there was no agreement conferring monopoly power.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 9 -

1  *iPhones*, 596 F. Supp. 2d at 1305 (quoting *Newcal*, 513 F.3d at 1048) (second emphasis added)).

2  Since no one gave contractual rights to Apple or ATTM ██████████, whether they did so

3  "knowingly" or "voluntarily" is legally irrelevant.

4      Defendants' argument that Plaintiffs' claims depend upon individualized proof of what

5  consumers knew ████████████████████ and when they knew it evades the real issue in

6  *Newcal*: whether Plaintiffs **contractually agreed** to give Apple and ATTM monopoly power for

7  ██████. Furthermore, it sidesteps this Court's prior holding denying their motion to dismiss,

8  quoting from *Newcal*, that the critical inquiry is whether Defendants' market power arises solely

9  from **contractual rights** given to them knowingly and voluntarily by Plaintiffs and the rest of the

10  Class. On that crucial issue – the crux of the case – the answer is a resounding and emphatic "**no**"

11  for every Plaintiff and every other Class member because every **identical** service agreement was

12  for two years, ██████████, and included an early termination provision. Rickert Reply Decl.,

13  Ex. A.[6]

14      In any event, whether ATTM's **identical**, integrated two-year service agreements

15  contractually gave Defendants the right to monopolize the iPhone voice and data aftermarket ██

16  ██████ is a question that will be answered the same way for each and every Plaintiff and each

17  and every Class member as well. Because Plaintiffs and all other Class members signed the **same**

18  **integrated two-year service contracts**, whether they **contractually agreed** to give monopoly power

19  to Apple and ATTM in the iPhone voice and data aftermarket – knowingly and voluntarily or

20  otherwise – can and should be answered the same way for everyone. *See, e.g., Menagerie Prods.*,

21  2009 U.S. Dist. LEXIS 108768 at *34-36.

        **3.**      **All Members Of The Class Were Harmed As Soon As iPhones**
22                             **Were Released Into The Market**

23      Defendants argue that class certification should be denied because a large number of Class

24

25  [6] ████████████████████████████████████████████

26  ████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1    members purportedly suffered no injury.  Citing no authority, Apple argues that consumers who

2    upgraded their iPhones before the expiration of their initial two-year contracts and ███████

3    ████████████████████████████████████████████████████████████████████████████████

4    ███████████████████.  Apple Br. at 18.  However, Defendants already have tried that

5    argument and lost it because the injury from Defendants' unlawful monopoly over iPhone voice

6    and data service began *immediately* on the signing of the contract – it did not await the expiration

7    of the initial two-year period.  As this Court held in denying Apple's motion to dismiss, the

8    aftermarket began "*at the point of purchase and initiation of service*," and continued "*from that*

9    *point forward* for at least the next five years and conceivably for the life of the iPhone." *iPhones*,

10   596 F. Supp. 2d at 1304 (emphasis added).

      Nor does injury to consumers depend on whether they signed new two-year agreements or

11   would switch to a new carrier if Defendants did not prevent them from doing so.  Signing new

12   agreements or trying to switch carriers does not negate injury.  Again, as this Court held in

13   denying Apple's motion to dismiss: "The fact that some consumers might not have sought to

14   switch service and thus do not realize the restriction which the Apple/ATTM Agreement has

15   imposed on them *does not alter the effect of Plaintiffs' allegation that their freedom in the*

16   *aftermarket has already been taken from them*." *iPhones*, 596 F. Supp. 2d at 1303-04 (emphasis

17   added).

18

19    Furthermore, Plaintiffs' economist, Simon Wilkie, Ph.D., has explained that consumers

20   were injured immediately by Defendants' monopolization of the iPhone voice and data

21   aftermarket, and he has demonstrated that their injuries can be quantified using standard economic

22   models based on class-wide proof.  *See* Expert Declaration of Simon J. Wilkie, Ph.D. [Document

23   submitted under seal, Docket No. 243] ("Wilkie Decl.") at ¶¶ 50; 64-68; Expert Reply Declaration

24   of Simon J. Wilkie, Ph.D ("Wilkie Reply Decl.") at ¶¶ 20-41, 56-59, filed concurrently herewith.

25           **4.    None Of The Plaintiffs Knew They Would Be Required To Use
                     ATTM For ███████████**

26    Plaintiffs' own deposition testimonies belie Defendants' assertion that consumers knew

27   ATTM, pursuant to its secret agreement with Apple, would be the exclusive provider of iPhone

28   voice and data service ███████████ – much less that they *agreed* to be bound to ATTM for that

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1  period. In fact, most importantly, none of the Plaintiffs testified that they agreed to use ATTM for

2  iPhone voice and data service ▬▬▬, or that they would have agreed to do so – a fact that

3  Defendants never once mention in 70 pages of briefing on the issue.

4          Despite their repeated assertion that the alleged misrepresentation concerning the duration

5  of ATTM's exclusivity raises individualized questions that can only be answered Plaintiff by

6  Plaintiff and Class member by Class member, it is most telling that during Plaintiffs' exhaustive

7  depositions, spread over more than 2,000 pages of testimony, only four Plaintiffs were even asked

8  if they knew about Defendants' ▬▬▬▬ **and none of them knew of the**

9  ▬▬▬▬ **or agreed to use ATTM for iPhone voice and data services** ▬▬▬.

10          For example, even though Plaintiff Kliegerman admitted he saw an article in a newspaper

11  or on the Internet reporting that ATTM would be the exclusive distributor of iPhones for five

12  years, he denied understanding ▬▬▬▬▬▬▬▬▬▬

13  ▬▬▬▬▬▬:

14     Q.   Do you have any idea what the phrase "exclusive U.S. distributor" means?
15     A.   No.
            . . .
16     Q.   . . . Do you – do you have any understanding of what the phrase "exclusive
            U.S. distribution rights for five years" means?
17     A.   No, I do not.
            . . .
18     Q.   . . . [W]henever you acquired those phones or purchased those phones, did
19          you understand that there was some exclusivity period when AT&T would
            be the only provider who would provide service for the iPhone at that time?
20     A.   *I understood that I was signing a two-year contract with AT&T*.
       Q.   Did you understand that there was any obligation on your part to use AT&T
21          for that phone service beyond the two-year period in these contracts?
22     A.   *No*.

23  Rickert Reply Decl., Ex. E (Kliegerman Tr.), 142:10-143:24 (emphasis added); *see id*. at

24  96:23-102:1.

25          Plaintiff Lee, who admitted to watching Apple's announcement of the iPhone, also

26  testified that he did not know of Defendant's ▬▬▬ exclusive arrangement or agree to use

27  ATTM voice and data service ▬▬▬:

28     Q.   So Cingular was the exclusive partner for the iPhone?
            . . .

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

A.    No – I did not believe that it was going to be a long-term exclusive contract with Cingular.

Q.    But you knew that Cingular was to be the exclusive provider for – for the iPhone?

A.    I knew that Cingular was due to be the launch partner for the phone. However, for example, when the Razr came out, it launched with one company and then went to everybody else. When the Blackberry came out, it launched with, you know, one company then went to everybody else. *It was my understanding that the iPhone would do the same*.

Rickert Reply Decl., Ex. F (Lee Tr.), 67:7-69:20 (emphasis added). Even more significantly, when asked if he considered any factors "that counseled against buying the iPhone," Plaintiff Lee testified:

A.    That the service with AT&T was going to be more expensive than the alternative from either Sprint or T-Mobile, that *I would be locked into a two-year contract with AT&T*, that the – unlike traditional phones, there was not going to be a subsidy on the iPhone. And also I had heard various disparaging remarks on the quality of AT&T's network, customer service, fees, et cetera.

*Id.* at 70:18-71:13 (emphasis added).

Plaintiff Smith testified that he "had no intention of staying with AT&T for five years." Rickert Reply Decl., Ex. G (Smith Tr.), 192:24-193:3. He also testified as follows:

Q.    . . . Your counsel just asked you if you knew that there was an alleged five-year exclusive agreement between Apple and AT&T at the time you bought your original 2G iPhone, correct?

A.    I was *not* aware at the time I purchased it that there was a five-year exclusive agreement.

*Id.* at 195:17-196:3 (emphasis added).

Finally, Plaintiff Sesso testified definitively as follows:

Q.    If you had known of the alleged five-year exclusivity in May of 2007, would you have bought your iPhones?

    . . .

A.    The answer to your question is, no, I don't think so. *If I had known that I would have been tied to a five-year contract I would have not*.

Rickert Reply Decl., Ex. H (Sesso Tr.), 105:1-20 (emphasis added).

Despite arguing that the "highly individualized" question of what consumers knew about Defendants' ███████ exclusivity agreement precludes class certification, Defendants did *not* ask any other Plaintiff at his or her deposition what they knew of the agreement or whether they had – or would have – agreed to use ATTM for ███████. If the five other Plaintiffs had been asked

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1   these questions, the answers would have been uniform: ***no Plaintiff knew when he or she first***
2   ***bought an iPhone or bought a new iPhone that they were obligated to use ATTM for voice and***
3   ***data service beyond the two-year term stated in their identical contracts, and none of them***
4   ***agreed to use ATTM for*** ███████.[7]

5       Apple and ATTM concede two critical facts that undermine their argument concerning
6   whether any Plaintiff or Class member knew of the ███████ exclusivity period. *First*, Defendants
7   have stipulated ████████

8   ████████████████████████████████████████████████████
9
10
11
12
13
14   ████████████. These important facts are incontrovertible.

15       The sum and substance of the evidence Apple and ATTM offer in support of their
16   argument that, notwithstanding the terminable two-year term of the service agreements, Plaintiffs
17   "knowingly" gave Apple and ATTM a ███████ monopoly over the iPhone voice and data
18   aftermarket, is a handful of newspaper, magazine, and internet reports that merely speculated
19   about the terms of the admittedly secret arrangement between Apple and ATTM and a cryptic
20   reference on the bottom of the iPhone box that a service plan with ATTM would be required after
21   the two-year agreement expired.   Those speculative reports – some published more than six
22   months before the first iPhone was ever sold – and the vague box label are a far cry from the
23   ***enforceable*** franchise agreement in *Queen City Pizza* and the ***enforceable*** insurance contract in
24   *Humana*.   As Plaintiffs explained in their opening class certification brief, ATTM could ***not***
25   enforce either the speculative articles by third parties or the box panel as constituting the terms of

26

---

27   [7]   *See* Rickert Reply Decl., Ex. I (Holman Rog Resp.), 10:4-14; Ex. J (Macasaddu Rog.
28   Resp.), 10:4-14; Ex. K (Morikawa Rog. Resp.), 10:4-15; Ex. L (Rivello Rog. Resp.), 10:4-17; Ex. M (Holman RFA Resp.), 7:14-21; Ex. N (Macasaddu RFA Resp.), 3:25-28; Ex. O (Morikawa RFA Resp.), 3:25-28; Ex. P (Rivello RFA Resp.), 7:14-21.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1   a binding contract between Defendants and the Plaintiffs for ████ against any Plaintiff or any

2   other Class member, whether they knew about them or not.  Apple and ATTM have not argued to

3   the contrary.

4       **E.**    **Whether Defendants' Exclusivity Agreement Was ████ –**
    **Which It Was – Is A Question Of Fact Common To All Members Of**

5           **The Class**

6       Defendants argue that class certification should be denied because the exclusivity

7   agreement between it and ATTM ████████.  Apple Br. at 6-7; ATTM Br. at

8   5.  According to Defendants, this is because ████

9   ████

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1

2

3

4          Moreover, whether the Agreement was for a ██████ period is itself a common question

5    that will have the same answer for all members of the Class.  As such, to the extent Defendants

6    attempt to dispute the plain language of the Agreement ████████████████████████████

7    ██████████████████, they have raised an issue that can and should be determined for all

8    members of the Class on a class-wide basis by common proof.  *See* Wilkie Reply Decl., ¶ 51

9    (changing the duration of exclusivity agreement does not change methodology).

10         **F.     Prof. Wilkie Properly Measured The Effect Of Defendants' Unlawful
              Monopoly Rather Than Defendants' Miscast "Non-Disclosure" Claim**

11         Courts in the Ninth Circuit eschew engaging in a "battle of experts" at the class

12   certification stage. *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 652 (N.D. Cal. 2007) ("It is

13   not necessary that plaintiffs show that their expert's methods will work with certainty at this time.

14   Rather, plaintiffs' burden is to present the court with a likely method for determining class

15   damages.") (quoting *In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677,  693 (N.D. Ga.

16   1991)); *In re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 110 (C.D. Cal. 2007) ("district court is

17   not permitted to discount the testimony of a plaintiff expert merely because the defendant has

18   challenged some aspect of the expert's opinion"); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D.

19   346, 353 (N.D. Cal. 2005) (same).  Indeed, all that is required for class certification purposes is for

20   an expert to testify that generally accepted economic methodologies are available to demonstrate

21   such impact and to reasonably calculate such damages on a class-wide basis. *Live Concert*, 247

22   F.R.D. at 144; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486

23   PJH, 2006 WL 1530166, at *8 (N. D. Cal. June 5, 2006) ("*DRAM*"); *Estate of Garrison v. Warner

24   *Bros., Inc.*, No. CV-95-8328 RMT, 1996 WL 407849, at *4 (C.D. Cal. 1996); *See, e.g., Bafus v.*

25   *Aspen Realty, Inc.*, 236 F.R.D. 652, 658 (D. Id. 2006) (expert declaration described what appeared

26   to the court to be a viable method for determining economic effect on a class basis).

27   ─────────────────────────
     [8] ████████████████████████████████████████████████

28   ████████████████████████████████████████████████

1    Defendants do not argue otherwise.  Plaintiffs' expert, Prof. Wilkie, has not merely set

2    forth established economic methods for assessing class-wide impact and opined on a theoretical

3    methodology for calculating antitrust damages. He has gone further than the law requires and has

4    calculated a preliminary estimate of damages for the Class.   That Defendants have offered a

5    competing expert who disagrees with Prof. Wilkie's conclusions and challenges some of his

6    methodologies is simply not a basis for denying class certification.  In any event, as shown in Prof.

7    Wilkie's Reply Declaration and below, Defendants' expert's criticisms are neither fair nor valid.

8                      **1.     Prof. Wilkie's Opinions Are Based On Widely Accepted
                              Methods And Properly Measure The Anticompetitive Effect Of
9                              Defendants' Challenged Conduct**

10   Defendants criticize Prof. Wilkie's opinions by arguing that he measured the effect of

11   exclusivity rather than incomplete disclosure, which Defendants insist is the proper issue in this

12   case. Apple Br. at 2, 19-22; ATTM Br. at 22-31.  Apple argues that Dr. Wilkie's opinions should

13   be discounted because he did not study whether prices would have been driven down if

14   Defendants ██████████████████████████████████████████████████████████

15   ████████████████████████████████." Apple Br. at 19-20. Likewise, ATTM argues that Prof. Wilkie

16   has studied "the wrong target."  ATTM Br. at 28.

17   Leaving aside that Defendants' argument invites an impermissible "battle of experts," it is

18   readily apparent that their criticism does not challenge Prof. Wilkie's methodology in the least.

19   Defendants concede that Prof. Wilkie's "but-for" methodology – what prices consumers would

20   have paid in the absence of Defendants' monopolization of the aftermarkets – is the accepted way

21   to calculate damages in an antitrust case such as this. *See* Apple Br. at 21; ATTM Br. at 22-23.

22   Rather, Defendants criticize the particular wrongful conduct that Prof. Wilkie studied, insisting

23   that ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████ – namely,

25   the losses suffered by consumers from being tied to ATTM for longer than two years and from

26   having their contractual termination right and right to switch carriers rendered meaningless.[9]

27   ───────────────────────────

28   [9]     *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 27 (1st Cir. 2008),
     cited by Apple, is clearly distinguishable. There, the First Circuit held that an indirect purchaser
     class – which presents considerably more problems than a direct purchaser class – could not be

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 17 -

1    Antitrust impact considers whether the plaintiff was harmed by the ***challenged conduct***.

2  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S. Ct. 1562 (1969).

3  Defendants admit that an economic expert should attempt to measure antitrust impact "resulting

4  from the alleged violation."  ATTM Br. at 22 (quoting *In re Hydrogen Peroxide Antitrust Litig.*,

5  552 F.3d 305, 311 (3rd Cir. 2008) (emphasis added)).  In antitrust cases, economists measure

6  whether consumers would have paid less in the absence of the challenged conduct, known as the

7  "but-for world."  *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P.*, 247 F.R.D.

8  156, 165 (C.D. Cal. 2007) ("'but for' world characterized by the absence of the … ***challenged***

9  ***practices***") (emphasis added); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039,

10  1055 (8th Cir. 2000) (antitrust plaintiffs must "construct a hypothetical market, a 'but-for' market,

11  free of the ***restraints and conduct alleged to be anticompetitive***") (emphasis added).

12    The parties agree that the experts must measure antitrust impact by considering what prices

13  consumers would have paid without the effects of the ***conduct alleged to be anticompetitive***.

14  Where the parties disagree is what anticompetitive conduct should be eliminated.  Defendants

15  insist that the alleged anticompetitive conduct is "non-disclosure" ▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮.  However, the actual anticompetitive conduct at issue is that

17  Defendants' ▮▮▮▮▮▮▮▮▮ prevented iPhone consumers from meaningfully exercising their

18  rights to switch carriers under the identical, terminable two-year contracts that every iPhone

19  consumer signed.

20    Consequently, to measure the effect of Defendants' monopolization of the aftermarket for

21  iPhone voice and data service, an expert must consider the damages consumers suffered as a result

22  of the restrictions that Apple and ATTM placed on them, impeding their ability to meaningfully

23  exercise their contractual right to switch carriers.  The damages resulting from those lost switching

24  ─────────────────────────────────────────

25  certified where the plaintiffs presented a "novel and complex" theory of impact on the indirect
purchasers of imported automobiles.  The First Circuit found plaintiffs' theory of impact to be
"implausible" because it rested on a number of questions that the plaintiffs' expert had not

26  answered, including how many cars would be imported if the alleged restrictions were lifted, how
the number of cars would be established, and how large the influx would have to be to affect the

27  market price paid by dealers and, in turn, by consumers. *Id.* Here, Prof. Wilkie's opinion does not
offer a novel and complex theory of impact or damages. Furthermore, none of the unanswered

28  hypothetical questions (or any remotely like them) or the complexities of an indirect market case
reflected in *New Motor Vehicles* are present in this case.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1  rights are properly measured by: (i) what prices consumers would have paid for iPhone voice and

2  data service if they had the right to switch, and (ii) the inherent value of the right to switch itself, a

3  right the consumers bargained for but never received.  That is, of course, precisely what Prof.

4  Wilkie has measured.[10]

5      Defendants' challenge to Prof. Wilkie's methodology for proving class-wide impact and

6  damages rests on two fundamental errors.  *First*, Defendants, contend that Prof. Wilkie should

7  have modeled class-wide damages based on what would have transpired had Plaintiffs known

8  about the ▮▮▮▮▮ exclusive *carrier* relationship *Defendants* had secretly agreed to. Apple Br. at

9  2, 19-22; ATTM Br. at 22-31.  Defendants fail to recognize, however, that Prof. Wilkie quite

10 properly focused instead on the two-year exclusive *distributorship* relationship that *Plaintiffs*

11 agreed to when they bought their iPhones.[11]

12     Again, leaving apart the fact that Defendants' argument invites an impermissible "battle of

13 experts," it is readily apparent from their criticisms that they simply do not understand – or choose

14 not to understand – Prof. Wilkie's methodology.  Defendants, however, concede that Prof.

15

---

16 [10]    Prof. Wilkie's opinion assesses "but for worlds" to derive these damages, which is a well-
    established and reliable damages methodology.  *See Little Caesar Enters., Inc. v. Smith*, 172
17 F.R.D. 236, 267 (E.D. Mich. 1997); *DRAM*, 2006 WL 1530166, at *10; *In re Sugar Indus.
    Antitrust Litig.*, No. MDL 201, 1976 WL 1374, at *27 (N.D. Cal. May 21, 1976). ▮▮▮▮▮▮▮▮▮

18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 [11]    Notwithstanding the dubious conceptual basis for assuming the "but for" world Defendants
    propose – namely, one where iPhone consumers know ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
26 ▮▮▮▮▮ but still enter two-year service agreements giving them an entirely meaningless "right" to
    "terminate" at any time – Prof. Wilkie demonstrates that applying Defendants' "but for" analysis
27 would still constitute a class-wide assessment of impact and damages, using class-wide proof. *See*
    Wilkie Reply Decl. at ¶¶ 13-16.
28

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

Wilkie's first "but-for" analysis – of the voice and data service plan prices consumers would have paid in the absence of Defendants' monopolization of that aftermarket – is the accepted way to calculate damages in an antitrust case such as this. *See* Apple Br. at 21; ATTM Br. at 22-23.

*Second*, Defendants – driven by their misconception of the proper *Newcal* legal standard – complain that Prof. Wilkie failed to take into account the supposed individualized impact of marketplace rumors and Defendants' disclosures (outside of the two-year service contracts) of a "multiyear" agreement when measuring Plaintiffs' ability to prove "incomplete disclosure" class-wide, which Defendants wrongly insist is the proper issue in this case. Expanding on Defendants' central argument that Plaintiffs have alleged a misrepresentation claim, ATTM argues it is necessary to consider "what each consumer would have done if he or she had the benefit of what Plaintiffs would consider to be adequate disclosures." ATTM Br. at 23. That argument is inconsistent with the Court's opinion denying Apple's motion to dismiss. After recognizing that Plaintiffs have alleged that "consumers have suffered a present injury *even if they have not attempted to switch service*," the Court held, "[t]he fact that some consumers might not have sought to switch service and thus do not realize the restriction which the Apple/ATTM Agreement has imposed on them *does not alter the effect of Plaintiffs' allegations that their freedom in the aftermarket has already been taken from them*." *iPhones*, 596 F. Supp. 2d at 1303-04 (emphasis added). Consistent with the Court's prior decision, "what each consumer would have done" is irrelevant. ATTM's contrary argument is simply an attempt to reargue Apple's unsuccessful motion to dismiss. That Prof. Wilkie chose not to measure the effect of an issue that is legally irrelevant is hardly the kind of criticism that should defeat class certification.

### 2. Defendants' Expert Has Not Offered Any Valid Criticisms Of Prof. Wilkie's Opinions That Would Require The Court To Deny Class Certification

Defendants offer an expert opinion from Daniel Rubinfeld that contests class certification on the grounds that Plaintiffs cannot prove antitrust impact on a class-wide basis because their claim purportedly depends upon highly individualized questions of consumers' beliefs concerning the scope and meaning of Defendants' (concededly secret) "exclusive" arrangement. Prof.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 20 -

1   Rubinfeld's opinion about consumers' beliefs misses the mark in the same way demonstrated

2   above that Defendants' argument misses it.

3        Prof. Rubinfeld's opinions about market knowledge are legally irrelevant.   Although a

4   professor of law, Prof. Rubinfeld admitted at his deposition ███████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   Rickert Reply Decl., Ex. Q (Rubinfeld Tr.), 53:25 to 55:4, 86:7 to 95:21.

7            *Id*. at 22:16-23:4.   He also admitted that █████████████████████████████

8   ████████████████████████████   *Id*. at 85:10 to 86:5.   This case raises precisely such a

9   problem: the law considers whether Plaintiffs and the other Class members ***contractually agreed***

10  to give monopoly power to Apple and ATTM ███████████, while Prof. Rubinfeld, applying an

11  "imperfect information" concept in an "informational market" context, considered instead what

12  consumers may have believed about Defendants' exclusive agreement.   *Id*. at 53:25 to 55:4,

13  103:20 to 104:14.  Prof. Rubinfeld, however, █████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████

15  ██████████████████████████████████████████████████████████.  *Id*. at 45:24 to

16  47:1, 105:24 to 107:7, 222:20 to 224:11.   Because Prof. Rubinfeld has not addressed the legally

17  relevant question – whether Defendants' market power arose from ***contractual rights*** that

18  consumers gave to them, his conclusion about what consumers may have believed does not

19  prevent the Court from hearing and adjudicating the merits of this case on a class-wide basis.[12]

20       Prof. Rubinfeld next levels several challenges to the substance of Prof. Wilkie's damages

21  calculations.   These include Prof. Rubinfeld's assertions ████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████

23  ─────────────────────────

24  [12] ████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████████████████████████████

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW



Plainly, these challenges invite just the sort of "battle of the experts" that courts in the Ninth Circuit eschew. More to the point, even if Prof. Rubinfeld were right (which he is not, *see* Wilkie Reply Decl. at ¶¶ 20, 26-27, 30-35), these types of challenges to calculations can and should be resolved at trial by the fact-finder in the same way for all Class members based upon common proof.

Indeed, all of Prof. Rubinfeld's challenges to the substance of Prof. Wilkie's opinions raise questions that affect all iPhone consumers in the same way. Apart from his legally irrelevant assertion about consumers' beliefs discussed above, none of his challenges raise the kind of individual issues that might preclude class certification.

For example,

Therefore, what price customers paid for service, and what service they received, will be the same for all ATTM customers and for all T-Mobile customers – albeit different between the two providers.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 22 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

### 3.   ATTM's Premature Challenge To The Admissibility Of Prof. Wilkie's Opinions Do Not Defeat Class Certification

18

Finally, there is no substance to ATTM's make-weight challenge to the admissibility of

19
20
Prof. Wilkie's opinions.  An expert's opinion supporting (or opposing) class certification is not

21
subjected to a full reliability analysis under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

22
113 S. Ct. 2786 (1993).  *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191 (N. D. Cal. 2004).  "Courts

23
have declined to engage in a *Daubert* analysis at the class certification stage of an action on the

24
ground that an inquiry into the admissibility of the proposed expert testimony under *Daubert*

25
would be an inappropriate consideration of the merits of the plaintiff's claims."  *Thomas &*

26
*Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 162 (C.D.

27
Cal. 2002) (citation omitted).  At the class certification stage, an expert opinion need only be

28
relevant and useful in evaluating whether class certification requirements have been met.  *In re*

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1    *First Am. Corp. ERISA Litig.*, Nos. SACV 07-01357-JVS (RNBx), CV 07-07602; CV 07-07585,

2    SACV 08-00110, 2009 WL 928294, at *1 (C.D. Cal. April 2, 2009) (citing *McPhail v. First*

3    *Command Fin. Planning, Inc.*, 247 F.R.D. 598, 604-05 (S.D. Cal. 2007) and *Thomas & Thomas*

4    *Rodmakers, Inc.*, 209 F.R.D. at 162).  The Court should not exclude expert testimony at the class

5    certification stage unless it is "so flawed that it would be inadmissible as a matter of law."  *In re*

6    *First Am. Corp. ERISA Litig.*, 2009 WL 928294, at *1 (internal quotations and citation omitted).[13]

7         In sum, Defendants' various criticisms of Prof. Wilkie's opinion do not raise any issue

8    that, consistent with the law and the Court's prior decision, points to any relevant shortcoming.

9    **G.    Plaintiffs' Antitrust Claims Against Apple Relating To The Applications Aftermarket Can And Should Be Resolved By Common Proof**

10

11        Plaintiffs' applications aftermarket claims fall into two categories.  *First*, Plaintiffs contend

12   that Apple unlawfully monopolized the applications aftermarket because iPhone consumers did

13   not contractually grant Apple the right to monopolize that aftermarket.  *Second*, even if Apple

14   lawfully acquired an applications aftermarket monopoly, Apple has unlawfully maintained and

15   enforced its monopoly by starkly anticompetitive means – namely,

16

17        .  *See* Wilkie Reply Decl., ¶ 57.  Both the issue of whether Apple

18   contractually acquired its aftermarket monopoly rights and the impact of Apple's software updates

19   affects all iPhone consumers equally.  Therefore, these claims are susceptible of predominantly

20   common proof and warrant class certification.  Wilkie Reply Decl. at ¶¶ 2, 60-62.

21        Defendants' expert does not dispute that

22        .  Each of Prof. Rubinfeld's

23   criticisms of Prof. Wilkie's conclusions concerning the availability of class-wide of proof of

24   _____

     [13]    In *In re Universal Srvc. Fund Tel. Billing Practices Litig.*, No. 02-MD01468-JWL, 2008
25   U.S. Dist. LEXIS 74548, at *23 (D. Kan. Sep. 26, 2008), cited by ATTM, AT&T Corp. moved to
     exclude Prof. Wilkie's expert testimony at trial on a variety of grounds.  The class already had
26   been certified, so the opinion has no relevance to the present inquiry.  In addition, the court denied
     the motion except in one limited, irrelevant instance.  At least ten times, the court denied AT&T's
27   arguments, including its argument that Prof. Wilkie provided no acceptable methodology for
     showing injury (*id*. at *19-20) as well as its renewed attack on a portion of the antitrust damages
28   (*id*. at *25-27) ("Court once again rejects this attack").  The only opinion excluded by the court
     concerned damages suffered by business customers – not an issue in this case.  *Id*. at *21-24.

     PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
     MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

1  impact and damages is based on a fundamental misunderstanding of Prof. Wilkie's approach and

2  methodology.

7                                                    Therefore, Defendants have not offered any valid reasons

8  for denying class certification of Plaintiffs' applications related claims.

**H.     Plaintiffs' Sub-Class Of Consumers Whose iPhones Were Bricked Should Be Certified**

**1.     The Sub-Class Is Properly Defined And Can Be Identified Based Upon Objective Criteria**

Plaintiffs have requested certification of a Sub-Class defined as all "iPhone customers

whose iPhones were also 'bricked' by Defendant Apple."  Opening Moving Br. at 8, fn. 11.

Whether an iPhone "bricked" is not a core liability question and it is therefore appropriately part

of the definition of the Sub-Class, contrary to Apple's argument.  Apple does not dispute that

.  *See* Confidential Declaration of John Wright in Support

of Defendant Apple Inc's Opposition to Plaintiffs' Motion for Class Certification [Docket No.

361] ("Wright Decl."), ¶¶ 22-23.  Furthermore, whether an iPhone "bricked" can be determined

objectively through a definition used by all parties in this case.  It has been understood that

"bricked" means, as defined in the Complaint, "rendered completely inoperable."  Revised

Consolidated Amended Class Action Complaint ("Complaint") [Docket No. 109], ¶ 5; Rickert

Reply Decl., Ex. R (Wright Tr.) 43:11-13

Therefore, determination whether

an unlocked and/or jailbroken iPhone "bricked" is not dependent upon what a plaintiff did to his

iPhone or why it bricked, as Apple argues.[14]  Nor is a consumer's awareness and consent in

---
14

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 25 -

1   downloading Version 1.1.1 relevant to the question whether the iPhone was "rendered completely

2   inoperable" after that consumer downloaded Version 1.1.1.  Finally, whether Apple replaced the

3   iPhone or not is also irrelevant to the question of whether a consumer's iPhone bricked in the first

4   place.  In any event, "'the mere fact that questions peculiar to each individual member of the class

5   remain after the common questions of the defendants' liability have been resolved does not dictate

6   the conclusion that a class action is impermissible.'" *O'Connor v. Boeing North American, Inc.*,

7   184 F.R.D. 311, 341 (C.D. Cal. 1998) (quoting *Sterling v. Velsicol Chemical Corp.*, 855 F.2d

8   1188, 1197 (6th Cir.1988)).[15]

9       Finally, even if Apple were correct that Plaintiffs' Sub-Class definition impermissibly

10  includes an issue of liability, *i.e.*, whether iPhones were bricked "by Apple," that defect is "rather

11  easily cured by recasting the definition in terms of Plaintiffs' liability theory." *See Perez v. First*

12  *American Title Ins. Co.*, No. CV-08-1184-PHX-DGC, 2009 WL 2486003, at *9 (D. Ariz. Aug. 12,

13  2009) (court exercised its discretion and redefined the proposed class).  Plaintiffs propose the

14  following alternative Sub-Class definition to eliminate this liability-based component:   "All

15  iPhone owners who downloaded Version 1.1.1 and whose iPhones then immediately bricked."[16]

16          **2.       Common Issues Predominate As To Plaintiffs' Magnuson-Moss**
            **Warranty Act ("MMWA"), Computer Fraud and Trespass**
17          **Claims**

18  ***MMWA:***  As this Court held in *iPhones*,

19      Under the MMWA, '[n]o warrantor of a consumer product may condition its

20

21

22

23  15    Apple maintains records of all iPhone exchanges and returns.   But, even if Apple
24  exchanged certain iPhones (in violation of its policy *not* to honor the warranties on iPhones that
    bricked from the Version 1.1.1 update), Apple is also liable in trespass for the time consumers
25  were unable to use their iPhones, and ATTM maintains records which reflect how long these
    consumers were deprived of the use of their iPhones.

26  16    Apple itself defines the Sub-Class in essentially this manner.  *See* Apple Br. at 11 (arguing
27  that                                                                                        .  Moreover, even the cases cited by Apple recognize that the
28  Court possesses significant discretion to modify the class definition.  *See Intratex Gas Co. v.*
    *Beeson*, 22 S.W.3d 398, 404 (Tex. 2000); *Pichler v. UNITE*, 228 F.R.D. 230, 247 (E.D. Pa. 2005).

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

written or implied warranty of such product on the consumer's using, in connection with such product, any article or service (other than article or service provided without charge under the terms of the warranty) which is identified by brand, trade, or corporate name.' 15 U.S.C. § 2302(c). … Plaintiffs' Complaint … alleges that Apple refused to honor the warranties of customers who used iPhone applications and cellular service not approved by Apple.

*iPhones*, 596 F. Supp. 2d at 1313. Therefore, whether Apple violated the MMWA does not, as Apple argues, require inquiry into the interaction of buyer and seller when a warranty claim was presented. Apple Br. at 32. It requires only inquiry into whether Apple's policy was to refuse to honor its warranty on those iPhones that had been unlocked and/or jailbroken to work on an "unauthorized" network or to use unauthorized applications. ████████████████

████████ Declaration of Rachele R. Rickert in Support of Plaintiffs' Opposition to Apple Inc.'s Motion for Summary Judgment on Plaintiffs' iPhone Operating System Version 1.1.1 Claims [Docket No. 347], Ex. F (Green Tr.), 56:14 to 58:16, Ex. G; Wright Decl., ¶¶ 27-28. Therefore, the MMWA claim will be proven by evidence common to all Sub-Class members.[18]

Apple's claim that no Plaintiff was refused warranty service by Apple is the subject of Apple's pending motion for Summary Judgment ("MSJ"). As demonstrated in Plaintiffs' opposition to the MSJ, Plaintiff Macasaddu's sworn testimony that Apple refused to replace his bricked iPhone is sufficient at this stage of the litigation to defeat Apple's MSJ on this point.

***Computer Fraud and Abuse Act ("CFAA"), Cal. Penal Code, § 502 and Trespass to Chattels***: Apple once again wrongly argues that Plaintiffs will have to show that class members did not consent to installing Version 1.1.1 in order to prove their computer fraud and trespass to chattels claims. Apple Br. at 32-33. While lack of authorization is an element of Plaintiffs' CFAA claim, 18 U.S.C. § 1030(a)(5)(A), "Plaintiffs have alleged that they authorized ***a software update***, not that they authorized ***damages*** to their iPhones." *iPhones*, 596 F. Supp. 2d at 1308 (emphasis added). The Court doesn't need to abandon its common sense and can presume that

---

[17] ████████████████████████████████████████████████████████████

[18] Apple, in a footnote, makes the throw-away argument that Plaintiffs have failed to show that the differences in state warranty laws do not defeat predominance, but fails to identify a single, genuine warranty issue that will vary among the states and cause manageability problems. Apple Br. at 32 n.18.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

class members did not behave in an economically irrational way and authorize Apple to damage their iPhones. *Carabetta Enterprises, Inc. v. United States,* 68 Fed.Cl. 410, 421 (Fed. Cl. 2005) (court presumed plaintiff would have acted in economic self-interest). Therefore, what any individual class member or Plaintiff thought Apple meant by its warning is irrelevant, since no reasonable iPhone consumer, who had just paid hundreds of dollars for their iPhone, would consent to its destruction.[19]

Moreover, Apple's argument that it did not "do anything" to brick iPhones belonging to Sub-Class members is a merits-based argument and does not defeat class certification. Plaintiffs are not required to prove their claims yet and in fact are unable to do so since, at Defendants' request, the Court bifurcated discovery, and merits discovery has yet to commence. In any event, Plaintiffs' attempts to determine what caused the bricking have been thwarted at every turn by Apple. On November 18, 2009, Plaintiffs moved to compel the production of large portions of the code. [Docket No. 212]. Plaintiffs subsequently withdrew their motion to compel because, following lengthy negotiations, Plaintiffs understood that Apple had agreed to produce enough of the code to permit them to determine what had caused the bricking. [Docket No. 228]. After determining that Apple had not produced relevant and necessary portions of the operating code (including the "core telephony library"), Plaintiffs renewed their motion to compel. [Docket No. 276]. At the hearing on Plaintiffs' motion, Apple's counsel represented to Plaintiffs' counsel **and to the Court** that it had already produced the entire core telephony library. Rickert Reply Decl., Ex. S (hearing transcript) at 51:4-7 ("We have produced all of the 1.1.1 portions of the core

---

[19]   This case is therefore clearly distinguishable from *Gene And Gene LLC v. BioPay LLC,* 541 F.3d 318, 327 (5th Cir. 2008), where the issue was "whether BioPay's fax advertisements were transmitted without the prior express invitation or permission of each recipient," and *Murray v. Financial Visions, Inc.,* No. CV-07-2578 PHX-FJM, 2008 U.S. Dist. LEXIS 93419, at *13 (D. Ariz. Nov. 6, 2008), where the issue was whether the plaintiffs, securities representatives, who were **required by SEC regulations** to provide their employer, the defendant brokerage firm, with copies of all correspondence related to securities, consented to the defendant's interception of their electronic communications. Furthermore, Apple does not, and indeed cannot, contend that any Plaintiff gave Apple permission to damage their iPhones.

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 28 -

telephony code. So we can take that off the table.  That was all produced on January 21.")[20]  On

March 26, 2010, Judge Trumbull denied Plaintiffs' renewed motion to compel based, in part, on

Apple's representation that it had produced the entire core telephony library.   Order Denying

Plaintiffs' Motion to Compel [Docket No. 383] at 2:8-10; 2:18-21.  However, when Plaintiffs'

expert, John M. Strawn, Ph.D. inspected the supplemental source code production on April 13,

2010, █████████████████████████

███████████.

      Moreover, Apple's argument that common questions of fact will not predominate is belied

by Apple's own account of what caused iPhones to brick and how Apple came to that

determination.   Apple, the company responsible for making and then breaking these iPhones,

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████.  *Id*.  Hence, by

its own methodology, Apple has demonstrated that Plaintiffs' computer fraud and trespass claims

will be proven by evidence common to the Sub-Class and not by testing individual Sub-Class

members' iPhones.[22]

---

[20] ████████████████████████████████████████
██████████████ Plaintiffs' Motion for Class Certification was due
the very next day.

[21]     There is no dispute that Apple exchanged Plaintiffs Smith's and Sesso's iPhones when
they bricked after being updated to Version 1.1.1.  *See* Apple's Motion for Summary Judgment
[Docket No. 265], at 7-8, 16 ("Apple replaced [those] phones").   Apple also claims to have
exchanged Plaintiff Macasaddu's bricked iPhone. *Id*. at 9, 18.

[22]     Dr. Strawn has never "conceded" the individualized nature of the causation inquiry as
Apple argues.  Apple Br. at 35.  ████████████████████████████
████████████████████████████████████████████

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 29 -

### I.    An Injunctive Class Is Appropriate

This case meets the requirements for certification under Rule 23(b)(2). Here, as in *iTunes*, Plaintiffs seek primarily "to bring an end to [Defendants'] restrictive technology practices." *iTunes*, 2008 WL 5574487, at *7; *see* Complaint, ¶ 12. For that reason, Plaintiffs seek remedies that, among other things, prohibit Defendants from monopolizing the aftermarkets for iPhone voice and data services and applications and from selling "locked" iPhones, compelling them to provide "unlock" codes to iPhone consumers, and prohibiting them from damaging "unlocked" iPhones or otherwise retaliating against iPhone consumers who seek to use their iPhones on other cellular networks or install third party applications. Therefore, Plaintiffs' request for injunctive relief is directly related to Defendants' unlawful conduct, contrary to Apple's argument.

Apple cites no authority for its argument that because the damages in this case are estimated to be ██████████████ it is therefore "primarily about damages." Apple Br. at 35. Nor does it proffer any evidence that Plaintiffs are atypical of iPhone consumers because they seek to bring an end to Defendants' restrictive technology practices. Apple's speculation that "most consumers" would like for these practices to continue defies common sense. Undoubtedly consumers would prefer not to have to pay the inflated prices they have been paying for iPhone wireless service and third party applications caused by Defendants' anticompetitive conduct.

### III.    CONCLUSION

For these additional reasons, Plaintiffs request that the Court grant their motion to certify the class action, to appoint Plaintiffs as representatives of the Class and the Sub-Class, and to appoint Wolf Haldenstein as Lead Class Counsel.

DATED:  April 19, 2010                    Respectfully submitted,

WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP
FRANCIS M. GREGOREK
RACHELE R. RICKERT

_____/s/ Rachele R. Rickert_____
         Rachele R. Rickert
750 B. Street, Suite 2770
San Diego, California 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
gregorek@whafh.com; rickert@whafh.com

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 30 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOLF HALDENSTEIN ADLER
    FREEMAN & HERZ LLP
MARK C. RIFKIN (*pro hac vice*)
ALEXANDER H. SCHMIDT (*pro hac vice*)
ZACHARY W. BIESANZ (*pro hac vice)*
270 Madison Avenue
New York, New York 10016
Telephone:  212/545-4600
Facsimile:   212/545-4677
rifkin@whafh.com
schmidt@whafh.com
biesanz@whafh.com

Plaintiffs' Interim Lead Counsel

RANDALL S. NEWMAN, P.C.
RANDALL S. NEWMAN
The Trump Building
40 Wall Street, 61st Floor
New York, New York 10005
Telephone:  212/797-3737
Facsimile:   212/797-3172
rsn@randallnewman.net

SHABEL & DENITTIS, P.C.
STEPHEN P. DENITTIS (*pro hac vice*)
NORMAN SHABEL (*pro hac vice*)
5 Greentree Centre, Suite 302
Marlton, New Jersey 08053
Telephone:  856/797-9951
Facsimile:   856/797-9978
sdenittis@shabeldenittis.com

Additional Counsel for Plaintiffs

APPLE:17543.REPLY.V2

PLAINTIFFS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF THEIR
MOTION FOR CLASS CERTIFICATION, MASTER FILE NO. C 07-05152 JW

- 31 -